# NOTICE OF MOTION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

105 STREET ASSOCIATES, LLC                    Index No.: 05-cv-9938 (VM)

            Plaintiff,             **DEFENDANT GREENWICH**
                                              **INSURANCE COMPANY**
    -against-                              **NOTICE OF MOTION FOR**
                                              **SUMMARY JUDGMENT**

GREENWICH INSURANCE COMPANY,

            Defendant.
------------------------------------------------------------------ X

    **PLEASE TAKE NOTICE**, that upon the annexed Local Rule 56.1(a) Statement of

Material Facts, the annexed declaration of GLENN J. FUERTH, dated April 13, 2007, the

exhibits annexed thereto, the annexed affidavit of MICHAEL BARNABA, sworn to on April 11,

2007, and the accompanying memorandum of law, Defendant, GREENWICH INSURANCE

COMPANY ("Greenwich"), by its attorneys WILSON, ELSER, MOSKOWITZ, EDELMAN &

DICKER LLP, will move this Court, before the Honorable Victor Marrero at the United States

Courthouse, 500 Pearl Street, New York, New York, 1007, for an Order to be entered , pursuant

to Rule 56(b) of the Federal Rules of Civil Procedure, granting Greenwich the following relief:

    (a) summary judgment, dismissing the 105 ST. ASSOCIATES Complaint
        in its entirety as against Greenwich; and

    (b) For such other and further relief as this Court may deem just and
        necessary.

Dated:    New York, New York
        April 13, 2007

                    Yours, etc.

       WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

            By: _____
               GLENN J. FUERTH (GJF5848)

1

(A Member of the Firm)
Attorneys for Defendant
GREENWICH INSURANCE COMPANY
150 East 42nd Street
New York, New York 10017-5639
(212) 490-3000

TO:    Donald F. Schneider
       Attorney for Plaintiff
       90 Broad Street, 6th Floor
       New York, NY 10004
       212-265-2266

2

# LOCAL RULE 56.1 STATEMENT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

105 STREET ASSOCIATES, LLC

                       Plaintiff,

        -against-

GREENWICH INSURANCE COMPANY,

                    Defendant.

------------------------------------------------------------------ X

Index No.: 05-cv-9938 (VM)

**DEFENDANT GREENWICH
INSURANCE COMPANY
LOCAL RULE 56.1
STATEMENT**

Defendant GREENWICH INSURANCE COMPANY ("Greenwich"), by its attorneys
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, pursuant to Local Rule 56.1
state that there are no genuine issues to be tried as to the following material facts:

    1. The declaratory judgment action by 105 St. Associates, LLC ("105 Street") seeks
coverage for defense and indemnification of the underlying action, ( "Primary Action") a
personal injury lawsuit brought against *inter alia*, 105 Street, by Richard Conrad ("Conrad").
The Primary Action by Conrad arises from injuries allegedly sustained while Conrad was
working for a sub-contractor, Jem Erectors, Inc. ("Jem Erectors") at the premises owned by 105
Street located at 235-237 East 105th Street, New York, New York (hereinafter referred to as the
"Subject Premises") on July 2, 2002. (Fuerth Aff., Ex. "A").

    2. The three defendants in the Primary Action are: 105 Street; BFC Construction Corp.
("BFC Construction"); and BFC Partners, L.P. ("BFC Partners"). BFC Construction was the
general contractor for the Subject Premises and its principals were Brandon Baron, Peter Ferrara,
and Donald Capoccia. Moreover, the "BFC" in both BFC Construction and BFC Partners stand

1

for the first letter of the last name of each principal, Baron, Ferrara and Capoccia.  Moreover, the principals of 105 Street were Baron, Ferrara, and Capoccia as well.  (B. Baron Dep., Fuerth Aff., Ex. "B").

3.    Additionally, all three named defendants in the Primary Action are located at the same business address.  As of March 26, 2007, according to the New York State Department of State, Division of Corporations, all three defendants in the Primary Action have the same designated agent and address for service of process: c/o Donald Capoccia, 2226 1st Avenue, New York, New York, 10029.  (NYS DOS Info, Fuerth Aff. Ex "C").

4.    At the time of the Conrad occurrence, 105 Street was insured by Greenwich under Commercial General Liability policy number WGG 5001058 (the "Policy") for the policy period of April 13, 2002 to April 15, 2003.  The Certificate of Insurance for 105 Street stated the named insured as:

> **105 Street Associates**
> **c/o BFC Construction Corp.**
> **2226 1st Avenue**
> **New York, NY 10029**

(Policy, Fuerth Aff. Ex. "D"; Certificate, Fuerth Aff., Ex. "E").

5.    As a condition precedent to coverage, the Policy requires 105 Street to provide Greenwich with notice of an "occurrence," which may result in a claim, as soon as practicable.  (Policy, Fuerth Aff. Ex. "D").

6.    On August 6, 2002, Conrad J. Benedetto, counsel for Conrad in the Primary Action, wrote via certified mail to BFC Construction advising it of Conrad's recent filing of a worker's compensation claim in connection with an alleged accident.  Specifically, Mr. Benedetto states in said letter that the Conrad claim arises from a July 2, 2002 accident at 105th Street between 2nd

2

and 3rd Avenue. The Subject Premises, owned by 105 Street is located at 105th Street between 2nd and 3rd Avenues. Additionally, Mr. Benedetto requested that BFC Construction forward the August 6, 2002 letter to its liability carrier. At that time, 105 Street failed to notify Greenwich of Conrad's alleged accident and subsequent worker's compensation claim. (August 6, 2002 letter, Fuerth Aff. Ex. "F").

7.   On September 9, 2002, Mr. Benedetto again wrote via certified mail to BFC Construction with a "second request" that it forward the aforementioned letter to its liability carrier and informing it of the potential lawsuit. Again, notwithstanding the fact that 105 Street owned the Subject Premises cited in both the August 6, 2002 and September 9, 2002 letters as where the Conrad claim occurred, 105 Street failed to forward the claim to Greenwich pursuant to the Policy agreement (September 9, 2002, Fuerth Aff., Ex. "H"; Policy, Fuerth Aff., Ex. "D").

8.   On April 20, 2004, Conrad served a summons and complaint naming 105 Street, BFC Construction, and BFC Partners as defendants, on the Secretary of State in connection with the July 2, 2002 accident. On the same day, the Secretary of State forwarded the Conrad summons and complaint via certified mail to 105 Street, BFC Construction, and BFC Partners. Furthermore, the Service of Process Unit, Division of Corporations, confirmed delivery and produced the signed return receipt by Estelle Rodriguez, the employee responsible for forwarding claims of the business entities residing at 2226 1st Avenue, New York, New York. However, despite the fact that 105 Street was a first-named defendant on the summons and complaint signed for by Estelle Rodriguez on April 26, 2004, 105 Street again failed to notify Greenwich of the Conrad lawsuit until August 18, 2004. (AOS, Fuerth Aff., Ex. I; Receipt, Fuerth Aff., Ex. "J"; March 28, 2007 letter, Fuerth Aff. Ex "K").

3

2758753.1

9. On July 8, 2004, counsel for Conrad wrote to Donald Capoccia, the registered agent for service of process and partner in all three of the named defendants in the Primary Action. The July 2004 letter notified BFC Construction that it was in default as it had not interposed an answer or appeared in connection with the Conrad action. Additionally, counsel enclosed a courtesy copy of the Summons and Complaint and again directed BFC Construction to forward all documents to its liability carrier. (July 8, 2004 letter, Fuerth Aff., Ex "L").

10. Nevertheless, according to Steven Potolsky, owner of North Shore Risk Management (hereinafter "North Shore"), the insurance broker for 105 Street, the July 8, 2004 letter was not forwarded to North Shore until July 19, 2004. At that time, Mr. Potolsky was inexplicably confused as to whether 105 Street was covered by insurance for the Primary Action, and thus failed to forward the claim to Greenwich for another month. In fact, Mr. Potolsky conceded that he did not immediately forward the July 8, 2004 letter to Greenwich because it was an "oversight" that was "corrected…a number of weeks later." (Potolsky Summary, Fuerth Aff., Ex. "M"; Potolsky Dep., pg. 77, lines 12-13, Fuerth Aff., Ex. "N").

11. Specifically, Mr. Potolsky was initially confused as to whether 105 Street had coverage for the Conrad claim and as such, failed to immediately notify Greenwich of the late claim. Two years prior, on or about September 18, 2002, Ms. Rodriguez had forwarded Mr. Potolsky the August 6, 2002 and September 9, 2002 letters from Mr. Benedetto informing BFC Construction of the Conrad worker's compensation claim. Among the papers forwarded by Ms. Rodriguez to Mr. Potolsky was a Certificate of Insurance for Jem Erectors, the subcontractor Conrad was employed by at the time of the alleged accident. Mr. Potolsky claims that the confusion concerning coverage stemmed from Jem Erector's Certificate of Insurance because it stated that the coverage provided was for a project on Madison Avenue, not for 105th Street, the

4

Subject Premises. Due to his confusion, Mr. Potolsky phoned Ms. Rodriguez to inquire as to the correct location of the Conrad accident. At that time, Mr. Potolsky claims that Ms. Rodriguez told him that she had no further information to give him other than what was already forwarded to North Shore. Despite being the broker for both 105 Street and BFC Construction, and the individual responsible for securing insurance coverage for the Subject Premises, Mr. Potolsky failed to forward the August 6, 2002 and September 9, 2002 letters to Greenwich in a timely fashion. (July 26, 2004 letter, Fuerth Aff., Ex. "O", Potolsky Dep., Fuerth Aff., Ex. "N"). ).

12. Two years later when Mr. Potolsky received the July 8, 2004 letter from 105 Street, he was again confused and sent the paperwork back to Ms. Rodriguez. Again, despite being the broker, Mr. Potolsky believed that 105 Street was not covered by insurance for the Conrad claim. Almost another month went by until Mr. Potolsky realized his ongoing mistake and forwarded the file on to Greenwich. (July 26, 2004 letter, Fuerth Aff., Ex. "O"; August 18, 2004 letter, Fuerth Aff., Ex. "P").

13. Greenwich was not notified of the accident until the late afternoon of August 18, 2004. Michael Barnaba, a claims analyst for XL Insurance, the claim administrator for Greenwich, handled the Conrad claim. After receiving the notice of claim from North Shore, on August 20, 2004, Mr. Barnaba requested from Ms. Weiner of North Shore, among other things, the summons and complaint in the Conrad action. August 20, 2004 was the first time that Greenwich was provided with the summons and complaint that was initially served on 105 Street four months prior on April 20, 2004. (Barnaba Aff. ¶ 3, Fuerth Aff. ¶ 16).

14. Specifically, on August 25, 2004, Mr. Barnaba faxed Estelle Rodriguez, an employee and contact for 105 Street, with requests for various documents necessary to properly investigate

5

the newly submitted Conrad claim.    Among other things, Mr. Barnaba requested: copies of

insurance certificates of 105 Street and BFC Construction; contracts between 105 Street and

BFC Construction; contracts between 105 Street or BFC Construction and the subcontractor, Jem

Erectors, Inc.; copies of corporate filings identifying the principals/members of 105 Street;

advisement as to whether 105 Street had an "on-site representative" for the duration of the

construction project; and copies of any and all incident/claim reports, daily project logs, etc.  To

date, a number of the aforementioned documents remain outstanding.  Significantly, 105 Street

failed to provide any copies of an incident/claim report, daily project log, or any documentation

pertaining to the Conrad incident. (August 25, 2004 fax, Fuerth Aff., Ex. "R"; Barnaba Aff.,

Fuerth Aff.).

15. After receiving notice from North Shore, Greenwich immediately began

investigating the Conrad claim and retained Wilson, Elser, Moskowitz, Edelman & Dicker, LLP

(hereinafter "Wilson Elser") as coverage counsel to confirm that 105 Street had not notified

Greenwich in a timely fashion of the Primary Action and/or the Conrad incident.  While Wilson

Elser was investigating the coverage issue, to the extent that 105 Street provided contracts with

other entities involved in the construction project to Greenwich, Mr. Barnaba began tendering

offers.  As a result, at least one of the tenders was denied based on late reporting. (Barnaba Aff.,

Fuerth Aff.).

16. On September 10, 2004, Wilson Elser submitted a coverage opinion to Greenwich

recommending a declination of coverage for the Conrad action as a result of late notice.

Specifically, Wilson Elser emphasized that 105 Street was served with the summons and

complaint on April 20, 2004, over four months prior to submitting the claim to Greenwich.

(September 10, 2004 letter, Fuerth Aff., Ex. "S").

17. On September 15, 2004, Ed Walsh, Assistant Vice President and Claim Manager for XL Insurance, officially authorized Mr. Barnaba to disclaim coverage for the Conrad action to 105 Street due to late notice. On September 20, 2004 a denial letter based on Wilson Elser's opinion of late notice was served on 105 Street. (September 20, 2004 letter, Fuerth Aff. ¶ 42-43, Ex. "T").

Dated:     New York, New York
           April 13, 2007

                                        Respectfully Submitted,

                    WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

                    By: _____
                          GLENN J. FUERTH (GJF5848)
                          (A Member of the Firm)
                          Attorneys for Defendants
                          GREENWICH INSURANCE COMPANY
                          150 East 42nd Street
                          New York, New York 10017-5639
                          (212) 490-3000

TO:     Donald F. Schneider
        Attorney for Plaintiff
        90 Broad Street, 6th Floor
        New York, NY 10004
        212-265-2266

# DECLARATION OF GLENN J. FUERTH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

105 STREET ASSOCIATES, LLC

                          Plaintiff,

          -against-

GREENWICH INSURANCE COMPANY,

                          Defendant.

------------------------------------------------------------------ X

Index No.: 05-cv-9938 (VM)

**DECLARATION OF GLENN
J. FUERTH IN SUPPORT OF
DEFENDANT, GREENWICH
INSURANCE COMPANY'S
MOTION FOR SUMMARY
JUDGMENT**

GLENN J. FUERTH, an attorney duly admitted to practice before the Bar of this Court, aware of the penalties of perjury, affirms as follows:

I am a member of the firm of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, attorneys for the defendant, GREENWICH INSURANCE COMPANY ("Greenwich"), and as such, I am fully familiar with all of the prior pleadings and proceedings that pertain to the instant action.

2.      I submit this affidavit in support of the instant motion for summary judgment on behalf of Greenwich, which seeks an order to be entered for the following relief:

(a) Pursuant to Federal Rules of Civil Practice Rule 56(b), dismissing the complaint of plaintiff, 105 STREET ASSOCIATES, LLC ("105 Street"), and

(b) For such other and further relief as this Court may deem just and necessary.

## FACTUAL BACKGROUND

3.      The declaratory judgment action by 105 Street seeks coverage for defense and indemnification of the underlying action, ("Primary Action") a personal injury lawsuit

1

brought against *inter alia*, 105 Street, by Richard Conrad ("Conrad"). The Primary Action by Conrad arises from injuries allegedly sustained while Conrad was working for a sub-contractor, Jem Erectors, Inc. ("Jem Erectors") at the premises owned by 105 Street located at 235-237 East 105th Street, New York, New York (hereinafter referred to as the "Subject Premises") on July 2, 2002.[1]

4.      The three defendants in the Primary Action are: 105 Street; BFC Construction Corp. ("BFC Construction"); and BFC Partners, L.P. ("BFC Partners"). BFC Construction was the general contractor for the Subject Premises and its principals were Brandon Baron, Peter Ferrara, and Donald Capoccia. It is unclear as to the role that BFC Partners played in the Primary Action. However, it should be noted that the "BFC" in both BFC Construction and BFC Partners stand for the first letter of the last name of each principal, Baron, Ferrara and Capoccia. Moreover, the principals of 105 Street were Baron, Ferrara, and Capoccia as well.[2] (B. Baron Dep. pg. 12, line 17, Exhibit "B").

5.      Additionally, all three named defendants in the Primary Action are located at the same business address. As of March 26, 2007, according to the New York State Department of State, Division of Corporations, all three defendants in the Primary Action have the same designated agent and address for service of process: c/o Donald Capoccia, 2226 1st Avenue, New York, New York, 10029.[3]

---

[1] All references to the Conrad Summons and Complaint in the Primary Action will be made as ("Conrad Complt. ¶_"). A copy of the Conrad Complaint is annexed hereto and made a part hereof as Exhibit "A."

[2] All references to the December 7, 2006 deposition transcript of Brandon Baron will be made as (B. Baron Dep. Pg_ Line __.) A copy of the December 7, 2006 B. Baron transcript is annexed hereto and made a part hereof as Exhibit "B."

[3] All references to the 105 Street, BFC Partners, and BFC Construction New York State Department of State Division of Corporations entity information will be made as ("NYS DOS Info"). Copies of the NYS DOS Info are annexed hereto and made a part hereof as Exhibit "C."

6.    At the time of the Conrad occurrence, 105 Street was insured by Greenwich under Commercial General Liability policy number WGG 5001058 (the "Policy")[4] for the policy period of April 13, 2002 to April 15, 2003.  The Certificate of Insurance for 105 Street[5] stated the named insured as:

> 105 Street Associates
> c/o BFC Construction Corp.
> 2226 1st Avenue
> New York, NY 10029

[Certificate, Exhibit "E"]

7.    Under the heading, "COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY," the Policy provides:

1.    Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

b.    This insurance applies to "bodily injury" and "property damage" only if:

(1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2)    The "bodily injury" or "property damage" occurs during the policy period.

c.    Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

---

[4] All references to the Policy will be made as (Pol. Section __).  A copy of the Policy is annexed hereto and made a part hereof as Exhibit D."

[5] All references to the Certificate of Insurance for 105 Street will be made as ("Certificate").  A copy of the Certificate is annexed hereto and made a part hereof as Exhibit "E."

3

The Policy contains the following definitions:

    (3)    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time

    (13)    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

As a condition precedent to coverage, the Policy requires 105 Street to provide Greenwich with notice of an "occurrence," which may result in a claim, as soon as practicable. Specifically, the relevant portions of the Policy provide as follows:

**"SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS":**

    2.    **Duties In The Event Of Occurrence, Offense, Claim Or Suit**

    a.    You must see to it that **we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim**. To the extent possible, notice should include:

    (1)    How, when and where the "occurrence" or offense took place;

    (2)    The names and addresses of any injured persons and witnesses; and

    (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b.    If a claim is made or "suit" is brought against any insured, you must:

    (1)    Immediately record the specifics of the claim or "suit" and the data received; and

    (2)    Notify us as soon as practicable. You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

4

c.      You and any other involved insured must:

   (1)    Immediately send us copies of any demands, notices, summonses
          or legal papers received in connection with the claim of "suit";

   (2)    Authorize us to obtain records  and other information;

   (3)    Cooperate with us in the investigation or settlement of the claim or
          defense against the "suit";…

(Pol. Section IV, Exhibit "D") [*emphasis added*].

8.      Accordingly, in order for coverage under the Policy to attach, 105 Street

was required to provide notice to Greenwich of the occurrence as soon as practicable or once 105

Street, its agents and/or employees, were aware of the occurrence.

9.      On August 6, 2002, Conrad J. Benedetto, counsel for Conrad in the

Primary Action, wrote via certified mail to BFC Construction advising it of Conrad's recent

filing of a worker's compensation claim in connection with an alleged accident.[6]  Specifically,

Mr. Benedetto states in said letter that the Conrad claim arises from a July 2, 2002 accident at

105th Street between 2nd and 3rd Avenue.  (August 6, 2002 letter, Exhibit "F").  The Subject

Premises, owned by 105 Street is located at 105th Street between 2nd and 3rd Avenues.[7]

Additionally, Mr. Benedetto requested that BFC Construction forward the August 6, 2002 letter

to its liability carrier.  At that time, 105 Street failed to notify Greenwich of Conrad's alleged

accident and subsequent worker's compensation claim, typical predicates to personal injury

lawsuits.

10.     Moreover, on September 9, 2002, Mr. Benedetto again wrote via certified

mail to BFC Construction with a "second request" that it forward the aforementioned letter to its

---

   [6]  All references to the August 6, 2002 letter from Conrad J. Benedetto to BFC Construction will be made
as ("August 6, 2002").  A copy of the August 6, 2002 letter is annexed hereto and made a part hereof as Exhibit "F."
   [7]  All references to the March 26, 2007 Google Map of 235 105th Street, New York, New York, will be
made as ("Google Map").  A copy of the Google Map is annexed hereto and made a part hereof as Exhibit "G."

liability carrier and informing it of the potential lawsuit.[8]  Again, notwithstanding the fact that 105 Street owned the Subject Premises cited in both the August 6, 2002 and September 9, 2002 letters as where the Conrad claim occurred, 105 Street failed to forward the claim to Greenwich pursuant to the Policy agreement (Pol. Section IV, Exhibit "D").

       11.    On April 20, 2004, Conrad served a summons and complaint naming 105 Street, BFC Construction, and BFC Partners as defendants, on the Secretary of State in connection with the July 2, 2002 accident.[9]  On the same day, the Secretary of State forwarded the Conrad summons and complaint via certified mail to 105 Street, BFC Construction, and BFC Partners.[10]  Furthermore, the Service of Process Unit, Division of Corporations, confirmed delivery and produced the signed return receipt by Estelle Rodriguez, the employee responsible for forwarding claims of the business entities residing at 2226 1st Avenue, New York, New York.[11]  However, despite the fact that 105 Street was a first-named defendant on the summons and complaint signed for by Estelle Rodriguez on April 26, 2004, 105 Street again failed to notify Greenwich of the Conrad lawsuit until August 18, 2004.

       12.    On July 8, 2004, counsel for Conrad wrote to Donald Capoccia, the registered agent for service of process and partner in all three of the named defendants in the Primary Action.[12]  The July 2004 letter notified BFC Construction that it was in default as it had not interposed an answer or appeared in connection with the Conrad action.  (July 8, 2004 letter).

---

[8]  All references to the September 9, 2002 letter from Conrad J. Benedetto to BFC Construction will be made as ("September 9, 2002 letter").  A copy of the September 9, 2002 letter is annexed hereto and made a part hereof as Exhibit "H."

[9]  All references to the Affidavit of Service by the Secretary of State, dated April 20, 2004, will be made as ("AOS").  A copy of the Affidavit of Service is annexed hereto and made a part hereof as Exhibit "I."

[10]  All references to the Receipt for Service dated April 20, 2004, will be made as ("Receipt").  A copy of the receipt is annexed hereto and made a part hereof as Exhibit "J."

[11]  All references to the March 28, 2007 letter and annexed copy of the April 26, 2004 certified mail return receipt, from Service of Process Unit, Division of Corporations, will be made as ("March 28, 2007 letter").  A copy of the March 28, 2007 letter is annexed hereto and made a part hereof as Exhibit "K."

[12]  All references to the July 8, 2004 letter from Kelner & Kelner to Donald Capoccia will be made as ("July 8, 2004 letter").  A copy of the July 8, 2004 letter is annexed hereto and made a part hereof as Exhibit "L."

Additionally, counsel enclosed a courtesy copy of the summons and complaint and again directed BFC Construction to forward all documents to its liability carrier. (July 8, 2004 letter).

13.    Nevertheless, according to Steven Potolsky, owner of North Shore Risk Management (hereinafter "North Shore"), the insurance broker for 105 Street, the July 8, 2004 letter was not forwarded to North Shore until July 19, 2004.[13]  At that time, Mr. Potolsky was inexplicably confused as to whether 105 Street was covered by insurance for the Primary Action, and thus failed to forward the claim to Greenwich for another month.[14] (Potolsky Summary, Exhibit "M").  In fact, Mr. Potolsky conceded that he did not immediately forward the July 8, 2004 letter to Greenwich because it was an "oversight" that was "corrected…a number of weeks later." (Potolsky Dep., pg. 77, lines 12-13, Exhibit "N").

14.    Specifically, Mr. Potolsky was initially confused as to whether 105 Street had coverage for the Conrad claim and as such, failed to immediately notify Greenwich of the late claim.[15]  Two years prior, on or about September 18, 2002, Ms. Rodriguez had forwarded Mr. Potolsky the August 6, 2002 and September 9, 2002 letters from Mr. Benedetto informing BFC Construction of the Conrad worker's compensation claim.  (July 26, 2004 letter, Exhibit "O").  Among the papers forwarded by Ms. Rodriguez to Mr. Potolsky was a Certificate of Insurance for Jem Erectors, the subcontractor Conrad was employed by at the time of the alleged accident.  (Potolsky Dep., pg. 33, lines 22-25, Exhibit "N").  Mr. Potolsky claims that the confusion concerning coverage stemmed from Jem Erector's Certificate of Insurance because it stated that the coverage provided was for a project on Madison Avenue, not for 105th Street, the

---

[13]    All references to the Steven Potolsky summarization of events will be made as ("Potolsky Summary"). A copy of the Potolsky summary is annexed hereto and made a part hereof as Exhibit "M."
[14]    All references to the December 5, 2006 Steven Potolsky deposition transcript will be made as ("Potolsky Dep. Pg_ Line _."). A copy of the Potolsky transcript is annexed hereto and made a part hereof as Exhibit "N."
[15]    All references to the July 26, 2004 letter from Steven Potolsky to Estelle Rodriguez, will be made as ("July 26, 2004 letter"). A copy of the July 26, 2004 letter annexed hereto and made a part hereof as Exhibit "O."

7

Subject Premises. (Potolsky Dep., pg. 34, lines 19-23, Exhibit "N"). Due to his confusion, Mr. Potolsky phoned Ms. Rodriguez to inquire as to the correct location of the Conrad accident. (Potolsky Dep., pg. 35, lines 7-9, Exhibit "N"). At that time, Mr. Potolsky claims that Ms. Rodriguez told him that she had no further information to give him other than what was already forwarded to North Shore. (Potolsky Dep., pg. 35, lines 16-18, Exhibit "N"). Despite being the broker for both 105 Street and BFC Construction, and the individual responsible for securing insurance coverage for the Subject Premises, Mr. Potolsky failed to forward the August 6, 2002 and September 9, 2002 letters to Greenwich in a timely fashion.

15.     Two years later when Mr. Potolsky received the July 8, 2004 letter from 105 Street, he was again confused and sent the paperwork back to Ms. Rodriguez. (July 24, 2004 letter, Exhibit "O"). Again, despite being the broker, Mr. Potolsky believed that 105 Street was not covered by insurance for the Conrad claim. (July 24, 2004 letter, Exhibit "O"). Almost another month went by until Mr. Potolsky realized his ongoing mistake and forwarded the file on to Greenwich.[16]

16.     Accordingly, more than two years after it occurred and four months after the lawsuit was served, Greenwich was not notified of the accident until the late afternoon of August 18, 2004[17]. (Barnaba Aff., ¶3). Michael Barnaba, a Senior Claims Consultant for XL Insurance, the claim administrator for Greenwich, handled the Conrad claim.[18] (Barnaba Aff., ¶1). After receiving the notice of claim from North Shore, on August 20, 2004, Mr. Barnaba

---

[16] All references to the August 18, 2004 letter from Steven Potolsky to Donald Schneider, will be made as ("August 18, 2004 letter"). A copy of the August 18, 2004 letter annexed hereto and made a part hereof as Exhibit "P."

[17] All references to the Affidavit of Michael Barnaba, sworn to on April 11, 2007, will be made as ("Barnaba Aff. ¶__). A copy of the Barnaba Aff. is annexed hereto and made a part hereof.

[18] All references to the December 29, 2006 deposition transcript of Michael Barnaba will be made as ("Barnaba Dep., pg.__, line __). A copy of the Barnaba transcript is annexed hereto and made a part hereof as Exhibit "Q."

8

requested from Ms. Weiner of North Shore, among other things, the summons and complaint in the Conrad action (Barnaba Aff., ¶3). August 20, 2004 was the first time that Greenwich was provided with the summons and complaint that was initially served on 105 Street **four months** prior on April 20, 2004. (Barnaba Aff., ¶3). Additionally, it should be noted that many documents requested from 105 Street remain outstanding. (Barnaba Aff., ¶5).

17.    Specifically, on August 25, 2004, Mr. Barnaba faxed Estelle Rodriguez, an employee and contact for 105 Street, with requests for various documents necessary to properly investigate the newly submitted Conrad claim.[19]  Among other things, Mr. Barnaba requested: copies of insurance certificates of 105 Street and BFC Construction; contracts between 105 Street and BFC Construction; contracts between 105 Street or BFC Construction and the subcontractor, Jem Erectors, Inc.; copies of corporate filings identifying the principals/members of 105 Street; advisement as to whether 105 Street had an "on-site representative" for the duration of the construction project; and copies of any and all incident/claim reports, daily project logs, etc. (Barnaba Aff., ¶5). To date, a number of the aforementioned documents remain outstanding. (Barnaba Aff., ¶5). Significantly, 105 Street failed to provide any copies of an incident/claim report, daily project log, or any documentation pertaining to the Conrad incident. (Barnaba Aff., ¶5).

18.    After receiving notice from North Shore, Greenwich immediately began investigating the Conrad claim and retained Wilson, Elser, Moskowitz, Edelman & Dicker, LLP (hereinafter "Wilson Elser") as coverage counsel to confirm that 105 Street had not notified Greenwich in a timely fashion of the Primary Action and/or the Conrad incident (Barnaba Aff., ¶4). While Wilson Elser was analyzing the issue of coverage, to the extent that 105 Street

---

[19]  All references to the August 25, 2004 fax from Mr. Barnaba to Ms. Rodriguez will be made as ("August 25, 2004 fax"). A copy of the August 25, 2004 fax is annexed hereto and made a part thereof as Exhibit "R."

provided contracts with other entities involved in the construction project to Greenwich, Mr. Barnaba began sending out tender letters. (Barnaba Aff., ¶6). As a result, at least one of the tenders was denied based on late reporting. (Barnaba Aff., ¶6).

19.    Upon completion of its coverage analysis, Wilson Elser submitted a coverage opinion to Greenwich recommending a declination of coverage for the Conrad action as a result of late notice.[20] (Barnaba Aff.,¶8). Specifically, Wilson Elser emphasized that 105 Street was served with the summons and complaint on April 20, 2004, over four months prior to submitting the claim to Greenwich. (Barnaba Aff.,¶8).

20.    On September 15, 2004, Ed Walsh, Assistant Vice President and Claim Manager for XL Insurance, officially authorized Mr. Barnaba to disclaim coverage for the Conrad action to 105 Street due to late notice (Barnaba Aff., ¶9). A mere five days later, on September 20, 2004 a denial letter based on Wilson Elser's opinion of late notice was sent to 105 Street.[21] (Barnaba Aff., ¶10).

21.    On or about October 24, 2005, 105 Street served a summons and complaint on Greenwich, seeking defense and indemnification for the Primary Action in the Supreme Court of the State of New York, New York County.[22] In response, pursuant to 28 USCA 1332, on or about November 21, 2005, Greenwich filed a notice of removal in the United States District Court for the Southern District of New York.[23] The United States District Court

---

[20] All references to the September 10, 2004 letter from Wilson Elser to XL Insurance, redacted pursuant to the November 7, 2006 Court Order, will be made as ("September 10, 2004 letter"). A copy of the September 10, 2004 letter is annexed to the affirmation in support, dated March 30, 2007, by Glenn J. Fuerth as Exhibit "S."

[21] All references to the September 20, 2004 denial letter from Wilson Elser on behalf of Greenwich to 105 Street will be made as ("September 20, 2004 letter"). A copy of the September 20, 2004 letter is annexed hereto and made a part hereof as Exhibit "T."

[22] All references to the 105 Street Summons and Complaint against Greenwich will be made as ("Complt. ¶"). A copy of the Complaint is annexed hereto and made a part hereof as Exhibit "U."

[23] All references to the Notice of Removal will be made as ("Removal Notice"). A copy of the Removal Notice is annexed hereto and made a part hereof as Exhibit "V."

2751951 1

for the Southern District removed the action, and Greenwich interposed an Answer on or about December 16, 2005.[24]

**ARGUMENT**

22.    There are no genuine issues of material fact, and thus Greenwich is entitled to judgment as a matter of law dismissing the complaint.  It is clear that 105 Street cannot proffer sufficient evidence to defeat Greenwich's motion for summary judgment.

**I.    NOTICE TO THE BROKER IS NOT NOTICE TO GREENWICH**

23.    The Policy clearly requires notice to Greenwich as a condition precedent to coverage.  North Shore, 105 Street's insurance broker, is the agent of the insured, not of the insurer.  Accordingly, any notice of occurrence given to North Shore on behalf of 105 Street is not notice to Greenwich, the insured.

24.    Contrary to the assertion that 105 Street first received notice of the Conrad lawsuit in "mid-July"[25], its broker North Shore did not notify Greenwich of the occurrence until late on August 18, 2004.  (Barnaba Aff., ¶3).  Moreover, Greenwich could not properly investigate the Conrad claim until at earliest, August 20, 2004, after Greenwich requested the Conrad summons and complaint, as well as the other documents necessary to properly investigate the Primary Action. (Barnaba Aff., ¶3).  Despite being requested, not all of the demanded documents by Greenwich were produced by 105 Street.  (Barnaba Aff., ¶5).  Thus, 105 Street cannot claim that it notified Greenwich prior to August 18, 2004, because notice to North Shore, its broker, was not notice to Greenwich, its liability insurer.  (Barnaba Aff., ¶2,).

---

[24]  All references to the Answer will be made as ("Answer").  A copy of the Answer is annexed hereto and made a part hereof as Exhibit "W."
[25]  All references to the March 20, 2007 letter to the Court by counsel for plaintiff, Donald Schneider, will be made as ("March 20, 2007 letter").  A copy of the March 20, 2007 letter is annexed hereto and made a part hereof as Exhibit "X."

2751951.1

25.    Section IV of the Policy, entitled Commercial General Liability Conditions, specifically, paragraph 2(a) of that section provides as follows:

> You must see to it that **we** are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. [emphasis added] (Exhibit "D").

26.    Further, the second paragraph of the first page of the Policy specifically provides that, "[t]he words 'we', 'us' and 'our' refer to the company providing this insurance." (Exhibit "D"). It cannot be disputed that Greenwich is the company that provided insurance to 105 Street. Further, North Shore was not an agent of Greenwich, and thus 105 Street and its agents failed to comply with the notice conditions of the policy as notice was only provided to its broker prior to August 18, 2004, not to Greenwich.

## II.    105 STREET FAILED TO COMPLY WITH THE NOTICE PROVISION OF THE POLICY AND THUS GREENWICH PROPERLY AND TIMELY DENIED COVERAGE

27.    Compliance with the terms of an insurance agreement is a condition precedent to coverage. The requirement that notice be given "as soon as practicable" is a standard provision in liability policies that requires notice within a reasonable time under the circumstances. Accordingly, absent a showing of legal justification, the failure to comply with the notice condition vitiates coverage.

28.    Furthermore, Greenwich need not show prejudice to sustain a coverage disclaimer. Instead, the burden is on 105 Street to demonstrate reasonableness for the failure to notify Greenwich for well over two years after the Conrad incident and four months after 105 Street was served with the summons and complaint in the Primary Action. As such, Greenwich may disclaim coverage under its insurance contract since 105 Street failed to provide both a notice of a potential claim and lawsuit as soon as practicable.

12

2751951.1

29.   It is undisputed that the Policy, which is the subject of this litigation, has a notice requirement. Specifically, Coverage "A" of Section I of the Policy entitled, "Bodily Injury and Property Damage Liability," provides, in pertinent part, as follows:

### 1. Insuring Agreement

a.   We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

30.   Furthermore, Section IV of the Policy entitled, "Commercial General Liability Conditions," in pertinent part, provides as follows:

2.   Duties In The Event Of Occurrence, Offense, Claim Or Suit

a.   You must see to it that we are notified <u>as soon as practicable</u> of an "occurrence" or an offense, which may result in a claim.  To the extent possible, notice should include: (emphasis added)

(1)   How, when and where the "occurrence" or offense took place;

(2)   The names and addresses of any injured persons and witnesses; and

(3)   The nature and location of any injury or damage arising out of the "occurrence" or offense.

31.   Section V of the Policy provides the following definitions:

3.   "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

13.   "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

13

As can be seen from the above referenced policy language, 105 Street was required to give Greenwich notice of an occurrence "as soon as practicable." (Pol. Section IV, Exhibit "D").

32.    In the instant declaratory judgment action, the incident in the Primary Action occurred on July 2, 2002. (Conrad Complaint ¶48, Exhibit "A"). Greenwich did not receive notice until at earliest, August 18, 2004, over two years after the occurrence, and four months after the lawsuit was served, despite the fact that 105 Street could have given notice on at least the following occasions:

- July 2, 2002 – Date of Loss
- August 6, 2002 – Notice of Worker's Compensation Claim
- September 9, 2002 – 2nd Notice of Worker's Compensation Claim
- April 20, 2004 – Summons & Complaint Served
- July 8, 2004 – Notice of Default of Primary Action

33.    Thus, 105 Street did not notify Greenwich of the occurrence "as soon as practicable." (Pol. Section IV, Exhibit "D"). 105 Street's two year delay in notifying Greenwich of the Conrad incident was unreasonable given the fact that 105 Street was aware of the incident given the close business, legal, and insurance-related relationship between BFC Construction and 105 Street. The August 6, 2002 and September 9, 2002 letters advising Plaintiff of the Conrad worker's compensation claim, including the date and location of the claimed occurrence, was sufficient notice of an occurrence *which may result in a claim.* (August 6, 2002 letter, Exhibit "F"; September 9, 2002 letter, Exhibit "H"; and Pol. Section IV, Exhibit "D").

34.    Moreover, if anyone was in the position to possess knowledge of the business entities that would be affected by the Conrad claim, it would be an employee of BFC Construction. First, BFC Construction is cited as the corporation in "care of" (c/o) of 105 Street

14

on the Certificate of Insurance. (Certificate, Exhibit "E."). Second, all three of the named defendants in the Primary Action are housed in the same 3,000 square foot business space[26]: 2226 First Avenue, New York, New York. (G. Baron Dep. pg. 17, line 17, Exhibit "Y."). In fact, there were approximately only five (5) or six (6) employees in the entire aforementioned office space[27]. (Richards Dep., pg. 48, line 19, Exhibit "Z"). Third, Donald Capoccia is the agent of service from the Secretary of State for all three of the named defendants in the Primary Action. (NYS DOS Info, Exhibit "C"). Fourth, with regard to BFC Construction, the "BFC" stood for "Baron, Ferrara, and Capoccia." All three of the principals of BFC Construction, were also the partners of 105 Street. (B. Baron Dep. pg. 12, line 17, Exhibit "B").

35.    Of significant note, all three of the named defendants share employees, including Estelle Rodriguez, one of the employees responsible for opening the mail for both BFC Construction and 105 Street. (B. Baron Dep., p. 23, line 15, Exhibit "B"). In addition to opening the mail, Ms. Rodriguez is responsible for sending Notice of Claims for personal injuries and forwarding insurance-related documents to North Shore, the insurance broker for 105 Street and BFC Construction. (B. Baron Dep., p. 24, line 19, Exhibit "B"). In fact, Ms. Rodriguez was the employee who signed the certified mail return receipt from the Secretary of State for the April 20, 2004 Conrad summons and complaint (March 28, 2007 letter, Exhibit "K"). In addition to the foregoing, Ms. Rodriguez was identified as the contact person for 105 Street when Greenwich required additional information to investigate the Conrad claim. (Barnaba Aff., ¶5, 7). Accordingly, 105 Street cannot claim that notice to BFC Construction of

---

[26] All references to the January 11, 2007 deposition transcript of Greg Baron will be made as (G. Baron Dep. Pg_ Line __.) A copy of the January 11, 2007 G. Baron transcript is annexed hereto and made a part hereof as Exhibit "Y."

[27] All references to the May 24, 2006 deposition transcript of Brad Richards will be made as (Richards Dep. Pg_ Line __.) A copy of the May 24, 2006 Richards transcript is annexed hereto and made a part hereof as Exhibit "Z."

2751951.1

the Conrad incident (occurring at the premises owned by 105 Street) and lawsuit was not notice to 105 Street as well.

36.     In addition to claiming that 105 Street was not aware of the Conrad claim prior to the initiation of the Conrad lawsuit, 105 Street also claims that it did not receive the April 20, 2004 summons and complaint until "mid-July." (March 20, 2007 letter, Exhibit "X"). However, service of process on a domestic corporation is deemed complete when the Secretary of State is so served, and thus 105 Street was served on April 20, 2004. (AOS, Exhibit "I").

37.     On April 20, 2004, 105 Street was properly served through the Secretary of State in accordance with New York State Business Law. *McKinney's Business Law §306(b)(1)*, (AOS, Exhibit "I").    Also on April 20, 2004, the Secretary of State immediately mailed the Conrad summons and complaint via certified mail to Donald Capoccia, 2226 First Avenue, New York, New York, 105 Street's designated agent and address for service of process. (Receipt of Service, Exhibit "J", and NYS DOCS Info, "Exhibit "C"). Additionally, a receipt of the certified mail, dated April 26, 2004, was returned to the Secretary of State by the U.S. Postal Service, signed by Estelle Rodriguez. (March 28, 2007 letter, Exhibit "K"). It should be noted that 105 Street is the first-named defendant on the complaint, and yet Ms. Rodriguez still failed to forward the complaint to Greenwich. (Complt., Exhibit "U"). However, regardless of 105 Street's assertions that it never received the Conrad summons and complaint, 105 Street, as a matter of law, was served on April 20, 2004 when the Secretary of State was served. Accordingly, 105 Street breached the Policy notice provisions when it failed to notify Greenwich of the Conrad action in a timely manner.

38.     Greenwich was therefore well within its rights to disclaim coverage, as compliance with the notice provision of the policy is a condition precedent to defense and

16

indemnification. In light of 105 Street's failure to comply with the notice provision of the policy, Greenwich properly and timely disclaimed coverage as a matter of law.

## III. GREENWICH TIMELY DISCLAIMED COVERAGE AND IS NOT OBLIGATED TO INDEMNIFY 105 STREET IN THE PRIMARY ACTION

39.    Insurers are urged to conduct investigations into coverage to avoid piecemeal disclaimers. Indeed, Greenwich was well within its rights, and in fact encouraged by New York law to conduct its investigation into 105 Street's claim.

40.    As the summons and complaint could not facially confirm when and who first became aware of the incident, but did allege that the incident occurred in July of 2002, Greenwich was justified in conducting an investigation into 105 Street's potential late notice. Additionally, the summons and complaint was dated April 20, 2004, but Greenwich was not notified until August 18, 2004. (Barnaba Aff. ¶3). In order to gather accurate information, an investigation was essential.

41.    Two days later, on August 20, 2004, Michael Barnaba, a Greenwich claims analyst, emailed North Shore, the broker for 105 Street, requesting additional documentation concerning the Conrad claim, including a request for the summons and complaint which had not been provided to Greenwich. (Barnaba Aff. ¶3). Although North Shore immediately forwarded the summons and complaint, a number of documents demanded from 105 Street remain outstanding to this day. (Barnaba Aff. ¶5).

42.    Five days later, on August 25, 2004, Greenwich retained coverage counsel to confirm the untimeliness of 105 Street's notification to Greenwich of the Conrad claim. (Barnaba Aff. ¶4). Sixteen days later, on September 10, 2004, after a thorough coverage

17

2751951.1

analysis, Wilson Elser opined that coverage should be denied to 105 Street on the basis of late notice. (Barnaba Aff. ¶8). Five days thereafter, Ed Walsh, Assistant Vice President and Claim Manager for XL Insurance, authorized Mr. Barnaba to disclaim coverage. (Barnaba Aff. ¶9). A mere five days later, by letter dated September 20, 2004, Greenwich properly and timely disclaimed coverage to 105 Street, only 30 days after receiving the summons and complaint in the Primary Action. (Barnaba Aff. ¶10).

43.    It should be noted that despite being the broker for both 105 Street and BFC Construction, and the individual responsible for securing insurance coverage for the Subject Premises, Mr. Potolsky required an entire month to investigate and comprehend the complexity and confusion surrounding the Conrad claim prior to transmitting notice of the claim to Greenwich. (August 18, 2004 letter, Exhibit "P"). In contrast, Greenwich was able to investigate, secure coverage counsel, send tender letters, and disclaim coverage within a month of receiving the Conrad summons and complaint. (September 20, 2004 letter, Exhibit "T").

44.    As a result of the fact that Greenwich did not have sufficient information in the materials provided in the notice of claim to disclaim coverage, Greenwich was justified in conducting its investigation into the potential violation of the notice provision of the Policy by 105 Street. (Barnaba Aff. ¶7). Accordingly, on or about September 10, 2004, when Greenwich received confirmation from Wilson Elser supporting the declination of coverage, this was the date upon which the time for Greenwich to disclaim coverage began to accrue (Barnaba Aff. ¶8). Therefore, Greenwich's disclaimer on September 20, 2004 is both proper and timely as it was made only 10 days after Greenwich became aware of information substantiating the grounds for disclaiming coverage.

## IV.    105 STREET IS NOT ENTITLED TO REIMBURSEMENT OF ATTORNEY FEES, COSTS AND OTHER EXPENSES

18

45.     105 Street is not entitled to any fees as a result of the declaratory judgment action because Greenwich did not place it in a defensive posture.   105 Street filed a summons and complaint seeking an Order declaring its rights and legal limitations under the subject policy. (Complt. ¶17, Exhibit "U").  Since 105 Street brought this affirmative action against Greenwich to settle its rights under the policy, 105 Street is not entitled to attorneys fees and costs incurred in its own defense of the underlying claims because Greenwich properly and timely denied coverage.  As such, 105 Street's request for relief for costs and disbursements must be denied, and the complaint must be dismissed in its entirety.

WHEREFORE, it is respectfully requested that the Court issue an order granting the relief requested herein in its entirety together with such other, further and different relief as the Court may deem just and proper.

Dated: New York, New York
        April 13, 2007

Yours, etc.,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By:     _____
        Glenn J. Fuerth (GJF5848)
        Attorneys for Defendant
        GREENWICH INSURANCE COMPANY
        150 East 42nd Street
        New York, New York 10017-5639
        (212) 490-3000

TO:     Donald F. Schneider
        Attorney for Plaintiff
        90 Broad Street, 6th Floor
        New York, NY 10004
        212-265-2266

19

2751951.1

# AFFIDAVIT OF MICHAEL BARNABA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- X

105 STREET ASSOCIATES, LLC

Index No.: 05-cv-9938 (VM)

                            Plaintiff,

                                              **AFFIDAVIT OF MICHAEL**
                                              **BARNABA IN SUPPORT OF**
            -against-                         **DEFENDANT GREENWICH**
                                              **INSURANCE COMPANY**
GREENWICH INSURANCE COMPANY,                  **MOTION FOR SUMMARY**
                                              **JUDGMENT**

                            Defendant.
--------------------------------------------------------------- X


STATE OF PENNSYLVANIA        )
                             )    SS:
COUNTY OF CHESTER            )


        MICHAEL BARNABA, duly sworn, deposes and says:

        1.      I have been employed by XL Insurance Environmental ("XL Insurance"), claims

administrator for Greenwich Insurance Company ("Greenwich"), since October of 2001.  My

present position is Senior Claims Consultant whereas in August and September of 2004, my

position was "Claims Analyst."  Accordingly, I am familiar with the assignment and

investigation of the claim of Richard Conrad v. 105 St. Associates, LLC, BFC Construction

Corp. and BFC Partners, LP ("Conrad claim"), Index No.: 105554/04, Supreme Court of New

York, County of New York.  Further, I was also the claims analyst assigned to the Conrad claim

concerning the coverage issues involving the plaintiff-purported insured, 105 Street Associates,

LLC ("105 Street").

        2.      Greenwich through XL Insurance, does not recognize North Shore Risk

Management ("North Shore") as its agent to receive notification of claims.  Notice from an

insured to its retail broker and/or wholesale broker, such as in this case from 105 Street to North

1

Shore, is not notice to Greenwich. To the contrary, Greenwich must receive a notice of the claim to satisfy the notice requirement under the Greenwich policy. Following receipt of proper notice, XL Insurance commences processing claims on behalf of Greenwich.

3.    Greenwich first received notice of the occurrence concerning this matter on August 18, 2004 from 105 Street's broker, North Shore, via facsimile as in the normal course of business.[1] (Barnaba Dep., pg. 22, lines 21-25, Exhibit "Q"). However, Greenwich did not receive the summons and complaint until August 20, 2004, when I requested it and various other documents from 105 Street, through North Shore, to properly begin investigating the claim. (Barnaba Dep., pg. 53, lines 21-23, Exhibit "Q").

4.    Recognizing a potential coverage issue, I recommended that coverage counsel be retained. (Barnaba Dep., pg. 54, lines 5-8, Exhibit "Q"). After the weekend, on August 25, 2004, I assigned Wilson, Elser, Moskowitz, Edelman & Dicker, LLP ("Wilson Elser") as coverage counsel to confirm that 105 Street had not notified Greenwich in a timely fashion of the Conrad lawsuit and/or the Conrad incident.

5.    Also on August 25, 2004, I faxed Estelle Rodriguez, an employee and contact for 105 Street, with a request for various documents necessary to properly investigate the newly submitted Conrad claim. (Barnaba Dep., pg. 51, lines 6-10, Exhibit "Q"). Among other things, I requested: copies of insurance certificates of 105 Street and BFC Construction; contracts between 105 Street and BFC Construction; contracts between 105 Street or BFC Construction and the subcontractor, Jem Erectors, Inc.; copies of corporate filings identifying the principals/members of 105 Street; advisement as to whether 105 Street had an "on-site representative" for the duration of the construction project; and copies of any and all

---

[1] All references to the December 29, 2006 deposition transcript of Michael Barnaba will be made as (Barnaba Dep., pg.__, line__). A copy of the December 29, 2006 transcript is annexed to the affirmation in support, dated April 11, 2007, by Glenn J. Fuerth as Exhibit "O."

incident/claim reports, daily project logs, etc.  To date, a number of the aforementioned documents remain outstanding.  (Barnaba Dep., pg. 59, lines 16-17, Exhibit "Q").  Significantly, 105 Street failed to provide any copies of an incident/claim report, daily project log, or any documentation pertaining to the Conrad incident.  (Barnaba Dep., pg. 60, lines 14-20, Exhibit "Q").

6.    To the extent that 105 Street provided contracts with other entities involved in the construction project, I immediately issued tender letters to other insurers that appeared to be obligated to provide coverage to 105 Street based upon contractual indemnification and additional insured procurement provisions.  (Barnaba Dep., pg. 64, lines 3-6, Exhibit "Q").  In response, at least one of the tenders was denied based on late reporting.  (Barnaba Dep., pg. 66, lines 21-25, Exhibit "Q").

7.    Due to the lack of information concerning the facts this case, North Shore's initial confusion as to whether 105 Street had coverage for the incident, the fact that the occurrence took place over two years from receipt of notice, and the non-production of the requisite aforementioned documents from 105 Street, a thorough factual investigation was necessary in order that Wilson Elser could be provided with sufficient information to confirm whether coverage should be afforded to 105 Street..

8.    On September 10, 2004, Wilson Elser confirmed to me that coverage should be denied based on late notice.  Significantly, Wilson Elser noted that 105 Street was served with the summons and complaint on April 20, 2004, over four months prior to submitting the claim to Greenwich.  (Barnaba Dep., pg. 88, lines 3-5, Exhibit "Q").

9    On September 15, 2004, I received authorization from Ed Walsh, Assistant Vice President and Claims Manager for XL Insurance, to disclaim coverage to 105 Street in

3

connection with the Conrad claim. (Barnaba Dep., pg. 79, lines 2-15, Exhibit "Q"). I then authorized Wilson Elser to formally deny coverage.

10. On September 20, 2004, on the basis of the analysis by Wilson Elser and the documents in the file, I authorized Wilson Elser to transmit a denial of coverage letter to 105 Street. Accordingly, the declination of coverage was proper, timely, and completely substantiated.

_____
Michael Barnaba

Sworn to before me this 11ᵗʰ day of
April, 2007

_Veronica A. Parriera_

NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Veronica A. Parriera, Notary Public
Uwchlan Twp., Chester County
My Commission Expires Sept. 7, 2008
Member, Pennsylvania Association Of Notaries

4

2751904.1



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------x

RICHARD CONRAD,

                                    Plaintiff,

            -against-

105 STREET ASSOCIATES, LLC,
BFC CONSTRUCTION CORP. and
BFC PARTNERS, L.P.,

                                    Defendants.
-------------------------------------------------------------x

Index No. 105554 04
Date Purchased 4 8 04

Plaintiffs Designate
NEW YORK
County as the place of Trial

The Basis of venue is
Defendants' Principal Place
Of Business

*SUMMONS*

Plaintiff resides at
4 Lake Michigan Drive
Little Egg Harbor, New Jersey
*County of Ocean*

*TO THE ABOVE NAMED DEFENDANT(S)*

            *YOU ARE HEREBY SUMMONED* to answer the complaint in this action to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff(s)' Attorneys within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
         March 31, 2004

                                    KELNER & KELNER, Esqs.

                        By:     *Gail S Kelner*
                                    GAIL S. KELNER
                                    Attorneys for Plaintiffs
                                    Office and P.O. Address
                                    140 Broadway, 37th Floor
                                    New York, New York 10005
                                    212-425-0700

Defendant's Address:

105 STREET ASSOCIATES, LLC:
         c/o Secretary of State

BFC CONSTRUCTION CORP.:
         c/o Secretary of State

BFC PARTNERS, L.P.:
         c/o Secretary of State

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

————————————————————————x

RICHARD CONRAD,                                    Index No. 105554/04

                          Plaintiff,

        -against-                                  **VERIFIED
                                                   COMPLAINT**

105 STREET ASSOCIATES, LLC,
BFC CONSTRUCTION CORP., and
BFC PARTNERS, L.P.

                          Defendants.

————————————————————————x

        Plaintiff, complaining of the defendants herein, by and through his attorneys, Kelner & Kelner,

Esqs., respectfully alleges, upon information and belief, as follows:

## AS AND FOR A FIRST CAUSE OF ACTION:

        1.      At all times hereinafter mentioned, defendant, 105 STREET ASSOCIATES LLC

(hereinafter referred to as defendant "105 STREET"), was a domestic limited liability company duly

organized and existing under and by virtue of the laws of the State of New York.

        2.      That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION CORP.

(hereinafter referred to as defendant "BFC CONSTRUCTION"), was a corporation duly organized

and existing under and by virtue of the laws of the State of New York.

        3.      That at all times hereinafter mentioned, defendant, BFC PARTNERS L.P. (hereinafter

referred to as defendant "BFC PARTNERS"), was a domestic limited partnership duly organized and

existing under and by virtue of the laws of the State of New York.

        4.      The causes of action asserted herein are not subject to the provisions of Article 16

CPLR or come within the stated exceptions found in CPLR 1602.

        5.      That at all times hereinafter mentioned, defendant, 105 STREET, was the owner of

premises located at 235- 237, 239-241 AND 243-247 East 105th Street, City, County and State of

New York.

6.   That at all times hereinafter mentioned, defendant, 105 STREET, was the owner of premises located at 235-237 East 105th Street in the City, County and State of New York (hereinafter referred to as the "subject premises").

7.   That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION, was the general contractor at the subject premises.

8.   That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION, was a construction manager at the subject premises.

9.   That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION, was a contractor at the subject premises.

10.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, was the developer of the said premises.

11.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, was the agent of the owner of the subject premises.

12.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, was the general contractor at the subject premises.

13.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, was a construction manager at the subject premises.

14.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, was a contractor at the subject premises.

15.   That at all times hereinafter mentioned, defendant, 105 STREET, its agents, servants and/or employees operated the subject premises.

16.   That at all times hereinafter mentioned, defendant, 105 STREET, its agents, servants and/or employees managed the subject premises.

Wednesday, August 18, 2004 12:59 PM   Greg Baron 212-348-3418                                    p.09

17.   That at all times hereinafter mentioned, defendant, 105 STREET, its agents, servants and/or employees maintained the subject premises.

18.   That at all times hereinafter mentioned, defendant, 105 STREET, its agents, servants and/or employees controlled the subject premises.

19.   That at all times hereinafter mentioned, defendant , BFC CONSTRUCTION, its agents, servants and/or employees operated the subject premises.

20.   That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION, its agents, servants and/or employees managed the subject premises.

21.   That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION, its agents, servants and/or employees maintained the subject premises.

22.   That at all times hereinafter mentioned, defendant, BFC CONSTRUCTION, its agents, servants and/or employees controlled the subject premises.

23.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, its agents, servants and/or employees operated the subject premises.

24.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, its agents, servants and/or employees managed the subject premises.

25.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, its agents, servants and/or employees maintained the subject premises.

26.   That at all times hereinafter mentioned, defendant, BFC PARTNERS, its agents, servants and/or employees controlled the subject premises.

27.   That on or prior to July 2, 2002, defendant, 105 STREET, or its authorized agents entered into a contract or written agreement with defendant BFC CONSTRUCTION, with reference to performing work and services at the aforesaid location.

28. That on or prior to July 2, 2002, defendant, BFC PARTNERS, or its authorized agents entered into a contract or written agreement with defendant BFC CONSTRUCTION with reference to performing work and services at the aforesaid location.

29. That on or prior to July 2, 2002, defendant, BFC CONSTRUCTION, was engaged to perform work and services at the subject premises pursuant to agreement with defendant 105 STREET.

30. That on or prior to July 2, 2002, defendant, BFC CONSTRUCTION, was engaged to perform work and services at the subject premises pursuant to agreement with defendant BFC PARTNERS.

31. That on or prior to July 2, 2002, defendant, 105 STREET, or its authorized agents hired and/or engaged defendant BFC CONSTRUCTION, to perform work, labor and services in and upon the subject premises.

32. That on or prior to July 2, 2002, defendant, BFC PARTNERS, or its authorized agents hired and/or engaged defendant, BFC CONSTRUCTION, to perform work, labor and services in and upon the subject premises.

33. That on or prior to July 2, 2002, defendant, 105 STREET, or its authorized agents entered into a contract or written agreement with defendant, BFC PARTNERS, with reference to performing work and services at the aforesaid location.

34. That on or prior to July 2, 2002, defendant, 105 STREET, or its authorized agents hired and/or engaged defendant, BFC PARTNERS, to perform work, labor and services in and upon the subject premises.

35. That on or prior to July 2, 2002, defendant, 105 STREET, or its authorized agents hired and/or engaged defendant, BFC PARTNERS, to develop the subject premises.

36.     That on or prior to July 2, 2002 , defendant, 105 STREET, or its authorized agents hired and/or engaged Jem Erectors, Inc. to perform work, labor and services in and upon the subject premises.

37.     That on or prior to July 2, 2002, defendant, BFC PARTNERS, or its authorized agents hired and/or engaged Jem Erectors, Inc. to perform work, labor and services in and upon the subject premises.

38.     That on or prior to July 2, 2002, defendant, BFC CONSTRUCTION, or its authorized agents hired and/or engaged Jem Erectors, Inc., to perform work, labor and services in and upon the subject premises.

39.     That at all times hereinafter mentioned, Jem Erectors, Inc. performed work in and upon the premises pursuant to contract and/or written agreement with defendant, 105 STREET.

40.     That at all times hereinafter mentioned, Jem Erectors, Inc. performed work in and upon the premises pursuant to contract and/or written agreement with defendant, BFC PARTNERS.

41.     That at all times hereinafter mentioned, Jem Erectors, Inc. performed work in and upon the premises pursuant to contract and/or written agreement with defendant, BFC CONSTRUCTION.

42.     At all times hereinafter mentioned, plaintiff, RICHARD CONRAD, was an employee of Jem Erectors, Inc.

43.     That on July 2, 2002, at approximately 10:00A.M., plaintiff, RICHARD CONRAD, was lawfully working at the subject premises as an employee of Jem Erectors, Inc.

44.     That at the aforesaid time and place, the work being performed by plaintiff, RICHARD CONRAD, at the subject premises was subject to the relevant and applicable provisions of the Labor Law of the State of New York.

45.    That on July 2, 2002, at approximately 10:00 A.M., plaintiff, RICHARD CONRAD, while lawfully engaged in his duties at the aforesaid site, was working on an elevated and unguarded work area at the subject premises.

46.    That on July 2, 2002, at approximately 10:00 A.M., while plaintiff, RICHARD CONRAD, was lawfully working at the subject premises, he fell.

47.    That on July 2, 2002, at approximately 10:00 A.M., while plaintiff, RICHARD CONRAD, was lawfully working at the subject premises, he was caused to fall from an elevated work area.

48.    That on July 2, 2002, at approximately 10:00 A.M., while plaintiff, RICHARD CONRAD, was lawfully working at the subject premises, he was caused to fall from an elevation, thereby sustaining serious injuries.

49.    That at the aforesaid time and place, plaintiff, RICHARD CONRAD, was injured as a result of the dangerous, defective and unsafe condition which was caused, created, allowed and/or permitted by defendant(s), its agents, servants and/or employees and that such condition was permitted to exist for an unreasonable length of time and was known or in the exercise of reasonable care should have been known to defendant(s), its agents, servants and/or employees.

50.    That the aforesaid premises was not so constructed, placed, managed, operated and located so as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein and using same including the plaintiff herein.

51.    That at the aforesaid time and place, the defendants herein failed to furnish or erect, or cause to be furnished or erected for the performance of such labor at the premises as was then and there being performed, scaffolding, hoists, stays, ladders, slings, hangars, blocks, pulleys and/or other devices so constructed, placed and/or operated so as to give plaintiff proper protection in the course of his employment.

6

52.    That the aforementioned occurrence and injuries resulting therefrom were caused solely and wholly by the negligence, recklessness and carelessness of defendants herein, their agents, servants and/or employees in the ownership, operation, management, maintenance and control of the premises and/or by their violation and failure to comply with applicable and relevant provisions of the Labor Law of the State of New York, including, but not limited to Sections 200, 240 and 241(6) thereof, as well as the applicable provisions of the NYCRR and New York Industrial Code applicable thereto.

53.    That by reason of the foregoing, plaintiff, RICHARD CONRAD, sustained severe permanent personal injuries and special damages.

54.    That by reason thereof, plaintiff, RICHARD CONRAD, has been damaged in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

## AS AND FOR A SECOND CAUSE OF ACTION:

55.    Plaintiff repeats, reiterates and realleges each and every allegation of this complaint numbered and designated "1" through "54", inclusive with the same force and effect as though more fully set forth at length herein.

56.    That prior to July 2, 2002, defendants, their agents, servants and/or employees, knew, or in the exercise of reasonable care should have known, of the dangerous and defective conditions existing at the premises.

57.    That upon information and belief, the dangerous, hazardous and defective condition complained of herein existed for a prolonged period of time, prior to the happening of the occurrence herein such that the defendants, their agents, servants and/or employees, in the exercise of reasonable care, knew or should have known of the dangerous and defective condition and said defendants failed to timely remedy same.

7

Wednesday, August 18, 2004 12:59 P    Greg Baron 212-348-3418

58.    That prior to July 2, 2002, the defendants herein, their agents, servants and/or employees knew, or in the exercise of reasonable care, should have known, that the dangerous and defective conditions as aforesaid were in violation of relevant and applicable provisions of the Labor Law of the State of New York.

59.    That prior to July 2, 2002, the defendants herein, their agents, servants and/or employees failed and neglected to cure and/or correct the dangerous and defective conditions as aforesaid, and further failed and/or neglected to correct the violations of the relevant and applicable provisions of the Labor Law of the State of New York.

60.    Prior to July 2, 2002, the defendants herein, their agents, servants and/or employees caused, permitted and/or allowed the subject premises to be, become and remain in the aforesaid dangerous and defective condition.

61.    That defendants herein by and through their agents, servants and/or employees and/or contractors and/or subcontractors had actual notice or knowledge of the dangerous and defective condition complained of herein and failed to timely and properly remedy same and provide a safe place for plaintiff, RICHARD CONRAD, to work.

62.    That defendants herein, by and through their agents, servants and/or employees and/or contractors and/or subcontractors, had constructive notice and knowledge of the dangerous and defective conditions complained of herein and failed to timely and properly remedy same and provide a safe place for plaintiff RICHARD CONRAD to work.

63.    That defendants herein by and through their agents, servants and/or employees and/or contractors and/or subcontractors created the dangerous and defective conditions complained of herein.

64.    The aforesaid acts of the defendants herein, their agents, servants and/or employees, constituted a conscious disregard of the substantial, unjustifiable risk of death, dismemberment and serious injury to the plaintiff as aforesaid, and further constituted a gross and significant deviation and departure from the standards of conduct that a reasonable person would have observed under the circumstances.

65.    That by reason thereof, plaintiff, RICHARD CONRAD, has been damaged in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

## AS AND FOR A THIRD CAUSE OF ACTION:

66.    Plaintiff repeats, reiterates and realleges each and every allegation of this complaint numbered and designated "1" through "65", inclusive with the same force and effect as though more fully set forth at length herein.

67.    At all times hereinafter mentioned, the conduct of the defendants, their agents, servants and/or employees was governed by the New York Labor Law and more particularly, Labor Law sections 200, 240(1) and 241(6).

68.    The defendants, their agents, servants and/or employees violated and/or failed to comply with the relevant and applicable provisions of the Labor Law, as aforesaid.

69.    Said violations of the Labor Law caused and/or contributed to the occurrence as aforesaid, and the resulting injuries to plaintiff.

70.    That by reason thereof, plaintiff, RICHARD CONRAD, has been damaged in an amount in excess of the jurisdictional limits of all lower courts which would otherwise have jurisdiction over this matter.

WHEREFORE, plaintiff RICHARD CONRAD demands judgment against defendants,

jointly and severally in an amount in excess of the jurisdictional limits of all lower courts which would

otherwise have jurisdiction over this matter, together with costs and disbursements of this action.

Dated: New York, New York
       March 31, 2004

                                              Respectfully submitted,

                                              KELNER & KELNER

                                      By:  _____
                                              GAIL S. KELNER
                                              Attorneys for Plaintiff(s)
                                              140 Broadway, 37th Floor
                                              New York, New York 10005
                                              (212) 425-0700

## VERIFICATION

The undersigned, an attorney admitted to practice in the Courts of the State of New York, hereby affirms as true under all the penalties of perjury that affirmant is one of the attorneys for the plaintiff in the within action; that affirmant has read the foregoing **COMPLAINT** and knows the contents thereof; that the same is true to affirmant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and that those matters affirmant believes to be true.

That the reason this verification is made by your affirmant and not by the plaintiff is that the plaintiff does not reside within the County of New York, which is the County in which your affirmant has her office.

Dated: New York, New York
       March 31, 2004

GAIL S. KELNER

Index No.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RICHARD CONRAD,

Plaintiff,

-against-

105 STREET ASSOCIATES, LLC, BFC CONSTRUCTION CORP. and
BFC PARTNERS, L.P.,

Defendants.

---

### SUMMONS AND VERIFIED COMPLAINT

---

### KELNER & KELNER, Esqs.
Attorneys for Plaintiff
140 Broadway, 37th Floor
New York, New York 10005
212-425-0700

---

To:

Attorneys for Defendant

is hereby admitted.

Service of a copy of the within

Dated:

Attorney for Plaintiff

---

PLEASE TAKE NOTICE

☐  NOTICE OF ENTRY
that the within is a (certified) true copy of a
entered in the office of the clerk of the within named Court on

☐  NOTICE OF SETTLEMENT
that an Order of which the within is a true copy will be presented for
one of the Judges of the within
settlement to the Honorable
named Court, at                                   on           , 200___ at 9:30 A.M.

Dated:

### KELNER & KELNER, Esqs.
Attorneys for Plaintiff
140 Broadway, 37th Floor
New York, New York   10005
212-425-0700



1

2   SUMPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF New York

3   ------------------------------------------------X
    105 STREET ASSOCIATES, LLC,

4
                                        PLAINTIFF,
5
              -against-                  Index No:
6                                        05-CV-9938

7

    GREENWICH INSURANCE COMPANY,
8
                                        DEFENDANT.
9   ------------------------------------------------X

10                  DATE: December 7, 2006

11                  TIME: 11:40 a.m.

12

13

14        EXAMINATION BEFORE TRIAL of the

15   Plaintiff, 105 STREET ASSOCIATES, LLC., by a

16   witness, BRANDON BARON, taken by the Defendant,

17   pursuant to an Agreement, held at the offices

18   of SCHNEIDER, GOLDSTEIN & BLOOMFIELD, 90 Broad

19   Street, New York, New York 10004, before a

20   Notary Public of the State of New York.

21

22

23

24

25

1

2       A P P E A R A N C E S:

3

4       SCHNEIDER, GOLDSTEIN & BLOOMFIELD, ESQS.
            Attorneys for the Plaintiffs
5           90 Broad Street
            New York, New York 10004
6           BY: DONALD SCHNEIDER, ESQ.

7

8
        WILSON, ELSER, MOSKOWITZ,
9       EDELMAN & DICKER, ESQS.
            Attorneys for the Defendant
10          150 East 42nd Street
            New York, New York 10017
11          BY: GLENN J. FUERTH, ESQ.

12

13                 *           *           *

14

15

16

17

18

19

20

21

22

23

24

25

1

2       **221. UNIFORM RULES FOR THE
         CONDUCT OF DEPOSITIONS**

3

        **221.1 Objections at Depositions**
4           **(a) Objections in general.** No objections
        shall be made at a deposition except those
5       which, pursuant to subdivision (b), (c) or (d)
        of Rule 3115 of the Civil Practice Law and
6       Rules, would be waived if not interposed, and
        except in compliance with subdivision (e) of
7       such rule.   All objections made at a
        deposition shall be noted by the officer before
8       whom the deposition is taken, and the answer
        shall be given and the deposition shall proceed
9       subject to the objections and to the right of a
        person to apply for appropriate relief pursuant
10      to Article 31 of the CPLR.
            **(b) Speaking objections restricted.**
11      Every objection raised during a deposition
        shall be stated succinctly and framed so as not
12      to suggest an answer to the deponent and, at
        the request of the questioning attorney, shall
13      include a clear statement as to any defect in
        form or other basis of error or irregularity.
14      Except to the extent permitted by CPLR Rule
        3115 or by this rule, during the course of the
15      examination persons in attendance shall not
        make statements or comments that interfere with
16      the questioning.

17      **221.2 Refusal to answer when objection is made**
            A deponent shall answer all questions at
18      a deposition, except (i) to preserve a
        privilege or right of confidentiality, (ii) to
19      enforce a limitation set forth in an order of
        the court, or (iii) when the question is
20      plainly improper and would, if answered, cause
        significant prejudice to any person.   An
21      attorney shall not direct a deponent not to
        answer except as provided in CPLR Rule 3115 or
22      this subdivision.   Any refusal to answer or
        direction not to answer shall be accompanied by
23      a succinct and clear statement of the basis
        therefor.   If the deponent does not answer a
24      question, the examining party shall have the
        right to complete the remainder of the
25      deposition.

1

2       **221. UNIFORM RULES FOR THE
          CONDUCT OF DEPOSITIONS**

3

**221.3 Communication with the deponent**

4            An attorney shall not interrupt the
        deposition for the purpose of communicating

5       with the deponent unless all parties consent or
        the communication is made for the purpose of

6       determining whether the question should not be
        answered on the grounds set forth in section

7       221.2 of these rules and, in such event, the
        reason for the communication shall be stated

8       for the record succinctly and clearly.

9

10

11           IT IS FURTHER STIPULATED AND AGREED that
        the transcript may be signed before any Notary

12      Public with the same force and effect as if
        signed before a clerk or a Judge of the court.

13

14           IT IS FURTHER STIPULATED AND AGREED that
        the examination before trial may be utilized

15      for all purposes as provided by the CPLR.

16

17           IT IS FURTHER STIPULATED AND AGREED that
        all rights provided to all parties by the CPLR
        cannot be deemed waived and the appropriate

18      sections of the CPLR shall be controlling with
        respect hereto.

19

20           IT IS FURTHER STIPULATED AND AGREED by
        and between the attorneys for the respective

21      parties hereto that a copy of this examination
        shall be furnished, without charge, to the

22      attorneys representing the witness testifying
        herein.

23

24

25

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

```
 1                      BARON

 2      B R A N D O N    B A R O N, called as a witness,

 3      having been first duly sworn by a Notary Public

 4      of the State of New York, was examined and

 5      testified as follows:

 6      EXAMINATION BY

 7      MR. FUERTH:

 8            Q.    Please state your name for the

 9      record.

10            A.    Brandon Baron.

11            Q.    Where do you reside?

12            A.    490 Dune Road, West Hampton Beach,

13      New York 11978.

14            Q.    Good morning, Mr. Baron.  My name

15      is Glen Fuerth.  I represent Greenwich

16      Insurance in this action.

17                  I am going to ask you some

18      questions today concerning the lawsuit that has

19      been brought by 105 Street Associates, LLC

20      against Greenwich Insurance company.

21                  What I ask is that you wait until

22      I'm finished with the question before you give

23      your answer.  The Court Reporter can only take

24      down one person at a time.  All your responses

25      must be a verbal responses because the Court
```

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

```
 1                    BARON

 2   Reporter is unable to note gestures.

 3              If there comes a time you don't

 4   understand a question, let me know and I will

 5   either rephrase it or have the Court Reporter

 6   read it back it to you; do you understand that?

 7         A.    Yes.

 8         Q.    What is your educational

 9   background?

10         A.    College.

11         Q.    When did you graduate and with what

12   degree?

13         A.    I was actually four credits short,

14   it was in communications.

15         Q.    You are presently employed?

16         A.    Riverview West Contracting.

17         Q.    In the period between July 2, 2002

18   and September 20, 2004, who were you employed

19   by?

20         A.    Would you say the dates again?

21         Q.    July 2, 2002 through September 20,

22   2004, who were you employed by?

23         A.    For most of the period, BFC

24   Construction.

25         Q.    When you say most of that period?
```

1                          BARON

2          A.    I think right near the end, I went

3    to Riverview Contracting.

4          Q.    So sometime in the fall?

5          A.    Yes.   That is an estimate.

6          Q.    Between July 2, 2002 and September

7    20, 2004, what interest, if any, did you have

8    in BFC Construction Corp?

9          A.    During that period, I was a member

10   of the corporation, partner.

11         Q.    Did you have any employment

12   position or employment function with BFC

13   Construction other than being a partner?

14         A.    My main activity was field

15   construction.

16         Q.    What did you do within field

17   construction?

18         A.    The equivalent of project

19   management.

20         Q.    This was for a project at 105th

21   Street; is that correct?

22         A.    No, this was in Brooklyn, two

23   projects simultaneously.

24         Q.    Which two?

25         A.    Pacific cluster and Crown Heights

```
 1                          BARON
 2    cluster.
 3             Q.     Did you have any work involvement
 4    with a project at 105th Street in Manhattan?
 5             A.     No.
 6             Q.     Did you have an understanding in
 7    the period of July 2, 2002 through September
 8    20, 2004 that BFC Construction Corp. was
 9    involved with a project located on 105th Street
10    between Second and Third Avenue in Manhattan?
11             A.     I was aware of it, yeah.
12             Q.     But you had no job responsibilities
13    with that project?
14             A.     No, no.
15             Q.     Unless I indicate otherwise, we are
16    going to be talking about the period of July 2,
17    2002 and September 20, 2004?
18             A.     Okay.
19             Q.     What, if any interest, did you have
20    as an entity of 105 Street Associates, LLC?
21             A.     My recollection is, I was a member
22    of the LLC.
23             Q.     Is that a partner, officer,
24    something else?
25             A.     I guess somewhat the equivalent of
```

```
 1                         BARON
 2     a partner.
 3          Q.    Within that time period, what
 4     interest, if any, did you have with an entity
 5     known as WNC Eastern Community Development
 6     Advisors, LLC?
 7          A.    No interest.
 8          Q.    Were you aware of an entity known
 9     as WNC, et cetera, in that time period?
10          A.    In a very vague sort of way, I had
11     heard the name.
12          Q.    In the time period we are talking
13     about, what, if any interest, did you have with
14     an entity known as BFC Partners?
15          A.    Really not sure.
16          Q.    Did you have some interest?
17          A.    I would have to be an associate
18     based on the fact that the B stands or Baron.
19          Q.    In this time period, to your
20     understanding, what was the relationship, if
21     any, between BFC Partners LLP and 105 Street
22     Associates LLC?
23               MR. SCHNEIDER:  I would object
24          simply for the record to the extent that
25          it calls for a legal conclusion, but you
```

```
 1                          BARON

 2          should answer it to the best of your

 3          understanding.

 4          A.    I know of no connection between

 5     those two entities.

 6          Q.    In the time period, to your

 7     understanding, what was the relationship, if

 8     any, between BFC Construction Corp. and 105

 9     Street Associates, LLC?

10               MR. SCHNEIDER:  Same objection.

11          Objection to the form.  You can answer

12          to the extent you can.

13          A.    My current understanding is that in

14     relation to the project that you asked me about

15     105th Street, this 105th Street entity was a

16     development entity and BFC was a construction

17     entity.

18          Q.    When did you come to have that

19     understanding?

20          A.    I don't really recall.

21          Q.    Was it after 2004?

22          A.    Yeah, in all likelihood, yeah.

23          Q.    Do you recall the circumstances

24     under which you came to have an understanding

25     as to the relationship, if any, between 105
```

```
 1                          BARON

 2     Street Associates, LLC and BFC Construction

 3     Corp.?

 4          A.     I think just knowing that one was a

 5     development entity and one was a contractor

 6     entity is what I based it on.  Maybe I came to

 7     a conclusion myself during that period.

 8          Q.     You don't remember anyone telling

 9     you that?

10          A.     No.

11          Q.     Other than you being a partner in

12     BFC Construction, who else was a partner?

13          A.     Joseph Ferrara.

14          Q.     Can you spell the last name?

15          A.     F-E-R-R-A-R-A, I believe and

16     Capoccia, Donald Capoccia, C-A-P, one P and two

17     Cs, C-A-P-O-C-C-I-A.

18          Q.     Those were the only partners you

19     are aware of?

20          A.     Yes.

21          Q.     Did the members of the partnership

22     change after September 20, 2004?

23          A.     Yes.

24          Q.     How did it change?

25          A.     The partners became -- well, I
```

```
1                          BARON

2    can't say they're the partners or the owners.

3    Whatever position they were in at that point,

4    became Peter Ferrara and Gregg Baron.

5         Q.    In the relevant time period, what

6    was your understanding as to who, other than

7    yourself, was a member or partner of 105 Street

8    Associates, LLC?

9              MR. SCHNEIDER:  When Mr. Fuerth

10             says the relevant time frame, do you

11             know the time frame he is speaking of?

12             THE WITNESS:  Yes.

13        A.    You are asking me 105th Street.

14        Q.    Yes, other than yourself.

15        A.    It would be a conjecture, but I

16   would conjecture it was the same partners.

17        Q.    Ferrara and Capoccia?

18        A.    Correct.  Although there may have

19   been others I'm not aware of.

20        Q.    Did you have an understanding or

21   come to have an understanding in the relevant

22   time period what was the purpose of forming 105

23   Street Associates, LLC?

24        A.    During that time period, I don't

25   believe I ever had a discussion about it or
```

13

```
1                          BARON
2     formed an understanding.
3          Q.     Did there come a time when you
4     became aware what the reason was for the
5     formation of 105 Street Associates, LLC?
6          A.     Following that time, that it was a
7     development entity for that project that you
8     named.
9          Q.     Did you ever come to have an
10    understanding as to whether 105 Street
11    Associates had an interest in BFC Construction
12    Corp. or vice versa?
13         A.     I would not think that that would
14    be the case.  I don't have a specific
15    understanding of it.
16         Q.     Again, in the relevant time period,
17    did you have an understanding as to what was
18    the relationship, if any, between BFC
19    Construction and BFC Partners?
20         A.     No.
21         Q.     Did you have an understanding as to
22    whether there was any relationship between BFC
23    Construction, 105 Street Associates, LLC, BFC
24    Partners or WNC Eastern Community?
25                MR. SCHNEIDER:  Objection to the
```

14

```
 1                          BARON

 2              form of the question.  Answer it if you

 3              can.

 4              Q.    What I'm just looking for is, not

 5      to ask 18 separate questions.  We have BFC

 6      Construction, 105 Street Associates LLC.  We

 7      have BFC Partners and WNC Eastern Community

 8      Development Advisors, LLC and what I'm looking

 9      at is, was one of those entities the parent

10      corporation of another?  Did one of those

11      entities have an ownership?

12              Just for example, BFC Partners

13      would own a certain percentage of BFC

14      Construction or 105 Street Associates, whatever

15      the various combinations could be.

16              A.    In light of what you said during

17      that period, I haven't even given it a thought,

18      but at this time I would conjecture none of

19      them had any interest in the other.

20              Q.    There was no ownership interest of,

21      let's say, BFC Partners and BFC Construction or

22      no ownership interest of BFC Partners and 105

23      Street Associates?

24              A.    I could be wrong, but not that I am

25      aware of.
```

15

```
 1                        BARON

 2          Q.     In the relevant time period, did

 3   you have an understanding as to what interest,

 4   if any, Gregg Baron had in BFC Construction

 5   Corp., 105 Street Associates LLC, WNC Eastern

 6   Community Development Advisors, LLC and BFC

 7   Partners LLP?

 8          A.     During that period, I believe none.

 9          Q.     Did he come to have an interest in

10   any of those entities after September 2004,

11   September 20th to be exact?

12          A.     Only BFC Construction.

13          Q.     That was after September 20th?

14          A.     To best of my recollection, I'm not

15   great with dates, but I believe so, yes.

16          Q.     To your understanding and it is not

17   irrelevant whether or not it was an

18   understanding you acquired in 2003 or '4 or

19   up-to-date, what interest did Donald Capoccia

20   have in BFC Construction?

21          A.     Equal to my interest for the same

22   time period.

23          Q.     What was the extent of your

24   interest in BFC Construction?

25          A.     As I said before, partner.
```

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

16

1                           BARON

2           Q.    Was there a percentage interest

3     that you had?

4           A.    Yeah, I believe one-third.

5           Q.    The other one-third was held by

6     Mr. Ferrara?

7           A.    Correct.

8           Q.    In the relevant time period, to

9     your understanding, what interest did Donald

10    Capoccia have in 105 Street Associates, LLC?

11          A.    To my understanding at this point,

12    a member.

13          Q.    Do you have an understanding as to,

14    again, what percentage membership or ownership

15    he had?

16          A.    In that case, I don't.

17          Q.    What membership did you have in 105

18    Street Associates?

19          A.    In terms of percentage, I'm not

20    aware.

21          Q.    Was there someone who had a

22    majority interest as you understand?

23          A.    Among myself and Mr. Capoccia and

24    Mr. Ferrara that wouldn't be customary.

25          Q.    So you all have one-third?

```
1                          BARON

2          A.    If there were no other partners,

3     that would be the case.

4          Q.    Do you have any understanding as to

5     what interest he held in WNC Eastern Community

6     Development Advisors, LLC?

7          A.    No.

8          Q.    Did you have an understanding as to

9     interest he held in BFC Partners, LLP?

10         A.    No.

11         Q.    Are you familiar with an individual

12    by the name Beth Berns, B-E-R-N-S?

13         A.    Yes.

14         Q.    Again, from the relevant time

15    period who was Beth Berns?

16         A.    She worked administratively on

17    development of various projects with myself and

18    my partners.

19         Q.    Was she employed by a particular

20    company?

21         A.    I mean --

22         Q.    Again, we are talking July '02 to

23    September '04?

24         A.    I don't know for a fact, I would

25    conjecture.
```

18

```
 1                         BARON
 2              MR. SCHNEIDER:  Don't conjecture.
 3         Q.    We are not looking for guesses just
 4    your best recollection?
 5         A.    I don't know.
 6         Q.    Did she have an ownership interest
 7    in any of the entities we've been speaking of?
 8         A.    An ownership interest?
 9         Q.    Yes.
10         A.    No, I wouldn't think so.
11         Q.    You don't know whether she worked
12    for any one of those entities in the relevant
13    time period?
14         A.    No.
15         Q.    In the relevant time period, did
16    you have an understanding as to who Elizabeth
17    Selby S-E-L-B-Y was?
18         A.    Yes.
19         Q.    Who is she?
20         A.    She works administratively with
21    Beth, seemingly as an assistant, something of
22    that nature.
23         Q.    Do you have understanding as to
24    which entity Miss Selby worked for?
25         A.    No.
```

```
1                         BARON

2          Q.    In the relevant time period, where

3    is the office of BFC Construction Corp.

4    located?

5          A.    2226 First Avenue.

6          Q.    Where was the office of 105 Street

7    Associates, LLC located?

8          A.    That I don't know.

9          Q.    What about WNC, et cetera?

10         A.    I don't know.

11         Q.    And BFC Partners, LLP?

12         A.    I don't know.

13         Q.    Did you know a fella by the name of

14   Brad Richards?

15         A.    Yes.

16         Q.    Who is he in the relevant time

17   period?

18         A.    During that time period, he worked

19   for 105th Street, he is a construction

20   personnel, generally.

21         Q.    He worked for 105 Street

22   Associates, LLC?

23         A.    Yes, sorry.

24         Q.    What was he, a project manager?

25         A.    Basically, yes.
```

20

```
 1                          BARON
 2          Q.    Did you know at the relevant time
 3    period an individual by the name of Estelle
 4    Rodriguez?
 5          A.    Yes.
 6          Q.    Who is she?
 7          A.    Secretary, administrative at BFC
 8    Construction.
 9          Q.    Did you have an understanding as to
10    her educational background?
11          A.    I don't know if she went to
12    college, I'm not sure.
13          Q.    Other than BFC Construction, had
14    she ever worked for BFC Partners, LLP?
15          A.    Not that I know of.
16          Q.    What about WN, et cetera?
17          A.    I don't know.
18          Q.    About 105 Street Associates?
19          A.    I don't know.
20          Q.    In the relevant time period, who,
21    if anyone, was responsible for sending Notices
22    of Claims for personal injuries to the
23    insurance broker for BFC Construction?
24          A.    Estelle.
25          Q.    What about 105 Street Associates?
```

```
 1                              BARON

 2          A.    I don't know.

 3          Q.    Now in terms of relevant time

 4    period, is it you do not know where the office

 5    of 105 Street Associates is or you don't

 6    remember?

 7          A.    I don't remember.  I would have to

 8    conjecture again.

 9          Q.    If I showed you a document would

10    that eliminate the conjecture?

11          A.    Sure, I could try.

12          Q.    Let me show you what has been

13    previously marked as Defendant's Exhibit F in a

14    May 24, 2006 deposition and I ask you whether

15    that refreshes your recollection, or as you say

16    eliminate your conjecture, concerning the

17    location of 105 Street Associates' office in

18    the relevant time period?

19          A.    That is what I would have

20    conjectured, which is 2226 First Avenue.

21          Q.    In the relevant time period, did

22    BFC Construction receive its mail at 226 First

23    Avenue?

24          A.    2226.

25          Q.    Yes, I'm sorry.
```

22

```
 1                        BARON

 2          A.     Yes, I believe so.

 3          Q.     Did 105 receive its mail at 2226

 4     First Avenue?

 5          A.     It appears so based on what I was

 6     shown.

 7          Q.     Having shown you what was

 8     previously marked as Defendant's Exhibit F, you

 9     have no reason to believe that 105 received its

10     mail any other place other than 2226 First

11     Avenue in the relevant time period?

12          A.     No reason.

13          Q.     Who opened the mail at 2226 First

14     Avenue that was sent to BFC Construction Corp.?

15          A.     Either Estelle or perhaps the

16     secretaries.

17          Q.     What about for 105?

18          A.     I don't know.

19          Q.     Was Estelle, to your understanding,

20     in charge of the secretary at 2226?

21          A.     Perhaps reluctantly so, she would

22     have over seen them.

23          Q.     Who made a determination as to who

24     opened mail addressed to BFC Construction

25     Corp., by either Estelle or the secretary,
```

23

```
 1                              BARON

 2       should be given to if there was no name on the

 3       letter?

 4            A.     Can you rephrase the question.

 5            Q.     In other words, if mail came to

 6       2226 addressed to BFC Construction, but no

 7       particular name on it, who would make a

 8       determination whether that should be given to

 9       you or to Mr. Capoccia or Brad Richards or

10       whatever?

11                  MR. SCHNEIDER:  Don't speculate.

12                  Answer it if you know.

13            A.     It would seem generally that

14       Estelle would, but not a steadfast rule.

15            Q.     Estelle would make the decision.

16            A.     Correct.

17            Q.     The people who would act on mail

18       sent to BFC Construction at 2226 would be who,

19       Mr. Capoccia or someone else?

20                  MR. SCHNEIDER:  Objection to the

21                  form of the question.  You can answer it

22                  if you understand it.

23            A.     It would depend on the content of

24       the letter.  It could be any employee depending

25       on the content.
```

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

24

```
 1                          BARON
 2          Q.     What about mail that related to
 3     Notices of Claims of workers getting hurt on a
 4     construction job for the 105th Street project?
 5          A.     I don't know.
 6          Q.     Do you know whether there was
 7     anyone who would act on Notices of Claims
 8     concerning injured construction workers on the
 9     105th Street project that were sent to 105
10     Street Associates, LLC?
11          A.     Is that the same question?
12          Q.     One was BFC Construction?
13          A.     Oh, I'm sorry, I miss understood.
14          Q.     Let me clarify then for the record.
15     If a Notice of Claim relating to an injured
16     construction worker on the project at 105th
17     Street came to 2226 First Avenue addressed to
18     BFC Construction, who would handle that?
19          A.     Generally, I would think Estelle.
20          Q.     Would she tell anybody?
21          A.     I don't know.
22          Q.     What about Bill of Particulars
23     claims for injured construction workers that
24     were addressed to 105 Street Associates at
25     2226?
```

```
 1                         BARON

 2        A.    That one I don't know.

 3        Q.    Let me show you what has been

 4   previously marked at Exhibit D at a December 5,

 5   2006 deposition?

 6        A.    Okay.

 7        Q.    Please look at it.

 8        A.    Okay.

 9        Q.    Were you aware in July of 2002

10   whether an attempt was made to have 105 Street

11   Associates, LLC be added as a named insured to

12   the construction insurance policy for BFC

13   Construction Corp.?

14        A.    Only from reading this letter.

15        Q.    So this is the first time that you

16   are aware of that?

17        A.    Yes.

18        Q.    Back then you had no knowledge?

19        A.    No.

20        Q.    Did you have an understanding that

21   North Shore Risk, I think it should be

22   Management, it is cutoff on that letter, or

23   whatever was shown on Exhibit B as the

24   insurance broker for BFC Construction Corp. in

25   July of 2002?
```

```
 1                          BARON

 2            A.    If I didn't have an understanding

 3    at that exact time, I did understand that at

 4    some point during the relevant period.

 5            Q.    Did you know whether North Shore

 6    Risk Management, during the relevant time

 7    period, was the insurance broker for 105 Street

 8    Associates, LLC?

 9            A.    No.

10            Q.    Did you ever come to learn that?

11            A.    No, it doesn't appear so based on

12    this letter.

13            Q.    I'm not limiting you to the letter.

14    Did you ever receive any information that led

15    you to understand that in July of 2002, North

16    Shore Risk Management was the broker for 105

17    Street Associates, LLC?

18            A.    No.

19            Q.    Did you ever come to understand

20    that North Shore Risk Management had been

21    terminated as the broker for BFC Construction?

22            A.    Very near the end of the relevant

23    period.

24            Q.    So it would be towards September of

25    '04?
```

```
1                        BARON

2          A.     Probably, actually possibly a

3     little later than that.  I don't recall.  I

4     think I recall it being tied to a new year.

5          Q.     To your recollection, new year of

6     '05?

7          A.     I don't remember.  In all

8     likelihood either '04 or '05.

9          Q.     Do you have an understanding as to

10    the reasons why north shore risk management was

11    terminated as a broker for BFC Construction?

12         A.     Perhaps a competitive bid from the

13    other broker.

14              MR. SCHNEIDER:  Again, don't

15         speculate.

16         A.     I have no knowledge of a specific

17    reason.

18         Q.     It's termination had nothing to do

19    with the fact it was unable to get 105th Street

20    Associates, LLC added as a named insured to the

21    construction insurance policy of BFC

22    Construction Corp. for the 105th Street

23    project?

24              MR. SCHNEIDER:  Object to the form

25         of the question, you can answer it if
```

1                          BARON

2          you can.

3          A.     No that I know of.

4          Q.     Let me show you what has been

5     previously marked as Exhibit C at a December 5,

6     2006 deposition and I ask whether you have ever

7     seen a copy of Exhibit C?

8          A.     Not that I recollect.

9          Q.     Now a letter such as Exhibit C

10    which makes reference to an incident of July 2,

11    2002 and 105th Street between Second and Third

12    Avenue, who, if anyone, would address such a

13    letter?

14         A.     This is to BFC Construction so it

15    would begin with Estelle.

16         Q.     When you say it would begin with

17    Estelle then who would it go to?

18         A.     If she needed someone else's

19    assistance, I'm sure she would ask for it, but

20    in the large majority she probably handled it

21    completely herself.

22         Q.     You don't know who she would go to

23    if she needed assistance?

24         A.     It would probably depend on the

25    situation if she needed assistance, but she

```
 1                          BARON

 2     would be the lead person.

 3              Q.     Back in 2002, was one of her job

 4     responsibilities to take a Notice of Claim for

 5     a letter such as Exhibit C forwarded onto BFC

 6     insurance broker?

 7              A.     Yeah.

 8              Q.     Let me show you what has been

 9     previously marked as Defendant's Exhibit G at a

10     December 5, 2006 deposition and I ask, have you

11     ever seen a copy of that document?

12              A.     No.

13              Q.     Let me show you what has been

14     previously marked as Exhibit D at a December 5,

15     2006 deposition and ask whether you've ever

16     seen this document?

17              A.     No.

18              Q.     Were you aware in September of '02

19     that there was an allegation that a Richard

20     Conrad had been injured at the 105th Street

21     project site?

22              A.     At that time, no.

23              Q.     Did there come a time when you

24     became aware of that?

25              A.     More recently.
```

```
 1                        BARON
 2          Q.    When?
 3          A.    Perhaps while reviewing legal
 4   bills, I may have seen the name.
 5          Q.    Let me show you what has been
 6   previously marked as Defendant's Exhibit F at a
 7   December 5, 2006 deposition, did you ever see
 8   this before?
 9          A.    No.
10          Q.    Do you recognize whose handwriting
11   it is?
12          A.    Nope.
13          Q.    Did BFC Construction have a policy
14   of preparing accident reports relating to
15   workers injured on his job sites?
16          A.    I don't know of a strict policy, it
17   would be the common sense thing to do.
18          Q.    Have you seen that done in other
19   circumstances?
20          A.    Yes.
21          Q.    Let me show you what has been
22   previously marked as Exhibit K for
23   identification at a December 5, 2006 deposition
24   and I ask whether you have ever seen this
25   document before?
```

```
 1                          BARON

 2        A.    No.

 3        Q.    Would anyone other than Estelle

 4   Rodriguez be responsible for responding to

 5   requests for documents made by a third-party

 6   claims administrator on behalf of BFC

 7   Construction Corporation's insurer?

 8        A.    When you say a third-party claims

 9   administrator, I don't understand the

10   circumstances.

11        Q.    I'm reading from the first line of

12   Exhibit K?

13        A.    Oh, I understand.  In other words,

14   they were handling the insurance company, so

15   basically it is the insurance company.

16        Q.    You know the bottom line if a

17   request such as --

18        A.    From someone that had the right to

19   request that information, then she would lead

20   the way.  She may ask for documents for people

21   in the field if that is what was being

22   requested, but she would be the one to make

23   sure it happened.

24        Q.    If the request that was being made

25   on behalf of the insurance company was to
```

                              BARON

1
2    provide copies of contracts, would that be
3    something that she would do on her own or
4    communicate the request to someone else at BFC
5    Construction Corp.?
6          A.    She would in all likelihood ask for
7    the documents from someone else, but be the
8    person responsible for getting along.
9          Q.    In 2002 would Estelle ask BFC
10   Construction Corp. for copies of contracts?
11         A.    I'm really not sure.
12         Q.    This type of communication
13   reflected by Defendant's Exhibit K would not be
14   something that you would get involved with as a
15   principal or member of BFC Construction Corp,
16   correct?
17         A.    No, only if I were responsible for
18   that project and being asked for document from
19   Estelle.
20         Q.    When you say responsible for that
21   project, would members of BFC Construction
22   Corp. have a responsibility for a particular
23   project?
24         A.    On occasion, yeah.  Commonly, I
25   would say that is the way, yeah.

```
 1                        BARON
 2        Q.      They would have a project manager
 3   reporting to them, but as the partner, so to
 4   speak, of BFC Construction that would be, you
 5   know, either your project or Mr. Capoccia's
 6   project or Ferrara's project?
 7        A.      Somewhat informally, but, yes.
 8        Q.      So looking at September 23, 2002,
 9   do you know whose project the 105th Street
10   project was?
11        A.      In that case, no, I don't know the
12   project management staff.
13        Q.      The project management staff for
14   the 105th Street job was who?
15        A.      Brad Richards, I also believe that
16   Robert Carrao, C-A-R-R-A-O, was involved.
17        Q.      Did he report to Richards or --
18        A.      Yeah, I believe he reported to
19   Richards at a more construction field level.
20        Q.      Who did Richards report to?
21        A.      I don't know that.
22        Q.      Let me show you what has been
23   previously marked as Defendant's Exhibit L at a
24   December 5, 2006 deposition and I ask whether
25   you have ever seen this document before?
```

```
 1                           BARON

 2          A.     No.

 3          Q.     In terms of who would handle it on

 4     behalf of BFC construction, would that be

 5     Estelle Richards?

 6          A.     Correct.

 7          Q.     I'm sorry, Estelle Rodriguez?

 8          A.     Yes, I apologize.

 9          Q.     If she needed some document she'd

10     ask somebody, but you don't know who, correct?

11          A.     It would depend on who would be

12     likely to have them.

13          Q.     In 2002 would Capoccia or Ferrara

14     have been likely to have contracts for the

15     105th Street project?

16          A.     I don't know which one, either

17     would have been more likely than me to, but I

18     don't know which one.

19          Q.     Let me show you what has been

20     previously marked as Exhibit N for

21     identification and I ask if you ever seen this

22     document before?

23          A.     No.

24          Q.     Aside from what you saw, Exhibit M

25     previously, were you aware that an October of
```

35

1                          BARON

2    2002 S-I-R-I-U-S Insurance Company had denied

3    coverage to BFC Construction Corp. for a claim

4    by Richard Conrad allegedly occurring on July

5    2, 2002 at the 235 East 105th Street project?

6         A.    No, not during that relevant time

7    period.

8         Q.    Did there come a time period when

9    you did learn about that?

10        A.    Much more recently.

11        Q.    When?

12        A.    It is hard to recall exactly when.

13        Q.    Generally?

14        A.    Through passing discussion in the

15   office, generally in response to legal billing.

16        Q.    When you had these passing

17   discussions, who would you have them with?

18        A.    In this case it is possible that I

19   discussed this with Brad Richards but only the

20   most quick brief couple of sentences level.

21        Q.    Do you have an understanding that

22   BFC Construction started a lawsuit against

23   Sirius America Insurance Company arising out of

24   this matter?

25        A.    Yes.

```
 1                       BARON

 2          Q.    How did you come to have that

 3    understanding?

 4          A.    In the same manner, through

 5    follow-up on ongoing legal matters.

 6          Q.    When you say follow-up, what do you

 7    mean by that?

 8          A.    Generally, I take some

 9    responsibility for filing legal bills, making

10    sure the lawyer gets paid so I ask them

11    questions about those things.

12          Q.    Other than reviewing the legal

13    bills, are you the person for communicating

14    with the attorney who is handling the lawsuit

15    involving Sirius Insurance Company?

16          A.    No.

17          Q.    Who is the point person?

18          A.    I'm really not sure.  I don't even

19    know when the decision was made to file the

20    suit.

21          Q.    Who would be the one to make the

22    decision to authorize counsel to file suit

23    against Sirius Insurance Company?

24          A.    In this case I can only guess it

25    would be a member.
```

```
 1                          BARON
 2          Q.    So it would be one of the partners
 3    of BFC Construction?
 4          A.    Yes.
 5          Q.    The membership of that partnership
 6    has changed because Gregg Baron has now
 7    substituted for you; is that correct?
 8          A.    Correct and Peter Ferrara.
 9          Q.    Peter Ferrara substituted for who?
10          A.    Joe.
11          Q.    For Joe Ferrara?
12          A.    Yes.
13          Q.    But before Gregg Baron and Peter
14    Ferrara were substituted in as partners, who,
15    if anyone, at BFC Construction Corp. would have
16    made the decision to authorize Counsels to see
17    Sirius Insurance Company?
18                MR. SCHNEIDER:  Asked and answered.
19          You can answer again, but don't
20          speculate.
21          A.    One of the three partners and in
22    this case not myself.
23          Q.    So, that would leave Mr. Capoccia
24    --
25          A.    Or Mr. Ferrara.
```

```
 1                         BARON

 2          Q.     Let me show you what has been

 3     marked as Exhibit O for identification at a

 4     December 5, 2006 deposition, I ask whether you

 5     have ever seen this before?

 6          A.     I can't really see it now.  Up to

 7     now, I haven't.

 8          Q.     Have you ever discussed the

 9     substance of Exhibit O with anyone?

10          A.     No.

11          Q.     Who is Gregg Cross?

12          A.     Chief financial officer.

13          Q.     Of?

14          A.     BFC Construction.

15          Q.     What point in time?

16          A.     During the relevant period.

17          Q.     Is he still the CFO?

18          A.     Of BFC?

19          Q.     Yes.

20          A.     Not that I am aware of.

21          Q.     In the relevant time period who was

22     the CFO to your understanding of 105 Street

23     Associates, LLC?

24          A.     I'm not sure.

25          Q.     Who was the CFO of BFC Partners,
```

```
 1                        BARON

 2    LLP?

 3          A.     I'm not sure.

 4          Q.     Gregg Baron, is that your bother?

 5          A.     Yes.

 6          Q.     Do you have an understanding as to

 7    whether Gregg Baron spoke to the managing

 8    director of North Shore Risk Management,

 9    Mr. Potolsky concerning the contents of

10    Exhibit O?

11          A.     No.

12          Q.     The relevant time period was Donald

13    Schneider and/or his firm Counsel for BFC

14    Construction Corp.?

15          A.     I don't know that far back whether

16    he was or not.

17          Q.     When did you become aware for the

18    first time that Donald Schneider and/or his

19    firm was Counsel for BFC Construction Corp.?

20          A.     Probably end of '04 to '05, perhaps

21    a little earlier.

22          Q.     Did you ever come to learn whether

23    Mr. Schneider and/or his firm is counsel for

24    105 Street Associates?

25          A.     No.
```

40

1                          BARON

2          Q.     In determining whether to authorize

3    Mr. Schneider and/or his firm to perform legal

4    services on behalf of BFC construction whose

5    decision would that be?

6          A.     Ultimately a partner's decision.

7          Q.     Would that decision by a partner be

8    made in consultation with the other partners?

9          A.     Not necessarily.

10         Q.     So one partner can decide to have a

11   lawyer do something without telling the other

12   two?

13         A.     Basically, yeah.

14         Q.     You do not know who, if anyone,

15   authorized him to start a lawsuit on behalf of

16   BFC Construction Corp. against Sirius, correct?

17         A.     No.

18         Q.     Do you have an understanding as to

19   who determined to have Mr. Schneider and/or his

20   firm start a lawsuit on behalf of 105 Street

21   Associates, LLC against Greenwich Insurance

22   Company?

23         A.     No, I don't.

24         Q.     Let me show you what was been

25   marked as Defendant's Exhibit Q. at a December

```
 1                          BARON

 2      5, 2006 deposition and I ask whether you have

 3      ever seen this document before?

 4              A.    Nope.

 5              Q.    Do you know whether as a result of

 6      receiving this letter Mr. Schneider and/or his

 7      firm was contacted to take action against

 8      Sirius America Insurance Company?

 9              A.    Only after the fact.

10              Q.    When you say after the fact, when

11      did you become aware?

12              A.    More recent discussions in the

13      legal circumstances.

14              Q.    When did you have those

15      discussions?

16              A.    Six months.

17              Q.    Six months ago?

18              A.    Maybe a year.

19              Q.    Some would be --

20              A.    '06.

21              Q.    Sometime in '06?

22              A.    Uh-huh.

23              Q.    Who did you have the discussions

24      with?

25              A.    In all likelihood, Mr. Schneider.
```

```
 1                          BARON
 2         Q.    What were the circumstances under
 3    which you had with Mr. Schneider?
 4               MR. SCHNEIDER:  At this point, I
 5               would caution the witness in answering
 6               that question not to disclose any
 7               substance of conversations we had.
 8         A.    I don't recall a specific
 9    circumstance we have discussed it but Estelle
10    is the only person I would have discussed it
11    with or learned it from but I don't recall a
12    specific conversation with Donald regarding
13    this case during that time.
14         Q.    Does Mr. Schneider and/or his firm
15    keep you personally apprised of the status of
16    lawsuit against Sirius?
17         A.    Not as a steadfast rule.
18         Q.    Whether or not it is a steadfast
19    rule, does he provide status reports concerning
20    the progress?
21         A.    To me personally?
22         Q.    Yes.
23         A.    No.
24         Q.    Who does he provide it to?
25         A.    I don't know.
```

```
1                          BARON

2          Q.    What about Greenwich Insurance

3    Company on behalf of 105 Street Associates,

4    LLC?

5          A.    Who would he report?

6          Q.    Yes.

7          A.    I don't know.

8          Q.    Have you given any depositions in

9    the lawsuit against Sirius?

10         A.    I don't think so, no.

11         Q.    Have you ever given a deposition

12   prior to today?

13         A.    Yes.

14         Q.    In other matters?

15         A.    Yeah, I think one other.

16         Q.    So you understand what I meant by

17   have you given a deposition?

18         A.    I sat at this table and had a

19   similar conversation.

20         Q.    But you are not sure if it was in

21   regard to Sirius?

22         A.    I know that it wasn't.

23         Q.    Have you been asked to provide any

24   material from Mr. Schneider concerning the BFC

25   lawsuit against Sirius Insurance Company?
```

```
 1                         BARON

 2         A.    No.

 3         Q.    Have you been asked to give any

 4    material to him and/or his firm concerning the

 5    105 Street Associates lawsuit against

 6    Greenwich?

 7         A.    No.

 8         Q.    The circumstances where you

 9    discussed the lawsuit by BFC Construction

10    against Sirius, was that over the phone, in

11    Mr. Schneider's office or something else?

12         A.    I don't recall the specifics.

13         Q.    Do you recall what gave rise to the

14    discussion about the lawsuit against Sirius?

15         A.    Perhaps today's proceedings, the

16    requirement of me to scheduling this

17    deposition.

18         Q.    But nothing other than that?

19         A.    No.

20         Q.    In preparing for your deposition

21    today, did you have to review any material?

22         A.    No.

23         Q.    Let me show you what has been

24    previously marked as Exhibit E at a May 24,

25    2006 deposition and my first question to you is
```

```
 1                      BARON

 2    whether you had an understanding whether

 3    Mr. Donald Capoccia was the agent to receive

 4    Service of Process from the Department of State

 5    for BFC Construction company?

 6            A.    I did not know that that was the

 7    case.

 8            Q.    Have you ever seen a copy of

 9    Exhibit E before?

10            A.    No.

11            Q.    Do you know whether the office of

12    BFC Partners, LLP was located at 2226 First

13    Avenue in 2004?

14            A.    I don't know.

15            Q.    For how long as of April 2004 had

16    2226 First Avenue been the office for BFC

17    Construction you know your best estimation?

18            A.    Probably going on ten years,

19    possibly.

20            Q.    Between April of '04 and September

21    20th of '04, had the office of BFC Construction

22    moved to another location other than 2226 First

23    Avenue?

24            A.    Not that I know of.

25            Q.    Had the office of 105 Street
```

```
 1                      BARON

 2   Associates, LLC been located at 2226 First

 3   Avenue in April of '04?

 4          A.    I don't know.  I was guessing

 5   before that was where it was located and

 6   confirmed it with the letter, but during that

 7   time period I don't know.

 8          Q.    Are you aware of whether the office

 9   of 105th Street Associates moved from 2226

10   First Avenue at any time between April of '04

11   and September of '04?

12          A.    I'm not aware of that.

13          Q.    Since you have been a member or

14   partner of BFC Construction, has it been sued?

15          A.    Yes.

16          Q.    Do you recall whether BFC

17   construction was served with suit papers, you

18   know a Summons and Complaint?

19          A.    I'm sure it was, I don't recall.

20          Q.    Who deals with that at BFC

21   Construction?

22          A.    Estelle.

23          Q.    Would she tell anyone that BFC

24   Construction has been sued?

25          A.    Probably only the most relevant
```

```
 1                         BARON

 2     people.

 3           Q.      Those the partners?

 4           A.      Not necessarily all the partners.

 5     Whichever one might be closely associated with

 6     the circumstances.

 7           Q.      Does Estelle Rodriguez have the

 8     authority to obtain Counsel?

 9           A.      No.

10           Q.      That is left to one of the

11     partners?

12           A.      Yeah, it is probably exclusive.

13           Q.      Do you know whether Capoccia is the

14     agent for Service of Process for BFC Partners

15     in April of '04?

16           A.      No.

17           Q.      You don't know whether Mr. Capoccia

18     was the agent for Service of Process for 105

19     Street Associates, LLC in the relevant time

20     period?

21           A.      No.

22           Q.      Do you know who would be notified

23     of the members or partners of 105 Street

24     Associates LLC concerning the service of

25     lawsuits on it?
```

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

48

```
 1                          BARON

 2         A.    No.

 3         Q.    Do you know who would have the

 4    authority at 105 Street Associates to retain

 5    counsel in the event it was sued?

 6         A.    A partner.

 7         Q.    Other than knowing that

 8    Mr. Capoccia was a member of 105 Street

 9    Associates, do you have an understanding as to

10    who, if anyone else, was?

11         A.    105 Street Associates, anybody

12    other than Mr. Capoccia was a member.

13         Q.    Right?

14         A.    Joseph Ferrara, myself.

15         Q.    You were a partner in the period of

16    July '02 through September '04, correct?

17         A.    That I don't know, we are speaking

18    of 105th Street.

19         Q.    Correct, 105 Street Associates,

20    LLC?

21         A.    I don't know the dates relating to

22    that.

23         Q.    Did you cease becoming a member of

24    105?

25         A.    Not that I know of.
```

```
 1                          BARON
 2          Q.    So it is still ongoing?
 3          A.    Yeah.
 4          Q.    The construction is finished on
 5   that project?
 6          A.    That is my understanding.
 7          Q.    But 105 is still in existence to
 8   operate and manage it?
 9          A.    I don't know that it has any
10   existing operating function.
11          Q.    Do you know if the relevant time
12   period whether Capoccia was the agent for
13   Service of Process for BFC Construction Corp.?
14          A.    No.
15          Q.    In terms of lawsuits against BFC
16   Construction Corp., other than Estelle
17   Rodriguez handling it, would any of the members
18   get involved?
19          A.    I need you to ask that again, I
20   apologize.
21          Q.    In the event of a lawsuit against
22   BFC Construction Corp. other than Estelle
23   Rodriguez, would any of the members get
24   involved in handling the lawsuit?
25                MR. SCHNEIDER:  Objection to the
```

```
 1                        BARON

 2          form of the question.  You can answer if

 3          you understand?

 4          A.    Again, it is something where if

 5    they were closely involved with the project or

 6    associated with it, they would probably come

 7    involved.

 8          Q.    Let me show you has been marked as

 9    Exhibit F at a May 24, 2006 deposition and ask

10    if you have ever seen this before?

11          A.    No.

12          Q.    The person who would respond to

13    this on behalf of the 105 Street Associates, do

14    you know who that would be?

15          A.    No.

16          Q.    You were never advised of a claim

17    being made against 105 Street Associates, LLC

18    with respect to the Richard Conrad matter?

19          A.    During the relevant time period,

20    not that I recall.

21          Q.    When did you become aware of it?

22          A.    The same answer with regard to

23    discussions stemming from legal bills.

24          Q.    Did you have any discussions with

25    Mr. Schneider concerning the lawsuit against
```

```
 1                        BARON

 2    105 by Richard Conrad within '06?

 3         A.    Yes.

 4         Q.    Did those discussions relate to,

 5    you know, coming here for the deposition?

 6         A.    Mostly, yes.

 7         Q.    But there were discussions other

 8    than coming here for this deposition?

 9         A.    Perhaps a few quick questions as to

10    what I recall or knew about these.

11         Q.    Did you have any knowledge or

12    recollection about the Conrad lawsuit?

13         A.    Nothing.

14         Q.    Let me show you what has been

15    marked as Exhibit T at a December 5th '06

16    deposition and I ask whether you had an

17    awareness that BFC Partners was sued by Richard

18    Conrad?

19         A.    BFC Partners?

20         Q.    Yes.

21         A.    I had one discussion about it.

22         Q.    With who?

23         A.    Estelle.

24         Q.    What did she say to you?

25         A.    She asked me about BFC Partners.
```

52

```
 1                          BARON
 2          Q.    Do you recall what she asked?
 3          A.    What the entity was.
 4          Q.    Did you tell her?
 5          A.    I didn't know.
 6          Q.    Are you familiar with a lawsuit
 7    entitled Reglodo, R-E-G-L-O-D-O verses BFC
 8    Construction Corp.?
 9          A.    I have heard that name.
10          Q.    Do you know what it involves?
11          A.    I believe an injury.
12          Q.    To a worker on a project?
13          A.    Yes.
14          Q.    Was it the 105th Street project?
15          A.    I don't know.
16          Q.    Are you aware that a lawsuit has
17    been brought on behalf the BFC Construction
18    Corp. against an insurance company concerning
19    the regular lawsuit?
20          A.    No.
21          Q.    Let me show you what was been
22    marked at Exhibit W at a December 5th '06
23    deposition and I ask whether you have seen a
24    copy of that document before?
25          A.    I don't recall seeing this.
```

```
 1                        BARON

 2          Q.    Let me ask you in August of 2004,

 3    to the extent that Mr. Schneider copied you on

 4    those documents, do you recall receiving those

 5    documents?

 6                 MR. SCHNEIDER:  Objection to the

 7            form of that question.  Answer it if you

 8            can.

 9          Q.    Were you ever made aware in August

10    of 2004 that Mr. Schneider had sent you

11    something and you never received it?

12          A.    No, I don't recall.

13          Q.    As far as you know, whatever

14    Mr. Schneider sent you you get?

15          A.    In some form, yeah.

16          Q.    Is there any question as to whether

17    he copied you a letter to someone whether you'd

18    get it?

19                 MR. SCHNEIDER:  Objection to the

20            form of the question.  Answer it if you

21            can.

22          Q.    Let me rephrase it.  Do you have

23    any reason to believe that if Mr. Schneider

24    copied you on a letter in August of '04 that

25    you wouldn't get it?
```

1                        BARON

2          A.    It is possible.

3          Q.    But you are not aware of any

4    instances?

5          A.    Nothing specific, no.

6          Q.    Have you had a chance to look at

7    this August 18 '04 letter that is part of

8    Exhibit W?

9          A.    Okay.

10         Q.    Do you recall any discussions had

11   between you Mr. Capoccia and Mr. Richards

12   concerning the substance of Mr. Schneider's

13   letter to Mr. Potolsky?

14         A.    No.

15         Q.    Were you aware of Mr. Potolsky

16   having sent a letter of July 26, '04 indicating

17   that there was no coverage for 105th Street

18   Associates, LLP at the time of the incident?

19         A.    No.

20         Q.    Were you aware of any coverage

21   being denied to 105 Street Associates for the

22   Conrad lawsuit?

23         A.    No.

24         Q.    Did you have any discussions with

25   in Schneider concerning the substance of the

1                          BARON

2    August 18, 2004 letter?

3         A.    No.

4         Q.    Did you have any discussions with

5    Mr. Schneider concerning Potolsky's letter of

6    July 26th, indicating that there was no

7    coverage for 105 Street Associates at the time

8    of the incident?

9         A.    Any discussions with Mr. Schneider

10   regarding this letter to Mr. Potolsky.

11        Q.    No, Potolsky's letter of July 26th?

12        A.    No.

13        Q.    Did you have any discussion at any

14   time prior to August 18th with Mr. Capoccia

15   about getting Mr. Schneider involved in writing

16   to Mr. Potolsky concerning the Richard Conrad

17   claim?

18        A.    No.

19        Q.    Do you know how it came that

20   Mr. Schneider wrote to Mr. Potolsky concerning

21   the Richard Conrad claim?

22        A.    No.

23        Q.    Let me show you what has been

24   previously marked as Exhibit A at a December 5,

25   2006 deposition and I ask whether you have ever

56

1                          BARON

2    seen that before?

3         A.    I don't recall seeing this letter.

4         Q.    And again the fact that you were

5    copied on the letter, does that refresh your

6    recollection as to whether you received it?

7         A.    No.

8         Q.    The fact that you were copied on

9    the letter does that lead you to believe that

10   you did in fact receive it?

11        A.    I'm not sure actually how this

12   works, whether the sender of the letter sent

13   specific copies or someone in my office makes

14   copies, I don't recall.

15        Q.    Back in August of '04, if you were

16   copied on correspondence that you know was sent

17   to you, would you in fact receive mail that was

18   addressed to you?

19        A.    I'm seems likely, yes.

20        Q.    You are not aware that there was a

21   time period in August where you weren't getting

22   your mail?

23        A.    No, no.

24        Q.    Did you call Steve Potolsky at any

25   time after August 18, 2004 to discuss with him

1                              BARON

2    the declaration of coverage to BFC Construction

3    Corp?

4              A.      Regarding a specific case.

5              Q.      Yes, concerning the Conrad case?

6              A.      No.

7              Q.      Have you ever spoken with

8    Mr. Potolsky concerning the denial of coverage

9    to BFC Construction concerning the Conrad case?

10             A.      No.

11             Q.      Have you ever spoken with

12   Mr. Potolsky concerning the denial of coverage

13   to 105 Street Associates, LLC arising from the

14   Conrad case?

15             A.      Nope.

16             Q.      Let me show you what has been

17   marked as Exhibit 7 at a June 5, 2006

18   deposition and I ask whether you have ever seen

19   a copy of that document before?

20             A.      No.

21             Q.      Let me show you what has been

22   previously marked as Exhibit 8 at a June 5,

23   2006 deposition and I ask whether you have ever

24   seen a copy of this?

25             A.      No.

```
 1                      BARON

 2          Q.     Did you ever have a discussion with

 3    Brad Richards concerning the denial of coverage

 4    by Greenwich Insurance Company to 105 Street

 5    Associates, LLC concerning the claim by Richard

 6    Conrad arising from an alleged injury of July

 7    2, 2002?

 8          A.     Not that I recall.

 9          Q.     Back in 2004 would Brad Richards

10    bring to the attention of one of the partners

11    of 105 Street Associates the fact that its

12    insurance company had to deny coverage for a

13    claim?

14               MR. SCHNEIDER:  I object to the

15          form of the question that it seems to me

16          to call for speculation, but answer if

17          you can.

18          A.     I don't think it would be him.  I

19    think it would probably be Estelle.

20          Q.     If he got a letter saying an

21    insurance company for 105th Street Associates

22    denied coverage for a claim, would he bring

23    that to the attention of someone other than

24    Estelle?

25          A.     No, if he received a letter, it
```

1                        BARON

2    would be through Estelle and if she told a

3    partner, she would tell him that and I don't

4    think he would tell anybody.

5              If he received a letter addressed

6    to him, he would bring it to Estelle.

7         Q.    He would not communicate with any

8    of the partners?

9              MR. SCHNEIDER:    Objection.    Calls

10         for speculation.

11        A.    I would really think he would go

12   back to Estelle.

13        Q.    Have you provided any documents to

14   Mr. Schneider concerning the claim by 105th

15   Street Associates between Greenwich Insurance

16   Company?

17        A.    Say that again.

18        Q.    Have you personally either sent or

19   had someone send at your direction any document

20   to Mr. Schneider concerning the lawsuit by

21   105th Street Associates against Greenwich

22   Insurance Company?

23        A.    No, not that I recall.

24        Q.    Have you had any discussions?

25        A.    I apologize.    I need to clarify

60

```
 1                            BARON
 2    something.  In the last question you were
 3    asking me if a letter came regarding 105th
 4    Street to Brad Richards.
 5          Q.    If a letter came to Mr. Richards
 6    addressed to 105 Street Associates?
 7          A.    I apologize, I miss understood.
 8          Q.    Let's make sure we have the record
 9    clear.  Exhibit 8 is a letter that went to
10    Mr. Richards dated September 20, 2005 addressed
11    to 105th Street Associates, LLC that in
12    substance denied coverage to 105 Street
13    Associates for the Conrad claim?
14          A.    I understand.
15          Q.    Is that information that
16    Mr. Richards would keep to himself or
17    communicate to somebody?
18          A.    He would communicate it to
19    somebody.  I can't speculate as to whom, but it
20    wouldn't be Estelle.
21          Q.    He would take it to a member then?
22          A.    Yes.
23          Q.    The members of 105th Street back
24    then were Mr. Capoccia you and Mr. Ferrara?
25          A.    I'm getting so tired, it is hard to
```

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

```
1                          BARON

2    remember.  During the relevant period, correct.

3         Q.    You don't recall Richard

4    communicating this to you?

5         A.    Not to me, know.

6         Q.    You don't recall having any

7    discussions with Mr. Capoccia or Mr. Ferrara

8    concerning the denial of claims?

9         A.    Not a member.

10        Q.    When was the first time you became

11   aware that Greenwich Insurance denied coverage

12   to 105th Street Associates in the Conrad claim?

13        A.    In preparation for this deposition.

14        Q.    That discussion was with

15   Mr. Schneider?

16        A.    I don't remember the specific

17   circumstances.

18              (Continued on next page to include

19         jurat.)

20

21

22

23

24

25
```

```
 1                         BARON

 2         Q.    The first discussion you had with

 3    Mr. Schneider related to the need for your to

 4    appear for a deposition, when was that?

 5         A.    Sometime in the last six months,

 6    thereabouts.

 7              MR. FUERTH:  No further questions.

 8              (Whereupon, at 1:42 p.m., the

 9         Examination of this Witness was

10         concluded.)

11

12

13                    _____
                              BRANDON BARON

14

15    Subscribed and sworn to before me

16    this _____ day of _____, 2006.

17    _____

18         NOTARY PUBLIC

19

20

21

22

23

24

25
```

Diamond Reporting -718-624-7200- 16 Court Street, B'klyn, NY 11241

```
 1                          BARON

 2                 C E R T I F I C A T E

 3
        STATE OF NEW YORK      )
 4                       :  SS.:
        COUNTY OF KINGS         )
 5

 6

 7         I, KELLI CELENTANO, a Notary Public for

 8    and within the State of New York, do hereby

 9    certify:

10         That the witness whose examination is

11    hereinbefore set forth was duly sworn and that

12    such examination is a true record of the

13    testimony given by that witness.

14         I further certify that I am not related

15    to any of the parties to this action by blood

16    or by marriage and that I am in no way

17    interested in the outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto set

19    my hand this 18th day of December, 2006.

20

21                    _____

22                         KELLI CELENTANO

23

24

25
```

ERRATA SHEET

Page Line          Original Text                    Correction

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____

_____  _____     _____          _____


_____          _____
        (Witness Name)                              (Witness Signature)

Subscribed and sworn to before me
this _____ day of _____, 2006

_____
        NOTARY PUBLIC

**Look-See Concordance Report**

- - -

UNIQUE WORDS: **765**
TOTAL OCCURRENCES: **3,124**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **8,671**

- - -

SINGLE FILE CONCORDANCE

- - -

CASE INSENSITIVE

- - -

INCLUDES ALL TEXT
OCCURRENCES

- - -

DATES **ON**

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS **ON**

─────── **– 0 –** ───────

**02** [3]
*17:22; 29:18; 48:16*
**04** [15]
*17:23; 26:25; 27:8; 39:20;
45:20, 21; 46:3, 10, 11;
47:15; 48:16; 53:24; 54:7, 16;
56:15*
**05** [3]
*27:6, 8; 39:20*
**05-cv-9938** [1]
*1:6*
**06** [5]
*41:20, 21; 51:2, 15; 52:22*

─────── **– 1 –** ───────

**10004** [2]
*1:19; 2:5*
**10017** [1]
*2:10*
**105** [56]
*1:3, 15; 5:19; 8:20; 9:21;
10:8, 25; 12:7, 22; 13:5, 10,
23; 14:6, 14, 22; 15:5; 16:10,
17; 19:6, 21; 20:18, 25; 21:5,
17; 22:3, 9, 17; 24:9, 24;
25:10; 26:7, 16; 38:22; 39:24;
40:20; 43:3; 44:5; 45:25;
47:18, 23; 48:4, 8, 11, 19, 24;
49:7; 50:13, 17; 51:2; 54:21;
55:7; 57:13; 58:4, 11; 60:6,
12*
**105th** [29]
*7:20; 8:4, 9; 10:15; 12:13;
19:19; 24:4, 9, 16; 27:19, 22;
28:11; 29:20; 33:9, 14; 34:15;
35:5; 46:9; 48:18; 52:14;
54:17; 58:21; 59:14, 21; 60:3,
11, 23; 61:12*
**11978** [1]
*5:13*
**11:40** [1]
*1:11*
**150** [1]
*2:10*
**18** [4]
*14:5; 54:7; 55:2; 56:25*
**18th** [2]

─────── **– 2 –** ───────

*55; 63:19*
**1:42** [1]
*62:8*

**2** [8]
*6:17, 21; 7:6; 8:7, 16; 28:10;
35:5; 58:7*
**20** [7]
*6:18, 21; 7:7; 8:8, 17; 11:22;
60:10*
**2002** [16]
*6:17, 21; 7:6; 8:7, 17; 25:9,
25; 26:15; 28:11; 29:3; 32:9;
33:8; 34:13; 35:2, 5; 58:7*
**2003** [1]
*15:18*
**2004** [15]
*6:18, 22; 7:7; 8:8, 17; 10:21;
11:22; 15:10; 45:13, 15; 53:2,
10; 55:2; 56:25; 58:9*
**2005** [1]
*60:10*
**2006** [18]
*1:10; 21:14; 25:5; 28:6;
29:10, 15; 30:7, 23; 33:24;
38:4; 41:2; 44:25; 50:9;
55:25; 57:17, 23; 62:16;
63:19*
**20th** [3]
*15:11, 13; 45:21*
**221** [2]
*3:2; 4:2*
**221.1** [1]
*3:3*
**221.2** [2]
*3:17; 4:7*
**221.3** [1]
*4:3*
**2226** [16]
*19:5; 21:20, 24; 22:3, 10, 13,
20; 23:6, 18; 24:17, 25;
45:12, 16, 22; 46:2, 9*
**226** [1]
*21:22*
**23** [1]
*33:8*
**235** [1]
*35:5*
**24** [3]
*21:14; 44:24; 50:9*
**26** [1]
*54:16*
**26th** [2]
*55:6, 11*

─────── **– 3 –** ───────

**31** [1]
*3:10*
**3115** [3]
*3:5, 14, 21*

─────── **– 4 –** ───────

**4** [1]
*15:18*
**42nd** [1]
*2:10*
**490** [1]
*5:12*

─────── **– 5 –** ───────

**5** [12]
*25:4; 28:5; 29:10, 14; 30:7,
23; 33:24; 38:4; 41:2; 55:24;
57:17, 22*
**5th** [2]
*51:15; 52:22*

─────── **– 7 –** ───────

**7** [2]
*1:10; 57:17*

─────── **– 8 –** ───────

**8** [2]
*57:22; 60:9*

─────── **– 9 –** ───────

**90** [2]
*1:18; 2:5*

─────── **– A –** ───────

**a.m.** [1]
*1:11*
**accident** [1]
*30:14*
**accompanied** [1]
*3:22*
**acquired** [1]
*15:18*
**act** [2]
*23:17; 24:7*
**action** [3]
*5:16; 41:7; 63:15*
**activity** [1]
*7:14*
**added** [2]
*25:11; 27:20*
**address** [1]
*28:12*
**addressed** [8]
*22:24; 23:6; 24:17, 24; 56:18;
59:5; 60:6, 10*
**administrative** [1]
*20:7*
**administratively** [2]
*17:16; 18:20*
**administrator** [2]
*31:6, 9*
**advised** [1]
*50:16*
**advisors** [4]
*9:6; 14:8; 15:6; 17:6*
**agent** [4]
*45:3; 47:14, 18; 49:12*
**agreed** [4]
*4:11, 14, 16, 20*
**agreement** [1]
*1:17*
**allegation** [1]
*29:19*
**alleged** [1]
*58:6*
**allegedly** [1]
*35:4*
**america** [2]
*35:23; 41:8*
**answer** [21]
*3:8, 12, 17, 21, 22, 23; 5:23;*

*10:2, 11; 14:2; 23:12, 21;
27:25; 37:19; 50:2, 22; 53:7,
20; 58:16*
**answered** [3]
*3:20; 4:6; 37:18*
**answering** [1]
*42:5*
**anybody** [3]
*24:20; 48:11; 59:4*
**apologize** [4]
*34:8; 49:20; 59:25; 60:7*
**appear** [2]
*26:11; 62:4*
**appears** [1]
*22:5*
**apply** [1]
*3:9*
**apprised** [1]
*42:15*
**appropriate** [2]
*3:9; 4:17*
**april** [5]
*45:15, 20; 46:3, 10; 47:15*
**arising** [3]
*35:23; 57:13; 58:6*
**article** [1]
*3:10*
**aside** [1]
*34:24*
**asking** [2]
*12:13; 60:3*
**assistance** [3]
*28:19, 23, 25*
**assistant** [1]
*18:21*
**associate** [1]
*9:17*
**associated** [2]
*47:5; 50:6*
**associates** [58]
*1:3, 15; 5:19; 8:20; 9:22;
10:9; 11:2; 12:8, 23; 13:5, 11,
23; 14:6, 14, 23; 15:5; 16:10,
18; 19:7, 22; 20:18, 25; 21:5,
17; 24:10, 24; 25:11; 26:8,
17; 27:20; 38:23; 39:24;
40:21; 43:3; 44:5; 46:2, 9;
47:19, 24; 48:4, 9, 11, 19;
50:13, 17; 54:18, 21; 55:7;
57:13; 58:5, 11, 21; 59:15,
21; 60:6, 11, 13; 61:12*
**attempt** [1]
*25:10*
**attendance** [1]
*3:15*
**attention** [2]
*58:10, 23*
**attorney** [4]
*3:12, 21; 4:4; 36:14*
**attorneys** [4]
*2:4, 9; 4:20, 22*
**august** [9]
*53:2, 9, 24; 54:7; 55:2, 14;
56:15, 21, 25*
**authority** [2]
*47:8; 48:4*
**authorize** [3]
*36:22; 37:16; 40:2*
**authorized** [1]
*40:15*
**avenue** [14]

*8:10; 19:5; 21:20, 23; 22:4,*
*11, 14; 24:17; 28:12; 45:13,*
*16, 23; 46:3, 10*
**aware** [25]
*8:11; 9:8; 11:19; 12:19; 13:4;*
*14:25; 16:20; 25:9, 16; 29:18,*
*24; 34:25; 38:20; 39:17;*
*41:11; 46:8, 12; 50:21; 52:16;*
*53:9; 54:3, 15, 20; 56:20;*
*61:11*
**awareness** [1]
*51:17*

**– B –**

**b‑e‑r‑n‑s** [1]
*17:12*
**background** [2]
*6:9; 20:10*
**baron** [11]
*1:16; 5:10, 14; 9:18; 12:4;*
*15:4; 37:6, 13; 39:4, 7; 62:13*
**based** [4]
*9:18; 11:6; 22:5; 26:11*
**basically** [3]
*19:25; 31:15; 40:13*
**basis** [2]
*3:13, 23*
**beach** [1]
*5:12*
**becoming** [1]
*48:23*
**behalf** [9]
*31:6, 25; 34:4; 40:4, 15, 20;*
*43:3; 50:13; 52:17*
**believe** [12]
*11:15; 12:25; 15:8, 15; 16:4;*
*22:2, 9; 33:15, 18; 52:11;*
*53:23; 56:9*
**berns** [2]
*17:12, 15*
**beth** [3]
*17:12, 15; 18:21*
**bfc** [88]
*6:23; 7:8, 12; 8:8; 9:14, 21;*
*10:8, 16; 11:2, 12; 13:11, 18,*
*19, 22, 23; 14:5, 7, 12, 13,*
*21, 22; 15:4, 6, 12, 20, 24;*
*17:9; 19:3, 11; 20:7, 13, 14,*
*23; 21:22; 22:14, 24; 23:6,*
*18; 24:12, 18; 25:12, 24;*
*26:21; 27:11, 21; 28:14; 29:5;*
*30:13; 31:6; 32:4, 9, 15, 21;*
*33:4; 34:4; 35:3, 22; 37:3, 15;*
*38:14, 18, 25; 39:13, 19;*
*40:4, 16; 43:24; 44:9; 45:5,*
*12, 16, 21; 46:14, 16, 20, 23;*
*47:14; 49:13, 15, 22; 51:17,*
*19, 25; 52:7, 17; 57:2, 9*
**bid** [1]
*27:12*
**bill** [1]
*24:22*
**billing** [1]
*35:15*
**bills** [4]
*30:4; 36:9, 13; 50:23*
**blood** [1]
*63:15*
**bloomfield** [2]
*1:18; 2:4*

**bother** [1]
*39:4*
**brad** [7]
*19:14; 23:9; 33:15; 35:19;*
*58:3, 9; 60:4*
**brandon** [3]
*1:16; 5:10; 62:13*
**brief** [1]
*35:20*
**broad** [2]
*1:18; 2:5*
**broker** [8]
*20:23; 25:24; 26:7, 16, 21;*
*27:11, 13; 29:6*
**brooklyn** [1]
*7:22*

**– C –**

**c‑a‑p** [1]
*11:16*
**c‑a‑p‑o‑c‑c‑i‑a** [1]
*11:17*
**c‑a‑r‑r‑a‑o** [1]
*33:16*
**call** [2]
*56:24; 58:16*
**calls** [2]
*9:25; 59:9*
**capoccia** [20]
*11:16; 12:17; 15:19; 16:10,*
*23; 23:9, 19; 34:13; 37:23;*
*45:3; 47:13, 17; 48:8, 12;*
*49:12; 54:11; 55:14; 60:24;*
*61:7*
**capoccia's** [1]
*33:5*
**carrao** [1]
*33:16*
**case** [13]
*13:14; 16:16; 17:3; 33:11;*
*35:18; 36:24; 37:22; 42:13;*
*45:7; 57:4, 5, 9, 14*
**caution** [1]
*42:5*
**cease** [1]
*48:23*
**celentano** [2]
*63:7, 22*
**certify** [2]
*63:9, 14*
**cetera** [3]
*9:9; 19:9; 20:16*
**cfo** [3]
*38:17, 22, 25*
**chance** [1]
*54:6*
**change** [2]
*11:22, 24*
**changed** [1]
*37:6*
**charge** [2]
*4:21; 22:20*
**chief** [1]
*38:12*
**circumstance** [1]
*42:9*
**circumstances** [8]
*10:23; 30:19; 31:10; 41:13;*
*42:2; 44:8; 47:6; 61:17*
**civil** [1]

**3:5**
**claim** [12]
*24:15; 29:4; 35:3; 50:16;*
*55:17, 21; 58:5, 13, 22;*
*59:14; 60:13; 61:12*
**claims** [7]
*20:22; 24:3, 7, 23; 31:6, 8;*
*61:8*
**clarify** [2]
*24:14; 59:25*
**clear** [3]
*3:13, 23; 60:9*
**clerk** [1]
*4:12*
**cluster** [2]
*7:25; 8:2*
**college** [2]
*6:10; 20:12*
**combinations** [1]
*14:15*
**coming** [2]
*51:5, 8*
**comments** [1]
*3:15*
**common** [1]
*30:17*
**commonly** [1]
*32:24*
**communicate** [4]
*32:4; 59:7; 60:17, 18*
**communicating** [3]
*4:4; 36:13; 61:4*
**communication** [4]
*4:3, 5, 7; 32:12*
**communications** [1]
*6:14*
**community** [5]
*9:5; 13:24; 14:7; 15:6; 17:5*
**company** [22]
*1:7; 5:20; 17:20; 31:14, 15,*
*25; 35:2, 23; 36:15, 23;*
*37:17; 40:22; 41:8; 43:3, 25;*
*45:5; 52:18; 58:4, 12, 21;*
*59:16, 22*
**competitive** [1]
*27:12*
**complaint** [1]
*46:18*
**complete** [1]
*3:24*
**completely** [1]
*28:21*
**compliance** [1]
*3:6*
**concerning** [24]
*5:18; 21:16; 24:8; 39:9;*
*42:19; 43:24; 44:4; 47:24;*
*50:25; 52:18; 54:12, 25; 55:5,*
*16, 20; 57:5, 8, 9, 12; 58:3, 5;*
*59:14, 20; 61:8*
**concluded** [1]
*62:10*
**conclusion** [2]
*9:25; 11:7*
**conduct** [2]
*3:2; 4:2*
**confidentiality** [1]
*3:18*
**confirmed** [1]
*46:6*
**conjecture** [8]

*3:5*
*12:15, 16; 14:18; 17:25; 18:2;*
*21:8, 10, 16*
**conjectured** [1]
*21:20*
**connection** [1]
*10:4*
**conrad** [15]
*29:20; 35:4; 50:18; 51:2, 12,*
*18; 54:22; 55:16, 21; 57:5, 9,*
*14; 58:6; 60:13; 61:12*
**consent** [1]
*4:5*
**construction** [78]
*6:24; 7:8, 13, 15, 17; 8:8;*
*10:8, 16; 11:2, 12; 13:11, 19,*
*23; 14:6, 14, 21; 15:4, 12, 20,*
*24; 19:3, 19; 20:8, 13, 23;*
*21:22; 22:14, 24; 23:6, 18;*
*24:4, 8, 12, 16, 18, 23; 25:12,*
*13, 24; 26:21; 27:11, 21, 22;*
*28:14; 30:13; 31:7; 32:5, 10,*
*15, 21; 33:4, 19; 34:4; 35:3,*
*22; 37:3, 15; 38:14; 39:14,*
*19; 40:4, 16; 44:9; 45:5, 17,*
*21; 46:14, 17, 21, 24; 49:4,*
*13, 16, 22; 52:8, 17; 57:2, 9*
**consultation** [1]
*40:8*
**contacted** [1]
*41:7*
**content** [2]
*23:23, 25*
**contents** [1]
*39:9*
**continued** [1]
*61:18*
**contracting** [2]
*6:16; 7:3*
**contractor** [1]
*11:5*
**contracts** [3]
*32:2, 10; 34:14*
**controlling** [1]
*4:18*
**conversation** [2]
*42:12; 43:19*
**conversations** [1]
*42:7*
**copied** [6]
*53:3, 17, 24; 56:5, 8, 16*
**copies** [3]
*32:2, 10; 56:13, 14*
**copy** [7]
*4:21; 28:7; 29:11; 45:8;*
*52:24; 57:19, 24*
**corp** [27]
*7:8; 8:8; 10:8; 11:3; 13:12;*
*15:5; 19:3; 22:14, 25; 25:13,*
*24; 27:22; 32:5, 10, 15, 22;*
*35:3; 37:15; 39:14, 19; 40:16;*
*49:13, 16, 22; 52:8, 18; 57:3*
**corporation** [2]
*7:10; 14:10*
**corporation's** [1]
*31:7*
**correspondence** [1]
*56:16*
**counsel** [6]
*36:22; 39:13, 19, 23; 47:8;*
*48:5*
**counsels** [1]

37:16
**county** [2]
1:2; 63:4
**couple** [1]
35:20
**course** [1]
3:14
**court** [6]
1:2; 3:19; 4:12; 5:23, 25; 6:5
**coverage** [12]
35:3; 54:17, 20; 55:7; 57:2, 8,
12; 58:3, 12, 22; 60:12; 61:11
**cplr** [6]
3:10, 14, 21; 4:15, 17, 18
**credits** [1]
6:13
**cross** [1]
38:11
**crown** [1]
7:25
**cs** [1]
11:17
**current** [1]
10:13
**customary** [1]
16:24
**cutoff** [1]
25:22

**– D –**

**date** [1]
1:10
**dated** [1]
60:10
**dates** [3]
6:20; 15:15; 48:21
**day** [2]
62:16; 63:19
**deals** [1]
46:20
**december** [14]
1:10; 25:4; 28:5; 29:10, 14;
30:7, 23; 33:24; 38:4; 40:25;
51:15; 52:22; 55:24; 63:19
**decide** [1]
40:10
**decision** [7]
23:15; 36:19, 22; 37:16; 40:5,
6, 7
**declaration** [1]
57:2
**deemed** [1]
4:17
**defect** [1]
3:13
**defendant** [3]
1:8, 16; 2:9
**defendant's** [7]
21:13; 22:8; 29:9; 30:6;
32:13; 33:23; 40:25
**degree** [1]
6:12
**denial** [4]
57:8, 12; 58:3; 61:8
**denied** [5]
35:2; 54:21; 58:22; 60:12;
61:11
**deny** [1]
58:12
**department** [1]

45:
**depend** [3]
23:23; 28:24; 34:11
**depending** [1]
23:24
**deponent** [6]
3:12, 17, 21, 23; 4:3, 5
**deposition** [33]
3:4, 7, 8, 11, 18, 25; 4:4;
21:14; 25:5; 28:6; 29:10, 15;
30:7, 23; 33:24; 38:4; 41:2;
43:11, 17; 44:17, 20, 25;
50:9; 51:5, 8, 16; 52:23;
55:25; 57:18, 23; 61:13; 62:4
**depositions** [4]
3:2, 3; 4:2; 43:8
**determination** [2]
22:23; 23:8
**determined** [1]
40:19
**determining** [2]
4:6; 40:2
**development** [8]
9:5; 10:16; 11:5; 13:7; 14:8;
15:6; 17:6, 17
**dicker** [1]
2:9
**direct** [1]
3:21
**direction** [2]
3:22; 59:19
**director** [1]
39:8
**disclose** [1]
42:6
**discuss** [1]
56:25
**discussed** [5]
35:19; 38:8; 42:9, 10; 44:9
**discussion** [8]
12:25; 35:14; 44:14; 51:21;
55:13; 58:2; 61:14; 62:2
**discussions** [14]
35:17; 41:12, 15, 23; 50:23,
24; 51:4, 7; 54:10, 24; 55:4,
9; 59:24; 61:7
**document** [12]
21:9; 29:11, 16; 30:25; 32:18;
33:25; 34:9, 22; 41:3; 52:24;
57:19; 59:19
**documents** [6]
31:5, 20; 32:7; 53:4, 5; 59:13
**doesn't** [1]
26:11
**donald** [8]
2:6; 11:16; 15:19; 16:9;
39:12, 18; 42:12; 45:3
**duly** [2]
5:3; 63:11
**dune** [1]
5:12

**– E –**

**east** [2]
2:10; 35:5
**eastern** [5]
9:5; 13:24; 14:7; 15:5; 17:5
**edelman** [1]
2:9
**educational** [2]

6:8; 20:10
**effect** [1]
4:12
**eliminate** [2]
21:10, 16
**elizabeth** [1]
18:16
**else's** [1]
28:18
**elser** [1]
2:8
**employed** [4]
6:15, 18, 22; 17:19
**employee** [1]
23:24
**employment** [2]
7:11, 12
**end** [3]
7:2; 26:22; 39:20
**enforce** [1]
3:19
**entities** [6]
10:5; 14:9, 11; 15:10; 18:7,
12
**entitled** [1]
52:7
**entity** [12]
8:20; 9:4, 8, 14; 10:15, 16,
17; 11:5, 6; 13:7; 18:24; 52:3
**equal** [1]
15:21
**equivalent** [2]
7:18; 8:25
**error** [1]
3:13
**esq** [2]
2:6, 11
**esqs** [2]
2:4, 9
**estelle** [27]
20:3, 24; 22:15, 19, 25;
23:14, 15; 24:19; 28:15, 17;
31:3; 32:9, 19; 34:5, 7; 42:9;
46:22; 47:7; 49:16, 22; 51:23;
58:19, 24; 59:2, 6, 12; 60:20
**estimate** [1]
7:5
**estimation** [1]
45:17
**et** [3]
9:9; 19:9; 20:16
**event** [3]
4:7; 48:5; 49:21
**exact** [2]
15:11; 26:3
**exactly** [1]
35:12
**examination** [8]
1:14; 3:15; 4:14, 21; 5:6;
62:9; 63:10, 12
**examined** [1]
5:4
**examining** [1]
3:24
**example** [1]
14:12
**except** [5]
3:4, 6, 14, 18, 21
**exclusive** [1]
47:12
**exhibit** [31]

21:13; 22:8; 25:4, 23; 28:5, 7,
9; 29:5, 9, 14; 30:6, 22;
31:12; 32:13; 33:23; 34:20,
24; 38:3, 9; 39:10; 40:25;
44:24; 45:9; 50:9; 51:15;
52:22; 54:8; 55:24; 57:17, 22;
60:9
**existence** [1]
49:7
**existing** [1]
49:10
**extent** [5]
3:14; 9:24; 10:12; 15:23; 53:3

**– F –**

**f-e-r-r-a-r-a** [1]
11:15
**fact** [10]
9:18; 17:24; 27:19; 41:9, 10;
56:4, 8, 10, 17; 58:11
**fall** [1]
7:4
**familiar** [2]
17:11; 52:6
**fella** [1]
19:13
**ferrara** [14]
11:13; 12:4, 17; 16:6, 24;
34:13; 37:8, 9, 11, 14, 25;
48:14; 60:24; 61:7
**ferrara's** [1]
33:6
**field** [4]
7:14, 16; 31:21; 33:19
**file** [2]
36:19, 22
**filing** [1]
36:9
**financial** [1]
38:12
**finished** [2]
5:22; 49:4
**firm** [8]
39:13, 19, 23; 40:3, 20; 41:7;
42:14; 44:4
**first** [19]
5:3; 19:5; 21:20, 22; 22:4, 10,
13; 24:17; 25:15; 31:11;
39:18; 44:25; 45:12, 16, 22;
46:2, 10; 61:10; 62:2
**follow-up** [2]
36:5, 6
**following** [1]
13:6
**follows** [1]
5:5
**force** [1]
4:12
**form** [10]
3:13; 10:11; 14:2; 23:21;
27:24; 50:2; 53:7, 15, 20;
58:15
**formation** [1]
13:5
**formed** [1]
13:2
**forming** [1]
12:22
**forth** [3]
3:19; 4:6; 63:11

forwarded [1]
  29:5
four [1]
  6:13
frame [2]
  12:10, 11
framed [1]
  3:11
fuerth [5]
  2:11; 5:7, 15; 12:9; 62:7
function [2]
  7:12; 49:10
furnished [1]
  4:21

– G –

gave [1]
  44:13
gestures [1]
  6:2
gets [1]
  36:10
give [2]
  5:22; 44:3
given [8]
  3:8; 14:17; 23:2, 8; 43:8, 11,
  17; 63:13
glen [1]
  5:15
glenn [1]
  2:11
goldstein [2]
  1:18; 2:4
graduate [1]
  6:11
great [1]
  15:15
greenwich [10]
  1:7; 5:15, 20; 40:21; 43:2;
  44:6; 58:4; 59:15, 21; 61:11
gregg [7]
  12:4; 15:4; 37:6, 13; 38:11;
  39:4, 7
grounds [1]
  4:6
guess [2]
  8:25; 36:24
guesses [1]
  18:3
guessing [1]
  46:4

– H –

hampton [1]
  5:12
hand [1]
  63:19
handle [2]
  24:18; 34:3
handled [1]
  28:20
handling [4]
  31:14; 36:14; 49:17, 24
handwriting [1]
  30:10
hard [2]
  35:12; 60:25
haven't [2]
  14:17; 38:7
heard [2]

heights [1]
  9:11;
  7:25
held [4]
  1:17; 16:5; 17:5, 9
hereby [1]
  63:8
herein [1]
  4:22
hereinbefore [1]
  63:11
hereto [2]
  4:18, 21
hereunto [1]
  63:18
hurt [1]
  24:3

– I –

identification [3]
  30:23; 34:21; 38:3
ii [1]
  3:18
iii [1]
  3:19
improper [1]
  3:20
incident [3]
  28:10; 54:18; 55:8
include [2]
  3:13; 61:18
index [1]
  1:5
indicate [1]
  8:15
indicating [2]
  54:16; 55:6
individual [2]
  17:11; 20:3
informally [1]
  33:7
information [3]
  26:14; 31:19; 60:15
injured [5]
  24:8, 15, 23; 29:20; 30:15
injuries [1]
  20:22
injury [2]
  52:11; 58:6
instances [1]
  54:4
insurance [28]
  1:7; 5:16, 20; 20:23; 25:12,
  24; 26:7; 27:21; 29:6; 31:14,
  15, 25; 35:2, 23; 36:15, 23;
  37:17; 40:21; 41:8; 43:2, 25;
  52:18; 58:4, 12, 21; 59:15,
  22; 61:11
insured [2]
  25:11; 27:20
insurer [1]
  31:7
interest [22]
  7:7; 8:19; 9:4, 7, 13, 16;
  13:11; 14:19, 20, 22; 15:3, 9,
  19, 21, 24; 16:2, 9, 22; 17:5,
  9; 18:6, 8
interested [1]
  63:17
interfere [1]

3:15
interposed [1]
  3:6
interrupt [1]
  4:4
involved [8]
  8:9; 32:14; 33:16; 49:18, 24;
  50:5, 7; 55:15
involvement [1]
  8:3
involves [1]
  52:10
involving [1]
  36:15
irregularity [1]
  3:13
irrelevant [1]
  15:17

– J –

job [5]
  8:12; 24:4; 29:3; 30:15; 33:14
joe [2]
  37:10, 11
joseph [2]
  11:13; 48:14
judge [1]
  4:12
july [16]
  6:17, 21; 7:6; 8:7, 16; 17:22;
  25:9, 25; 26:15; 28:10; 35:4;
  48:16; 54:16; 55:6, 11; 58:6
june [2]
  57:17, 22
jurat [1]
  61:19

– K –

keep [2]
  42:15; 60:16
kelli [2]
  63:7, 22
kings [1]
  63:4
knowing [2]
  11:4; 48:7
knowledge [3]
  25:18; 27:16; 51:11

– L –

large [1]
  28:20
last [3]
  11:14; 60:2; 62:5
law [1]
  3:5
lawsuit [20]
  5:18; 35:22; 36:14; 40:15, 20;
  42:16; 43:9, 25; 44:5, 9, 14;
  49:21, 24; 50:25; 51:12; 52:6,
  16, 19; 54:22; 59:20
lawsuits [2]
  47:25; 49:15
lawyer [2]
  36:10; 40:11
lead [3]
  29:2; 31:19; 56:9
learn [3]
  26:10; 35:9; 39:22

learned [1]
  42:11
leave [1]
  37:23
legal [9]
  9:25; 30:3; 35:15; 36:5, 9, 12;
  40:3; 41:13; 50:23
let's [2]
  14:21; 60:8
letter [30]
  23:3, 24; 25:14, 22; 26:12,
  13; 28:9, 13; 29:5; 41:6; 46:6;
  53:17, 24; 54:7, 13, 16; 55:2,
  5, 10, 11; 56:3, 5, 9, 12;
  58:20, 25; 59:5; 60:3, 5, 9
level [2]
  33:19; 35:20
light [1]
  14:16
likelihood [4]
  10:22; 27:8; 32:6; 41:25
limitation [1]
  3:19
limiting [1]
  26:13
line [2]
  31:11, 16
llc [37]
  1:3, 15; 5:19; 8:20, 22; 9:6,
  22; 10:9; 11:2; 12:8, 23; 13:5,
  23; 14:6, 8; 15:5, 6; 16:10;
  17:6; 19:7, 22; 24:10; 25:11;
  26:8, 17; 27:20; 38:23; 40:21;
  43:4; 46:2; 47:19, 24; 48:20;
  50:17; 57:13; 58:5; 60:11
llp [8]
  9:21; 15:7; 17:9; 19:11;
  20:14; 39:2; 45:12; 54:18
located [6]
  8:9; 19:4, 7; 45:12; 46:2, 5
location [2]
  21:17; 45:22

– M –

mail [10]
  21:22; 22:3, 10, 13, 24; 23:5,
  17; 24:2; 56:17, 22
main [1]
  7:14
majority [2]
  16:22; 28:20
manage [1]
  49:8
management [9]
  7:19; 25:22; 26:6, 16, 20;
  27:10; 33:12, 13; 39:8
manager [2]
  19:24; 33:2
managing [1]
  39:7
manhattan [2]
  8:4, 10
manner [1]
  36:4
marked [19]
  21:13; 22:8; 25:4; 28:5; 29:9,
  14; 30:6, 22; 33:23; 34:20;
  38:3; 40:25; 44:24; 50:8;
  51:15; 52:22; 55:24; 57:17,
  22

**marriage** [1]
63:16

**material** [3]
43:24; 44:4, 21

**matter** [3]
35:24; 50:18; 63:17

**matters** [2]
36:5; 43:14

**mean** [2]
17:21; 36:7

**meant** [1]
43:16

**member** [12]
7:9; 8:21; 12:7; 16:12; 32:15;
36:25; 46:13; 48:8, 12, 23;
60:21; 61:9

**members** [6]
11:21; 32:21; 47:23; 49:17,
23; 60:23

**membership** [3]
16:14, 17; 37:5

**miss** [3]
18:24; 24:13; 60:7

**months** [3]
41:16, 17; 62:5

**morning** [1]
5:14

**moskowitz** [1]
2:8

**mostly** [1]
51:6

**moved** [2]
45:22; 46:9

**mr** [73]
5:7, 14; 9:23; 10:10; 12:9;
13:25; 16:6, 23, 24; 18:2;
23:9, 11, 19, 20; 27:14, 24;
33:5; 37:18, 23, 25; 39:9, 23;
40:3, 19; 41:6, 25; 42:3, 4,
14; 43:24; 44:11; 45:3; 47:17;
48:8, 12; 49:25; 50:25; 53:3,
6, 10, 14, 19, 23; 54:11, 12,
13, 15; 55:5, 9, 10, 14, 15,
16, 20; 57:8, 12; 58:14; 59:9,
14, 20; 60:5, 10, 16, 24; 61:7,
15; 62:3, 7

**myself** [5]
11:7; 16:23; 17:17; 37:22;
48:14

– N –

**name** [11]
5:8, 14; 9:11; 11:14; 17:12;
19:13; 20:3; 23:2, 7; 30:4;
52:9

**named** [3]
13:8; 25:11; 27:20

**nature** [1]
18:22

**nope** [1]
30:12; 41:4; 57:15

**north** [6]
25:21; 26:5, 15, 20; 27:10;
39:8

**notary** [5]
1:20; 4:11; 5:3; 62:18; 63:7

**note** [1]
6:2

**noted** [1]
3:7

**noti..** [1]
24:15; 29:4

**notices** [3]
20:21; 24:3, 7

**notified** [1]
47:22

– O –

**object** [3]
9:23; 27:24; 58:14

**objection** [10]
3:11, 17; 10:10, 11; 13:25;
23:20; 49:25; 53:6, 19; 59:9

**objections** [1]
3:3, 4, 7, 9, 10

**obtain** [1]
47:8

**occasion** [1]
32:24

**occurring** [1]
35:4

**october** [1]
34:25

**office** [12]
19:3, 6; 21:4, 17; 35:15;
44:11; 45:11, 16, 21, 25;
46:8; 56:13

**officer** [3]
3:7; 8:23; 38:12

**offices** [1]
1:17

**oh** [2]
24:13; 31:13

**okay** [1]
8:18; 25:6, 8; 54:9

**one-third** [3]
16:4, 5, 25

**ongoing** [2]
36:5; 49:2

**opened** [2]
22:13, 24

**operate** [1]
49:8

**operating** [1]
49:10

**order** [1]
3:19

**outcome** [1]
63:17

**owners** [1]
12:2

**ownership** [6]
14:11, 20, 22; 16:14; 18:6, 8

– P –

**p.m.** [1]
62:8

**pacific** [1]
7:25

**page** [1]
61:18

**paid** [1]
36:10

**papers** [1]
46:17

**parent** [1]
14:9

**part** [1]
54:7

**particulars** [1]

24:22

**parties** [4]
4:5, 17, 21; 63:15

**partner** [15]
7:10, 13; 8:23; 9:2; 11:11, 12;
12:7; 15:25; 33:3; 40:7, 10;
46:14; 48:6, 15; 59:3

**partner's** [1]
40:6

**partners** [34]
9:14, 21; 11:18, 25; 12:2, 16;
13:19, 24; 14:7, 12, 21, 22;
15:7; 17:2, 9, 18; 19:11;
20:14; 37:2, 14, 21; 38:25;
40:8; 45:12; 47:3, 4, 11, 14,
23; 51:17, 19, 25; 58:10; 59:8

**partnership** [2]
11:21; 37:5

**party** [1]
3:24

**passing** [2]
35:14, 16

**people** [3]
23:17; 31:20; 47:2

**percentage** [4]
14:13; 16:2, 14, 19

**perform** [1]
40:3

**period** [48]
6:17, 23, 25; 7:9; 8:7, 16; 9:3,
9, 12, 19; 10:6; 11:7; 12:5,
22, 24; 13:16; 14:17; 15:2, 8,
22; 16:8; 17:15; 18:13, 15;
19:2, 17, 18; 20:3, 20; 21:4,
18, 21; 22:11; 26:4, 7, 23;
35:7, 8; 38:16, 21; 39:12;
46:7; 47:20; 48:15; 49:12;
50:19; 56:21; 61:2

**permitted** [1]
3:14

**person** [9]
3:9, 20; 5:24; 29:2; 32:8;
36:13, 17; 42:10; 50:12

**personal** [1]
20:22

**personally** [3]
42:15, 21; 59:18

**personnel** [1]
19:20

**persons** [1]
3:15

**peter** [4]
12:4; 37:8, 9, 13

**phone** [1]
44:10

**place** [1]
22:10

**plainly** [1]
3:20

**plaintiff** [2]
1:4, 15

**plaintiffs** [1]
2:4

**please** [2]
5:8; 25:7

**point** [6]
12:3; 16:11; 26:4; 36:17;
38:15; 42:4

**policy** [4]
25:12; 27:21; 30:13, 16

**position** [2]

7:12; 12:3

**potolsky** [9]
39:9; 54:13, 15; 55:10, 16,
20; 56:24; 57:8, 12

**potolsky's** [2]
55:5, 11

**practice** [1]
3:5

**prejudice** [1]
3:20

**preparation** [1]
61:13

**preparing** [2]
30:14; 44:20

**presently** [1]
6:15

**preserve** [1]
3:18

**previously** [14]
21:13; 22:8; 25:4; 28:5; 29:9,
14; 30:6, 22; 33:23; 34:20,
25; 44:24; 55:24; 57:22

**principal** [1]
32:15

**prior** [1]
43:12; 55:14

**privilege** [1]
3:18

**proceed** [1]
3:8

**proceedings** [1]
44:15

**process** [4]
45:4; 47:14, 18; 49:13

**progress** [1]
42:20

**project** [30]
7:18, 20; 8:4, 9, 13; 10:14;
13:7; 19:24; 24:4, 9, 16;
27:23; 29:21; 32:18, 21, 23;
33:2, 5, 6, 9, 10, 12, 13;
34:15; 35:5; 49:5; 50:5;
52:12, 14

**projects** [2]
7:23; 17:17

**provide** [4]
32:2; 42:19, 24; 43:23

**provided** [4]
3:21; 4:15, 17; 59:13

**public** [5]
1:20; 4:12; 5:3; 62:18; 63:7

**purpose** [3]
4:4, 5; 12:22

**purposes** [1]
4:15

**pursuant** [3]
1:17; 3:5, 9

– Q –

**question** [18]
3:19, 24; 4:6; 5:22; 6:4; 14:2;
23:4, 21; 24:11; 27:25; 42:6;
44:25; 50:2; 53:7, 16, 20;
58:15; 60:2

**questioning** [2]
3:12, 16

**questions** [8]
3:17; 5:18; 14:5; 36:11; 51:9;
62:7

**quick** [2]

35:20; 51:9

**– R –**

**r-e-g-l-o-d-o** [1]
  *52:7*
**raised** [1]
  *3:11*
**read** [1]
  *6:6*
**reading** [2]
  *25:14; 31:11*
**reason** [6]
  *4:7; 13:4; 22:9, 12; 27:17;*
  *53:23*
**reasons** [1]
  *27:10*
**recall** [24]
  *10:20, 23; 27:3, 4; 35:12;*
  *42:8, 11; 44:12, 13; 46:16,*
  *19; 50:20; 51:10; 52:22, 25;*
  *53:4, 12; 54:10; 56:3, 14;*
  *58:8; 59:23; 61:3, 6*
**receive** [6]
  *21:22; 22:3; 26:14; 45:3;*
  *56:10, 17*
**received** [5]
  *22:9; 53:11; 56:6; 58:25; 59:5*
**receiving** [2]
  *41:6; 53:4*
**recent** [1]
  *41:12*
**recently** [2]
  *29:25; 35:10*
**recognize** [2]
  *30:10*
**recollect** [1]
  *28:8*
**recollection** [7]
  *8:21; 15:14; 18:4; 21:15;*
  *27:5; 51:12; 56:6*
**record** [16]
  *4:8; 5:9; 9:24; 24:14; 60:8;*
  *63:12*
**reference** [1]
  *28:10*
**reflected** [1]
  *32:13*
**refresh** [1]
  *56:5*
**refreshes** [1]
  *21:15*
**refusal** [2]
  *3:17, 22*
**regard** [2]
  *43:21; 50:22*
**regarding** [4]
  *42:12; 55:10; 57:4; 60:3*
**reglodo** [1]
  *52:7*
**regular** [1]
  *52:19*
**relate** [1]
  *51:4*
**related** [3]
  *24:2; 62:3; 63:14*
**relating** [3]
  *24:15; 30:14; 48:21*
**relation** [1]
  *10:14*
**relationship** [5]

9:20; 1      , 25; 13:18, 22
**relevant** [29]
  *12:5, 10, 21; 13:16; 15:2;*
  *16:8; 17:14; 18:12, 15; 19:2,*
  *16; 20:2, 20; 21:3, 18, 21;*
  *22:11; 26:4, 6, 22; 35:6;*
  *38:16, 21; 39:12; 46:25;*
  *47:19; 49:11; 50:19; 61:2*
**relief** [1]
  *3:9*
**reluctantly** [1]
  *22:21*
**remainder** [1]
  *3:24*
**remember** [6]
  *11:8; 21:6, 7; 27:7; 61:2, 16*
**rephrase** [3]
  *6:5; 23:4; 53:22*
**report** [3]
  *33:17, 20; 43:5*
**reported** [1]
  *33:18*
**reporter** [3]
  *5:23; 6:2, 5*
**reporting** [1]
  *33:3*
**reports** [2]
  *30:14; 42:19*
**represent** [1]
  *5:15*
**representing** [1]
  *4:22*
**request** [5]
  *3:12; 31:17, 19, 24; 32:4*
**requested** [1]
  *31:22*
**requests** [1]
  *31:5*
**requirement** [1]
  *44:16*
**reside** [1]
  *5:11*
**respect** [2]
  *4:18; 50:18*
**respective** [1]
  *4:20*
**respond** [1]
  *50:12*
**responding** [1]
  *31:4*
**response** [1]
  *35:15*
**responses** [2]
  *5:24, 25*
**responsibilities** [2]
  *8:12; 29:4*
**responsibility** [2]
  *32:22; 36:9*
**responsible** [5]
  *20:21; 31:4; 32:8, 17, 20*
**restricted** [1]
  *3:10*
**result** [1]
  *41:5*
**retain** [1]
  *48:4*
**review** [1]
  *44:21*
**reviewing** [2]
  *30:3; 36:12*
**richard** [9]

29:19; 35:4; 50:18; 51   17;
  *55:16, 21; 58:5; 61:3*
**richards** [15]
  *19:14; 23:9; 33:15, 17, 19,*
  *20; 34:5; 35:19; 54:11; 58:3,*
  *9; 60:4, 5, 10, 16*
**right** [6]
  *3:9, 18, 24; 7:2; 31:18; 48:13*
**rights** [1]
  *4:17*
**rise** [1]
  *44:13*
**risk** [6]
  *25:21; 26:6, 16, 20; 27:10;*
  *39:8*
**riverview** [2]
  *6:16; 7:3*
**road** [1]
  *5:12*
**robert** [1]
  *33:16*
**rodriguez** [6]
  *20:4; 31:4; 34:7; 47:7; 49:17,*
  *23*
**rule** [8]
  *3:5, 7, 14, 21; 23:14; 42:17,*
  *19*
**rules** [4]
  *3:2, 6; 4:2, 7*

**– S –**

**s-e-l-b-y** [1]
  *18:17*
**s-i-r-i-u-s** [1]
  *35:2*
**sat** [1]
  *43:18*
**saying** [1]
  *58:20*
**scheduling** [1]
  *44:16*
**schneider** [43]
  *1:18; 2:4, 6; 9:23; 10:10;*
  *12:9; 13:25; 18:2; 23:11, 20;*
  *27:14, 24; 37:18; 39:13, 18,*
  *23; 40:3, 19; 41:6, 25; 42:3,*
  *4, 14; 43:24; 49:25; 50:25;*
  *53:3, 6, 10, 14, 19, 23; 54:25;*
  *55:5, 9, 15, 20; 58:14; 59:9,*
  *14, 20; 61:15; 62:3*
**schneider's** [2]
  *44:11; 54:12*
**second** [2]
  *8:10; 28:11*
**secretaries** [1]
  *22:16*
**secretary** [3]
  *20:7; 22:20, 25*
**section** [1]
  *4:6*
**sections** [1]
  *4:18*
**seemingly** [1]
  *18:21*
**selby** [2]
  *18:17, 24*
**send** [1]
  *59:19*
**sender** [1]
  *56:12*

**sending** [1]
  *20:21*
**sense** [1]
  *30:17*
**sentences** [1]
  *35:20*
**separate** [1]
  *14:5*
**september** [17]
  *6:18, 21; 7:6; 8:7, 17; 11:22;*
  *15:10, 11, 13; 17:23; 26:24;*
  *29:18; 33:8; 45:20; 46:11;*
  *48:16; 60:10*
**served** [1]
  *46:17*
**service** [5]
  *45:4; 47:14, 18, 24; 49:13*
**services** [1]
  *40:4*
**she'd** [1]
  *34:9*
**shore** [6]
  *25:21; 26:5, 16, 20; 27:10;*
  *39:8*
**show** [18]
  *21:12; 25:3; 28:4; 29:8, 13;*
  *30:5, 21; 33:22; 34:19; 38:2;*
  *40:24; 44:23; 50:8; 51:14;*
  *52:21; 55:23; 57:16, 21*
**signed** [2]
  *4:11, 12*
**significant** [1]
  *3:20*
**simultaneously** [1]
  *7:23*
**sirius** [12]
  *35:23; 36:15, 23; 37:17;*
  *40:16; 41:8; 42:16; 43:9, 21,*
  *25; 44:10, 14*
**site** [1]
  *29:21*
**sites** [1]
  *30:15*
**situation** [1]
  *28:25*
**six** [3]
  *41:16, 17; 62:5*
**somebody** [3]
  *34:10; 60:17, 19*
**someone** [10]
  *16:21; 23:19; 28:18; 31:18;*
  *32:4, 7; 53:17; 56:13; 58:23;*
  *59:19*
**somewhat** [2]
  *8:25; 33:7*
**sorry** [4]
  *19:23; 21:25; 24:13; 34:7*
**sort** [1]
  *9:10*
**speak** [1]
  *33:4*
**speaking** [4]
  *3:10; 12:11; 18:7; 48:17*
**specific** [8]
  *13:14; 27:16; 42:8, 12; 54:5;*
  *56:13; 57:4; 61:16*
**specifics** [1]
  *44:12*
**speculate** [4]
  *23:11; 27:15; 37:20; 60:19*
**speculation** [2]

58:16; 59:10

**spell** [1]
11:14

**spoke** [1]
39:7

**spoken** [2]
57:7, 11

**ss** [1]
63:4

**staff** [2]
33:12, 13

**stands** [1]
9:18

**start** [2]
40:15, 20

**started** [1]
35:22

**state** [7]
1:2, 20; 5:4, 8; 45:4; 63:3, 8

**stated** [2]
3:11; 4:7

**statement** [2]
3:13, 23

**statements** [1]
3:15

**status** [2]
42:15, 19

**steadfast** [3]
23:14; 42:17, 18

**stemming** [1]
50:23

**steve** [1]
56:24

**stipulated** [4]
4:11, 14, 16, 20

**street** [82]
1:3, 15, 19; 2:5, 10; 5:19;
7:21; 8:4, 9, 20; 9:21; 10:9,
15; 11:2; 12:7, 13, 23; 13:5,
10, 23; 14:6, 14, 23; 15:5;
16:10, 18; 19:6, 19, 21;
20:18, 25; 21:5, 17; 24:4, 9,
10, 17, 24; 25:10; 26:7, 17;
27:19, 22; 28:11; 29:20; 33:9,
14; 34:15; 35:5; 38:22; 39:24;
40:20; 43:3; 44:5; 45:25;
46:9; 47:19, 23; 48:4, 8, 11,
18, 19; 50:13, 17; 52:14;
54:17, 21; 55:7; 57:13; 58:4,
11, 21; 59:15, 21; 60:4, 6, 11,
12, 23; 61:12

**strict** [1]
30:16

**subdivision** [3]
3:5, 6, 22

**subject** [1]
3:9

**subscribed** [1]
62:15

**substance** [5]
38:9; 42:7; 54:12, 25; 60:12

**substituted** [3]
37:7, 9, 14

**succinct** [1]
3:23

**succinctly** [2]
3:11; 4:8

**sued** [4]
46:14, 24; 48:5; 51:17

**suggest** [1]
3:12

**suit** [1]
36:20, 22; 46:17

**summons** [1]
46:18

**sumpreme** [1]
1:2

**sworn** [3]
5:3; 62:15; 63:11

**– T –**

**table** [1]
43:18

**talking** [3]
8:16; 9:12; 17:22

**telling** [2]
11:8; 40:11

**ten** [1]
45:18

**terminated** [2]
26:21; 27:11

**termination** [1]
27:18

**terms** [4]
16:19; 21:3; 34:3; 49:15

**testified** [1]
5:5

**testifying** [1]
4:22

**testimony** [1]
63:13

**thereabouts** [1]
62:6

**therefor** [1]
3:23

**they're** [1]
12:2

**third** [2]
8:10; 28:11

**third-party** [2]
31:5, 8

**three** [1]
37:21

**tied** [1]
27:4

**tired** [1]
60:25

**today's** [1]
44:15

**towards** [1]
26:24

**transcript** [1]
4:11

**trial** [2]
1:14; 4:14

**true** [1]
63:12

**type** [1]
32:12

**– U –**

**uh-huh** [1]
41:22

**ultimately** [1]
40:6

**unable** [2]
6:2; 27:19

**understand** [12]
6:4, 6; 16:22; 23:22; 26:3, 15,
19; 31:9, 13; 43:16; 50:3;
60:14

**understanding** [38]
8:6; 9:20; 10:3, 7, 13, 19, 24;
12:6, 20, 21; 13:2, 10, 15, 17,
21; 15:3, 16, 18; 16:9, 11, 13;
17:4, 8; 18:16, 23; 20:9;
22:19; 25:20; 26:2; 27:9;
35:21; 36:3; 38:22; 39:6;
40:18; 45:2; 48:9; 49:6

**understood** [2]
24:13; 60:7

**uniform** [2]
3:2; 4:2

**up-to-date** [1]
15:19

**utilized** [1]
4:14

**– V –**

**vague** [1]
9:10

**verbal** [1]
5:25

**versa** [1]
13:12

**verses** [1]
52:7

**vice** [1]
13:12

**– W –**

**wait** [1]
5:21

**waived** [2]
3:6; 4:17

**we've** [1]
18:7

**weren't** [1]
56:21

**west** [2]
5:12; 6:16

**whereof** [1]
63:18

**whereupon** [1]
62:8

**whichever** [1]
47:5

**wilson** [1]
2:8

**witness** [9]
1:16; 4:22; 5:2; 12:12; 42:5;
62:9; 63:10, 13, 18

**wn** [1]
20:16

**wnc** [7]
9:5, 9; 13:24; 14:7; 15:5;
17:5; 19:9

**words** [2]
23:5; 31:13

**work** [1]
8:3

**worked** [6]
17:16; 18:11, 24; 19:18, 21;
20:14

**worker** [2]
24:16; 52:12

**workers** [3]
24:3, 8, 23; 30:15

**works** [2]
18:20; 56:12

**wouldn't** [4]
16:24; 18:10; 53:25; 60:20

**writing** [1]
55:15

**wrong** [1]
14:24

**wrote** [1]
55:20

**– Y –**

**yeah** [13]
8:11; 10:22; 16:4; 29:7;
32:24, 25; 33:18; 40:13;
43:15; 47:12; 49:3; 53:15

**year** [3]
27:4, 5; 41:18

**years** [1]
45:18

**york** [13]
1:2, 19, 20; 2:5, 10; 5:4, 13;
63:3, 8

**you'd** [1]
53:17

**you've** [1]
29:15

**yourself** [2]
12:7, 14

# EXHIBIT "C"

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: BFC CONSTRUCTION CORP.

Selected Entity Status Information

**Current Entity Name:** BFC CONSTRUCTION CORP.
**Initial DOS Filing Date:** JUNE 12, 1992
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
BFC CONSTRUCTION CORP.
2226 FIRST AVE
NEW YORK, NEW YORK, 10029-2307
**Chairman or Chief Executive Officer**
DONALD A CAPOCCIA
2226 FIRST AVE
NEW YORK, NEW YORK, 10029-2307
**Principal Executive Office**
BFC CONSTRUCTION CORP.
2226 FIRST AVE
NEW YORK, NEW YORK, 10029-2307
**Registered Agent**
NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results          New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: BFC PARTNERS, L.P.

Selected Entity Status Information

**Current Entity Name:** BFC PARTNERS, L.P.
**Initial DOS Filing Date:** JUNE 16, 1992
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC LIMITED PARTNERSHIP
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O DONALD CAPOCCIA
2226 1ST AVE.
NEW YORK, NEW YORK, 10029

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results                                        New Search

Division of Corporations, State Records and UCC Home Page      NYS Department of State Home Page

# NYS Department of State

## Division of Corporations

### Entity Information

Selected Entity Name: 105 STREET ASSOCIATES, LLC

Selected Entity Status Information

**Current Entity Name:** 105 STREET ASSOCIATES, LLC
**Initial DOS Filing Date:** DECEMBER 04, 2000
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC LIMITED LIABILITY COMPANY
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O DONALD CAPOCCIA
2226 FIRST AVE
NEW YORK, NEW YORK, 10029

**Registered Agent**

NONE

NOTE: New York State does not issue organizational identification numbers.

Search Results                    New Search

Division of Corporations, State Records and UCC Home Page     NYS Department of State Home Page



# GREENWICH INSURANCE COMPANY

70 Seaview Avenue, Stamford, CT 06901-6040

## COMMERCIAL GENERAL LIABILITY COVERAGE PART
## DECLARATIONS

Renewal of Number*

Policy No. WGG 5001058

Named Insured and Mailing Address (No., Street, Town or City, County, State, Zip Code)*
105 Street Associates, LLC

c/o BFC Construction Corp.
2226 First Ave
New York, NY 10029

Policy Period *: From     April 15, 2002     to     April 15, 2003     at 12:01 A.M. Standard Time at your mailing
address shown above.

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE
AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

### LIMITS OF INSURANCE

| | |
|---|---|
| General Aggregate Limit (Other Than Products—Completed Operations) | $2,000,000 |
| Products—Completed Operations Aggregate Limit | $Included |
| Personal and Advertising Injury Limit | $1,000,000 |
| Each Occurrence Limit | $1,000,000 |
| Fire Damage Limit | $50,000   Any One Fire |
| Medical Expense Limit | $5,000   Any One Person |

### RETROACTIVE DATE (CG 00 02 only)

Coverage A of this Insurance does not apply to "bodily injury" or "property damage" which occurs before the Retroactive
Date, if any, shown here: _____

(Enter Date or "None" if no Retroactive Date applies)

### DESCRIPTION OF BUSINESS AND LOCATION OF PREMISES

Form of Business:
Other
Business Description*:
Renovations

Location of All Premises You Own, Rent or Occupy:

    See Schedule Attached

### PREMIUM   $39,750

| Classification | Code No. | Premium Basis | Pr/Co Rate | All Other | Advance Premium Pr/Co | All Other |
|---|---|---|---|---|---|---|
| | | | | | $ | $ |
| See Schedule Attached | | | | | | |

Total Advance Premium    $

Premium shown is payable*: $_____ at inception; $_____ 1st Anniversary; $_____ 2nd Anniversary

### FORMS AND ENDORSEMENTS

Forms and Endorsements applying to this Coverage Part and made part of this policy at time of issue†:

    See Schedule Attached

Countersigned:*                                              WKF & C Agency, Inc
                                          By _____
                                                         Authorized Representative

Entry optional if shown in Common Policy Declarations.
-Forms and Endorsements applicable to this Coverage Part omitted if shown elsewhere in the policy

THESE DECLARATIONS AND THE COMMON POLICY DECLARATIONS, IF APPLICABLE, TOGETHER WITH THE COMMON POLICY CONDITIONS, COVERAGE
FORM(S) AND FORMS AND ENDORSEMENTS, IF ANY, ISSUED TO FORM A PART THEREOF, COMPLETE THE ABOVE NUMBERED POLICY.
                    Includes copyrighted material of Insurance Services Office, Inc., with its permission.
                          Copyright, Insurance Services Office, Inc., 1983, 1984

IDL 190 (2)-0 (11-85)                                                        Page 1 of 1

GR0000000017

COMMERCIAL GENERAL LIABILITY
CG 00 01 07 98

# COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage Read the entire policy carefully to determine rights, duties and what is and is not covered.

Throughout this policy the words "you" and "your" refer to the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy The words "we", "us" and "our" refer to the company providing this insurance

The word "insured" means any person or organization qualifying as such under Section II -- Who Is An Insured

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V -- Definitions

## SECTION I – COVERAGES

### COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

   a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:

      (1) The amount we will pay for damages is limited as described in Section III -- Limits Of Insurance; and

      (2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

   No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

   b. This insurance applies to "bodily injury" and "property damage" only if:

      (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

      (2) The "bodily injury" or "property damage" occurs during the policy period

   c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

2. Exclusions

   This insurance does not apply to:

   a. Expected Or Intended Injury

      "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   b. Contractual Liability

      "Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

      (1) That the insured would have in the absence of the contract or agreement; or

      (2) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

         (a) Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

Copyright, Insurance Services Office, Inc., 1997

(b) Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged

c. Liquor Liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only if you are in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages

d. Workers' Compensation And Similar Laws

Any obligation of the insured under a workers' compensation, disability benefits or unemployment compensation law or any similar law.

e. Employer's Liability

"Bodily injury" to:

(1) An "employee" of the insured arising out of and in the course of:

(a) Employment by the insured; or

(b) Performing duties related to the conduct of the insured's business; or

(2) The spouse, child, parent, brother or sister of that "employee" as a consequence of Paragraph (1) above

This exclusion applies:

(1) Whether the insured may be liable as an employer or in any other capacity; and

(2) To any obligation to share damages with or repay someone else who must pay damages because of the injury

This exclusion does not apply to liability assumed by the insured under an "insured contract"

f. Pollution

(1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. However, this subparagraph does not apply to:

(i) "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

(ii) "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insured at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible; or

(d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such insured, contractor or subcontractor;

(ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor; or

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire"

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"

(2) Any loss, cost or expense arising out of any:

(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants"

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority

g. Aircraft, Auto Or Watercraft

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading".

This exclusion does not apply to:

(1) A watercraft while ashore on premises you own or rent;

(2) A watercraft you do not own that is:

(a) Less than 26 feet long; and

(b) Not being used to carry persons or property for a charge;

(3) Parking an "auto" on, or on the ways next to, premises you own or rent, provided the "auto" is not owned by or rented or loaned to you or the insured;

(4) Liability assumed under any "insured contract" for the ownership, maintenance or use of aircraft or watercraft; or

(5) "Bodily injury" or "property damage" arising out of the operation of any of the equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment"

  Copyright, Insurance Services Office, Inc , 1997

GR0000000003

h. Mobile Equipment

"Bodily injury" or "property damage" arising out of

(1) The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured; or

(2) The use of "mobile equipment" in, or while in practice for, or while being prepared for, any prearranged racing, speed, demolition, or stunting activity

i. War

"Bodily injury" or "property damage" due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution. This exclusion applies only to liability assumed under a contract or agreement.

j. Damage To Property

"Property damage" to

(1) Property you own, rent, or occupy;

(2) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(3) Property loaned to you;

(4) Personal property in the care, custody or control of the insured;

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Paragraphs (1), (3) and (4) of this exclusion do not apply to "property damage" (other than damage by fire) to premises, including the contents of such premises, rented to you for a period of 7 or fewer consecutive days. A separate limit of insurance applies to Damage To Premises Rented To You as described in Section III – Limits Of Insurance

Paragraph (2) of this exclusion does not apply if the premises are "your work" and were never occupied, rented or held for rental by you.

Paragraphs (3), (4), (5) and (6) of this exclusion do not apply to liability assumed under a sidetrack agreement.

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard"

k. Damage To Your Product

"Property damage" to "your product" arising out of it or any part of it.

l. Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard"

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor

m. Damage To Impaired Property Or Property Not Physically Injured

"Property damage" to "impaired property" or property that has not been physically injured, arising out of

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use

n. Recall Of Products, Work Or Impaired Property

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of

(1) "Your product";

(2) "Your work"; or

(3) "Impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

o. Personal And Advertising Injury

"Bodily injury" arising out of "personal and advertising injury"

Exclusions c. through n. do not apply to damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner. A separate limit of insurance applies to this coverage as described in Section III – Limits Of Insurance

     Copyright, Insurance Services Office, Inc., 1997     CG 00 01 07 98     □

GR0000000004

## COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY

### 1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "personal and advertising injury" to which this insurance does not apply. We may, at our discretion, investigate any offense and settle any claim or "suit" that may result But:

(1) The amount we will pay for damages is limited as described in Section III – Limits Of Insurance ; and

(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.

No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.

b. This insurance applies to "personal and advertising injury" caused by an offense arising out of your business but only if the offense was committed in the "coverage territory" during the policy period

### 2. Exclusions

This insurance does not apply to:

a. "Personal and advertising injury":

(1) Caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury";

(2) Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity;

(3) Arising out of oral or written publication of material whose first publication took place before the beginning of the policy period;

(4) Arising out of a criminal act committed by or at the direction of any insured;

(5) For which the insured has assumed liability in a contract or agreement This exclusion does not apply to liability for damages that the insured would have in the absence of the contract or agreement;

(6) Arising out of a breach of contract, except an implied contract to use another's advertising idea in your "advertisement";

(7) Arising out of the failure of goods, products or services to conform with any statement of quality or performance made in your "advertisement";

(8) Arising out of the wrong description of the price of goods, products or services stated in your "advertisement";

(9) Committed by an insured whose business is advertising, broadcasting, publishing or telecasting. However, this exclusion does not apply to Paragraphs 14.a., b and c. of "personal and advertising injury" under the Definitions Section; or

(10) Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants" at any time

b. Any loss, cost or expense arising out of any:

(1) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or

(2) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants"

## COVERAGE C MEDICAL PAYMENTS

### 1. Insuring Agreement

a. We will pay medical expenses as described below for "bodily injury" caused by an accident:

(1) On premises you own or rent;

(2) On ways next to premises you own or rent; or

(3) Because of your operations;

provided that:

(1) The accident takes place in the "coverage territory" and during the policy period;

(2) The expenses are incurred and reported to us within one year of the date of the accident; and

(3) The injured person submits to examination, at our expense, by physicians of our choice as often as we reasonably require

b. We will make these payments regardless of fault. These payments will not exceed the applicable limit of insurance. We will pay reasonable expenses for:

(1) First aid administered at the time of an accident;

(2) Necessary medical, surgical, x-ray and dental services, including prosthetic devices; and

(3) Necessary ambulance, hospital, professional nursing and funeral services.

## 2. Exclusions

We will not pay expenses for "bodily injury":

a. To any insured.

b. To a person hired to do work for or on behalf of any insured or a tenant of any insured.

c. To a person injured on that part of premises you own or rent that the person normally occupies.

d. To a person, whether or not an "employee" of any insured, if benefits for the "bodily injury" are payable or must be provided under a workers' compensation or disability benefits law or a similar law.

e. To a person injured while taking part in athletics.

f. Included within the "products-completed operations hazard".

g. Excluded under Coverage A.

h. Due to war, whether or not declared, or any act or condition incident to war. War includes civil war, insurrection, rebellion or revolution.

## SUPPLEMENTARY PAYMENTS -- COVERAGES A AND B

1. We will pay, with respect to any claim we investigate or settle, or any "suit" against an insured we defend:

a. All expenses we incur.

b. Up to $250 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which the Bodily Injury Liability Coverage applies. We do not have to furnish these bonds.

c. The cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance. We do not have to furnish these bonds.

d. All reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or "suit", including actual loss of earnings up to $250 a day because of time off from work.

e. All costs taxed against the insured in the "suit".

f. Prejudgment interest awarded against the insured on that part of the judgment we pay. If we make an offer to pay the applicable limit of insurance, we will not pay any prejudgment interest based on that period of time after the offer.

g. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

These payments will not reduce the limits of insurance.

2. If we defend an insured against a "suit" and an indemnitee of the insured is also named as a party to the "suit", we will defend that indemnitee if all of the following conditions are met:

a. The "suit" against the indemnitee seeks damages for which the insured has assumed the liability of the indemnitee in a contract or agreement that is an "insured contract";

b. This insurance applies to such liability assumed by the insured;

c. The obligation to defend, or the cost of the defense of, that indemnitee, has also been assumed by the insured in the same "insured contract";

d. The allegations in the "suit" and the information we know about the "occurrence" are such that no conflict appears to exist between the interests of the insured and the interests of the indemnitee;

e. The indemnitee and the insured ask us to conduct and control the defense of that indemnitee against such "suit" and agree that we can assign the same counsel to defend the insured and the indemnitee; and

f. The indemnitee:

(1) Agrees in writing to:

(a) Cooperate with us in the investigation, settlement or defense of the "suit";

(b) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the "suit";

(c) Notify any other insurer whose coverage is available to the indemnitee; and

(d) Cooperate with us with respect to coordinating other applicable insurance available to the indemnitee; and

    Copyright, Insurance Services Office, Inc., 1997    CG 00 01 07 98    □

GR0000000006

(2) Provides us with written authorization to·

    (a) Obtain records and other information related to the "suit"; and

    (b) Conduct and control the defense of the indemnitee in such "suit"

So long as the above conditions are met, attorneys' fees incurred by us in the defense of that indemnitee, necessary litigation expenses incurred by us and necessary litigation expenses incurred by the indemnitee at our request will be paid as Supplementary Payments. Notwithstanding the provisions of Paragraph 2.b.(2) of Section I – Coverage A – Bodily Injury And Property Damage Liability, such payments will not be deemed to be damages for "bodily injury" and "property damage" and will not reduce the limits of insurance

Our obligation to defend an insured's indemnitee and to pay for attorneys' fees and necessary litigation expenses as Supplementary Payments ends when·

a. We have used up the applicable limit of insurance in the payment of judgments or settlements; or

b. The conditions set forth above, or the terms of the agreement described in ˋParagraph f. above, are no longer met.

## SECTION II – WHO IS AN INSURED

1. If you are designated in the Declarations as·

    a. An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner

    b. A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business

    c. A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business. Your managers are insureds, but only with respect to their duties as your managers

    d. An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

2. Each of the following is also an insured·

    a. Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business. However, none of these "employees" is an insured for·

      (1) "Bodily injury" or "personal and advertising injury"·

        (a) To you, to your partners or members (if you are a partnership or joint venture), to your members (if you are a limited liability company), or to a co-"employee" while that co-"employee" is either in the course of his or her employment or performing duties related to the conduct of your business;

        (b) To the spouse, child, parent, brother or sister of that co-"employee" as a consequence of Paragraph (1)(a) above;

        (c) For which there is any obligation to share damages with or repay someone else who must pay damages because of the injury described in Paragraphs (1)(a) or (b) above; or

        (d) Arising out of his or her providing or failing to provide professional health care services.

      (2) "Property damage" to property·

        (a)· Owned, occupied or used by,

        (b) Rented to, in the care, custody or control of, or over which physical control is being exercised for any purpose by

      you, any of your "employees", any partner or member (if you are a partnership or joint venture), or any member (if you are a limited liability company)

    b. Any person (other than your "employee"), or any organization while acting as your real estate manager

    c. Any person or organization having proper temporary custody of your property if you die, but only·

      (1) With respect to liability arising out of the maintenance or use of that property; and

      (2) Until your legal representative has been appointed

d. Your legal representative if you die, but only with respect to duties as such. That representative will have all your rights and duties under this Coverage Part

3. With respect to "mobile equipment" registered in your name under any motor vehicle registration law, any person is an insured while driving such equipment along a public highway with your permission. Any other person or organization responsible for the conduct of such person is also an insured, but only with respect to liability arising out of the operation of the equipment, and only if no other insurance of any kind is available to that person or organization for this liability. However, no person or organization is an insured with respect to

a. "Bodily injury" to a co-"employee" of the person driving the equipment; or

b. "Property damage" to property owned by, rented to, in the charge of or occupied by you or the employer of any person who is an insured under this provision

4. Any organization you newly acquire or form, other than a partnership, joint venture or limited liability company, and over which you maintain ownership or majority interest, will qualify as a Named Insured if there is no other similar insurance available to that organization However:

a. Coverage under this provision is afforded only until the 90th day after you acquire or form the organization or the end of the policy period, whichever is earlier;

b. Coverage A does not apply to "bodily injury" or "property damage" that occurred before you acquired or formed the organization; and

c. Coverage B does not apply to "personal and advertising injury" arising out of an offense committed before you acquired or formed the organization

No person or organization is an insured with respect to the conduct of any current or past partnership, joint venture or limited liability company that is not shown as a Named Insured in the Declarations

## SECTION III – LIMITS OF INSURANCE

1. The Limits of Insurance shown in the Declarations and the rules below fix the most we will pay regardless of the number of

a. Insureds;

b. Claims made or "suits" brought; or

c. Persons or organizations making claims or bringing "suits"

2. The General Aggregate Limit is the most we will pay for the sum of

a. Medical expenses under Coverage C;

b. Damages under Coverage A, except damages because of "bodily injury" or "property damage" included in the "products-completed operations hazard"; and

c. Damages under Coverage B.

3. The Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages because of "bodily injury" and "property damage" included in the "products-completed operations hazard"

4. Subject to 2. above, the Personal and Advertising Injury Limit is the most we will pay under Coverage B for the sum of all damages because of all "personal and advertising injury" sustained by any one person or organization

5. Subject to 2. or 3. above, whichever applies, the Each Occurrence Limit is the most we will pay for the sum of

a. Damages under Coverage A; and

b. Medical expenses under Coverage C

because of all "bodily injury" and "property damage" arising out of any one "occurrence"

6. Subject to 5. above, the Damage To Premises Rented To You Limit is the most we will pay under Coverage A for damages because of "property damage" to any one premises, while rented to you, or in the case of damage by fire, while rented to you or temporarily occupied by you with permission of the owner

7. Subject to 5. above, the Medical Expense Limit is the most we will pay under Coverage C for all medical expenses because of "bodily injury" sustained by any one person

The Limits of Insurance of this Coverage Part apply separately to each consecutive annual period and to any remaining period of less than 12 months, starting with the beginning of the policy period shown in the Declarations, unless the policy period is extended after issuance for an additional period of less than 12 months. In that case, the additional period will be deemed part of the last preceding period for purposes of determining the Limits of Insurance

Copyright, Insurance Services Office, Inc , 1997

CG 00 01 07 98    □

GR0000000008

## SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

### 1. Bankruptcy

Bankruptcy or insolvency of the insured or of the insured's estate will not relieve us of our obligations under this Coverage Part.

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

a. You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1) How, when and where the "occurrence" or offense took place;

(2) The names and addresses of any injured persons and witnesses; and

(3) The nature and location of any injury or damage arising out of the "occurrence" or offense

b. If a claim is made or "suit" is brought against any insured, you must:

(1) Immediately record the specifics of the claim or "suit" and the date received; and

(2) Notify us as soon as practicable

You must see to it that we receive written notice of the claim or "suit" as soon as practicable

c. You and any other involved insured must:

(1) Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

(2) Authorize us to obtain records and other information;

(3) Cooperate with us in the investigation or settlement of the claim or defense against the "suit"; and

(4) Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply

d. No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

### 3. Legal Action Against Us

No person or organization has a right under this Coverage Part:

a. To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

b. To sue us on this Coverage Part unless all of its terms have been fully complied with

A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial; but we will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance. An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative

### 4. Other Insurance

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:

a. Primary Insurance

This insurance is primary except when b. below applies  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary  Then, we will share with all that other insurance by the method described in c. below

b. Excess Insurance

This insurance is excess over:

(1) Any of the other insurance, whether primary, excess, contingent or on any other basis:

(a) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";

(b) That is Fire insurance for premises rented to you or temporarily occupied by you with permission of the owner;

(c) That is insurance purchased by you to cover your liability as a tenant for "property damage" to premises rented to you or temporarily occupied by you with permission of the owner; or

(d) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Section I – Coverage A – Bodily Injury And Property Damage Liability

(2) Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

Copyright, Insurance Services Office, Inc , 1997

GR0000000009

When this insurance is excess, we will have no duty under Coverages A or B to defend the insured against any "suit" if any other insurer has a duty to defend the insured against that "suit" If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of

(1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2) The total of all deductible and self-insured amounts under all that other insurance

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part

c. Method Of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

5. Premium Audit

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates

b. Premium shown in this Coverage Part as advance premium is a deposit premium only At the close of each audit period we will compute the earned premium for that period. Audit premiums are due and payable on notice to the first Named Insured. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

6. Representations

By accepting this policy, you agree

a. The statements in the Declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this policy in reliance upon your representations

7. Separation Of Insureds

Except with respect to the Limits of Insurance, and any rights or duties specifically assigned in this Coverage Part to the first Named Insured, this insurance applies

a. As if each Named Insured were the only Named Insured; and

b. Separately to each insured against whom claim is made or "suit" is brought.

8. Transfer Of Rights Of Recovery Against Others To Us

If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them

9. When We Do Not Renew

If we decide not to renew this Coverage Part, we will mail or deliver to the first Named Insured shown in the Declarations written notice of the nonrenewal not less than 30 days before the expiration date

If notice is mailed, proof of mailing will be sufficient proof of notice

SECTION V -- DEFINITIONS

1. "Advertisement" means a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters

2. "Auto" means a land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment. But "auto" does not include "mobile equipment"

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time

4. "Coverage territory" means

a. The United States of America (including its territories and possessions), Puerto Rico and Canada;

Copyright, Insurance Services Office, Inc., 1997

CG 00 01 07 98    □

GR0000000010

b. International waters or airspace, provided the injury or damage does not occur in the course of travel or transportation to or from any place not included in a. above; or

c. All parts of the world if:

(1) The injury or damage arises out of:

(a) Goods or products made or sold by you in the territory described in a. above; or

(b) The activities of a person whose home is in the territory described in a. above, but is away for a short time on your business; and

(2) The insured's responsibility to pay damages is determined in a "suit" on the merits, in the territory described in a. above or in a settlement we agree to.

5. "Employee" includes a "leased worker". "Employee" does not include a "temporary worker".

6. "Executive officer" means a person holding any of the officer positions created by your charter, constitution, by-laws or any other similar governing document.

7. "Hostile fire" means one which becomes uncontrollable or breaks out from where it was intended to be.

8. "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

b. You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

a. The repair, replacement, adjustment or removal of "your product" or "your work"; or

b. Your fulfilling the terms of the contract or agreement.

9. "Insured contract" means:

a. A contract for a lease of premises. However, that portion of the contract for a lease of premises that indemnifies any person or organization for damage by fire to premises while rented to you or temporarily occupied by you with permission of the owner is not an "insured contract";

b. A sidetrack agreement;

c. Any easement or license agreement, except in connection with construction or demolition operations on or within 50 feet of a railroad;

d. An obligation, as required by ordinance, to indemnify a municipality, except in connection with work for a municipality;

e. An elevator maintenance agreement;

f. That part of any other contract or agreement pertaining to your business (including an indemnification of a municipality in connection with work performed for a municipality) under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

Paragraph f. does not include that part of any contract or agreement:

(1) That indemnifies a railroad for "bodily injury" or "property damage" arising out of construction or demolition operations, within 50 feet of any railroad property and affecting any railroad bridge or trestle, tracks, road-beds, tunnel, underpass or crossing;

(2) That indemnifies an architect, engineer or surveyor for injury or damage arising out of:

(a) Preparing, approving, or failing to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders or drawings and specifications; or

(b) Giving directions or instructions, or failing to give them, if that is the primary cause of the injury or damage; or

(3) Under which the insured, if an architect, engineer or surveyor, assumes liability for an injury or damage arising out of the insured's rendering or failure to render professional services, including those listed in (2) above and supervisory, inspection, architectural or engineering activities.

10. "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

11. "Loading or unloading" means the handling of property:

a. After it is moved from the place where it is accepted for movement into or onto an aircraft, watercraft or "auto";

b. While it is in or on an aircraft, watercraft or "auto"; or

GR0000000011

c. While it is being moved from an aircraft, watercraft or "auto" to the place where it is finally delivered;

but "loading or unloading" does not include the movement of property by means of a mechanical device, other than a hand truck, that is not attached to the aircraft, watercraft or "auto".

12. "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a. Bulldozers, farm machinery, forklifts and other vehicles designed for use principally off public roads;

b. Vehicles maintained for use solely on or next to premises you own or rent;

c. Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

(1) Power cranes, shovels, loaders, diggers or drills; or

(2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

(1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

(2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo

However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos":

(1) Equipment designed primarily for:

(a) Snow removal;

(b) Road maintenance, but not construction or resurfacing; or

(c) Street cleaning;

(2) Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions

14. "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

a. False arrest, detention or imprisonment;

b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

d. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

e. Oral or written publication of material that violates a person's right of privacy;

f. The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement"

15. "Pollutants" mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

    Copyright, Insurance Services Office, Inc., 1997    CG 00 01 07 98    □

GR0000000012

b. Does not include "bodily injury" or "property damage" arising out of

(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;

(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or

(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.

17. "Property damage" means

a. Physical injury to tangible property, including all resulting loss of use of that property All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged "Suit" includes

a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or

b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

19. "Temporary worker" means a person who is furnished to you to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions

20. "Your product" means

a. Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by

(1) You;

(2) Others trading under your name; or

(3) A person or organization whose business or assets you have acquired; and

b. Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products

"Your product" includes

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

b. The providing of or failure to provide warnings or instructions

"Your product" does not include vending machines or other property rented to or located for the use of others but not sold

21. "Your work" means

a. Work or operations performed by you or on your behalf; and

b. Materials, parts or equipment furnished in connection with such work or operations

"Your work" includes:

a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

b. The providing of or failure to provide warnings or instructions

Copyright, Insurance Services Office, Inc , 1997

GR0000000013



**EXHIBIT "E"**

**ACORD** **GENERAL LIABILITY NOTICE OF OCCURRENCE/CLAIM** CSR EG | DATE (MM/DD/YYYY) 08/16/04

| PRODUCER | PHONE (A/C, No, Ext): 516-484-7500 | | X NOTICE OF OCCURRENCE | DATE OF OCCURRENCE AND TIME | AM | DATE OF CLAIM | PREVIOUSLY REPORTED |
| | | | NOTICE OF CLAIM | 07/02, 02 | PM | | YES X NO |
| North Shore Risk Mgmt. LLC | | | EFFECTIVE DATE 04/10/02 | EXPIRATION DATE 04/10/03 | POLICY TYPE X OCCURRENCE CLAIMS MADE | | RETROACTIVE DATE |
| PO Box 9007 | | | COMPANY | NAIC CODE: | MISCELLANEOUS INFO (Site & location code) | |
| Roslyn Heights NY 11577-9007 | | | | | | |
| CODE: | SUB CODE: | | POLICY NUMBER WGG 5001058 | | REFERENCE NUMBER | |
| AGENCY CUSTOMER ID: 105ST-1 | | | | | | |

**INSURED** | **CONTACT** X CONTACT INSURED

| NAME AND ADDRESS | SOC SEC # OR FEIN | NAME AND ADDRESS | WHERE TO CONTACT see below |
| 105 Street Associates, LLC | | 105 Street Associates, LLC | |
| c/o BFC Construction Corp. | | Greg Cross | WHEN TO CONTACT |
| 2226 First Avenue | | 2226 First Avenue | daily |
| New York NY 10029 | | New York NY 1002! | |
| RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) 212 722-3671 | RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) (212) 722-3671 |

**OCCURRENCE**

| LOCATION OF OCCURRENCE (Include city & state) | 105th Street New York NY | AUTHORITY CONTACTED |
| DESCRIPTION OF OCCURRENCE (Use separate sheet, if necessary) | Richard Conrad; employee of sub lost his balance & sustained persl. injuries | |

**POLICY INFORMATION**

| COVERAGE PART OR FORMS (Insert form #s and edition dates) | | | | | | | | |
| GENERAL AGGREGATE | PROD/COMP OP AGG | PERS & ADV INJ | EACH OCCURRENCE | FIRE DAMAGE | MEDICAL EXPENSE | DEDUCTIBLE | PD |
| 2000000. | 1000000. | 1000000. | 1000000. | 50000. | 5000. | | BI |
| UMBRELLA EXCESS | UMBRELLA | EXCESS | CARRIER: | LIMITS: | AGGR | PER CLAIM/OCC | BI/PD |

**TYPE OF LIABILITY**

| PREMISES: INSURED IS: | OWNER | TENANT | X OTHER: job site | TYPE OF PREMISES |
| OWNER'S NAME & ADDRESS (If not insured) | | | | OWNERS PHONE (A/C, No, Ext) |
| PRODUCTS: INSURED IS: | MANUFACTURER | VENDOR | OTHER: | TYPE OF PRODUCT |
| MANUFACTURER'S NAME & ADDRESS (If not insured) | | | | MANUFACT PHONE (A/C, No, Ext) |
| WHERE CAN PRODUCT BE SEEN? | | | | |
| OTHER LIABILITY INCLUDING COMPLETED OPERATIONS (Explain) | | | | |

**INJURED/PROPERTY DAMAGED**

| NAME & ADDRESS (Injured/Owner) | Richard Conrad | | | PHONE (A/C, No, Ext) |
| AGE | SEX M | OCCUPATION laborer | EMPLOYER'S NAME & ADDRESS JEM Erector Inc. 142 Stokes Road Shamong NJ 08088 | PHONE (A/C, No, Ext) |
| DESCRIBE INJURY | | | WHERE TAKEN | WHAT WAS INJURED DOING? |
| FATALITY | | | | WHEN CAN PROPERTY BE SEEN? |
| DESCRIBE PROPERTY (Type, model, etc) | | ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? | |

**WITNESSES**

| NAME & ADDRESS | BUSINESS PHONE (A/C, No, Ext) | RESIDENCE PHONE (A/C, No) |
| | | |

**REMARKS**

letter from claimant's attny & copy of policy, attached

| REPORTED BY Estelle Rodriguez | REPORTED TO Barbara Weiner | SIGNATURE OF INSURED | SIGNATURE OF PRODUCER |

ACORD 3 (2002/01) | NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE | © ACORD CORPORATION 1986

# EXHIBIT "F"

LAW OFFICES

# CONRAD J. BENEDETTO

ONE GREENTREE CENTRE
SUITE 201
MARLTON, NEW JERSEY 08053

Telephone:   (856) 983-7033
Fax:          (856) 983-6000

CONRAD J. BENEDETTO•

• ALSO MEMBER OF PA BAR

PHILADELPHIA OFFICE
1615 SOUTH BROAD STREET
PHILADELPHIA, PENNSYLVANIA 19148
PHONE:   (215) 389-1900
FAX:      (215) 271-2910

TOLL FREE:

(800) 985-1333

PLEASE REPLY TO:
NEW JERSEY

August 6, 2002

BFC Construction
2226 1st Avenue
New York, NY 10029

Re:   Our Client      :   Richard Conrad
       D/Accident    :   7/2/02
       Location       :   105th Street between 2nd & 3rd Avenue

Dear Sir or Madam:

Please be advised this office represents Richard Conrad in a workmen's compensation claim for personal injuries sustained as a result of a fall down accident, which occurred the date and location captioned above. Kindly forward this letter to your liability insurance carrier as promptly as possible.

Thank you for your prompt and courteous attention to this matter.

Very truly yours,

Conrad J. Benedetto

/ps

CERTIFIED & REGULAR MAIL
RETURN RECEIPT REQUESTED



DEFENDANT'S
EXHIBIT

P00141

RECEIVED TIME   MAY. 25.   1:03PM

Law Offices
CONRAD J. BENEDETTO
ONE GREENTREE CENTRE
SUITE 201
MARLTON, NJ 08053

Law Offices
CONRAD J. BENEDETTO
ONE GREENTREE CENTRE
SUITE 201
MARLTON, NJ 08053

7000 0600 0021 6247 0731

**CERTIFIED MAIL**

BFC Construction
2226 1st Avenue
New York, NY 10029

BFC Construction
2226 1st Avenue
New York, NY 10029

7000 0600 0021 6223 7402







P00142

RECEIVED TIME  MAY. 25.  1:03PM





Address **235 E 105th St**
**New York, NY 10029**





LAW OFFICES

# CONRAD J. BENEDETTO

ONE GREENTREE CENTRE
SUITE 201
MARLTON, NEW JERSEY 08053

Telephone: (856) 983-7033
Fax:        (856) 983-6000

CONRAD J. BENEDETTO*

\* ALSO MEMBER OF PA BAR

**PHILADELPHIA OFFICE**
1615 SOUTH BROAD STREET
PHILADELPHIA, PENNSYLVANIA 19148
PHONE:  (215) 389-1900
FAX:     (215) 271-8910

TOLL FREE:

(800) 985-1333

PLEASE REPLY TO:
NEW JERSEY

September 9, 2002

## SECOND REQUEST

BFC Construction
2226 1st Avenue
New York, NY 10029

Re:  Our Client    :    **Richard Conrad**
     D/Accident   :    **7/2/02**
     Location      :    **105th Street between 2nd & 3rd Avenue**

Dear Sir or Madam:

Please be advised this office represents Richard Conrad in a workmen's compensation claim for personal injuries sustained as a result of a fall down accident, which occurred the date and location captioned above. Kindly forward this letter to your liability insurance carrier as promptly as possible.

Thank you for your prompt and courteous attention to this matter.

Very truly yours,

Conrad J. Benedetto

/ps

**CERTIFIED & REGULAR MAIL
RETURN RECEIPT REQUESTED**



ORIGINAL

Kolner 18200

**STATE OF NEW YORK**
**SUPREME COURT**

COUNTY OF NEW YORK

INDEX NO: 04-105554
FILED ON: April 8, 2004
DISTRICT:

---

*Richard Conrad*

vs

*105 Street Associates, LLC, et al*

Plaintiff(s)

Defendant(s)

---

STATE OF NEW YORK, COUNTY OF ALBANY, SS.:

**AFFIDAVIT OF SERVICE**
**BY THE SECRETARY OF STATE**

Stephen L. Collen _____, being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on ____ April 20, 2004 ____, at __10:00am__, at the office

of the Secretary of State of the State of New York in the City of Albany, New York, deponent served the annexed

Summons and Verified Complaint

on

105 Street Associates, LLC

Defendant in this action, by delivering to and leaving with _____ Carol Vogt _____, Authorized Agent, in the Office of

the Secretary of State of the State of New York, personally at the Office of the Secretary of State of the State of New

York, two (2) true copies thereof and that at the time of making such service, deponent paid said Secretary of State

the statutory fee, if required. Service was made pursuant to Section __303 Limited Liability Company Law__.

☐ Service was completed by mailng notice of such service and one (1) true copy thereof by ☐ Registered or

☐ 1st Class Mail and Certified Mail. # _____, Return Receipt Requested on _____

to said defendant at: _____

☒ Papers so served were properly endorsed with the index number and date of filing.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office of the

Secretary of State of the State of New York, duly authorized to accept such service on behalf of said defendant.

Description of the person served: Approx. Age: __47 years__    Approx. weight: __110 lbs.__    Approx. Ht.: __5' 1"__

Sex: __Female__    Color of skin: __White__    Color of hair: __Brown__    Other: _____

Sworn to before me on_____ April 20, 2004 ____

**FILED**

APR 29 2004

NEW YORK
COUNTY CLERK'S OFFICE

MARCY A. O'HARE
NOTARY PUBLIC, State of New York
No. 4865530, Qualified in Albany County
Term Expires July 14, 2006

Stephen L. Collen

Invoice•Work Order # 0404375



STATE OF NEW YORK    COUNTY OF NEW YORK    FILED ON:  April 8, 2004

SUPREME COURT    DISTRICT:

Richard Conrad

Plaintiff(s)

vs

105 Street Associates, LLC, et al

Defendant(s)

STATE OF NEW YORK, COUNTY OF ALBANY, SS.:    **AFFIDAVIT OF SERVICE**
**BY THE SECRETARY OF STATE**

Stephen L. Collen _____, being duly sworn, deposes and says: deponent is over

the age of eighteen (18) years; that on _____ April 20, 2004 _____, at ___ 10:00am ___ at the office

of the Secretary of State of the State of New York in the City of Albany, New York, deponent served the annexed

Summons and Verified Complaint

, on

BFC Partners, L.P.

Defendant in this action, by delivering to and leaving with _____ Carol Vogt _____, Authorized Agent, in the Office of

the Secretary of State of the State of New York, personally at the Office of the Secretary of State of the State of New

York, two (2) true copies thereof and that at the time of making such service, deponent paid said Secretary of State

the statutory fee, if required. Service was made pursuant to Section ___ 121-109 Revised Limited Partnership Law ___.

☐ Service was completed by mailing notice of such service and one (1) true copy thereof by      ☐ Registered or

☐ 1st Class Mail and Certified Mail, # _____, Return Receipt Requested on _____

to said defendant at: _____

☒ Papers so served were properly endorsed with the index number and date of filing.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office of the

Secretary of State of the State of New York, duly authorized to accept such service on behalf of said defendant.

Description of the person served:   Approx. Age: _47 years_      Approx. weight: _110 lbs._      Approx. Ht.: _5' 1"_

Sex: _Female_    Color of skin: _White_    Color of hair: _Brown_    Other: _____

Sworn to before me on _____ April 20, 2004 _____

_____      _____

MARCY A. O'HARE      Stephen L. Collen
NOTARY PUBLIC, State of New York
No. 4865530, Qualified in Albany County      Invoice•Work Order # 0404373
Term Expires July 14, 2006

STATE OF NEW YORK
SUPREME COURT

COUNTY OF NEW YORK

FILED ON: April 8, 2004
DISTRICT:

Richard Conrad

vs

Plaintiff(s)

105 Street Associates, LLC, et al

Defendant(s)

STATE OF NEW YORK, COUNTY OF ALBANY, SS.:

# AFFIDAVIT OF SERVICE
## BY THE SECRETARY OF STATE

_Stephen L. Collen_____, being duly sworn, deposes and says: deponent is over the age of eighteen (18) years; that on _____April 20, 2004_____, at ___10:00am___, at the office of the Secretary of State of the State of New York in the City of Albany, New York, deponent served the annexed

Summons and Verified Complaint_____, on

BFC Construction Corp._____

Defendant in this action, by delivering to and leaving with ____Carol Vogt_____, Authorized Agent, in the Office of the Secretary of State of the State of New York, personally at the Office of the Secretary of State of the State of New York, two (2) true copies thereof and that at the time of making such service, deponent paid said Secretary of State the statutory fee, if required. Service was made pursuant to Section __306 Business Corporation Law__.

☐ Service was completed by mailing notice of such service and one (1) true copy thereof by ☐ Registered or ☐ 1st Class Mail and Certified Mail, # _____, Return Receipt Requested on _____ to said defendant at: _____

☒ Papers so served were properly endorsed with the index number and date of filing.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly authorized to accept such service on behalf of said defendant.

Description of the person served:  Approx. Age: _47 years_    Approx. weight: _110 lbs._    Approx. Ht.: _5' 1"_

Sex: _Female_   Color of skin: _White_   Color of hair: _Brown_   Other: _____

Sworn to before me on_____April 20, 2004_____

MARCY A. O'HARE
NOTARY PUBLIC, State of New York
No. 4865530, Qualified in Albany County
Term Expires July 14, 2006

Stephen L. Collen

Invoice-Work Order # 0404374

SUPREME COURT OF THE STATE OF NEW YORK COUNTY OF NEW YORK

---

RICHARD CONRAD

PLAINTIFF(S)

- AGAINST -

105 STREET ASSOCIATES, LLC, BFC CONSTRUCTION CORP., AND
BFC PARTNERS, L.P.,

DEFENDANT(S)

---

INDEX NO. 04-105554

---

AFFIDAVIT OF SERVICE

---

Kelner & Kelner Esqs.,
140 Broadway, 37th Fl.
New York N.Y. 10005
(212) 233-7890



State of New York - Department of State
Receipt for Service

Receipt #:  200404200155
Date of Service:  04/20/2004
Service Company:  83 STAR PROCESS SERVICE

Cash #: 200404200142
Fee Paid: $40 - CHECK

Service was directed to be made pursuant to:  SECTION 121-109 OF THE REVISED
LIMITED PARTNERSHIP ACT

Party Served:  BFC PARTNERS, L.P.

Plaintiff/Petitioner:
          CONRAD, RICHARD

Service of Process Address:
C/O DONALD CAPOCCIA
2226 1ST AVE.
NEW YORK, NY 10029

Kelner

P00081

Secretary of State
By  CAROL VOGT



DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 5/2/06  RPTR:
PENGAD 800-631-6989





STATE OF NEW YORK
SUPREME COURT

COUNTY OF NEW YORK

**NEW YORK**
COUNTY CLERK'S OFFICE

*Richard Conrad*

APR 2 9 2004

vs

NOT
WITH

*105 Street Associates, LLC, et al*

INDEX NO: 04-105554
FILED ON:   April 8, 2004
DISTRICT:

NEW YORK
COUNTY CLERK'S OFFICE

APR 2 9 2004

NOT
WITH

Plaintiff(s)

Defendant(s)

STATE OF NEW YORK, COUNTY OF ALBANY, SS.:

**AFFIDAVIT OF SERVICE
BY THE SECRETARY OF STATE**

_____ Stephen L. Collen _____, being duly sworn, deposes and says: deponent is over the age of eighteen (18) years; that on _____ April 20, 2004 _____, at _ 10:00am _, at the office of the Secretary of State of the State of New York in the City of Albany, New York, deponent served the annexed

_____ Summons and Verified Complaint _____

_____, on

_____ BFC Partners, L.P. _____

Defendant in this action, by delivering to and leaving with _____ Carol Vogt _____, Authorized Agent, in the Office of the Secretary of State of the State of New York, personally at the Office of the Secretary of State of the State of New York, two (2) true copies thereof and that at the time of making such service, deponent paid said Secretary of State the statutory fee, if required. Service was made pursuant to Section _ 121-109 Revised Limited Partnership Law _.

☐ Service was completed by mailng notice of such service and one (1) true copy thereof by _____ ☐ Registered or
   ☐ 1st Class Mail and Certified Mail, # _____, Return Receipt Requested on _____
to said defendant at: _____

☒ Papers so served were properly endorsed with the index number and date of filing.

Deponent further says that deponent knew the person so served as aforesaid to be the agent in the Office of the Secretary of State of the State of New York, duly authorized to accept such service on behalf of said defendant.

Description of the person served:  Approx. Age: _ 47 years _    Approx. weight: _ 110 lbs. _    Approx. Ht.: _ 5' 1" _
Sex: _ Female _   Color of skin: _ White _   Color of hair: _ Brown _   Other: _____

Sworn to before me on_____ April 20, 2004 _____

_____
MARCY A. O'HARE
NOTARY PUBLIC, State of New York
No. 4865530, Qualified in Albany County
Term Expires July 14, 2006

_____
Stephen L. Collen

R00082

Invoice•Work Order # 0404373





STATE OF NEW YORK
## DEPARTMENT OF STATE
41 STATE STREET
ALBANY, NY 12231-0001

ELIOT SPITZER
GOVERNOR

LORRAINE A. CORTÉS-VÁZQUEZ
SECRETARY OF STATE

March 28th, 2007

Wilson, Elser, Moskowtiz, Edelman & Dicker LLP
150 E. 42nd Street
New York, NY 10017-5639

### RE: RICHARD CONRAD VS. BFC CONSTRUCTION CORP.

Ladies/Gentlemen:

Receipt is acknowledged of your request of March 26th, 2007.

Our records indicate that service in the above entitled action was made in this office on April 20th, 2004.

Copy of this process was sent by our office by certified mail to the defendant at its designated address:

### BFC CONSTRUCTION CORP.
### 2226 FIRST AVE
### NEW YORK, NY 10029-2307

A copy of the receipt for certified mail was returned to our office by the U.S. Postal Service.

Sincerely,

Service of Process Unit
Division of Corporations
(518) 486-5049

New York State Department of State
41 State Street
Albany, NY 12231

PS Form 3800, 6/02

**Receipt # 200404200153**

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature: ☐ Addressee or ☐ Agent)

X *Rodriguez*

B. Received By:  (Please Print Clearly)

C. Date of Delivery   4/26/04

D. Addressee's Address (If Different from Address Used by Sender.)

APR 2 6 2004

Secondary Address / Suite / Apt. / Floor    (Please Print Clearly)

USPS

Delivery Address

City            State    ZIP + 4 Code



## CERTIFIED MAIL

7111 5495 5583 1273 6894

**RETURN RECEIPT REQUESTED**

Article Addressed To:

BFC CONSTRUCTION CORP.
BFC CONSTRUCTION CORP.
2226 FIRST AVE
NEW YORK, NY 10029-2307



**KELNER AND KELNER**

ATTORNEYS AT LAW
140 BROADWAY
37TH FLOOR
NEW YORK, N.Y. 10005

(212) 425-0700
FAX NO.: (212) 425-0007

L. I. OFFICE
114 OLD COUNTRY ROAD, SUITE 152
MINEOLA, N.Y. 11501

July 8, 2004

<u>*Via Certified Mail*</u>

105 Street Associates, LLC
c/o Donald Capoccia
2226 First Avenue
New York, New York 10029

Re: Richard Conrad v. 105 Street Associates, LLC., Et Al.

Dear Sir/Madam,

This office represents the plaintiff in the above-reference matter. A recent review of our file reveals that on April 20, 2004 a Summons and Verified Complaint with respect to this matter was served upon you via the Secretary of State. To date, however, we have not received an appearance and/or answer on your behalf. Thus, you are in default.

Enclosed please find a copy of the summons and complaint, together with a copy of the affidavit of service thereof. It is suggested that you turn the enclosed documentation over to the appropriate party so that an appearance and/or answer can be interposed on your behalf.

Your failure to so appear and/or answer within ten (10) days from the date of this letter will leave us no alternative but to move for a Default Judgement as against you.

Very truly yours,

Kelner & Kelner, Esqs.

Kathleen M. Campoverde,
Paralegal for Gail S. Kelner, Esq.

P00079



Our first and only notification of this incident (Richard Conrad vs. BFC Construction Corp.) was received by my office on September 16, 2002. Estelle Rodriguez of BFC Construction Corp. forwarded to my office in a letter dated September 12, 2002, a copy of the original letter and second request from the Law Offices of Conrad J. Benedetto pertaining to this incident. In her correspondence, she included a description of the incident dated July 1, 2002, a copy of a certificate of insurance from Jem Erectors, Inc. referencing a Madison Avenue project and a picture of the site. In a subsequent phone call to Estelle on the date of our receipt, she mentioned that she was unaware of any details pertaining to this incident and did not know what project of BFC Construction Corp. that it involved.

We immediately reported the incident to the insurance carrier for BFC Construction Corp. by fax. (a copy of our incident report is attached) and a copy of their acknowledgement of September 23, 2002 is attached. Please note that the letter from the Law Offices of Conrad J. Benedetto references BFC Construction Corp., only, and not any other entities. This was the only correspondence sent to my office with regard to the incident. In addition, there was no lawsuit sent to us with regard to this matter to indicate an action being brought against either 105 Street Associates, LLC or BFC Partners, L.P.

On October 11, 2002, the Insurance Carrier for BFC Construction Corp. through their claims administration issued a declination citing a variety of reasons .... one of which was a violation of the terms and conditions in reporting the incident "2 months and 16 days" after the client was aware of it (late reporting). In addition, they cited a specific exclusion of coverage regarding the policy warranty that BFC Construction Corp. have a signed written contract with anyone who performs work on their behalf requiring them to indemnify and hold them harmless. Harold J. Siering's letter is specific on this point and references attempts to secure copies of the signed written contract. Upon receipt of this declination, I immediately contacted Greg Cross at BFC and suggested that he turn the file over to Donald Schneider, their attorney. Accordingly, on October 21, 2002, we faxed to Greg a copy of the entire file for handling. This was the last we heard of this incident that was declined by Sirius America Insurance Company.

Then, on July 19, 2004, we received by certified mail a copy of the summons that was revised to include Richard Conrad against 105 Street Associates, LLC and BFC Partners, L.P., in addition to BFC Construction Corp. I referred back to the original claim that was denied by the Sirius America Insurance Company and returned the summons to the insured with my letter dated July 25, 2004 (copy attached), urging them to refer this to their attorney for further handling. I incorrectly stated in my letter of July 26, 2004 that 105 Street Associates, LP did not have insurance for the date of the incident referenced above. I received a call from Greg Baron of BFC Construction Corp. on August 16, 2004 to discuss the claim further. I requested a copy of the documentation which was then faxed to me. Thereafter, we put the Insurance Carrier for 105 Street Associates, LLC (Greenwich Insurance Company) on notice of this incident. The only documentation we were able to provide the Greenwich Insurance Co. with was the contents of our file that made no reference to 105 Street Associates, LLC.



DEFENDANT'S EXHIBIT
B
12/5/06 mH





**12/05/06 105 STREET ASSOCIATES vs GREENWICH**     **WITNESS: S. POTOLSKY**

**Diamond Reporting**

**Page 1 to Page 127**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:    (718) 624-7200*
*FAX:    (718) 855-1772*



Page 1

(1)
(2) DISTRICT COURT OF THE STATE OF NEW YORK
    COUNTY OF NEW YORK
(3) ------------------------------------X
    105 STREET ASSOCIATES, LLC,
(4)
    PLAINTIFF,
(5)
    -against- Index No· 05CV 9938(VM)
(6)
    GREENWICH INSURANCE COMPANY,
(7)
    DEFENDANT.
(8) ------------------------------------X
(9) **DATE:**    December 5, 2006
(10) **TIME:**    11·00 a.m.
(11)
(12)
(13) EXAMINATION BEFORE TRIAL of a
(14) Non-Party Witness, STEVEN POTOLSKY, taken by
(15) the Defendant, pursuant to a Subpoena, held at
(16) the offices of North Shore Risk Management,
(17) LLC, 33 Powerhouse Road, Roslyn, New York
(18) 11577, before a Notary Public of the State of
(19) New York.
(20)
(21)
(22)
(23)
(24)
(25)

Page 2

(1)
(2) A P P E A R A N C E S:
(3)
(4) SCHNEIDER, GOLDSTEIN, BLOOMFIELD, LLP.
    Attorneys for the Plaintiff
(5)  90 Broad Street, 6th Floor
    New York, New York 10004
(6) BY· DONALD F. SCHNEIDER, ESQ
(7)
(8) WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER,
    LLP.
(9)  Attorneys for the Defendant
    150 East 42nd Street
(10) New York, New York 10017-5639
    BY· GLENN I. FUERTH, ESQ.
(11)
(12)
(13)
(14) * * *
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)

(23)
(24)
(25)

Page 3

(1)
(2)  221. UNIFORM RULES FOR THE
     CONDUCT OF DEPOSITIONS
(3)
     221.1 Objections at Depositions
(4)  (a) Objections in general. No objections
     shall be made at a deposition except those
(5)  which, pursuant to subdivision (b), (c) or (d)
     of Rule 3115 of the Civil Practice Law and
(6)  Rules, would be waived if not interposed, and
     except in compliance with subdivision (e) of
(7)  such rule. All objections made at a
     deposition shall be noted by the officer
(8)  before whom the deposition is taken, and the
     answer shall be given and the deposition shall
(9)  proceed subject to the objections and to the
     right of a person to apply for appropriate
(10) relief pursuant to Article 31 of the CPLR.
     (b) Speaking objections restricted.
(11) Every objection raised during a deposition
     shall be stated succinctly and framed so as
(12) not to suggest an answer to the deponent and,
     at the request of the questioning attorney,
(13) shall include a clear statement as to any
     defect in form or other basis of error or
(14) irregularity. Except to the extent permitted
     by CPLR Rule 3115 or by this rule, during the
(15) course of the examination persons in
     attendance shall not make statements or
(16) comments that interfere with the questioning.
(17) 221.2 Refusal to answer when objection is made
     A deponent shall answer all questions at
(18) a deposition, except (i) to preserve a
     privilege or right of confidentiality, (ii) to
(19) enforce a limitation set forth in an order of
     the court, or (iii) when the question is
(20) plainly improper and would, if answered, cause
     significant prejudice to any person. An
(21) attorney shall not direct a deponent not to
     answer except as provided in CPLR Rule 3115 or
(22) this subdivision. Any refusal to answer or
     direction not to answer shall be accompanied
(23) by a succinct and clear statement of the basis
     therefor. If the deponent does not answer a
(24) question, the examining party shall have the
     right to complete the remainder of the
(25) deposition.

Page 4

(1)
(2)  221. UNIFORM RULES FOR THE
     CONDUCT OF DEPOSITIONS
(3)
     221.3 Communication with the deponent
(4)  An attorney shall not interrupt the
     deposition for the purpose of communicating
(5)  with the deponent unless all parties consent

or the communication is made for the purpose
(6) of determining whether the question should not
be answered on the grounds set forth in
(7) section 221.2 of these rules and, in such
event, the reason for the communication shall
(8) be stated for the record succinctly and
clearly.
(9)
(10)
(11)    IT IS FURTHER STIPULATED AND AGREED that
the transcript may be signed before any Notary
(12) Public with the same force and effect as if
signed before a clerk or a Judge of the court.
(13)
(14)    IT IS FURTHER STIPULATED AND AGREED that
the examination before trial may be utilized
(15) for all purposes as provided by the CPLR.
(16)
IT IS FURTHER STIPULATED AND AGREED that
(17) all rights provided to all parties by the CPLR
cannot be deemed waived and the appropriate
(18) sections of the CPLR shall be controlling with
respect hereto.
(19)
(20)    IT IS FURTHER STIPULATED AND AGREED by
and between the attorneys for the respective
(21) parties hereto that a copy of this examination
shall be furnished, without charge, to the
(22) attorneys representing the witness testifying
herein.
(23)
(24)
(25)

### Page 5

(1)
(2) S T E V E N  P O T O L S K Y, called as a
(3) witness, having been first duly sworn by a
(4) Notary Public of the State of New York, was
(5) examined and testified as follows:
(6) EXAMINATION BY
(7) MR. FUERTH:
(8)    Q.    Please state your name for the
(9) record.
(10)    A.    Steven Potolsky.
(11)    Q.    Where do you reside?
(12)    A.    50 East 89th Street, Apartment
(13) 32-F, New York, New York 10128.
(14)    Q.    Good morning, Mr. Potolsky. My
(15) name is Glenn Fuerth. I represent Greenwich
(16) Insurance Company in a declaratory judgment
(17) action started by 105 Street Associates, LLC.
(18) Initially Ms. Weiner from your office had been
(19) subpoenaed, but by agreement with counsel, you
(20) are taking her place, or at least you will be
(21) testifying instead of her.
(22)    If there comes a time where you
(23) don't understand a question that I ask you,
(24) please let me know and I will rephrase it.
(25)    Also, since the court reporter can only take

### Page 6

(1)
(2) down verbal responses, please respond in some
(3) fashion to my questions other than with a
(4) gesture, because that will not be reflected in
(5) the transcript.
(6)    As the court reporter can only
(7) take down what one person is saying at a time,
(8) please wait for me to finish my question
(9) before you begin to give an answer. Do you
(10) understand that?
(11)    A.    Yes.
(12)    Q.    Have you ever been deposed before?
(13)    A.    No.
(14)    Q.    Before this deposition, did you
(15) have any discussions with Donald Schneider
(16) concerning the declaratory judgment action?
(17)    A.    Yes.
(18)    Q.    When did you have those
(19) discussions with him?
(20)    A.    I don't know when it first was,
(21) but it was probably – I had a discussion with
(22) him at the time the claim was denied and
(23) periodically over this interim period until
(24) today.
(25)    Q.    Did you have any specific

### Page 7

(1)
(2) discussions with Mr. Schneider, forgetting
(3) about the background of the circumstances
(4) giving rise to the DJ action, but as opposed
(5) to specific discussions concerning your
(6) deposition today?
(7)    A.    No. Not specific discussions
(8) about the deposition, just discussions about
(9) the incident leading up to this deposition.
(10)    Q.    That was with respect to the
(11) submission of the claim, the denial of
(12) coverage and that periodic discussions
(13) thereafter?
(14)    A.    The sequence of events, yes.
(15)    Q.    Now, I notice that you're looking
(16) at a written document. What is that?
(17)    A.    I summarized for myself the
(18) information that you had requested for this
(19) deposition. So instead of turning back to the
(20) paperwork, I could look at this quickly.
(21)    MR. FUERTH:    Could we get that
(22) marked as Defendant's A for identification,
(23) please.
(24)    (Whereupon, the aforementioned
(25) document was marked as Defendant's Exhibit A

### Page 8

(1)
(2) for identification as of this date by the
(3) Reporter )
(4)    Q.    Now, going back before the Conrad
(5) claim came in, did your company prepare the
(6) submission for coverage for a company known as
(7) BFC Construction relating to a project at
(8) 235-247 East 105th Street?

(9)    A.    For BFC Construction, I renewed
(10)    their general liability policy as of January 1
(11)    '02 to '03. Which would be inclusive of all
(12)    the construction projects they were involved
(13)    in.
(14)    Q.    Of those construction projects,
(15)    it's your understanding that one of them was
(16)    located at 235-247 East 105th Street?
(17)    A.    I'm not clear if I knew that at
(18)    the time, but it was made – I was made aware
(19)    of it and I ended up lining up separate
(20)    insurance for 105th Street Associates, LLC in
(21)    April of '02.
(22)    Q.    Now, in terms of the CGL policy
(23)    for BFC, was there and endorsement that
(24)    covered various project locations without
(25)    specifying the location or something else?

Page 9

(1)
(2)    A.    There was an ISO endorsement 2503
(3)    which had a per project aggregate. So each
(4)    individual project did not have to be named.
(5)    Q.    Who, if anyone, did you discuss
(6)    the renewal of the CGL policy with from BFC?
(7)    A.    There could have been any number
(8)    of people prior to January of '02, because
(9)    it's just part of their renewal process. I
(10)    have to get a lot of information and contract
(11)    applications. So it would have involved a
(12)    number of people at BFC, and I can't who they
(13)    were.
(14)    Q.    Do you recall which people that
(15)    you had dealt with at BFC concerning its
(16)    insurance needs irrespective whether it was
(17)    the CGL policy?
(18)    A.    Ordinarily what would happen was,
(19)    and I'm remembering back because they're not
(20)    currently a client of mine. I would speak
(21)    to – really any number of – a few people,
(22)    one who would be Donald Capoccia.
(23)    Q.    Could you spell that for the
(24)    reporter
(25)    A.    Capoccia, C-A-P-O-C-C-I-A.

Page 10

(1)
(2)    Estelle Rodriguez, Greg Baron.
(3)    Q    B-A-R-O-N?
(4)    A.    Right. You know, there may have
(5)    been some other people, but these were my
(6)    principal contacts.
(7)    Q.    What did you understand Mr
(8)    Capoccia's position to be with BFC?
(9)    A.    One of the principals.
(10)    Q.    Ms. Rodriguez?
(11)    A.    An assistant.
(12)    Q.    When you say assistant, like a
(13)    secretary/office manager, something like that?
(14)    A.    Secretarial office manager, that's
(15)    correct.
(16)    Q    Mr  Baron?

(17)    A.    Also a principal.
(18)    Q.    Now, with respect to the policy
(19)    that you procured for 105 Street Associates,
(20)    what type of policy was that?
(21)    A.    From 105 Street Associates I
(22)    procured a comprehensive general liability and
(23)    builders risk.
(24)    Q.    In preparing that submission, who
(25)    did you speak with who you understood to be

Page 11

(1)
(2)    with 105 Street Associates?
(3)    A.    Ordinarily I would be contacted
(4)    for a variety of projects that they might have
(5)    been involved in on behalf of owners. It
(6)    could have been Beth Burns. There was another
(7)    woman, I think her name was Elizabeth Selby at
(8)    the time. I'm not certain of that, but I know
(9)    Beth was.
(10)    Q    Did you understand Ms  Burns or
(11)    Ms. Selby to be principals of 105 Street
(12)    Associates?
(13)    A.    No.
(14)    Q.    What did you understand their
(15)    position to be?
(16)    A.    Working on behalf of the owners.
(17)    Q.    Again, were they assistants,
(18)    secretaries, office managers?
(19)    A.    I think Beth was one of the people
(20)    in charge of development projects.
(21)    Q.    Ms  Selby?
(22)    A.    Also the same.
(23)    Q.    Did you have an understanding as
(24)    to who, if anyone, was a principal of 105
(25)    Street Associates?

Page 12

(1)
(2)    A.    Not at the outset.
(3)    Q.    Did you come to have an
(4)    understanding at some point?
(5)    A.    I did because we tried to add 105
(6)    Street Associates to a BFC policy, but we
(7)    subsequently found out there was a
(8)    noncombinability issue because of the
(9)    ownership.
(10)    Q.    What was the ownership that made
(11)    it – that gave rise to the non --
(12)    A.    I think it was a limited partner.
(13)    An entity called WNC, that had a 99 percent
(14)    interest in the project.
(15)    Q.    Did you understand who the
(16)    principals were of WNC?
(17)    A.    No.
(18)    Q.    Did you ever come to learn whether
(19)    Mr Capoccia or Mr Baron had an interest in
(20)    the WNC limited partnership?
(21)    A.    In the limited partnership, no.
(22)    Q.    Did you ever come to learn whether
(23)    Mr  Capoccia or Mr. Baron had an interest in
(24)    105 Street Associates?

BSA          12/05/06 105 STREET ASSOCIATES vs GREENWICH    WITNESS: S. POTOLSKY    XMAX(4/4)

Page 13

(25)  A.  I believe a general partner

(1)

(2)  interest not there. I don't know whether it

(3)  was their individual names, but there may have

(4)  been an entity that was created where they

(5)  would have a part ownership.

(6)  Q.  So, to your understanding, Mr

(7)  Capoccia and Mr. Baron had an interest in some

(8)  entity that had an ownership interest in 105

(9)  Street Associates?

(10)  A.  A limited – a minor interest.

(11)  Q.  You don't recall what the entity

(12)  was that Mr. Capoccia and Mr. Baron had an

(13)  interest in that in turn had an interest in

(14)  105 Street Associates?

(15)  A.  I have it.

(16)  Q.  You do have it?

(17)  A.  I do have it.

(18)  Q.  Is it –

(19)  A.  Yes. At least I think I have it.

(20)  We'll see in a second.

(21)  No, I don't. I don't know the

(22)  entity, but I do know that it said that WNC

(23)  Eastern Community Development Advisors, LLC

(24)  has a 99 percent interest in the deal.

(25)  Q.  In 105?

Page 14

(1)

(2)  A.  In 105, correct.

(3)  Q.  Is that a letter that you're

(4)  looking at?

(5)  A.  It was a fax to Donald Capoccia

(6)  about my inability to add 105 Street

(7)  Associates to the master general liability

(8)  policy that was placed by Sirius America.

(9)  MR. FUERTH:    Could we have that

(10)  marked, please.

(11)  (Whereupon, the aforementioned fax

(12)  was marked as Defendant's Exhibit B for

(13)  identification as of this date by the

(14)  Reporter.)

(15)  Q.  Looking at what has been marked as

(16)  Defendant's Exhibit B for identification,

(17)  there is an indication that, quote, the

(18)  company will not add the entity as there is no

(19)  combinable ownership interest, close quote.

(20)  To your understanding, what was

(21)  that referring to?

(22)  A.  I was requested by Donald Capoccia

(23)  to, instead of placing a separate liability

(24)  policy on behalf of 105 Street Associates in

(25)  April, their intent was to combine this entity

Page 15

(1)

(2)  under a master liability insurance program in

(3)  order to save the premium so there wouldn't be

(4)  a double hit.

(5)  Q.  Let me show you what has been

(6)  previously mark as Greenwich Exhibit B, at a

(7)  May 24th, 2006 deposition. And I ask you

(8)  whether you have ever seen this before, and if

(9)  so, what is this, to your understanding.

(10)  A.  It's an application that I

(11)  prepared in order to place a general liability

(12)  policy on behalf of 105 Street Associates,

(13)  LLC. It's dated March 14th, 2002.

(14)  Q.  Was this prepared as a result of

(15)  the refusal of Sirius, that's S-I-R-I-U-S, to

(16)  have 105 named as an additional insured on

(17)  BFC's –

(18)  A.  No.

(19)  Q.  – CGL?

(20)  A.  No.

(21)  Q.  What was the reason that this

(22)  submission was prepared?

(23)  A.  I was approached on this as a

(24)  project that BFC Construction Corp was looking

(25)  into back in March, and I was approached by, I

Page 16

(1)

(2)  believe either Beth Burns or Elizabeth Selby,

(3)  as I mentioned. For me the normal procedure

(4)  was to go out, shop out, get insurance quotes,

(5)  in the event that separate insurance needed to

(6)  be taken out on behalf of this ownership

(7)  entity.

(8)  Q.  So this submission that is in

(9)  Exhibit B was prepared before you received –

(10)  A.  That's correct.

(11)  Q.  Just let me finish.

(12)  – before you receive the refusal

(13)  from Sirius to have 105 named as an additional

(14)  insured?

(15)  A.  That's correct. Sorry.

(16)  Q.  So, Defendant Greenwich Exhibit B

(17)  from the May 24 deposition was prepared as a

(18)  potential fall back position?

(19)  A.  No.

(20)  Q.  Then please explain.

(21)  A.  A policy of insurance was placed

(22)  on general liability and a builders risk

(23)  policy was taken out on behalf of 105 Street

(24)  Associates, LLC as a requirement in order for

(25)  them to be able to close construction on it.

Page 17

(1)

(2)  So a separate insurance was placed on their

(3)  behalf.

(4)  Q.  Would it be fair to say, then,

(5)  that the attempt to have 105 named as an

(6)  additional insurance on the BFC policy was to

(7)  make the BFC policy primary in the event of a

(8)  claim arising from the construction?

(9)  A.  The intent was to add on 105

(10)  Street Associates, LLC as a named insured, not

(11)  as an additional insured. Because they had a

(12)  blanket additional insured endorsement on the

(13)  existing policy with Sirius America. I

(14)  believe it's as required by contract what the

(15)  intent of Donald Capoccia was. What he wanted
(16)  to do was to be able to eliminate the policy
(17)  that had been placed with Greenwich and save
(18)  the money, and have this entity included as a
(19)  named insured on the BFC Construction policy
(20)  with Sirius America.
(21)    Q.   So it was then the intention to
(22)  cancel the Greenwich policy if 105 would be an
(23)  additional insured?
(24)    A.   A named insured.
(25)    Q.   I'm sorry, yes. A named insured

Page 18

(1)
(2)  with the intention to cancel the Greenwich
(3)  policy if 105 would be a named insured?
(4)    A.   That is correct.
(5)    Q.   With respect to the Exhibit B
(6)  submission from the May 24 deposition, was it
(7)  Mr. Capoccia that you dealt with from BFC?
(8)    A.   I'm not understanding the
(9)  question.
(10)    Q.   In terms of having the Greenwich
(11)  policy be cancelled if 105 became a named
(12)  insured on the BFC policy, with respect to
(13)  that transaction, who were you dealing with
(14)  from BFC?
(15)    A.   I believe both Donald Capoccia and
(16)  Beth Burns.
(17)    Q.   Who, if anyone, were you dealing
(18)  with from 105?
(19)    A.   Donald Capoccia or Beth Burns.
(20)    Q.   Now, to your understanding, back
(21)  in July of 2002, where was BFC's office
(22)  located?
(23)    A.   2226 First Avenue, New York City.
(24)    Q.   What about 105 Street Associates?
(25)    A.   The same.

Page 19

(1)
(2)    Q.   Back in July of 2002, did you have
(3)  an understanding that Mr Capoccia worked out
(4)  of the 2226 First Avenue location?
(5)    A.   Yes.
(6)    Q.   Did you have an understanding that
(7)  Mr Greg Baron worked out of the 2226 First
(8)  Avenue?
(9)    A.   Yes.
(10)    Q.   What about Ms Beth Burns?
(11)    A.   Yes.
(12)    Q.   What about Estelle Rodriguez?
(13)    A.   Yes.
(14)    Q.   Did you have an understanding as
(15)  to whether Ms. Rodriguez worked for both BFC
(16)  and 105 back in July of 2002?
(17)    A.   I can't answer that. I know she
(18)  worked for BFC Construction. I can't comment
(19)  on her involvement with 105 Street Associates.
(20)    Q.   How do you know she worked for
(21)  BFC?
(22)    A.   I have known Estelle since BFC was

(23)  formed.
(24)    Q.   When was that? When was it
(25)  formed?

Page 20

(1)
(2)    A.   The exact dates I don't know.
(3)    Q.   Approximately.
(4)    A.   Let's say 1992. I'm not certain
(5)  on the dates.
(6)    Q.   Early '90s, would that be fair?
(7)    A.   I believe so. Could be the mid
(8)  '90s. I'm not certain.
(9)    Q.   Sometime before '96, would that be
(10)  a fair ballpark?
(11)    A.   I believe so, yes.
(12)    Q.   Let me show you what has been
(13)  marked previously as Greenwich Exhibit A in a
(14)  May 24, '06 deposition. And I ask whether you
(15)  have ever seen a copy of this document before?
(16)    A.   I personally don't recall seeing
(17)  this document.
(18)    Q.   Did you ever come to have an
(19)  understanding as -- or have an awareness of
(20)  the subject of this document?
(21)    A.   I'm aware that we placed a general
(22)  liability policy, and this appears to be an
(23)  inspection of that property.
(24)    Q.   And you have that understanding
(25)  based upon reviewing the document, also your

Page 21

(1)
(2)  experience as a broker?
(3)    A.   It's standard procedure, a policy
(4)  is placed, the insurance carriers set up an
(5)  inspection of the premises.
(6)    Q.   Did you have any specific
(7)  awareness that such as an inspection was being
(8)  performed in May of 2002?
(9)    A.   I'm not -- ordinarily -- I'm the
(10)  owner here, and I have an underwriter here who
(11)  handles the day-to-day handling of an
(12)  account. So I was not aware of it
(13)  specifically.
(14)    Q.   That would be something that your
(15)  underwriter would be involved with?
(16)    A.   Yes. The person in my office,
(17)  correct.
(18)    Q.   And the underwriter for this
(19)  particular submission was who?
(20)    A.   I'm not sure whether it was Edward
(21)  Griminger or Joyce Piselli in my office. It
(22)  may have been Joyce. I'm not certain.
(23)    Q.   Now, let me show you what has been
(24)  previously marked as Defendant Greenwich C for
(25)  identification, on May 24, 2006. And I ask

Page 22

(1)
(2)  you, what is this document?
(3)    A.   An ACORD 25 S certificate of
(4)  liability.

(5)    Q.    Do you have an understanding as to
(6)  why what has been marked at Defendant's
(7)  Exhibit C was prepared?
(8)    A.    It would have been prepared as BFC
(9)  with the general contractor for the new
(10)  construction of this property. And it was
(11)  prepared on November 1st, 2002.
(12)    Q.    Was Exhibit C prepared to provide
(13)  evidence of 105 Street Associates being a
(14)  named insured on the BFC policy?
(15)    A.    No.
(16)    Q.    What was the reason that that
(17)  would be prepared?
(18)    A.    It was to evidence coverage that
(19)  105 Street Associates was added as an
(20)  additional insured, not a named insured.
(21)  Again, there is a distinction.
(22)    Q.    To your understanding, what is the
(23)  distinction between a named insured and
(24)  additional and an additional insured?
(25)    A.    A named insured provides primary

Page 23

(1)
(2)  coverage for the entity that's added on to a
(3)  specific policy. An additional insured
(4)  provides vicarious liability acts of the named
(5)  insured, in this case, BFC Construction Corp.
(6)    Q.    Was this certificate of insurance
(7)  showing 105 as an additional insured to the
(8)  BFC policy prepared after the request was
(9)  refused to have 105 Street Associates be a
(10)  named insured?
(11)    A.    Based on the date this was issued,
(12)  I would say yes.
(13)    Q.    What was the reason that a
(14)  certificate was prepared to have 105 be an
(15)  additional named insured on the BFC policy?
(16)    A.    Again, you keep saying additional
(17)  named insured. This was not requested. This
(18)  is an additional insured status. There is
(19)  again a distinction between the named insured
(20)  and an additional insured.
(21)    Q.    And the additional insured is the
(22)  one that gets the vicarious coverage arising
(23)  from the negligent acts of BFC?
(24)    A.    Correct.
(25)    Q.    And the additional named insured

Page 24

(1)
(2)  would obtain primary coverage?
(3)    A.    A named insured would obtain
(4)  primary coverage, correct.
(5)    Q.    Is there a designation of
(6)  additional named insured?
(7)    A.    No. The insurance carrier would
(8)  not add 105 Street Associates as a named
(9)  insured onto the policy because of a
(10)  noncombinability.
(11)    Q.    So, what was the reason for
(12)  seeking to have 105 noted as an additional

(13)  insured to the BFC policy?
(14)    A.    It's probably a requirement that
(15)  they had when the project was developed. They
(16)  would have to look at documents, but this is a
(17)  standard procedure where an ownership entity
(18)  would ask a general contractor to include them
(19)  as additional insured.
(20)    Q.    With respect to the additional
(21)  insured request, was it the intent of 105 to
(22)  cancel the CGL policy with Greenwich?
(23)    A.    Could you repeat that.
(24)    Q.    Sure. As I understand it, at the
(25)  time that the attempt was made to have 105 as

Page 25

(1)
(2)  an additional named insured on the BFC policy,
(3)  the intent was to cancel the CGL policy that
(4)  had been issued to 105 by Greenwich; correct?
(5)    MR. SCHNEIDER:    Object to the form
(6)  of the question. You can answer
(7)    THE WITNESS:    I'm sorry –
(8)    Q.    That's a legal thing between –
(9)    MR. SCHNEIDER:    I was just making
(10)  an objection for the record and you can go
(11)  ahead and answer it, if you can.
(12)    A.    The intent would have been to
(13)  cancel the primary policy that was placed by
(14)  Greenwich, but Sirius America would not add on
(15)  105 Street Associates to the general liability
(16)  policy that they issued in the name of BFC
(17)  Construction Corp.
(18)    Q.    At that time, the intent was to
(19)  have 105 be an additional named insured,
(20)  correct?
(21)    A.    At the time when we applied to
(22)  Sirius America, the intent was to see if it
(23)  were combinable on that policy, correct.
(24)    Q.    Now, at the time that the
(25)  certificate was prepared where 105 Street

Page 26

(1)
(2)  Associates was to be an additional insured on
(3)  the BFC policy with Sirius, was there an
(4)  intention other than what was required by the
(5)  contract to then cancel the Greenwich policy?
(6)    A.    No.
(7)    Q.    No. So they would only have
(8)  cancelled the Greenwich policy had 105 been
(9)  added as an additional named insured?
(10)    A.    Yes. They needed primary
(11)  liability, correct.
(12)    Q.    And because the additional insured
(13)  status only provided vicarious coverage, 105
(14)  did not intend to cancel the Greenwich policy?
(15)    A.    That's correct.
(16)    MR. FUERTH:    Could you mark this
(17)  as C, please.
(18)    (Whereupon, the aforementioned
(19)  Letter was marked as Defendant's Exhibit C for
(20)  identification as of this date by the

(21)  Reporter )

(22)    Q.    Mr. Potolsky, I show you what has

(23)  been marked as Defendant's Exhibit C for

(24)  identification.

(25)    MR. SCHNEIDER:    May I see it

Page 27

(1)

(2)  before –

(3)    MR. FUERTH:    Let me just read it

(4)  into the record and then I will show it to

(5)  you.

(6)    Q.    C for identification, which is an

(7)  August 6th, 2002 letter from a Conrad

(8)  Benedetto, B-E-N-E-D-E-T-T-O, addressed to BFC

(9)  Construction. And the second page consists of

(10)  a certified – a copy of a certified mail

(11)  envelope. And I just want to show it to

(12)  counsel, and then I will ask whether you have

(13)  ever seen a copy of that document before

(14)    A.    Yes. I have seen a copy of the

(15)  letter.

(16)    Q.    What were the circumstances where

(17)  you saw that letter?

(18)    A.    I received a copy of the letter on

(19)  September 16th, 2002.

(20)    Q.    Who did you receive the copy of

(21)  the letter from?

(22)    A.    Estelle Rodriguez.

(23)    MR. FUERTH:    Could you mark this

(24)  as D.

(25)    (Whereupon, the aforementioned

Page 28

(1)

(2)  Letter was marked as Defendant's Exhibit D for

(3)  identification as of this date by the

(4)  Reporter )

(5)    MR. SCHNEIDER:    Do you have

(6)  additional copies of all of the documents?

(7)    MR. FUERTH:    No, I'm sorry.

(8)    Q.    I show you what has been marked as

(9)  Exhibit D, which is a September 12th, 2002

(10)  letter, apparently on a BFC letterhead,

(11)  addressed to North Shore Risk Management from

(12)  Estelle Rodriguez and I ask whether you have

(13)  ever seen a copy of that letter before?

(14)    A.    Yes.

(15)    Q.    That was the letter that you just

(16)  testified to was received in your office on

(17)  September 16th?

(18)    A.    Correct.

(19)    Q.    Did you personally receive that

(20)  September 12th letter from Ms. Rodriguez or

(21)  someone in your office?

(22)    A.    Someone in my office.

(23)    Q.    Did it then --

(24)    A.    Filtered to me.

(25)    Q.    It filtered to you.

Page 29

(1)

(2)    You had previously indicated that

(3)  either Mr Griminger or Ms. Piselli were the

(4)  underwriters on this risk at North Shore  In

(5)  September of 2002, did North Shore have a

(6)  claims department that would handle claims

(7)  sent in by their insureds?

(8)    A.    I have a person who's assigned to

(9)  handling claims, yes.

(10)    Q.    Who was that?

(11)    A.    Barbara Weiner.

(12)    Q.    Was she assigned to handling

(13)  claims in September of 2002?

(14)    A.    Yes.

(15)    Q.    Was Ms. Weiner the individual who

(16)  brought Exhibit D to your attention?

(17)    A.    No. The person who opened the

(18)  mail.

(19)    Q.    What was the reason that it came

(20)  to you as opposed to Ms. Weiner?

(21)    A.    I see all the mail.

(22)    Q.    And then you distribute to

(23)  whomever it goes to?

(24)    A.    Correct.

(25)    Q.    After you received Exhibit D what,

Page 30

(1)

(2)  if anything, did you do in response?

(3)    A.    I called Estelle Rodriguez up.

(4)    Q.    Do you recall the substance of

(5)  your discussion with her?

(6)    A.    Absolutely.

(7)    Q.    What was it?

(8)    A.    I asked her for the particulars on

(9)  what happened, what project it involved.

(10)    Q.    Anything else?

(11)    A.    And I probably discussed the

(12)  contents of her transmittal to me.

(13)    Q.    Would you consider the letter that

(14)  is Exhibit D to be a notification of a claim

(15)  by an insured to your office?

(16)    A.    Yes.

(17)    Q.    When your office receives a

(18)  notification of a claim from an insured, do

(19)  you set up a claim file?

(20)    A.    Yes.

(21)    Q.    How is the claim file identified?

(22)    A.    There is a separate claims

(23)  transmittal form that's prepared. Depending

(24)  upon the documentation that we have, we may

(25)  include a copy of the insurance policy. We

Page 31

(1)

(2)  try to obtain the certificate of insurance, in

(3)  this instance from a subcontract, BFC

(4)  contractor on a job, or whatever we have that

(5)  we can provide to an insurance company.

(6)    Q.    In terms of the physical file that

(7)  is set up, how is it identified? Is it

(8)  identified by insured, claimant, project

(9)  location –

(10)    A.    By insured.

BSA      12/05/06 105 STRE  ASSOCIATES vs GREENWICH      WI  ESS: S. POTOLSKY      XMAX(8/8)

(11)     Q.   So a claim file was set up,
(12)  labeled, so to speak, BFC Construction?
(13)     A.   Correct.
(14)     Q.   How do you distinguish one claim
(15)  from another, assuming an insured would have
(16)  more than one claim?
(17)     A.   I believe it's handled in date
(18)  order. Based on the date of loss.
(19)     Q.   Is it put physically in the same
(20)  file or a separate file set up?
(21)     A.   There are files that are set up,
(22)  in this instance by client. So I believe BFC,
(23)  any claims that they might have had, general
(24)  liability claims, would be put in one file and
(25)  property claims in another.

Page 32

(1)
(2)     Q.   So just assuming for discussion
(3)  purposes that one particular insured at one
(4)  particular project had seven claims over
(5)  different times, they would all go into the
(6)  same claim folder?
(7)     A.   Depending upon the size of the
(8)  actual claim and the amount of documentation,
(9)  there could be multiple files, but they're in
(10)  the same part of a filing area or cabinet.
(11)     Q.   What I'm looking at specifically
(12)  is, you know, is it a letter sized folder that
(13)  the claim information gets put into and that
(14)  has a label with the insured's name on it?
(15)     A.   Again, depending upon the size of
(16)  the claim, there may be multiple incidents in
(17)  a file where it could be in a file by itself.
(18)     Q.   Would it be in a letter sized
(19)  folder in a particular file cabinet?
(20)     A.   Yes.
(21)     Q.   That file cabinet was set up
(22)  alphabetically by insured?
(23)     A.   Yes.
(24)     Q.   Is there a claim file for the
(25)  Richard Conrad incident of July 2, 2002?

Page 33

(1)
(2)     A.   Yes.
(3)     Q.   Do you have that with you here
(4)  today?
(5)     A.   Yes.
(6)     Q.   Is that in front you?
(7)     A.   Yes.
(8)     Q.   Could I see that, please
(9)     A.   (Witness complies.)
(10)  (Whereupon, an off-the-record
(11)  discussion was held.)
(12)  MR. FUERTH:   Mark that as E,
(13)  please.
(14)  (Whereupon, the aforementioned
(15)  Documents were marked as Defendant's Exhibits
(16)  E, F and G for identification as of this date
(17)  by the Reporter.)
(18)     Q.   Mr. Potolsky, let me show you what

(19)  has been marked as Defendant's Exhibit E for
(20)  identification, and I ask you, what is that
(21)  document?
(22)     A.   It's a certificate of insurance
(23)  which evidences an insurance carrier for Gem
(24)  Erectors and Precast Management, Inc. It's
(25)  confusing, in so far as it appears to be

Page 34

(1)
(2)  unrelated to the project in question.
(3)     Q.   When you say it appears to be
(4)  confusing because it doesn't relate to the
(5)  project in question, is that because under the
(6)  section where it says description of
(7)  operations slash location, et cetera, the
(8)  location of this particular project is not
(9)  listed?
(10)     A.   No. There is a project that is
(11)  listed on that particular certificate of
(12)  insurance, but it appears to contradict an
(13)  accident location that was sent by the
(14)  attorney Conrad Benedetto.
(15)     Q.   And that is because, looking at
(16)  Exhibit D – I'm sorry, Exhibit – withdrawn.
(17)  How does that contradict the
(18)  information sent by Benedetto?
(19)     A.   Well, the reference to this date
(20)  of accident for Richard Conrad was on 105
(21)  Street between Second and Third Avenue, and
(22)  the certificate of insurance indicates a
(23)  Madison Avenue project.
(24)     Q.   Benedetto's letter, to your
(25)  understanding, was accurate concerning the

Page 35

(1)
(2)  site of the accident?
(3)     A.   I have no idea.
(4)     Q.   Have you come to learn whether it
(5)  was accurate concerning the site of the
(6)  accident?
(7)     A.   I believe so. At the time I had
(8)  no idea, and that's why the call was made to
(9)  Estelle Rodriguez.
(10)     Q.   You called her to find out
(11)  specifically which project the accident
(12)  occurred at?
(13)     A.   Yes.
(14)     Q.   Did she have knowledge of which
(15)  project?
(16)     A.   I was told, I have no idea what
(17)  project this is about, we have no idea who
(18)  this person is. This is all I have.
(19)     Q.   Then how did you come to get
(20)  possession of Defendant's Exhibit E, which is
(21)  the Gem Erectors certificate of liability?
(22)     A.   It came with the documents that I
(23)  received on September 16th, 2002. Sent from
(24)  BFC.
(25)     Q.   And that was the September 12th

Page 36

(1)
(2)  letter from Ms. Rodriguez that is Exhibit D?
(3)     A.   Correct.
(4)     Q.   Now, Ms. Rodriguez in the
(5)  September 12th letter makes reference to a
(6)  location of 142 Stokes, S-T-O-K-E-S, Road. To
(7)  your understanding, was she referring to the
(8)  principal address of Gem as opposed to the
(9)  address of the project?
(10)     A.   I believe it would be the address
(11)  of Jem. Which seems to be correct when you
(12)  look at the certificate of insurance.
(13)     Q.   Which is Exhibit E?
(14)     A.   Correct.
(15)     Q.   To your understanding, did Jem
(16)  Erectors' general liability insurer, noted as
(17)  QBE Insurance Corp on Exhibit E, ever respond
(18)  to a tender on behalf of BFC Construction?
(19)     A.   I have no idea.
(20)     Q.   As broker for BFC, would getting
(21)  involved in tendering claims to subcontractors
(22)  be part of –
(23)     A.   No.
(24)     Q.   – your job involvement with BFC?
(25)     A.   No.

Page 37

(1)
(2)     Q.   Let me show you what has been
(3)  marked as Defendant's Exhibit F for
(4)  identification, and I ask whether you have
(5)  ever seen a copy of that document?
(6)     A.   Yes.
(7)     Q.   How did you come to see that?
(8)     A.   Also included in the September
(9)  16th or September 12th transmittal from BFC.
(10)     Q.   Did you discuss this document,
(11)  Defendant's Exhibit F, with Ms. Rodriguez
(12)  after you received the letter of September
(13)  12th, which is Exhibit D?
(14)     A.   Yes, I discussed all of the
(15)  paperwork that she sent.
(16)     Q.   Let me show you what has been
(17)  marked as Exhibit G for identification I ask
(18)  whether you ever received that before or saw
(19)  it before?
(20)     A.   Yes.
(21)     Q.   Was that also included in the
(22)  September 12th letter?
(23)     A.   No, that was received by my office
(24)  on September 19th, I believe.
(25)     Q.   Do you recall the manner in which

Page 38

(1)
(2)  your office received Exhibit G?
(3)     A.   No, I don't even see a copy here
(4)  right now.
(5)     Q.   Well, Exhibit G, I represent, came
(6)  from your claim file.
(7)     A.   Yes.
(8)     Q.   So what I'm asking, was there some

(9)  cover letter that transmitted that Exhibit G
(10)  to you or was there some other means by which
(11)  you received it?
(12)     A.   I don't believe so. No, it came
(13)  by itself.
(14)     Q.   Do you have the envelope or a copy
(15)  of the envelope in which Exhibit G came to
(16)  your office?
(17)     A.   No.
(18)     Q.   Do you recall the manner in which
(19)  Exhibit G came to your office, as it's just
(20)  addressed to BFC Construction?
(21)     A.   No.
(22)     Q.   Did you discuss Exhibit G with
(23)  anyone from BFC Construction after you
(24)  received it?
(25)     A.   It appears to be a second

Page 39

(1)
(2)  notification to BFC of the conversation that I
(3)  had when the original transmittal was sent to
(4)  me on September 12th by Estelle Rodriguez.
(5)     MR. FUERTH:   Could you read that
(6)  answer back, please
(7)     (Thereupon, the last answer was
(8)  read back by the court reporter.)
(9)     Q.   I just don't understand when you
(10)  indicated it seems to be as a result of a
(11)  conversation that you had.
(12)     A.   Estelle sent a letter on September
(13)  12th, which I received on September 16th,
(14)  which had a copy of this letter, the original
(15)  letter.
(16)     Q.   When you say the original letter,
(17)  that's the August 6th letter?
(18)     A.   That's correct.
(19)  So it was a copy of that letter,
(20)  and I had this conversation with her three
(21)  days prior.
(22)     Q.   Well, the September 9 letter or
(23)  Exhibit G is dated subsequent to Exhibit C.
(24)  So what I'm asking is, though the substance of
(25)  Exhibit G and C are the same, one being

Page 40

(1)
(2)  Exhibit G is clearly a second request, did you
(3)  discuss that second request with Estelle?
(4)     A.   I don't remember.
(5)     Q.   Do you maintain memoranda of
(6)  discussions that you have with insureds
(7)  relating to claims made against them?
(8)     A.   No.
(9)     Q.   So let's say these conversations
(10)  with Estelle, there is no note that you made
(11)  concerning having a conversation with her?
(12)     A.   That's correct.
(13)     Q.   How do you recall having a
(14)  conversation with Estelle?
(15)     A.   I remember the letter that came
(16)  in.

(17)    Q.    You remember her September –

(18)    A.    I remember this. Yes.

(19)    Q.    Do you remember all of the claims

(20)    that are made against your insureds?

(21)    A.    No. There are certain clients I

(22)    pay more specific attention to.

(23)    Q.    BFC was one of them?

(24)    A.    When it came to this – in this

(25)    area, yes.

Page 41

(1)

(2)    Q.    What was the reason for that?

(3)    A.    Just, I felt that I needed to stay

(4)    on top of things a bit more.

(5)    Q.    What was the reason for that?

(6)    A.    Just, I felt it – there was a lot

(7)    of activity, it was a very busy client, and I

(8)    wanted to make sure something didn't fall

(9)    through the cracks.

(10)    Q.    So, in other words, you sort of

(11)    displaced Ms  Weiner as the claim person for

(12)    this particular client?

(13)    A.    No. I didn't displace Ms.

(14)    Weiner. In this particular instance there

(15)    were – if there was a claim that would come

(16)    in, I would want to see it, review it, and

(17)    then give direction to Barbara Weiner in how

(18)    to process it, to tell her to prepare it and

(19)    send it out to the insurance carrier.

(20)    Q.    Back in 2002, had Ms  Weiner been

(21)    with you for a while?

(22)    A.    Yes, 25 years.

(23)    Q.    So, I take it that in 2002 she

(24)    knew about claim transmittal to insurance

(25)    companies?

Page 42

(1)

(2)    A.    Yes.

(3)    Q.    What was the reason that you would

(4)    instruct Ms. Weiner how to transmit this claim

(5)    to insurance companies?

(6)    A.    When this claim came in, and I

(7)    reviewed it first, it seemed unclear. And

(8)    what I wanted to do was get more information

(9)    or at least as much information I could get so

(10)    then I could give her direction on how to

(11)    process it.

(12)    I contacted Estelle Rodriguez

(13)    because it seemed unclear where the project

(14)    was, who was involved. And I saw certificate

(15)    of insurance, which referenced the Madison

(16)    Avenue project. And I wanted to make sure

(17)    that I had more information to submit it

(18)    properly to whichever carriers were involved.

(19)    Q.    Well, was there something unclear

(20)    about the Benedetto letters in terms of where

(21)    the claim allegedly arose from?

(22)    A.    The – there was – I think there

(23)    was a reference to 105th between Second and

(24)    Third Avenues. BFC Construction Corp at that

(25)    time was very active as a general contractor

Page 43

(1)

(2)    and construction manager. They were involved

(3)    in many projects and many sites in this

(4)    locality. And it could have been any number

(5)    of projects.

(6)    So I called up to get specifics

(7)    about it and find out exactly what it

(8)    pertained to. And at that point when I did

(9)    that, I was told, we have no idea who this

(10)    person is, we have no idea what project it is

(11)    on. This was the response I got.

(12)    Q.    Now, the handwritten note that is

(13)    Exhibit F for identification, were you

(14)    informed as to who prepared that document?

(15)    A.    No.

(16)    Q.    Did you make any inquiry as to who

(17)    prepared it?

(18)    A.    I asked Estelle about the

(19)    documents. I can't say in particular. I

(20)    can't remember the exact conversation I had

(21)    and everything we discussed.

(22)    Q.    I'm just asking for the

(23)    substance.

(24)    A.    But I discussed the entire packet

(25)    that she sent in because it seemed a little

Page 44

(1)

(2)    unclear.

(3)    Q.    Did she give you any response as

(4)    to who prepared this?

(5)    A.    She did not.

(6)    Q.    Did you subsequently find out who

(7)    prepared Exhibit F?

(8)    A.    I did not.

(9)    Q.    So, to this day, you have no idea?

(10)    A.    I have no idea.

(11)    Q.    So what instructions did you give

(12)    to Ms  Weiner concerning the transmittal of

(13)    this claim to the insurance company?

(14)    A.    As BFC was the only entity named

(15)    in the letter, and I had no better idea what

(16)    job or project or whether this person was even

(17)    involved in anything related to BFC, I told

(18)    Barbara to put the carrier on notice, the

(19)    general liability carrier for BFC

(20)    Construction.

(21)    Q.    That would be Sirius?

(22)    A.    Correct.

(23)    Q.    Putting the CGL carrier on notice,

(24)    was that a standard procedure that you –

(25)    A.    Yes.

Page 45

(1)

(2)    Q.    – do?

(3)    Let me finish first.

(4)    A.    I'm sorry.

(5)    Q.    Is that a standard procedure that

(6)    you do when insureds notify you of liability

(7)  claims?
(8)  A.  Yes.
(9)  Q.  So what was done, if anything,
(10)  differently concerning this BFC risk than you
(11)  would normally to?
(12)  A.  Nothing was done differently.
(13)  What happened was I got a bit more involved.
(14)  In many cases a claim will be clear cut, and I
(15)  will just turn it over and have them submit it
(16)  to an insurance carrier, the general liability
(17)  carrier. In this particular instance, I
(18)  looked through the paperwork that was sent, it
(19)  seemed unclear to me. So I made the call.
(20)  Q.  And the call was to Estelle?
(21)  A.  Estelle. And I didn't leave it to
(22)  my claims person to make that call.
(23)  MR. FUERTH:  If we could have this
(24)  marked as H, please.
(25)  (Whereupon, the aforementioned

Page 46

(1)
(2)  ACORD form was marked as Defendant's Exhibit H
(3)  for identification as of this date by the
(4)  Reporter.)
(5)  Q.  I'm showing you what has been
(6)  marked as Defendant's Exhibit H, which is a
(7)  September 18th, 2002 ACORD form that bears the
(8)  Bates number P00144.
(9)  Now, this is the ACORD form --
(10)  this is the ACORD form that was prepared by
(11)  your office as a result of the receipt of the
(12)  September 12th letter from BFC?
(13)  A.  Correct.
(14)  Q.  If it was reported to you, what is
(15)  the reason that you have noted Barbara Weiner
(16)  in the box on the bottom of the form?
(17)  A.  She is the one who repaired the
(18)  ACORD notice.
(19)  Q.  This ACORD form was sent to
(20)  Sirius?
(21)  A.  Correct.
(22)  Q.  Let me show you what has -- well,
(23)  let me mark it first. I, please
(24)  (Whereupon, the aforementioned
(25)  Document was marked as Defendant's Exhibit I

Page 47

(1)
(2)  for identification as of this date by the
(3)  Reporter.)
(4)  Q.  Let me show you what has been
(5)  marked as Defendant's Exhibit I. It's a
(6)  September 19th, 2002 document from Tri City
(7)  Insurance to North Shore Risk Management,
(8)  bearing Bates number P00145. And I ask you
(9)  whether you have ever seen a copy of Exhibit I
(10)  before?
(11)  A.  Yes.
(12)  Q.  Did you make any response to Ms.
(13)  George at Tri City?
(14)  A.  No, no, no. We sent the

(15)  transmittal, the claims transmittal to Tri
(16)  City, who is the wholesaler who placed the
(17)  policy. And they are confirming receipt of
(18)  our notification to them.
(19)  Q.  So, in essence, you made no
(20)  response for that reason to this confirmation?
(21)  A.  We're just acknowledging receipt
(22)  of our claim transmittal.
(23)  Q.  So Tri City was the wholesale
(24)  broker?
(25)  A.  That's correct.

Page 48

(1)
(2)  Q.  With respect to this confirmation,
(3)  what was the reason that you sent the ACORD to
(4)  the wholesale broker in addition do sending it
(5)  to Sirius?
(6)  A.  We sent it to Sirius via Tri
(7)  City. We don't send it directly to the
(8)  insurance carrier.
(9)  Q.  Is there some transmittal that
(10)  accompanied the ACORD form which is
(11)  Defendant's H?
(12)  A.  There should be. I don't see it,
(13)  but it's date ordered on my computer, so I'm
(14)  sure I could get you a copy of that.
(15)  Q.  So all of the documents that are
(16)  part of your claim file would also be in the
(17)  computer?
(18)  A.  Yes. That I have been involved
(19)  with, yes. I could get you a copy of that if
(20)  you wanted.
(21)  Q.  Could you?
(22)  A.  Yes.
(23)  Q.  All right. Great.
(24)  MR. FUERTH:  Off the record.
(25)  (Whereupon, an off-the-record

Page 49

(1)
(2)  discussion was held.)
(3)  (Whereupon, a short recess was
(4)  taken.)
(5)  MR. FUERTH:  Could you mark this
(6)  as J, please.
(7)  (Whereupon, the aforementioned
(8)  Document was marked as Defendant's Exhibit J
(9)  for identification as of this date by the
(10)  Reporter )
(11)  Q.  With respect to Exhibit J, that is
(12)  the document to Tri City where the ACORD form
(13)  was enclosed?
(14)  A.  Correct.
(15)  Q  What else besides the ACORD form
(16)  was enclosed in that letter? Because it's
(17)  mentions that's ten pages
(18)  A.  It's indicated on the ACORD form
(19)  there was a letter from the claimant's
(20)  attorney, the incident report, certificate of
(21)  insurance, and a copy of the policy.
(22)  Q.  And Exhibit H, which was the ACORD

(23) form, that document plus what was attached to
(24) it is noted in the remarks section, that was
(25) all sent by your office to Tri City for

## Page 50

(1)
(2) transmittal to Sirius?
(3)    A.    That's correct.
(4)    MR. FUERTH:    Could you mark this
(5) Exhibit K, please.
(6)    (Whereupon, the aforementioned
(7) Letter was marked as Defendant's Exhibit K for
(8) identification as of this date by the
(9) Reporter.)
(10)    Q.    Let me show you what has been
(11) marked as Defendant's Exhibit K for
(12) identification, bearing Bates numbers P00146
(13) and P00147, which is a September 23, 2002
(14) letter from Risk Management Services to BFC
(15) Construction, showing North Shore Risk
(16) Management as a copy.
(17) I show that to you, Mr. Potolsky,
(18) and ask whether you have ever seen a copy of
(19) that document before?
(20)    A.    Yes.
(21)    Q.    Did you take any action with
(22) respect to Exhibit K?
(23)    A.    Yes. I formed notes, which I
(24) have. Not on this particular – this was just
(25) acknowledging a claim.

## Page 51

(1)
(2)    Q.    But it's also asking BFC to
(3) provide copies of contracts with contractors
(4) and subcontractors; correct?
(5)    A.    Yes.
(6)    Q.    Do you know whether Ms. Weiner
(7) took any action in response to Exhibit K?
(8)    A.    I can't answer that. I don't
(9) think there was anything that my office did.
(10) There may have been a phone call discussing
(11) the content of it, but I'm not sure.
(12)    Q.    When you say there may have been a
(13) phone call discussing the content, would that
(14) have been to Ms. Rodriguez –
(15)    A.    It's pure speculation. I don't
(16) know.
(17)    Q.    That's one instruction I forgot to
(18) give you. Don't guess. If you don't have a
(19) recollection or if you don't know, please let
(20) me know.
(21)    A.    Right.
(22)    MR. FUERTH:    Would you mark this
(23) as L, please.
(24)    (Whereupon, the aforementioned
(25) Letter was marked as Defendant's Exhibit L for

## Page 52

(1)
(2) identification as of this date by the
(3) Reporter.)
(4)    Q.    What is being marked as

(5) Defendant's Exhibit L for identification is a
(6) risk management letter of September 26th, 2002
(7) to BFC Construction bearing Bates number
(8) P00148.
(9) I ask you, Mr. Potolsky, have you
(10) ever seen this document before?
(11)    A.    I don't seem to have this.
(12) Personally I haven't seen it.
(13)    Q.    Would this be, to your
(14) understanding, an indication or further
(15) request from risk management to BFC to be
(16) provided with a copy of a contract between BFC
(17) construction and Jem Erectors?
(18)    MR. SCHNEIDER:    I object to the
(19) form of the question.
(20)    A.    Yes.
(21)    Q.    Would that indicate to you that
(22) BFC Construction had not complied with risk
(23) management's initial request to be provided
(24) with that claim material?
(25)    A.    I can't answer for risk

## Page 53

(1)
(2) management. I don't know what BFC sent to
(3) them. They certainly didn't send it through
(4) me. I never saw this, so...
(5)    Q.    Did you ever have any discussions
(6) with anyone subsequent to September 26th about
(7) that letter?
(8)    A.    No, not that I can recall.
(9)    MR. FUERTH:    M, please.
(10)    (Whereupon, the aforementioned
(11) Letter was marked as Defendant's Exhibit M for
(12) identification as of this date by the
(13) Reporter.)
(14)    Q.    What has been marked as
(15) Defendant's Exhibit M for identification is a
(16) risk management letter of September 23, 2002
(17) to BFC Construction, with a copy to North
(18) Shore Risk Management bearing Bates number
(19) P00153 to P00154.
(20)    A.    Isn't this just a copy of what you
(21) said before this?
(22)    Q.    You know what, my apologies. No,
(23) it's not. It's not.
(24)    A.    Then I may have misspoke on this.
(25) I have seen one of them. I may have misspoke

## Page 54

(1)
(2) on this.
(3)    Q.    Let's go –
(4)    A.    If I can –
(5)    Q.    Absolutely.
(6)    A.    I take that back.
(7)    Q.    Okay.
(8)    A.    I saw one acknowledgment of
(9) claim.
(10)    Q.    You know what, your – let's see
(11) the difference here. You are correct and
(12) evidently this is a duplicate. And I'm

---

(13) *talking about Exhibit M is a duplicate of*
(14) *Exhibit K with this bearing two different*
(15) *Bates stamps from Plaintiff's office. So*
(16) *we'll just leave that the way it is.*
(17)   MR. FUERTH:    Mark this as N,
(18) please.
(19)   (Whereupon, the aforementioned
(20) Letter was marked as Defendant's Exhibit N for
(21) identification as of this date by the
(22) Reporter.)
(23)   Q.   What has been marked as
(24) *Defendant's Exhibit N is a risk management*
(25) *letter of October 11th, 2002 to BFC*

### Page 55

(1)
(2) *Construction, with a copy to Tri City*
(3) *Insurance Brokers and North Shore Risk*
(4) *Management, bearing Bates number P00149*
(5) *through P00152.*
(6) *Mr. Potolsky, have you seen a copy*
(7) *of Exhibit N prior to today?*
(8)   A.   Yes.
(9)   Q.   *To your understanding, what does*
(10) *Exhibit N purport to be?*
(11)   A.   Denial of coverage to BFC with
(12) regard to this 7-22-2002 loss involving
(13) Richard Conrad.
(14)   Q.   *And now, to your understanding,*
(15) *the grounds for the denial were what?*
(16)   A.   There were three items. The first
(17) item was late reporting, I believe. Just –
(18) right, two months and 16 days to report the
(19) loss. And there were, I believe, a couple of
(20) other reasons for denial of the claim.
(21)   Q.   *Would looking at your memo which*
(22) *is Exhibit A refresh your recollection?*
(23)   A.   That's what I'm doing. I'm doing
(24) both.
(25)   Q.   *I'm sorry. Okay.*

### Page 56

(1)
(2) *You have indicated late notices,*
(3) *one basis What else?*
(4)   A.   There was another one which
(5) indicated that this particular location was
(6) not designated in the policy. And I believe
(7) this assertion by the insurance carrier could
(8) be refuted because with the per project
(9) aggregate, the 2503, the particular location
(10) did not have to be specified in the policy.
(11) And that was not the intent or the spirit of
(12) the policy. So I believe that condition could
(13) be refuted.
(14) The third item was the exclusion
(15) of coverage, the sack 22 endorsement, which
(16) has very specific conditions upon which
(17) coverage be afforded.
(18)   Q.   *Were you aware in that SAIC –*
(19) *that's what? S-A-I-C?*
(20)   A.   S-A-I-C, yes.

(21)   Q.   *For the court reporter's benefit*
(22) *Were you aware of that exclusion*
(23) *at the time that you submitted the coverage*
(24) *for BFC?*
(25)   A.   Yes. I had the client sign the

### Page 57

(1)
(2) acknowledgment of that endorsement. Actually,
(3) the insurance carrier requires that the client
(4) sign it.
(5)   Q.   *That acknowledgment of the*
(6) *endorsement, was that all contracts with*
(7) *subcontractors had to be signed and in*
(8) *writing?*
(9)   A.   Yes.
(10)   Q.   *Now, after your receipt of a copy*
(11) *of Exhibit N, did you contact anyone at risk*
(12) *management or Sirius Insurance?*
(13)   A.   No.
(14)   Q.   *What was the reason for that?*
(15)   A.   They had denied coverage based on
(16) three issues. I had a conversation with the
(17) client about it.
(18)   Q.   *That was Greg Cross?*
(19)   A.   Correct.
(20)   Q.   *You just indicated that you*
(21) *believed the second grounds for the denial*
(22) *being the location not designated in the*
(23) *policy could be refuted. What was the reason*
(24) *that you did not communicate that position to*
(25) *risk management or Sirius?*

### Page 58

(1)
(2)   A.   Because of the – I reviewed it
(3) and I felt that the one that should be
(4) refuting these items would be the client's
(5) attorney.
(6)   Q.   *As a broker, do you negotiate or*
(7) *discuss coverage issues with insurers?*
(8)   A.   Do I discuss coverage issues with
(9) insurers?
(10)   Q.   *Yes  In other words – let me*
(11) *rephrase it.*
(12) *You know, as part of your*
(13) *brokerage service for an insured, do you*
(14) *communicate with insurance companies when*
(15) *insured receive either reservation of rights*
(16) *letters or denial of coverage letters?*
(17)   A.   I'm sorry. Could you repeat
(18) that. Do I speak to clients about that?
(19)   Q.   *Do you speak to the insurer?*
(20)   A.   No, I don't.
(21)   Q.   *Ever?*
(22)   A.   I can't say ever. I can't make a
(23) categorical statement like that.
(24)   Q   *You don't consider initially*
(25) *discussing either a reservation of rights or*

### Page 59

(1)
(2) *more particularly a denial of coverage with*

(3) the insurer as part of the brokerage service?

(4) A.    Depending upon what the nature of

(5) the denial of coverage is. If I believe it's

(6) incorrect, then I will take issue with it.

(7) Q    Now, what was your view about the

(8) late notice issue?

(9) A.    I don't take a position on that.

(10) I can't – I can't take a position on an

(11) insurance company denying coverage based on

(12) late notices.

(13) Q.    Well, in Exhibit N, it makes

(14) reference to a delay of two months and 16

(15) days. Did you agree with that statement in

(16) the denial letter comprising Exhibit N?

(17) A.    I think it's something that's

(18) appearing more and more with insurance

(19) carriers, and this one in particular who makes

(20) no bones about it that they are going to try

(21) to fight every claim. Whereas one carrier

(22) would consider it reasonable, another would

(23) consider it unreasonable.

(24) Q.    But in terms of the actual

(25) computation of the two months and 16 days, did

Page 60

(1)

(2) you have an understanding as to what that was

(3) based on?

(4) A.    No.

(5) Q    Because in looking at Exhibit C,

(6) which is the August 6th letter, that was sent

(7) to you by BFC Construction on September 12,

(8) which would be less than two months and 16

(9) days; correct?

(10) A.    Correct.

(11) Q    And then you in turn got it off to

(12) Tri City within, I think, two days. So that

(13) would still be within two months and 16 days?

(14) A.    Correct.

(15) Q.    Do you know whether there was any

(16) delay in Tri City forwarding your ACORD form

(17) to whomever on behalf of Sirius?

(18) A.    No.

(19) Q    There was no delay?

(20) A.    I don't know.

(21) Q.    Do you have any knowledge as to

(22) when Sirius and/or risk management received

(23) notification of the Conrad claim?

(24) A.    I would assume that it had taken

(25) place once I received confirmation from Tri

Page 61

(1)

(2) City.

(3) Q.    The Tri City confirmation was

(4) September 19th, and they indicate that in

(5) Exhibit I, the claim was forwarded to Sirius

(6) In this confirmation is dated September 19th.

(7) Taking all those dates together,

(8) did you come to have an understanding as to

(9) where the two months and 16 days alleged late

(10) notice came from?

(11) A.    I didn't comment on it. Because

(12) if there was – my guess is there would have

(13) been the August – what's the transmittal

(14) date? I didn't focus on that myself, but the

(15) original date was August 6th, my assumption is

(16) that that is what they were basing it on. I

(17) assume that letter was sent certified mail to

(18) the client.

(19) Q.    Which letter was sent certified

(20) mail to the client?

(21) A.    The August 6th. I would assume

(22) they were basing that based on when they

(23) believed the client BFC had received the

(24) letter.

(25) Q.    Well, August 6th to September 23

Page 62

(1)

(2) is not two months and 16 days.

(3) A.    That's correct. I really don't

(4) know.

(5) Q.    So you may no inquiry to determine

(6) what the basis for that two months and 16 day

(7) delay was?

(8) A.    No.

(9) Q.    Did you ever come to have an

(10) understanding that the two months and 16 day

(11) delay was based on the date of accident being

(12) July 2, 2002 as noted in Exhibit G, which is

(13) the Benedetto second request letter?

(14) A.    To be honest with you, I'm looking

(15) back right now. I didn't pay particular

(16) attention. At the time I didn't make a note

(17) or remember this particular issue. So it's

(18) difficult for me to comment on it now because

(19) we're now four years later. So I don't have a

(20) memory on it.

(21) Q.    But you were involved with this

(22) claim because of the fact that BFC was very

(23) busy so rather than have Ms. Weiner deal with

(24) it, you were overseeing what she was doing; is

(25) that correct?

Page 63

(1)

(2) A.    Could you restate that.

(3) Q.    Sure. In substance, did you

(4) testify before that because BFC was involved

(5) in a lot of projects, that you directed Ms

(6) Weiner how to submit the claim as opposed to

(7) letting her handle it herself?

(8) A.    No, not how to submit –

(9) MR. SCHNEIDER:    Object to the form

(10) of the question and characterization.

(11) A.    I don't instruct her how to submit

(12) a claim. In this particular instance, I

(13) looked at the claim that came to our office,

(14) and because there was something that seemed

(15) unclear about it, I made a call, and when I

(16) got the response from the client, then I

(17) instructed Barbara to send it to the insurance

(18) company. I didn't tell her what to send or

(19) what not to send.

(20)    Q.    You took an interest in this

(21) particular claim because it appeared unclear

(22) to you?

(23)    A.    Correct.

(24)    Q.    Did you have an understanding as

(25) to whether the Sirius policy required

Page 64

(1)

(2) notification by an insured when they first had

(3) knowledge of an incident?

(4)    A.    Could you restate that, please.

(5)    Q.    Sure. Did you have an

(6) understanding as to what circumstances

(7) required an insured under the Sirius CGL

(8) policy to give notification of a claim?

(9)    A.    It wasn't specified – it wasn't

(10) carrier specific. It's standard to know as

(11) soon as practical or as soon as they're made

(12) aware of the incident, they have to report it

(13) to the insurance carrier.

(14)    Q.    Had you dealt with Mr. Schneider

(15) prior to October of 2002?

(16)    A.    Possibly on an unrelated issue.

(17) I'm not – I don't recollect whether I spoke

(18) to Don before.

(19)    Q.    Well, how did you come to know

(20) that Mr. Schneider was the attorney for BFC in

(21) October of 2002?

(22)    A.    Again, offhand, I can't – I just

(23) don't have any recollection of how Don's name

(24) came to me. It could have been on any number

(25) of circumstances.

Page 65

(1)

(2)    Q.    When an insured has coverage

(3) denied for a claim, is it your standard

(4) practice to advise the insured to have their

(5) counsel get involved?

(6)    A.    I don't think I have a standard

(7) practice, but this was – I had a conversation

(8) in this particular matter with the client, and

(9) I recommended that they turn it over to their

(10) attorney.

(11)    Q.    What was the conversation that you

(12) had with Mr. Cross?

(13)    A.    I spoke to Greg, and I discussed

(14) the contents of the claim denial with him, and

(15) I recommended that he turn this over to his

(16) attorney to handle it.

(17)    Q.    Was there anything in the

(18) conversation that you had with Mr. Cross that

(19) led you to recommend turning it over to his

(20) attorney?

(21)    A.    Yes. There was a denial of

(22) coverage.

(23)    Q.    Right. So –

(24)    A.    And discussing the – probably the

(25) specifics about that, is my guess.

Page 66

(1)

(2)    Q.    What I'm looking for is what about

(3) this particular denial caused you to recommend

(4) that cross get in contact with his attorney?

(5)    A.    Because they were so active in so

(6) many different projects, I was speaking to the

(7) client on a regular basis and various people

(8) at BFC. So this would just be a normal – I

(9) think this was a normal conversation that I

(10) had with him. I had a claim denial and I

(11) wanted to apprise them of it in the event they

(12) weren't aware of it.

(13)    Q.    What led you to believe that they

(14) were not aware of the claim denial in view of

(15) the fact that you were copied on a letter that

(16) was sent to BFC's address?

(17)    A.    The – because of the level of

(18) activity that they were involved in, I don't

(19) know – I didn't know who would have had that

(20) letter. So I wanted to make sure that I

(21) discussed it with someone who could I felt act

(22) on it. And Greg Cross was the CFO at that

(23) time.

(24)    Q.    Of BFC?

(25)    A.    Correct.

Page 67

(1)

(2)    Q.    And you also understood that he

(3) had an interest in the entity that had an

(4) interest in 105?

(5)    A.    No. I have no knowledge of Greg

(6) Cross's involvement.

(7)    Q.    I'm sorry. It was Greg Baron. My

(8) mistake

(9) Was there anything that led you to

(10) believe that the letter being addressed to

(11) Estelle Rodriguez, and I'm referring to

(12) Exhibit N, would not be understood as to the

(13) significance of the letter?

(14)    A.    Nothing in particular. I just

(15) felt that I needed to have this conversation

(16) with someone so it could be responded to.

(17)    Q.    Why didn't you speak to Estelle?

(18)    A.    I felt that more appropriate to

(19) speak to the CFO who I was discussing any

(20) number of issues with anyway. And I felt that

(21) he would be an appropriate party to contact.

(22)    Q.    Did you have any concerns about

(23) Estelle's ability to deal with the denial of

(24) coverage?

(25)    A.    No.

Page 68

(1)

(2)    Q.    Did you consider this claim to be

(3) a significant claim in terms of potential

(4) exposure?

(5)    A.    I consider every claim and denial

(6) of claim to be significant. I had no idea

(7) about the particulars or severity of the

(8) incident or anything like that. But I do

(9) consider it serious, and I contacted the
(10) client.
(11)   Q.   Was there anything in particular
(12) that caused you to go to the chief financial
(13) officer as opposed to communicate with the
(14) person who had been the recipient at BFC of
(15) all the claim communication?
(16)   A.   I can't think of anything
(17) offhand. There might have been another
(18) subject that I had to speak to this individual
(19) about. I just don't recall.
(20)   Q.   This denial of coverage was
(21) something that you would not have Ms Weiner
(22) communicate to the insured?
(23)   A.   In some instances, yes, and in
(24) some instances, no.
(25)   Q.   Well, what I'm looking for is,

Page 69

(1)
(2) what infused this particular claim or insured
(3) with whatever that has now attracted the
(4) attention of the owner of North Shore Risk
(5) Management as opposed to having your claim
(6) person deal with the person at BFC who was
(7) handling the claim?
(8)   A.   I think because of the complexity
(9) of the account and the involvement that I had
(10) with the account and a number of different
(11) projects, I felt that I should be the one to
(12) have the conversation.
(13)   Q.   When you say complexity of the
(14) account?
(15)   A.   Just the activity. They had a lot
(16) of different projects that they were working
(17) on, and I had regular conversations with
(18) people at BFC.
(19)   Q.   How many projects did BFC have
(20) ongoing in August through October of 2002?
(21)   A.   It would have been dozens. I
(22) don't have a particular number, but they were
(23) very active.
(24)   Q.   Does your firm serve as the broker
(25) for other general contractors such as – you

Page 70

(1)
(2) know, companies such as BFC?
(3)   A.   Yes. We represent other general
(4) contractors.
(5)   Q.   Was BFC's activities significantly
(6) greater than your other clients?
(7)   A.   Some it was similar.
(8)   Q.   With all of those, you get
(9) involved with transmitting note – or
(10) instructing Ms. Weiner about transmitting
(11) notices of claim?
(12)   A.   For the most part I get – they
(13) will come through me, and I will have her send
(14) it in claims.
(15)   Q.   Was the I guess personal attention
(16) paid to BFC something that you do with your

(17) other general contractors?
(18)   A.   A number of them yes.
(19)   Q.   When you had the conversation with
(20) Mr Cross concerning the denial, had he been
(21) aware of it before you called him?
(22)   A.   I don't recall.
(23)   Q.   Did you inform him of the grounds
(24) for the denial?
(25)   A.   I can't answer that, I believe I

Page 71

(1)
(2) went over the denial with him.
(3)   Q.   Do you recall what his response to
(4) you, if anything, was?
(5)   A.   I suggested that he turn a copy of
(6) the entire file over to his attorney for
(7) handling.
(8)   Q.   But before you made that
(9) suggestion –
(10)   A.   He said, yeah, I think this is a
(11) problem and we have to deal with it.
(12)   Q.   But before you made the suggestion
(13) to get his attorney involved, did he make any
(14) response to you?
(15)   A.   No.
(16)   Q.   Did he indicate to you any
(17) dissatisfaction with your firm in placing the
(18) coverage with Sirius?
(19)   A.   No.
(20)   Q.   Did he indicate any
(21) dissatisfaction with your firm concerning the
(22) handling of the claims transmission?
(23)   A.   No.
(24)   Q.   So, as you recall, the reason that
(25) you suggested the file be given to BFC's

Page 72

(1)
(2) counsel, was because of the denial and the
(3) fact that BFC was involved in a lot of
(4) projects and it was a complicated risk?
(5)   A.   I don't think one thing is related
(6) to the other. I contacted the client and I
(7) recommended that they turn this over to their
(8) attorney because the coverage was denied.
(9)   Q.   So that was the singular basis?
(10)   A.   That's correct.
(11)   Q.   Now, did you keep in contact with
(12) Mr. Cross concerning the efforts by BFC's
(13) counsel in responding to the denial?
(14)   A.   No.
(15)   Q.   Were you ever requested to provide
(16) any information to BFC or its counsel with
(17) respect to the denial after you had your call
(18) with Mr. Cross?
(19)   A.   No. Or not that I can recall.
(20) It's possible somebody called me.
(21)   Q.   All we can expect is your best
(22) recollection.
(23)   (Whereupon, the aforementioned
(24)   Letter was marked as Defendant's Exhibit O for

Page 73

(1)
(2)  Reporter.)
(3)    Q.    Exhibit O is a letter dated July
(4)  26th, 2004 from North Shore Risk Management to
(5)  BFC Construction bearing Bates number P00137
(6)  through P00138.
(7)    Mr. Potolsky, I show you what has
(8)  been marked as Exhibit O, and I ask whether
(9)  you authored that document?
(10)    A.    I did.
(11)    Q.    The signature on the bottom, is
(12)  that yours?
(13)    A.    Yes.
(14)    Q.    What were the circumstances giving
(15)  rise to the transmittal of Exhibit O?
(16)    A.    I believe I received a summons and
(17)  complaint that referenced that prior -- that
(18)  referenced the prior individual comment.
(19)    Q.    Do you have a copy of that summons
(20)  and complaint that you received?
(21)    A.    I believe I do.
(22)    Q    Do you have that?
(23)    A.    Yes.
(24)    MR. FUERTH:    Can we mark this as
(25)  P, I believe.

Page 74

(1)
(2)    (Whereupon, the aforementioned
(3)  Complaint was marked as Defendant's Exhibit P
(4)  for identification as of this date by the
(5)  Reporter.)
(6)    Q.    What has been marked as
(7)  Defendant's Exhibit P for identification is a
(8)  copy of a verified complaint, with no index
(9)  number on it, dated March 31, 2004.
(10)    MR. SCHNEIDER:    Off the record.
(11)    (Whereupon, an off-the-record
(12)  discussion was held.)
(13)    MR. FUERTH:    At the suggestion of
(14)  Plaintiff's counsel, although the first page
(15)  of the verified complaint does not bear an
(16)  index number, the backing of the summons and
(17)  verified complaint appears to bear some
(18)  number. Whether or not it's an index number
(19)  is not clear.
(20)    Q.    Now, Mr. Potolsky, you indicated
(21)  that you sent your July 26th, 2004 letter to
(22)  Ms. Rodriguez because you had received the
(23)  verified complaint that is Exhibit P?
(24)    A.    I believe that's correct, yes.
(25)    Q.    Where did she get or from whom did

Page 75

(1)
(2)  you get the verified complaint from?
(3)    A.    It came from BFC Construction.
(4)    Q.    Was there a cover letter from BFC?
(5)    A.    No.
(6)    Q.    How do you know it came from BFC

(7)    Construction?
(8)    A.    Because I remembered at the time,
(9)  you know, I shouldn't say that. I believe it
(10)  came from BFC Construction and I reviewed it.
(11)  It came to us on the 19th of July. It was
(12)  signed for. It may have come by registered or
(13)  certified mail.
(14)    Q.    Did you keep the envelope?
(15)    A.    I will have to ask Barbara. I
(16)  don't know whether we have it.
(17)    Q.    Could you do me a favor, could you
(18)  check --
(19)    A.    Do you want me to do it right
(20)  now?
(21)    Q.    Could you, please?
(22)    A.    Yes. Sure.
(23)    (Whereupon, an off-the-record
(24)  discussion was held.)
(25)    A.    I don't have it.

Page 76

(1)
(2)    Q.    You went and you checked to see
(3)  whether there was a certified mail envelope
(4)  that accompanied Exhibit P and you just
(5)  indicated off the record that you were unable
(6)  to locate --
(7)    A.    I don't have the envelope.
(8)    Q.    Do you have any documentation that
(9)  would indicate how your company received
(10)  Exhibit P?
(11)    A.    I don't. What happened was I
(12)  returned the original to the client in my
(13)  transmittal of July 26th, 2004.
(14)    Q.    So when you're talking about
(15)  returning the original, that would be the
(16)  portion of Defendant's Exhibit O that states,
(17)  "Enclosed herewith is the paperwork that was
(18)  recently sent to my office"?
(19)    A.    Correct.
(20)    Q.    What was the reason that you
(21)  returned it to BFC?
(22)    A.    Because I believe it pertained to
(23)  the claim of July 2nd, 2002 that had been
(24)  denied and I understood that it was being
(25)  handled by their attorney.

Page 77

(1)
(2)    Q.    Well, the claim of 2002 did not
(3)  include 105 Street Associates; is that
(4)  correct?
(5)    A.    That is correct.
(6)    Q.    So this, in fact, was a different
(7)  claim; correct?
(8)    A.    Correct.
(9)    Q.    What was the reason that you did
(10)  not have BFC and/or 105 notify Greenwich
(11)  Insurance Company of the claim?
(12)    A.    That was an oversight. Which was
(13)  corrected. A number of weeks later.
(14)    MR. SCHNEIDER:    I object to the

(15) compound form of the question.
(16)     Q.    Let me rephrase it.
(17) Did you look at the verified
(18) complaint that is Exhibit B when it came to
(19) your office?
(20)     A.    I can't answer whether I looked at
(21) it in particular or whether Ms. Weiner,
(22) Barbara from my office did. I'm going to make
(23) the assumption that I did because I'm the one
(24) who wrote this letter. So I would have
(25) reviewed it.

Page 78

(1)
(2)     Q.    Would you also have reviewed it
(3) because you open the mail?
(4)     A.    I don't open the mail. There is
(5) someone who opens the mail, then the mail
(6) comes to me and then I distribute it.
(7)     Q.    Would –
(8)     A.    Assuming that I was in the office
(9) on the day when it came in. I may not have
(10) been because it was in the Summer months. I
(11) don't know if I was here that particular day.
(12)     Q.    But other than being away, is it
(13) the general practice that when someone else
(14) opens the mail, they would deliver to you mail
(15) which would include pleadings such as a
(16) verified complaint?
(17)     A.    The mail would be delivered to me
(18) and then I would distribute it.
(19)     Q.    Well, what I'm saying is, that
(20) pleadings would be considered part of the
(21) mail?
(22)     A.    Sure.
(23)     Q.    When you're away, who does the
(24) mail go to?
(25)     A.    Depending upon what the nature of

Page 79

(1)
(2) the mail is. If it's a piece of underwriting,
(3) it would go to the particular underwriter. If
(4) it's a claim, it would go to my claims person.
(5)     Q.    Who determines what go to which
(6) person?
(7)     A.    Depending upon what the nature of
(8) the material is that comes in. So the entire
(9) stack of paperwork could go to either one of
(10) my underwriters or could go to Barbara for
(11) distribution and they would do it.
(12)     Q.    So if you weren't here, Barbara or
(13) one of your underwriters would have
(14) distributed the mail?
(15)     A.    That's correct.
(16)     Q.    Something such as Exhibit P, which
(17) is a complaint, would have been given to
(18) Barbara –
(19)     A.    Correct.
(20)     Q.    – had she not received the mail?
(21)     A.    Correct.
(22)     Q.    So for whatever reason, as of the

(23) writing of your July 26th, 2004 letter, you
(24) understood Exhibit P to solely involve BFC
(25) Construction as opposed to 105 Street; is that

Page 80

(1)
(2) correct?
(3)     A.    I didn't put two and two
(4) together. I looked at the incident and it
(5) seemed to be relating back to this 2002 date
(6) of loss. And I assumed it was part of the
(7) BFC.
(8)     Q.    Had you thought 105 was involved,
(9) you would have then sent an ACORD form to Tri
(10) City; correct?
(11)     A.    That's correct. Well, not to Tri
(12) City. They weren't the wholesaler for the
(13) placement of 105 Street Associates.
(14)     Q.    Who would you have sent the ACORD
(15) to?
(16)     A.    To the wholesaler that placed the
(17) Greenwich policy.
(18)     Q.    Is that WKF ampersand C agency?
(19)     A.    No, no, no. That is the –
(20) they're, I believe, program administrator for
(21) Greenwich, and the wholesaler I believe was Si
(22) Zimmerman out of Massachusetts. His company
(23) was Zimmerman Speciality. I believe. I'm
(24) not – that's to the best of my knowledge
(25) right now.

Page 81

(1)
(2)     Q.    Let me show you what has been
(3) previously marked as Plaintiff's Exhibit 2 for
(4) identification, and I ask whether you have
(5) ever seen this document before?
(6)     A.    Yes.
(7)     Q.    What is the reason that Ms. Weiner
(8) is sending the summons and complaint to WKF&C
(9) agency? What is she sending the complaint
(10) there for?
(11)     A.    Follow my letter of July 26th,
(12) 2004 to Estelle Rodriguez – let me see this.
(13) I just want to make sure that I'm saying – I
(14) sent in my letter not recognizing the separate
(15) policy that was written by Greenwich
(16) immediately, I sent this back to Estelle and
(17) recommended that they turn it over to legal
(18) counsel immediately. Believing that this was
(19) part of the same action.
(20)     Q.    That's your July 26th letter?
(21)     A.    Right.
(22)     Q.    But what I am asking you is,
(23) Plaintiff's Exhibit 2 marked at the June 5,
(24) '06 deposition is a transmittal from Barbara
(25) Weiner to WKF&C. My question to you is, what

Page 82

(1)
(2) is the reason that the summons and complaint
(3) is being sent to WKF&C?
(4)     A.    I had a conversation with – I was

Page 82

(5) contacted, I believe by Greg Baron and another
(6) person in their organization that Brad
(7) Richards, if I'm not mistaken, and we had a
(8) further conversation about this claim and I
(9) recall the policy that was placed by
(10) Greenwich, the general liability policy. And
(11) I don't remember whether it was something that
(12) struck a cord with me or they had pointed it
(13) out. And then as soon as that was done, I
(14) requested they fax me a copy of the paperwork,
(15) which I in turn sent to Greenwich, that
(16) transmission from Barbara.
(17)    Q.    But what was the reason that you
(18) were transmitting or Barbara was transmitting
(19) the summons and complaint directly to WKF&C as
(20) opposed to the wholesale broker which I think
(21) you indicated was Schneiderman or something?
(22)    A.    Zimmerman.
(23)    Q.    Zimmerman.
(24)    A.    I don't know whether – Barbara,
(25) because we dealt with Greenwich for many

Page 83

(1)
(2) years, and knowing that WKF&C is the program
(3) administrator, she probably sent it directly
(4) to him, because she had a, I guess like a
(5) working relationship. And we didn't want to
(6) waste any time, we didn't want to waste any
(7) time, we wanted to get it.
(8)    Q.    Now, when you say you spoke with
(9) Greg Baron and Brad Richards, they –
(10)    A.    I believe that's his name. I'm
(11) not exactly sure. But I know Greg Baron. I
(12) had a conversation with him.
(13)    Q.    You understood them to be with
(14) BFC?
(15)    A.    Correct.
(16)    Q.    So you had a conversation with
(17) Baron and Richards after you sent your July
(18) 26th letter?
(19)    A.    Correct.
(20)    Q.    What was the discussion that you
(21) had?
(22)    A.    We were discussing the summons and
(23) complaint. And the issue of the Greenwich
(24) policy, the separate general liability policy
(25) that was issued by Greenwich came up. And it

Page 84

(1)
(2) was at that point that I realized that they
(3) should be put on notice immediately.
(4)    Q.    So either Mr. Baron or Mr.
(5) Richards raised the issue of the Greenwich
(6) policy?
(7)    A.    I don't recall whether they did it
(8) or whether just in conversation I then
(9) remembered there was a separate policy.
(10)    Q.    What was the reason that you
(11) called them up to discuss the summons and
(12) complaint after sending your July 26th, '04 –

(13)    A.    I believe they called me.
(14)    Q.    What was the substance of their, I
(15) guess, opening conversation with you, if you
(16) recall?
(17)    A.    I don't recall the specifics.
(18) However, we discussed the matter. And I
(19) realized at that point, I said, please get me
(20) over this immediately.
(21)    Q.    So you had it, you sent it back to
(22) them, and then they sent it back – you asked
(23) them to send it back to you?
(24)    A.    Correct.
(25)    Q.    What was the reason that you

Page 85

(1)
(2) didn't keep a copy in your file of what you
(3) had sent to them with your July 26th letter?
(4)    A.    I'm assuming that – I'm assuming
(5) that this is what summons and complaints was
(6) what was part of it, which I have given you
(7) your Exhibit M. At that point I might not
(8) have had my hands on it, or I couldn't find
(9) it, couldn't locate it, so I asked for a copy.
(10)    Q.    When you made reference to Exhibit
(11) M, did you mean Exhibit P?
(12)    A.    Yes. I'm sorry. Pardon me.
(13)    MR. FUERTH:    Mark this as Q
(14)    (Whereupon, the aforementioned
(15) Letter was marked as Defendant's Exhibit Q for
(16) identification as of this date by the
(17) Reporter.)
(18)    Q.    What has been marked as
(19) Defendant's Exhibit Q is an August 20, 2004
(20) letter from Risk Management to BFC
(21) Construction Corporation bearing Bates numbers
(22) P00155 to P00156.
(23) Mr. Potolsky, I show you what has
(24) been marked as Exhibit Q, and have you ever
(25) seen a copy of that document?

Page 86

(1)
(2)    A.    No, I don't see that, no. I don't
(3) see it.
(4)    Q.    Did you, when you had the
(5) conversation with Mr Baron and Mr. Richards,
(6) tell them to also send the summons and
(7) complaint to BFC's insurer?
(8)    A.    I'm sorry?
(9)    Q.    When you spoke to Mr. Baron and
(10) Mr Richards after you sent them your July
(11) 26th letter, which is Exhibit O –
(12)    A.    Right.
(13)    Q.    – during that conversation, did
(14) you tell them to send the verified complaint
(15) which is Exhibit P to Sirius Insurance?
(16)    A.    No, no, no, we did not. That was
(17) the fax to John Purpura. No, not John
(18) Purpura. He would have sent it on to Sirius,
(19) and we would have sent it to the insurance
(20) carrier for 105 Street Associates, and then

(21) sent it to the insurance carrier for BFC

(22) Partners, which is an unrelated entity.

(23)     *Q.    Do you have any transmittal*

(24) *showing that it was sent to the various*

(25) *entities that you just testified to?*

### Page 87

(1)

(2)     A.    I thought I provided that. This

(3) was on the -- might have been Purpura --

(4)     MR. SCHNEIDER:    Isn't that

(5) Sirius?

(6)     A.    Purpura may be Sirius. I guess

(7) they weren't the program administrator for

(8) Greenwich. It was sent to Purpura referencing

(9) this policy, and it was sent to Michael

(10) Barnaber (phonetic). I would have to ask

(11) Barbara. I think both may be involved with

(12) Greenwich.

(13)     *Q.    This Purpura, do you know how to*

(14) *spell that name?*

(15)     A.    I don't know. I would assume that

(16) she did.

(17)     *Q.    Because on Plaintiff's Exhibit 2*

(18) *there is --*

(19)     A.    Do you want me to call Barbara in

(20) to ask? That's not necessary.

(21)     *Q.    Right. There is no Purpura --*

(22)     A.    Then it might not have been him.

(23)     *Q.    -- on Exhibit 2*

(24)     A.    Do you want me to check? Do you

(25) want me to just print the transmittals?

### Page 88

(1)

(2)     *Q.    Yes, but let me just ask you one*

(3) *question.*

(4)     A.    No, no, no. Do you want me to go

(5) and check?

(6)     *Q.    Sure*

(7)     (Whereupon, an off-the-record

(8) discussion was held.)

(9)     (Whereupon, the aforementioned Fax

(10) Cover Sheet was marked as Defendant's Exhibit

(11) S for identification as of this date by the

(12) Reporter )

(13)     *Q.    The fax cover sheet that you had*

(14) *testified was sent to Sirius, that is*

(15) *reflected by Exhibit S; is that correct? To*

(16) *Juan Purpura?*

(17)     A.    Yes.

(18)     *Q.    That was sent on August 18th of*

(19) *2004, correct?*

(20)     A.    Correct.

(21)     *Q.    That was sent to him because BFC*

(22) *Construction was named in the complaint?*

(23)     A.    Yes. And I just thought it would

(24) be a good idea to send it on.

(25)     *Q.    But you had understood that*

### Page 89

(1)

(2) *coverage had been denied for this claim?*

(3)     A.    That's correct.

(4)     *Q.    What was the reason that you were*

(5) *sending it or having Ms. Weiner send it to*

(6) *Sirius although you knew about the denial?*

(7)     A.    I figured it would just make good

(8) sense to send it on to them.

(9)     *Q.    For what reason?*

(10)     A.    No particular reason.

(11)     *Q.    Did you suggest to Mr. Baron and*

(12) *Mr Richards to send the complaint to Mr.*

(13) *Schneider to send on to Sirius?*

(14)     A.    No. It would have been

(15) transmitted to the insurance carrier. I would

(16) have done that.

(17)     *Q.    You had previously sent your file*

(18) *to Mr. Schneider relating to the Sirius denial*

(19) *of coverage, correct?*

(20)     A.    I didn't send it to Mr. Schneider,

(21) I sent it to Greg Cross --

(22)     *Q.    And then --*

(23)     A.    -- of BFC.

(24)     *Q.    And then he was to send it --*

(25)     A.    He would have contacted Don

### Page 90

(1)

(2) Schneider, I assume.

(3)     *Q.    Did you suggest to Baron or*

(4) *Richards that verified complaint get sent*

(5) *to Schneider?*

(6)     A.    I can't recall the conversation.

(7)     (Whereupon, the aforementioned

(8) Exhibit was marked as Defendant's Exhibit R

(9) for identification as of this date by the

(10) Reporter.)

(11)     *Q.    Now, Defendant's Exhibit R is the*

(12) *fax cover sheet from Ms Weiner to Michael*

(13) *Barnaber; correct?*

(14)     A.    Okay.

(15)     *Q.    Was there a document that had been*

(16) *sent prior to August 20th that triggered a*

(17) *conversation between Ms. Weiner and Mr.*

(18) *Barnaber?*

(19)     A.    No, not that I'm aware of.

(20)     *Q.    Let me show you what has been*

(21) *marked as Plaintiff's Exhibit 3 at a June 5,*

(22) *'06 deposition. And I ask whether you have*

(23) *ever seen a copy of this document before?*

(24)     A.    I'm sorry. Barnaber was sent on

(25) the 18th.

### Page 91

(1)

(2)     *Q.    Barnaber was sent on the 20th.*

(3)     A.    Then Barbara would have sent that

(4) the day I got the fax from Greg Cross -- Greg

(5) Baron. I received the fax of the summons and

(6) complaint. I'm sorry. I do have the John

(7) Purpura here. And that same day she forwarded

(8) it on to WKF&C. And then I don't know how

(9) Michael Barnaber got involved, but somebody

(10) may have asked to send it to him. I can't

BSA    12/05/06 105 STREET ASSOCIATES vs GREENWICH    WITNESS: S. POTOLSKY    XMAX(21/21)

(11) answer for her. I don't know.
(12)    Q.    Let me ask you something. You
(13) said you received something by fax?
(14)    A.    Correct. We had the conversation
(15) because I needed the – I couldn't locate
(16) summons and complaint, so Greg Baron faxed a
(17) copy of it on August 18th, 2004. And that day
(18) it was faxed on to Greenwich or to, I guess
(19) WKF&C and Sirius.
(20)    Q.    Is it your recollection that what
(21) was marked as Exhibit P was faxed to you by
(22) Mr. Baron on August 18th?
(23)    A.    Yes.
(24)    Q    So this document came to you, that
(25) I'm holding in my hand now as Exhibit P, came

Page 92

(1)
(2) to you on the 18th?
(3)    A.    There is a reference to a fax on
(4) the 18th.
(5)    Q.    Right. But what I'm asking you is
(6) Exhibit P, how did you get Exhibit P?
(7)    A.    I believe that's what came in an
(8) envelope from BFC on or around July 19th,
(9) 2004. Because I responded to particulars of
(10) it on the 25th.
(11)    Q.    So Exhibit P came to you from BFC
(12) when?
(13)    A.    I think on or around July 2004.
(14)    Q.    That was by mail?
(15)    A.    I believe so.
(16)    Q.    Was there, to your recollection, a
(17) cover letter?
(18)    A.    No.
(19)    Q    Was there any cover document?
(20)    A.    Nothing.
(21)    Q.    So just a verified complaint came
(22) in the mail?
(23)    A.    Correct.
(24)    Q.    And you understand it was from BFC
(25) because of the envelope?

Page 93

(1)
(2)    A.    I would say yes. Right now, I
(3) don't recall.
(4)    Q.    So right now you have no specific
(5) recollection as to who sent you Exhibit P?
(6)    A.    Yes, I assume that it was sent
(7) from BFC.
(8)    Q    You assume, but you have no
(9) specific memory?
(10)    A.    I don't have specific.
(11)    MR. FUERTH:    Could you mark that
(12) as T, please
(13)    (Whereupon, the aforementioned
(14) Documents were marked as Defendant's Exhibit T
(15) for identification as of this date by the
(16) Reporter.)
(17)    Q.    So showing you what is marked as
(18) Exhibit T, that is the July 8, 2004 letter,

(19) and then the –
(20)    A.    July 8th?
(21)    Q.    Yes. It's July 8th, 2004 letter
(22) to BFC.
(23)    A.    Yes, I never saw that letter.
(24)    Q    Did you see that letter on August
(25) 18th?

Page 94

(1)
(2)    A.    On August I did.
(3)    Q.    All I'm saying is, Exhibit T
(4) consists of a July 8, 2004 letter, a receipt
(5) from the Department of State, an affidavit of
(6) service by the Secretary of State, and a
(7) summons and verified complaint which was faxed
(8) to you on August 18th. Is that correct?
(9)    A.    Correct.
(10)    Q.    So the July 8th letter in Exhibit
(11) T, you had never seen?
(12)    A.    Never seen it before.
(13)    Q.    The first time you saw it was on
(14) August 18th, correct?
(15)    A.    Correct.
(16)    Q.    On August 18, 2004 Ms. Weiner sent
(17) Plaintiff's Exhibit 3 to WFK&C?
(18)    A.    Correct.
(19)    Q.    Now, the ACORD would list what was
(20) being sent to WFK&C in addition to the ACORD;
(21) correct?
(22)    A.    Correct. On the bottom would be a
(23) notation.
(24)    Q.    What is the reason that on August
(25) 18th Ms. Weiner sent a letter from the

Page 95

(1)
(2) claimant's attorney and a copy of the policy
(3) to WFK&C but not the summons and complaint?
(4)    MR. SCHNEIDER:    Object to the form
(5) of the question.
(6)    Q.    Withdrawn. I will rephrase it.
(7) Do you know if on August 18th,
(8) 2004, Ms. Weiner sent anything to WFK&C other
(9) than what consists of Exhibit 3?
(10)    A.    I can't – I don't know. I can't
(11) answer that. It appears that she sent, on
(12) that date, the claimant's attorney a copy of
(13) the policy.
(14)    Q.    A letter?
(15)    A.    A letter.
(16)    Q    But then Exhibit S shows that on
(17) August 18, she is sending a summons and
(18) complaint to Purpura at Sirius.
(19)    A.    That seems correct as well.
(20)    Q.    Do you have an understanding as to
(21) what the reason was, if any, that she is
(22) sending the summons and complaint to Sirius
(23) and a letter to WFK&C?
(24)    A.    No. It should have gone with the
(25) summons and complaint, should have gone at

Page 96

(1)
(2) that point as well. And I believe I did give
(3) you another exhibit for Michael Barnaber.
(4)    Q.    Yes. We're going to get there.
(5) But that's not on August 18.
(6) Also looking at Plaintiff's
(7) Exhibit 3, is there a letter included in that
(8) exhibit from the claimant's attorney?
(9)    A.    It says there is. I don't know.
(10) Let me see how many pages were sent.
(11) It appears that there wasn't. It
(12) appears that there wasn't. The claimant's
(13) attorney's letter, there are six pages, and it
(14) was probably sent in follow up to –
(15)    Q.    Let me show you what has been
(16) previously marked as Exhibit 5. Is that the
(17) follow up?
(18)    A.    August 20th, yes, Michael
(19) Barnaber. "In accordance with our
(20) conversation, enclosed is the ACORD notice, a
(21) copy of policy and summons and verified
(22) complaint pertaining to the above."
(23)    Q.    He's also enclosing an August 6th,
(24) 2002 letter from the claimant's attorney?
(25)    A.    It's 23 pages, so I probably asked

Page 97

(1)
(2) her to send the entire file.
(3)    Q.    Now, that fax cover sheet that's
(4) on Exhibit A is the same thing as Exhibit R,
(5) correct?
(6)    A.    Yes.
(7)    Q.    Now, the material that was sent to
(8) WFK&C and then two days later on the 20th to
(9) Michael Barnaber related to 105 Street
(10) Associates; correct?
(11)    A.    Correct. To my understanding.
(12)    Q.    What is the reason that Ms. Weiner
(13) in the fax cover sheet that is Exhibit 5,
(14) indicates that the claimant's attorney letter
(15) of August 6th is, quote, putting us on notice
(16) for the construction company we insured?
(17)    A.    Let me see this. Because we had
(18) no idea or indication of another entity as a
(19) party to this. There is no mention of it.
(20) The only thing that we had was BFC
(21) Construction, and I guess he wanted to provide
(22) the claims examiner with whatever information
(23) that he had.
(24)    Q.    Well, at the time that Ms. Weiner
(25) is sending the fax cover sheet on August 20,

Page 98

(1)
(2) you have the claimant's attorney's letter of
(3) July 8, 2004, August 6, 2002 – I'm sorry,
(4) July 8, 2004, and a copy of the summons which
(5) named 105 Street Associates
(6)    A.    Okay.
(7)    Q.    What is the reason that the fax
(8) cover sheet to Barnaber who insured 105 Street

(9) Associates, doesn't reference the owner as
(10) opposed to the construction company?
(11)    A.    I can't answer that. I think her
(12) intent was to – because at that point we
(13) realized that this was part of the claim
(14) against BFC, and she just sent correspondence
(15) from that claim.
(16)    Q.    When you're faxing – when I say
(17) you, your company from Ms. Weiner, is faxing
(18) Barnaber on August 20, that is after the phone
(19) call that you had with Baron and Richards
(20) where they advised you of the involvement of
(21) 105 Street Associates, and you decide to
(22) notify Greenwich; correct?
(23)    A.    Correct.
(24)    Q.    So in notifying Greenwich who
(25) insures 105, what is the reason that there is

Page 99

(1)
(2) no reference to 105 being placed on notice by
(3) the attorney's letter and being named as a
(4) defendant in the summons?
(5)    A.    Why is there no reference to 105
(6) Street Associates?
(7)    Q.    Yes.
(8)    A.    We sent a copy of the policy. So
(9) clearly – and the summons and complaint,
(10) which was also including 105 Street
(11) Associates. So, are you talking about –
(12)    Q.    Does the information on the fax
(13) cover sheet, is that at variance with the
(14) enclosures?
(15)    A.    I can't answer that. I can't
(16) answer that. It just may be the language she
(17) used.
(18)    Q.    The language she used solely
(19) relates to the construction company and not
(20) the owner; correct?
(21)    A.    The language that she used in
(22) referencing this policy pertains to the owner
(23) 105 Street Associates, LLC.
(24)    Q.    The Re does, R-E, that refers to
(25) the owner?

Page 100

(1)
(2)    A.    Well, he was only involved in 105
(3) Street Associates, LLC, so she sent the
(4) summons and complaint pertaining to that.
(5)    Q.    Right. But what I'm saying is
(6) that in the body of the text to him, does not
(7) say that this is enclosing a letter from the
(8) claimant's attorney –
(9)    A.    I think by referencing it up
(10) above, she's referencing the owner of the
(11) project.
(12)    Q.    So as you interpret this, Barnaber
(13) is supposed to follow the Re as opposed to the
(14) text of the letter from Ms. Weiner?
(15)    A.    Yes, because she –
(16)    MR. SCHNEIDER:    Object to the form

(17)  of the question.

(18)     A.    She's referencing a policy number

(19)  which pertains to 105 Street Associates, LLC.

(20)     Q.    Let me show you what has been

(21)  previously marked as Plaintiff's Exhibit 7 on

(22)  June 5, '06 deposition, which is an August 25

(23)  letter from Michael Barnaber at Excell to Ms

(24)  Rodriguez.

(25)     Have you ever seen a copy of

Page 101

(1)

(2)  Exhibit 7 before?

(3)     A.    I believe so. No. No. I have a

(4)  September 15th transmittal. Let me see this

(5)  August 25th.

(6)     MR. SCHNEIDER:    Look at the CC.

(7)     A.    I never saw this.

(8)     Q.    Okay. Now, did there come a time

(9)  when you received a copy of the letter from

(10)  Greenwich to 105 Street Associates?

(11)     A.    Now I see a letter dated September

(12)  15, 2004.

(13)     Q.    Were you copied on that letter?

(14)     A.    No. I don't remember how we got

(15)  this,

(16)  but –

(17)     Q.    That was going to be my next

(18)  question.

(19)     A.    I don't know how I have this,

(20)  then. Because it says – the copy is to –

(21)  via certified mail to Sirius. And unless

(22)  there were other cc's. I don't know how I

(23)  have this.

(24)     Q.    Would that have been given to you

(25)  by Mr. Schneider?

Page 102

(1)

(2)     A.    I guess if I have it, it was

(3)  probably given to me by BFC Construction. I

(4)  really don't know how this came to me.

(5)     Q.    Given to you by BFC?

(6)     A.    I guess BFC would have sent it to

(7)  me.

(8)     Q.    Why not 105?

(9)     A.    Maybe it was 105. I can't answer

(10)  that. I just don't know.

(11)     Q.    Then let me show you what has been

(12)  marked as Plaintiff's Exhibit 8, which is a

(13)  September 20, 2004 letter from Steven

(14)  Postelnek, P-O-S-T-E-L-N-E-K, from my firm, to

(15)  Brad Richards at 105. It shows a copy to

(16)  you.

(17)     A.    Correct.

(18)     Q.    You have a copy of that in your

(19)  file?

(20)     A.    Yes.

(21)     Q.    Now, had you had any discussions

(22)  with anyone at 105 Street Associates between

(23)  August 20 when Ms  Weiner faxes the material

(24)  to Mr. Barnaber and the date that you received

(25)  the September 20th letter that is Plaintiff's

Page 103

(1)

(2)  Exhibit 8?

(3)     A.    I don't believe so.

(4)     Q.    Do you know whether Ms  Weiner

(5)  had?

(6)     A.    I don't believe so.

(7)     Q.    Did you receive a copy of

(8)  Plaintiff's Exhibit 8, which is the September

(9)  20th letter?

(10)     A.    Yes. I have that here. That came

(11)  from your office?

(12)     Q.    Correct.

(13)     Did you have any communications

(14)  with Mr. Postelnek concerning the letter?

(15)     A.    I did not, to the best of my

(16)  knowledge.

(17)     Q.    Do you know whether Ms  Weiner

(18)  did?

(19)     A.    I don't believe so.

(20)     Q.    Did you have any discussions with

(21)  anyone at 105 Street Associates concerning the

(22)  letter?

(23)     A.    I don't believe so.

(24)     Q.    Did you have any discussions with

(25)  anyone at BFC concerning the letter?

Page 104

(1)

(2)     A.    It's possible. I don't recall.

(3)     Q.    And there would be no notes that

(4)  you would make of such a discussion?

(5)     A.    Right. I don't have any.

(6)     Q.    Did you recommend to 105 Street

(7)  Associates that they get in touch with

(8)  Mr  Schneider?

(9)     A.    I don't recall having any specific

(10)  conversations. So I can't make that sort of

(11)  statement. There have been conversations,

(12)  phone calls that I have had, dealing with a

(13)  variety of items, and this might have been one

(14)  of them.

(15)     Q.    Well, when Sirius denied coverage

(16)  to BFC, you sent a letter that BFC should turn

(17)  the material over to its attorney, Mr

(18)  Schneider; correct?

(19)     A.    Right. Correct.

(20)     Q.    Did you have an understanding in

(21)  September of '04 that Mr. Schneider also

(22)  represented 105 Street Associates?

(23)     A.    No. I don't have specific

(24)  knowledge on that. When the summons and

(25)  complaint was faxed to me on 18th of August

Page 105

(1)

(2)  from Greg Baron, I understood that their

(3)  attorney was going to be monitoring this as

(4)  well.

(5)     Q.    When you say the fax from Baron,

(6)  that's Exhibit T; correct?

(7)    A.    Correct.

(8)    Q.    Did he speak to you on the 18th

(9)    and let you know that 105 Street's attorney

(10)   was going to be monitoring the matter?

(11)   A.    I can't remember the specifics of

(12)   the phone call, other than discussing that

(13)   they needed to send it to me and I needed to

(14)   send it on to the insurance carrier S A S A.

(15)   Q.    But you just indicated that there

(16)   was also discussion about 105 Street's

(17)   attorney monitoring the matter.

(18)   A.    I don't know.

(19)   Q.    Is that mentioned then –

(20)   A.    I don't know. I'm certain that I

(21)   had the conversation with them at the time. I

(22)   don't know if the reference was to BFC's

(23)   attorney or 105 Street's attorney.

(24)   Q.    But there was, on August 18th, a

(25)   discussion concerning an attorney monitoring

Page 106

(1)

(2)    the matter?

(3)    A.    I believe that I mentioned that

(4)    they should have that as well.

(5)    Q.    When you say "they," you're

(6)    referring to 105?

(7)    A.    When I spoke to Brad Richards and

(8)    Greg Baron, but I did not have -- there was no

(9)    indication that Don Schneider was the attorney

(10)   for 105 Street Associates or – the dealings

(11)   that I had with Don Schneider or any reference

(12)   to Don Schneider pertained to BFC Construction

(13)   Corp.

(14)   Q.    When you were talking to Brad

(15)   Richards and Greg Baron, they were with BFC,

(16)   as you understood, or with 105?

(17)   A.    Greg I understood to be with

(18)   both. Brad Richards, I didn't know Brad

(19)   Richards so I can't --

(20)   Q.    But Baron was with both BFC and

(21)   105?

(22)   A.    He was – yes.

(23)   Q.    What was his --

(24)   A.    I have no idea what his capacity

(25)   was.

Page 107

(1)

(2)    Q.    But you did know that he was with

(3)    105 as well?

(4)    A.    Yes.

(5)    Q.    He told you that a lawyer for 105

(6)    was going to monitor that?

(7)    A.    No.

(8)    MR. SCHNEIDER:    Objection.

(9)    A.    No.

(10)   Q.    Did he indicate to you that a

(11)   lawyer was going to be monitoring the matter?

(12)   A.    No. I don't remember the

(13)   specifics of the conversation. I would assume

(14)   that that's something I might have brought up

(15)   that somebody should be overseeing this, but

(16)   what we had to do was immediately report it to

(17)   the insurance company. I assumed that

(18)   somebody had been -- an attorney had been

(19)   monitoring this all along for BFC.

(20)   Q.    Why would they have to monitor it

(21)   for 105?

(22)   A.    Because 105 was also named in this

(23)   action.

(24)   Q.    Was there any indication to you on

(25)   August 18th that there was any coverage issue

Page 108

(1)

(2)    in terms of 105?

(3)    A.    Coverage issue other than

(4)    acknowledgment of Greenwich policy which we

(5)    had to notify immediately.

(6)    Q.    Right. Was there any indication

(7)    to you on August 18th that coverage might be

(8)    adversely impacted with respect to 105, as of

(9)    that date?

(10)   A.    The coverage would be -- no.

(11)   Q.    So, what I'm getting at is, at

(12)   that point you just transmitted the notice of

(13)   claim, what would be the reason that you would

(14)   suggest an attorney monitor the matter for

(15)   105?

(16)   A.    I didn't say 105. At least I

(17)   don't believe I said 105. It might have been

(18)   BFC Construction related. Sorry if I

(19)   misspoke.

(20)   Again, I don't remember the

(21)   specifics. It's really difficult. I just

(22)   don't remember the specifics of the

(23)   conversation other than to know that I

(24)   received a copy of the summons and complaint

(25)   along with a letter from -- it was an

Page 109

(1)

(2)    attorney's letter, and that I forwarded that

(3)    on to the insurance company for 105 Street

(4)    Associates.

(5)    Q.    Did anyone contact you from BFC

(6)    and/or 105 or Mr. Schneider's office after the

(7)    receipt of the September 20 denial of coverage

(8)    letter?

(9)    A.    I have no specific recollection of

(10)   that.

(11)   Q.    Now, when we first started today,

(12)   you indicated that you had had some

(13)   conversations with Mr Schneider about the

(14)   progression of the lawsuits.

(15)   A.    Right.

(16)   Q.    Now, are those conversations that

(17)   you had concerning the lawsuit filed against

(18)   Sirius, the lawsuit filed against Greenwich or

(19)   something else?

(20)   A.    The conversation that I had with

(21)   Don Schneider were principally regarding a

(22)   deposition for my employee Barbara Weiner at

(23) the time. And there was some conversations
(24) which went back to, I don't remember if it was
(25) July or August, whenever, or June, whenever it

Page 110

(1)
(2) was -- whenever it was.
(3)     Q.    The date of the subpoena is May
(4) 31.
(5)     A.    Okay. So it was right around that
(6) time. And then we started having -- there was
(7) some phone conversations. First Barbara may
(8) have had with Don Schneider, and then I
(9) probably had them as well.
(10)     Q.    What were those conversations
(11) about?
(12)     A.    Concerning an upcoming deposition.
(13)     Q.    What were the conversations about
(14) concerning the upcoming deposition?
(15)     A.    One, my concern about Barbara
(16) having to go into the city. It was a whole
(17) big ordeal. I said, it might be more suitable
(18) for me to handle this, because I was more
(19) intimately aware of many of the events
(20) surrounding this.
(21)     Q.    Other than you substituting for
(22) Barbara and holding it out here, what other
(23) conversations did you have?
(24)     A.    Well, conversations that I had
(25) with Don, I guess over a period of time, I

Page 111

(1)
(2) don't remember when our first conversation
(3) was. It was probably right around the time of
(4) this. I'm trying to think what it would have
(5) been. I probably had a conversation with him
(6) as well back in 2004 because of this concern
(7) with the BFC and the denial of coverage from
(8) Sirius America. And there might have been
(9) some information that they were looking for to
(10) try to help them in that regard.
(11)     Q.    What about conversations with Mr.
(12) Schneider concerning the Greenwich denial of
(13) coverage?
(14)     A.    I can't answer that because I
(15) don't know at what point he was called upon to
(16) monitor this for 105 Street Associates.
(17)     Q.    Have you ever had a discussion
(18) with Mr. Schneider concerning the action
(19) against Greenwich that involved the substance
(20) of the lawsuit as opposed to where we were
(21) going to hold your deposition?
(22)     A.    No. I don't recall that.
(23)     Q.    Have you received any written
(24) communications from -- when I say Mr.
(25) Schneider, either him or someone from his

Page 112

(1)
(2) firm?
(3)     A.    I don't know if I can -- I don't
(4) know how to respond to that, because I believe

(5) Don Schneider was involved in another incident
(6) having to deal with BFC. So there might have
(7) been correspondence going back and forth. I'm
(8) not certain about what claim it was
(9) regarding. Barbara would have been more aware
(10) of that, conversations with Mr. Schneider
(11) about that.
(12)     Q.    Well, when you say another
(13) incident involving BFC, is that something
(14) other than the Sirius denial of coverage?
(15)     A.    Yes. Other than that.
(16)     Q.    What is that related to?
(17)     A.    I believe just another claim. An
(18) unrelated claim.
(19)     Q.    Have you had any discussions with
(20) Mr. Schneider concerning either the
(21) prosecution of the suit against Sirius, or the
(22) prosecution of the suit against Greenwich?
(23)     A.    I talked about sequence of events,
(24) how they unfolded, and discussed information
(25) that I had provided to my client in letter

Page 113

(1)
(2) form. I don't think there was -- or whether
(3) discussing the specifics of my letters or
(4) correspondence to the client. I don't believe
(5) there was anything, or at least I cannot
(6) recall anything specific regarding the claim
(7) itself.
(8)     Q.    Well, anything specific about just
(9) the lawsuit or anything else?
(10)     A.    I don't recall.
(11)     Q.    Now, the letters from Mr
(12) Schneider concerning the BFC matter, is that
(13) in your claim file or someplace else?
(14)     A.    The letter -- I'm sorry?
(15)     Q.    You said that you may have
(16) received some correspondence from Mr
(17) Schneider
(18)     A.    There might have been phone calls
(19) that Barbara may have had with Don Schneider.
(20) I don't recall any specifics of it. I don't
(21) know if there were any letters.
(22)     Q.    Would that be in a claim file or
(23) in a different file?
(24)     A.    It could be in a different file if
(25) it's unrelated to this file. If it were in

Page 114

(1)
(2) this file, you know --
(3)     Q.    I'm sorry?
(4)     A.    If it were in this file, if there
(5) was specific correspondence from his office to
(6) me, then I would have included that.
(7)     Q.    At any point did BFC or 105 Street
(8) send you a letter threatening a claim arising
(9) out of this Conrad claim and denial of
(10) coverage?
(11)     A.    Threatening a claim to who?
(12)     Q.    Against your company.

BSA                 12/05/06 105 STREET ASSOCIATES vs GREENWICH   WITNESS: S. POTOLSKY       XMAX(26/26)

(13)    A.    No.

(14)    Q.    Thank you for your time.

(15)    MR. SCHNEIDER:    Let's go off the

(16)  record.

(17)    (Whereupon, an off-the-record

(18)  discussion was held.)

(19)    MR. SCHNEIDER:    The witness just

(20)  asked for a read back of the last few

(21)  questions and answers indicating the

(22)  possibility he might want to add or modify an

(23)  answer. The reporter has indicated for some

(24)  technical reason she was unable to do that at

(25)  this very moment.

Page 115

(1)

(2)  So the witness or was mentioned to

(3)  the witness that he would have an opportunity

(4)  to review the questions and answers when he

(5)  receives a transcript in written form, an

(6)  opportunity, if so required to make any

(7)  corrections.

(8)    MR. FUERTH:    Just, I reserve my

(9)  rights in the event that the corrections

(10)  and/or changes are significant, to further

(11)  inquire, but it probably will not be

(12)  necessary.

(13)    THE WITNESS:    Thank you.

(14)    (Whereupon, an off-the-record

(15)  discussion was held.)

(16)    (Whereupon, a short recess was

(17)  taken.)

(18)    (Whereupon, the aforementioned Fax

(19)  was marked as Defendant's Exhibit U for

(20)  identification as of this date by the

(21)  Reporter.)

(22)    Q.    Mr. Potolsky, you went and you

(23)  searched your files and you were able to find

(24)  some correspondence with Mr. Schneider's

(25)  firm. The first document is a March 22, 2005

Page 116

(1)

(2)  fax from Donald Schneider to Barbara Weiner.

(3)  And I ask you whether you have seen this

(4)  document before?

(5)    A.    Yes, I provided it to you.

(6)    Q.    Now, the handwriting –

(7)    A.    That's Barbara's.

(8)    Q.    That's Barbara's?

(9)    A.    Right.

(10)    Q.    Do you know what this the

(11)  significance of that handwriting or the

(12)  handwriting dates?

(13)    A.    The dates of most – there were

(14)  two separate claims that were involved here

(15)  that were being referenced.

(16)    Q.    The Regolodo, R-E-G-O-L-O-D-O,

(17)  matter, was there also a declination of

(18)  coverage in that one?

(19)    A.    I'm not aware of that. It's an

(20)  unrelated claim.

(21)    Q.    Do you know what the status of the

(22)  claim is?

(23)    A.    It's unrelated to the Conrad.

(24)    Q.    Understood. But what I'm asking

(25)  is, do you have an understanding as to the

Page 117

(1)

(2)  reason that Mr. Schneider asked for

(3)  notification to the insurer of the Regolodo

(4)  suit as well?

(5)    A.    I don't know the specifics, so I

(6)  can't respond to that.

(7)    MR. SCHNEIDER:    Off the record for

(8)  a moment.

(9)    (Whereupon, an off-the-record

(10)  discussion was held.)

(11)    Q.    Do you have a claim file for the

(12)  Regolodo lawsuit?

(13)    A.    I would assume so.

(14)    Q.    I would ask it be readily

(15)  available.

(16)    A.    I would have to ask Barbara. I'm

(17)  sure she could track it down.

(18)    Q.    I will continue to ask you about

(19)  the other documents. If she could look at

(20)  that, please.

(21)    (Whereupon, an off-the-record

(22)  discussion was held.)

(23)    Q.    There was a subpoena sent, and so

(24)  what I will do is, I will send you a letter

(25)  saying in furtherance of the subpoena.

Page 118

(1)

(2)    A.    The subpoena was specific, and I

(3)  tried to give you whatever I had. You didn't

(4)  ask me for any unrelated files.

(5)    Q.    Understood. This came up through

(6)  this.

(7)    MR. FUERTH:    Just to clarify the

(8)  record, the document that is the March 22,

(9)  2005 fax from Mr. Schneider to Barbara Weiner

(10)  is Exhibit U. If I misspoke and called it V,

(11)  that was incorrect. It's Exhibit U.

(12)    MR. SCHNEIDER:    Can we go back,

(13)  because I haven't heard any of the new exhibit

(14)  designations.

(15)  Can I just see what has been

(16)  marked.

(17)    MR. FUERTH:    Yes, Exhibit U.

(18)    MR. SCHNEIDER:    This is U, not V?

(19)    MR. FUERTH:    Correct.

(20)    (Whereupon, the aforementioned Fax

(21)  was marked as Defendant's Exhibit V for

(22)  identification as of this date by the

(23)  Reporter.)

(24)    Q.    Now, what I am showing you is what

(25)  has been marked as Exhibit V, which is a March

Page 119

(1)

(2)  28th fax from Ms. Weiner to Mr. Schneider for

(3) both the Conrad and Regolodo lawsuits. And I
(4) take it she is just responding to the request
(5) made in Exhibit U; is that correct?
(6)    A.    Yes.
(7)    (Whereupon, the aforementioned Fax
(8) was marked as Defendant's Exhibit W for
(9) identification as of this date by the
(10) Reporter.)
(11)    Q.    What has been marked as Exhibit W
(12) is an August 18 fax cover page from Mr.
(13) Schneider to Mr. Potolsky, enclosing an August
(14) 18, 2004 letter from Mr. Schneider to Mr.
(15) Potolsky. And I ask whether you have ever
(16) seen Exhibit W prior to today?
(17)    A.    I did on August 18th.
(18)    Q.    Now, did you call Mr. Schneider
(19) after you received Exhibit W?
(20)    A.    If I could look at this, because I
(21) don't recall, to the best of my knowledge. I
(22) don't believe I called Mr. Schneider at that
(23) point. I had a conversation with Greg Baron
(24) and Greg Richards on the 18th, and they faxed
(25) me the summons and the complaint. And I don't

Page 120

(1)
(2) know. I don't recall. I don't think Don was
(3) on the call, but I can't answer for sure.
(4)    (Whereupon, the aforementioned
(5) Letter was marked as Defendant's Exhibit X for
(6) identification as of this date by the
(7) Reporter.)
(8)    Q.    Let me show you what has been
(9) marked as Exhibit X, which is an August 18,
(10) 2004 letter to Donald Schneider from Mr
(11) Potolsky, consisting of three pages, showing
(12) as a cc a Mr Capoccia, C-A-P-O-C-C-I-A, Mr.
(13) Baron, Brandon Baron, B-R-A-N-D-O-N, Greg
(14) Baron and Brad Richards.
(15) What is the reason that you sent
(16) Exhibit X as opposed to calling Mr Schneider
(17) on the phone?
(18)    A.    My guess is because a letter had
(19) been sent to me, faxed to me.
(20)    Q.    So you –
(21)    A.    So I felt it necessary to respond
(22) in writing.
(23)    Q.    Did you have any further phone
(24) communications with any of the people listed
(25) as a cc?

Page 121

(1)
(2)    A.    I don't recall, and I – I don't
(3) recall. You know, I have conversations with,
(4) I'm sure, Greg Baron after the fact, but this
(5) is what I recall in terms of – because you
(6) had asked if I had any communication with
(7) Donald Schneider, and I believe it was this
(8) way. I don't remember speaking to him on the
(9) phone.
(10)    Q.    Did Mr Schneider respond to your

(11) letter?
(12)    A.    No. This is all I have.
(13)    Q.    Have you received any
(14) documentation on behalf of BFC and/or 105
(15) Street Associates agreeing to toll? Do you
(16) know what I mean by tolling?
(17)    A.    I don't.
(18)    Q.    To suspend the running of any
(19) statue of limitations for making a claim –
(20)    A.    No.
(21)    Q.    – against you in exchange for
(22) providing cooperation in the lawsuits against
(23) the insurers?
(24)    A.    Never.
(25)    Q.    Has anyone on behalf of BFC and/or

Page 122

(1)
(2) 105 asked you to cooperate in their lawsuits
(3) against the various insurers who are being
(4) sued?
(5)    A.    Never.
(6)    Q.    Is BFC still a client of your
(7) firm?
(8)    A.    BFC Construction Corporation is
(9) not a client of our firm.
(10)    Q.    When did it cease being a client?
(11)    A.    January 2003.
(12)    Q.    Was there an explanation given to
(13) you?
(14)    A.    There were – yes, there were a
(15) number of explanations.
(16)    Q.    And they were given to you by
(17) whom?
(18)    A.    I'm trying to remember how it was
(19) communicated to me. I can tell you what
(20) happened.
(21)    Q.    Sure, please.
(22)    A.    Because I was unable to combine
(23) some entities. They didn't want to do
(24) business with me because they felt these were
(25) combinable, you know, there was a possibility

Page 123

(1)
(2) of combining entities, when I couldn't do it,
(3) they figured they would give the account to
(4) someone else.
(5)    Q.    When you say combining the
(6) entities, that was trying to put together 105?
(7)    A.    Exactly. There was a whole
(8) protocol that I use. And it just wasn't
(9) combinable. They were unrelated entities and
(10) I couldn't do it. So I think they were upset
(11) about that.
(12)    Q.    There was no reference to any of
(13) these declinations of coverage?
(14)    A.    No. Not at all.
(15)    Q.    Is 105 Street Associates still a
(16) client of yours?
(17)    A.    No.
(18)    Q.    Was there any communication –

(19)    A.    That was a construction project.
(20)    The construction was over. And I wasn't asked
(21)    to place permanent insurance.
(22)    Q.    Was there any explanation given to
(23)    you for that?
(24)    A.    No.
(25)    Q.    I think BFC Partners was another

### Page 124

(1)
(2)    entity?
(3)    A.    BFC Partners owns a building at
(4)    226 First Avenue.
(5)    Q.    Was that entity ever a client of
(6)    yours?
(7)    A.    Yes.
(8)    Q.    Is it still?
(9)    A.    It is.
(10)    MR. FUERTH:    Thank you very much.
(11)    (Whereupon, at 3:20 p m , the
(12)    examination of this witness was concluded.)
(13)
(14)

STEVEN POTOLSKY

(15)
(16)    Subscribed and sworn to before me
(17)    this        day of            , 20     .
(18)

NOTARY PUBLIC

(19)
(20)
(21)
(22)
(23)
(24)
(25)

### Page 125

(1)
(2)    E X H I B I T S
(3)    DEFENDANT'S EXHIBITS:
(4)
(5)    EXHIBIT EXHIBIT PAGE
(6)    LETTER DESCRIPTION
(7)    A    Document 7
(8)    B Fax 14
(9)    C Letter 21
(10)    D Letter 27
(11)    E Documents 33
(12)    F Documents 33
(13)    G Documents 33
(14)    H ACORD Form 46
(15)    I Document 46
(16)    J Document 49
(17)    K Letter 50
(18)    L Letter 51
(19)    M Letter 53
(20)    N Letter 54
(21)    O Letter 72
(22)    P Complaint 74
(23)    Q    Letter 85
(24)    R Letter 90

### Page 126

(1)
(2)
(3)    EXHIBIT EXHIBIT PAGE
(4)    LETTER DESCRIPTION
(5)    S Fax Cover Sheet 88
(6)    T Documents 93
(7)    U Fax 115
(8)    V Fax 118
(9)    W Fax 119
(10)    X Letter 120
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

### Page 127

(1)
(2)    C E R T I F I C A T E
(3)
(4)    STATE OF NEW YORK )
        · SS .
(5)    COUNTY OF SUFFOLK )
(6)
(7)
(8)    I, MELISSA HARBORD, a Notary Public for
(9)    and within the State of New York, do hereby
(10)    certify·
(11)    That the witness whose examination is
(12)    hereinbefore set forth was duly sworn and that
(13)    such examination is a true record of the
(14)    testimony given by that witness.
(15)    I further certify that I am not related
(16)    to any of the parties to this action by blood
(17)    or by marriage and that I am in no way
(18)    interested in the outcome of this matter.
(19)    IN WITNESS WHEREOF, I have hereunto set
(20)    my hand this 25th day of December, 2006.
(21)
(22)

MELISSA HARBORD

(23)
(24)
(25)

BSA    12/05/06 105 STREET ASSOCIATES vs GREENWICH    NESS: S. POTOLSKY    Look-See(29)

**Look-See Concordance Report**

- - -

UNIQUE WORDS: **1,329**
TOTAL OCCURRENCES: **6,379**
NOISE WORDS: **384**
TOTAL WORDS IN FILE: **18,247**

- - -

SINGLE FILE CONCORDANCE

- - -

CASE SENSITIVE

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES **ON**

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS **ON**

**– DATES –**

**7-22-2002** [1]
 *55:12*
**April** [1]
 *14:25*
**April of 02** [1]
 *8:21*
**August** [5]
 *61:13; 69:20; 94:2; 104:25; 109:25*
**August 6, 2002** [1]
 *98:3*
**August 6th** [6]
 *39:17; 60:6; 61:15, 21, 25; 97:15*
**August 6th, 2002** [2]
 *27:7; 96:23*
**August 8th** [1]
 *94:14*
**August 18** [3]
 *95:17; 96:5; 119:12*
**August 18, 2004** [3]
 *94:16; 119:13; 120:9*
**August 18th** [9]
 *88:18; 91:22; 93:24; 94:8, 24; 105:24; 107:25; 108:7; 119:17*
**August 18th, 2004** [2]
 *91:17; 95:7*
**August 20** [3]
 *97:25; 98:18; 102:23*
**August 20, 2004** [1]
 *85:19*
**August 20th** [2]
 *90:16; 96:18*
**August 25** [1]
 *100:22*
**August 25th** [1]
 *101:5*
**December, 2006** [1]
 *127:20*
**December 5, 2006** [1]
 *1:9*
**January, 2003** [1]
 *122:11*
**January 1** [1]
 *8:10*
**January of 02** [1]
 *9:8*

**July** [2]
 *75:11; 109:25*
**July, 2004** [1]
 *92:13*
**July 2, 2002** [2]
 *32:25; 62:12*
**July 2nd, 2002** [1]
 *76:23*
**July 8, 2004** [4]
 *93:18; 94:4; 98:3, 4*
**July 8th** [2]
 *93:20; 94:10*
**July 8th, 2004** [1]
 *93:21*
**July 19th, 2004** [1]
 *92:8*
**July 26th** [5]
 *81:20; 83:17; 84:12; 85:3; 86:10*
**July 26th, 2004** [5]
 *73:3; 74:21; 76:13; 79:23; 81:11*
**July of 2002** [3]
 *18:21; 19:2, 16*
**June** [1]
 *109:25*
**June 5** [3]
 *81:23; 90:21; 100:22*
**March** [1]
 *15:25*
**March 14th, 2002** [1]
 *15:13*
**March 22, 2005** [2]
 *115:25; 118:8*
**March 28th** [1]
 *118:25*
**March 31, 2004** [1]
 *74:9*
**May 24** [3]
 *16:17; 18:6; 20:14*
**May 24, 2006** [1]
 *21:25*
**May 24th, 2006** [1]
 *15:7*
**May 31** [1]
 *110:3*
**May of 2002** [1]
 *21:8*
**November 1st, 2002** [1]
 *22:11*
**October 11th, 2002** [1]
 *54:25*
**October of 2002** [3]
 *64:15, 21; 69:20*
**September** [1]
 *40:17*
**September 9** [1]
 *39:22*
**September 12** [1]
 *60:7*
**September 12th** [9]
 *28:20; 35:25; 36:5; 37:9, 12, 22; 39:4, 12; 46:12*
**September 12th, 2002** [1]
 *28:9*
**September 15, 2004** [1]
 *101:11*
**September 15th** [1]
 *101:4*
**September 16th** [3]
 *28:17; 37:8; 39:13*

**September 16th, 2002** [2]
 *27:19; 35:23*
**September 18th, 2002** [1]
 *46:7*
**September 19th** [3]
 *37:24; 61:4, 6*
**September 19th, 2002** [1]
 *47:6*
**September 20** [1]
 *109:7*
**September 20, 2004** [1]
 *102:13*
**September 20th** [2]
 *102:25; 103:8*
**September 23** [1]
 *61:25*
**September 23, 2002** [2]
 *50:13; 53:16*
**September 26th** [1]
 *53:6*
**September 26th, 2002** [1]
 *52:6*
**September of 04** [1]
 *104:21*
**September of 2002** [2]
 *29:5, 13*

**– 0 –**

**02** [3]
 *8:11, 21; 9:8*
**03** [1]
 *8:11*
**04** [2]
 *84:12; 104:21*
**05CV** [1]
 *1:5*
**06** [4]
 *20:14; 81:24; 90:22; 100:22*

**– 1 –**

**1** [1]
 *8:10*
**10004** [1]
 *2:5*
**10017-5639** [1]
 *2:10*
**10128** [1]
 *5:13*
**105** [94]
 *1:3; 5:17; 10:19, 21; 11:2, 11, 24; 12:5, 24; 13:8, 14, 25; 14:2, 6, 24; 15:12, 16; 16:13, 23; 17:5, 9, 22; 18:3, 11, 18, 24; 19:16, 19; 22:13, 19; 23:7, 9, 14; 24:8, 12, 21, 25; 25:4, 15, 19, 25; 26:8, 13; 34:20; 67:4; 77:3, 10; 79:25; 80:8, 13; 86:20; 97:9; 98:5, 8, 21, 25; 99:2, 5, 10, 23; 100:2, 19; 101:10; 102:8, 9, 15, 22; 103:21; 104:6, 22; 105:9, 16, 23; 106:6, 10, 16, 21; 107:3, 5, 21, 22; 108:2, 8, 15, 16, 17; 109:3, 6; 111:16; 114:7; 121:14; 122:2; 123:6, 15*
**105th** [4]
 *8:8, 16, 20; 42:23*
**115** [1]
 *126:7*
**11577** [1]

**1:18**
**118** [1]
 *126:8*
**119** [1]
 *126:9*
**11:00** [1]
 *1:10*
**11th** [1]
 *54:25*
**12** [1]
 *60:7*
**120** [1]
 *126:10*
**12th** [10]
 *28:9, 20; 35:25; 36:5; 37:9, 13, 22; 39:4, 13; 46:12*
**14** [1]
 *125:8*
**142** [1]
 *36:6*
**14th** [1]
 *15:13*
**15** [1]
 *101:12*
**150** [1]
 *2:9*
**15th** [1]
 *101:4*
**16** [9]
 *55:18; 59:14, 25; 60:8, 13; 61:9; 62:2, 6, 10*
**16th** [5]
 *27:19; 28:17; 35:23; 37:9; 39:13*
**18** [6]
 *94:16; 95:17; 96:5; 119:12, 14; 120:9*
**18th** [18]
 *46:7; 88:18; 90:25; 91:17, 22; 92:2, 4; 93:25; 94:8, 25; 95:7; 104:25; 105:8, 24; 107:25; 108:7; 119:17, 24*
**1992** [1]
 *20:4*
**19th** [6]
 *37:24; 47:6; 61:4, 6; 75:11; 92:8*
**1st** [1]
 *22:11*

**– 2 –**

**2** [6]
 *32:25; 62:12; 81:3, 23; 87:17, 23*
**20** [7]
 *85:19; 97:25; 98:18; 102:13, 23; 109:7; 124:17*
**2002** [30]
 *15:13; 18:21; 19:2, 16; 21:8; 22:11; 27:7, 19; 28:9; 29:5, 13; 32:25; 35:23; 41:20, 23; 46:7; 47:6; 50:13; 52:6; 53:16; 54:25; 62:12; 64:15, 21; 69:20; 76:23; 77:2; 80:5; 96:24; 98:3*
**2003** [1]
 *122:11*
**2004** [23]
 *73:4; 74:9, 21; 76:13; 79:23; 81:12; 85:19; 88:19; 91:17;*

**Diamond Reporting**    (718) 624-7200

92:9, 13; 93:18, 21; 94:4, 16;
95:8; 98:3, 4; 101:12; 102:13;
111:6; 119:14; 120:10
**2005** [2]
115:25; 118:9
**2006** [4]
1:9; 15:7; 21:25; 127:20
**20th** [6]
90:16; 91:2; 96:18; 97:8;
102:25; 103:9
**21** [1]
125:9
**22** [3]
56:15; 115:25; 118:8
**221** [2]
3:2; 4:2
**221.1** [1]
3:3
**221.2** [2]
3:17; 4:7
**221.3** [1]
4:3
**2226** [3]
18:23; 19:4, 7
**226** [1]
124:4
**23** [4]
50:13; 53:16; 61:25; 96:25
**235-247** [2]
8:8, 16
**24** [4]
16:17; 18:6; 20:14; 21:25
**24th** [1]
15:7
**25** [3]
22:3; 41:22; 100:22
**2503** [2]
9:2; 56:9
**25th** [3]
92:10; 101:5; 127:20
**26th** [12]
52:6; 53:6; 73:4; 74:21;
76:13; 79:23; 81:11, 20;
83:18; 84:12; 85:3; 86:11
**27** [1]
125:10
**28th** [1]
119:2
**2nd** [1]
76:23

**– 3 –**

**3** [4]
90:21; 94:17; 95:9; 96:7
**31** [3]
3:10; 74:9; 110:4
**3115** [3]
3:5, 14, 21
**32-F** [1]
5:13
**33** [4]
1:17; 125:11, 12, 13
**3:20** [1]
124:11

**– 4 –**

**42nd** [1]
2:9
**46** [2]
125:14, 15

**49** [1]
125:16

**– 5 –**

**5** [6]
1:9; 81:23; 90:21; 96:16;
97:13; 100:22
**50** [2]
5:12; 125:17
**51** [1]
125:18
**53** [1]
125:19
**54** [1]
125:20

**– 6 –**

**6** [1]
98:3
**6th** [9]
2:5; 27:7; 39:17; 60:6; 61:15,
21, 25; 96:23; 97:15

**– 7 –**

**7** [3]
100:21; 101:2; 125:7
**7-22-2002** [1]
55:12
**72** [1]
125:21
**74** [1]
125:22

**– 8 –**

**8** [7]
93:18; 94:4; 98:3, 4; 102:12;
103:2, 8
**85** [1]
125:23
**88** [1]
126:5
**89th** [1]
5:12
**8th** [4]
93:20, 21; 94:10, 14

**– 9 –**

**9** [1]
39:22
**90** [2]
2:5; 125:24
**90s** [2]
20:6, 8
**93** [1]
126:6
**96** [1]
20:9
**99** [2]
12:13; 13:24
**9938** [1]
1:5

**– A –**

**a.m.** [1]
1:10
**ability** [1]
67:23
**able** [3]

16:25; 17:16; 115:23
**Absolutely** [2]
30:6; 54:5
**accident** [6]
34:13, 20; 35:2, 6, 11; 62:11
**accompanied** [3]
3:22; 48:10; 76:4
**accordance** [1]
96:19
**account** [5]
21:12; 69:9, 10, 14; 123:3
**accurate** [2]
34:25; 35:5
**acknowledging** [2]
47:21; 50:25
**acknowledgment** [4]
54:8; 57:2, 5; 108:4
**ACORD** [20]
22:3; 46:2, 7, 9, 10, 18, 19;
48:3, 10; 49:12, 15, 18, 22;
60:16; 80:9, 14; 94:19, 20;
96:20; 125:14
**act** [1]
66:21
**action** [9]
5:17; 6:16; 7:4; 50:21; 51:7;
81:19; 107:23; 111:18;
127:16
**active** [3]
42:25; 66:5; 69:23
**activities** [1]
70:5
**activity** [3]
41:7; 66:18; 69:15
**acts** [2]
23:4, 23
**actual** [2]
32:8; 59:24
**add** [7]
12:5; 14:6, 18; 17:9; 24:8;
25:14; 114:22
**added** [2]
22:19; 23:2; 26:9
**addition** [2]
48:4; 94:20
**additional** [27]
15:16; 16:13; 17:6, 11, 12,
23; 22:20, 24; 23:3, 7, 15, 16,
18, 20, 21, 25; 24:6, 12, 19,
20; 25:2, 19; 26:2, 9, 12; 28:6
**address** [4]
36:8, 9, 10; 66:16
**addressed** [4]
27:8; 28:11; 38:20; 67:10
**administrator** [3]
80:20; 83:3; 87:7
**adversely** [1]
108:8
**advise** [1]
65:4
**advised** [1]
98:20
**Advisors** [1]
13:23
**affidavit** [1]
94:5
**afforded** [1]
56:17
**aforementioned** [22]
7:24; 14:11; 26:18; 27:25;
33:14; 45:25; 46:24; 49:7;

50:6; 51:24; 53:10; 54:19;
72:23; 74:2; 85:14; 88:9;
90:7; 93:13; 115:18; 118:20;
119:7; 120:4
**agency** [2]
80:18; 81:9
**aggregate** [2]
9:3; 56:9
**agree** [1]
59:15
**AGREED** [4]
4:11, 14, 16, 20
**agreeing** [1]
121:15
**agreement** [1]
5:19
**alleged** [1]
61:9
**allegedly** [1]
42:21
**alphabetically** [1]
32:22
**America** [6]
14:8; 17:13, 20; 25:14, 22;
111:8
**amount** [1]
32:8
**ampersand** [1]
80:18
**answer** [27]
3:8, 12, 17, 21, 22, 23; 6:9;
19:17; 25:6, 11; 39:6, 7; 51:8;
52:25; 70:25; 77:20; 91:11;
95:11; 98:11; 99:15, 16;
102:9; 111:14; 114:23; 120:3
**answered** [2]
3:20; 4:6
**answers** [2]
114:21; 115:4
**anyway** [1]
67:20
**Apartment** [1]
5:12
**apologies** [1]
53:22
**apparently** [1]
28:10
**appeared** [1]
63:21
**appearing** [1]
59:18
**appears** [9]
20:22; 33:25; 34:3, 12; 38:25;
74:17; 95:11; 96:11, 12
**application** [1]
15:10
**applications** [1]
9:11
**applied** [1]
25:21
**apply** [1]
3:9
**apprise** [1]
66:11
**approached** [2]
15:23, 25
**appropriate** [4]
3:9; 4:17; 67:18, 21
**Approximately** [1]
20:3
**April** [2]

8:21; 14:25
**area** [2]
32:10; 40:25
**arising** [3]
17:8; 23:22; 114:8
**arose** [1]
42:21
**Article** [1]
3:10
**asking** [7]
38:8; 39:24; 43:22; 51:2;
81:22; 92:5; 116:24
**assertion** [1]
56:7
**assigned** [2]
29:8, 12
**assistant** [2]
10:11, 12
**assistants** [1]
11:17
**ASSOCIATES** [1]
1:3
**Associates** [46]
5:17; 8:20; 10:19, 21; 11:2,
12, 25; 12:6, 24; 13:9, 14;
14:7, 24; 15:12; 16:24; 17:10;
18:24; 19:19; 22:13, 19; 23:9;
24:8; 25:15; 26:2; 77:3;
80:13; 86:20; 97:10; 98:5, 9,
21; 99:6, 11, 23; 100:3, 19;
101:10; 102:22; 103:21;
104:7, 22; 106:10; 109:4;
111:16; 121:15; 123:15
**assume** [9]
60:24; 61:17, 21; 87:15; 90:2;
93:6, 8; 107:13; 117:13
**assumed** [2]
80:6; 107:17
**Assuming** [1]
78:8
**assuming** [4]
31:15; 32:2; 85:4
**assumption** [2]
61:15; 77:23
**attached** [1]
49:23
**attempt** [2]
17:5; 24:25
**attendance** [1]
3:15
**attention** [5]
29:16; 40:22; 62:16; 69:4;
70:15
**attorney** [31]
3:12, 21; 4:4; 34:14; 49:20;
58:5; 64:20; 65:10, 16, 20;
66:4; 71:6, 13; 72:8; 76:25;
95:2, 12; 96:8, 24; 97:14;
100:8; 104:17; 105:3, 9, 17,
23, 25; 106:9; 107:18; 108:14
**attorney's** [4]
96:13; 98:2; 99:3; 109:2
**Attorneys** [2]
2:4, 9
**attorneys** [2]
4:20, 22
**attracted** [1]
69:3
**August** [40]
27:7; 39:17; 60:6; 61:13, 15,
21, 25; 69:20; 85:19; 88:18;

90:16; 91:17, 22; 93:24; 94:2,
8, 14, 16, 24; 95:7, 17; 96:5,
18, 23; 97:15, 25; 98:3, 18;
100:22; 101:5; 102:23;
104:25; 105:24; 107:25;
108:7; 109:25; 119:12, 13,
17; 120:9
**authored** [1]
73:9
**available** [1]
117:15
**Avenue** [7]
18:23; 19:4, 8; 34:21, 23;
42:16; 124:4
**Avenues** [1]
42:24
**aware** [13]
8:18; 20:21; 21:12; 56:18, 22;
64:12; 66:12, 14; 70:21;
90:19; 110:19; 112:9; 116:19
**awareness** [2]
20:19; 21:7

— B —

**B-A-R-O-N** [1]
10:3
**B-E-N-E-D-E-T-T-O** [1]
27:8
**B-R-A-N-D-O-N** [1]
120:13
**background** [1]
7:3
**backing** [1]
74:16
**ballpark** [1]
20:10
**Barbara** [26]
29:11; 41:17; 44:18; 46:15;
63:17; 75:15; 77:22; 79:10,
12, 18; 81:24; 82:16, 18, 24;
87:11, 19; 91:3; 109:22;
110:7, 15, 22; 112:9; 113:19;
116:2; 117:16; 118:9
**Barbara's** [2]
116:7, 8
**Barnaber** [14]
87:10; 90:13, 18, 24; 91:2, 9,
96:3, 19; 97:9; 98:8, 18;
100:12, 23; 102:24
**Baron** [31]
10:2, 16; 12:19, 23; 13:7, 12;
19:7; 67:7; 82:5; 83:9, 11, 17;
84:4; 86:5, 9; 89:11; 90:3;
91:5, 16, 22; 98:19; 105:2, 5;
106:8, 15, 20; 119:23;
120:13, 14; 121:4
**Based** [2]
23:11; 31:18
**based** [6]
20:25; 57:15; 59:11; 60:3;
61:22; 62:11
**basing** [2]
61:16, 22
**basis** [6]
3:13, 23; 56:3; 62:6; 66:7;
72:9
**Bates** [9]
46:8; 47:8; 50:12; 52:7;
53:18; 54:15; 55:4; 73:5;
85:21

**bear** [2]
74:15, 17
**bearing** [8]
47:8; 50:12; 52:7; 53:18;
54:14; 55:4; 73:5; 85:21
**bears** [1]
46:7
**behalf** [11]
11:5; 16; 14:24; 15:12; 16:6,
23; 17:3; 36:18; 60:17;
121:14, 25
**believe** [47]
12:25; 16:2; 17:14; 18:15;
20:7, 11; 31:17, 22; 35:7;
36:10; 37:24; 38:12; 55:17,
19; 56:6, 12; 59:5; 66:13;
67:10; 70:25; 73:16, 21, 25;
74:24; 75:9; 76:22; 80:20, 21,
23; 82:5; 83:10; 84:13; 92:7,
15; 96:2; 101:3; 103:3, 6, 19,
23; 106:3; 108:17; 112:4, 17;
113:4; 119:22; 121:7
**believed** [2]
57:21; 61:23
**Believing** [1]
81:18
**Benedetto** [5]
27:8; 34:14, 18; 42:20; 62:13
**Benedetto's** [1]
34:24
**benefit** [1]
56:21
**besides** [1]
49:15
**Beth** [7]
11:6, 9, 19; 16:2; 18:16, 19;
19:10
**BFC** [119]
8:7, 9, 23; 9:6, 12, 15; 10:8;
12:6; 15:24; 17:6, 7, 19; 18:7,
12, 14; 19:15, 18, 21, 22;
22:8, 14; 23:5, 8, 15, 23;
24:13; 25:2, 16; 26:3; 27:8;
28:10; 31:3, 12, 22; 35:24;
36:18, 20, 24; 37:9; 38:20,
23; 39:2; 40:23; 42:24; 44:14,
17, 19; 45:10; 46:12; 50:14;
51:2; 52:7, 15, 16, 22; 53:2,
17; 54:25; 55:11; 56:24; 60:7;
61:23; 62:22; 63:4; 64:20;
66:8, 24; 68:14; 69:6, 18, 19;
70:2, 16; 72:3, 16; 73:5; 75:3,
4, 6, 10; 76:21; 77:10; 79:24;
80:7; 83:14; 85:20; 86:21;
88:21; 89:23; 92:8, 11, 24;
93:7, 22; 97:20; 98:14; 102:3,
5, 6; 103:25; 104:16; 106:12,
15, 20; 107:19; 108:18;
109:5; 111:7; 112:6, 13;
113:12; 114:7; 121:14, 25;
122:6, 8; 123:25; 124:3
**BFC's** [8]
15:17; 18:21; 66:16; 70:5;
71:25; 72:12; 86:7; 105:22
**bit** [2]
41:4; 45:13
**blanket** [1]
17:12
**blood** [1]
127:16
**BLOOMFIELD** [1]

2:4
**body** [1]
100:6
**bones** [1]
59:20
**box** [1]
46:16
**Brad** [8]
82:6; 83:9; 102:15; 106:7, 14,
18; 120:14
**Brandon** [1]
120:13
**Broad** [1]
2:5
**broker** [7]
21:2; 36:20; 47:24; 48:4;
58:6; 69:24; 82:20
**brokerage** [2]
58:13; 59:3
**Brokers** [1]
55:3
**builders** [2]
10:23; 16:22
**building** [1]
124:3
**Burns** [6]
11:6, 10; 16:2; 18:16, 19;
19:10
**business** [1]
122:24
**busy** [2]
41:7; 62:23

— C —

**C-A-P-O-C-C-I-A** [2]
9:25; 120:12
**cabinet** [3]
32:10, 19, 21
**call** [13]
35:8; 45:19, 20, 22; 51:10,
13; 63:15; 72:17; 87:19;
98:19; 105:12; 119:18; 120:3
**calling** [1]
120:16
**calls** [2]
104:12; 113:18
**cancel** [7]
17:22; 18:2; 24:22; 25:3, 13;
26:5, 14
**cancelled** [2]
18:11; 26:8
**capacity** [1]
106:24
**Capoccia** [14]
9:22, 25; 12:19, 23; 13:7, 12;
14:5, 22; 17:15; 18:7, 15, 19;
19:3; 120:12
**Capoccia's** [1]
10:8
**carrier** [18]
24:7; 33:23; 41:19; 44:18, 19,
23; 45:16, 17; 48:8; 56:7;
57:3; 59:21; 64:10, 13; 86:20,
21; 89:15; 105:14
**carriers** [3]
21:4; 42:18; 59:19
**case** [1]
23:5
**cases** [1]
45:14

**categorical** [1]
58:23

**caused** [2]
66:3; 68:12

**CC** [1]
101:6

**cc** [2]
120:12, 25

**cc's** [1]
101:22

**cease** [1]
122:10

**certificate** [12]
22:3; 23:6, 14; 25:25; 31:2;
33:22; 34:11, 22; 35:21;
36:12; 42:14; 49:20

**certified** [7]
27:10; 61:17, 19; 75:13; 76:3;
101:21

**certify** [2]
127:10, 15

**cetera** [1]
34:7

**CFO** [2]
66:22; 67:19

**CGL** [8]
8:22; 9:6, 17; 15:19; 24:22;
25:3; 44:23; 64:7

**changes** [1]
115:10

**characterization** [1]
63:10

**charge** [2]
4:21; 11:20

**check** [3]
75:18; 87:24; 88:5

**checked** [1]
76:2

**chief** [1]
68:12

**circumstances** [5]
7:3; 27:16; 64:6, 25; 73:14

**City** [15]
18:23; 47:6, 13, 16, 23; 48:7;
49:12, 25; 55:2; 60:12, 16;
61:2, 3; 80:10, 12

**city** [1]
110:16

**Civil** [1]
3:5

**claim** [76]
6:22; 7:11; 8:5; 17:8; 30:14,
18, 19, 21; 31:11, 14, 16;
32:6, 8, 13, 16, 24; 38:6;
41:11, 15, 24; 42:4, 6, 21;
44:13; 45:14; 47:22; 48:16;
50:25; 52:24; 54:9; 55:20;
59:21; 60:23; 61:5; 62:22;
63:6, 12, 13, 21; 64:8; 65:3,
14; 66:10, 14; 68:2, 3, 5, 6,
15; 69:2, 5, 7; 70:11; 76:23;
77:2, 7, 11; 79:4; 82:8; 89:2;
98:13, 15; 108:13; 112:8, 17,
18; 113:6, 13, 22; 114:8, 9,
11, 116:20, 22; 117:11;
121:19

**claimant** [1]
31:8

**claimant's** [9]
49:19; 95:2, 12; 96:8, 12, 24;
97:14; 98:2; 100:8

**claims** [20]
29:6, 9, 13; 30:22; 31:23, 24,
25; 32:4; 36:21; 40:7, 19;
45:7, 22; 47:15; 70:14; 71:22;
79:4; 97:22; 116:14

**clarify** [1]
118:7

**clear** [5]
3:13, 23; 8:17; 45:14; 74:19

**clerk** [1]
4:12

**client** [23]
9:20; 31:22; 41:7, 12; 56:25;
57:3, 17; 61:18, 20, 23;
63:16; 65:8; 66:7; 68:10;
72:6; 76:12; 112:25; 113:4;
122:6, 9, 10; 123:16; 124:5

**client's** [1]
58:4

**clients** [3]
40:21; 58:18; 70:6

**combinable** [4]
14:19; 25:23; 122:25; 123:9

**combine** [2]
14:25; 122:22

**combining** [2]
123:2, 5

**comment** [4]
19:18; 61:11; 62:18; 73:18

**comments** [1]
3:16

**communicate** [4]
57:24; 58:14; 68:13, 22

**communicated** [1]
122:19

**communicating** [1]
4:4

**Communication** [1]
4:3

**communication** [5]
4:5, 7; 68:15; 121:6; 123:18

**communications** [3]
103:13; 111:24; 120:24

**Community** [1]
13:23

**companies** [4]
41:25; 42:5; 58:14; 70:2

**COMPANY** [1]
1:6

**Company** [2]
5:16; 77:11

**company** [16]
8:5, 6; 14:18; 31:5; 44:13;
59:11; 63:18; 76:9; 80:22;
97:16; 98:10, 17; 99:19;
107:17; 109:3; 114:12

**Complaint** [2]
74:3; 125:22

**complaint** [35]
73:17, 20; 74:8, 15, 17, 23;
75:2; 77:18; 78:16; 79:17;
81:8, 9; 82:2, 19; 83:23;
84:12; 86:7, 14; 88:22; 89:12;
90:4; 91:6, 16; 92:21; 94:7;
95:3, 18, 22, 25; 96:22; 99:9;
100:4; 104:25; 108:24;
119:25

**complaints** [1]
85:5

**complete** [1]
3:24

**complexity** [2]
69:8, 13

**compliance** [1]
3:6

**complicated** [1]
72:4

**complied** [1]
52:22

**complies** [1]
33:9

**compound** [1]
77:15

**comprehensive** [1]
10:22

**comprising** [1]
59:16

**computation** [1]
59:25

**computer** [2]
48:13, 17

**concern** [2]
110:15; 111:6

**Concerning** [1]
110:12

**concerning** [21]
6:16; 7:5; 9:15; 34:25; 35:5;
40:11; 44:12; 45:10; 70:20;
71:21; 72:12; 103:14, 21, 25;
105:25; 109:17; 110:14;
111:12, 18; 112:20; 113:12

**concerns** [1]
67:22

**concluded** [1]
124:12

**condition** [1]
56:12

**conditions** [1]
56:16

**CONDUCT** [2]
3:2; 4:2

**confidentiality** [1]
3:18

**confirmation** [5]
47:20; 48:2; 60:25; 61:3, 6

**confirming** [1]
47:17

**confusing** [1]
33:25; 34:4

**Conrad** [10]
8:4; 27:7; 32:25; 34:14, 20;
55:13; 60:23; 114:9; 116:23;
119:3

**consent** [1]
4:5

**consider** [7]
30:13; 58:24; 59:22, 23; 68:2,
5, 9

**considered** [1]
78:20

**consisting** [1]
120:11

**consists** [3]
27:9; 94:4; 95:9

**Construction** [32]
8:7, 9, 15:24; 17:19; 19:18;
23:5; 25:17; 27:9; 31:12;
36:18; 38:20, 23; 42:24;
44:20; 50:15; 52:7, 22; 53:17;
55:2; 60:7; 73:5; 75:3, 7, 10;
79:25; 85:21; 88:22; 97:21;
102:3; 106:12; 108:18; 122:8

**construction** [12]
8:12, 14; 16:25; 17:8; 22:10;
43:2; 52:17; 97:16; 98:10;
99:19; 123:19, 20

**contact** [5]
57:11; 66:4; 67:21; 72:11;
109:5

**contacted** [6]
11:3; 42:12; 68:9; 72:6; 82:5;
89:25

**contacts** [1]
10:6

**content** [2]
51:11, 13

**contents** [2]
30:12; 65:14

**continue** [1]
117:18

**contract** [4]
9:10; 17:14; 26:5; 52:16

**contractor** [4]
22:9; 24:18; 31:4; 42:25

**contractors** [4]
51:3; 69:25; 70:4, 17

**contracts** [2]
51:3; 57:6

**contradict** [2]
34:12, 17

**controlling** [1]
4:18

**conversation** [33]
39:2, 11, 20; 40:11, 14;
43:20; 57:16; 65:7, 11, 18;
66:9; 67:15; 69:12; 70:19;
82:4, 8; 83:12, 16; 84:8, 15;
86:5, 13; 90:6, 17; 91:14;
96:20; 105:21; 107:13;
108:23; 109:20; 111:2, 5;
119:23

**conversations** [15]
40:9; 69:17; 104:10, 11;
109:13, 16, 23; 110:7, 10, 13,
23, 24; 111:11; 112:10; 121:3

**cooperate** [1]
122:2

**cooperation** [1]
121:22

**copied** [2]
66:15; 101:13

**copies** [2]
28:6; 51:3

**copy** [47]
4:21; 20:15; 27:10, 13, 14,
18, 20; 28:13; 30:25; 37:5;
38:3, 14; 39:14, 19; 47:9;
48:14, 19; 49:21; 50:16, 18;
52:16; 53:17, 20; 55:2, 6;
57:10; 71:5; 73:19; 74:8;
82:14; 85:2, 9, 25; 90:23;
91:17; 95:2, 12; 96:21; 98:4;
99:8; 100:25; 101:9, 20;
102:15, 18; 103:7; 108:24

**cord** [1]
82:12

**Corp** [6]
15:24; 23:5; 25:17; 36:17;
42:24; 106:13

**Corporation** [2]
85:21; 122:8

**corrected** [1]
77:13

corrections [2]
    115:7, 9
correspondence [6]
    98:14; 112:7; 113:4, 16;
    114:5; 115:24
counsel [8]
    5:19; 27:12; 65:5; 72:2, 13,
    16; 74:14; 81:18
COUNTY [2]
    1:2; 127:5
couple [1]
    55:19
course [1]
    3:15
COURT [1]
    1:2
court [6]
    3:19; 4:12; 5:25; 6:6; 39:8;
    56:21
Cover [2]
    88:10; 126:5
cover [12]
    38:9; 75:4; 88:13; 90:12;
    92:17, 19; 97:3, 13, 25; 98:8;
    99:13; 119:12
Coverage [1]
    108:3
coverage [38]
    7:12; 8:6; 22:18; 23:2, 22;
    24:2, 4; 26:13; 55:11; 56:15,
    17, 23; 57:15; 58:7, 8, 16;
    59:2, 5, 11; 65:2, 22; 67:24;
    68:20; 71:18; 72:8; 89:2, 19;
    104:15; 107:25; 108:7, 10;
    109:7; 111:7, 13; 112:14;
    114:10; 116:18; 123:13
covered [1]
    8:24
CPLR [6]
    3:10, 14, 21; 4:15, 17, 18
cracks [1]
    41:9
created [1]
    13:4
Cross [9]
    57:18; 65:12, 18; 66:22;
    70:20; 72:12, 18; 89:21; 91:4
cross [1]
    66:4
Cross's [1]
    67:6
currently [1]
    9:20
cut [1]
    45:14

– D –

DATE [1]
    1:9
date [35]
    8:2; 14:13; 23:11; 26:20;
    28:3; 31:17, 18; 33:16; 34:19;
    46:3; 47:2; 48:13; 49:9; 50:8;
    52:2; 53:12; 54:21; 61:14, 15;
    62:11; 72:25; 74:4; 80:5;
    85:16; 88:11; 90:9; 93:15;
    95:12; 102:24; 108:9; 110:3;
    115:20; 118:22; 119:9; 120:6
dated [6]
    15:13; 39:23; 61:6; 73:3;

74:9; 101:11
dates [5]
    20:2, 5; 61:7; 116:12, 13
day [10]
    44:9; 62:6, 10; 78:9, 11; 91:4,
    7, 17; 124:17; 127:20
day-to-day [1]
    21:11
days [10]
    39:21; 55:18; 59:15, 25; 60:9,
    12, 13; 61:9; 62:2; 97:8
deal [6]
    13:24; 62:23; 67:23; 69:6;
    71:11; 112:6
dealing [3]
    18:13, 17; 104:12
dealings [1]
    106:10
dealt [4]
    9:15; 18:7; 64:14; 82:25
December [1]
    1:9; 127:20
decide [1]
    98:21
declaratory [2]
    5:16; 6:16
declination [1]
    116:17
declinations [1]
    123:13
deemed [1]
    4:17
defect [1]
    3:13
DEFENDANT [1]
    1:7
Defendant [4]
    1:15; 2:9; 16:16; 21:24
defendant [1]
    99:4
DEFENDANT'S [1]
    125:3
Defendant's [41]
    7:22, 25; 14:12, 16; 22:6;
    26:19, 23; 28:2; 33:15, 19;
    35:20; 37:3, 11; 46:2, 6, 25;
    47:5; 48:11; 49:8; 50:7, 11;
    51:25; 52:5; 53:11, 15; 54:20,
    24; 72:24; 74:3, 7; 76:16;
    85:15, 19; 88:10; 90:8, 11;
    93:14; 115:19; 118:21; 119:8;
    120:5
delay [5]
    59:14; 60:16, 19; 62:7, 11
deliver [1]
    78:14
delivered [1]
    78:17
Denial [1]
    55:11
denial [29]
    7:11; 55:15, 20; 57:21; 58:16;
    59:2, 5, 16; 65:14, 21; 66:3,
    10, 14; 67:23; 68:5, 20;
    70:20, 24; 71:2; 72:2, 13, 17;
    89:6, 18; 109:7; 111:7, 12;
    112:14; 114:9
denied [7]
    6:22; 57:15; 65:3; 72:8;
    76:24; 89:2; 104:15
denying [1]

59:11
Department [1]
    94:5
department [1]
    29:6
Depending [5]
    30:23; 32:7; 59:4; 78:25; 79:7
depending [1]
    32:15
deponent [6]
    3:12, 17, 21, 23; 4:3, 5
deposed [1]
    6:12
deposition [24]
    3:4, 7, 8, 11, 18, 25; 4:4;
    6:14; 7:6, 8, 9, 19; 15:7;
    16:17; 18:6; 20:14; 81:24;
    90:22; 100:22; 109:22;
    110:12, 14; 111:21
DEPOSITIONS [2]
    3:2; 4:2
Depositions [1]
    3:3
DESCRIPTION [2]
    125:6; 126:4
description [1]
    34:6
designated [2]
    56:6; 57:22
designation [1]
    24:5
designations [1]
    118:14
determine [1]
    62:5
determines [1]
    79:5
determining [1]
    4:6
developed [1]
    24:15
Development [1]
    13:23
development [1]
    11:20
DICKER [1]
    2:8
difference [1]
    54:11
differently [2]
    45:10, 12
difficult [2]
    62:18; 108:21
direct [1]
    3:21
directed [1]
    63:5
direction [3]
    3:22; 41:17; 42:10
discuss [7]
    9:5; 37:10; 38:22; 40:3; 58:7,
    8, 84:11
discussed [8]
    30:11; 37:14; 43:21, 24;
    65:13; 66:21; 84:18; 112:24
discussing [8]
    51:10, 13; 58:25; 65:24;
    67:19; 83:22; 105:12; 113:3
discussion [17]
    6:21; 30:5; 32:2; 33:11; 49:2;
    74:12; 75:24; 83:20; 88:8;

104:4; 105:16, 25; 111:17;
    114:18; 115:15; 117:10, 22
discussions [13]
    6:15, 19; 7:2, 5, 7, 8, 12;
    40:6; 53:5; 102:21; 103:20,
    24; 112:19
displace [1]
    41:13
displaced [1]
    41:11
dissatisfaction [2]
    71:17, 21
distinction [3]
    22:21, 23; 23:19
distinguish [1]
    31:14
distribute [3]
    29:22; 78:6, 18
distributed [1]
    79:14
distribution [1]
    79:11
DISTRICT [1]
    1:2
DJ [1]
    7:4
Document [5]
    46:25; 49:8; 125:7, 15, 16
document [27]
    7:16, 25; 20:15, 17, 20, 25;
    22:2; 27:13; 33:21; 37:5, 10;
    43:14; 47:6; 49:12, 23; 50:19;
    52:10; 73:9; 81:5; 85:25;
    90:15, 23; 91:24; 92:19;
    115:25; 116:4; 118:8
documentation [4]
    30:24; 32:8; 76:8; 121:14
Documents [6]
    33:15; 93:14; 125:11, 12, 13;
    126:6
documents [6]
    24:16; 28:6; 35:22; 43:19;
    48:15; 117:19
doesn't [2]
    34:4; 98:9
Don [11]
    64:18; 89:25; 106:9, 11, 12;
    109:21; 110:8, 25; 112:5;
    113:19; 120:2
Don's [1]
    64:23
DONALD [1]
    2:6
Donald [10]
    6:15; 9:22; 14:5, 22; 17:15;
    18:15, 19; 116:2; 120:10;
    121:7
double [1]
    15:4
dozens [1]
    69:21
duly [1]
    5:3; 127:12
duplicate [2]
    54:12, 13

– E –

Early [1]
    20:6
East [4]

2:9; 5:12; 8:8, 16
**Eastern** [1]
13:23
**EDELMAN** [1]
2:8
**Edward** [1]
21:20
**effect** [1]
4:12
**efforts** [1]
72:12
**eliminate** [1]
17:16
**Elizabeth** [2]
11:7; 16:2
**ELSER** [1]
2:8
**employee** [1]
109:22
**Enclosed** [1]
76:17
**enclosed** [3]
49:13, 16; 96:20
**enclosing** [3]
96:23; 100:7; 119:13
**enclosures** [1]
99:14
**ended** [1]
8:19
**endorsement** [6]
8:23; 9:2; 17:12; 56:15; 57:2,
6
**enforce** [1]
3:19
**entities** [5]
86:25; 122:23; 123:2, 6, 9
**entity** [17]
12:13; 13:4, 8, 11, 22; 14:18,
25; 16:7; 17:18; 23:2; 24:17;
44:14; 67:3; 86:22; 97:18;
124:2, 5
**envelope** [8]
27:11; 38:14, 15; 75:14; 76:3,
7; 92:8, 25
**Erectors** [4]
33:24; 35:21; 36:16; 52:17
**error** [1]
3:13
**ESQ** [2]
2:6, 10
**essence** [1]
47:19
**Estelle** [20]
10:2; 19:12, 22; 27:22; 28:12;
30:3; 35:9; 39:4, 12; 40:3, 10,
14; 42:12; 43:18; 45:20, 21;
67:11, 17; 81:12, 16
**Estelle's** [1]
67:23
**et** [1]
34:7
**event** [5]
4:7; 16:5; 17:7; 66:11; 115:9
**events** [3]
7:14; 110:19; 112:23
**evidence** [2]
22:13, 18
**evidences** [1]
33:23
**evidently** [1]
54:12

**exact** [2]
20:2; 43:20
**Exactly** [1]
123:7
**exactly** [2]
43:7; 83:11
**EXAMINATION** [2]
1:13; 5:6
**examination** [6]
3:15; 4:14, 21; 124:12;
127:11, 13
**examined** [1]
5:5
**examiner** [1]
97:22
**examining** [1]
3:24
**Excell** [1]
100:23
**Except** [1]
3:14
**except** [4]
3:4, 6, 18, 21
**exchange** [1]
121:21
**exclusion** [1]
56:14, 22
**EXHIBIT** [4]
125:5; 126:3
**Exhibit** [140]
7:25; 14:12, 16; 15:6; 16:9,
16; 18:5; 20:13; 22:7, 12;
26:19, 23; 28:2, 9; 29:16, 25;
30:14; 33:19; 34:16; 35:20;
36:2, 13, 17; 37:3, 11, 13, 17;
38:2, 5, 9, 15, 19, 22; 39:23,
25; 40:2; 43:13; 44:7; 46:2, 6,
25; 47:5, 9; 49:8, 11, 22;
50:5, 7, 11, 22; 51:7, 25;
52:5; 53:11, 15; 54:13, 14,
20, 24; 55:7, 10, 22; 57:11;
59:13, 16; 60:5; 61:5; 62:12;
67:12; 72:24; 73:3, 8, 15;
74:3, 7, 23; 76:4, 10, 16;
77:18; 79:16, 24; 81:3, 23;
85:7, 10, 11, 15, 19, 24;
86:11, 15; 87:17, 23; 88:10,
15; 90:8, 11, 21; 91:21, 25;
92:6, 11; 93:5, 14, 18; 94:3,
10, 17; 95:9, 16; 96:7, 16;
97:4, 13; 100:21; 101:2;
102:12; 103:2, 8; 105:6;
115:19; 118:10, 11, 17, 21,
25; 119:5, 8, 11, 16, 19;
120:5, 9, 16
**exhibit** [3]
96:3, 8; 118:13
**EXHIBITS** [1]
125:3
**Exhibits** [1]
33:15
**existing** [1]
17:13
**expect** [1]
72:21
**experience** [1]
21:2
**explain** [1]
16:20
**explanation** [2]
122:12; 123:22

**explanations** [1]
122:15
**exposure** [1]
68:4
**extent** [1]
3:14

– F –

**fact** [5]
62:22; 66:15; 72:3; 77:6;
121:4
**fair** [3]
17:4; 20:6, 10
**fall** [2]
16:18; 41:8
**fashion** [1]
6:3
**favor** [1]
75:17
**Fax** [9]
88:9; 115:18; 118:20; 119:7;
125:8; 126:5, 7, 8, 9
**fax** [20]
14:5, 11; 82:14; 86:17; 88:13;
90:12; 91:4, 5, 13; 92:3; 97:3,
13, 25; 98:7; 99:12; 105:5;
116:2; 118:9; 119:2, 12
**faxed** [7]
91:16, 18, 21; 94:7; 104:25;
119:24; 120:19
**faxes** [1]
102:23
**faxing** [2]
98:16, 17
**felt** [10]
41:3, 6; 58:3; 66:21; 67:15,
18, 20; 69:11; 120:21; 122:24
**fight** [1]
59:21
**figured** [2]
89:7; 123:3
**file** [28]
30:19, 21; 31:6, 11, 20, 24;
32:17, 19, 21, 24; 38:6;
48:16; 71:6, 25; 85:2; 89:17;
97:2; 102:19; 113:13, 22, 23,
24, 25; 114:2, 4; 117:11
**filed** [2]
109:17, 18
**files** [4]
31:21; 32:9; 115:23; 118:4
**filing** [1]
32:10
**Filtered** [1]
28:24
**filtered** [1]
28:25
**financial** [1]
68:12
**find** [5]
35:10; 43:7; 44:6; 85:8;
115:23
**finish** [3]
6:8; 16:11; 45:3
**firm** [8]
69:24; 71:17, 21; 102:14;
112:2; 115:25; 122:7, 9
**First** [5]
18:23; 19:4, 7; 110:7; 124:4
**first** [12]

5:3; 6:20; 42:7; 45:3; 46:23;
55:16; 64:2; 74:14; 94:13;
109:11; 111:2; 115:25
**Floor** [1]
2:5
**focus** [1]
61:14
**folder** [3]
32:6, 12, 19
**Follow** [1]
81:11
**follow** [3]
96:14, 17; 100:13
**follows** [1]
5:5
**force** [1]
4:12
**forgetting** [1]
7:2
**forgot** [1]
51:17
**Form** [1]
125:14
**form** [23]
3:13; 25:5; 30:23; 46:2, 7, 9,
10, 16, 19; 48:10; 49:12, 15,
18, 23; 52:19; 60:16; 63:9;
77:15; 80:9; 95:4; 100:16;
113:2; 115:5
**formed** [3]
19:23, 25; 50:23
**forth** [4]
3:19; 4:6; 112:7; 127:12
**forwarded** [3]
61:5; 91:7; 109:2
**forwarding** [1]
60:16
**found** [1]
12:7
**four** [1]
62:19
**framed** [1]
3:11
**front** [1]
33:6
**FUERTH** [26]
2:10; 5:7; 7:21; 14:9; 26:16;
27:3, 23; 28:7; 33:12; 39:5;
45:23; 48:24; 49:5; 50:4;
51:22; 53:9; 54:17; 73:24;
74:13; 85:13; 93:11; 115:8;
118:7, 17, 19; 124:10
**Fuerth** [1]
5:15
**furnished** [1]
4:21
**furtherance** [1]
117:25

– G –

**gave** [1]
12:11
**Gem** [3]
33:23; 35:21; 36:8
**George** [1]
47:13
**gesture** [1]
6:4
**gets** [2]
23:22; 32:13

give [10]
    6:9; 41:17; 42:10; 44:3, 11;
    51:18; 64:8; 96:2; 118:3;
    123:3
Given [1]
    102:5
given [10]
    3:8; 71:25; 79:17; 85:6;
    101:24; 102:3; 122:12, 16;
    123:22; 127:14
giving [2]
    7:4; 73:14
GLENN [1]
    2:10
Glenn [1]
    5:15
goes [1]
    29:23
GOLDSTEIN [1]
    2:4
Great [1]
    48:23
greater [1]
    70:6
GREENWICH [1]
    1:6
Greenwich [36]
    5:15; 15:6; 16:16; 17:17, 22;
    18:2, 10; 20:13; 21:24; 24:22;
    25:4, 14; 26:5, 8, 14; 77:10;
    80:17, 21; 81:15; 82:10, 15,
    25; 83:23, 25; 84:5; 87:8, 12;
    91:18; 98:22, 24; 101:10;
    108:4; 109:18; 111:12, 19;
    112:22
Greg [22]
    10:2; 19:7; 57:18; 65:13;
    66:22; 67:5, 7; 82:5; 83:9, 11;
    89:21; 91:4, 16; 105:2; 106:8,
    15, 17; 119:23, 24; 120:13;
    121:4
Griminger [2]
    21:21; 29:3
grounds [4]
    4:6; 55:15; 57:21; 70:23
guess [13]
    51:18; 61:12; 65:25; 70:15;
    83:4; 84:15; 87:6; 91:18;
    97:21; 102:2, 6; 110:25;
    120:18

— H —

hand [2]
    91:25; 127:20
handle [4]
    29:6; 63:7; 65:16; 110:18
handled [2]
    31:17; 76:25
handles [1]
    21:11
handling [6]
    21:11; 29:9, 12; 69:7; 71:7,
    22
hands [1]
    85:8
handwriting [3]
    116:6, 11, 12
handwritten [1]
    43:12
HARBORD [2]

127:8, 22
haven't [2]
    52:12; 118:13
He's [1]
    96:23
heard [1]
    118:13
held [10]
    1:15; 33:11; 49:2; 74:12;
    75:24; 88:8; 114:18; 115:15;
    117:10, 22
help [1]
    111:10
hereby [1]
    127:9
herein [1]
    4:22
hereinbefore [1]
    127:12
hereto [2]
    4:18, 21
hereunto [1]
    127:19
herewith [1]
    76:17
hit [1]
    15:4
hold [1]
    111:21
holding [2]
    91:25; 110:22
honest [1]
    62:14

— I —

idea [14]
    35:3, 8, 16, 17; 36:19; 43:9,
    10; 44:9, 10, 15; 68:6; 88:24;
    97:18; 106:24
identification [36]
    7:22; 8:2; 14:13, 16; 21:25;
    26:20, 24; 27:6; 28:3; 33:16,
    20; 37:4, 17; 43:13; 46:3;
    47:2; 49:9; 50:8, 12; 52:2, 5;
    53:12, 15; 54:21; 72:25; 74:4,
    7; 81:4; 85:16; 88:11; 90:9;
    93:15; 115:20; 118:22; 119:9;
    120:6
identified [3]
    30:21; 31:7, 8
ii [1]
    3:18
iii [1]
    3:19
immediately [6]
    81:16, 18; 84:3, 20; 107:16;
    108:5
impacted [1]
    108:8
improper [1]
    3:20
inability [1]
    14:6
Inc [1]
    33:24
incident [9]
    7:9; 32:25; 49:20; 64:3, 12;
    68:8; 80:4; 112:5, 13
incidents [1]
    32:16

include [5]
    3:13; 24:18; 30:25; 77:3;
    78:15
included [5]
    17:18; 37:8, 21; 96:7; 114:6
inclusive [1]
    8:11
incorrect [2]
    59:6; 118:11
Index [1]
    1:5
index [3]
    74:8, 16, 18
indicate [6]
    52:21; 61:4; 71:16, 20; 76:9;
    107:10
indicated [12]
    29:2; 39:10; 49:18; 56:2, 5;
    57:20; 74:20; 76:5; 82:21;
    105:15; 109:12; 114:23
indicates [2]
    34:22; 97:14
indicating [1]
    114:21
indication [6]
    14:17; 52:14; 97:18; 106:9;
    107:24; 108:6
individual [5]
    9:4; 13:3; 29:15; 68:18; 73:18
inform [1]
    70:23
information [12]
    7:18; 9:10; 32:13; 34:18;
    42:8, 9, 17; 72:16; 97:22;
    99:12; 111:9; 112:24
informed [1]
    43:14
infused [1]
    69:2
initial [1]
    52:23
Initially [1]
    5:18
initially [1]
    58:24
inquire [1]
    115:11
inquiry [2]
    43:16; 62:5
inspection [3]
    20:23; 21:5, 7
instance [5]
    31:3, 22; 41:14; 45:17; 63:12
instances [2]
    68:23, 24
instruct [2]
    42:4; 63:11
instructed [1]
    63:17
instructing [1]
    70:10
instruction [1]
    51:17
instructions [1]
    44:11
INSURANCE [1]
    1:6
Insurance [7]
    5:16; 36:17; 47:7; 55:3;
    57:12; 77:11; 86:15
insurance [41]

8:20; 9:16; 15:2; 16:4, 5, 21;
    17:2, 6; 21:4; 23:6; 24:7;
    30:25; 31:2, 5; 33:22, 23;
    34:12, 22; 36:12; 41:19, 24;
    42:5, 15; 44:13; 45:16; 48:8;
    49:21; 56:7; 57:3; 58:14;
    59:11, 18; 63:17; 64:13;
    86:19, 21; 89:15; 105:14;
    107:17; 109:3; 123:21
insured [56]
    15:16; 16:14; 17:10, 11, 12,
    19, 23, 24, 25; 18:3, 12;
    22:14, 20, 23, 24, 25; 23:3, 5,
    7, 10, 15, 17, 18, 19, 20, 21,
    25; 24:3, 6, 9, 13, 19, 21;
    25:2, 19; 26:2, 9, 12; 30:15,
    18; 31:8, 10, 15; 32:3, 22;
    58:13, 15; 64:2, 7; 65:2, 4;
    68:22; 69:2; 97:16; 98:8
insured's [1]
    32:14
insureds [4]
    29:7; 40:6, 20; 45:6
insurer [5]
    36:16; 58:19; 59:3; 86:7;
    117:3
insurers [4]
    58:7, 9; 121:23; 122:3
insures [1]
    98:25
intend [1]
    26:14
intent [10]
    14:25; 17:9, 15; 24:21; 25:3,
    12, 18, 22; 56:11; 98:12
intention [3]
    17:21; 18:2; 26:4
interest [14]
    12:14, 19, 23; 13:2, 7, 8, 10,
    13, 24; 14:19; 63:20; 67:3, 4
interested [1]
    127:18
interfere [1]
    3:16
interim [1]
    6:23
interposed [1]
    3:6
interpret [1]
    100:12
interrupt [1]
    4:4
intimately [1]
    110:19
involve [1]
    79:24
involved [26]
    8:12; 9:11; 11:5; 21:15; 30:9;
    36:21; 42:14, 18; 43:2; 44:17;
    45:13; 48:18; 62:21; 63:4;
    65:5; 66:18; 70:9; 71:13;
    72:3; 80:8; 87:11; 91:9;
    100:2; 111:19; 112:5; 116:14
involvement [5]
    19:19; 36:24; 67:6; 69:9;
    98:20
involving [2]
    55:12; 112:13
irregularity [1]
    3:14
irrespective [1]

9:16
**ISO** [1]
9:2
**issue** [9]
12:8; 59:6, 8; 62:17; 64:16;
83:23; 84:5; 107:25; 108:3
**issued** [4]
23:11; 25:4, 16; 83:25
**issues** [4]
57:16; 58:7, 8; 67:20
**item** [2]
55:17; 56:14
**items** [3]
55:16; 58:4; 104:13

**– J –**

**January** [3]
8:10; 9:8; 122:11
**Jem** [3]
36:11, 15; 52:17
**job** [3]
31:4; 36:24; 44:16
**John** [3]
86:17; 91:6
**Joyce** [2]
21:21, 22
**Juan** [1]
88:16
**Judge** [1]
4:12
**judgment** [2]
5:16; 6:16
**July** [27]
18:21; 19:2, 16; 32:25; 62:12;
73:3; 74:21; 75:11; 76:13, 23;
79:23; 81:11, 20; 83:17;
84:12; 85:3; 86:10; 92:8, 13;
93:18, 20, 21; 94:4, 10; 98:3,
4; 109:25
**June** [4]
81:23; 90:21; 100:22; 109:25

**– K –**

**keep** [4]
23:16; 72:11; 75:14; 85:2
**knowing** [1]
83:2
**knowledge** [8]
35:14; 60:21; 64:3; 67:5;
80:24; 103:16; 104:24;
119:21

**– L –**

**label** [1]
32:14
**labeled** [1]
31:12
**language** [3]
99:16, 18, 21
**last** [2]
39:7; 114:20
**late** [5]
55:17; 56:2; 59:8, 12; 61:9
**Law** [1]
3:5
**lawsuit** [5]
109:17, 18; 111:20; 113:9;
117:12
**lawsuits** [4]

**109**:14; 119:3; 121:22; 122:2
**lawyer** [2]
107:5, 11
**leading** [1]
7:9
**learn** [3]
12:18, 22; 35:4
**leave** [2]
45:21; 54:16
**legal** [2]
25:8; 81:17
**Let's**
20:4; 54:3; 114:15
**let's** [2]
40:9; 54:10
**LETTER** [2]
125:6; 126:4
**Letter** [19]
26:19; 28:2; 50:7; 51:25;
53:11; 54:20; 72:24; 85:15;
120:5; 125:9, 10, 17, 18, 19,
20, 21, 23, 24; 126:10
**letter** [99]
14:3; 27:7, 15, 17, 18, 21;
28:10, 13, 15, 20; 30:13;
32:12, 18; 34:24; 36:2, 5;
37:12, 22; 38:9; 39:12, 14,
15, 16, 17, 19, 22; 40:15;
44:15; 46:12; 49:16, 19;
50:14; 52:6; 53:7, 16; 54:25;
59:16; 60:6; 61:17, 19, 24;
62:13; 66:15, 20; 67:10, 13;
73:3; 74:21; 75:4; 77:24;
79:23; 81:11, 14, 20; 83:18;
21, 23, 24; 94:4, 10, 25;
95:14, 15, 23; 96:7, 13, 24;
97:14; 98:2; 99:3; 100:7, 14,
23; 101:9, 11, 13; 102:13, 25;
103:9, 14, 22, 25; 104:16;
108:25; 109:2, 8; 112:25;
113:14; 114:8; 117:24;
119:14; 120:10, 18; 121:11
**letterhead** [1]
28:10
**letters** [6]
42:20; 58:16; 113:3, 11, 21
**letting** [1]
63:7
**level** [1]
66:17
**liability** [20]
8:10; 10:22; 14:7, 23; 15:2,
11; 16:22; 20:22; 22:4; 23:4;
25:15; 26:11; 31:24; 35:21;
36:16; 44:19; 45:6, 16; 82:10;
83:24
**limitation** [1]
3:19
**limitations** [1]
121:19
**limited** [4]
12:12, 20, 21; 13:10
**lining** [1]
8:19
**list** [1]
94:19
**listed** [3]
34:9, 11; 120:24
**LLC** [11]
1:3, 17; 5:17; 8:20; 13:23;

15:13; 16:24; 17:10; 99:23;
100:3, 19
**LLP** [2]
2:4, 8
**locality** [1]
43:4
**locate** [3]
76:6; 85:9; 91:15
**located** [2]
8:16; 18:22
**location** [10]
8:25; 19:4; 31:9; 34:7, 8, 13;
36:6; 56:5, 9; 57:22
**locations** [1]
8:24
**loss** [4]
31:18; 55:12, 19; 80:6
**lot** [5]
9:10; 41:6; 63:5; 69:15; 72:3

**– M –**

**Madison** [2]
34:23; 42:15
**mail** [12]
27:10; 29:18, 21; 61:17, 20;
75:13; 76:3; 78:3, 4, 5, 14,
17, 21, 24; 79:2, 14, 20;
92:14, 22; 101:21
**maintain** [1]
40:5
**Management** [11]
1:16; 28:11; 33:24; 47:7;
50:14, 16; 53:18; 55:4; 69:5;
73:4; 85:20
**management** [8]
52:6, 15; 53:2, 16; 54:24;
57:12, 25; 60:22
**management's** [1]
52:23
**manager** [3]
10:13, 14; 43:2
**managers** [1]
11:18
**manner** [2]
37:25; 38:18
**March** [6]
15:13, 25; 74:9; 115:25;
118:8, 25
**Mark** [3]
33:12; 54:17; 85:13
**mark** [9]
15:6; 26:16; 27:23; 46:23;
49:5; 50:4; 51:22; 73:24;
93:11
**marked** [56]
7:22, 25; 14:10, 12, 15;
20:13; 21:24; 22:6; 26:19, 23;
28:2, 8; 33:15, 19; 37:3, 17;
45:24; 46:2, 6, 25; 47:5; 49:8;
50:7, 11; 51:25; 52:4; 53:11,
14; 54:20, 23; 72:24; 73:8;
74:3, 6; 81:3, 23; 85:15, 18,
24; 88:10; 90:8, 21; 91:21;
93:14, 17; 96:16; 100:21;
102:12; 115:19; 118:16, 21,
25; 119:8, 11; 120:5, 9
**marriage** [1]
127:17
**Massachusetts** [1]
80:22

**master** [2]
14:7; 15:2
**material** [5]
52:24; 79:8; 97:7; 102:23;
104:17
**matter** [8]
65:8; 84:18; 105:10, 17;
106:2; 107:11; 108:14;
113:12; 116:17; 127:18
**May** [7]
15:7; 16:17; 18:6; 20:14;
21:8, 25; 110:3
**mean** [2]
85:11; 121:16
**means** [1]
38:10
**MELISSA** [2]
127:8, 22
**memo** [1]
55:21
**memoranda** [1]
40:5
**memory** [2]
62:20; 93:9
**mention** [1]
97:19
**mentioned** [4]
16:3; 105:19; 106:3; 115:2
**mentions** [1]
49:17
**Michael** [7]
87:9; 90:12; 91:9; 96:3, 18;
97:9; 100:23
**mid** [1]
20:7
**mine** [1]
9:20
**minor** [1]
13:10
**misspoke** [4]
53:24, 25; 108:19; 118:10
**mistake** [1]
67:8
**mistaken** [1]
82:7
**modify** [1]
114:22
**moment** [2]
114:25; 117:8
**money** [1]
17:18
**monitor** [4]
107:6, 20; 108:14; 111:16
**monitoring** [6]
105:3, 10, 17, 25; 107:11, 19
**months** [10]
55:18; 59:14, 25; 60:8, 13;
61:9; 62:2, 6, 10; 78:10
**morning** [1]
5:14
**MOSKOWITZ** [1]
2:8
**MR** [43]
5:7; 7:21; 14:9; 25:5, 9;
26:16, 25; 27:3, 23; 28:5, 7;
33:12; 39:5; 45:23; 48:24;
49:5; 50:4; 51:22; 52:18;
53:9; 54:17; 63:9; 73:24;
74:10, 13; 77:14; 85:13; 87:4;
93:11; 95:4; 100:16; 101:6;
107:8; 114:15, 19; 115:8;

117:7; 118:7, 12, 17, 18, 19;
124:10
**Mr** [75]
5:14; 7:2; 10:7, 16; 12:19, 23;
13:6, 7, 12; 18:7; 19:3, 7;
26:22; 29:3; 33:18; 50:17;
52:9; 55:6, 64:14, 20; 65:12,
18; 70:20; 72:12, 18; 73:7;
74:20; 84:4; 85:23; 86:5, 9,
10; 89:11, 12, 18, 20; 90:17;
91:22; 101:25; 102:24;
103:14; 104:8, 17, 21; 109:6,
13; 111:11, 18, 24; 112:10,
20; 113:11, 16; 115:22, 24;
117:2; 118:9; 119:2, 12, 13,
14, 18, 22; 120:10, 12, 16;
121:10
**Ms** [44]
5:18; 10:10; 11:10, 11, 21;
19:10, 15; 28:20; 29:3, 15,
20; 36:2, 4; 37:11; 41:11, 13,
20; 42:4; 44:12; 47:12; 51:6,
14; 62:23; 63:5; 68:21; 70:10;
74:22; 77:21, 81:7; 89:5;
90:12, 17; 94:16, 25; 95:8;
97:12, 24; 98:17; 100:14, 23;
102:23; 103:4, 17; 119:2
**multiple** [2]
32:9, 16
**myself** [2]
7:17; 61:14

**– N –**

**name** [8]
5:8, 15; 11:7; 25:16; 32:14;
64:23; 83:10; 87:14
**named** [31]
9:4; 15:16; 16:13; 17:5, 10,
19, 24, 25; 18:3, 11; 22:14,
20, 23, 25; 23:4, 10, 15, 17,
19, 25; 24:3, 6, 8; 25:2, 19;
26:9; 44:14; 88:22; 98:5;
99:3; 107:22
**names** [1]
13:3
**nature** [3]
59:4; 78:25; 79:7
**needs** [1]
9:16
**negligent** [1]
23:23
**negotiate** [1]
58:6
**non** [1]
12:11
**Non-Party** [1]
1:14
**noncombinability** [2]
12:8; 24:10
**normal** [3]
16:3; 66:8, 9
**normally** [1]
45:11
**North** [10]
1:16; 28:11; 29:4, 5; 47:7;
50:15; 53:17; 55:3; 69:4; 73:4
**NOTARY** [1]
124:18
**Notary** [4]
1:18; 4:11; 5:4; 127:8

**notation** [1]
94:23
**note** [4]
40:10; 43:12; 62:16; 70:9
**noted** [6]
3:7; 24:12; 36:16; 46:15;
49:24; 62:12
**notes** [2]
50:23; 104:3
**notice** [11]
7:15; 44:18, 23; 46:18; 59:8;
61:10; 84:3; 96:20; 97:15;
99:2; 108:12
**notices** [3]
56:2; 59:12; 70:11
**notification** [8]
30:14, 18; 39:2; 47:18; 60:23;
64:2, 8; 117:3
**notify** [4]
45:6; 77:10; 98:22; 108:5
**notifying** [1]
98:24
**November** [1]
22:11
**number** [22]
9:7, 12, 21; 43:4; 46:8; 47:8;
52:7; 53:18; 55:4; 64:24;
67:20; 69:10, 22; 70:18; 73:5;
74:9, 16, 18; 77:13; 100:18;
122:15
**numbers** [2]
50:12; 85:21

**– O –**

**Object** [6]
25:5; 63:9; 95:4; 100:16
**object** [2]
52:18; 77:14
**Objection** [1]
107:8
**objection** [3]
3:11, 17; 25:10
**Objections** [2]
3:3, 4
**objections** [4]
3:4, 7, 9, 10
**obtain** [3]
24:2, 3; 31:2
**occurred** [1]
35:12
**October** [4]
54:25; 64:15, 21; 69:20
**off-the-record** [9]
33:10; 48:25; 74:11; 75:23;
88:7; 114:17; 115:14; 117:9,
21
**offhand** [2]
64:22; 68:17
**office** [28]
5:18; 10:13, 14; 11:18; 18:21;
21:16, 21; 28:16, 21, 22;
30:15, 17; 37:23; 38:2, 16,
19; 46:11; 49:25; 51:9; 54:15;
63:13; 76:18; 77:19, 22; 78:8;
103:11; 109:6; 114:5
**officer** [2]
3:7; 68:13
**offices** [1]
1:16
**Okay** [6]

54:7; 55:25; 90:14; 98:6;
101:8; 110:5
**ongoing** [1]
69:20
**open** [2]
78:3, 4
**opened** [1]
29:17
**opening** [1]
84:15
**opens** [2]
78:5, 14
**operations** [1]
34:7
**opportunity** [2]
115:3, 6
**opposed** [12]
7:4; 29:20; 36:8; 63:6; 68:13;
69:5; 79:25; 82:20; 98:10;
100:13; 111:20; 120:16
**ordeal** [1]
110:17
**order** [5]
3:19; 15:3, 11; 16:24; 31:18
**ordered** [1]
48:13
**Ordinarily** [2]
9:18; 11:3
**ordinarily** [1]
21:9
**organization** [1]
82:6
**original** [6]
39:3, 14, 16; 61:15; 76:12, 15
**outcome** [1]
127:18
**outset** [1]
12:2
**overseeing** [2]
62:24; 107:15
**oversight** [1]
77:12
**owner** [7]
21:10; 69:4; 98:9; 99:20, 22,
25; 100:10
**owners** [2]
11:5, 16
**ownership** [7]
12:9, 10; 13:5, 8; 14:19; 16:6;
24:17
**owns** [1]
124:3

**– P –**

**P-O-S-T-E-L-N-E-K** [1]
102:14
**p.m.** [1]
124:11
**P00137** [1]
73:5
**P00138** [1]
73:6
**P00144** [1]
46:8
**P00145** [1]
47:8
**P00146** [1]
50:12
**P00147** [1]
50:13

**P00148** [1]
52:8
**P00149** [1]
55:4
**P00152** [1]
55:5
**P00153** [1]
53:19
**P00154** [1]
53:19
**P00155** [1]
85:22
**P00156** [1]
85:22
**packet** [1]
43:24
**PAGE** [2]
125:5; 126:3
**page** [3]
27:9; 74:14; 119:12
**pages** [5]
49:17; 96:10, 13, 25; 120:11
**paid** [1]
70:16
**paperwork** [6]
7:20; 37:15; 45:18; 76:17;
79:9; 82:14
**Pardon** [1]
85:12
**part** [13]
9:9; 13:5; 32:10; 36:22;
48:16; 58:12; 59:3; 70:12;
78:20; 80:6; 81:19; 85:6;
98:13
**particulars** [1]
30:8; 68:7; 92:9
**parties** [4]
4:5, 17, 21; 127:16
**partner** [2]
12:12, 25
**Partners** [3]
86:22; 123:25; 124:3
**partnership** [1]
12:20, 21
**party** [3]
3:24; 67:21; 97:19
**pay** [2]
40:22; 62:15
**people** [9]
9:8, 12, 14, 21; 10:5; 11:19;
66:7; 69:18; 120:24
**percent** [2]
12:13; 13:24
**performed** [1]
21:8
**period** [2]
6:23; 110:25
**periodic** [1]
7:12
**periodically** [1]
6:23
**permanent** [1]
123:21
**permitted** [1]
3:14
**person** [17]
3:9, 20; 6:7; 21:16; 29:8, 17;
35:18; 41:11; 43:10; 44:16;
45:22; 68:14; 69:6; 79:4, 6;
82:6
**personal** [1]

70:15

**Personally** [1]
52:12

**personally** [2]
20:16; 28:19

**persons** [1]
3:15

**pertained** [3]
43:8; 76:22; 106:12

**pertaining** [2]
96:22; 100:4

**pertains** [2]
99:22; 100:19

**phone** [10]
51:10, 13; 98:18; 104:12;
105:12; 110:7; 113:18;
120:17, 23; 121:9

**phonetic** [1]
87:10

**physical** [1]
31:6

**physically** [1]
31:19

**piece** [1]
79:2

**Piselli** [2]
21:21; 29:3

**place** [4]
5:20; 15:11; 60:25; 123:21

**placed** [11]
14:8; 16:21; 17:2, 17; 20:21;
21:4; 25:13; 47:16; 80:16;
82:9; 99:2

**placement** [1]
80:13

**placing** [2]
14:23; 71:17

**plainly** [1]
3:20

**PLAINTIFF** [1]
1:4

**Plaintiff** [1]
2:4

**Plaintiff's** [12]
54:15; 74:14; 81:3, 23; 87:17;
90:21; 94:17; 96:6; 100:21;
102:12, 25; 103:8

**pleadings** [2]
78:15, 20

**Please** [1]
5:8

**please** [24]
5:24; 6:2, 8; 7:23; 14:10;
16:20; 26:17; 33:8, 13; 39:6;
45:24; 46:23; 49:6; 50:5;
51:19, 23; 53:9; 54:18; 64:4;
75:21; 84:19; 93:12; 117:20;
122:21

**plus** [2]
49:23

**point** [11]
12:4; 43:8; 84:2, 19; 85:7;
96:2; 98:12; 108:12; 111:15;
114:7; 119:23

**pointed** [1]
82:12

**policy** [64]
8:10, 22; 9:6, 17; 10:18, 20;
12:6; 14:8, 24; 15:12; 16:21,
23; 17:6, 7, 13, 16, 19, 22;
18:3, 11, 12; 20:22; 21:3;

22:14; 23:3, 8, 15; 24:9, 13,
22; 25:2, 3, 13, 16, 23; 26:3,
5, 8, 14; 30:25; 47:17; 49:21;
56:6, 10, 12; 57:23; 63:25;
64:8; 80:17; 81:15; 82:9, 10;
83:24; 84:6, 9; 87:9; 95:2, 13;
96:21; 99:8, 22; 100:18;
108:4

**portion** [1]
76:16

**position** [6]
10:8; 11:15; 16:18; 57:24;
59:9, 10

**possession** [1]
35:20

**possibility** [2]
114:22; 122:25

**Postelnek** [2]
102:14; 103:14

**potential** [2]
16:18; 68:3

**POTOLSKY** [2]
1:14; 124:14

**Potolsky** [14]
5:10, 14; 26:22; 33:18; 50:17;
52:9; 55:6; 73:7; 74:20;
85:23; 115:22; 119:13, 15;
120:11

**Powerhouse** [1]
1:17

**practical** [1]
64:11

**Practice** [1]
3:5

**practice** [3]
65:4, 7; 78:13

**Precast** [1]
33:24

**prejudice** [1]
3:20

**premises** [1]
21:5

**premium** [1]
15:3

**prepare** [2]
8:5; 41:18

**prepared** [19]
15:11, 14, 22; 16:9, 17; 22:7,
8, 11, 12, 17; 23:8, 14; 25:25;
30:23; 43:14, 17; 44:4, 7,
46:10

**preparing** [1]
10:24

**preserve** [1]
3:18

**previously** [8]
15:6; 20:13; 21:24; 29:2;
81:3; 89:17; 96:16; 100:21

**primary** [6]
17:7; 22:25; 24:2, 4; 25:13;
26:10

**principal** [4]
10:6, 17; 11:24; 36:8

**principally** [1]
109:21

**principals** [3]
10:9; 11:11; 12:16

**print** [1]
87:25

**prior** [8]
9:8; 39:21; 55:7; 64:15;

73:17, 18; 90:16; 119:16

**privilege** [1]
3:18

**problem** [1]
71:11

**procedure** [5]
16:3; 21:3; 24:17; 44:24; 45:5

**proceed** [1]
3:9

**process** [3]
9:9; 41:18; 42:11

**procured** [2]
10:19, 22

**program** [4]
15:2; 80:20; 83:2; 87:7

**progression** [1]
109:14

**project** [26]
8:7, 24; 9:3, 4; 12:14; 15:24;
24:15; 30:9; 31:8; 32:4; 34:2,
5, 8, 10, 23; 35:11, 15, 17;
36:9; 42:13, 16; 43:10; 44:16;
56:8; 100:11; 123:19

**projects** [12]
8:12, 14; 11:4, 20; 43:3, 5;
63:5; 66:6; 69:11, 16, 19;
72:4

**properly** [1]
42:18

**property** [3]
20:23; 22:10; 31:25

**prosecution** [2]
112:21, 22

**protocol** [1]
123:8

**provide** [5]
22:12; 31:5; 51:3; 72:15;
97:21

**provided** [9]
3:21; 4:15, 17; 26:13; 52:16,
23; 87:2; 112:25; 116:5

**provides** [2]
22:25; 23:4

**providing** [1]
121:22

**PUBLIC** [1]
124:18

**Public** [4]
1:18; 4:12; 5:4; 127:8

**pure** [1]
51:15

**purport** [1]
55:10

**purpose** [2]
4:4, 5

**purposes** [2]
4:15; 32:3

**Purpura** [7]
86:17, 18; 87:3, 6, 8, 13, 21;
88:16; 91:7; 95:18

**pursuant** [3]
1:15; 3:5, 10

**Putting** [1]
44:23

**putting** [1]
97:15

## – Q –

**QBE** [1]
36:17

**question** [17]
3:19, 24; 4:6; 5:23; 6:8; 18:9;
25:6; 34:2, 5; 52:19; 63:10;
77:15; 81:25; 88:3; 95:5;
100:17; 101:18

**questioning** [2]
3:12, 16

**questions** [4]
3:17; 6:3; 114:21; 115:4

**quickly** [1]
7:20

**quote** [3]
14:17, 19; 97:15

**quotes** [1]
16:4

## – R –

**R-E** [1]
99:24

**R-E-G-O-L-O-D-O** [1]
116:16

**raised** [2]
3:11; 84:5

**Re** [2]
99:24; 100:13

**read** [4]
27:3; 39:5, 8; 114:20

**readily** [1]
117:14

**realized** [3]
84:2, 19; 98:13

**reason** [35]
4:7; 15:21; 22:16; 23:13;
24:11; 29:19; 41:2, 5; 42:3;
46:15; 47:20; 48:3; 57:14, 23;
71:24; 76:20; 77:9; 79:22;
81:7; 82:2, 17; 84:10, 25;
89:4, 9, 10; 94:24; 95:21;
97:12; 98:7, 25; 108:13;
114:24; 117:2; 120:15

**reasonable** [1]
59:22

**reasons** [1]
55:20

**recall** [30]
9:14; 13:11; 20:16; 30:4;
37:25; 38:18; 40:13; 53:8;
68:19; 70:22; 71:3, 24; 72:19;
82:9; 84:7, 16, 17; 90:6; 93:3;
104:2, 9; 111:22; 113:6, 10,
20; 119:21; 120:2; 121:2, 3, 5

**receipt** [6]
46:11; 47:17, 21; 57:10; 94:4;
109:7

**receive** [5]
16:12; 27:20; 28:19; 58:15;
103:7

**received** [29]
16:9; 27:18; 28:16; 29:25;
35:23; 37:12, 18, 23; 38:2,
11, 24; 39:13; 60:22, 25;
61:23; 73:16, 20; 74:22; 76:9;
79:20; 91:5, 13; 101:9;
102:24; 108:24; 111:23;
113:16; 119:19; 121:13

**receives** [2]
30:17; 115:5

**recently** [1]
76:18

**recess** [2]

**recipient** [1]
  68:14
**recognizing** [1]
  81:14
**recollect** [1]
  64:17
**recollection** [8]
  51:19; 55:22; 64:23; 72:22;
  91:20; 92:16; 93:5; 109:9
**recommend** [3]
  65:19; 66:3; 104:6
**recommended** [4]
  65:9, 15; 72:7; 81:17
**record** [11]
  4:8; 5:9; 25:10; 27:4; 48:24;
  74:10; 76:5; 114:16; 117:7;
  118:8; 127:13
**reference** [12]
  34:19; 36:5; 42:23; 59:14;
  85:10; 92:3; 98:9; 99:2, 5;
  105:22; 106:11; 123:12
**referenced** [4]
  42:15; 73:17, 18; 116:15
**referencing** [5]
  87:8; 99:22; 100:9, 10, 18
**referring** [4]
  14:21; 36:7; 67:11; 106:6
**refers** [1]
  99:24
**reflected** [2]
  6:4; 88:15
**refresh** [1]
  55:22
**Refusal** [1]
  3:17
**refusal** [3]
  3:22; 15:15; 16:12
**refused** [1]
  23:9
**refuted** [3]
  56:8, 13; 57:23
**refuting** [1]
  58:4
**regard** [2]
  55:12; 111:10
**regarding** [3]
  109:21; 112:9; 113:6
**registered** [1]
  75:12
**Regolodo** [4]
  116:16; 117:3, 12; 119:3
**regular** [2]
  66:7; 69:17
**relate** [1]
  34:4
**related** [6]
  44:17; 72:5; 97:9; 108:18;
  112:16; 127:15
**relates** [1]
  99:19
**relating** [4]
  8:7; 40:7; 80:5; 89:18
**relationship** [1]
  83:5
**relief** [1]
  3:10
**remainder** [1]
  3:24
**remarks** [1]
  49:24

**remember** [17]
  40:4, 15, 17, 18, 19; 43:20;
  62:17; 82:11; 101:14; 105:11;
  107:12; 108:20, 22; 109:24;
  111:2; 121:8; 122:18
**remembered** [2]
  75:8; 84:9
**remembering** [1]
  9:19
**renewal** [2]
  9:6, 9
**renewed** [1]
  8:9
**repaired** [1]
  46:17
**repeat** [2]
  24:23; 58:17
**rephrase** [4]
  5:24; 58:11; 77:16; 95:6
**report** [3]
  49:20; 55:18; 64:12; 107:16
**reported** [1]
  46:14
**Reporter** [22]
  8:3; 14:14; 26:21; 28:4;
  33:17; 46:4; 47:3; 49:10;
  50:9; 52:3; 53:13; 54:22;
  73:2; 74:5; 85:17; 88:12;
  90:10; 93:16; 115:21; 118:23;
  119:10; 120:7
**reporter** [1]
  5:25; 6:6; 9:24; 39:8; 114:23
**reporter's** [1]
  56:21
**reporting** [1]
  55:17
**represent** [3]
  5:15; 38:5; 70:3
**represented** [1]
  104:22
**representing** [1]
  4:22
**request** [9]
  3:12; 23:8; 24:21; 40:2, 3;
  52:15, 23; 62:13; 119:4
**requested** [5]
  7:18; 14:22; 23:17; 72:15;
  82:14
**required** [5]
  17:14; 26:4; 63:25; 64:7;
  115:6
**requirement** [2]
  16:24; 24:14
**requires** [1]
  57:3
**reservation** [2]
  58:15, 25
**reserve** [1]
  115:8
**reside** [1]
  5:11
**respect** [11]
  4:18; 7:10; 10:18; 18:5, 12;
  24:20; 48:2; 49:11; 50:22;
  72:17; 108:8
**respective** [1]
  4:20
**respond** [6]
  6:2; 36:17; 112:4; 117:6;
  120:21; 121:10
**responded** [2]

**remember** ___
  67:16; 92:9
**responding** [2]
  72:13; 119:4
**response** [9]
  30:2; 43:11; 44:3; 47:12, 20;
  51:7; 63:16; 71:3, 14
**responses** [1]
  6:2
**restate** [2]
  63:2; 64:4
**restricted** [1]
  3:10
**result** [3]
  15:14; 39:10; 46:11
**returned** [2]
  76:12, 21
**returning** [1]
  76:15
**review** [2]
  41:16; 115:4
**reviewed** [5]
  42:7; 58:2; 75:10; 77:25; 78:2
**reviewing** [1]
  20:25
**Richard** [3]
  32:25; 34:20; 55:13
**Richards** [16]
  82:7; 83:9, 17; 84:5; 86:5, 10;
  89:12; 90:4; 98:19; 102:15;
  106:7, 15, 18, 19; 119:24;
  120:14
**Right** [14]
  10:4; 51:21; 65:23; 81:21;
  86:12; 87:21; 92:5; 93:2;
  100:5; 104:5, 19; 108:6;
  109:15; 116:9
**right** [12]
  3:9, 18, 24; 38:4; 48:23;
  55:18; 62:15; 75:19; 80:25;
  93:4; 110:5; 111:3
**rights** [4]
  4:17; 58:15, 25; 115:9
**rise** [1]
  7:4; 12:11; 73:15
**Risk** [7]
  1:16; 28:11; 47:7; 50:14, 15;
  53:18; 55:3; 69:4; 73:4; 85:20
**risk** [14]
  10:23; 16:22; 29:4; 45:10;
  52:6, 15, 22, 25; 53:16;
  54:24; 57:11, 25; 60:22; 72:4
**Road** [2]
  1:17; 36:6
**Rodriguez** [19]
  10:2, 10; 19:12, 15; 27:22;
  28:12, 20; 30:3; 35:9; 36:2, 4;
  37:11; 39:4; 42:12; 51:14;
  67:11; 74:22; 81:12; 100:24
**Roslyn** [1]
  1:17
**Rule** [3]
  3:5, 14, 21
**rule** [2]
  3:7, 14
**RULES** [2]
  3:2; 4:2
**Rules** [1]
  3:6
**rules** [1]
  4:7
**running** [1]

**remember** ___
  121:18
_____

**– S –**
_____

**S-A-I-C** [2]
  56:19, 20
**S-I-R-I-U-S** [1]
  15:15
**S-T-O-K-E-S** [1]
  36:6
**sack** [1]
  56:15
**SAIC** [1]
  56:18
**save** [2]
  15:3; 17:17
**saying** [7]
  6:7; 23:16; 78:19; 81:13;
  94:3; 100:5; 117:25
**SCHNEIDER** [20]
  2:4, 6; 25:5, 9; 26:25; 28:5;
  52:18; 63:9; 74:10; 77:14;
  87:4; 95:4; 100:16; 101:6;
  107:8; 114:15, 19; 117:7;
  118:12, 18
**Schneider** [40]
  6:15; 7:2; 64:14, 20; 89:13,
  18, 20; 90:2, 5; 101:25;
  104:8, 18, 21; 106:9, 11, 12;
  109:13, 21; 110:8; 111:12,
  18, 25; 112:5, 10, 20; 113:12,
  17, 19; 116:2; 117:2; 118:9;
  119:2, 13, 14, 18, 22; 120:10,
  16; 121:7, 10
**Schneider's** [2]
  109:6; 115:24
**Schneiderman** [1]
  82:21
**searched** [1]
  115:23
**Second** [2]
  34:21; 42:23
**second** [7]
  13:20; 27:9; 38:25; 40:2, 3;
  57:21; 62:13
**Secretarial** [1]
  10:14
**secretaries** [1]
  11:18
**Secretary** [1]
  94:6
**secretary** [1]
  10:13
**section** [3]
  4:7; 34:6; 49:24
**sections** [1]
  4:18
**seeking** [1]
  24:12
**Selby** [4]
  11:7, 11, 21; 16:2
**send** [23]
  41:19; 48:7; 53:3; 63:17, 18,
  19; 70:13; 84:23; 86:6, 14;
  88:24; 89:5, 8, 12, 13, 20, 24;
  91:10; 97:2; 105:13, 14;
  114:8; 117:24
**sending** [8]
  48:4; 81:8, 9; 84:12; 89:5;
  95:17, 22; 97:25
**sense** [1]

89:8

**separate** [10]
8:19; 14:23; 16:5; 17:2;
30:22; 31:20; 81:14; 83:24;
84:9; 116:14

**September** [37]
27:19; 28:9, 17, 20; 29:5, 13;
35:23, 25; 36:5; 37:8, 9, 12,
22, 24; 39:4, 12, 13, 22;
40:17; 46:7, 12; 47:6; 50:13;
52:6; 53:6, 16; 60:7; 61:4, 6,
25; 101:4, 11; 102:13, 25;
103:8; 104:21; 109:7

**sequence** [2]
7:14; 112:23

**serious** [1]
68:9

**serve** [1]
69:24

**service** [3]
58:13; 59:3; 94:6

**Services** [1]
50:14

**seven** [1]
32:4

**severity** [1]
68:7

**She's** [1]
100:18

**she's** [1]
100:10

**Sheet** [2]
88:10; 126:5

**sheet** [7]
88:13; 90:12; 97:3, 13, 25;
98:8; 99:13

**shop** [1]
16:4

**Shore** [10]
1:16; 28:11; 29:4, 5; 47:7;
50:15; 53:18; 55:3; 69:4; 73:4

**show** [22]
15:5; 20:12; 21:23; 26:22;
27:4, 11; 28:8; 33:18; 37:2,
16; 46:22; 47:4, 50:10, 17;
73:7; 81:2; 85:23; 90:20;
96:15; 100:20; 102:11; 120:8

**showing** [7]
23:7; 46:5; 50:15; 86:24;
93:17; 118:24; 120:11

**shows** [2]
95:16; 102:15

**Si** [1]
80:21

**sign** [2]
56:25; 57:4

**signature** [1]
73:11

**signed** [4]
4:11, 12; 57:7; 75:12

**significance** [2]
67:13; 116:11

**significant** [4]
3:20; 68:3, 6; 115:10

**significantly** [1]
70:5

**singular** [1]
72:9

**Sirius** [38]
14:8; 15:15; 16:13; 17:13, 20;
25:14, 22; 26:3; 44:21; 46:20;
48:5, 6; 50:2; 57:12, 25;
60:17, 22; 61:5; 63:25; 64:7;
71:18; 86:15, 18; 87:5, 6;
88:14; 89:6, 13, 18; 91:19;
95:18, 22; 101:21; 104:15;
109:18; 111:8; 112:14, 21

**site** [1]
35:2, 5

**sites** [1]
43:3

**six** [1]
96:13

**size** [2]
32:7, 15

**sized** [2]
32:12, 18

**slash** [1]
34:7

**solely** [2]
79:24; 99:18

**somebody** [4]
72:20; 91:9; 107:15, 18

**Someone** [1]
28:22

**someone** [7]
28:21; 66:21; 67:16; 78:5, 13;
111:25; 123:4

**someplace** [1]
113:13

**Sorry** [2]
16:15; 108:18

**sorry** [15]
17:25; 25:7; 28:7; 34:16;
45:4; 55:25; 58:17; 67:7;
85:12; 86:8; 90:24; 91:6;
98:3; 113:14; 114:3

**sort** [2]
41:10; 104:10

**speak** [9]
9:20; 10:25; 31:12; 58:18, 19;
67:17, 19; 68:18; 105:8

**Speaking** [1]
3:10

**speaking** [2]
66:6; 121:8

**Speciality** [1]
80:23

**specific** [18]
6:25; 7:5, 7; 21:6; 23:3;
40:22; 56:16; 64:10; 93:4, 9,
10; 104:9, 23; 109:9; 113:6,
8; 114:5; 118:2

**specifically** [3]
21:13; 32:11; 35:11

**specifics** [10]
43:6; 65:25; 84:17; 105:11;
107:13; 108:21, 22; 113:3,
20; 117:5

**specified** [2]
56:10; 64:9

**specifying** [1]
8:25

**speculation** [1]
51:15

**spell** [2]
9:23; 87:14

**spirit** [1]
56:11

**spoke** [5]
64:17; 65:13; 83:8; 86:9;
106:7

**SS** [1]
127:4

**stack** [1]
79:9

**stamps** [1]
54:15

**standard** [7]
21:3; 24:17; 44:24; 45:5;
64:10; 65:3, 6

**started** [3]
5:17; 109:11; 110:6

**STATE** [1]
1:2; 127:4

**State** [5]
1:18; 5:4; 94:5, 6; 127:9

**state** [1]
5:8

**stated** [2]
3:11; 4:8

**statement** [5]
3:13, 23; 58:23; 59:15;
104:11

**statements** [1]
3:15

**states** [1]
76:16

**status** [3]
23:18; 26:13; 116:21

**statute** [1]
121:19

**stay** [1]
41:3

**STEVEN** [2]
1:14; 124:14

**Steven** [2]
5:10; 102:13

**STIPULATED** [4]
4:11, 14, 16, 20

**Stokes** [1]
36:6

**STREET** [1]
1:3

**Street** [54]
2:5, 9; 5:12, 17; 8:8, 16, 20;
10:19, 21; 11:2, 11, 25; 12:6,
24; 13:9, 14; 14:6, 24; 15:12;
16:23; 17:10; 18:24; 19:19;
22:13, 19; 23:9; 24:8; 25:15,
25; 34:21; 77:3; 79:25; 80:13;
86:20; 97:9; 98:5, 8, 21; 99:6,
10, 23; 100:3, 19; 101:10;
102:22; 103:21; 104:6, 22;
106:10; 109:3; 111:16; 114:7;
121:15; 123:15

**Street's** [3]
105:9, 16, 23

**struck** [1]
82:12

**subcontract** [1]
31:3

**subcontractors** [3]
36:21; 51:4; 57:7

**subdivision** [3]
3:5, 6, 22

**subject** [3]
3:9; 20:20; 68:18

**submission** [7]
7:11; 8:6; 10:24; 15:22; 16:8;
18:6; 21:19

**submit** [5]
42:17; 45:15; 63:6, 8, 11

**submitted** [1]
56:23

**Subpoena** [1]
1:15

**subpoena** [4]
110:3; 117:23, 25; 118:2

**subpoenaed** [1]
5:19

**Subscribed** [1]
124:16

**subsequent** [2]
39:23; 53:6

**subsequently** [2]
12:7; 44:6

**substance** [6]
30:4; 39:24; 43:23; 63:3;
84:14; 111:19

**substituting** [1]
110:21

**succinct** [1]
3:23

**succinctly** [2]
3:11; 4:8

**sued** [1]
122:4

**SUFFOLK** [1]
127:5

**suggest** [4]
3:12; 89:11; 90:3; 108:14

**suggested** [2]
71:5, 25

**suggestion** [3]
71:9, 12; 74:13

**suit** [3]
112:21, 22; 117:4

**suitable** [1]
110:17

**summarized** [1]
7:17

**Summer** [1]
78:10

**summons** [25]
73:16, 19; 74:16; 81:8; 82:2,
19; 83:22; 84:11; 85:5; 86:6;
91:5, 16; 94:7; 95:3, 17, 22,
25; 96:21; 98:4; 99:4, 9;
100:4; 104:24; 108:24;
119:25

**supposed** [1]
100:13

**surrounding** [1]
110:20

**suspend** [1]
121:18

**sworn** [3]
5:3; 124:16; 127:12

─────────────

**– T –**

**talked** [1]
112:23

**talking** [3]
54:13; 76:14; 99:11; 106:14

**technical** [1]
114:24

**ten** [1]
49:17

**tender** [1]
36:18

**tendering** [1]
36:21

terms [8]
8:22; 18:10; 31:6; 42:20;
59:24; 68:3; 108:2; 121:5
testified [4]
5:5; 28:16; 86:25; 88:14
testify [1]
63:4
testifying [2]
4:22; 5:21
testimony [1]
127:14
text [2]
100:6, 14
Thank [3]
114:14; 115:13; 124:10
thereafter [1]
7:13
therefor [1]
3:23
Thereupon [1]
39:7
they're [4]
9:19; 32:9; 64:11; 80:20
Third [2]
34:21; 42:24
third [1]
56:14
Threatening [1]
114:11
threatening [1]
114:8
three [4]
39:20; 55:16; 57:16; 120:11
times [1]
32:5
toll [1]
121:15
tolling [1]
121:16
touch [1]
104:7
track [1]
117:17
transaction [1]
18:13
transcript [3]
4:11; 6:5; 115:5
transmission [2]
71:22; 82:16
transmit [1]
42:4
transmittal [17]
30:12, 23; 37:9; 39:3; 41:24;
44:12; 47:15, 22; 48:9; 50:2;
61:13; 73:15; 76:13; 81:24;
86:23; 101:4
transmittals [1]
87:25
transmitted [3]
38:9; 89:15; 108:12
transmitting [4]
70:9, 10; 82:18
Tri [14]
47:6, 13, 15, 23; 48:6; 49:12,
25; 55:2; 60:12, 16, 25; 61:3;
80:9, 11
TRIAL [1]
1:13
trial [1]
4:14
triggered [1]

90:16
true [1]
127:13
turning [2]
7:19; 65:19
type [1]
10:20

– U –

unable [3]
76:5; 114:24; 122:22
unclear [7]
42:7, 13, 19; 44:2; 45:19;
63:15, 21
understand [9]
5:23; 6:10; 10:7; 11:10, 14;
12:15; 24:24; 39:9; 92:24
understanding [30]
8:15; 11:23; 12:4; 13:6;
14:20; 15:9; 18:8, 20; 19:3, 6,
14; 20:19, 24; 22:5, 22;
34:25; 36:7, 15; 52:14; 55:9,
14; 60:2; 61:8; 62:10; 63:24;
64:6; 95:20; 97:11; 104:20;
116:25
Understood [2]
116:24; 118:5
understood [10]
10:25; 67:2, 12; 76:24; 79:24;
83:13; 88:25; 105:2; 106:16,
17
underwriter [4]
21:10, 15, 18; 79:3
underwriters [3]
29:4; 79:10, 13
underwriting [1]
79:2
unfolded [1]
112:24
UNIFORM [2]
3:2; 4:2
unreasonable [1]
59:23
unrelated [9]
34:2; 64:16; 86:22; 112:18;
113:25; 116:20, 23; 118:4;
123:9
upcoming [2]
110:12, 14
upset [1]
123:10
utilized [1]
4:14

– V –

variance [1]
99:13
variety [1]
11:4; 104:13
verbal [1]
6:2
verified [12]
74:8, 15, 17, 23; 75:2; 77:17;
78:16; 86:14; 90:4; 92:21;
94:7; 96:21
via [1]
48:6; 101:21
vicarious [3]
23:4, 22; 26:13
view [2]

59:7; 66:14
VM [1]
1:5

– W –

wait [1]
6:8
waived [2]
3:6; 4:17
wanted [9]
17:15; 41:8; 42:8, 16; 48:20;
66:11, 20; 83:7; 97:21
waste [2]
83:6
We'll [1]
13:20
we'll [1]
54:16
We're [2]
47:21; 96:4
we're [1]
62:19
weeks [1]
77:13
Weiner [36]
5:18; 29:11, 15, 20; 41:11,
14, 17, 20; 42:4; 44:12;
46:15; 51:6; 62:23; 63:6;
68:21; 70:10; 77:21; 81:7, 25;
89:5; 90:12, 17; 94:16, 25;
95:8; 97:12, 24; 98:17;
100:14; 102:23; 103:4, 17;
109:22; 116:2; 118:9; 119:2
weren't [4]
66:12; 79:12; 80:12; 87:7
WFK [6]
94:17, 20; 95:3, 8, 23; 97:8
what's [1]
61:13
whenever [2]
109:25; 110:2
Whereas [1]
59:21
WHEREOF [1]
127:19
Whereupon [34]
7:24; 14:11; 26:18; 27:25;
33:10, 14; 45:25; 46:24;
48:25; 49:3, 7; 50:6; 51:24;
53:10; 54:19; 72:23; 74:2, 11;
75:23; 85:14; 88:7, 9; 90:7;
93:13; 114:17; 115:14, 16,
18; 117:9, 21; 118:20; 119:7;
120:4; 124:11
whichever [1]
42:18
who's [1]
29:8
wholesale [3]
47:23; 48:4; 82:20
wholesaler [4]
47:16; 80:12, 16, 21
whomever [2]
29:23; 60:17
WILSON [1]
2:8
Withdrawn [1]
95:6
withdrawn [1]
34:16

WITNESS [3]
25:7; 115:13; 127:19
Witness [2]
1:14; 33:9
witness [8]
4:22; 5:3; 114:19; 115:2, 3;
124:12; 127:11, 14
WKF [8]
80:18; 81:8, 25; 82:3, 19;
83:2; 91:8, 19
WNC [4]
12:13, 16, 20; 13:22
woman [1]
11:7
words [2]
41:10; 58:10
worked [5]
19:3, 7, 15, 18, 20
Working [1]
11:16
working [2]
69:16; 83:5
wouldn't [1]
15:3
writing [3]
57:8; 79:23; 120:22
written [4]
7:16; 81:15; 111:23; 115:5
wrote [1]
77:24

– Y –

yeah [1]
71:10
years [3]
41:22; 62:19; 83:2
YORK [3]
1:2; 127:4
York [11]
1:17, 19; 2:5, 10; 5:4, 13;
18:23; 127:9
yours [2]
73:12; 123:16; 124:6

– Z –

Zimmerman [4]
80:22, 23; 82:22, 23

# EXHIBIT "O"

**NORTH SHORE  RISK MANAGEMENT LLC**

82 Powerhouse Road
P.O. Box 9007
Roslyn Heights, NY 11577-9007

Phone: 516.484.7000
Fax: 516.484.5018
www.narmlnsurance.com

July 26, 2004

BFC Construction Corp.
225 First Avenue
New York, NY 10029
Att: Estelle Rodriguez

Re: Richard Conrad vs. 105 Street Associates, LLC
July 2, 2002 date of loss

Dear Estelle:

Enclosed herewith is the paperwork that was recently sent to my office with regard to the above captioned matter. Recently, it appears that BFC Partners, LP was included in this action, although the claim appears to be unrelated to BFC Partners, LP activity.

As discussed, this claim was forwarded to my office on September 18, 2002 and was immediately forwarded to the insurance carrier. Their investigation results are attached and they declined coverage to BFC Construction Corp, citing a number of reasons. In addition, there was no coverage for 105 Street Associates, LP, at the time of the incident. I was not approached on this entity until mid July, 2002 and my correspondence to the insurance carrier is attached requesting coverage. This coverage was subsequently denied based on an issue of non-combinability ... which we all discussed extensively.

On October 21, 2002, following the response from the Insurance Carrier, we were requested by your office (Greg Cross) to fax a copy of the paperwork to you so that Don Snyder could be contacted to handle this. That was the last we heard on the matter.

I urge you to turn this matter over to your legal counsel immediately. If I can be of any further assistance, please do not hesitate to contact me.

Sincerely,

Steven Potolsky
Managing Director
SP:dw
enc.



DEFENDANT'S EXHIBIT

P00137

Ms. Barbara Weiner
North Shore Risk Management LLC
33 Powerhouse Road
Roslyn Heights, NY 11577

7003 2260 0002 6962 9145

**U.S. Postal Service**
**CERTIFIED MAIL**  RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark
Here

P00138





DEFENDANT'S
EXHIBIT
X
12/5/06 mH

August 18, 2004

Schneider Goldstein Bloomfield LLP
90 Broad Street (6th floor)
New York, NY 10004
Att: Donald F. Schneider

Re: Richard Conrad vs. BFC Construction Corp. ; Date of loss – July 2, 2002

Dear Donald:

Pursuant to your letter today, I would like to correct a few inaccuracies with regard to the above incident. As I mentioned to Greg Baron and Brad Richards on August 16, 2004, I incorrectly stated in my letter of July 26, 2004 that 105 Street Associates, LP did not have insurance for the date of the incident referenced above. The reference to this entity, however, did not pertain to the declination of coverage for BFC Construction Corp. in this matter as I indicated in the letter and I included a copy of the declination from Sirius America Insurance Company.

Your statement that "our clients previously sent notifications to your office of a claim and the lawsuit, respectively" is not quite correct. Our first and only notification of this incident was received by my office on September 16, 2002. Estelle Rodriguez forwarded to my office in a letter dated September 12, 2002, the original letter and second request from the Law Offices of Conrad J. Benedetto pertaining to this incident. In her correspondence, she included a description of the incident dated July 1, 2002, a copy of a certificate of insurance from Jem Erectors, Inc. referencing a Madison Avenue project and a picture of the site. In a subsequent phone call to Estelle on the date of our receipt, she mentioned that she was unaware of any details pertaining to this incident. We immediately reported the incident to the insurance carrier for BFC Construction Corp. by fax. (a copy of our incident report is attached) and a copy of their acknowledgement of September 23, 2002 is attached. Please note that the letter from the Law Offices of Conrad J. Benedetto references BFC Construction Corp., only, and not any other entities. This was the only correspondence sent to my office with regard to the incident. In addition, there was no lawsuit sent to us with regard to this matter to indicate an action being brought against either 105 Street Associates, LLC or BFC Partners, L.P.

Page #2

On October 11, 2002, the Insurance Carrier for BFC Construction Corp. through their claims administration issued a declination citing a variety of reasons. The first one cited a violation of the terms and conditions in reporting the incident "2 months and 16 days" after the client was aware of it (late reporting). The second one cited is, in my estimation, incorrect on the part of the Insurance Carrier (this also, by the way, led to my incorrect statement regarding the coverage issue for 105 Street Associates, LLC in my letter of July 26, 2004). The Carrier's statement that "underwriters rejected covering the accident location in this policy" is misguided. What the underwriters rejected was adding 105 Street Associates, LLC to the general liability policy of BFC Construction Corp. as a named insured, citing a non-combinable financial control and interest. 105 Street Associates, LLC, however, was covered under separate insurance continuously through this period. Our original intent in requesting this combination was to be able to save our client money in what Donald Capoccia considered a duplication of coverage. This second reason for the declination of coverage, in my estimation, can be refuted. The third reason cited, and this may be the most difficult to overcome, is the specific exclusion of coverage regarding the policy warranty that BFC Construction Corp. have a signed written contract with anyone who performs work on their behalf requiring them to indemnify and hold them harmless. Harold J. Siering's letter is specific on this point and references attempts to secure copies of the signed written contract.

Upon receipt of this declination, I immediately contacted Greg Cross at BFC and suggested that he turn the file over to you. Accordingly, on October 21, 2002, we faxed to Greg a copy of the entire file for handling. This was the last we heard of this incident that was declined by Sirius America Insurance Company.

As a result of my conversation with Greg Baron on August 16, 2004, we have put the Insurance Carrier for 105 Street Associates, LLC (Greenwich Insurance Company) on notice of this incident. The only documentation we have been able to provide them with has been the contents of our file that makes no reference to 105 Street Associates, LLC. As respects BFC Partners, L.P. please give me some guidance on how you would like this handled. To the best of my knowledge they are not involved in this.

Page #3

Unfortunately, I'll be out of town through September 6, 2004 (my last date is this Friday) but the file is being handled by my in-house employee, Barbara Weiner.  If you need any additional information, you can always contact her.

Very truly yours,

Steven Potolsky
SP:dw
enc.
cc: Donald Capoccia, Brandon Baron,
    Greg Baron and Brad Richards, by fax.

# EXHIBIT "Q" Part I



COPY

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------

105 STREET ASSOCIATES, LLC.,

                                        Plaintiff,


        - against -

GREENWICH INSURANCE COMPANY,


                                        Defendant.

-------------------------------------------------

                    Wilson, Elser, Moskowitz,
                    Edlerman & Dicker, LLP.
                    Philadelphia, Pennsylvania

                    December 29, 2006
                    10:35 a.m.


EXAMINATION BEFORE TRIAL of Defendant, BY:

MICHAEL BARNABA, taken by Plaintiff, Pursuant

to Order, and held at the above-mentioned time

and place, before Marc Schafler, a

Stenographer and Notary Public within and for

the State of New York.

2

1

2

3

4                    A P P E A R A N C E S:

5

6        SCHNEIDER, GOLDSTEIN,
         BLOOMFIELD, LLP.

7        Attorneys for Plaintiff
         90 Broad Street, 6th Floor

8        New York, New York 10004
         BY: DONALD SCHNEIDER, ESQ.

9

10

11

         WILSON, ELSER, MOSKOWITZ,

12       EDELMAN & DICKER, LLP.
         Attorneys for Defendant

13       150 East 42nd Street
         New York, New York 10017

14       BY: GLENN J. FUERTH, ESQ.

15

16

17

18

19

20

21

22

23

24

25

3

1

2

3                      S T I P U L A T I O N S

4

5          IT IS HEREBY STIPULATED AND

6    AGREED, by and between the attorneys for the

7    respective parties herein, as follows:

8

9          That all rights provided by the

10   CPLR, including the right to object to any

11   question except as to form, or to move to

12   strike any testimony at this examination, are

13   reserved for the trial:  In addition, the

14   failure to object to any question or to move

15   to strike the testimony at this examination,

16   shall not be a bar or waiver of the right to

17   make such objection or motion at, and is

18   reserved for, the trial of this action.

19

20

21

22

23

24

25

4

1

2

3

4              This examination, when

5    transcribed, may be sworn or affirmed to by

6    the witness, before any Notary Public; failure

7    to do so, or to return the original transcript

8    to Counsel for the party on whose behalf it

9    was taken, shall not be deemed a waiver of the

10   rights provided by Rule 3116 of the CPLR, and

11   shall be controlled thereby.

12

13

14              IT IS FURTHER STIPULATED AND

15   AGREED, that filing and certification of the

16   original of this examination shall be the same

17   and thereby waived; and that a copy of the

18   transcript shall be furnished to counsel

19   representing the witness herein, without

20   charge.

21

22

23

24

25

5

BARNABA

1

2

3    M I C H A E L      J.    B A R N A B A,

4    called as a witness, after first having been

5    duly sworn by the Notary Public (Marc

6    Schafler), in and for the State of New York,

7    was examined and testified as follows:

8

9    BY THE REPORTER:

10

11        Q.      State your full name for

12    the record, please.

13        A.      Michael J. Barnaba.

14        Q.      What is your address?

15        A.      My work address is 520

16    Eagleview Boulevard, P.O. 636, Exton,

17    Pennsylvania 19341.

18

19    EXAMINATION BY

20    MR. SCHNEIDER:

21

22            Q.    Good morning, Mr. Barnaba?

23            A.    Good morning.

24            Q.    My name is Donald

25        Schneider.  I represent the plaintiff

6

BARNABA

1

2    105 Street Associates, LLC. in this

3    lawsuit against Greenwich Insurance

4    Company.

5              Have you ever had your

6    deposition taken before?

7         A.    Yes.

8         Q.    You know that the

9    gentleman to your immediate right is

10   the court stenographer who will be

11   taking down and then transcribing my

12   questions and your answers.

13        A.    Yes.

14        Q.    And any colloquy that

15   counsel has?

16        A.    Yes.

17        Q.    If at any time you do not

18   hear the question, please just let me

19   know and I will have it repeated.  If

20   at any time you do not understand a

21   question, please tell me and I will

22   attempt to rephrase it.  Okay?

23        A.    Thank you.

24        Q.    If at any time you need

25   to take a break, tell me or your

7

1          BARNABA

2    counsel?

3          A.    Yes, sir.

4          Q.    Okay, let's get started.

5    Mr. Barnaba, did you review any

6    documents in preparation for your

7    deposition today?

8          A.    I did.

9          Q.    What documents did you

10   review?

11         A.    I reviewed certain

12   documents that Mr. Fuerth showed me

13   yesterday afternoon.

14         Q.    To your recollection,

15   what documents did you review

16   yesterday?

17         A.    Portions of my claim

18   file.  I guess I should say "the claim

19   file."

20         Q.    Does that summarize all

21   of the documents you looked at that

22   were from the claim file?

23         A.    I believe so.

24         Q.    Specifically, tell me

25   what you recall, specific documents

8

1              BARNABA

2     that you recall reviewing?

3          A.     I believe I reviewed some

4     or all of my claim file notes.

5          Q.     Those would be notes on a

6     claim pad?

7          A.     The notes that I had

8     typed into our claim system which I

9     can identify -- The notes that I wrote

10    into the file on an electronic file in

11    the computer.  I reviewed various

12    documents that were submitted to the

13    insurer as part of the file; initial

14    communications from the broker with

15    the first loss submission and the

16    enclosures that were submitted with

17    the initial report; some subsequent

18    communications from the insured and

19    the broker, and I recall also

20    reviewing a copy of a letter which I

21    directed to the ensure seeking

22    additional information on the claim.

23                 I also reviewed a

24    redacted copy of counsel's initial

25    report to me.  I believe that is

9

1    BARNABA

2    everything.  There may have been other

3    documents.

4        Q.    One of the things you

5    told me are documents submitted to the

6    insurer?

7        A.    Whatever initial

8    communications we received from the

9    insurance broker reporting the claim

10    to us or reporting the claim to

11    whomever -- probably WKF & C Agency,

12    and whatever enclosures would have

13    been submitted with that, an accord

14    loss notice.  There was a copy of

15    summons, but I don't believe -- I

16    believe that was sent subsequent to

17    the initial report.  There was a

18    letter of representation directed to a

19    BFC entity.  I don't remember if it

20    was Construction, Inc. or what the

21    balance was.  That is all that I can

22    readily think of.

23        Q.    Can you tell me what you

24    mean by a letter of representation?

25        A.    A letter from the

ACORD

10

INJURED

BARNABA

1

2     attorney who represented the (insured

3     party directed to BFC Construction.    I

4     would have to read the letter.

5          Q.    I understand.    Thank you.

6     Just tell me yes or no, have you ever

7     taken any medication or drugs in the

8     last 48 hours?

9          A.    No.

10          Q.    You're currently employed

11     by XL Specialty Insurance Company, is

12     that correct?

13          A.    No.

14          Q.    By whom are you employed?

15          A.    I'm employed by XL

16     Insurance - Environmental.

17          Q.    That's the full name?

18          A.    I believe that is how I'm

19     referred on my business (call.  )I am

20     employed by the XL Insurance

21     Environmental Division.    We refer to

22     ourselves internally as XL

23     Environmental and I believe it is XL

24     Insurance - Environmental.    That's the

25     way it is.

CALL

11

1               BARNABA

2               Q.    What is the relationship,

3       if any, between XL insurance -

4       Environmental and XL Specialty Claims

5       Administrators.

6               MR. FUERTH: Objection, you

7       can answer, if you know.

8               A.    XL Specialty Claims

9       Administrators is a name that the

10      adjusting division that I work for was

11      previously called.

12              Q.    What is the adjusting

13      division currently called?

14              A.    XL Insurance -

15      Environmental.

16              Q.    If you know, what is the

17      relationship between XL Insurance -

18      Environmental and XL Speciality

19      Insurance Company?

20              MR. FUERTH: Objection, you

21          can answer.

22              A.    I don't know.

23              Q.    The offices of XL

24      Insurance - Environmental are at 520

25      Eagleview Boulevard in Exton,

12

1                          BARNABA

2          Pennsylvania?

3                    MR. FUERTH: Objection.  You

4          can answer.

5              A.     That is where the main

6          office is located.

7              Q.     What office do you work

8          out of?

9              A.     I work in an adjacent

10         building located at 600 Eagleview

11         Boulevard.

12             Q.     How long have you been

13         employed by XL Insurance -

14         environmental?

15             A.     I have been employed by

16         my current employer since October of

17         2001.  The name changed during that

18         time period which may be leading to

19         some of your confusion.

20                   MR. FUERTH: He didn't ask

21         you that.

22             Q.     I appreciate that and I

23         do understand that.  Whom did you work

24         for prior to October 2001?

25             A.     You want me to start at

13

1                        BARNABA

2        the beginning of my career.

3              Q.    No, I would just like you

4        to tell me any affiliate or related

5        companies you worked for, if any,

6        since October 2001?

7                    MR. FUERTH: Since or

8        before?

9                    MR. SCHNEIDER: I'm sorry,

10       before.

11                   MR. FUERTH: Objection, you

12       can answer.

13             A.    Immediately prior to

14       October 2001, I was employed by Great

15       American Insurance Company.

16             Q.    From when to when,

17       approximately?

18             A.    I'm trying to count

19       backwards. I believe from July 1996

20       through October of 2001.

21             Q.    What was your title or

22       job function while you worked for

23       Great American?

24             A.    I was the claims

25       adjuster. I believe my title was --

14

BARNABA

1

2      I'm sorry, I'm trying to remember what

3      our titles were.  I performed -- I was

4      a claim handler under different

5      titles.

6              Q.      What is your job function

7      with XL Insurance - Environmental?

8              A.      I'm a senior claims

9      consultant.

10              Q.      Has that been your title

11      since you joined the company?

12              A.      No.

13              Q.      You said senior claims

14      consultant?

15              A.      Yes.

16              Q.      For how long have you had

17      that title?

18              A.      I believe my title

19      changed in April of 2006.

20              Q.      It became senior claims

21      consultant?

22              A.      Yes.

23              Q.      Immediately prior to

24      becoming senior claims consultant what

25      your title?

15

BARNABA

A.      Senior claims analyst.

Q.      For how long were you a senior claims analyst?

A.      I believe my title became senior claims analyst sometime in 2002.

Q.      What are your current duties and responsibilities as senior claims consultant?

A.      Well, I'm essentially a claims adjuster.  I administrate claims for commercial accounts, typically general liability and auto liability cases.

Q.      Did your job function change when you became senior claims consultant?

A.      No.

Q.      Just for ease of discussion, if it is okay with you, when I refer to XL, unless I tell you differently, I will be referring to XL Insurance Environmental, in other words, your current employer.  Is it

16

BARNABA

1

2    okay that I use that, "XL," and you

3    will know what I mean?

4        A.    Yes, yes.

5        Q.    In 2004, was XL the

6    claims administrator for Greenwich

7    Insurance Company?

8        A.    Yes.

9        Q.    In 2004, what were XL's

10    responsibilities as claims

11    administrator for Greenwich Insurance

12    Company?

13        MR. FUERTH: Objection to

14    form.

15        A.    I need to clarify my last

16    answer.

17        Q.    Go ahead.

18        A.    In 2004, XL Insurance -

19    Environmental was a claims

20    administrator for XL Insurance

21    Programs.  XL Insurance -

22    Environmental was also a claims

23    administrator for Greenwich Insurance

24    Company, for XL Insurance -

25    Environmental and possibly other XL

17

1                           BARNABA

2      divisions.

3              Q.      Could you read back that

4      answer?

5

6                      (Whereupon, the reporter

7      read back the above-referred to

8      portion.)

9

10             Q.      Vis-a-vis Greenwich

11     Insurance Company, what were XL

12     Environmental's responsibilities as

13     claims administrator?

14                     MR. FUERTH: Objection; you

15     can answer.

16             A.      For whom?

17             Q.      With respect to Greenwich

18     Insurance Company?

19             A.      For Greenwich Insurance

20     Company on behalf of XL Insurance

21     Programs?

22             Q.      Go ahead, yes.

23             A.      We were acting in a third

24     party administrator capacity for XL.

25     I will just refer to it as XL

18

BARNABA

1

2  Environmental and XL programs, if

3  that's okay for simplicity sake.  We

4  were acting in a third party

5  administrating capacity for XL

6  programs which we performed a claims

7  handling function for XL programs.

8      Q.    Now, in 2004, whom did

9  you report to, if anyone?

10      A.    My supervisor in 2004 was

11  Gary Barber, my direct supervisor.

12      Q.    How many people reported

13  to you in 2004?

14      A.    No one.

15      Q.    Do you know what Mr.

16  Barber's title was?

17      A.    Claims supervisor, I

18  believe.

19      Q.    Did there come a time

20  that a decision was made to deny

21  coverage to 105 Street Associates,

22  LLC. in connection with the lawsuit by

23  Richard Conrad?

24      A.    Yes.

25      Q.    To the best of your

19

BARNABA

1
2    recollection, approximately when did
3    that occur?
4        A.    From my recollection in
5    reviewing the document yesterday
6    afternoon, I believe that decision
7    occurred on September 15, 2004.
8        Q.    Did you participate in
9    making the decision to deny coverage?
10       A.    Yes.
11       Q.    Did anyone else
12   participate in that decision, besides
13   yourself?
14       A.    The decision to deny
15   coverage was denied by Ed Walsh of XL
16   Programs.
17       Q.    Other than yourself and
18   Mr. Walsh, do you know if anyone else
19   participated in making the decision to
20   deny coverage?
21       A.    In making the decision to
22   deny coverage?
23       Q.    Yes.
24       A.    We had consulting
25   coverage counsel.  I wouldn't know if

20

BARNABA

1

2    I could say that they participated in

3    the decision.

4         Q.    Anyone else?

5         A.    Not that I recall.

6         Q.    Do you know if Mr. Walsh

7    had full authority to make a decision

8    to deny coverage?

9              MR. FUERTH: Objection, you

10   can answer.

11        Q.    Without the consent of

12   Greenwich Insurance Company?

13             MR. FUERTH: Objection, you

14   can answer.

15        A.    Mr. Walsh is the claims

16   manager for XL Programs, and to the

17   best of my knowledge, he had full

18   authority to make coverage

19   determinations on his book of

20   business.

21        Q.    You had some

22   responsibilities with respect to the

23   claim of 105 Street Associates in

24   connection with the injury alleged to

25   have been suffered by Richard Conrad,

21

BARNABA

1

2    is that correct?

3        A.    Yes.

4        Q.    Could you describe for me

5    what your duties and responsibilities

6    were in that regard?

7        A.    I was the claims analyst

8    or senior claims analyst assigned to

9    investigate the claim.  My duties

10   would have included reviewing the

11   claim for coverage, and evaluating

12   liability and damages.  I had

13   reporting requirements to -- my

14   authority on this program was 75,000

15   dollars.  Any claims that exceeded

16   75,000 dollars or had certain

17   catastrophic injury triggers, it was

18   my obligation to bring that to the

19   attention of XL Programs, Mr. Walsh's

20   department.

21            It was also my

22   responsibility to bring any coverage

23   issues to their attention or potential

24   coverage issues.

25       Q.    Did you have the

22

BARNABA

1

2    responsibility to bring coverage

3    issues to the attention of Mr. Walsh

4    only if the claim was over 75,000 or

5    met the other threshold or in all

6    circumstances?

7            MR. FUERTH: Objection.

8    Objection, you can answer.

9        A.    We had no authority to

10   deny coverage on XL Programs business

11   without consulting with them.

12       Q.    When for the first time

13   did you learn of the claim by Richard

14   Conrad with respect to 105 Street

15   Associates?

16       A.    I believe I would have to

17   look at my file notes, but I believe

18   it was August 19th, August 20th, 2004.

19       Q.    How did the claim first

20   come to your attention?

21       A.    From my memory in the

22   documents that I reviewed yesterday

23   afternoon, the claim was faxed to our

24   office late in the afternoon on August

25   18th and was assigned to me at some

23

BARNABA

1

2       time on August 19th.  That could be

3       confirmed by the acknowledgment letter

4       that was initialed on the file as well

5       as my initial notes on the file.

6               MR. FUERTH: He didn't ask

7       you that.

8               Q.      When the claim was first

9       assigned to you, what documents, if

10      any, did you receive?

11              A.      I would need to review

12      the file materials to answer that.

13              Q.      What is the first step

14      you recall taking with respect to the

15      claim after it was assigned to you?

16              A.      Well, the first step when

17      I receive an claim is that I review

18      all the documentation that was

19      submitted to me, which would typically

20      include the policy, any communications

21      between the insured and their broker,

22      and their broker and WKF & C and

23      possibly communications directed to

24      the insurance company.

25              Q.      That is just as a general

24

BARNABA

1

2      matter, correct?

3          A.    Yes.

4          Q.    In this case to the best

5      of your recollection, what documents

6      did you review when you were first

7      assigned to the file?

8              MR. FUERTH: Objection, you

9      can answer, but he indicated without

10     looking at his file, he really

11     couldn't recall.

12         A.    I would really need to

13     review the file documents to say what

14     I reviewed.  I don't recall what was

15     enclosed with the original submission.

16         Q.    Now, in a case of the

17     claim by Mr. Conrad, after you

18     reviewed whatever documents you did,

19     what did you do next with respect to

20     the claims handling process?

21         A.    Again, I really can't say

22     with certainty without having the

23     claim documents in front of me what I

24     did.

25              MR. SCHNEIDER: Please mark

25

1                          BARNABA

2          as Plaintiff's Exhibit 1, a one-page

3          letter headed "acknowledgment of loss"

4          on the letterhead of XL Insurance -

5          Environmental, dated August 19, 2004,

6          and please mark as Plaintiff's Exhibit

7          2, a one-page document on the

8          letterhead of WKF & C Agency, Inc.,

9          headed underneath the address "claim

10         notification."

11

12              (Whereupon, the above-

13         referred to documents were marked

14         Plaintiff's Exhibits 1 and 2 for

15         Identification, as of this date.)

16

17              Q.    Do you see the document

18         which has been marked as Plaintiff's

19         Exhibit 1?

20              A.    Yes.

21              Q.    Which is the

22         acknowledgment of loss?

23              A.    Yes.

24              Q.    Can you identify that

25         document?

26

BARNABA

1
2          A.      That is a acknowledgment
3     of loss letter issued on our claim
4     file.
5          Q.      That is, above your typed
6     name is a photocopy of your signature?
7          A.      That is not my signature.
8          Q.      That was signed on your
9     behalf?
10          A.      Yes.
11          Q.      You prepared this letter?
12          A.      I did not.
13          Q.      Who prepared it?
14          A.      I don't know.
15          Q.      Is it your practice in
16     certain situations to have someone
17     else prepare and sign a letter on your
18     behalf?
19          A.      An acknowledgement of
20     loss letter is issued on all claim
21     files at the time that they are set up
22     by an administrative staff.
23          Q.      Now, who is WKF & C
24     Agency, Inc. in relation to XL
25     Insurance?

27

BARNABA

1

2         MR. FUERTH: Objection, you

3    can answer.

4         A.    WKF & C Agency, Inc. to

5    my knowledge is a business partner

6    with XL Insurance Programs in some

7    capacity.

8         Q.    Is WKF & C Agency, Inc.

9    an agent of some type for Greenwich

10   Insurance Company?

11        MR. FUERTH: Objection, you

12   can answer.

13        A.    I don't know that I can

14   categorize them as such.

15        Q.    Have you had a chance to

16   review this letter?

17        A.    Which letter?

18        Q.    The acknowledgment of

19   loss, Plaintiff's Exhibit 1, which we

20   are talking about?

21        A.    Yes.

22        Q.    Does that letter in any

23   way refresh your recollection of what

24   documents you received at the time

25   that the matter was assigned to you?

28

1                    BARNABA

2           A.     No.

3           Q.     Could you identify

4    Plaintiff's Exhibit 2?

5                  MR. FUERTH: Objection, you

6    can answer.

7           A.     Plaintiff's Exhibit 2

8    appears to be a fax cover page issued

9    by WKF & C Agency, Inc. to my claims

10   department, dated August 18, 2004.

11          Q.     Do you see the

12   handwriting towards the upper right of

13   the document?

14          A.     Yes.

15          Q.     Do you recognize it?

16          A.     Yes.

17          Q.     Whose handwriting is it?

18          A.     Bill Helmig.

19          Q.     What was Mr. Helmig's

20   department in 2004?

21          A.     I'm not sure.

22          Q.     What was his job function

23   in 2004?

24                 MR. FUERTH:  Objection.

25   You can answer.

TITLE

29

1                           BARNABA

2          A.    He was claims manager for

3    my department.

4          Q.    Staying with Plaintiff's

5    Exhibit 2, there is a sentence that

6    reads "please find a first report of

7    the above mentioned insured."  Could

8    you tell me what the term "first

9    report" refers to?

10         A.    It would be a first

11   submission of claim to our claim

12   department.

13         Q.    In this case, do you

14   recall what the first report consisted

15   of?

16         A.    I do not.

17         Q.    Is there any document in

18   the claim file that would refresh your

19   recollection as to what documents you

20   reviewed upon being assigned to this

21   claim?

22              MR. FUERTH: Objection, you

23   can answer.

24         A.    Well, the fax cover page

25   states that it was an 11 page

30

BARNABA

1

2    transmittal, so I would need to see

3    what the other -- assuming we received

4    all 11 pages, what were the other

5    pages that were received at the time

6    of this fax transmittal.

7         Q.    Let me show you what has

8    been previously marked as Defendant's

9    Exhibit F at a deposition on 5-24-

10   2006 in this case.  It consists of two

11   pages.  I ask you to take a look at

12   both of those pages.

13        A.    Okay.

14        Q.    My first question to you

15   is whether you have seen these two

16   pages before today?

17        A.    I'm not sure if I saw the

18   top page.  I believe the second page

19   was part of my file.  The top page may

20   have been as well, but I don't recall.

21        Q.    Return to Plaintiff's

22   Exhibit 2, which is the claim

23   notification.  Do you see in the

24   bottom right-hand corner the initials

25   "SB"?

31

BARNABA

1

2          A.      Yes.

3          Q.      Do you know what that

4     refers to?

5          A.      I do not.

6          Q.      In the bottom left-hand

7     corner of this document, do you see

8     where it says "North Shore Risk

9     Management, Barbara Weiner?

10         A.      Yes.

11         Q.      Did you ever have any

12    communications with Ms. Weiner?

13         A.      I don't recall.

14         Q.      Do you recall ever having

15    any communications with anyone at

16    North Shore Risk Management?

17         A.      I don't know.

18              MR. SCHNEIDER: Please mark

19    as Plaintiff's Exhibit 3 a document

20    which consists of Bates number pages

21    GR269 through and including GR285.

22

23              (Whereupon, the above-

24    referred to document was marked

25    Plaintiff's Exhibit 3 for

32

BARNABA

1

2     Identification, as of this date.)

3

4          Q.     My question to you is

5     whether you had seen a copy of this

6     document prior to yesterday?

7          A.     Prior to yesterday?

8               MR. FUERTH: Objection, you

9     can answer.

10          A.     Some of the documents

11     look familiar, but I don't know that I

12     can testify that I had seen all the

13     documents before yesterday or even

14     that I saw all the documents

15     yesterday.

16          Q.     I'm not asking you what

17     your attorney showed you.  Let focus

18     on page-by-page, and I would like you

19     to tell me whether you recall having

20     seen each of the pages that I'm going

21     to show you prior to yesterday.

22               Do you see the

23     numbering in the bottom right-hand

24     corner, do you see where it says GR?

25          A.     Yes.

33

1          BARNABA

2          Q.    I'm going to refer to

3     this page as GR269 so we are on the

4     same page, so to speak.  Do you recall

5     having seen a copy of page GR269

6     before yesterday?

7          A.    I do not.

8          Q.    I think you testified

9     about GR 270.  Let's move to GR271.  I

10    ask you whether you recall having seen

11    a copy of this page before yesterday.

12              MR. FUERTH: Again, note my

13    objection to "before yesterday."  Is

14    the real thrust of your inquiry

15    whether he saw them between the period

16    of August 18, '04 and I believe

17    September 2004 when the declination

18    was sent?  I mean if he saw it a month

19    ago --

20              MR. SCHNEIDER: That's fair

21    enough.  Let's make that the premises

22    of the time period, when you saw each

23    of the pages.

24         Q.    I'm going to ask you

25    about between August 18, 2004 and

34

BARNABA

1
2      September 20, 2004, okay?

3          A.     Okay.

4          Q.     With that as the

5      premises, do you recall whether you

6      saw GR271 during that period?

7          A.     I can't testify from

8      memory whether or not I reviewed this

9      piece of paper two-and-a-half years

10     ago.

11         Q.     How about GR272?

12         A.     Again, I cannot testify

13     with any certainty that this matches

14     documents that were received in my

15     claim file in August or September of

16     2004.

17         Q.     When you received

18     documents that ultimately went into

19     the claim file, was it your practice

20     to keep a list of the documents in the

21     claim file?

22         A.     No.

23         Q.     Was it your practice to

24     keep a list of the documents received

25     in connection with any particular

35

1                        BARNABA

2      claim?

3              MR. FUERTH: Like an index,

4      you mean?

5              MR. SCHNEIDER: Yes.

6          A.    No.

7          Q.    Sitting here now, how, if

8      at all, would you determine what

9      documents you reviewed between August

10     18, 2004 and September 20, 2004?

11         A.    Well, if I had a copy of

12     the claim file in front of me, I could

13     look and see what it contained.  There

14     would be -- Well, my answer is what it

15     is.

16         Q.    Do you recall having seen

17     any document which you understood to

18     be a summons and complaint in a

19     lawsuit by Richard Conrad?

20         A.    I do recall that there

21     was a lawsuit contained within my file

22     documents.

23         Q.    That lawsuit was one

24     brought by Richard Conrad to the best

25     of your knowledge?

BARNABA

1

2      A.    I believe so.  I don't

3  know that I can testify that this

4  exhibit is the lawsuit that you are

5  showing me.

6              MR. SCHNEIDER: Please mark

7  as Plaintiff's Exhibit 4 a document

8  previously Bates numbered GR263 to and

9  including GR268.

10

11             (Whereupon, the above-

12  referred to document was marked

13  Plaintiff's Exhibit 4 for

14  Identification, as of this date.)

15

16      Q.    My question to you,

17  Mr. Barnaba, is whether during the

18  period August 18, 2004 through

19  September 20, 2004 you saw any of the

20  pages of what has been marked as

21  Plaintiff's Exhibit 4?

22      A.    Well again, I'm not

23  trying to by difficult.  I don't know

24  that I am comfortable testifying from

25  my recollection from documents that I

37

BARNABA

1

2    reviewed two-and-a-half years ago.

3    This is a the first page that I'm

4    looking at.  It is a cover page from

5    an insurance company to KF & C

6    Agency.  From my memory, I cannot

7    testify whether or not this document

8    was part of my claims file.

9            The second page is an

10   accord notice of loss.  From memory, I

11   do recall that mine contained such a

12   form, but again, I don't know that I

13   can testify with certainty this is the

14   exact form that was part of my file.

15           The latter pages that

16   you are showing me are policy

17   documents.  My file would have

18   contained a copy of the applicable

19   policy, but I don't know that I can

20   testify that these are the same policy

21   documents that were within my claim

22   file.

23           MR. SCHNEIDER: Please mark

24   as Plaintiff's Exhibit 5 a document

25   that appears to be Bates numbered

38

```
1                        BARNABA

2        GR25.

3

4                  (Whereupon, the above-

5        referred to document was marked

6        Plaintiff's Exhibit 5 for

7        Identification, as of this date.)

8

9              Q.     Had you had a chance to

10       review Exhibit 5?

11             A.     I had.

12             Q.     Can you identify this

13       document?

14             A.     This is an e-mail sent by

15       me on August 20, 2004 to an e-mail

16       address.  Do you want me to state what

17       the e-mail address is?

18             Q.     No, it is addressed to

19       the right of where it says "to:",

20       correct?

21             A.     Yes.

22             Q.     Presumably, an insurance

23       broker requesting copies of documents.

24             A.     Yes.

25             Q.     How did you obtain an
```

39

BARNABA

1

2    e-mail address for the person whom you

3    say is presumably an insurance broker?

4         A.    Well, my file either

5    would have been the -- the initial

6    documents contained in my file either

7    would have contained this person's

8    contact information or I would have

9    called him or her and requested their

10   e-mail.  If I'm testifying from

11   memory, from my file notes about this,

12   I believe I called an insurance broker

13   requesting copies of documents that

14   were referenced, but were not enclosed

15   with the initial claim report to our

16   office, and from memory, this

17   insurance broker requested an e-mail

18   from me confirming who I was so I sent

19   this document, this e-mail transmittal

20   to that person formally requesting the

21   information.

22        Q.    Do you recall as you sit

23   here now the name of the insurance

24   broker?

25        A.    From the e-mail address,

40

BARNABA

1

2    I believe it was Beth Weiner, but do I

3    recall it, no.

4         Q.    Now, above the

5    salutation, there is a number that

6    begins "P5502044."  Can you tell me

7    what that refers to?

8         A.    That was my file number.

9         Q.    Also referred to a claim

10   number?

11        A.    Yes.

12        Q.    The "WGG" followed by

13   seven digits, is that a policy number?

14        A.    That would have been a

15   Greenwich (file) number for 105 Street

16   Associates.

17        Q.    Do you recall if the

18   broker responded to your e-mail?

19        A.    I believe that she did.

20        Q.    In what fashion did she

21   respond?

22        A.    She forwarded additional

23   documents for our file.

24        Q.    What additional documents

25   did you receive from the broker?

*policy* (handwritten annotation)

BARNABA

1

2       A.     Are you asking me to

3   reply from memory?

4       Q.     Yes.

5       A.     I don't recall.

6           MR. SCHNEIDER: Please mark

7   as Plaintiff's Exhibit 6 documents

8   Bates numbered GR14 through and

9   including GR24.

10

11          (Whereupon, the above-

12  referred to document was marked

13  Plaintiff's Exhibit 6 for

14  Identification, as of this date.)

15

16      Q.     Could you identify this

17  document for us?

18      A.     Well, the first page

19  appears to be a fax cover sheet from

20  Barbara Weiner directed to myself

21  dated August 20, 2004.

22      Q.     Did you in fact receive

23  this fax cover sheet?

24      A.     I can't say that for

25  certain because the fax transmittal

42

BARNABA

1

2    information is cut off from the top of

3    the page.

4          Q.      To your recollection, did

5    Ms. Weiner send you some documents in

6    response to your request?

7          A.      Yes.

8          Q.      But you don't remember

9    what those documents are?

10          A.      From memory, I can't

11    state what those documents were, no.

12    Do you want me to go through the rest

13    of the documents?

14          Q.      Yes, please.

15          A.      The second page is a

16    general liability notice of occurrence

17    claim form.  Considering it has my

18    handwriting, I'm willing to testify to

19    some degree of certainty that it was

20    in my claim file.

21          Q.      Before you move on, could

22    you tell me what your handwritten

23    notes reflect?  It has a fax number

24    and perhaps a phone number?

25          A.      It appears that I made a

43

BARNABA

1

2    notation of the insured's contact

3    information.  I see a fax number, a

4    telephone number, two names that I

5    wrote down, Estelle Rodriguez.  The

6    second name I wrote down was Robert

7    Corallo.

8        Q.    Do you recall from what

9    source you obtained those two names?

10        A.    I do not recall.

11        Q.    Can you tell me whose, if

12    you recall, whose phone number you

13    wrote down?

14        A.    Presumably, it is the

15    insured's contact information, but I

16    can't say that for certain.

17        Q.    Continue.

18        A.    The following pages 3, 4,

19    5, 6 --

20            MR. FUERTH: Can you

21    identify the Bates numbers so that it

22    will be easier that way?

23        A.    GR16, GR17, GR18, and

24    GR19 are policy documents issued by

25    Greenwich Insurance Company to 105

44

1                        BARNABA

2    Street Associates, LLC.

3         Q.    You are now on GR20?

4         A.    GR20 appears to be a

5    letter of representation from the

6    attorney who represents Richard Conrad

7    directed to BFC Construction, dated

8    August 6, 2002.

9         Q.    Do you recall having

10   received that document?

11        A.    I recall receiving that

12   there was a similar document in my

13   file.  Again, I can't state with

14   certainty this was the document in my

15   file.

16        Q.    When you say you can

17   recall a similar document in your

18   file, in what way was it similar to

19   GR20?

20        A.    I recall that my file

21   contained a letter of representation

22   from the injured party's attorney that

23   dated to August of 2002 directed to

24   some entity.

25        Q.    Please continue.

45

BARNABA

1

2      A.      Actually, that was

3   incorrect because the following

4   documents are dated July.  I recall my

5   file contained a letter of

6   representation from an attorney --

7   These are two different attorneys.  I

8   should have reviewed these more

9   carefully.  Can you give me a moment?

10          MR. SCHNEIDER:  Sure, take

11   your time.

12          A.      Just GR20 appears to be a

13   letter from an attorney who

14   represented the injured party in a

15   workers' compensation action directed

16   to BFC Construction on August 6th of

17   2002 and GR21 appears to be a letter

18   of representation from the law firm

19   that represented the injured party in

20   their tort claim directed to BFC

21   Partners, L.P.

22              I recall that my file

23   contained a letter of representation

24   from a law firm directed to a BFC

25   entity that dated to 2004, but from

46

1                        BARNABA

2    memory beyond that, I cannot testify

3    if it was either of these specific

4    letters.

5                    GR22 appears to be a

6    receipt for service for BFC Partners,

7    L.P.

8           Q.    Do you recall whether

9    there is a copy of that letter in your

10   claim file?

11          A.    I believe that there was.

12          Q.    Please turn to the next

13   page.

14          A.    GR23 is an affidavit of

15   service.

16          Q.    Do you recall whether a

17   copy of that page is contained in your

18   claim file?

19          A.    I recall that there was

20   some manner of service documentation

21   in my file, but from my memory, I

22   can't state from memory whether it was

23   GR22 or GR23 or some other document.

24          Q.    Do you recall the source

25   of that document, who you received it

BARNABA

1

2      from?

3          A.      I believe that was

4      included in the correspondence I

5      received from Ms. Weiner.  The last

6      page is GR24 and this appears to be a

7      cover page for a summons filed by

8      Richard Conrad against 105 Street

9      Associates, LLC., BFC Construction

10     Corp. and BFC Partners, LP.

11         Q.      Turning to GR14, the top

12     page, it starts "Dear mike in

13     accordance with our conversation.  Do

14     you recall having any conversation

15     with Barbara Weiner on or about the

16     date of this page which is August 20,

17     2004?

18         A.      I don't specifically

19     recall the conversation, no.

20         Q.      Do you recall whether or

21     not you had a conversation with a

22     Barbara Weiner on or about August 20,

23     2004?

24         A.      I recall that the file

25     notes, the one I reviewed yesterday,

48

1                            BARNABA

2    reflected a telephone conversation,

3    but I don't recall the actual

4    conversation from memory, no.

5         Q.    As you sit here now, you

6    do not recall anything that you said

7    to Ms. Weiner or that Ms. Weiner said

8    to you during the telephone

9    conversation, is that correct?

10        A.    I do not.

11             MR. FUERTH: Could we just

12   make the record complete when he was

13   looking at GR24, I don't think you

14   asked him whether that was part of his

15   file.  I think he testified to the

16   other documents whether they were or

17   were not.

18             MR. SCHNEIDER: I will be

19   happy to ask him.  I thought he

20   answered in another context.

21        Q.    Looking at GR24, is that

22   part of any document contained in the

23   claims file?

24        A.    Again, I recall that my

25   file contained a copy of a lawsuit.  I

49

1                          BARNABA

2       can't state that this particular

3       document was part of our file

4       materials.

5            Q.    Other than the

6       conversation you just testified about

7       with Ms. Weiner on or about August 20,

8       2004, do you recall having any other

9       conversation with Ms. Weiner or anyone

10      else from North Shore concerning

11      Richard Conrad's claim?

12           A.    Prior to my discussions

13      with counsel yesterday afternoon, I

14      really don't recall any conversations

15      with any parties on this particular

16      claim file.  I discussed it with

17      Mr. Fuerth yesterday.  That is the

18      only conversation I truly recall about

19      this claim.

20           Q.    After you received

21      documents from Ms. Weiner and

22      presumably reviewed them, what did you

23      do next with respects to your claims

24      handling?

25           A.    I would defer to my file

50

BARNABA

1

2       notes which would document what I did

3       on the file.

4            Q.    We will get to your file

5       notes.  I just want to be clear and

6       I'm asking you of your own independent

7       recollection, do you recall what you

8       did on this matter after you reviewed

9       documents from Mrs. Weiner?

10           MR. FUERTH: Without looking

11      at your notes, do you have a memory?

12           A.    I believe that following

13      my review, I submitted -- following my

14      review of the whatever documentation

15      was submitted to me by Ms. Weiner,

16      that I reviewed that documentation and

17      then sent a request to the insured for

18      additional documentation or

19      information.

20           MR. SCHNEIDER: Please mark

21      as Plaintiff's Exhibit 7 a document

22      Bates numbered GR31 to 32.

23           (Whereupon, the above-

24      referred to document was marked

25      Plaintiff's Exhibit 7 for

51

1                    BARNABA

2    Identification, as of this date.)

3         A.    Okay.

4         Q.    Can you identify this

5    document?

6         A.    This is a letter that was

7    faxed to the insurer, 105 Street

8    Associates, LLC. by myself requesting

9    additional information and

10   documentation.

11        Q.    You prepared this letter

12   and signed it, correct?

13        A.    I probably dictated it

14   and it is my signature.

15        Q.    Would you say this was a

16   standard type letter that you

17   generally send out to an insured for

18   further information?

19             MR. FUERTH: Objection, you

20   can answer.

21        A.    This is not a form

22   letter.  I dictated this from scratch

23   or typed it from scratch.

24        Q.    Directing your attention

25   to paragraph 3 on the first page of

52

BARNABA

1

2    this letter, can you tell me why you

3    requested from the insured copies of

4    the corporate filings to identify the

5    principals or members of 105 Street

6    Associates, LLC.?

7        A.    Yes, I was beginning to

8    investigate the timeliness of the

9    insureds first report of claim and I

10   was trying to determine the

11   relationship between 105 Street

12   Associates, LLC. and the construction

13   entities referenced in the claims

14   materials that were submitted to me.

15           MR. SCHNEIDER: Could you

16   read back the answer to me, please?

17

18           (Whereupon, the reporter

19   read back the above-referred to

20   portion.)

21

22       Q.    What was the reason that

23   you began to investigate the

24   timeliness of the claim?

25       A.    Well, the first report of

53

BARNABA

1

2    claim came in more than two years

3    after the incident occurred and after

4    the filing of a lawsuit.  It included

5    a letter of representation from an

6    attorney to a BFC entity which was

7    more than -- also quite aged, I

8    believe also about approximately two

9    years old, so I was trying to

10    determine if my insured had received

11    notice when the construction entities

12    had received notice of the claim.

13        Q.    Besides seeking the

14    information you sought in this letter

15    of August 25, what other steps did you

16    take to investigate the timeliness of

17    the claim.

18              MR. FUERTH: At that time?

19              MR. SCHNEIDER: As of the

20    date of the letter.

21        A.    Well, I recall that I

22    sent a request to the broker for

23    additional documentation.  I sent this

24    request to the insured for additional

25    documentation and information and

54

BARNABA

1
2    recognizing at the outset of the claim
3    that there appears to be a late
4    reporting situation.
5                    I also recommended to
6    XL Programs that we consult with
7    coverage counsel on a possible late
8    notice disclaimer of coverage.
9         Q.    In your answer, you refer
10    to a request to the broker for
11    additional documentation.  Was that
12    the request you made of Ms. Weiner?
13         A.    I believe I only made one
14    request to her.
15         Q.    When did you seek out
16    coverage counsel?
17                    MR. FUERTH: Objection to
18    form.  You can answer.
19         A.    I would need to defer to
20    my file materials, my notes and my
21    e-mails, but approximately the same
22    time this letter was issued, give or
23    take a day or two.
24         Q.    Besides seeking information
25    from the broker and from the insured

BARNABA

1
2      by this letter of August 25, and

3      seeking coverage counsel, did you do

4      anything else to investigate the

5      timeliness of the claim?

6          A.    I don't believe so.

7          Q.    I'm not limiting my

8      question to August 25.  I'm asking you

9      at any time whether it was before

10     August 25th or after August 25, 2004,

11     did you take any other steps to

12     determine the timeliness of the claim,

13     other than what you just testified to.

14         MR. FUERTH:  He is asking

15     now for that full period of August 18

16     through September 20, what did you do

17     to investigate?

18         A.    I believe that that is

19     it.  Other than recommending that

20     counsel be consulted and sending a

21     request to the (independent) insured for

22     additional information, I believe that

23     was the extent of the investigation at

24     that time.

25         Q.    At that time, you ended

56

BARNABA

1

2          the --

3                A.    That was the extent of

4          the investigation.  That was the

5          extent of the investigation,

6          period.  Okay.

7                Q.    Okay.  Again, for the

8          record, is it your testimony that

9          other than seeking information from

10         the broker, and the insured and hiring

11         coverage counsel, you did not take any

12         other steps to investigate whether the

13         claim was late?

14               MR. FUERTH: Objection to

15         the characterization of testimony.

16         You can answer over my objection.

17               A.    No.

18               Q.    Do you know whether

19         anyone else at XL took any steps to

20         investigate the timeliness of the

21         claim?

22               A.    No -- No, they did not.

23               Q.    Do you know if coverage

24         counsel ever took any steps to

25         investigate the timeliness of the

57

BARNABA

1

2    claim?

3        A.    I don't know that I would

4    categorize it as an investigation, but

5    coverage counsel was asked to analysis

6        --

7        MR. FUERTH: Objection.

8    Don't go into discussions that you had

9    with my firm.  That is privileged.

10       A.    Part of the coverage

11   counsel consultation process was to

12   determine when the insured, and if the

13   insured had been legally served with

14   the complaint, and if so, when did

15   that occur?

16       Q.    Just for the record

17   coverage counsel that you just

18   referred to was the law firm of

19   Wilson, Elser, Moskowitz Edelman &

20   Dicker?

21       A.    It was.

22       Q.    What attorney or

23   attorneys at that firm?

24       A.    I don't recall.

25       Q.    Did you ever receive -

58

1                            BARNABA

2      yes or no - did you ever receive a

3      report from coverage counsel or a

4      communication from coverage counsel

5      concerning when the insured was served

6      with the complaint or whether the

7      insured was served with a complaint?

8           A.    I did.

9           Q.    In what form did you

10     receive that information, in writing

11     or oral?

12          A.    In writing.

13               MR. FUERTH: Could we take

14     five-minute break?

15               MR. SCHNEIDER: A couple of

16     minute more, then we can take a break.

17          Q.    After a denial of

18     coverage letter was issued in this

19     case, was any investigation conducted

20     or continued as to the timeliness of

21     the claim?

22          A.    Well, at the time

23     coverage was denied, we still had a

24     request pending with the insured that

25     had not been responded to, but we did

59

1                    BARNABA

2    not take any steps after the

3    declination of coverage to follow up

4    on those requests, presuming that they

5    had no interest in cooperating after

6    coverage had been denied.

7          Q.    To whom had the request

8    been made that was not responded to?

9          A.    I refer to Exhibit 7

10   which made five separate requests to

11   the insured for information and

12   documentation.

13         Q.    Is it your recollection

14   that XL or you never received a

15   response?

16         A.    We received a partial

17   response.

18         Q.    Partial response, okay.

19   In what respect was the response

20   incomplete?

21         A.    From memory, I believe

22   that the only portion -- the only

23   information or documentation which

24   they supplied were the contracts that

25   I had requested which would have been

60

BARNABA

1
2  requests numbers 1 and 2 and I'm not
3  certain from memory whether they were
4  fully responsive to those two
5  requests.  From memory, I do not
6  believe that they responded to
7  requests number 3 to identify the
8  principals of 105 Street Associates.
9  I do not believe from memory that they
10 ever advised me who -- if 105 Street
11 Associates had an on-site
12 representative for the project or
13 identified that person, and in
14 response to number 5, I do not believe
15 they ever provided us with copies of
16 any of their own loss reports, claims
17 reports, incident reports, daily
18 project logs or other information or
19 documentation which they may have had
20 pertaining to this incident.
21        Q.    After August 25, 2004,
22 did you or anyone else on behalf of XL
23 make any follow-up requests to the
24 insured for the information that you
25 do not recall having received?

61

BARNABA

1

2          A.     I do not believe so.

3                 MR. SCHNEIDER: Let's take

4       that five minute break.

5

6                 (Whereupon, at this time a

7       recess was taken.)

8

9                 Q.     Mr. Barnaba, before the

10      break, we were talking about

11      Plaintiff's Exhibit 7 which is the

12      August 25th letter.  I want to make

13      sure that you have that in front of

14      you.

15                A.     I do.

16                Q.     Could you tell me the

17      reason you requested the documents set

18      forth in paragraph 1 of your letter?

19                MR. FURETH: That is numbered 1?

20                Q.     Paragraph numbered 1.

21                A.     From my initial

22      review of the claim, it appeared that

23      we had -- We insured the owner's

24      interest in a construction project and

25      we would typically, whenever we have

62

BARNABA

1

2    the owner's risk in a construction

3    project, we would first look to

4    see what the terms of the construction

5    agreements were between the owner and

6    the general contractor and the

7    subcontractors, because typically,

8    they can contain the indemnification

9    in favor of the property owners and

10   the insurance clauses that favor the

11   property owners with the hope that any

12   claims presented against our insured

13   could be passed through to these other

14   entities based on the terms of the

15   contract or insurance agreements.

16       Q.    To your recollection,

17   what document or documents did you

18   receive in response to paragraph 1?

19       A.    I received at least one

20   contract, probably two from memory.

21       Q.    Do you recall between

22   which entities the contract or

23   contracts were between?

24       A.    Do I recall that?  No, I

25   do not.

POSSIBL

63

BARNABA

1

2      Q.    Do you recall if 105

3  Street Associates was a party to any

4  contract that you received?

5      A.    I can't say that I recall

6  that.  I believe they were, but I

7  can't testify from memory 100 percent.

8      Q.    Do you recall who sent

9  you any documents responsive to

10  paragraph 1?  How did you receive it?

11      A.    I don't recall if they

12  were mailed or faxed or e-mailed to

13  me.  Presumably, either Ms. Rodriguez

14  or someone at 105 Street Associates or

15  their insurance brokers or someone

16  responded on their behalf.

17      Q.    Do you recall if the

18  documents were accompanied by cover

19  letter of any type?

20      A.    I do not recall that.

21      Q.    As you sit here now, do

22  you recall if you received in response

23  to paragraph 1 of this letter all the

24  documents that you thought you were

25  going to get?

64

BARNABA

1

2    A.    I recall that I received

3    some documents.  I recall issuing

4    tender letters to other entities and

5    insurance companies in response to

6    those documents, but I can't testify

7    from memory that I received everything

8    that I requested.

9         Q.    Do you recall to what

10   entities you issued tender offers?

11        A.    I recall that I sent

12   a tender letter to the general

13   contractor entity which was I believe

14   it was a BFC entity.  I'm not sure

15   what, BFC something, and I believe I

16   tended also to at least one

17   subcontractor and also to their

18   respective insurers, if I identified

19   their insurers at that time.

20             MR. SCHNEIDER: I would call

21   for the production of any tender

22   letter or letters issued by XL or

23   Greenwich to the extent not previously

24   produced.

25             MR. FURETH: I believe that

65

BARNABA

1

2    -- first of all, I am almost positive

3    that we identified all, I'm almost

4    positive we produced the entire file

5    consistent with Magistrate Judge

6    Freeman's orders, and in there, was a

7    tender letter I believe an entity

8    named Sirius, and that's, by counsel,

9    today is the only tender letter in the

10   file.

11            MR. SCHNEIDER: I'm just

12   putting that out there.  I do recall

13   there was one tender letter that was

14   turned over.  The witness' testimony

15   or recollection seems to indicate that

16   there was more than one tender

17   letter.

18            THE WITNESS:  I thought

19   there was at least two from my

20   recollection.

21            MR. SCHNEIDER: I'm making

22   that request.

23            MR. FURETH: Just for the

24   record, I believe that tender letter

25   was to more than one insurer, but, you

66

BARNABA

1

2      know, we will make or conduct a

3      search.

4              Q.      Do you recall whether you

5      received any responses to any tender

6      letters sent out?

7              A.      I believe I received two

8      responses.

9              Q.      Do you recall from whom?

10             A.      I do not recall from

11     whom.

12             Q.      Were those responses in

13     writing?

14             A.      Yes.

15             Q.      Do you recall the sum and

16     substance of either response?

17             A.      I believe one of the

18     insurers simply wrote to acknowledge

19     the claim, that they received a record

20     of the claim and they were

21     investigating, and I believe another

22     of the insurers either directed a

23     denial to us or copied us on a denial

24     of coverage, and I believe that was on

25     the basis of late reporting, but I'm

67

BARNABA

1

2     not positive.

3              MR. SCHNEIDER:  Here too, I

4     would call for the production of any

5     response to the tender letter to the

6     extent not previously produced.

7              MR. FURETH: I will repeat

8     my response to the prior request.

9              MR. SCHNEIDER: Absolutely.

10             Q.     Returning to Plaintiff's

11    Exhibit 7, which I see you still have

12    in front of you, can you tell me the

13    reason you asked for the documents

14    that are specified in paragraph number

15    2?

16             A.     My response to my

17    paragraph number 2 would be the same

18    for my response as number 1, I was

19    looking to find any and all companies

20    that might owe coverage to the

21    insured.

22             Q.     Do you recall what

23    document or documents you received in

24    response to request 2?

25             A.     I don't recall.

68

1                    BARNABA

2          Q.      Now, I believe it was

3      your testimony that you did not

4      receive any documents in response to

5      paragraph number 3, correct?

6          A.      I don't believe that I

7      did.

8          Q.      Do you recall receiving

9      any documents concerning the

10     organization or identity of the

11     members of any of the parties whom

12     Richard Conrad had sued?

13         A.      I don't believe that

14     information was supplied in response

15     to my letter, but I could be

16     mistaken.  I would need to review the

17     response that I received.  From

18     memory, I don't believe that was part

19     of it.

20         Q.      When you say the response

21     you received, are you talking about a

22     letter or documents or both?

23         A.      Again, I don't have my

24     claim file to refer to.  But -- I

25     recall from memory that I received

69

1                       BARNABA

2       some manner of response from my

3       correspondence directed to the

4       insured.  I don't recall who responded

5       to me, in what format, other than

6       that I know it was in writing, but it

7       included one contract, if not more

8       than one contract.

9             Q.     Can you tell me why you

10      requested the information you did in

11      paragraph 4 of your letter on page 2?

12            A.     Well, I was trying to

13      identify the person who would be most

14      knowledgeable of the project and

15      potential the incident itself.

16            Q.     Is there any other reason

17      you requested the information you did

18      in paragraph 4?

19            A.     Could you read back my

20      response to the last question?

21

22                  (Whereupon, the reporter

23      read back the above-referred to

24      response.)

25

70

BARNABA

1

2          MR. FURETH:  What he is

3      asking, why did you want to identify

4      those people?  Am I correct?

5          Q.      Was there any other

6      reason for requesting the information

7      in paragraph 4?

8          A.      Identifying that party

9      would have potentially been relevant

10     to my liability and coverage

11     investigation into the claim.

12         Q.      Now, returning for a

13     moment to Plaintiff's Exhibit 6, if

14     you would, the second page of that

15     document, do you remember you

16     testified that the handwriting in the

17     upper right is yours?

18         A.      It is.

19         Q.      You read for us the name

20     record Coral lo?

21         A.      Yes.

22         Q.      Do you recall what

23     information you were told about Robert

24     Corallo?

25         A.      I do not.

71

BARNABA

Q.    Did you take any steps to contact Mr. Corallo?

A.    I could not answer that without reviewing my file notes and they would probably not be that specific.

Q.    If you had made an effort to contact Mr. Corallo, would your file notes reflect that?

A.    I think most likely they would reflect with the, quote, insured, but I may not have defined who at the insured I placed a call to.

Q.    As you sit here now, do you know why you wrote down "Robert Corallo"?

A.    Someone supplied him and Ms. Rodriguez as contact parties for the insured to me, presumably, the broker, but I can't say where I got those names from.

Q.    As you sit here now, do you have any reason to believe as to

72

1                          BARNABA

2      whether Mr. Robert Corallo was an

3      on-site representative of any part at

4      the job?

5              A.      I don't know who Mr.

6      Corallo was.

7              Q.      Did you receive any

8      information in response to request 4?

9                  MR. FURETH: Back to 7?

10                 MR. SCHNEIDER: I'm sorry,

11     on Plaintiff's Exhibit 7.

12             A.      I don't believe so.

13     Again, I would have to refer to

14     whatever my communications were with

15     the insured which should be reflected

16     in any correspondence in the claim

17     file or possibly in my file notes.

18             Q.      Did you ever receive any

19     information requested in paragraph

20     number 5 of your August 25 letter?

21             A.      I do not believe that the

22     insured supplied with me anything

23     other than contract related documents,

24     but again, I would have to see what

25     type of a written communication I

73

1                         BARNABA

2        received.

3                        From memory, I don't

4        believe they supplied any of that

5        information.

6             Q.    Can you explain why you

7        did not follow up with the insured to

8        the extent you thought that it had not

9        provided all of the information you

10       had requested?

11            A.    Well, in the approximate

12       less than two-week period after I made

13       the initial request, we had come to

14       the conclusion that coverage should be

15       denied for late reporting.

16            Q.    What facts did you learn

17       from the investigation that was

18       conducted to determine whether the

19       first report of claim was late?

20            A.    Are you asking the basis

21       of the denial?

22            Q.    That is another way of

23       saying it, yes.

24            A.    We made the decision to

25       deny coverage based -- once we

74

BARNABA

1

2    confirmed that the insured had been

3    legally served and when they had been

4    served and reviewed the duration of

5    the delay following the service and

6    when the claim was first reported to

7    us, that was the basis of the

8    disclaimer.

9            At that time, we

10   concluded that was a sufficient basis

11   for the disclaimer.  Our investigation

12   into the insured's actual notice was

13   not complete at that time.

14            Let me rephrase it.

15   We hadn't at that time -- at the time

16   that we determined that coverage

17   should be disclaimed for failure to

18   timely report the claim following

19   service of the lawsuit, we had not

20   progressed with our investigation to

21   determine whether or not the insured

22   had knowledge prior to having been

23   sued, which would possibly have been a

24   further basis for coverage denial.

25            MR. SCHNEIDER: Could you

# EXHIBIT "Q" Part II

75

BARNABA

1

2     read back the entire answer.

3

4               (Whereupon, the reporter

5     read back the above-referred to

6     portion.)

7

8          Q.     Let me show the witness

9     what was previously marked as

10    Defendant's Exhibit L at a deposition

11    on 5-24-06 in this case and

12    specifically refer you to the page of

13    this multi-page exhibit which is

14    GR30.  I ask you if you would read

15    that.

16         A.     Okay.

17         Q.     Can you identify that

18    document for us?

19         A.     This appears to be

20    correspondence directed to myself from

21    105 Street Associates, LLC., dated

22    August 26, 2004 and it has what

23    appears to be a date stamp of having

24    been received in our office on August

25    27th.  I believe that is our date

BARNABA

1

2    stamp.  It is similar, if it is not

3    ours.

4        Q.    Now, does this document

5    refresh your recollection as to the

6    information provided by the insured,

7    at least along with the particular

8    letter that is represented by GR30?

9        A.    Yes, most of the

10   documents referenced on the cover

11   letter are not attached to this

12   exhibit.

13       Q.    I understand that.

14       A.    What was the question?

15   I'm sorry.

16            MR. SCHNEIDER: Could you

17   read back the question, rather than my

18   paraphrasing.

19

20            (Whereupon, the reporter

21   read back the above-referred to

22   portion.)

23

24       A.    I guess I would actually

25   change my response to say, no.  Simply

77

BARNABA

1

2    looking at this document does not

3    refresh my recollection as to what I

4    had received at that time.

5         Q.    Directing your attention

6    to paragraph number 1 in this letter,

7    do you have any reason to believe that

8    you did not receive a copy of a

9    Precast Erector contract between BFC

10   Construction and Larry E. Knight?

11        A.    I do not.

12             MR. FURETH: You don't

13   recall?

14             THE WITNESS:   I do not

15   recall the referenced enclosures not

16   being enclosed with the

17   communication.

18        Q.    Does that document

19   refresh your recollection that the

20   insured provided to you some document

21   which identified the members of 105

22   Street Associates?

23             MR. FURETH: Do you have a

24   specific memory of getting that

25   document?

78

1        BARNABA

2            THE WITNESS: No, I don't

3    have any specific memory of getting

4    this particular document.

5            MR. FURETH: Or anything

6    close?

7            THE WITNES: Or anything

8    that is close now.

9            MR. FURETH: All right.

10       A.    I testified previously

11   that I received some manner of a

12   response directed to the insured, but

13   just looking at what appears to be the

14   actual response, I still can't answer

15   from memory that I recall receiving

16   these documents or the enclosures.

17           MR. FURETH: I just note my

18   objection because he is being shown a

19   cover letter, but the cover letter has

20   attached to it documents that are not

21   reflective of the items noted in the

22   cover letter, so in essence, the

23   witness is being asked to go from

24   memory as to what he received.

25       Q.    What was the date on

79

BARNABA

1

2    which the decision was made to deny

3    coverage?

4         A.    The date that I

5    recommended to XL perhaps that we

6    disclaim coverage was I believe via

7    e-mail from myself to Ed Walsh on

8    September 12 2004.

9         Q.    What was the date that

10   the decision was actually made to deny

11   coverage?

12        A.    The declination was

13   authorized by Mr. Walsh I believe on

14   September 15, but I would need to see

15   his e-mail to see that.

16        Q.    Between August 27, 2004,

17   the day that is the date stamp on that

18   letter and September 15, 2004, what

19   steps, if any, did you take to obtain

20   any of the information that you had

21   requested of the insured and you

22   thought you had not received?

23        A.    The only action I recall

24   taking in response to having received

25   this correspondence was to issue the

80

BARNABA

1

2 tender letters to the other

3 contractors and the carriers.  If I

4 did anything beyond that, it would be

5 documented in my file notes.  I don't

6 recall anything beyond that.

7        Q.    Now, directing your

8 attention to paragraph 6 still on a

9 portion of the Defendant's Exhibit L,

10 you were given the name of the project

11 manager as a Mr. Robert Corallo?

12        A.    Yes.

13        Q.    Now, that is the name you

14 had written down on that other

15 document, you had identified, correct?

16        A.    It is.

17        Q.    You were given a

18 telephone number for Mr. Corallo?

19        A.    I was.

20        Q.    Did you make any effort

21 to contact Mr. Corallo?

22        A.    Not that I recall.

23        Q.    Can you explain why not?

24       /A.    At the time that I

25 received this correspondence, I

81

BARNABA

1

2 believe I had already made a formal

3 referral to coverage counsel, and

4 based upon my initial review of the

5 documents submitted, I had a strong

6 suspicion that we already had

7 sufficient information available to

8 disclaim coverage based upon the

9 failure to timely forward the suit

10 papers following receipt of the

11 lawsuit by the insured.

12                   From memory, I do not

13 believe that my file contained

14 documentation of the service to my

15 insured, but rather contained

16 documentation of service to

17 co-defendants, but the date of the

18 summons was well before the claim was

19 first reported to our office, so I

20 suspect at that juncture that once we

21 verified the service dates it won't be

22 necessary for us to progress with the

23 notice portion of the investigation

24 beyond that.

25           Q.     To your knowledge, who

82

1          BARNABA

2    verified the service dates?

3          A.     Counsel.

4          Q.     Counsel you had referred

5    to as coverage counsel?

6          A.     Coverage counsel; yes.

7          MR. SCHNEIDER:  Please mark

8    as Plaintiff's Exhibit 8 a document

9    Bates numbered GR307 through 309.

10

11          (Whereupon, the above-

12    referred to document was marked

13    Plaintiff's Exhibit 8 for

14    Identification, as of this date.)

15

16          MR. SCHNEIDER: Please mark

17    as Plaintiff's Exhibit 9 documents

18    Bates numbered GR300 through and

19    including 306, which is a letter on

20    the letterhead of Wilson, Elser, dated

21    September 10, 2004.

22

23          (Whereupon, the above-

24    referred to document was marked

25    Plaintiff's Exhibit 9 for

83

BARNABA

1

2    Identification, as of this date.)

3

4          Q.    Please take a moment to

5    look at Plaintiff's Exhibit 8 and 9

6    and let me know when you are done.

7          A.    Okay, I reviewed them.

8          Q.    Can you first identify

9    Plaintiff's Exhibit 8?

10          A.    Plaintiff's Exhibit 8 is

11    an e-mail to me from Reena Blinkoff

12    who is coverage counsel with Wilson,

13    Elser directed to myself, dated

14    September 10, 2004, which enclosed her

15    first report or her initial analysis

16    of coverage, as well as a draft

17    declination letter.

18          Q.    Is Plaintiff's Exhibit 9,

19    the draft declination letter that you

20    just referred to --

21          A.    Plaintiffs Exhibit 9 is

22    the actual report submitted to me via

23    e-mail by counsel.  It does not

24    enclose the draft denial of coverage

25    letter.  It is just a coverage report,

84

BARNABA

1

2    the analysis by counsel.

3         Q.    So there was a separate

4    draft declination letter that you

5    received from Miss Blinkoff on or

6    about September 10?

7         A.    There were two pages sent

8    to her e-mail.  The first was

9    Plaintiff's Exhibit 9 which was

10   coverage counsel's initial report of

11   coverage directed to myself.  The

12   second attachment was a draft denial

13   of coverage letter.

14              MR. FURETH: Can we go off

15   the record for a minute?

16

17              (Whereupon, at this time a

18   recess was taken.)

19

20         Q.    Before this break, we

21   were talking about Plaintiff's Exhibit

22   8 and 9.  I believe you had testified

23   about the first page of Plaintiff's 8.

24   I would like you to, if you could,

25   open the rest of the document.  There

BARNABA

2   are two additional pages, only the

3   second one has any substance.

4       A.    The second page is my

5   e-mail response to Ms. Blinkoff dated

6   September 16th, at which time the

7   denial of coverage was authorized.

8   The letter goes on to include some

9   instructions on some further

10  directions to counsel as to adding

11  cc's to the draft denial letter before

12  issuing it, and I also instructed

13  coverage counsel to either copy the

14  plaintiff's attorney or notify them on

15  separate letter that we were

16  disclaiming coverage, and I left that

17  to her discretion.

18      Q.    Why did you add certain

19  cc's?

20      A.    As a courtesy, we would

21  identify the insurance broker with

22  that explanation.  The first cc was to

23  North Shore Risk Management.  The

24  second cc was for informational

25  purposes to our claims contact at WK &

86

BARNABA

1

2      C Agency who requested that they be

3      copied on our coverage denial

4      correspondence to aid them in the

5      communication with their insurance

6      brokers, and the latter part of that

7      is just based on my understanding of

8      New York law that the carrier --

9              MR. FURETH: When you say

10     "the latter part" --

11         A.    The direction to either

12     copy plaintiff's counsel or notify

13     them on separate cover was based upon

14     my understanding of the New York

15     insurance rules and regulations which

16     require that an insurer notify the

17     plaintiff's attorney in some capacity

18     when they deny coverage which may or

19     may not have been necessary.

20         Q.    Do you have any legal

21     training?

22         A.    I do not.

23         Q.    Now, the date on the

24     second page of this document, GR308,

25     of your statement e-mailed to Miss

87

BARNABA

1

2   Blinkoff where you say "denial is

3   authorized" is dated September 16th,

4   2004, correct?

5          A.    Yes.

6          Q.    By that date, you had

7   received Mr. Walsh's approval of your

8   recommendation that coverage be

9   denied, correct?

10         A.    Yes, from my recollection

11  of the documents that I reviewed

12  yesterday, Mr. Walsh had sent me an

13  e-mail in the evening of September

14  15th authorizing the denial of

15  coverage on this claim.

16         Q.    Now, directing your

17  attention to Plaintiff's Exhibit 9, am

18  I correct in assuming that you

19  reviewed this entire document before

20  making any recommendation to Mr.

21  Walsh?

22         A.    Yes.

23         Q.    Could you tell me upon

24  what facts in Plaintiff's Exhibit 9

25  you relied in making a recommendation

88

BARNABA

1

2    to deny coverage?

3         A.    Counsel's advice that the

4    insured had been served on April 20,

5    2004 by the Secretary of State.

6         Q.    What page of this letter

7    is that contained on?

8         A.    On first noting it on

9    page 2, the last paragraph.  I presume

10   it was discussed further in the report

11   as well.

12             MR. FURETH: Don't presume

13   anything, just look at it?

14        A.    I see it first on page 2

15   the bottom paragraph, page 3 at the

16   top, it again states that the insured

17   first received notice of the lawsuit

18   by service dated April 20, 2004 with

19   service of process directed to 105

20   Street Associates.  Again, on page 6

21   in the second paragraph, counsel wrote

22   to me here notice was first received

23   by 105 Street Associates via summons

24   and verified complaint served on the

25   Secretary of State on April 20, 2004.

89

1                         BARNABA

2          In turn, notice was first received by

3          WKF & C on August 18, 2004.

4                         Ultimately, the nearly

5          four month delay in properly reporting

6          this matter is clearly unreasonable

7          and we recommended to deny coverage on

8          a late notice basis.

9          Q.      Was any effort made prior

10         to September 20, 2004 to determine

11         whether 105 Street Associates actually

12         received a copy of the summons and

13         complaint from the New York Secretary

14         of State?

15         A.      Presumably, this was

16         determined sometime between my

17         assignment to coverage counsel in late

18         August and their first report to me on

19         September 10th following their legal

20         analysis and presumably a docket

21         check.

22         Q.      Do you understand

23         anything in Plaintiff's Exhibit 9 to

24         talk about whether the insured

25         actually received a copy of the

90

BARNABA

1

2      summons and complaint on or about

3      April 20, 2004?

4           A.      My understand of New York

5      law is that it is irrelevant if the

6      insured actually received a copy of

7      the lawsuit if they were legally

8      served through their last registered

9      agent with New York State.  Without my

10     signature here and reading the entire

11     report, I don't know if this is

12     commented on in the legal analysis.

13                 MR. SCHNEIDER: Could you

14     read back my question?

15

16                 (Whereupon, the reporter

17     read back the above-referred to

18     portion.)

19

20          A.      I'm sorry, can you read

21     it back again?

22

23                 (Whereupon, the reporter

24     read back the above-referred to

25     portion.)

91

BARNABA

1

2

3          MR. FURETH: He answerd that

4     question.  Can you read back the

5     answer?

6

7          (Whereupon, the reporter

8     read back the above-referred to

9     portion.)

10

11         MR. FURETH:  There was a

12    response.  You were just not satisfied

13    in the way responded to your question.

14         MR. SCHNEIDER: That is

15    correct.

16         MR. FURETH: With respect to

17    rereading that question, number 1,

18    please note my objection, asked and

19    answered, and number 2, the document

20    speaks for itself.

21              Do you want him to sit

22    there and read that document to see

23    whether it says something about actual

24    receipt?

25         MR. SCHNEIDER: I asked him

BARNABA

1

2     his understanding of the document.

3            MR. FURETH: You are asking

4     him whether he understands that the

5     document says whether or not the

6     insured actually received it?  (To the

7     witness)  In order to satisfy him, you

8     are going to have to read through the

9     whole thing because either it says it

10    or it doesn't.

11           A.     It speaks to its

12    relevance.  Counsel writes to me on

13    page 5 in the third paragraph under

14    "analysis" That knowledge of an

15    occurrence obtained by an agent

16    charged with the duty to report such

17    matters is imputed to the principal,

18    which I would take as speaking to

19    service being proper once it was

20    perfected upon the insured's legal

21    agent OR registered agent.

22           MR. FURETH: This is your

23    understanding, because I have an

24    objection that this, A, the document

25    speaks for itself, and B, we are

BARNABA

1
2  asking you to opine legal case law.

3  What the question to you is, what did

4  you understand?

5          MR. SCHNEIDER: Yes.

6          A.     Just solely from this

7  document or from my --

8          Q.     At the time you made a

9  recommendation to Mr. Walsh to deny

10  coverage.

11          A.     At the time that I made

12  a request to Mr. Walsh to deny

13  coverage, my understanding of New York

14  law, it was in fact irrelevant whether

15  or not the insured agent actually

16  received a copy of the lawsuit so long

17  as they were legally served as

18  prescribed under New York law.

19          Q.     Thank you.  Now, at any

20  time, did you investigate whether or

21  not the insured actually received a

22  copy of the summons and complaint in

23  April, May or June 2004?

24          MR. FURETH: It is a yes or

25  no.

94

BARNABA

1

2          A.      No.

3          Q.      At any time, did you

4    authorize an investigation into

5    whether the insured actually received

6    a copy of the summons and complaint in

7    April, May or June 2004?

8                  MR. FURETH: Again, note my

9    objection, but over my objection, you

10   can answer.

11         A.      No.

12         Q.      To your knowledge, did

13   anyone investigate whether the insured

14   actually received a copy of the

15   summons and complaint in the Conrad

16   lawsuit during April, May or June

17   2004?

18                 MR. FURETH: Note my

19   objection.  You can answer over my

20   objection.

21         A.      No.

22         Q.      Without telling me

23   anything that you may have said to

24   counsel or counsel said to you, after

25   you received and reviewed Plaintiff's

95

BARNABA

1

2    Exhibit 9, which is the September 10

3    letter, did you have any communication

4    with counsel concerning its contents

5    between then and September 20, 2004?

6        A.    Not that I recall.

7        Q.    Do you recall whether you

8    asked counsel any questions concerning

9    the contents of the September 10

10   letter at any time between September

11   10 and September 20, 2004?

12        MR. FURETH: Objection,

13   asked and answered; you can answer.

14        A.    I don't recall contacting

15   them with any questions after having

16   received their report.

17        Q.    After you received the

18   September 10 letter, you forwarded it

19   to Mr. Walsh, correct?

20        A.    I did.

21        Q.    Did you have any oral

22   communication with Mr. Walsh

23   concerning either your recommendation

24   or the contents of the September 10

25   letter?

96

1                     BARNABA

2          A.     Not that I recall.

3          Q.     In what form did Mr.

4    Walsh communicate to you his approval

5    of your recommendation to deny

6    coverage?

7          A.     Via e-mail.

8          Q.     On Plaintiff's Exhibit 9,

9    can you turn to page 305?  It is

10   GR305.  Do you see towards the bottom

11   under the heading "request for

12   authority," do you see that partially

13   cut off heading?

14         A.     Yes.

15         Q.     It says "in light of the

16   foregoing, we request authority to

17   issue the enclosed supplemental

18   coverage letter denying coverage for

19   this matter."  Do you see that?

20         A.     Yes.

21         Q.     Now, is the enclosed

22   coverage letter the letter that was

23   ultimately sent to the insured denying

24   coverage?  Is that the same letter?

25         A.     With the slight

97

BARNABA

1

2     modifications, I believe as directed

3     in my e-mail authorizing the denial.

4          Q.    Could you tell my why it

5     is referred to as a supplemental

6     coverage letter?

7               MR. FURETH: Objection, it

8     calls for the operation of someone's

9     mind.  You can answer it.

10         A.    To my knowledge, it was

11    not a supplemental coverage letter.  I

12    assume it was a typographical error in

13    counsel's communication, and I'm not

14    allowed to assume.  I don't know.

15              MR. SCHNEIDER: Please mark

16    as Plaintiff's Exhibit 10 a document

17    marked GR406 and GR407.

18

19              (Whereupon, the above-

20    referred to document was marked

21    Plaintiff's Exhibit 10 for

22    Identification, as of this date.)

23

24         Q.    Can you identify the

25    Exhibit 10?

98

BARNABA

1

2 A. This is a copy of Mr.

3 Walsh's response to me authorizing the

4 denial of coverage on this claim.

5 Q. That is the portion of

6 this document dated September 16,

7 2004, correct?

8 A. Yes, I believe that is

9 incorrect because my -- I believe this

10 is just a bad copy.  It is actually

11 September 15th.

12 Q. Beneath that is a copy of

13 an e-mail from you to Mr. Walsh,

14 correct?

15 A. Yes.

16 Q. That is dated September

17 10, 2004?

18 A. Yes.

19 Q. Is it fair to say that

20 this is your e-mail to Mr. Walsh

21 asking for authorization to deny

22 coverage?

23 A. Yes.

24 Q. And to issue the proposed

25 coverage denial?

99

BARNABA

1

2        A.     Yes.

3        Q.     What is Broadspire?

4        A.     Broadspire is the current

5   third-party administrator.  Broadspire

6   is one of the current third-party

7   administrators for XL Programs for

8   this WKF & C book of business.

9        Q.     What materials did you

10   send on September 10th to Mr. Walsh,

11   besides this e-mail?

12        A.     I forwarded to him Ms.

13   Blinkoff's e-mail to me which enclosed

14   the coverage report and the draft

15   denial letter.

16        Q.     Any other materials?

17        A.     I don't believe so.

18        Q.     I believe you testified

19   earlier that you made entries or notes

20   concerning this claim on a claim note

21   pad?

22        A.     I made notes into my

23   computer which would be recorded

24   electronically.

25        Q.     Is it recorded on a

100

1       BARNABA

2       document referred to as a claim note

3       pad?

4               A.    It could be.

5               MR. SCHNEIDER: Please mark

6       as Plaintiff's Exhibit 11, a document

7       Bates number GR408 to GR409, and at

8       the top it reads "claim abstract

9       report," and beneath it says "claim

10      note pad."

11

12              (Whereupon, the above-

13      referred to document was marked

14      Plaintiff's Exhibit 11 for

15      Identification, as of this date.)

16

17              Q.    Would you take a moment

18      to review this document?

19              A.    Okay.

20              Q.    Can you identify that

21      document?

22              A.    These are printouts of my

23      -- some or all of my file notes.

24              Q.    When you say "some or

25      all," could you explain in what other

101

BARNABA

1

2  form or what other document your file

3  notes on this claim might be included?

4       A.    Well, they are

5  electronically stored through my

6  computer system.  I will have to take

7  your word for it that is a complete

8  printout of my file notes.

9       Q.    I don't know, that is

10  what I'm trying to find out.  I

11  received this from your counsel.

12      A.    I can look at my work

13  products and discern that August 2004

14  is my first note to the file which is

15  reflected here.

16      Q.    If you made notes that

17  are not reflected on this document,

18  where would they be?

19      A.    In our computer system.

20  I don't know that there are any notes.

21      Q.    You don't know one way or

22  the other?

23      A.    I would need see if there

24  are any gaps or if this is complete.

25  It appears to be complete.

102

BARNABA

1

2          Q.      It does.  What do you

3      base that statement on?

4          A.      I'm not seeing any gaps,

5      any obvious gaps -- Well, actually,

6      no, I can say it appears that some of

7      my notes were redacted.

8                  MR. FURETH: By counsel,

9      that was per court order.

10         Q.      Those would be notes

11     under the dates 9-8 and 9-17?

12         A.      It appears to be so.

13         Q.      Do you see any notes or

14     any other redactions --

15         A.      Not readily, no.

16         Q.      Was it standard operating

17     procedure for claims adjusters at XL

18     to keep claim notes?

19         A.      Yes.

20         Q.      There are manuals of

21     operations that tell you to do that?

22         A.      There is a claims manual

23     for XL Environmental.  I don't know

24     that it speaks to that detail as to

25     requiring file notes.  It may speak in

103

BARNABA

1

2    general terms or it may speak

3    specifically to them.

4         Q.    In general terms, what

5    does the claims manual for XL contain?

6         A.    I guess an outline of how

7    the company feels a claim should be

8    handled.

9         Q.    Can you tell me

10   approximately how many pages the

11   claims manual is?

12        A.    It is a binder.

13        Q.    About how many inches

14   thick?

15        A.    An inch or two perhaps,

16   and I don't know that all that is -- I

17   have a claims manual binder at my

18   desk.  I don't know that it is only a

19   claims manual binder.  There may be

20   other documents.

21        Q.    Did this claims manual

22   _exist in 2004?

23        A.    I believe so, or a claims

24   manual existed in 2004 for XL

25   Environmental.

104

BARNABA

1

2       Q.      Do you make reference

3   from time to time to the claims manual

4   to tell you how to do your job?

5       A.      Not really, no.

6       Q.      Did you ever review it at

7   any time?

8       A.      I did.

9       Q.      Does the claims manual

10  discuss anything about factual

11  investigations?

12      A.      It may.

13      Q.      Can you tell me any other

14  subject matter of the claims manual?

15      A.      It would probably cover

16  the whole spectrum.

17              MR. FURETH: Do you know or

18  are you guessing?

19              THE WITNESS:  From memory,

20  no.

21              MR. FURETH: Then don't

22  guess.

23      Q.      Besides investigations,

24  do you recall any other specific

25  subject matters of the claims manual?

105

BARNABA

1

2          A.      In detail, no.

3          Q.      Generally?

4          A.      No, I don't.

5               MR. SCHNEIDER:  At this

6     point, I would renew our prior written

7     request for a copy of the claims

8     manual.

9               MR. FURETH: I will take it

10    under advisement.

11         Q.      Now, on Plaintiff's

12    Exhibit 11, let's look at the first

13    date, 8-20-04.  I take it that the

14    entry for this date is the first entry

15    you made with respect to this claim?

16         A.      Yes.

17         Q.      After the date where it

18    says "user ID," it says "Barnaba, M."

19    I assume that refers to you.

20         A.      Yes.

21         Q.      Do you personally type

22    the entries into your computer system?

23         A.      Yes.

24         Q.      You don't ask anyone else

25    to do it?

106

BARNABA

1

2      A.    No.

3      Q.    Now, if you will refer

4    for a moment, please, to Plaintiff's

5    Exhibit 6 and I believe you testified

6    this was at least the fax cover sheet

7    was from Barbara Weiner to you on

8    August 20th and enclosed were some

9    documents, although you weren't sure

10    exactly what you received?

11      A.    Yes.

12      Q.    Directing your attention

13    to Plaintiff's Exhibit 11, the entry

14    for 8-24-04, it begins "I have

15    additional materials from broker," and

16    then it goes on.

17      A.    Yes.

18      Q.    Can you tell me what

19    those additional materials from broker

20    that you were referring to?

21    A.    From my file note?

22      Q.    Yes.

23      A.    It says "I have

24    additional materials from broker,

25    including a LOR," which is my

107

1               BARNABA

2       abbreviation for letter of

3       representation "directed to BFC

4       Construction."  Then I put in a

5       parenthesis, "I presume they are GC,"

6       general contractor.  "They are the

7       care of in mailing address to named

8       insured," end of parenthesis, dated

9       8-6-02.

10                  "Although it only

11      states for with work comp against

12      BFC.  Also I have suit papers which

13      were apparently served on the insured

14      on 4-20-04.  Notified XLP," which is

15      XL Programs, "of labor law matter.

16      Requested permission to consult with

17      coverage counsel as late reporting

18      denial may be supported.  I called

19      insured contact to request contracts

20      with GC and sub so I can tender to the

21      other carriers pending coverage

22      analysis.  I was asked to put request

23      in writing so I faxed a request to

24      them," and then my initials "MJB."

25          Q.     Referring back to the

108

BARNABA

1

2  beginning of this notation where it

3  says "I have additional materials from

4  broker," do you believe those to be

5  the materials that you received on

6  8-20 or did you receive materials

7  after 8-20?

8      A.    I believe these are the

9  materials that I received from the

10  broker.

11      Q.    On 8-20?

12      A.    On 8-20, which I

13  summarized in my file notes or

14  reviewed and summarized on August

15  24th.

16      Q.    Now, staying with the

17  entry for 8-24, it says "I called

18  insured contact."  Who was that?

19      A.    From memory, I can't say

20  for sure, but presumably, it was

21  Estelle Rodriguez since I sent a

22  communication to her at -- I wrote in

23  my notes -- Let me just see for a

24  minute, because my notes reflect that

25  I was asked to put my request in

109

BARNABA

1

2    writing, then I faxed a request to her

3    attention so I assume it was to her.

4        Q.    As you sit here now, do

5    you recall what you said to Ms.

6    Rodriguez, that was the person you

7    spoke to, and what that person said

8    back to you?

9        A.    I do not.

10        Q.    You have no recollection?

11        A.    No.

12        Q.    Now, directing your

13    attention to the entry for 8-31 --

14        A.    Would you like me to read

15    that?

16        Q.    Please.

17        A.    It says "I have package

18    of materials from the insured.  I lack

19    coverage info for GC" or general

20    contractor.  "I called contact and

21    spoke with Brad Richards."

22        Q.    Let me stop you there.

23    Who did you understand Brad Richards

24    to be?

25        A.    I assume he worked for

110

BARNABA

1

2   the insured, but I can't say from

3   memory who he was.

4        Q.    As you sit here now, do

5   you recall anything you said to Mr.

6   Richards and anything Mr. Richards

7   said to you during this phone call?

8        A.    I do not.

9        Q.    Go on.

10       A.    "He told me BFC, the GC,

11  was insured with Sirius America and he

12  will follow up with his broker and

13  forward that info shortly.  He said

14  broker is on vacation.  I told him we

15  need that as ASAP as it is time

16  sensitive.  I had all documents copied

17  and sent to coverage counsel.  As soon

18  as I have GC's coverage info, I will

19  get tenders out to all party," and

20  then my initials.

21      Q.    Do you believe you ever

22  received the GC coverage info?

23      A.    I do believe that I

24  received that because my next file

25  note on September 8 states that "I

111

BARNABA

1

2     have tendered to the GC, the GC's

3     carrier, sub and sub's carrier."

4          Q.     Is there any reference in

5     your notes of 8-31 or anywhere else in

6     this document that you asked Mr.

7     Richards or anyone else at the insured

8     for more information besides the GC's

9     coverage info?

10         A.     No.

11         Q.     Directing your attention

12    to your entry for 10-6-04, could you

13    read that?

14         A.     "Utica rep calls," then I

15    identified the rep.

16         Q.     That is all right.  I

17    assume that was Utica Insurance

18    Company?

19         A.     Yes, Utica Insurance

20    Company representative.  They were

21    acknowledging my tender letter which I

22    assume I sent to them and they

23    indicated they were sending the file

24    to coverage counsel for review and

25    would send an acknowledgment letter to

112

BARNABA

1

2    me shortly.

3        Q.    Do you recall who Utica's

4    insured was?

5        A.    I do not.

6        Q.    Now, the next entry for

7    10-12, do you see the part that reads

8    "Larry Knight's carrier writes and

9    acknowledges tender.  Notes they are

10   investigating"?  Do you know if Larry

11   Knight's carrier was Utica or whether

12   that was a different tender?

13       A.    In order for me to

14   discern this, I need to see who the

15   parties were in the insurance

16   certificates in order to sought that

17   out for you.

18       Q.    Could you turn to the

19   next page, it reads the date 10-18.

20   What is the first word, "FC's -- "

21       A.    It looks like it is cut

22   off.  It should be "BFC's carrier."

23   We are missing the very left edge of

24   the entire --

25       Q.    Okay, that makes sense.

113

BARNABA

1

2          MR. FURETH: What do you

3     want with the 10-18 entry?

4          MR. SCHNEIDER: Nothing

5     more.  Now I understand.

6          THE WITNESS: We are just

7     missing like the first letter.

8          Q.     Could you turn to the

9     entry for 1-18-05, and could you read

10    that?

11         A.     It states "Larry Knight's

12    carrier writes to deny tender.  Looks

13    like they have bracket AI

14    endorsement."

15         Q.     Can you explain what that

16    is?

17         A.     An endorsement on their

18    policy which presumably would

19    automatically grant additional insured

20    status to the property owner or

21    probably others if required in a

22    contract.  I had to receive a letter,

23    but generally a blanket additional

24    insured endorsement will state that we

25    will provide additional insured

1                       BARNABA

2          coverage for parties required in a

3          contract, which automatically triggers

4          the coverage.

5               Q.      Why don't you continue?

6               A.      "They deny citing to

7          language that excludes coverage for

8          the independent acts or omissions of

9          the contractual AI."

10              Q.      What is the "AI" again

11         is?

12              A.      The contractual

13         additional insured.  "Pretty weak

14         basis for denial and it was issued

15         late.  In any event, we have

16         disclaimed coverage in this matter,

17         followed by my initials.

18              Q.      The last entry is 5-26-

19         05, is that correct?

20              A.      Yes.

21              Q.      Could you read it?

22              A.      "Broker forwards suit

23         papers filed by GC against their

24         carrier and everyone else in this

25         matter.  I am having file reopened and

BARNABA

1

2    this will need to go out to coverage

3    counsel for anticipated supplemental

4    denial of coverage."

5        Q.    Could you tell me what

6    you are referring to when you say

7    "anticipated supplemental denial of

8    coverage"?

9        A.    Well, I assume -- we

10   received suit papers which apparently

11   named the insured and it was my belief

12   that now that -- wait a minute.  I

13   don't want to suppose.  Let me read

14   this and digest what I meant.

15           MR. FURETH: If you can.

16       A.    Presumably, whatever

17   suits --

18           MR. FURETH: Do you know?

19       A.    He is asking me what I

20   meant by my note.

21           MR. FURETH: When you say:

22   "presumably," are you recalling or are

23   you guessing what you meant, because

24   don't guess.

25       A.    I believe I know in

116

BARNABA

1
2      reading my words that receipt of these
3      additional pleadings would likely
4      trigger the need for an additional
5      coverage correspondence of some
6      capacity which I wrote "anticipated
7      supplemental denial of coverage."
8          Q.    I'm confused by the word
9      "supplemental."  You denied coverage
10     on late notice, correct?
11         A.    We denied coverage in
12     writing.
13         Q.    That supplemental denial
14     letter that you were contemplating,
15     what would that have been based on,
16     the same facts of the prior letter or
17     something new?
18         A.    That I can't recall.  I
19     would need to review the actual nature
20     of the lawsuit that came in to see why
21     I was thinking an additional
22     supplemental -- additional coverage
23     correspondence was necessary.
24         Q.    Now, do you have any
25     reason to believe that you made any

BARNABA

1

2    entries in connection with this claim

3    after 5-26-05?

4         A.    I did not.

5              MR. SCHNEIDER: Please mark

6    as Exhibit 12 documents bearing Bates

7    number 403 to 405.

8

9              (Whereupon, the above-

10   referred to document was marked

11   Plaintiff's Exhibit 12 for

12   Identification, as of this date.)

13

14        Q.    Can you identify this

15   document?

16        A.    It appears to be a legal

17   bill sent by Wilson, Elser to

18   Broadspire dated November 19, 2004.

19        Q.    Is this the bill that

20   your notes reflect you approved for

21   payment?

22             MR. FURETH: Objection to

23   form.

24        Q.    Let me be more specific.

25   Did you approve this bill for payment?

118

BARNABA

1

2          MR. FURETH: Objection to

3    form. You haven't asked him whether

4    he received it.

5          Q.    Did you ever see this

6    document before?

7          MR. FURETH: When you say

8    "before," prior to -- Let's stay

9    within two weeks of November 19th of

10   2004.

11         Q.    Have you seen a copy of

12   this document in either 2004 or 2005?

13         MR. FURETH: When did

14   litigation start in this case?

15         MR. SCHNEIDER: Sometime in

16   2005.

17         MR. FURETH: Up until the

18   start of litigation, that's why I want

19   a time line on that.

20         MR. SCHNEIDER: I don't know

21   if that is going to be helpful, and

22   I'm not sure that is a relevant date.

23         Q.    Just yes or no, did you

24   ever see a copy of this bill prior to

25   yesterday?

119

BARNABA

1

2          MR. FURETH: Objection to

3     form.  You can answer.

4          A.     I don't know if I ever

5     seen a copy of this bill.

6          Q.     Directing your attention

7     to Plaintiff's Exhibit 11 again, would

8     you take a look at the entry for

9     December 1 of '04?

10         A.     Okay.

11         Q.     Do you see where it says

12    "paid coverage counsel time through

13    late September"?  Can you tell me what

14    that refers to?

15         A.     That indicates that I

16    made a notation that I paid a legal

17    bill.

18         Q.     What was the basis for

19    your paying the bill?

20         A.     I would have received a

21    bill in the mail and paid it.

22         Q.     Was it your practice to

23    review bills before you authorized

24    their payment?

25              MR. FURETH: Objection to

120

BARNABA

1

2    form.

3        MR. SCHNEIDER: Fair enough.

4        MR. FURETH: The objection

5    that I have is that the bill that is

6    Plaintiff's 12 went to Broadspire who

7    is a TPA, and I just don't want to

8    have any confusion. Perhaps if you

9    can inquire of him what the dealings

10   were with Broadspire concerning

11   payment of bills.

12       THE WITNESS: I would happy

13   to try to explain that.

14       MR. SCHNEIDER: We can do it

15   that way.

16       A.    Broadspire was not in any

17   way involved with this account on the

18   date of that bill. What I suspect

19   occurred is that when counsel was

20   asked to generate a copy of an earlier

21   legal bill, it printed out with the

22   old file handlers mailing information.

23   As I understand, Broadspire is

24   currently the file handler, but they

25   were not in November of 2004.

121

BARNABA

1
2      Presumably, the original invoice that

3      was sent to me had been addressed to

4      me and not to Broadspire.  When

5      counsel tried to reproduce the

6      invoice, their system generated a

7      current client contact information.

8              Q.      At the end of the day,

9      are you saying that the bill

10     eventually came to you?

11             A.      The bill that I received

12     would have had a date stamp from my

13     office as well as a payment stamp from

14     my office, so I can't say for certain

15     that this is the actual bill that I

16     received, although I suspect that it

17     is the bill that I made reference to

18     in that note.

19             Q.      You authorized it for

20     payment, correct?

21             A.      Yes.

22             Q.      Would I be correct in

23     assuming you reviewed the bill before

24     you authorized it for payment?

25             A.      Yes.

122

BARNABA

1

2        MR. SCHNEIDER: Let's mark

3    as Plaintiff Exhibit 13, a document

4    baring numbers P00103 to P00108.

5

6                (Whereupon, the above-

7    referred to document was marked

8    Plaintiff's Exhibit 13 for

9    Identification, as of this date.)

10

11        Q.    My question will be if

12    you can identify the document?

13        A.    This appears to be the

14    denial letter that was issued to the

15    insured by Greenwich's counsel, dated

16    September 20, 2004.

17        Q.    As you sit here now, do

18    you know if this differed in any way

19    from the draft denial of coverage

20    letter that you received from Ms.

21    Blinkoff earlier in September?

22                MR. FURETH: Other than to

23    what he testified to?

24                MR. SCHNEIDER: Other than

25    what he testified to.

123

BARNABA

1

2      A.      It appears to have made

3  the cc changes that I requested in

4  authorizing the denial, and other than

5  that, I don't see any changes.

6      Q.      Do you know why the

7  letter was addressed to Mr. Richards?

8      A.      I do not.

9      Q.      After you received the

10  draft denial of coverage letter, did

11  you suggest or request any changes in

12  it, other than the changes in the

13  cc's?

14      A.      No.

15      Q.      Other than Plaintiff's

16  Exhibit 13, is there any other letter

17  issued to 105 Street Associates, LLC.

18  which denied coverage with respect to

19  this claim?

20          MR. FURETH: On behalf of

21  XL?

22          MR. SCHNEIDER: On behalf of

23  XL.

24      A.      Not that I am aware of

25  while I was the file handler.

124

BARNABA

1

2          Q.     Did there come a time

3  when you stopped being the file

4  handler?

5          A.     There did.

6          Q.     When was that?

7          A.     Broadspire assumed the

8  third party administrative duties for

9  this program effective June 1st, 2005,

10  with the sole exception, I retained

11  about a dozen lead poisoning cases at

12  the request of XL Programs.

13         Q.    In connection with

14  Broadspire assuming duties for this

15  program, did you turn over your claim

16  file or a copy of your claim file in

17  this matter to Broadspire?

18         A.    Yes.

19       MR. FURETH: He is asking

20  your claim file or a company which --

21         A.    The original claim file

22  would have been sent to Broadspire

23  with copies of anything electronically

24  stored, paper copies, but they would

25  have the original.  Our original file

125

BARNABA

1

2    would have been sent to Broadspire.

3         Q.    I'm sorry, I didn't quite

4    understand.  Are you saying you saved

5    paper copies of it?

6         A.    No, we did not retain

7    copies, just whatever was stored in

8    our computer system.

9         Q.    Where is Broadspire's

10   office located?

11        A.    Somewhere in New Jersey,

12   I believe.

13             MR. SCHNEIDER: Why don't we

14   take a short break and then we will

15   finish up.

16

17             (Whereupon, at this time a

18   recess was taken.)

19

20        Q.    I'm just going back to

21   one area.  You had mentioned you have

22   a claims manual for XL Environmental,

23   correct?

24        A.    There is a claims manual

25   issued to XL Environmental pertaining

126

BARNABA

1
2   to the handling of claims for XL

3   Environmental.

4             MR. FURETH: Because

5   particularly based on what Walsh had

6   testified to, and we just had a

7   discussion out there because he

8   realized, I guess, the import of his

9   comment regarding XL Environmental, so

10  if I may, at the time that you were

11  adjusting this Conrad claim for XL

12  Programs, was there a claims manual

13  given to you for the adjustments of

14  claims for XL programs?

15            THE WITNESS: No.

16            MR. FURETH: Does the XL

17  Environmental claims manual that you

18  have testified to apply to the manner

19  in which claims were handled for XL

20  Programs?

21            THE WITNESS: I believe XL

22  Environmental claims manual was only

23  applicable to claims handled for XL

24  Environmental.

25            Q.    What document or

127

BARNABA

1

2    documents did you have which told you

3    how to handle claims for XL Programs?

4         A.     I'm not sure if there was

5    a memo or an e-mail issued by Mr.

6    Walsh when we first began to service,

7    to process claims on their behalf, but

8    there was a short directive as to our

9    settlement authority on what types of

10   claims would be reportable to XL

11   Programs, but beyond reporting

12   triggers and reporting authority,

13   there was not any specific

14   instructions on claims handling.

15        Q.     How did you know how to

16   do your job or what was excepted of

17   you when you were claims handling for

18   XL Programs as opposed to XL

19   Environmental?

20        A.     Well, I just handled

21   claims based upon my experience of how

22   claims are supposed to be handled

23   based on training with other carriers

24   as to what constituted good faith

25   claims handling practices.

128

BARNABA

1

2          Q.      Do you have any training

3    in claims handling from XL Programs?

4          A.      No.

5          Q.      Could you briefly

6    describe your educational background

7    starting with high school?

8          A.      I am a high school

9    graduate.

10         Q.      What high school and

11   when?

12         A.      Upper Derby Senior High

13   School, 1985.

14         Q.      Did you ever take any

15   courses concerning anything after high

16   school?

17         A.      I have some college

18   experience, but not a degree.

19         Q.      What college did you

20   attend?

21         A.      Delaware County Community

22   College.

23         Q.      For how many years?

24         A.      I took classes on and off

25   over a number of years.

129

BARNABA

1

2          Q.      Did you obtain a degree

3   from that college?

4          A.      I did not.

5          Q.      Did you ever take any

6   courses whether given by an employer

7   or authorized by an employer or on

8   your own that relate to claims

9   handling?

10         A.      Yes, many over the years.

11         Q.      Given by whom?

12         A.      I worked with four

13  different employers.  At this point,

14  each one had some manner of a training

15  program so there would be internal

16  training on various claims recommended

17  topics, and I have taken Insurance

18  Institute of America courses.  I have

19  attended seminars.  I have attended

20  training classes, both internal and

21  external over the years.

22         Q.      I know you I asked you

23  about training material.  Were there

24  any classes offered or given by XL

25  Programs concerning claims handling?

130

BARNABA

1

2          A.      By XL Programs, no.

3          Q.      Where did you first work

4     after graduating high school?

5          A.      In insurance or in

6     general?

7          Q.      In general.

8          A.      It is a ways back,

9     counselor.

10          Q.      When did you first work

11     in the insurance industry?

12          A.      I began working in the

13     insurance industry in April of 1988

14     for Aetna Life and Casualty.

15          Q.      What was your job?

16          A.      I began in the mail and

17     file room for a few month and then

18     they trained me as an office claims

19     adjuster in the latter part of 1988.

20          Q.      What type of policies or

21     what type of insurance --

22          A.      It was commercial, auto

23     and some commercial general

24     liability.  At that time, I was only

25     handling property damage claims.

131

BARNABA

1
2          Q.     How long did you do that

3     for Aetna?

4          A.     I worked for Aetna until

5     approximately July of 2000.

6          Q.     What was your job at

7     Aetna at the time you left?

8          A.     I was an inside property

9     damage adjuster with some title that I

10    can't readily recall, but that is what

11    I did.

12         Q.     Where did you go after

13    you left Aetna?

14         A.     I went to work for

15    Crawford and Company Risk Management

16    Services.

17         Q.     They are in Pennsylvania?

18         A.     They were in Broomall,

19    Pennsylvania.

20         Q.     What was your job there?

21         A.     When I was hired, I was

22    an inside liability adjuster, and then

23    at some point when I was there, I

24    became an outside adjuster and I

25    believe I switched back to an inside

132

BARNABA

1

2    adjuster before I left.

3          Q.     Where did you go after

4    that?

5                MR. FURETH: You want to get

6    the end date?

7                THE WITNESS:  I worked

8    there until approximately July of

9    2004 -- No, July of 1994.

10          Q.     Let's go back.  You were

11    in Aetna from April '88 to when?

12          A.     To approximately July of

13    2000, a little over two years.

14          Q.     I thought you said July

15    of 1990.

16          A.     I'm sorry, July of 1990.

17          Q.     Then you went to Crawford

18    and Company?

19          A.     Yes, for approximately

20    four years.

21          Q.     Until sometime in '94?

22          A.     July of '94.

23          Q.     And then?

24          A.     In July of '94, I went to

25    work for a company -- I believe when I

133

BARNABA

1

2    was hired it was called Worldwide

3    Underwriters Insurance Company.  I

4    worked for the same people until

5    October of 2001 when I came to XL,

6    which at that time it was known as

7    ECS, but in the approximately seven-

8    year period when I worked for

9    Worldwide Underwriters, the name

10   changed several times.

11            It went from Worldwide

12   Underwriters to Providian Auto and

13   Home Insurance Company.  Then the name

14   changed to Worldwide Insurance Group

15   which was sold to Great American

16   Insurance Company who was my employer

17   when I left that building.

18        Q.    During that seven-year

19   stint ,what was your job?

20        A.    I was a liability

21   adjuster.

22        Q.    It was when you first

23   came to XL that you started doing

24   claims adjusters?

25        A.    No, I have been a claims

134

BARNABA

1

2  adjuster since 1988 with one title or

3  another. That has been my function.

4       Q.     In what jobs did you do

5  claims adjusting on general

6  comprehensive liability?

7       A.     I did some general

8  liability with Aetna for property

9  damage only claims. When I worked for

10  Crawford and Company, I handled

11  general liability and auto liability

12  as well as some other product

13  lines. When I worked for Providian

14  Worldwide, that was only all personal

15  lines auto, and then with my present

16  employer, I have been handling general

17  liability and auto liability and some

18  other product lines.

19       Q.     Other than Mr. Fureth,

20  did you discuss anything about your

21  deposition with anyone else?

22       A.     Not in any detail, no,

23  just to alert people that I was being

24  deposed or I would be out of the

25  office for deposition.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

105 STREET ASSOCIATES, LLC                          Index No.: 05-cv-9938 (VM)

                        Plaintiff,

                                                    **AFFIDAVIT OF**
            -against-                               **CORRECTIONS**

GREENWICH INSURANCE COMPANY,

                        Defendant.
-------------------------------------------------------------------- X

        STATE OF PENNSYLVANIA    )
                                 ) ss.:
        COUNTY OF CHESTER        )


    I, Michael J. Barnaba, being duly sworn, deposes and says:

    1.  The following constitutes corrections to the testimony that I gave with respect to the above-
entitled matter on December 29, 2006.

| **Page** | **Line** | **Delete** | **Insert** |
|------|------|-----------|-----------|
| 8  | 21 | Ensure     | Insured |
| 9  | 13 | Accord     | ACORD |
| 10 | 2  | Insured    | Injured |
| 10 | 19 | Call       | Card |
| 19 | 15 | Denied     | Made |
| 23 | 4  | Initiated  | Issued |
| 23 | 17 | An         | Any |
| 28 | 20 | Department | Title |
| 37 | 5  | KF& C      | WKF&C |
| 37 | 10 | Accord     | ACORD |
| 38 | 11 | Had        | Have |
| 40 | 15 | File       | Policy |
| 47 | 10 | BBC        | BC |

FEB 0 0 2007

2686705.1

| Page | Line | Delete | Insert |
|------|------|--------|--------|
| 51 | 7 | Insurer | Insured |
| 55 | 21 | Independent | Broker and Insured |
| 57 | 5 | Analysis | Analyze |
| 62 | 20 | Probably | Possibly |
| 64 | 16 | Tended | Tendered |
| 69 | 6 | But | That |
| 81 | 20 | Suspect | Suspected |
| 81 | 21 | Won't | Wouldn't |
| 85 | 21 | Identify | Copy |
| 85 | 22 | Explanation | Declination |
| 90 | 4 | Understand | Understanding |
| 90 | 10 | Signature | Setting |
| 110 | 19 | Party | Parties |
| 112 | 16 | Sought | Sort |
| 113 | 13 | Bracket | Blanket |
| 113 | 22 | I had to receive a letter | I'd have to review the letter |
| 119 | 4 | I ever | I've ever |
| 128 | 12 | Derby | Darby |
| 129 | 13 | This | Some |

Michael J. Barnaba

Sworn to before me
this _21st_ day of February, 2007

Veronica A. Parriera
NOTARY PUBLIC

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Veronica A. Parriera, Notary Public
Uwchlan Twp., Chester County
My Commission Expires Sept. 7, 2008
Member, Pennsylvania Association Of Notaries

2686705.1

135

BARNABA

1

2      Q.      Did you discuss the

3    substance of the case or the claim

4    with anyone, other than Mr. Fureth?

5      A.      No; maybe briefly with

6    Mr. Walsh.

7      Q.      When did you speak to

8    Mr. Walsh about it?

9      A.      I think he just told me

10    -- I don't know that we discussed the

11    substance.  He just told me following

12    his deposition that it was uneventful.

13      MR. SCHNEIDER: Thank you,

14    no further questions at this time.

15      (TIME NOTED: 2:04 p.m.)

16

17    ----------------------------------

18      MICHAEL J. BARNABA

19

20    Subscribed and sworn to before me this

21    _28th__ day of _February_, 2007.

22

23

24    _Veronica A. Parrera_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Veronica A. Parrera, Notary Public
Uwchlan Twp., Chester County
My Commission Expires Sept. 7, 2008
Member, Pennsylvania Association Of Notaries

25    NOTARY P

135

BARNABA

1

2          Q.      Did you discuss the

3     substance of the case or the claim

4     with anyone, other than Mr. Fureth?

5          A.      No; maybe briefly with

6     Mr. Walsh.

7          Q.      When did you speak to

8     Mr. Walsh about it?

9          A.      I think he just told me

10    -- I don't know that we discussed the

11    substance.  He just told me following

12    his deposition that it was uneventful.

13          MR. SCHNEIDER: Thank you,

14    no further questions at this time.

15               (TIME NOTED: 2:04 p.m.)

16

17          _____

18          MICHAEL J. BARNABA

19

20    Subscribed and sworn to before me this

21    _____ day of _____, 2007.

22

23

24          _____

25    NOTARY PUBLIC

136

```
 1                      BARNABA

 2                    I N D E X

 3    WITNESS           EXAMINATION BY      PAGES

 4    MICHAEL BARNABA   MR. SCHNEIDER       5 - 135

 5

 6    PAGE         E X H I B I T S        PLAINTIFF'S

 7                                         FOR ID.

 8    25      ACKNOWLEDGMENT OF LOSS          1

 9    25      CLAIMS NOTIFICATION             2

10    31      16 PAGE 8-18-04 FAX             3

11    36      6 PAGE 8-18-04 FAX              4

12    38      8-20-04 LETTER                  5

13    41      23 PAGE8-20-04 FAX              6

14    50      7-2-02 FAX                      7

15    82      3 PAGE EMAIL LETTER             8

16    82      WILSON, ELSER E-MAIL            9

17    97      2 PAGE MR. WALSH RESPONSE      10

18    100     PRINTOUT OF FILE NOTES         11

19    117     WILSON, ELSER LEGAL BILL       12

20    122     9-20-04 DENIAL LETTER          13

21

22    PAGE  REQUEST FOR INFORMATION/DOCUMENTATION

23    64    TENDER LETTER ISSUED BY XL OR GREENWICH.

24    67    RESPONSE TO TENDER LETTER.

25
```

137

1                                    BARNABA

2                        C E R T I F I C A T E

3    STATE OF NEW YORK      )

4    COUNTY OF NASSAU       )

5

6              I, MARC SCHAFLER, a Stenotype

7    Reporter and Notary Public within and for the

8    State of New York, do hereby certify:

9

10             That the witness whose deposition is

11   herein before set forth, was duly sworn by me,

12   and that such examination is a true record of

13   the testimony given by such witness to the

14   best of my ability.

15

16             I further certify that I am not

17   related to any of the parties to this action

18   by blood or marriage, and that I am in no way

19   interested in the outcome of this matter.

20

21             IN WITNESS HEREOF, I have hereunto

22   set my hand this ___15th___ day of _January____, 2007.

23

24                        _____

25                        MARC SCHAFLER

## A

abbreviation 107:2
ability 137:14
above-mentioned 1·17
above-referred 17:7 52:19 69:23 75:5 76:21 90:17,24 91:8
Absolutely 67:9
abstract 100:8
accompanied 63:18
accord 9:13 37:10
account 120:17
accounts 15:13
acknowledge 66:18
acknowledgement 26:19
acknowledges 112:9
acknowledging 111:21
acknowledgment 23:3 25:3,22 26:2 27:18 111:25 136:8
acting 17:23 18·4
action 3:18 45:15 79:23 137:17
acts 114:8
actual 48:3 74:12 78:14 83:22 91:23 116:19 121:15
add 85:18
adding 85:10
addition 3:13
additional 8:22 40:22,24 50:18 51:9 53:23,24 54:11 55:22 85:2 106:15,19 106:24 108:3 113:19,23,25 114:13 116:3,4 116:21,22
address 5:14,15 25·9 38:16,17 39:2,25 107:7
addressed 38:18 121:3 123:7
adjacent 12:9
adjuster 13:25 15:12 130:19 131:9,22,24 132:2 133:21

134:2
adjusters 102:17 133:24
adjusting 11:10 11:12 126:11 134:5
adjustments 126:13
administrate 15:12
administrating 18:5
administrative 26:22 124:8
administrator 16:6,11,20,23 17:13,24 99:5
administrators 11:5,9 99:1
advice 88:3
advised 60:10
advisement 105:10
Aetna 130:14 131:3,4,7,13 132:11 134:8
affidavit 46:14
affiliate 13:4
affirmed 4:5
afternoon 7:13 19:6 22:23,24 49:13
aged 53:7
Agency 9:11 25:8 26:24 27:4,8 28:9 37:6 86:2
agent 27:9 90:9 92:15,21,21 93:15
ago 33:19 34:10 37:2
AGREED 3:6 4:15
agreements 62:5 62:15
ahead 16:17 17:22
AI 113:13 114:9 114:10
aid 86:4
alert 134:23
alleged 20:24
allowed 97:14
America 110:11 129:18
American 13:15 13:23 133:15
analysis 57:5 83:15 84:2 89:20 90:12 92:14 107:22

analyst 15:2,4,6 21:7,8
answer 11:7,21 12:4 13:12 16:16 17:4,15 20:10,14 22:8 23:12 24:9 27:3 27:12 28:6,25 29:23 32:9 35:14 51:20 52:16 54:9,18 56:16 71:4 75:2 78:14 91:5 94:10,19 95:13 97:9 119:3
answerd 91:3
answered 48:20 91:19 95:13
answers 6:12
anticipated 115:3 115:7 116:6
apparently 107:13 115:10
appeared 61:22
appears 28:8 37:25 41:19 42:25 44·4 45:12,17 46:5 47:6 54:3 75:19 75:23 78:13 101:25 102:6,12 117:16 122:13 123:2
applicable 37:18 126:23
apply 126:18
appreciate 12:22
approval 87:7 96:4
approve 117:25
approved 117:20
approximate 73:11
approximately 13:17 19:2 53·8 54:21 103:10 131·5 132:8,12 132:19 133:7
April 14:19 88:4 88:18,25 90:3 93:23 94:7,16 130:13 132:11
area 125:21
ASAP 110:15
asked 48:14 57:5 67:13 78:23 91:18,25 95:8 95:13 107:22 108:25 111:6 118:3 120:20

129:22
asking 32:16 41:2 50:6 55:8,14 70:3 73:20 92:3 93:2 98:21 115:19 124:19
assigned 21:8 22:25 23:9,15 24:7 27:25 29:20
assignment 89:17
Associates 1·4 6:2, 18:21 20:23 22:15 40:16 44:2 47:9 51:8 52:6,12 60·8,11 63:3,14 75:21 77:22 88:20,23 89·11 123:17
assume 97:12,14 105:19 109:3,25 111:17,22 115:9
assumed 124:7
assuming 30:3 87:18 121:23 124:14
attached 76:11 78:20
attachment 84:12
attempt 6:22
attend 128:20
attended 129:19 129:19
attention 21:19,23 22:3,20 51:24 77:5 80:8 87:17 106:12 109:3,13 111:11 119:6
attorney 10:2 32:17 44:6,22 45:6,13 53·6 57:22 85:14 86:17
attorneys 2:7,12 3:6 45:7 57:23
August 22:18,18 22:24 23:2 25:5 28:10 33:16,25 34:15 35:9 36:18 38:15 41:21 44:8,23 45:16 47:16,22 49:7 53·15 55:2 55:8,10,10,15 60:21 61:12 72:20 75:22,24 79:16 89:3,18 101:13 106:8 108:14
authority 20:7,18

21:14 22:9 96:12,16 127:9 127:12
authorization 98:21
authorize 94:4
authorized 79:13 85:7 87:3 119:23 121:19 121:24 129:7
authorizing 87:14 97:3 98:3 123:4
auto 15:14 130:22 133·12 134:11 134:15,17
automatically 113:19 114:3
available 81:7
aware 123:24
a.m 1:13

## B

B 5:3,3 92:25 136:6
back 17:3,7 52:16 52:19 69:19,23 72:9 75:2,5 76:17,21 90·14 90:17,21,24 91:4,8 107:25 109:8 125:20 130:8 131:25 132:10
background 128:6
backwards 13:19
bad 98:10
balance 9:21
bar 3:16
Barbara 31:9 41:20 47:15,22 106:7
Barber 18:11
Barber's 18:16
baring 122:4
Barnaba 1:16 5:1 5·13,22 6:1 7:1 7:5 8:1 9:1 10·1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25·1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1,17 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1

46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1,9 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1,18
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1,18
136:1,4 137:1
base 102:3
based 62:14 73:25
  81:4,8 86:7,13
  116:15 126:5
  127:21,23
basis 66:25 73:20
  74:7,10,24 89:8
  114:14 119:18
Bates 31:20 36:8
  37:25 41:8
  43:21 50:22
  82:9,18 100:7
  117:6
BBC 47:10
bearing 117:6
becoming 14:24
began 52:23 127:6
  130:12,16
beginning 13:2
  52:7 108:2
begins 40:6
  106:14
behalf 4:8 17:20

26:9,18 60:22
  63:16 123:20,22
  127:7
belief 115:11
believe 7:23 8:3
  8:25 9:15,16
  10:18,23 13:19
  13:25 14:18
  15:5 18:18 19:6
  22:16,17 30:18
  33:16 36:2
  39:12 40:2,19
  46:11 47:3
  50:12 53:8
  54:13 55:6,18
  55:22 59:21
  60:6,9,14 61:2
  63:6 64:13,15
  64:25 65:7,24
  66:7,17,21,24
  68:2,6,13,18
  71:25 72:12,21
  73:4 75:25 77:7
  79:6,13 81:2,13
  84:22 97:2 98:8
  98:9 99:17,18
  103:23 106:5
  108:4,8 110:21
  110:23 115:25
  116:25 125:12
  126:21 131:25
  132:25
beneath 98:12
  100:9
best 18:25 20:17
  24:4 35:24
  137:14
Beth 40:2
beyond 46:2 80:4
  80:6 81:24
  127:11
BFC 9:19 10:3
  44:7 45:16,20
  45:24 46:6 47:9
  53:6 64:14,15
  77:9 107:3,12
  110:10
BFC's 112:22
bill 28:18 117:17
  117:19,25
  118:24 119:5,17
  119:19,21 120:5
  120:18,21 121:9
  121:11,15,17,23
  136:19
bills 119:23
  120:11
binder 103:12,17
  103:19
blanket 113:23

Blinkoff 83:11
  84:5 85:5 87:2
  122:21
Blinkoff's 99:13
blood 137:18
BLOOMFIELD
  2:6
book 20:19 99:8
bottom 30:24 31:6
  32:23 88:15
  96:10
Boulevard 5:16
  11:25 12:11
bracket 113:13
Brad 109:21,23
break 6:25 58:14
  58:16 61:4,10
  84:20 125:14
briefly 128:5
  135:5
bring 21:18,22
  22:2
Broad 2:7
Broadspire 99:3,4
  99:5 117:18
  120:6,10,16,23
  121:4 124:7,14
  124:17,22 125:2
Broadspire's
  125:9
broker 8:14,19
  9:9 23:21,22
  38:23 39:3,12
  39:17,24 40:18
  40:25 53:22
  54:10,25 56:10
  71:22 85:21
  106:15,19,24
  108:4,10 110:12
  110:14 114:22
brokers 63:15
  86:6
Broomall 131:18
brought 35:24
building 12:10
  133:17
business 10:19
  20:20 22:10
  27:5 99:8

_____
      C
_____
C 2:4 5:3 9:11
  23:22 25:8
  26:23 27:4,8
  28:9 37:5 86:2
  89:3 99:8 107:5
  137:2,2
call 10:19 64:20
  67:4 71:14
  110:7

called 5:4 11:11
  11:13 39:9,12
  107:18 108:17
  109:20 133:2
calls 97:8 111:14
capacity 17:24
  18:5 27:7 86:17
  116:6
care 107:7
career 13:2
carefully 45:9
carrier 86:8 111:3
  111:3 112:8,11
  112:22 113:12
  114:24
carriers 80:3
  107:21 127:23
case 24:4,16 29:13
  30:10 58:19
  75:11 93:2
  118:14 135:3
cases 15:15
  124:11
Casualty 130:14
catastrophic
  21:17
categorize 27:14
  57:4
cc 85:22,24 123:3
cc's 85:11,19
  123:13
certain 7:11 21:16
  26:16 41:25
  43:16 60:3
  85:18 121:14
certainty 24:22
  34:13 37:13
  42:19 44:14
certificates
  112:16
certification 4:15
certify 137:8,16
chance 27:15 38:9
change 15:17
  76:25
changed 12:17
  14:19 133:10,14
changes 123:3,5
  123:11,12
characterization
  56:15
charge 4:20
charged 92:16
check 89:21
circumstances
  22:6
citing 114:6
claim 7:17,18,22
  8:4,6,8,22 9:9
  9:10 14:4 20:23

21:9,11 22:4,13
  22:19,23 23:8
  23:15,17 24:17
  24:23 25:9 26:3
  26:20 29:11,11
  29:18,21 30:22
  34:15,19,21
  35:2,12 37:21
  39:15 40:9
  42:17,20 45:20
  46:10,18 49:11
  49:16,19 52:9
  52:24 53:3,12
  53:17 54:2 55:5
  55:12 56:13,21
  57:2 58:21
  61:22 66:19,20
  68:24 70:11
  72:16 73:19
  74:6,18 81:18
  87:15 98:4
  99:20,20 100:2
  100:8,9 101:3
  102:18 103:7
  105:15 117:2
  123:19 124:15
  124:16,20,21
  126:11 135:3
claims 11:4,8
  13:24 14:8,13
  14:20,24 15:2,4
  15:6,10,12,13
  15:17 16:6,10
  16:19,22 17:13
  18:6,17 20:15
  21:7,8,15 24:20
  28:9 29:2 37:8
  48:23 49:23
  52:13 60:16
  62:12 85:25
  102:17,22 103:5
  103:11,17,19,21
  103:23 104:3,9
  104:14,25 105:7
  125:22,24 126:2
  126:12,14,17,19
  126:22,23 127:3
  127:7,10,14,17
  127:21,22,25
  128:3 129:8,16
  129:25 130:18
  130:25 133:24
  133:25 134:5,9
  136:9
clarify 16:15
classes 128:24
  129:20,24
clauses 62:10
clear 50:5
clearly 89:6

client 121:7
close 78:6,8
college 128:17,19
  128:22 129:3
colloquy 6:14
come 18:19 22:20
  73:13 124:2
comfortable
  36:24
comment 126:9
commented 90:12
commercial 15:13
  130:22,23
communicate
  96:4
communication
  58:4 72:25
  77:17 86:5 95:3
  95:22 97:13
  108:22
communications
  8:14,18 9:8
  23:20,23 31:12
  31:15 72:14
Community
  128:21
comp 107:11
companies 13:5
  64:5 67:19
company 1:7 6:4
  10:11 11:19
  13:15 14:11
  16:7,12,24
  17:11,18,20
  20:12 23:24
  27:10 37:5
  43:25 103:7
  111:18,20
  124:20 131:15
  132:18,25 133:3
  133:13,16
  134:10
compensation
  45:15
complaint 35:18
  57:14 58:6,7
  88:24 89:13
  90:2 93:22 94:6
  94:15
complete 48:12
  74:13 101:7,24
  101:25
comprehensive
  134:6
computer 8:11
  99:23 101:6,19
  105:22 125:8
concerning 49:10
  58:5 68:9 95:4,8
  95:23 99:20

120:10 128:15
  129:25
concluded 74:10
conclusion 73:14
conduct 66:2
conducted 58:19
  73:18
confirmed 23:3
  74:2
confirming 39:18
confused 116:8
confusion 12:19
  120:8
connection 18:22
  20:24 34:25
  117:2 124:13
Conrad 18:23
  20:25 22:14
  24:17 35:19,24
  44:6 47:8 68:12
  94:15 126:11
Conrad's 49:11
consent 20:11
Considering
  42:17
consisted 29:14
consistent 65:5
consists 30:10
  31:20
constituted
  127:24
construction 9:20
  10:3 44:7 45:16
  47:9 52:12
  53:11 61:24
  62:2,4 77:10
  107:4
consult 54:6
  107:16
consultant 14:9
  14:14,21,24
  15:10,18
consultation
  57:11
consulted 55:20
consulting 19:24
  22:11
contact 39:8 43:2
  43:15 71:3,9,20
  80:21 85:25
  107:19 108:18
  109:20 121:7
contacting 95:14
contain 62:8
  103:5
contained 35:13
  35:21 37:11,18
  39:6,7 44:21
  45:5,23 46:17
  48:22,25 81:13

81:15 88:7
contemplating
  116:14
contents 95:4,9,24
context 48:20
continue 43:17
  44:25 114:5
continued 58:20
contract 62:15,20
  62:22 63:4 69:7
  69:8 72:23 77:9
  113:22 114:3
contractor 62:6
  64:13 107:6
  109:20
contractors 80:3
contracts 59:24
  62:23 107:19
contractual 114:9
  114:12
controlled 4:11
conversation
  47:13,14,19,21
  48:2,4,9 49:6,9
  49:18
conversations
  49:14
cooperating 59:5
copied 66:23 86:3
  110:16
copies 38:23
  39:13 52:3
  60:15 124:23,24
  125:5,7
copy 4:17 8:20,24
  9:14 32:5 33:5
  33:11 35:11
  37:18 46:9,17
  48:25 77:8
  85:13 86:12
  89:12,25 90:6
  93:16,22 94:6
  94:14 98:2,12
  98:12 105:7
  118:11,24 119:5
  120:20 124:16
Coral 70:20
Corallo 43:7
  70:24 71:3,9,18
  72:2,6 80:11,18
  80:21
corner 30:24 31:7
  32:24
Corp 47:10
corporate 52:4
correct 10:12 21:2
  24:2 38:20 48:9
  51:12 68:5 70:4
  80:15 87:4,9,18
  91:15 95:19

98:7,14 114:19
  116:10 121:20
  121:22 125:23
correspondence
  47:4 69:3 72:16
  75:20 79:25
  80:25 86:4
  116:5,23
counsel 4:8,18
  6:15 7:2 19:25
  49:13 54:7,16
  55:3,20 56:11
  56:24 57:5,11
  57:17 58:3,4
  65:8 81:3 82:3,4
  82:5,6 83:12,23
  84:2 85:10,13
  86:12 88:21
  89:17 92:12
  94:24,24 95:4,8
  101:11 102:8
  107:17 110:17
  111:24 115:3
  119:12 120:19
  121:5 122:15
counselor 130:9
counsel's 8:24
  84:10 88:3
  97:13
count 13:18
County 1:2
  128:21 137:4
couple 58:15
courses 128:15
  129:6,18
court 1:2 6:10
  102:9
courtesy 85:20
cover 28:8 29:24
  37:4 41:19,23
  47:7 63:18
  76:10 78:19,19
  78:22 86:13
  104:15 106:6
coverage 18:21
  19:9,15,20,22
  19:25 20:8,18
  21:11,22,24
  22:2,10 54:7,8
  54:16 55:3
  56:11,23 57:5
  57:10,17 58:3,4
  58:18,23 59:3,6
  66:24 67:20
  70:10 73:14,25
  74:16,24 79:3,6
  79:11 81:3,8
  82:5,6 83:12,16
  83:24,25 84:10
  84:11,13 85:7

85:13,16 86:3
  86:18 87:8,15
  88:2 89:7,17
  93:10,13 96:6
  96:18,18,22,24
  97:6,11 98:4,22
  98:25 99:14
  107:17,21
  109:19 110:17
  110:18,22 111:9
  111:24 114:2,4
  114:7,16 115:2
  115:4,8 116:5,7
  116:9,11,22
  119:12 122:19
  123:10,18
co-defendants
  81:17
CPLR 3:10 4:10
Crawford 131:15
  132:17 134:10
current 12:16
  15:8,25 99:4,6
  121:7
currently 10:10
  11:13 120:24
cut 42:2 96:13
  112:21

D

D 136:2
daily 60:17
damage 130:25
  131:9 134:9
damages 21:12
date 25:15 32:2
  36:14 38:7
  41:14 47:16
  51:2 53:20
  75:23,25 78:25
  79:4,9,17 81:17
  82:14 83:2
  86:23 87:6
  97:22 100:15
  105:13,14,17
  112:19 117:12
  118:22 120:18
  121:12 122:9
  132:6
dated 25:5 28:10
  41:21 44:7,23
  45:4,25 75:21
  82:20 83:13
  85:5 87:3 88:18
  98:6,16 107:8
  117:18 122:15
dates 81:21 82:2
  102:11
day 54:23 79:17
  121:8 135:21

137:22
dealings 120:9
Dear 47:12
December 1:13
  119:9
decision 18:20
  19:6,9,12,14,19
  19:21 20:3,7
  73:24 79:2,10
declination 33:17
  59:3 79:12
  83:17,19 84:4
deemed 4:9
Defendant 1:8,15
  2:12
Defendant's 30:8
  75:10 80:9
defer 49:25 54:19
defined 71:13
degree 42:19
  128:18 129:2
Delaware 128:21
delay 74:5 89:5
denial 58:17
  66:23,23 73:21
  74:24 83:24
  84:12 85:7,11
  86:3 87:2,14
  97:3 98:4,25
  99:15 107:18
  114:14 115:4,7
  116:7,13 122:14
  122:19 123:4,10
  136:20
denied 19:15
  58:23 59:6
  73:15 87:9
  116:9,11 123:18
deny 18:20 19:9
  19:14,20,22
  20:8 22:10
  73:25 79:2,10
  86:18 88:2 89:7
  93:9,12 96:5
  98:21 113:12
  114:6
denying 96:18,23
department 21:20
  28:10,20 29:3
  29:12
deposed 134:24
deposition 6:6 7:7
  30:9 75:10
  134:21,25
  135:12 137:10
Derby 128:12
describe 21:4
  128:6
desk 103:18
detail 102:24

105:2 134:22
determinations
  20:19
determine 35:8
  52:10 53:10
  55:12 57:12
  73:18 74:21
  89:10
determined 74:16
  89:16
Dicker 1:11 2:12
  57:20
dictated 51:13,22
differed 122:18
different 14:4
  45:7 112:12
  129:13
differently 15:23
difficult 36:23
digest 115:14
digits 40:13
direct 18:11
directed 8:21 9:18
  10:3 23:23
  41:20 44:7,23
  45:15,20,24
  66:22 69:3
  75:20 78:12
  83:13 84:11
  88:19 97:2
  107:3
directing 51:24
  77:5 80:7 87:16
  106:12 109:12
  111:11 119:6
direction 86:11
directions 85:10
directive 127:8
discern 101:13
  112:14
disclaim 79:6 81:8
disclaimed 74:17
  114:16
disclaimer 54:8
  74:8,11
disclaiming 85:16
discretion 85:17
discuss 104:10
  134:20 135:2
discussed 49:16
  88:10 135:10
discussion 15:21
  126:7
discussions 49:12
  57:8
division 10:21
  11:10,13
divisions 17:2
docket 89:20
document 19:5

25:7,17,25
28:13 29:17
31:7,19,24 32:6
35:17 36:7,12
37:7,24 38:5,13
39:19 41:12,17
44:10,12,14,17
46:23,25 48:22
49:3 50:2,21,24
51:5 62:17
67:23 70:15
75:18 76:4 77:2
77:18,20,25
78:4 80:15 82:8
82:12,24 84:25
86:24 87:19
91:19,22 92:2,5
92:24 93:7
97:16,20 98:6
100:2,6,13,18
100:21 101:2,17
111:6 117:10,15
118:6,12 122:3
122:7,12 126:25
documentation
  23:18 46:20
  50:14,16,18
  51:10 53:23,25
  54:11 59:12,23
  60:19 81:14,16
documented 80:5
documents 7:6,9
  7:12,15,21,25
  8:12 9:3,5 22:22
  23:9 24:5,13,18
  24:23 25:13
  27:24 29:19
  32:10,13,14
  34:14,18,20,24
  35:9,22 36:25
  37:17,21 38:23
  39:6,13 40:23
  40:24 41:7 42:5
  42:9,11,13
  43:24 45:4
  48:16 49:21
  50:9 61:17
  62:17 63:9,18
  63:24 64:3,6
  67:13,23 68:4,9
  68:22 72:23
  76:10 78:16,20
  81:5 82:17
  87:11 103:20
  106:9 110:16
  117:6 127:2
doing 133:23
dollars 21:15,16
Donald 2:8 5:24
dozen 124:11

draft 83:16,19,24
  84:4,12 85:11
  99:14 122:19
  123:10
drugs 10:7
duly 5:5 137:11
duration 74:4
duties 15:9 21:5,9
  124:8,14
duty 92:16

E

E 2:4,4 5:3 7:10
  136:2,6 137:2,2
Eagleview 5:16
  11:25 12:10
earlier 99:19
  120:20 122:21
ease 15:20
easier 43:22
East 2:13
ECS 133:7
Ed 19:15 79:7
Edelman 2:12
  57:19
edge 112:23
Edlerman 1:11
educational 128:6
effective 124:9
effort 71:8 80:20
  89:9
either 39:4,6 46:3
  63:13 66:16,22
  85:13 86:11
  92:9 95:23
  118:12
electronic 8:10
electronically
  99:24 101:5
  124:23
Elser 1:10 2:11
  57:19 82:20
  83:13 117:17
  136:16,19
EMAIL 136:15
employed 10:10
  10:14,15,20
  12:13,15 13:14
employer 12:16
  15:25 129:6,7
  133:16 134:16
employers 129:13
enclose 83:24
enclosed 24:15
  39:14 77:16
  83:14 96:17,21
  99:13 106:8
enclosures 8:16
  9:12 77:15
  78:16

ended 55:25
endorsement
  113:14,17,24
ensure 8:21
entire 65:4 75:2
  87:19 90:10
  112:24
entities 52:13
  53:11 62:14,22
  64:4,10
entity 9:19 44:24
  45:25 53:6
  64:13,14 65:7
entries 99:19
  105:22 117:2
entry 105:14,14
  106:13 108:17
  109:13 111:12
  112:6 113:3,9
  114:18 119:8
environmental
  10:16,21,23,24
  11:4,15,18,24
  12:14 14:7
  15:24 16:19,22
  16:25 18:2 25:5
  102:23 103:25
  125:22,25 126:3
  126:9,17,22,24
  127:19
Environmental's
  17:12
Erector 77:9
error 97:12
ESQ 2:8,14
essence 78:22
essentially 15:11
Estelle 43:5
  108:21
evaluating 21:11
evening 87:13
event 114:15
eventually 121:10
exact 37:14
exactly 106:10
examination 1:15
  3:12,15 4:4,16
  5:19 136:3
  137:12
examined 5:7
exceeded 21:15
excepted 127:16
exception 124:10
excludes 114:7
exhibit 25:2,6,19
  27:19 28:4,7
  29:5 30:9,22
  31:19,25 36:4,7
  36:13,21 37:24
  38:6,10 41:7,13

50:21,25 59:9
61:11 67:11
70:13 72:11
75:10,13 76:12
80:9 82:8,13,17
82:25 83:5,9,10
83:18,21 84:9
84:21 87:17,24
89:23 95:2 96:8
97:16,21,25
100:6,14 105:12
106:5,13 117:6
117:11 119:7
122:3,8 123:16
**Exhibits** 25:14
**exist** 103:22
**existed** 103:24
**experience** 127:21
128:18
**explain** 73:6
80:23 100:25
113:15 120:13
**explanation** 85:22
**extent** 55:23 56:3
56:5 64:23 67:6
73:8
**external** 129:21
**Exton** 5:16 11:25
**e-mail** 38:14,15
38:17 39:2,10
39:17,19,25
40:18 79:7,15
83:11,23 84:8
85:5 87:13 96:7
97:3 98:13,20
99:11,13 127:5
136:16
**e-mailed** 63:12
86:25
**e-mails** 54:21

**F**

**F** 30:9 137:2
**fact** 41:22 93:14
**facts** 73:16 87:24
116:16
**factual** 104:10
**failure** 3:14 4:6
74:17 81:9
**fair** 33:20 98:19
120:3
**faith** 127:24
**familiar** 32:11
**fashion** 40:20
**favor** 62:9,10
**fax** 28:8 29:24
30:6 41:19,23
41:25 42:23
43:3 106:6
136:10,11,13,14

**faxed** 22:23 51:7
63:12 107:23
109:2
**FC's** 112:20
**feels** 103:7
**file** 7:18,19,22 8:4
8:10,10,13
22:17 23:4,5,12
24:7,10,13 26:4
29:18 30:19
34:15,19,21
35:12,21 37:8
37:14,17,22
39:4,6,11 40:8
40:15,23 42:20
44:13,15,18,20
45:5,22 46:10
46:18,21 47:24
48:15,23,25
49:3,16,25 50:3
50:4 54:20 65:4
65:10 68:24
71:5,10 72:17
72:17 80:5
81:13 100:23
101:2,8,14
102:25 106:21
108:13 110:24
111:23 114:25
120:22,24
123:25 124:3,16
124:16,20,21,25
130:17 136:18
**filed** 47:7 114:23
**files** 26:21
**filing** 4:15 53:4
**filings** 52:4
**find** 29:6 67:19
101:10
**finish** 125:15
**firm** 45:18,24
57:9,18,23
**first** 5:4 8:15
22:12,19 23:8
23:13,16 24:6
29:6,8,10,14
30:14 37:3
41:18 51:25
52:9,25 62:3
65:2 73:19 74:6
81:19 83:8,15
84:8,23 85:22
88:8,14,17,22
89:2,18 101:14
105:12,14
112:20 113:7
127:6 130:3,10
133:22
**five** 59:10 61:4
**five-minute** 58:14

**Floor** 2:7
**focus** 32:17
**follow** 59:3 73:7
110:12
**followed** 40:12
114:17
**following** 43:18
45:3 50:12,13
74:5,18 81:10
89:19 135:11
**follows** 3:7 5:7
**follow-up** 60:23
**foregoing** 96:16
**form** 3:11 16:14
37:12,14 42:17
51:21 54:18
58:9 96:3 101:2
117:23 118:3
119:3 120:2
**formal** 81:2
**formally** 39:20
**format** 69:5
**forth** 61:18
137:11
**forward** 81:9
110:13
**forwarded** 40:22
95:18 99:12
**forwards** 114:22
**four** 89:5 129:12
132:20
**Freeman's** 65:6
**front** 24:23 35:12
61:13 67:12
**Fuerth** 2:14 7:12
11:6,20 12:3,20
13:7,11 16:13
17:14 20:9,13
22:7 23:6 24:8
27:2,11 28:5,24
29:22 32:8
33:12 35:3
43:20 48:11
49:17 50:10
51:19 53:18
54:17 55:14
56:14 57:7
58:13
**full** 5:11 10:17
20:7,17 55:15
**fully** 60:4
**function** 13:22
14:6 15:16 18:7
28:22 134:3
**Fureth** 61:19
64:25 65:23
67:7 70:2 72:9
77:12,23 78:5,9
78:17 84:14
86:9 88:12 91:3

91:11,16 92:3
92:22 93:24
94:8,18 95:12
97:7 102:8
104:17,21 105:9
113:2 115:15,18
115:21 117:22
118:2,7,13,17
119:2,25 120:4
122:22 123:20
124:19 126:4,16
132:5 134:19
135:4
**furnished** 4:18
**further** 4:14
51:18 74:24
85:9 88:10
135:14 137:16

**G**

**gaps** 101:24 102:4
102:5
**Gary** 18:11
**GC** 107:20 109:19
110:10,22 111:2
114:23
**GC's** 110:18
111:2,8
**general** 15:14
23:25 42:16
62:6 64:12
103:2,4 107:6
109:19 130:6,7
130:23 134:5,7
134:11,16
**generally** 51:17
105:3 113:23
**generate** 120:20
**generated** 121:6
**gentleman** 6:9
**getting** 77:24 78:3
**give** 45:9 54:22
**given** 80:10,17
126:13 129:6,11
129:24 137:13
**GLENN** 2:14
**go** 16:17 17:22
42:12 57:8
78:23 84:14
110:9 115:2
131:12 132:3,10
**goes** 85:8 106:16
**going** 32:20 33:2
33:24 63:25
92:8 118:21
125:20
**GOLDSTEIN** 2:6
**good** 5:22,23
127:24
**GR** 32:24 33:9

**graduate** 128:9
**graduating** 130:4
**grant** 113:19
**Great** 13:14,23
133:15
**Greenwich** 1:7
6:3 16:6,11,23
17:10,17,19
20:12 27:9
40:15 43:25
64:23 136:23
**Greenwich's**
122:15
**Group** 133:14
**GR14** 41:8 47:11
**GR16** 43:23
**GR17** 43:23
**GR18** 43:23
**GR19** 43:24
**GR20** 44:3,4,19
45:12
**GR21** 45:17
**GR22** 46:5,23
**GR23** 46:14,23
**GR24** 41:9 47:6
48:13,21
**GR25** 38:2
**GR263** 36:8
**GR268** 36:9
**GR269** 31:21 33:3
33:5
**GR271** 33:9 34:6
**GR272** 34:11
**GR285** 31:21
**GR30** 75:14 76:8
**GR300** 82:18
**GR305** 96:10
**GR307** 82:9
**GR308** 86:24
**GR31** 50:22
**GR406** 97:17
**GR407** 97:17
**GR408** 100:7
**GR409** 100:7
**guess** 7:18 76:24
103:6 104:22
115:24 126:8
**guessing** 104:18
115:23

**H**

**H** 5:3 136:6
**hand** 137:22
**handle** 127:3
**handled** 103:8
126:19,23
127:20,22
134:10
**handler** 14:4
120:24 123:25

124:4
handlers 120:22
handling 18:7
  24:20 49:24
  126:2 127:14,17
  127:25 128:3
  129:9,25 130:25
  134:16
handwriting
  28:12,17 42:18
  70:16
handwritten
  42:22
happy 48:19
  120:12
headed 25:3,9
heading 96:11,13
hear 6:18
held 1:17
Helmig 28:18
Helmig's 28:19
helpful 118:21
HEREOF 137:21
hereunto 137:21
high 128:7,8,10
  128:12,15 130:4
hired 131:21
  133:2
hiring 56:10
Home 133:13
hope 62:11
hours 10:8

**I**
ID 105:18 136:7
Identification
  25:15 32:2
  36:14 38:7
  41:14 51:2
  82:14 83:2
  97:22 100:15
  117:12 122:9
identified 60:13
  64:18 65:3
  77:21 80:15
  111:15
identify 8:9 25:24
  28:3 38:12
  41:16 43:21
  51:4 52:4 60:7
  69:13 70:3
  75:17 83:8
  85:21 97:24
  100:20 117:14
  122:12
Identifying 70:8
identity 68:10
immediate 6:9
Immediately
  13:13 14:23

import 126:8
imputed 92:17
inch 103:15
inches 103:13
incident 53:3
  60:17,20 69:15
include 23:20
  85:8
included 21:10
  47:4 53:4 69:7
  101:3
including 3:10
  31:21 36:9 41:9
  82:19 106:25
incomplete 59:20
incorrect 45:3
  98:9
indemnification
  62:8
independent 50:6
  55:21 114:8
index 35:3
indicate 65:15
indicated 24:9
  111:23
indicates 119:15
industry 130:11
  130:13
info 109:19
  110:13,18,22
  111:9
information 8:22
  39:8,21 42:2
  43:3,15 50:19
  51:9,18 53:14
  53:25 54:24
  55:22 56:9
  58:10 59:11,23
  60:18,24 68:14
  69:10,17 70:6
  70:23 72:8,19
  73:5,9 76:6
  79:20 81:7
  111:8 120:22
  121:7
informational
  85:24
INFORMATIO...
  136:22
initial 8:13,17,24
  9:7,17 23:5 39:5
  39:15 61:21
  73:13 81:4
  83:15 84:10
initialed 23:4
initials 30:24
  107:24 110:20
  114:17
injured 44:22
  45:14,19

injury 20:24
  21:17
inquire 120:9
inquiry 33:14
inside 131:8,22,25
Institute 129:18
instructed 85:12
instructions 85:9
  127:14
insurance 1:7 6:3
  9:9 10:11,16,20
  10:24 11:3,14
  11:17,19,24
  12:13 13:15
  14:7 15:24 16:7
  16:11,18,20,21
  16:23,24 17:11
  17:18,19,20
  20:12 23:24
  25:4 26:25 27:6
  27:10 37:5
  38:22 39:3,12
  39:17,23 43:25
  62:10,15 63:15
  64:5 85:21 86:5
  86:15 111:17,19
  112:15 129:17
  130:5,11,13,21
  133:3,13,14,16
insured 8:18 10:2
  23:21 29:7
  50:17 51:17
  52:3 53:10,24
  54:25 55:21
  56:10 57:12,13
  58:5,7,24 59:11
  60:24 61:23
  62:12 67:21
  69:4 71:13,14
  71:21 72:15,22
  73:7 74:2,21
  76:6 77:20
  78:12 79:21
  81:11,15 88:4
  88:16 89:24
  90:6 92:6 93:15
  93:21 94:5,13
  96:23 107:8,13
  107:19 108:18
  109:18 110:2,11
  111:7 112:4
  113:19,24,25
  114:13 115:11
  122:15
insureds 52:9
insured's 43:2,15
  74:12 92:20
insurer 8:13 9:6
  51:7 65:25
  86:16

insurers 64:18,19
  66:18,22
interest 59:5
  61:24
interested 137:19
internal 129:15
  129:20
internally 10:22
investigate 21:9
  52:8,23 53:16
  55:4,17 56:12
  56:20,25 93:20
  94:13
investigating
  66:21 112:10
investigation
  55:23 56:4,5
  57:4 58:19
  70:11 73:17
  74:11,20 81:23
  94:4
investigations
  104:11,23
invoice 121:2,6
involved 120:17
irrelevant 90:5
  93:14
issue 79:25 96:17
  98:24
issued 26:3,20
  28:8 43:24
  54:22 58:18
  64:10,22 114:14
  122:14 123:17
  125:25 127:5
  136:23
issues 21:23,24
  22:3
issuing 64:3 85:12
items 78:21

**J**
J 2:14 5:3,13
  135:18
Jersey 125:11
job 13:22 14:6
  15:16 28:22
  72:4 104:4
  127:16 130:15
  131:6,20 133:19
jobs 134:4
joined 14:11
Judge 65:5
July 13:19 45:4
  131:5 132:8,9
  132:12,14,16,22
  132:24
juncture 81:20
June 93:23 94:7
  94:16 124:9

**K**
keep 34:20,24
  102:18
Knight 77:10
Knight's 112:8,11
  113:11
know 6:8,19 11:7
  11:16,22 16:3
  18:15 19:18,25
  20:6 26:14
  27:13 31:3,17
  32:11 36:3,23
  37:12,19 56:18
  56:23 57:3 66:2
  69:6 71:17 72:5
  83:6 90:11
  97:14 101:9,20
  101:21 102:23
  103:16,18
  104:17 112:10
  115:18,25
  118:20 119:4
  122:18 123:6
  127:15 129:22
  135:10
knowledge 20:17
  27:5 35:25
  74:22 81:25
  92:14 94:12
  97:10
knowledgeable
  69:14
known 133:6

**L**
L 3:3 5:3 75:10
  80:9
labor 107:15
lack 109:18
language 114:7
Larry 77:10 112:8
  112:10 113:11
late 22:24 54:3,7
  56:13 66:25
  73:15,19 89:8
  89:17 107:17
  114:15 116:10
  119:13
law 45:18,24
  57:18 86:8 90:5
  93:2,14,18
  107:15
lawsuit 6:3 18:22
  35:19,21,23
  36:4 48:25 53:4
  74:19 81:11
  88:17 90:7
  93:16 94:16
  116:20

lead 124:11
leading 12:18
learn 22:13 73:16
left 85:16 112:23
131:7,13 132:2
133:17
left-hand 31:6
legal 86:20 89:19
90:12 92:20
93:2 117:16
119:16 120:21
136:19
legally 57:13 74:3
90:7 93:17
letter 8:20 9:18,24
9:25 10:4 23:3
25:3 26:3,11,17
26:20 27:16,17
27:22 44:5,21
45:5,13,17,23
46:9 51:6,11,16
51:22 52:2 53:5
53:14,20 54:22
55:2 58:18
61:12,18 63:19
63:23 64:12,22
65:7,9,13,17,24
67:5 68:15,22
69:11 72:20
76:8,11 77:6
78:19,19,22
79:18 82:19
83:17,19,25
84:4,13 85:8,11
85:15 88:6 95:3
95:10,18,25
96:18,22,22,24
97:6,11 99:15
107:2 111:21,25
113:7,22 116:14
116:16 122:14
122:20 123:7,10
123:16 136:12
136:15,20,23,24
letterhead 25:4,8
82:20
letters 46:4 64:4
64:22 66:6 80:2
let's 7:4 33:9,21
61:3 105:12
118:8 122:2
132:10
liability 15:14,15
21:12 42:16
70:10 130:24
131:22 133:20
134:6,8,11,11
134:17,17
Life 130:14
light 96:15

limiting 55:7
line 118:19
lines 134:13,15,18
list 34:20,24
litigation 118:14
118:18
little 132:13
LLC 1:4 6:2 18:22
44:2 47:9 51:8
52:6,12 75:21
123:17
LLP 1:11 2:6,12
lo 70:20
located 12:6,10
125:10
logs 60:18
long 12:12 14:16
15:3 93:16
131:2
look 22:17 30:11
32:11 35:13
62:3 83:5 88:13
101:12 105:12
119:8
looked 7:21
looking 24:10
37:4 48:13,21
50:10 67:19
77:2 78:13
looks 112:21
113:12
LOR 106:25
loss 8:15 9:14 25:3
25:22 26:3,20
27:19 37:10
60:16 136:8
LP 47:10
L.P 45:21 46:7

M

M 5:3 105:18
Magistrate 65:5
mail 119:21
130:16
mailed 63:12
mailing 107:7
120:22
main 12:5
making 19:9,19
19:21 65:21
87:20,25
Management 31:9
31:16 85:23
131:15
manager 20:16
29:2 80:11
manner 46:20
69:2 78:11
126:18 129:14
manual 102:22

103:5,11,17,19
103:21,24 104:3
104:9,14,25
105:8 125:22,24
126:12,17,22
manuals 102:20
Marc 1:18 5:5
137:6,25
mark 24:25 25:6
31:18 36:6
37:23 41:6
50:20 82:7,16
97:15 100:5
117:5 122:2
marked 25:13,18
30:8 31:24
36:12,20 38:5
41:12 50:24
75:9 82:12,24
97:17,20 100:13
117:10 122:7
marriage 137:18
matches 34:13
material 129:23
materials 23:12
49:4 52:14
54:20 99:9,16
106:15,19,24
108:3,5,6,9
109:18
matter 24:2 27:25
50:8 89:6 96:19
104:14 107:15
114:16,25
124:17 137:19
matters 92:17
104:25
mean 9:24 16:3
33:18 35:4
meant 115:14,20
115:23
medication 10:7
members 52:5
68:11 77:21
memo 127:5
memory 22:21
34:8 37:6,10
39:11,16 41:3
42:10 46:2,21
46:22 48:4
50:11 59:21
60:3,5,9 62:20
63:7 64:7 68:18
68:25 73:3
77:24 78:3,15
78:24 81:12
104:19 108:19
110:3
mentioned 29:7
125:21

met 22:5
Michael 1:16 5:13
135:18 136:4
mike 47:12
mind 97:9
mine 37:11
minute 58:16 61:4
84:15 108:24
115:12
missing 112:23
113:7
mistaken 68:16
MJB 107:24
modifications
97:2
moment 45:9
70:13 83:4
100:17 106:4
month 33:18 89:5
130:17
morning 5:22,23
Moskowitz 1:10
2:11 57:19
motion 3:17
move 3:11,14 33:9
42:21
multi-page 75:3

N

N 2:4 3:3 5:3
136:2
name 5:11,24
10:17 11:9
12:17 26:6
39:23 43:6
70:19 80:10,13
133:9,13
named 65:8 107:7
115:11
names 43:4,9
71:23
NASSAU 137:4
nature 116:19
nearly 89:4
necessary 81:22
86:19 116:23
need 6:24 16:15
23:11 24:12
30:2 54:19
68:16 79:14
101:23 110:15
112:14 115:2
116:4,19
never 59:14
new 1:2,2,20 2:8,8
2:13,13 5:6 86:8
86:14 89:13
90:4,9 93:13,18
116:17 125:11
137:3,8

North 31:8,16
49:10 85:23
Notary 1:19 4:6
5:5 135:25
137:7
notation 43:2
108:2 119:16
note 33:12 78:17
91:18 94:8,18
99:20 100:2,10
101:14 106:21
110:25 115:20
121:18
noted 78:21
135:15
notes 8:4,5,7,9
22:17 23:5
39:11 42:23
47:25 50:2,5,11
54:20 71:5,10
72:17 80:5
99:19,22 100:23
101:3,8,16,20
102:7,10,13,18
102:25 108:13
108:23,24 111:5
112:9 117:20
136:18
notice 9:14 37:10
42:16 53:11,12
54:8 74:12
81:23 88:17,22
89:2,8 116:10
notification 25:10
30:23 136:9
Notified 107:14
notify 85:14 86:12
86:16
noting 88:8
November 117:18
118:9 120:25
number 31:20
40:5,8,10,13,15
42:23,24 43:3,4
43:12 60:7,14
67:14,17,18
68:5 72:20 77:6
80:18 91:17,19
100:7 117:7
128:25
numbered 36:8
37:25 41:8
50:22 61:19,20
82:9,18
numbering 32:23
numbers 43:21
60:2 122:4

O

O 3:3

object 3:10,14
objection 3:17
  11:6,20 12:3
  13:11 16:13
  17:14 20:9,13
  22:7,8 24:8 27:2
  27:11 28:5,24
  29:22 32:8
  33:13 51:19
  54:17 56:14,16
  57:7 78:18
  91:18 92:24
  94:9,9,19,20
  95:12 97:7
  117:22 118:2
  119:2,25 120:4
obligation 21:18
obtain 38:25
  79:19 129:2
obtained 43:9
  92:15
obvious 102:5
occur 19:3 57:15
occurred 19:7
  53:3 120:19
occurrence 42:16
  92:15
October 12:16,24
  13:6,14,20
  133:5
offered 129:24
offers 64:10
office 12:6,7
  22:24 39:16
  75:24 81:19
  121:13,14
  125:10 130:18
  134:25
offices 11:23
okay 6:22 7:4
  15:21 16:2 18:3
  30:13 34:2,3
  51:3 56:6,7
  59:18 75:16
  83:7 100:19
  112:25 119:10
old 53:9 120:22
omissions 114:8
once 73:25 81:20
  92:19
one-page 25:2,7
on-site 60:11 72:3
open 84:25
operating 102:16
operation 97:8
operations 102:21
opine 93:2
opposed 127:18
oral 58:11 95:21
order 1:17 92:7

102:9 112:13,16
orders 65:6
organization
  68:10
original 4:7,16
  24:15 121:2
  124:21,25,25
outcome 137:19
outline 103:6
outset 54:2
outside 131:24
owe 67:20
owner 62:5
  113:20
owners 62:9,11
owner's 61:23
  62:2

                P
P 2:4,4 3:3
package 109:17
pad 8:6 99:21
  100:3,10
page 28:8 29:24
  29:25 30:18,18
  30:19 33:3,4,5
  33:11 37:3,4,9
  41:18 42:3,15
  46:13,17 47:6,7
  47:12,16 51:25
  69:11 70:14
  75:12 84:23
  85:4 86:24 88:6
  88:9,14,15,20
  92:13 96:9
  112:19 136:6,10
  136:11,15,17,22
pages 30:4,5,11
  30:12,16 31:20
  32:20 33:23
  36:20 37:15
  43:18 84:7 85:2
  103:10 136:3
page-by-page
  32:18
PAGE8-20-04
  136:13
paid 119:12,16,21
paper 34:9 124:24
  125:5
papers 81:10
  107:12 114:23
  115:10
paragraph 51:25
  61:18,20 62:18
  63:10,23 67:14
  67:17 68:5
  69:11,18 70:7
  72:19 77:6 80:8
  88:9,15,21

92:13
paraphrasing
  76:18
parenthesis 107:5
  107:8
part 8:13 30:19
  37:8,14 48:14
  48:22 49:3
  57:10 68:18
  72:3 86:6,10
  112:7 130:19
partial 59:16,18
partially 96:12
participate 19:8
  19:12
participated
  19:19 20:2
particular 34:25
  49:2,15 76:7
  78:4
particularly 126:5
parties 3:7 49:15
  68:11 71:20
  112:15 114:2
  137:17
partner 27:5
Partners 45:21
  46:6 47:10
party 4:8 10:3
  17:24 18:4
  45:14,19 63:3
  70:8 110:19
  124:8
party's 44:22
passed 62:13
paying 119:19
payment 117:21
  117:25 119:24
  120:11 121:13
  121:20,24
pending 58:24
  107:21
Pennsylvania
  1:11 5:17 12:2
  131:17,19
people 18:12 70:4
  133:4 134:23
percent 63:7
perfected 92:20
performed 14:3
  18:6
period 12:18
  33:15,22 34:6
  36:18 55:15
  56:6 73:12
  133:8
permission 107:16
person 39:2,20
  60:13 69:13
  109:6,7

personal 134:14
personally 105:21
person's 39:7
pertaining 60:20
  125:25
Philadelphia 1:11
phone 42:24
  43:12 110:7
photocopy 26:6
piece 34:9
place 1:18
placed 71:14
plaintiff 1:4,16
  2:7 5:25 122:3
Plaintiffs 83:21
plaintiff's 25:2,6
  25:14,18 27:19
  28:4,7 29:4
  30:21 31:19,25
  36:7,13,21
  37:24 38:6 41:7
  41:13 50:21,25
  61:11 67:10
  70:13 72:11
  82:8,13,17,25
  83:5,9,10,18
  84:9,21,23
  85:14 86:12,17
  87:17,24 89:23
  94:25 96:8
  97:16,21 100:6
  100:14 105:11
  106:4,13 117:11
  119:7 120:6
  122:8 123:15
  136:6
pleadings 116:3
please 5:12 6:18
  6:21 24:25 25:6
  29:6 31:18 36:6
  37:23 41:6
  42:14 44:25
  46:12 50:20
  52:16 82:7,16
  83:4 91:18
  97:15 100:5
  106:4 109:16
  117:5
point 105:6
  129:13 131:23
poisoning 124:11
policies 130:20
policy 23:20 37:16
  37:19,20 40:13
  43:24 113:18
POO103 122:4
POO108 122:4
portion 17:8
  52:20 59:22
  75:6 76:22 80:9

81:23 90:18,25
  91:9 98:5
Portions 7:17
positive 65:2,4
  67:2
possible 54:7
possibly 16:25
  23:23 72:17
  74:23
potential 21:23
  69:15
potentially 70:9
practice 26:15
  34:19,23 119:22
practices 127:25
Precast 77:9
premises 33:21
  34:5
preparation 7:6
prepare 26:17
prepared 26:11
  26:13 51:11
prescribed 93:18
present 134:15
presented 62:12
presumably 38:22
  39:3 43:14
  49:22 63:13
  71:21 89:15,20
  108:20 113:18
  115:16,22 121:2
presume 88:9,12
  107:5
presuming 59:4
Pretty 114:13
previously 11:11
  30:8 36:8 64:23
  67:6 75:9 78:10
principal 92:17
principals 52:5
  60:8
printed 120:21
printout 101:8
  136:18
printouts 100:22
prior 12:24 13:13
  14:23 32:6,7,21
  49:12 67:8
  74:22 89:9
  105:6 116:16
  118:8,24
privileged 57:9
probably 9:11
  51:13 62:20
  71:6 104:15
  113:21
procedure 102:17
process 24:20
  57:11 88:19
  127:7

produced 64:24
65:4 67:6
product 134:12
134:18
production 64:21
67:4
products 101:13
program 21:14
124:9,15 129:15
programs 16:21
17:21 18:2,6,7
19:16 20:16
21:19 22:10
27:6 54:6 99:7
107:15 124:12
126:12,14,20
127:3,11,18
128:3 129:25
130:2
progress 81:22
progressed 74:20
project 60:12,18
61:24 62:3
69:14 80:10
proper 92:19
properly 89:5
property 62:9,11
113:20 130:25
131:8 134:8
proposed 98:24
provide 113:25
provided 3:9 4:10
60:15 73:9 76:6
77:20
Providian 133:12
134:13
Public 1:19 4:6
5:5 135:25
137:7
purposes 85:25
Pursuant 1:16
put 107:4,22
108:25
putting 65:12
p.m 135:15
P.O 5:16
P5502044 40:6

**Q**

question 3:11,14
6:18,21 30:14
32:4 36:16 55:8
69:20 76:14,17
90:14 91:4,13
91:17 93:3
122:11
questions 6:12
95:8,15 135:14
quite 53:7 125:3
quote 71:12

**R**

R 2:4 5:3 137:2
read 10:4 17:3,7
52:16,19 69:19
69:23 70:19
75:2,5,14 76:17
76:21 90:14,17
90:20,24 91:4,8
91:22 92:8
109:14 111:13
113:9 114:21
115:13
readily 9:22
102:15 131:10
reading 90:10
116:2
reads 29:6 100:8
112:7,19
real 33:14
realized 126:8
really 24:10,12,21
49:14 104:5
reason 52:22
61:17 67:13
69:16 70:6
71:25 77:7
116:25
recall 7:25 8:2,19
20:5 23:14
24:11,14 29:14
30:20 31:13,14
32:19 33:4,10
34:5 35:16,20
37:11 39:22
40:3,17 41:5
43:8,10,12 44:9
44:11,17,20
45:4,22 46:8,16
46:19,24 47:14
47:19,20,24
48:3,6,24 49:8
49:14,18 50:7
53:21 57:24
60:25 62:21,24
63:2,5,8,11,17
63:20,22 64:2,7
64:9,11 65:12
66:4,9,10,15
67:22,25 68:8
68:25 69:4
70:22 77:13,15
78:15 79:23
80:6,22 95:6,7
95:14 96:2
104:24 109:5
110:5 112:3
116:18 131:10
recalling 115:22
receipt 46:6 81:10
91:24 116:2

receive 23:10,17
40:25 41:22
57:25 58:2,10
62:18 63:10
68:4 72:7,18
77:8 108:6
113:22
received 9:8 27:24
30:3,5 34:14,17
34:24 44:10
46:25 47:5
49:20 53:10,12
59:14,16 60:25
62:19 63:4,22
64:2,7 66:5,7,19
67:23 68:17,21
68:25 73:2
75:24 77:4
78:11,24 79:22
79:24 80:25
84:5 87:7 88:17
88:22 89:2,12
89:25 90:6 92:6
93:16,21 94:5
94:14,25 95:16
95:17 101:11
106:10 108:5,9
110:22,24
115:10 118:4
119:20 121:11
121:16 122:20
123:9
receiving 44:11
68:8 78:15
recess 61:7 84:18
125:18
recognize 28:15
recognizing 54:2
recollection 7:14
19:2,4 24:5
27:23 29:19
36:25 42:4 50:7
59:13 62:16
65:15,20 76:5
77:3,19 87:10
109:10
recommendation
87:8,20,25 93:9
95:23 96:5
recommended
54:5 79:5 89:7
129:16
recommending
55:19
record 5:12 48:12
56:8 57:16
65:24 66:19
70:20 84:15
137:12
recorded 99:23,25

redacted 8:24
102:7
redactions 102:14
Reena 83:11
refer 10:21 15:22
17:25 33:2 54:9
59:9 68:24
72:13 75:12
106:3
reference 104:2
111:4 121:11
referenced 39:14
52:13 76:10
77:15
referral 81:3
referred 10:19
25:13 31:24
36:12 38:5 40:9
41:12 50:24
57:18 82:4,12
82:24 83:20
97:5,20 100:2
100:13 117:10
122:7
referring 15:23
106:20 107:25
115:6
refers 29:9 31:4
40:7 105:19
119:14
reflect 42:23
71:10,12 108:24
117:20
reflected 48:2
72:15 101:15,17
reflective 78:21
refresh 27:23
29:18 76:5 77:3
77:19
regard 21:6
regarding 126:9
registered 90:8
92:21
regulations 86:15
relate 129:8
related 13:4 72:23
137:17
relation 26:24
relationship 11:2
11:17 52:11
relevance 92:12
relevant 70:9
118:22
relied 87:25
remember 9:19
14:2 42:8 70:15
renew 105:6
reopened 114:25
rep 111:14,15
repeat 67:7

repeated 6:19
rephrase 6:22
74:14
reply 41:3
report 8:17,25
9:17 18:9 29:6,9
29:14 39:15
52:9,25 58:3
73:19 74:18
83:15,22,25
84:10 88:10
89:18 90:11
92:16 95:16
99:14 100:9
reportable 127:10
reported 18:12
74:6 81:19
reporter 5:9 17:6
52:18 69:22
75:4 76:20
90:16,23 91:7
137:7
reporting 9:9,10
21:13 54:4
66:25 73:15
89:5 107:17
127:11,12
reports 60:16,17
60:17
represent 5:25
representation
9:18,24 44:5,21
45:6,18,23 53:5
107:3
representative
60:12 72:3
111:20
represented 10:2
45:14,19 76:8
representing 4:19
represents 44:6
reproduce 121:5
request 42:6
50:17 53:22,24
54:10,12,14
55:21 58:24
59:7 65:22 67:8
67:24 72:8
73:13 93:12
96:11,16 105:7
107:19,22,23
108:25 109:2
123:11 124:12
136:22
requested 39:9,17
52:3 59:25
61:17 64:8
69:10,17 72:19
73:10 79:21
86:2 107:16

123:3
requesting 38:23
  39:13,20 51:8
  70:6
requests 59:4,10
  60:2,5,7,23
require 86:16
required 113:21
  114:2
requirements
  21:13
requiring 102:25
rereading 91:17
reserved 3:13,18
respect 17:17
  20:22 22:14
  23:14 24:19
  59:19 91:16
  105:15 123:18
respective 3:7
  64:18
respects 49:23
respond 40:21
responded 40:18
  58:25 59:8 60:6
  63:16 69:4
  91:13
response 42:6
  59:15,17,18,19
  60:14 62:18
  63:22 64:5
  66:16 67:5,8,16
  67:18,24 68:4
  68:14,17,20
  69:2,20,24 72:8
  76:25 78:12,14
  79:24 85:5
  91:12 98:3
  136:17,24
responses 66:5,8
  66:12
responsibilities
  15:9 16:10
  17:12 20:22
  21:5
responsibility
  21:22 22:2
responsive 60:4
  63:9
rest 42:12 84:25
retain 125:6
retained 124:10
return 4:7 30:21
returning 67:10
  70:12
review 7:5,10,15
  23:11,17 24:6
  24:13 27:16
  38:10 50:13,14
  61:22 68:16

81:4 100:18
104:6 111:24
116:19 119:23
reviewed 7:11 8:3
  8:11,23 22:22
  24:14,18 29:20
  34:8 35:9 37:2
  45:8 47:25
  49:22 50:8,16
  74:4 83:7 87:11
  87:19 94:25
  108:14 121:23
reviewing 8:2,20
  19:5 21:10 71:5
Richard 18:23
  20:25 22:13
  35:19,24 44:6
  47:8 49:11
  68:12
Richards 109:21
  109:23 110:6,6
  111:7 123:7
right 3:10,16 6:9
  28:12 38:19
  70:17 78:9
  111:16
rights 3:9 4:10
right-hand 30:24
  32:23
risk 31:8,16 62:2
  85:23 131:15
Robert 43:6 70:23
  71:17 72:2
  80:11
Rodriguez 43:5
  63:13 71:20
  108:21 109:6
room 130:17
Rule 4:10
rules 86:15

———— S ————
S 2:4 3:3,3 136:6
sake 18:3
salutation 40:5
satisfied 91:12
satisfy 92:7
saved 125:4
saw 30:17 32:14
  33:15,18,22
  34:6 36:19
saying 73:23
  121:9 125:4
says 31:8 32:24
  38:19 91:23
  92:5,9 96:15
  100:9 105:18,18
  106:23 108:3,17
  109:17 119:11
SB 30:25

Schafler 1:18 5:6
137:6,25
Schneider 2:6,8
  5:20,25 13:9
  24:25 31:18
  33:20 35:5 36:6
  37:23 41:6
  45:10 48:18
  50:20 52:15
  53:19 58:15
  61:3 64:20
  65:11,21 67:3,9
  72:10 74:25
  76:16 82:7,16
  90:13 91:14,25
  93:5 97:15
  100:5 105:5
  113:4 117:5
  118:15,20 120:3
  120:14 122:2,24
  123:22 125:13
  135:13 136:4
school 128:7,8,10
  128:13,16 130:4
scratch 51:22,23
search 66:3
second 30:18 37:9
  42:15 43:6
  70:14 84:12
  85:3,4,24 86:24
  88:21
Secretary 88:5,25
  89:13
see 25:17 28:11
  30:2,23 31:7
  32:22,24 35:13
  43:3 62:4 67:11
  72:24 79:14,15
  88:14 91:22
  96:10,12,19
  101:23 102:13
  108:23 112:7,14
  116:20 118:5,24
  119:11 123:5
seeing 102:4
seek 54:15
seeking 8:21
  53:13 54:24
  55:3 56:9
seen 30:15 32:5,12
  32:20 33:5,10
  35:16 118:11
  119:5
seminars 129:19
send 42:5 51:17
  99:10 111:25
sending 55:20
  111:23
senior 14:8,13,20
  14:24 15:2,4,6,9

15:17 21:8
128:12
sense 112:25
sensitive 110:16
sent 9:16 33:18
  38:14 39:18
  50:17 53:22,23
  63:8 64:11 66:6
  84:7 87:12
  96:23 108:21
  110:17 111:22
  117:17 121:3
  124:22 125:2
sentence 29:5
separate 59:10
  84:3 85:15
  86:13
September 19:7
  33:17 34:2,15
  35:10 36:19
  55:16 79:8,14
  79:18 82:21
  83:14 84:6 85:6
  87:3,13 89:10
  89:19 95:2,5,9
  95:10,11,18,24
  98:6,11,16
  99:10 110:25
  119:13 122:16
  122:21
served 57:13 58:5
  58:7 74:3,4 88:4
  88:24 90:8
  93:17 107:13
service 46:6,15,20
  74:5,19 81:14
  81:16,21 82:2
  88:18,19 92:19
  127:6
Services 131:16
set 26:21 61:17
  137:11,22
settlement 127:9
seven 40:13 133:7
seven-year 133:18
sheet 41:19,23
  106:6
Shore 31:8,16
  49:10 85:23
short 125:14
  127:8
shortly 110:13
  112:2
show 30:7 32:21
  75:8
showed 7:12
  32:17
showing 36:5
  37:16
shown 78:18

sign 26:17
signature 26:6,7
  51:14 90:10
signed 26:8 51:12
similar 44:12,17
  44:18 76:2
simplicity 18:3
simply 66:18
  76:25
sir 7:3
Sirius 65:8 110:11
sit 39:22 48:5
  63:21 71:16,24
  91:21 109:4
  110:4 122:17
Sitting 35:7
situation 54:4
situations 26:16
slight 96:25
sold 133:15
sole 124:10
solely 93:6
someone's 97:8
soon 110:17
sorry 13:9 14:2
  72:10 76:15
  90:20 125:3
  132:16
sought 53:14
  112:16
source 43:9 46:24
speak 33:4 102:25
  103:2 135:7
speaking 92:18
speaks 91:20
  92:11,25 102:24
Speciality 11:18
Specialty 10:11
  11:4,8
specific 7:25 46:3
  71:7 77:24 78:3
  104:24 117:24
  127:13
specifically 7:24
  47:18 75:12
  103:3
specified 67:14
spectrum 104:16
spoke 109:7,21
staff 26:22
stamp 75:23 76:2
  79:17 121:12,13
standard 51:16
  102:16
start 12:25 118:14
  118:18
started 7:4 133:23
starting 128:7
starts 47:12
state 1:2,20 5:6,11

38:16 42:11
44:13 46:22
49:2 88:5,25
89:14 90:9
113:24 137:3,8
statement 86:25
102:3
states 29:25 88:16
107:11 110:25
113:11
status 113:20
stay 118:8
staying 29:4
108:16
stenographer
1:19 6:10
Stenotype 137:6
step 23:13,16
steps 53:15 55:11
56:12,19,24
59:2 71:2 79:17
stint 133:19
STIPULATED
3:5 4:14
stop 109:22
stopped 124:3
stored 101:5
124:24 125:7
Street 1:4 2:7,13
6:2 18:21 20:23
22:14 40:15
44:2 47:8 51:7
52:5,11 60:8,10
63:3,14 75:21
77:22 88:20,23
89:11 123:17
strike 3:12,15
strong 81:5
sub 107:20 111:3
subcontractor
64:17
subcontractors
62:7
subject 104:14,25
submission 8:15
24:15 29:11
submitted 8:12,16
9:5,13 23:19
50:13,15 52:14
81:5 83:22
Subscribed
135:20
subsequent 8:17
9:16
substance 66:16
85:3 135:3,11
sub's 111:3
sued 68:12 74:23
suffered 20:25
sufficient 74:10

81:7
suggest 123:11
suit 81:9 107:12
114:22 115:10
suits 115:17
sum 66:15
summarize 7:20
summarized
108:13,14
summons 9:15
35:18 47:7
81:18 88:23
89:12 90:2
93:22 94:6,15
supervisor 18:10
18:11,17
supplemental
96:17 97:5,11
115:3,7 116:7,9
116:13,22
supplied 59:24
68:14 71:19
72:22 73:4
supported 107:18
suppose 115:13
supposed 127:22
SUPREME 1:2
sure 28:21 30:17
45:10 61:13
64:14 106:9
108:20 118:22
127:4
suspect 81:20
102:18 121:16
suspicion 81:6
switched 131:25
sworn 4:5 5:5
135:20 137:11
system 8:8 101:6
101:19 105:22
121:6 125:8

---
T
---
T 3:3,3 136:6
137:2,2
take 6:25 30:11
45:10 53:16
54:23 55:11
56:11 58:13,16
59:2 61:3 71:2
79:19 83:4
92:18 100:17
101:6 105:9,13
119:8 125:14
128:14 129:5
taken 1:16 4:9 6:6
10:7 61:7 84:18
125:18 129:17
talk 89:24
talking 27:20

61:10 68:21
84:21
telephone 43:4
48:2,8 80:18
tell 6:21,25 7:24
9:23 10:6 13:4
15:22 29:8
32:19 40:6
42:22 43:11
52:2 61:16
67:12 69:9
87:23 97:4
102:21 103:9
104:4,13 106:18
115:5 119:13
telling 94:22
tended 64:16
tender 64:4,10,12
64:21 65:7,9,13
65:16,24 66:5
67:5 80:2
107:20 111:21
112:9,12 113:12
136:23,24
tendered 111:2
tenders 110:19
term 29:8
terms 62:4,14
103:2,4
testified 5:7 33:8
48:15 49:6
55:13 70:16
78:10 84:22
99:18 106:5
122:23,25 126:6
126:18
testify 32:12 34:7
34:12 36:3 37:7
37:13,20 42:18
46:2 63:7 64:6
testifying 36:24
39:10
testimony 3:12,15
56:8,15 65:14
68:3 137:13
Thank 6:23 10:5
93:19 135:13
thick 103:14
thing 92:9
things 9:4
think 9:22 33:8
48:13,15 71:11
135:9
thinking 116:21
third 17:23 18:4
92:13 124:8
third-party 99:5,6
thought 48:19
63:24 65:18
73:8 79:22

132:14
threshold 22:5
thrust 33:14
time 1:17 6:17,20
6:24 12:18
18:19 22:12
23:2 26:21
27:24 30:5
33:22 45:11
53:18 54:22
55:9,24,25
58:22 61:6
64:19 74:9,13
74:15,15 77:4
80:24 84:17
85:6 93:8,11,20
94:3 95:10
104:3,3,7
110:15 118:19
119:12 124:2
125:17 126:10
130:24 131:7
133:6 135:14,15
timeliness 52:8,24
53:16 55:5,12
56:20,25 58:20
timely 74:18 81:9
times 133:10
title 13:21,25
14:10,17,18,25
15:5 18:16
131:9 134:2
titles 14:3,5
today 7:7 30:16
65:9
told 9:5 70:23
110:10,14 127:2
135:9,11
top 30:18,19 42:2
47:11 88:16
100:8
topics 129:17
tort 45:20
TPA 120:7
trained 130:18
training 86:21
127:23 128:2
129:14,16,20,23
transcribed 4:5
transcribing 6:11
transcript 4:7,18
transmittal 30:2,6
39:19 41:25
trial 1:15 3:13,18
tried 121:5
trigger 116:4
triggers 21:17
114:3 127:12
true 137:12
truly 49:18

try 120:13
trying 13:18 14:2
36:23 52:10
53:9 69:12
101:10
turn 46:12 89:2
96:9 112:18
113:8 124:15
turned 65:14
Turning 47:11
two 30:10,15 43:4
43:9 45:7 53:2,8
54:23 60:4
62:20 65:19
66:7 84:7 85:2
103:15 118:9
132:13
two-and-a-half
34:9 37:2
two-week 73:12
type 27:9 51:16
63:19 72:25
105:21 130:20
130:21
typed 8:8 26:5
51:23
types 127:9
typically 15:14
23:19 61:25
62:7
typographical
97:12

---
U
---
U 3:3
ultimately 34:18
89:4 96:23
underneath 25:9
understand 6:20
10:5 12:23
76:13 89:22
90:4 93:4
109:23 113:5
120:23 125:4
understanding
86:7,14 92:2,23
93:13
understands 92:4
understood 35:17
Underwriters
133:3,9,12
uneventful 135:12
unreasonable
89:6
upper 28:12 70:17
128:12
use 16:2
user 105:18
Utica 111:14,17
111:19 112:11

**Utica's** 112:3

**V**

**vacation** 110:14
**various** 8:11
129:16
**verified** 81:21
82:2 88:24
**Vis-a-vis** 17:10

**W**

**wait** 115:12
**waived** 4:17
**waiver** 3:16 4:9
**Walsh** 19:15,18
20:6,15 22:3
79:7,13 87:12
87:21 93:9,12
95:19,22 96:4
98:13,20 99:10
126:5 127:6
135:6,8 136:17
**Walsh's** 21:19
87:7 98:3
**want** 12:25 38:16
42:12 50:5
61:12 70:3
91:21 113:3
115:13 118:18
120:7 132:5
**way** 10:25 27:23
43:22 44:18
73:22 91:13
101:21 120:15
120:17 122:18
137:18
**ways** 130:8
**weak** 114:13
**weeks** 118:9
**Weiner** 31:9,12
40:2 41:20 42:5
47:5,15,22 48:7
48:7 49:7,9,21
50:9,15 54:12
106:7
**went** 34:18 120:6
131:14 132:17
132:24 133:11
**weren't** 106:9
**WGG** 40:12
**willing** 42:18
**Wilson** 1:10 2:11
57:19 82:20
83:12 117:17
136:16,19
**WITNES** 78:7
**witness** 4:6,19 5:4
65:14,18 75:8
77:14 78:2,23
92:7 104:19

113:6 120:12
126:15,21 132:7
136:3 137:10,13
137:21
**WK** 85:25
**WKF** 9:11 23:22
25:8 26:23 27:4
27:8 28:9 89:3
99:8
**word** 101:7
112:20 116:8
**words** 15:25
116:2
**work** 5:15 11:10
12:7,9,23
101:12 107:11
130:3,10 131:14
132:25
**worked** 13:5,22
109:25 129:12
131:4 132:7
133:4,8 134:9
134:13
**workers** 45:15
**working** 130:12
**Worldwide** 133:2
133:9,11,14
134:14
**wouldn't** 19:25
**writes** 92:12
112:8 113:12
**writing** 58:10,12
66:13 69:6
107:23 109:2
116:12
**written** 72:25
80:14 105:6
**wrote** 8:9 43:5,6
43:13 66:18
71:17 88:21
108:22 116:6

**X**

**X** 136:2,6
**XL** 10:11,15,20
10:22,23 11:3,4
11:8,14,17,18
11:23 12:13
14:7 15:22,23
16:2,5,18,20,21
16:24,25 17:11
17:20,24,25
18:2,5,7 19:15
20:16 21:19
22:10 25:4
26:24 27:6 54:6
56:19 59:14
60:22 64:22
79:5 99:7
102:17,23 103:5

103:24 107:15
123:21,23
124:12 125:22
125:25 126:2,9
126:11,14,16,19
126:21,23 127:3
127:10,18,18
128:3 129:24
130:2 133:5,23
136:23
**XLP** 107:14
**XL's** 16:9

**Y**

**year** 133:8
**years** 34:9 37:2
53:2,9 128:23
128:25 129:10
129:21 132:13
132:20
**yesterday** 7:13,16
19:5 22:22 32:6
32:7,13,15,21
33:6,11,13
47:25 49:13,17
87:12 118:25
**York** 1:2,2,20 2:8
2:8,13,13 5:6
86:8,14 89:13
90:4,9 93:13,18
137:3,8

**0**

**04** 33:16 119:9
**05** 114:19

**1**

**1** 25:2,14,19 27:19
60:2 61:18,19
61:20 62:18
63:10,23 67:18
77:6 91:17
119:9 136:8
**1st** 124:9
**1-18-05** 113:9
**10** 82:21 83:14
84:6 95:2,9,11
95:18,24 97:16
97:21,25 98:17
136:17
**10th** 89:19 99:10
**10-12** 112:7
**10-18** 112:19
113:3
**10-6-04** 111:12
**10:35** 1:13
**100** 63:7 136:18
**10004** 2:8
**10017** 2:13
**105** 1:4 6:2 18:21

20:23 22:14
40:15 43:25
47:8 51:7 52:5
52:11 60:8,10
63:2,14 75:21
77:21 88:19,23
89:11 123:17
**11** 29:25 30:4
100:6,14 105:12
106:13 119:7
136:18
**117** 136:19
**12** 79:8 117:6,11
120:6 136:19
**122** 136:20
**13** 122:3,8 123:16
136:20
**135** 136:4
**15** 19:7 79:14,18
**15th** 87:14 98:11
**150** 2:13
**16** 98:6 136:10
**16th** 85:6 87:3
**18** 28:10 33:16,25
35:10 36:18
55:15 89:3
**18th** 22:25
**19** 25:5 117:18
**19th** 22:18 23:2
118:9
**19341** 5:17
**1985** 128:13
**1988** 130:13,19
134:2
**1990** 132:15,16
**1994** 132:9
**1996** 13:19

**2**

**2** 25:7,14 28:4,7
29:5 30:22 60:2
67:15,17,24
69:11 88:9,14
91:19 136:9,17
**2:04** 135:15
**20** 34:2 35:10
36:19 38:15
41:21 47:16,22
49:7 55:16 88:4
88:18,25 89:10
90:3 95:5,11
122:16
**20th** 22:18 106:8
**2000** 131:5 132:13
**2001** 12:17,24
13:6,14,20
133:5
**2002** 15:7 44:8,23
45:17
**2004** 16:5,9,18

18:8,10,13 19:7
22:18 25:5
28:10,20,23
33:17,25 34:2
34:16 35:10,10
36:18,19 38:15
41:21 45:25
47:17,23 49:8
55:10 60:21
75:22 79:8,16
79:18 82:21
83:14 87:4 88:5
88:18,25 89:3
89:10 90:3
93:23 94:7,17
95:5,11 98:7,17
101:13 103:22
103:24 117:18
118:10,12
120:25 122:16
132:9
**2005** 118:12,16
124:9
**2006** 1:13 14:19
30:10
**2007** 135:21
137:22
**23** 136:13
**24th** 108:15
**25** 53:15 55:2,8,10
60:21 72:20
136:8,9
**25th** 55:10 61:12
**26** 75:22
**27** 79:16
**27th** 75:25
**270** 33:9
**29** 1:13

**3**

**3** 31:19,25 43:18
51:25 60:7 68:5
88:15 136:10,15
**305** 96:9
**306** 82:19
**309** 82:9
**31** 136:10
**3116** 4:10
**32** 50:22
**36** 136:11
**38** 136:12

**4**

**4** 36:7,13,21 43:18
69:11,18 70:7
72:8 136:11
**4-20-04** 107:14
**403** 117:7
**405** 117:7
**41** 136:13

**42nd** 2:13
**48** 10:8

**5**

**5** 37:24 38:6,10
    43:19 60:14
    72:20 92:13
    136:4,12
**5-24** 30:9
**5-24-06** 75:11
**5-26** 114:18
**5-26-05** 117:3
**50** 136:14
**520** 5:15 11:24

**6**

**6** 41:7,13 43:19
    44:8 70:13 80:8
    88:20 106:5
    136:11,13
**6th** 2:7 45:16
**600** 12:10
**636** 5:16
**64** 136:23
**67** 136:24

**7**

**7** 50:21,25 59:9
    61:11 67:11
    72:9,11 136:14
**7-2-02** 136:14
**75,000** 21:14,16
    22:4

**8**

**8** 82:8,13 83:5,9
    83:10 84:22,23
    110:25 136:15
**8-18-04** 136:10,11
**8-20** 108:6,7,11,12
**8-20-04** 105:13
    136:12
**8-24** 108:17
**8-24-04** 106:14
**8-31** 109:13 111:5
**8-6-02** 107:9
**82** 136:15,16
**88** 132:11

**9**

**9** 82:17,25 83:5,18
    83:21 84:9,22
    87:17,24 89:23
    95:2 96:8
    136:16
**9-17** 102:11
**9-20-04** 136:20
**9-8** 102:11
**90** 2:7
**94** 132:21,22,24

**97** 136:17

151

Errata Sheet

Name of Witness _____

| Page | Line No. | From | To |
|------|----------|------|-----|
| | | | |

# EXHIBIT "R"



XL Specialty Claims Administrator
520 Eagleview Boulevard
PO Box 636
Exton, PA 19341-0636
USA
Phone  800-432-2481
           610-458-7445
Fax      610-458-7448

August 25, 2004

VIA – FACSIMILE ONLY
FAX NO. (212) 534-5021

Estelle Rodriguez
105 Street Associates, LLC
c/o BFC Construction Corp.

| RE: | | | |
|---|---|---|---|
| Insured | : | 105 Street Associates, LLC |
| Claimant | : | Richard Conrad |
| Date of Loss | : | July 2, 2002 |
| Issuing Company | : | Greenwich Insurance Company |
| Policy No. | : | WGG5001058 |
| Our File No. | : | P5502044 |

Dear Ms. Rodriguez:

Please be advised that we are the claims administrators for Greenwich Insurance Company, and are handling this matter on their behalf.  We acknowledge receipt of a copy of the lawsuit captioned *Richard Conrad against 105 Street Associates, LLC, BFC Construction Corp. and BFC Partners, LLP.*  The claim is currently under review and we are requesting additional information from your office to assist with our coverage analysis and ongoing handling of this matter.  Specifically, we are requesting the following information/documentation at this time:

1.    We need a complete copy of the contract between 105 Street Associates, LLC and BFC Construction Corporation, along with any insurance certificates and/or insurance information supplied by BFC Construction Corporation effective July 2, 2002 for this project.

2.    We need a copy of the subcontract and any insurance information between 105 Street Associates, LLC or BFC Construction Corporation and subcontractor, Jem Erectors, Inc.

3.    We are requesting copies of the corporate filings to identify the principals/members of 105 Street Associates, LLC.

A division of XL Specialty Insurance Company                                    A member of the XL Capital group

August 25, 2004
Page 2

4.     Please advise if 105 Street Associates, LLC had an on-site representative for the duration of this project, and if so, identify that individual and provide us his/her contact information.

5.     We are requesting copies of any reports you may have regarding the incident itself: claim reports, incident reports, daily project logs, etc.

We anticipate that additional information and documentation will be required as we move forward; however, we are asking that you expedite the aforementioned documents and information to us at this time.

If you have any questions or would like to discuss this matter in further detail, please contact me at your convenience.  My mailing address is P. O. Box 688, 520 Eagleview Blvd., Exton, PA 19341-0688.  My fax number is (610) 458-2519 and e-mail address is Michael.Barnaba@xlenvironmental.com.

Regards,

Michael J. Barnaba
Senior Claims Analyst

MJB/vap

GR0000000032



## WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

150 East 42nd Street, New York, New York 10017-5639    Tel: (212) 490-3000    Fax: (212) 490-3038

*New York • Los Angeles • San Francisco • Washington, DC • Newark • Philadelphia • Baltimore • Miami • Chicago • White Plains, NY*
*Dallas • Albany, NY • San Diego • Houston • Garden City, NY • Boston • McLean, VA • Stamford • London*
*Affiliate Offices: Paris • Berlin • Cologne • Frankfurt • Munich*

www.wemed.com

September 10, 2004

<u>PRIVILEGED AND CONFIDENTIAL</u>                    <u>RESPONSE REQUESTED</u>
<u>FIRST REPORT OF COVERAGE COUNSEL</u>               1) Approval to Send Enclosed
                                                        Declination Letter

*Via E-Mail and Regular Mail*

Mike Barnaba
XL Environmental, Inc.
520 Eagleview Boulevard
P.O. Box 636
Exton, PA 19341-0636

|       |            |                        |
|-------|------------|------------------------|
| Re:   | Insured:   | 105 Street Associates, LLC |
|       | Claimant:  | Richard Conrad         |
|       | Policy No.:| WGG 5001058            |
|       | D/Loss:    | July 2, 2002           |
|       | Client File:| P5502044              |
|       | Our File:  | 06928.00226            |

Dear Mr. Barnaba:

This correspondence will confirm our acknowledgement of the assignment and constitute our first report based upon our investigation, analysis and review. Our review of the materials presented support a declination of coverage with regard to this matter on a late notice basis. We request authority to issue the enclosed coverage letter to the insured, declining coverage.

### BACKGROUND

On July 2, 2002, the complainant, Richard Conrad ("Conrad"), was allegedly injured when he fell at a work site at a building located at 235-237 East 105th Street, New York, New York (the "Building"). Conrad was an employee of Jem Erectors, Inc., the subcontractor working at the Building. The Building is owned by the insured entity 105 Street Associates, LLC ("105 Street"), whose office is located at 2226 First Avenue, New York, New York 10029.

We note that while the address shown for the named insured is the same as that listed for co-defendants, BFC Construction Corp. ("BFC Construction"), and BFC Partners, neither BFC Construction, nor BFC Partners, are named insureds under the Policy. Rather, we understand

1701963.1

PLAINTIFF'S EXHIBIT **9**
FOR IDENTIFICATION
DATE **12-29-06**
MARC SCHAFLER

GR0000000300

XL Environmental No. P5502044
Our File No. 06928.00226
Page 2

that as the general contractor, BFC Construction is insured by Sirius. We also understand that BFC Partners was the developer in this matter, and we do not know if it maintains General Liability Insurance.

| | |
|---|---|
| INSURED: | 105 Street Associates, LLC |
| | c/o BFC Construction Corp. |
| | 2226 First Avenue |
| | New York, NY 10029-2307 |
| CLAIMANT: | Richard Conrad |
| COVERAGE: | Greenwich Insurance Company Commercial General Liability Insurance Policy No. WGG 5001058; effective April 15, 2002 to April 15, 2003; $1,000,000 per occurrence and $2,000,000 in the aggregate. |
| D/LOSS: | July 2, 2002 |
| D/CLAIM REPORTED: | August 19, 2004 |
| NATURE OF CLAIM: | Personal injury by employee of subcontractor |
| LITIGATION: | Richard Conrad v. 105 Street Associates, LLC, BFC Construction Corp., and BFC Partners. L.P., Index No. 105554/04. |
| LIABILITY OF INSURED: | Undetermined at this time. |
| LIABILITY OF UNDERWRITERS: | Does not follow that of the insured. |

## BACKGROUND

Our review of the materials submitted to date reveals that notice of the alleged accident was first received by WKF&C Agency, Inc. on August 18, 2004, by facsimile from the insured's broker, North Shore Risk Management, LLC ("North Shore"), with a Notice of Occurrence/Claim. In addition, on August 20, 2004, North Shore also submitted the Notice of Occurrence/Claim, the summons and verified complaint and an August 6, 2002 letter from the claimant's counsel to the insured advising of a workmen's compensation claim filed on the claimant's behalf.

We note that the insured appears to have been served on April 20, 2004 by service of the Summons and Verified Complaint served on the Secretary of State.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
1701963.1

XL Environmental No. P5502044
Our File No. 06928.00226
Page 3

## LITIGATION

On April 8, 2004, the claimant commenced an action in the Supreme Court of the State of New York, County of New York entitled, Richard Conrad v. 105 Street Associates, LLC, BFC Construction Corp., and BFC Partners, L.P., index no. 105554/04, for personal injuries sustained while working at the insured's premises. Thereafter, the insured first received notice of the lawsuit by service dated April 20, 2004. The service of process was directed to 105 Street Associates.

## COVERAGE

### 1. The Policy

Greenwich Commercial General Liability Insurance Policy No. WGG 5001058 was issued to 105 Street Associates, LLC on an occurrence basis for the period of April 15, 2002 to April 15, 2003 with a limit of liability of $1,000,000 per occurrence and $2,000,000 in the aggregate.

Under the heading, "COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY," the Policy provides:

    1.    Insuring Agreement

    a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

    b.    This insurance applies to "bodily injury" and "property damage" only if:

        (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

        (2)    The "bodily injury" or "property damage" occurs during the policy period.

    c.    Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

The Policy contains the following definitions:

XL Environmental No. P5502044
Our File No. 06928.00226
Page 4

(3)    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time

(13)    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

The Policy further sets forth in "SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS":

2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit

a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

(1)    How, when and where the "occurrence" or offense took place;

(2)    The names and addresses of any injured persons and witnesses; and

(3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.    If a claim is made or "suit" is brought against any insured, you must:

(1)    Immediately record the specifics of the claim or "suit" and the date received; and

(2)    Notify us as soon as practicable. You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.    You and any other involved insured must:

(1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim of "suit";

(2)    Authorize us to obtain records and other information;

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
1701963 1

XL Environmental No. P5502044
Our File No. 06928.00226
Page 5

   (3)  Cooperate with us in the investigation or settlement of the claim or defense against the "suit";...

  As defined by the Policy, the terms "we", "us" and "our" refer "to the Company providing the insurance."

## 2. Analysis

  Under New York law, compliance with an insurance policy notice provision operates as a condition precedent to coverage. Sirignano v. Chicago Ins. Co., 192 F. Supp. 2d 199, 203 (S.D.N.Y. 2002); White v. City of New York, 598 N.Y.S.2d 759, 760 (1993); Paramount Ins. Co. v. Rosedale Gardens, Inc., 743 N.Y.S.2d 59, 62 (1st Dep't 2002). Absent a showing of legal justification, the failure to comply with the notice condition vitiates coverage. Sirignano, supra, at 203; Security Mut. Ins. Co. v. Acker-Fitzsimons Corp., 340 N.Y.S.2d 902, 905 (1972); Paramount Ins. Co. , supra, at 63.

  The duty to provide notice arises when circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim on the subject policy. Sirignano, supra, at 203; Security Mut. Ins. Co., supra, at 907; Paramount Ins. Co. , supra, at 62. Therefore, the duty to give notice frequently arises prior to the commencement of an action with respect to a claim.

  Knowledge of an occurrence obtained by an agent charged with the duty to report such matters is imputed to the principal. Paramount Ins. Co., supra, at 63; White v. City of New York, supra, at 760. A reasonable possibility that coverage "may exist even though there are some factors that tend to suggest the opposite" of the policy's involvement is sufficient to trigger the duty. Christiania General Ins. Corp. v. Great American Ins. Co., 979 F.2d 268, 276 (2d Cir. 1992). A provision requiring notice when it "appears likely" that a claim will or "may" involve a policy does not require a certainty, or even a probability, that the policy will be involved. Id. When the policy requires notice whenever a claim may arise, the fact that a particular occurrence will result in a ripened claim does not relieve the insured from advising the carrier of that event. Heydt Contracting Corp. v. American Home Assur. Co., 536 N.Y.S.2d 770, 773 (1st Dep't 1989). An insurer need not demonstrate prejudice in order to deny coverage on the basis of late notice. Travelers Insurance Company v. Buffalo Reinsurance Company, 735 F. Supp. 2d 492 (S.D.N.Y. 1990); Security Mut. Ins. Co., supra, at 905.

  Where a policy requires notice of loss "as soon as practicable", the insured must provide such notice within a reasonable time in view of all the facts and circumstances. Security Mut. Ins. Co., supra, at 906; Paramount Ins. Co., supra, at 62; Nationwide Ins. Co. v. Empire Ins. Group, 742 N.Y.S.2d 387, 389 (2d Dep't 2002). The phrase "as soon as practicable" is an "elastic" measure of time, and "there is no inflexible test of reasonableness." Mighty Midgets, Inc. v. Centennial Ins. Co., 416 N.Y.S.2d 559 (1979). While New York courts recognize some excuses for an insured's failure to provide timely notice of a potential claim, the insured has the burden of proving the reasonableness of the delay. Security Mut. Ins. Co., supra, at 906; Paramount Ins. Co. ; supra, at 63. New York courts have held that relatively short delays in providing notice of an actual or potential claim violate the notice requirement. American Home

GR0000000304

XL Environmental No. P5502044
Our File No. 06928.00226
Page 6

<u>Assur. Co. v. Republic Ins. Co.</u>, 984 f.2d 76 (2d Cir. 1993) [one to two month delay]; <u>Heydt</u>, <u>supra</u> [approximately 4 months]; Power <u>Authority of New York v. Westinghouse Elec. Corp.</u>, 502 N.Y.S.2d 420 (1st Dep't 1986) [53 days]; <u>Horowitz v. Transamerica Ins. Co.</u>, 683 N.Y.S.2d 290 (2nd Dep't 1999) [48 days].

Here, notice was first received by 105 Street Associates via summons and verified complaint served on the Secretary of State on April 20, 2004. In turn, notice was first received by WKF&C on August 18, 2004, by facsimile from the insured's broker, North Shore Risk Management, LLC ("North Shore"), of the Notice of Occurrence/Claim.

Ultimately, the nearly four (4) month delay in properly reporting this matter is clearly unreasonable, and we recommend denying coverage on a late notice basis.

## <u>OTHER INSTANCE OF POTENTIAL LATE NOTICE</u>

We point out that our review of the materials submitted also reveals that the insured may have first received notice of this matter in August 2002, by letter of claimant's counsel, Conrad J. Benedetto, dated August 6, 2002, advising of a workmen's compensation claim filed on behalf of the claimant in this matter. While the letter is addressed to co-defendant BFC Construction, we note that it was submitted along with other materials by the insured to Greenwich. In addition, it appears that BFC Construction is located at the same address as the insured, and from what we understand, is associated with the Insured.

*REDACTED PER 11/7/06 COURT ORDER*

## REQUEST FOR AUTHORITY

In light of the foregoing, we request authority to issue the enclosed supplemental coverage letter denying coverage for this matter.

We will continue to keep you apprised of all material developments in this matter. Of course, should you have any further questions, please contact the undersigned or Reena G. Blinkoff, who is assisting in this matter

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
1701963.1

GR0000000305

XL Environmental No: P5502044
Our File No. 06928.00226
Page 7

Very truly yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Stephen A. Postelnek

SAP:ms

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
1701963.1

GR0000000306

# EXHIBIT "T"

# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

150 East 42nd Street, New York, New York 10017-5639   Tel: (212) 490-3000   Fax: (212) 490-3038

*New York• Los Angeles • San Francisco • Washington, DC • Newark • Philadelphia • Baltimore • Miami • Chicago • White Plains, NY*
*Dallas • Albany, NY • San Diego • Houston • Garden City, NY • Boston • McLean, VA • Stamford • London*
*Affiliate Offices: Paris • Berlin • Cologne • Frankfurt • Munich*

—

**www.wemed.com**

September 20, 2004

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

**Certified Article Number**

7160 3901 9848 5158 8386

**SENDERS RECORD**

105 Street Associates, LLC
C/o BFC Construction Corp.
2226 First Avenue
New York, New York 10029

Attention: Brad Richards

> Re:  Insured:       105 Street Associates, LLC
>       Claimant:      Richard Conrad
>       Policy No.:    WGG 5001058
>       D/Loss:        July 2, 2002
>       Client File:   P5502044
>       Our File:      06928.00226

Dear Mr. Richards:

   Please be advised that the undersigned law firm represents the interests of Greenwich Insurance Company ("Greenwich"), which provides Commercial General Liability Insurance on an occurrence basis to 105 Street Associates, LLC ("105 Street Associates") for the period of April 15, 2002, to April 15, 2003, under policy number WGG5001058. This letter will serve to advise you of Greenwich's coverage position regarding the claim initiated by Richard Conrad ("Conrad") with respect to an accident that allegedly occurred on July 2, 2002.

   This letter sets forth the facts upon which we rely at this time in evaluating coverage and our understanding of the situation from the materials provided to date, and may be subject to change as more information becomes available. Should you have information that is contrary to these facts that may impact your coverage or our evaluation, this information should be provided to the undersigned as soon as possible.

   We are recently in receipt of the information and documentation you submitted in regard to the above-referenced matter. While we lend no credence to Mr. Conrad's claim, referenced therein, we are constrained to advise you on behalf of Greenwich that coverage is not afforded under the Policy for this matter.

1702393.1

GR0000000189

By way of background, based upon the documents reviewed to date, on July 2, 2002, Richard Conrad ("Conrad"), was allegedly injured when he fell at a work site at a building located at 235-237 East 105th Street, New York, New York (the "Building"). Conrad was an employee of Jem Erectors, Inc., the subcontractor working at the Building. The Building is owned by the insured entity 105 Street Associates, LLC, whose office is located at 2226 First Avenue, New York, New York 10029.

We understand that 105 Street Associates first received notice of the claim on April 20, 2004, with the affidavit of service of the summons and verified complaint served on the Secretary of State. In turn, notice of the alleged accident was first received by WKF&C Agency, Inc. on August 18, 2004, by facsimile from the insured's broker, North Shore Risk Management, LLC ("North Shore"), with a Notice of Occurrence/Claim. Also, on August 20, 2004, North Shore also submitted the Notice of Occurrence/Claim, the summons and verified complaint and an August 6, 2002 letter from the claimant's counsel to the insured advising of a workmen's compensation claim filed on the claimant's behalf.

While we are unclear as to whether you received notice of the August 6, 2002 letter from claimant's counsel, should further investigation establish that you received notice of the occurrence prior to April 20, 2004, we reserve our rights to deny coverage for late notice on that basis as well.

## THE POLICY

After reviewing the policy language and the applicable case law, Greenwich Insurance Company denies coverage for late notice in accordance with the terms and conditions of the Policy.

Greenwich Commercial General Liability Insurance Policy No. WGG 5001058 was issued to 105 Street Associates, LLC for the period of April 15, 2002 to April 15, 2003, with a limit of liability of $1,000,000 per occurrence and $2,000,000 in the aggregate.

Under the heading, "**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**," the subject Policy provides:

1.    Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

b.    This insurance applies to "bodily injury" and "property damage" only if:

GR0000000190

Our File No. 06928.0021
Page 3

    (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    (2)    The "bodily injury" or "property damage" occurs during the policy period.

c.    Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

The Policy contains the following definitions:

    (3)    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

    (13)    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

The Policy further sets forth in "SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS":

    2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit

    a.    You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim.  To the extent possible, notice should include:

    (1)    How, when and where the "occurrence" or offense took place;

    (2)    The names and addresses of any injured persons and witnesses; and

    (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

    b.    If a claim is made or "suit" is brought against any insured, you must:

    (1)    Immediately record the specifics of the claim or "suit" and the data received; and

GR0000000191

    (2)    Notify us as soon as practicable. You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

c.    You and any other involved insured must:

    (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim of "suit";

    (2)    Authorize us to obtain records and other information;

    (3)    Cooperate with us in the investigation of settlement of the claim or defense against the "suit";

As provided in the Policy, "[t]he words "we", "us" and "our" refer "to the Company providing the insurance."

As you can see from the above cited policy language, the insured is required to give Greenwich notice of an occurrence which may result in a claim as soon as practicable.

Under New York law, compliance with an insurance policy notice provision operates as a condition precedent to coverage. Sirignano v. Chicago Ins. Co., 192 F. Supp. 2d 199, 203 (S.D.N.Y. 2002); White v. City of New York, 598 N.Y.S.2d 759,760 (1993); Paramount Ins. Co. v. Rosedale Gardens, Inc., 743 N.Y.S.2d 59, 62 (1st Dep't 2002). Absent a showing of legal justification, the failure to comply with the notice condition vitiates coverage. Sirignano, supra, at 203; Security Mut. Ins. Co. v. Acker-Fitzsimons Corp., 340 N.Y.S.2d 902, 905 (1972); Paramount Ins. Co. , supra, at 63.

The duty to provide notice arises when circumstances known to the insured at that time would have suggested to a reasonable person the possibility of a claim on the subject policy. Sirignano, supra, at 203; Security Mut. Ins. Co., supra, at 907; Paramount Ins. Co. , supra, at 62. Therefore, the duty to give notice frequently arises prior to the commencement of an action with respect to a claim.

Knowledge of an occurrence obtained by an agent charged with the duty to report such matters is imputed to the principal. Paramount Ins. Co., supra, at 63; White v. City of New York, supra, at 760. A reasonable possibility that coverage "may exist even though there are some factors that tend to suggest the opposite" of the policy's involvement is sufficient to trigger the duty. Christiania General Ins. Corp. v. Great American Ins. Co., 979 F.2d 268, 276 (2d Cir. 1992). A provision requiring notice when it "appears likely" that a claim will or "may" involve a policy does not require a certainty, or even a probability, that the policy will be involved. Id. When the policy requires notice whenever a claim may arise, the fact that a particular occurrence will result in a ripened claim does not relieve the insured from advising the carrier of that event. Heydt Contracting Corp. v. American Home Assur. Co., 536 N.Y.S.2d 770, 773 (1st Dep't 1989). An insurer need not demonstrate prejudice in order to deny coverage on the basis of late

GR0000000192

Our File No. 06928.002<s>

Page 5

notice. <u>Travelers Insurance Company v. Buffalo Reinsurance Company</u>, 735 F. Supp. 2d 492 (S.D.N.Y. 1990); <u>Security Mut. Ins. Co.</u>, <u>supra</u>, at 905.

Where a policy requires notice of loss "as soon as practicable", the insured must provide such notice within a reasonable time in view of all the facts and circumstances. <u>Security Mut. Ins. Co.</u>, <u>supra</u>, at 906; <u>Paramount Ins. Co.</u>, <u>supra</u>, at 62; <u>Nationwide Ins. Co. v. Empire Ins. Group</u>, 742 N.Y.S.2d 387, 389 (2d Dep't 2002). The phrase "as soon as practicable" is an "elastic" measure of time, and "there is no inflexible test of reasonableness." <u>Mighty Midgets, Inc. v. Centennial Ins. Co.</u>, 416 N.Y.S.2d 559 (1979). While New York courts recognize some excuses for an insured's failure to provide timely notice of a potential claim, the insured has the burden of proving the reasonableness of the delay. <u>Security Mut. Ins. Co.</u>, <u>supra</u>, at 906; <u>Paramount Ins. Co.</u>, <u>supra</u>, at 63. New York courts have held that relatively short delays in providing notice of an actual or potential claim violate the notice requirement. <u>American Home Assur. Co. v. Republic Ins. Co.</u>, 984 f.2d 76 (2d Cir. 1993) [one to two month delay]; <u>Heydt</u>, <u>supra</u> [approximately 4 months]; Power <u>Authority of New York v. Westinghouse Elec. Corp.</u>, 502 N.Y.S.2d 420 (1st Dep't 1986) [53 days]; <u>Horowitz v. Transamerica Ins. Co.</u>, 683 N.Y.S.2d 290 (2nd Dep't 1999) [48 days].

As referenced above, here, notice was first received on April 20, 2004 by affidavit of service of the summons and verified complaint served on the Secretary of State. However, notice was first reported to WKF&C on August 18, 2004 in the form of a facsimile from North Shore, with a Notice of Occurrence/Claim. Therefore, 105 Street Associates was on notice of the claim well in advance of its notice of the Claim to Greenwich.

The nearly four (4) month delay in reporting this matter is clearly unreasonable and leads Greenwich to deny coverage. Since coverage is denied based on your breach of the policy's requirements, a defense of any lawsuit filed will not be afforded to you, nor will Greenwich indemnify 105 Street Associates for any losses that may be asserted with this claim. Therefore, we suggest that you contact your personal attorney regarding this matter.

We understand, however, that the general contractor, BFC Construction Corporation is insured by Sirius with regard to the construction project related to this claim. In addition, pursuant to the Subcontractor Agreement between BFC Construction and Larry E. Knight, coverage is to be afforded for this matter by Graphic Arts Mutual Insurance Company. We note that Greenwich's coverage is excess to all other valid and collectible insurance. We recommend, therefore, if you have not already done so, that you contact the relevant carriers, as well as any Umbrella Carriers, Errors and Omissions Carriers, or other insurance carriers where coverage may be applicable.

Please note that this letter is not to be construed as a waiver of any of the rights, which Greenwich Insurance Company may have under the policy. Nor is it an admission of any liability of Greenwich Insurance Company to your company. Furthermore, if you have any information that would contradict this coverage determination, please provide the information as soon as possible.

We trust the foregoing is satisfactory. Should you have any questions or comments, or if you believe you have any material information, documentation or evidence which would alter

GR0000000193

Our File No. 06928.0022
Page 6

this determination that there is no coverage under the Policy, please do not hesitate to contact the undersigned.

Should you wish to take up this matter with the New York State Insurance Department, you may write or visit the: 1) Consumer Services Bureau, New York State Insurance Department, at either 160 W. Broadway, New York, NY 10013; 2) Agency Building One, Governor Nelson A. Rockefeller Empire State Plaza, Albany, NY 12257; or 3) 220 Delaware Avenue, Suite 229, Buffalo, NY 14202.

If you have any questions or comments concerning this letter or your Policy, or if you have additional information that you would like to bring to our attention, please do not hesitate to contact us.

Very truly yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Stephen A. Postelnek

SAP:ms

cc:    Kelner & Kelner
       140 Broadway, 37th Floor
       New York, New York 10005

       Attention: Gail Kelner



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X
105 STREET ASSOCIATES, LLC,

                                       Plaintiff,

              -against-

GREENWICH INSURANCE COMPANY,

                                  Defendant.
-------------------------------------------------------------X

Date Summons and Complaint
filed: _____ , 2005

Index No.

**05603783**

**SUMMONS**

Plaintiff designates New York
County as the place of trial

The basis of venue is the principal place
of business of each party and where
the cause of action arose.

Plaintiff resides at
2226 First Avenue
County of New York

**FILED**
OCT 24 2005
NEW YORK
COUNTY CLERK'S OF

To the above-named Defendant

    **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this summons, to serve a

notice of appearance, on the plaintiff's attorneys within 20 days after the service of this

summons, exclusive of the day of service (or within 30 days after the service is complete if this



summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief demanded

in the complaint.

Dated: New York, New York
      October 17, 2005

                SCHNEIDER GOLDSTEIN BLOOMFIELD LLP

                By: _____
                      Donald F. Schneider
                      Attorneys for Plaintiff
                      Office and P.O. Address:
                      90 Broad Street, 6th Floor
                      New York, New York 10004
                      (212) 265-2266

Defendant's address:


Greenwich Insurance Company
Seaview House
70 Seaview Avenue
Stamford, CT 06902

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

105 STREET ASSOCIATES, LLC,                        :

                                        Plaintiff,    :

                                                                  Index No.        /05
            -against-                                  :
                                                                  **COMPLAINT**
GREENWICH INSURANCE COMPANY,          :

                                        Defendant.   :

------------------------------------------------------------------X

       Plaintiff 105 Street Associates LLC ("Plaintiff"), by its undersigned attorneys,

Schneider Goldstein Bloomfield LLP, as and for its Complaint herein, alleges:


## THE PARTIES

    1.    At all times relevant herein, Plaintiff was and still is a limited liability

company duly organized and existing under and by virtue of the laws of the State of New York.


    2.    Upon information and belief, at all times relevant herein, Defendant

Greenwich Insurance Company ("Greenwich") was and still is an insurance company organized

and existing under the laws of the State of New York.


    3.    Greenwich conducts an insurance business in the State of New York.


S:\docs\BFC\Conrad\Pleadings\complaint.wpd

## ADDITIONAL ALLEGATIONS APPLICABLE
## TO ALL CAUSES OF ACTION

**The Insurance Policy**

4.      Greenwich made, issued, and delivered to Plaintiff comprehensive commercial general liability insurance policy no. WGG5001058 on an occurrence basis (the "Greenwich Policy") for the period from April 15, 2002 to April 15, 2003 (the "Policy Period").

5.      Plaintiff was an insured under the Greenwich Policy.

6.      Plaintiff has duly performed all of the terms and conditions of the Greenwich Policy on its part to be performed.

**The Claim by Richard Conrad**

7.      An individual named Richard Conrad claimed to have suffered injury during the Policy Period at 235 East 105th Street, New York, New York, a location specified in the Greenwich Policy.

8.      Richard Conrad commenced a personal injury action against Plaintiff and others, entitled Conrad v. 105 Street Associates LLC, et al, Index No. 105554/04 (the "Conrad Action").

9.    Promptly upon learning of the alleged occurrence and claim by Richard Conrad, Plaintiff duly notified the insurance agent and Greenwich thereof and transmitted a copy of the Summons and Complaint in the Conrad Action.

10.    The Conrad Action is within the scope of coverage under the Greenwich Policy.

11.    The insurance coverage provided by the Greenwich Policy was in full force and effect all times relevant herein.

12.    Greenwich has an obligation under the Greenwich Policy to defend and indemnify Plaintiff in connection with the Conrad Action.

13.    Plaintiff demanded that Greenwich assume its responsibilities and obligations to it under the Greenwich Policy with respect to the Conrad Action.

14.    Nonetheless, Greenwich wrongfully disclaimed any obligation to defend and indemnify Plaintiff in the Conrad Action, thereby breaching its obligations under the Greenwich Policy.

15.    Plaintiff lacks an adequate remedy at law.

## FIRST CAUSE OF ACTION

16.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 15 above as if fully set forth herein.

17.    A justiciable controversy exists between Plaintiff and Greenwich. Plaintiff believes that it has fully complied with the Greenwich Policy and that Greenwich is obligated to defend and indemnify Plaintiff in connection with the Conrad Action. On the other hand, Greenwich asserts that it is not obligated to defend and indemnify Plaintiff with respect to the Conrad Action.

18.    By reason of the foregoing, Plaintiff is entitled to a judgment declaring that Greenwich is obligated to fully insure, defend and indemnify Plaintiff in connection with the Conrad Action.

## SECOND CAUSE OF ACTION

19.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 15 above as if fully set forth herein.

20.    By reason of the foregoing, Plaintiff is entitled to a judgment directing and compelling Greenwich to fully comply with its defense and indemnity obligations with respect to the Conrad Action.

### THIRD CAUSE OF ACTION

21.    Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 15 above as if fully set forth herein.

22.    As a result of Greenwich's wrongful refusal to defend Plaintiff in the Conrad Action, Plaintiff retained litigation counsel to defend the Conrad Action in order to protect its interests.

23.    As a result of Greenwich's breach of its obligation to provide a defense to Plaintiff, Plaintiff has incurred and paid attorney's fees and expenses, and upon information and belief, will continue to incur and pay attorney's fees and expenses, in connection with the defense of the Conrad Action.

24.    By reason of the foregoing, Plaintiff is entitled to damages, including the attorneys' fees and expenses it has incurred and paid, and upon information and belief, will continue to incur and pay, in connection with the Conrad Action, in an amount which will be proven at the trial of this action.

**WHEREFORE**, Plaintiff 105 Street Associates, LLC. demands judgment against Defendant Greenwich Insurance Company as follows:

        (a)     On the First Cause of Action, a judgment declaring the rights and obligations of the parties under the Greenwich Policy, including Greenwich's obligations to fully insure, defend and indemnify Plaintiff with respect to the Conrad Action;

        (b)     On the Second Cause of Action, a judgment directing and compelling Greenwich to fully comply with and fulfill its defense and indemnity obligations with respect to the Conrad Action;

        (c)     On the Third Cause of Action, damages in a sum that will be proven at the trial of this action; and

        (d)     Granting such other and further relief as to this Court may seem just and proper, including the costs and disbursements of this action.

Dated: New York, New York
       October 17, 2005

                      SCHNEIDER GOLDSTEIN BLOOMFIELD LLP

                      By: _____
                         Donald F. Schneider
                         Attorneys for Plaintiff
                         Office and P.O. Address:
                         90 Broad Street, 6th Floor
                         New York, New York 10004
                         (212) 265-2266



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| 105 STREET ASSOCIATES, LLC | Index No.: 05-603783 |
| Plaintiff, | |
| -against- | |
| GREENWICH INSURANCE COMPANY, | |
| Defendant. | |

**TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK:**

Defendants, GREENWICH INSURANCE COMPANY (hereinafter "GREENWICH"), by their attorneys, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, respectfully submit as follows:

1. On October 24, 2005, the above-entitled action was commenced against defendants in the Supreme Court of the State of New York, County of New York, and is now pending in such court.

2. Pursuant to the insurance policy (WGG5001058) issued by GREENWICH, Plaintiff, 105 STREET ASSOCIATES, LLC, seeks financial damages allegedly sustained as a result of defendant's alleged wrongful disclaimer to defend and indemnify Plaintiff in an underlying action brought against Plaintiff on or about April 29, 2004, currently pending in Supreme Court, New York County.

3. On October 25, 2005, defendant GREENWICH was served with a summons and a complaint in the above-entitled action by delivery of copies of the summons and

1

complaint to defendant, GREENWICH, at their actual place of business in the State of Connecticut.

4. Upon information and belief, no further proceedings have been had in this action in New York County Supreme Court.

5. The amount in controversy in the above-entitled action, exclusive of interest and costs, exceeds $75,000.

6. Plaintiff, 105 STREET ASSOCIATES, LLC is a citizen and resident of the County of New York, State of New York.

7. Defendant GREENWICH is a citizen and resident of the State of Connecticut.

8. This Court has original jurisdiction of the Federal Action pursuant to 28 USCA §1332, and the action may therefore be removed to this Court pursuant to 28 USCA §1441.

9. Copies of the summons and complaint served on defendant in the above-entitled action are annexed hereto as Exhibit "A".

10. This notice is filed with this Court within thirty (30) days after service on defendant of the summons and complaint in the above-entitled action.

**WHEREFORE,** defendant GREENWICH requests that the above-entitled action be removed from the New York County Supreme Court to this Court.


Dated· November 21, 2005          WILSON, ELSER, MOSKOWITZ, EDELMAN &  DICKER LLP

                                        by: _____

                                             Jill Cadre (JC 4127)
                                             Attorneys for Defendant
                                             150 East 42nd Street
                                             New York, New York 10017-5639
                                             (212) 490-3000
                                             File No.:  06928.00226

TO:    Donald F. Schneider
       Attorney for Plaintiff
       90 Broad Street, 6th Floor
       New York, NY 10004
       212-265-2266

2100130.1



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- X

105 STREET ASSOCIATES, LLC                          Index No.: 05-cv-9938 (VM)

               Plaintiff,

                                  **DEFENDANT GREENWICH**
        -against-                **INSURANCE COMPANY'S**
                                  **ANSWER TO PLAINTIFF'S**
GREENWICH INSURANCE COMPANY     **COMPLAINT**

               Defendant.
-------------------------------------------------------------------- X

Defendant, GREENWICH INSURANCE COMPANY, (hereinafter "Greenwich"), whose principal place of business is 70 Seaview Avenue, Stamford, Connecticut, by and through its attorneys, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, hereby answers the Complaint of the Plaintiff, 105 STREET ASSOCIATES, LLC (hereinafter "105" or "Plaintiff"), upon information and belief, as follows:

### THE PARTIES

FIRST:      Denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 of the Complaint.

SECOND:    Denies each and every allegation contained in paragraph 2 of the complaint except admits that Greenwich is a Connecticut corporation with a principal place of business at 70 Seaview Avenue, Stamford, Connecticut, engaged in the practice of issuing insurance policies and begs leave to refer all questions of fact to the Court upon the trial of this action.

THIRD:      Denies the allegations contained in paragraph 3 of the Complaint except admits that Greenwich is a Connecticut corporation with a principal place of business at 70 Seaview Avenue, Stamford, Connecticut, engaged in the practice of issuing insurance policies in the State

of New York and begs leave to refer all questions of fact to the Court upon the trial of this action.

## ADDITIONAL ALLEGATIONS APPLICABLE
## TO ALL CAUSES OF ACTION

## AS TO THE INSURANCE POLICY

FOURTH:    Denies the allegations contained in paragraph 4 of the Complaint except admits Greenwich issued a commercial general liability policy no. WGG5001058 to provide plaintiff with general liability insurance and begs leave to refer to the true terms and conditions of the policy at the trial of this action.

FIFTH:    Denies the allegations contained in paragraph 5 of the Complaint except admits Greenwich issued a commercial general liability policy to plaintiff and begs leave to refer to the true terms and conditions of the policy at the trial of this action.

SIXTH:    Denies the allegations contained in paragraph 6 of the Complaint.

## THE CLAIM BY RICHARD CONRAD

SEVENTH:    Denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 7 of the Complaint and begs leaves to all questions of fact to the Court upon trial of this action.

EIGHTH:    Denies knowledge and information sufficient to form a belief as to the truth of the allegations contained in paragraph 8 of the Complaint and begs leaves to all questions of fact and law to the Court upon trial of this action.

2121611.1

NINTH:        Denies the allegations contained in paragraph 9 of the Complaint and begs leaves

to all questions of fact to the Court upon trial of this action.

TENTH:        Denies the allegations contained in paragraph 10 of the Complaint and begs leave

to refer to the true terms and conditions of the policy at the trial of this action.

ELEVENTH:  Denies the allegations contained in paragraph 11 of the Complaint and begs leave

to refer to the true terms and conditions of the policy at the trial of this action.

TWELFTH:    Denies the allegations contained in paragraph 12 of the Complaint.

THIRTEENTH:        Denies the allegations contained in paragraph 13 of the Complaint and

begs leave to refer all questions of fact to the Court upon trial of this action.

FOURTEENTH:        Denies the allegations contained in paragraph 14 of the Complaint.

FIFTEENTH:        Denies the allegations contained in paragraph 15 of the Complaint and

begs leave to refer all questions of law to the Court upon the trial of this action.

### FIRST CAUSE OF ACTION

SIXTEENTH:        Repeats, reiterates and realleges each and every response to the allegations

contained in paragraphs 1-15 of the Complaint as and for its response to the allegations

contained in paragraph 16 of the Complaint with the same force and effect as if fully set forth at

length herein.

SEVENTEENTH:        Denies the allegations contained in paragraph 17 of the complaint except

admits that Greenwich is not obligated to defend and indemnify plaintiff with respect to the

"Conrad action" and begs leave to refer to the Contract and to refer the policy and all questions of fact to the Court at the trial of this action.

EIGHTEENTH:          Denies the allegations contained in paragraph 18 of the Complaint.

## SECOND CAUSE OF ACTION

NINETEENTH:          Repeats, reiterates and realleges each and every response to the allegations contained in paragraphs 1-18 of the Complaint as and for its response to the allegations contained in paragraph 19 of the Complaint with the same force and effect as if fully set forth at length herein.

TWENTIETH:          Denies the allegations contained in paragraph 20 of the Complaint.

## THIRD CAUSE OF ACTION

TWENTY-FIRST:          Repeats, reiterates and realleges each and every response to the allegations contained in paragraphs 1-20 of the Complaint as and for its response to the allegations contained in paragraph 21 of the Complaint with the same force and effect as if fully set forth at length herein.

TWENTY-SECOND: Denies the allegations contained in paragraph twenty second of the Complaint as against Greenwich and begs leave to refer all questions of fact and law to the Court upon the trial of this action.

TWENTY-THIRD:          Denies knowledge and information sufficient to form a belief as to the truth of the allegation contained in paragraph twenty third of the Complaint and begs leave to refer all questions of fact to the Court upon the trial of this action.

2121611 1

TWENTY-FOURTH: Denies the allegations contained in paragraph twenty fourth of the Complaint.

## AS AND FOR A FIRST SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-FIFTH:    The Complaint fails to state a cause of action for which relief can be granted.

## AS AND FOR A SECOND SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-SIXTH:    Upon information and belief, if damages were sustained by plaintiff, which Greenwich expressly denies, as alleged in the Complaint such damages are attributable in whole or in part to the culpable conduct of plaintiff without any negligence, fault or want of care on the part of Greenwich.

## AS AND FOR A THIRD SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-SEVENTH: Upon information and belief, plaintiff has failed to take such reasonable measures so as to mitigate and reduce losses and damages, if any, as alleged in the Complaint.

## AS AND FOR A FOURTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-EIGHTH:   The alleged insured has failed to carry their burden of proof by clear and convincing evidence to demonstrate the compliance of all terms, conditions and coverage, of the purported Greenwich Policy.

## AS AND FOR A FIFTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

TWENTY-NINTH:    To the extent that the Complaint states a claim against Greenwich upon which relief could be granted, which Greenwich expressly denies, such claim is or may be barred in whole or in part by application of the doctrines of laches, estoppel, waiver, unclean hands, other equitable doctrines and/or by the applicable statutes of limitations.

## AS AND FOR A SIXTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTIETH: The Complaint is, or may be, barred and subject to dismissal for failure to join necessary and/or indispensable parties.

## AS AND FOR A SEVENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-FIRST:    Coverage, if any, for the alleged "Conrad Action" as set forth in the Complaint is or may barred or excluded to the extent that the insured has failed to comply with any or all material terms and conditions precedent to the purported Greenwich Policy including, without limitation, any provisions governing notice of occurrence or accident, notice of claims or suit, assistance and cooperation.

## AS AND FOR A EIGHTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-SECOND: The purported Greenwich Policy is not applicable to and Greenwich has no indemnity obligation, if any, for any liabilities or monetary obligations assumed, or monies voluntary paid, or that it was not legally obligated to pay as damages by its alleged insured or that were paid without Greenwich's consent for the alleged "Conrad Action" as set forth in the Complaint.

## AS AND FOR A NINTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-THIRD: The purported Greenwich Policy would not provide coverage for non-fortuitous acts and/or any loss, injury, damage or risks which was known or should have been known by the insured at the time of application and/or inception of the purported Greenwich Policy.

## AS AND FOR A TENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-FOURTH: Greenwich's indemnity obligation, which Greenwich expressly denies, under the purported Greenwich Policy for the alleged "Conrad Action" as set forth in the

Complaint, would be limited to amounts the insured is legally obligated to pay as damages because of "personal injury" or "bodily injury" within the meaning of the purported Greenwich Policy.

## AS AND FOR A ELEVENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-FIFTH: As a condition precedent to coverage, the Greenwich Policy requires that the insured comply with notice requirements.  Greenwich has no obligation under the purported Greenwich Policy to the extent that it was not provided with timely and proper notice required by the purported Greenwich Policy with respect to the alleged "Conrad Action" as set forth in the Complaint.

## AS AND FOR A TWELVTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-SIXTH:  The claims are barred because there is no actual and justiciable controversy existing between the parties.

## AS AND FOR A THIRTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-SEVENTH: Upon information and belief, the plaintiff in the underlying action sustained his injuries, if any, wholly due to the negligence of the plaintiff in the instant action.

## AS AND FOR A FOURTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-EIGHTH: The insurance/indemnity provisions contained in the contract relied upon by plaintiff in its complaint are in violation of the New York General Obligations Law Section 15-108 and are void and unenforceable as against public policy.

## AS AND FOR A FIFTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

THIRTY-NINETH: To the extent that the Greenwich is liable, which Greenwich expressly denies, in the underlying Conrad action, a proper allocation of loss or damage between Greenwich, the plaintiff and/or other insurers, if any, is required. Such allocation may result in no sums being allocated to the Greenwich policy. In no event is Greenwich required to provide coverage in excess of its share under a fair and proper allocation.

## AS AND FOR A SIXTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

FOURTIETH: Any person/entity seeking to establish coverage under any policy issued to 105 by Greenwich bears the burden of proving the terms and conditions of that policy. To the extent that the terms and conditions of a policy cannot be established for any particular policy period during which coverage is alleged, claims of coverage as to that period fail as a matter of law.

## AS AND FOR A SEVENTEENTH SEPARATE AND COMPLETE AFFIRMATIVE DEFENSE

FORTY-FIRST: The Complaint does not set forth sufficient facts to allow Greenwich to determine all potential affirmative defenses (including defenses based upon the terms, conditions or exclusions of the policies that have been issued by Greenwich.) Accordingly, Greenwich reserves its right to assert additional defenses when such information is ascertained through discovery and further investigation. Greenwich specifically reserves the right to rely upon any defense arising from the terms, conditions and exclusions of its purported policy.

**WHEREFORE**, Defendant Greenwich demands judgment dismissing the plaintiff's Complaint; judgment over and against plaintiff declaring that Greenwich has no obligation to provide any coverage to plaintiff with respect to the underlying Conrad action; judgment declaring the rights of Greenwich as to a proper allocation of loss or damages against plaintiffs; judgment declaring the rights of Greenwich as to a proper allocation of loss or damages against the other insurers, if any; judgment awarding Greenwich its costs, disbursements and attorneys' fees incurred in this action; and such other and further relief as to this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Defendant Greenwich demands a trial by jury on all issues so triable.


Dated: New York, New York
      December 16, 2005

                        By:_____
                        Jill Cadre (JC-4127)
                        WILSON, ELSER, MOSKOWITZ,
                        EDELMAN & DICKER LLP
                        Attorneys for Defendant
                        Greenwich Insurance Company
                        150 East 42nd Street
                        New York, New York 10017-5639
                        (212) 490-3000
                        File No.: 06928.00226

TO:    Donald F. Schneider
        Attorney for Plaintiff
        90 Broad Street, 6th Floor
        New York, NY 10004
        212-265-2266



# SCHNEIDER GOLDSTEIN BLOOMFIELD LLP

COUNSELLORS AT LAW

90 BROAD STREET, 6TH FLOOR

NEW YORK, NY 10004

(212) 265-2266

JAY BLOOMFIELD
HARVEY N. GOLDSTEIN
DONALD F. SCHNEIDER

FAX: (212) 265-2442
EMAIL@LEXNEWYORK.COM

March 20, 2007

**VIA FEDERAL EXPRESS**

Honorable Victor Marrero
United States District Judge
United States Courthouse
500 Pearl Street
New York, New York 10007

> **Re:**   *105 Street Associates LLC v. Greenwich Insurance Company*
> 05-CV-9938 (VM) (DCF)

Dear Judge Marrero:

We represent 105 Street Associates LLC ("Plaintiff"), the Plaintiff in the above-referenced action.

We write in accordance with your rules to request a pre-motion conference in connection with Plaintiff's intended motion for summary judgment. Pursuant to the most recent scheduling order, the last day to file dispositive motions is March 30, 2007.

This action arises due to the disclaimer by Defendant Greenwich Insurance Company ("Defendant") of its defense and indemnity obligations pursuant to a Commercial General Liability Policy (the "Policy") that it issued to Plaintiff. Plaintiff alleges that Defendant's obligations pursuant to the Policy were invoked by a personal injury action against Plaintiff entitled *Conrad v. 105 Street Associates LLC, et al.*, Index No. 105554/04 (the "Conrad Action").

Defendant asserts that Plaintiff breached the notice provision of the Policy by failing to notify the insurer of a claim as soon as practicable. Defendant contends that Plaintiff first received notice of the occurrence when the Summons and Complaint in the Conrad Action was served on the New York Secretary of State as Plaintiff's agent on April 20, 2004. However,

Plaintiff did not receive mailed service of the Summons and Complaint, and asserts that it first received notice of the occurrence and lawsuit a few months later in mid-July 2004 when it received a letter from counsel for the personal injury plaintiff in the Conrad Action notifying it of the Conrad Action, which Plaintiff promptly transmitted to its insurance broker on July 19, 2004 for transmission to Defendant's agent. Defendant asserts that it did not receive notice until August 18, 2004 when its agent was notified of the claim by Plaintiff's insurance broker. Defendant issued a letter of disclaimer on September 20, 2004. An Answer to the Complaint in the Conrad Action was not due, and was not served, until after the date of Defendant's disclaimer.

Plaintiff's contentions are essentially two-fold. First, it will argue in support of summary judgment that Defendant was notified of the occurrence and the Conrad Action as soon as it learned of same, i.e., as soon as practicable. Plaintiff will further contend that Defendant's disclaimer was untimely as a matter of law.

In the Complaint, Plaintiff seeks (i) a judgment declaring that Defendant is obligated to fully insure, defend and indemnify Plaintiff in connection with the Conrad Action (First Claim for Relief), (ii) a judgment directing and compelling Defendant to fully comply with and fulfill its defense and indemnity obligations with respect to the Conrad Action (Second Claim for Relief), and (iii) monetary damages measured by the attorneys's fees and costs incurred in defending the Conrad Action (Third Claim for Relief). Summary judgment will be sought on the First and Second Claims for Relief and on the issue of liability on the Third Claim for Relief.

We thank you for your time and attention to this matter.

Respectfully submitted,

Donald F. Schneider

DFS/gk
Cc: Glenn Fuerth, Esq. (via Federal Express)



EXHIBIT "Y"

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------------X
     105 STREET ASSOCIATES, LLC,
4
                                        PLAINTIFF,
5
                        -against-        INDEX NO:
6                                        05CV9938(VM)

7    GREENWICH INSURANCE COMPANY,

8                                        DEFENDANT.
     ------------------------------------------------X
9

10                      DATE: January 11, 2007

11                      TIME: 11:22 a.m.

12

13              EXAMINATION BEFORE TRIAL of the

14   Non-Party Witness, GREGORY BARON, taken by the

15   Respective Parties, pursuant to a Notice, held

16   at the offices of Schneider, Goldstein

17   Bloomfield, LLP, 90 Broad Street, New York,

18   New York 10004, before a Notary Public of the

19   State of New York.

20

21

22

23

24

25



DIAMOND REPORTING-718-624-7200-16 Court Street., B'klyn, NY

```
 1

 2   A P P E A R A N C E S :

 3

 4        SCHNEIDER, GOLDSTEIN BLOOMFIELD, LLP
                    Attorneys for the Plaintiff
 5                  90 Broad Street
                    New York, New York 10004
 6                  BY: DONALD E. SCHNEIDER, ESQ.

 7

 8        WILSON, ELSER, MOSKOWITZ,
          EDELMAN & DICKER, L.L.P.
 9                  Attorneys for the Defendant
                    150 East 42nd Street
10                  New York, New York 10017
                    BY: GLENN J. FUERTH, ESQ.
11                  FILE NO: 06928.00226

12

13
                    *          *          *
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1
 2          F E D E R A L    S T I P U L A T I O N S
 3
 4
 5              IT IS HEREBY STIPULATED AND AGREED
 6     by and between the counsel for the respective
 7     parties hereto, that the filing, sealing, and
 8     certification of the within deposition shall
 9     be and the same are hereby waived;
10
11              IT IS FURTHER STIPULATED AND
12     AGREED that all objections, except as to the
13     form of the question, shall be reserved to the
14     times of the trial.
15
16              IT IS FURTHER STIPULATED AND
17     AGREED that the within deposition may be
18     signed before any Notary Public with the same
19     force and effect as if signed and sworn to
20     before this court.
21
22
23                  *       *       *       *
24
25
```

1

2      G R E G O R Y     B A R O N, called as a

3      witness, having been first duly sworn by a

4      Notary Public of the State of New York, was

5      examined and testified as follows:

6      EXAMINATION BY

7      MR. FUERTH:

8            Q.      Please state your name for the

9      record.

10           A.      Gregory Baron.

11           Q.      Where do you reside?

12           A.      301 East 79th Street, Apartment

13     34D, New York, New York 10021.

14           Q.      Good morning, Mr. Baron.  I will

15     be asking you some questions on behalf of the

16     Defendant, Greenwich Insurance Company today.

17                 Please wait for me to finish

18     asking the question before you give an answer

19     so that the reporter can take it down.  If

20     there comes a time where you don't understand

21     a question, please let me know and I will

22     rephrase it.  You have to give a verbal

23     response because the transcript will not

24     reflect head gestures or anything.

25                 Do you understand that?

DIAMOND REPORTING-718-624-7200-16 Court Street., B'klyn, NY

```
 1                         BARON
 2        A.     Yes.
 3        Q.     Could you give me your educational
 4   background?
 5        A.     Graduated from NYU School of
 6   Commerce.
 7        Q.     When was that?
 8        A.     1968.
 9        Q.     Have you taken any postgraduate
10   education?
11        A.     No.
12        Q.     The period that I will be limiting
13   myself to; unless otherwise indicated, is July
14   2, 2002 and September 20, 2004.  What was your
15   source of employment?
16        A.     I was actually sort of semiretired
17   at that time.
18        Q.     To the extent that you were not
19   retired, what were you doing?
20        A.     Helping my son, advising him.
21        Q.     Helping and advising your son.  I
22   take it that was Brandon?
23        A.     Yes.
24        Q.     What were you helping and advising
25   him about?
```

```
 1                    BARON
 2        A.    Basically, they were -- it was in
 3   the real estate development business.  And he,
 4   you know, used to come to me sometimes for
 5   advice.  Nothing formal.
 6        Q.    So, you had no source of
 7   employment in that period?
 8        A.    No.
 9        Q.    At any time, what interest, if
10   any, did you have in an entity known as BFC
11   Construction Corp?
12        A.    None.
13        Q.    Never?  You never had an interest?
14        A.    No.
15        Q.    What interest, if any, did you
16   ever have in 105 Street Associates, LLC?
17        A.    None.
18        Q.    What interest, if any, did you
19   ever have in WNC Eastern Community Development
20   Advisors?
21        A.    None.
22        Q.    What interest, if any, did you
23   ever have in BFC Partners, LP?
24        A.    None.
25        Q.    What interest, if any, did you
```

```
 1                   BARON
 2   ever have with respect to a development
 3   located on 105th Street in Manhattan?
 4        A.      No interest.
 5        Q.      Did you ever, after September 20,
 6   2004, come to have an interest in any of the
 7   entities that I just named for you?
 8        A.      No.
 9        Q.      Do you have an understanding, as
10   to what the purpose was for the formation of
11   105 Street Associates, LLC?
12        A.      Limited knowledge.
13        Q.      What is your knowledge?
14        A.      I believe that they are the owners
15   of the building on 105th Street.
16        Q.      Do you have an understanding
17   between the period of July 2, 2002 and
18   September 20, 2004 what the relationship was,
19   if any, between BFC Construction and 105
20   Street Associates, LLC?
21        A.      Well, I believe BFC Construction
22   was the contractor.
23        Q.      Do you have an understanding as to
24   what, if any, was the relationship between BFC
25   Partners and 105 Street Associates, LLC?
```

```
 1                    BARON
 2        A.    None.  I have no knowledge.
 3        Q.    Between July 2nd of 2002 and
 4   September 20th of 2004, to your understanding,
 5   what interest did Brandon Baron have in BFC
 6   Construction?
 7        A.    None.
 8        Q.    Did he come to have an interest
 9   after September 20, 2004?
10        A.    Yes.
11        Q.    When?
12        A.    It was probably about maybe
13   September of 2005, possibly, or closer to the
14   end of the year of 2005.
15             MR. SCHNEIDER:   Off the record.
16             (Whereupon, an off-the-record
17        discussion was held.)
18        Q.    To your understanding, did Brandon
19   Baron come to have an interest in BFC
20   Construction Corp. in September of '05?
21        A.    I don't know if it was September,
22   but it was approximately over a year ago from
23   today.
24        Q.    What interest, if any, did Brandon
25   Baron ever have in 105 Street Associates?
```

```
 1                        BARON

 2        A.     None.

 3        Q.     What interest did he ever have in

 4  WNC Eastern Community Development Advisers,

 5  LLC?

 6        A.     None.

 7        Q.     What interest did he ever have in

 8  BFC Partners, LP?

 9        A.     None.

10        Q.     Between July 2, 2002 and September

11  20, 2004, to your understanding, what interest

12  did Donald Capocci, C-A-P-O-C-C-I, have in BFC

13  Construction?

14        A.     Was a principal.

15        Q.     What interest did he have in that

16  time period in 105 Street Associates?

17        A.     Also a principal.

18        Q.     What interest did he have in that

19  time period in WNC Eastern Community

20  Development Advisors?

21        A.     None.

22        Q.     What interest did he have in that

23  time period in BFC Partners, LP?

24        A.     I don't know.

25        Q.     Do you have an understanding as to
```

```
1                        BARON
2     what BFC Partners, LP is?
3          A.     No.
4          Q.     Are you familiar with a Beth
5     Berns, B-E-R-N-S?
6          A.     I know who she is.
7          Q.     Who is she?
8          A.     She used to work at the BFC
9     office.
10         Q.     In what capacity?
11         A.     I don't really know what her role
12    was.
13         Q.     When you say "BFC office", is that
14    BFC Construction or BFC Partners or something
15    else?
16         A.     Construction.
17         Q.     When you say that she used to work
18    at the BFC Construction office, where was that
19    located?
20         A.     2226 First Avenue, New York, New
21    York 10029.
22         Q.     Did you ever have an office at
23    that location?
24         A.     Yes.
25         Q.     When?
```

```
 1                        BARON
 2        A.      Well, you know, I was not a real
 3   employee.  I used to have an office.  I still
 4   -- I have an office where I visit
 5   occasionally.
 6        Q.      For what purpose do you have an
 7   office there?
 8        A.      Helping my son.
 9        Q.      When did you first have an office
10   there?
11        A.      Probably early 1990s.  Might have
12   been later than that.
13        Q.      Someplace in the 1990s, right?
14        A.      Yes.
15        Q.      You still have an office there?
16        A.      Yes.
17        Q.      So, you have continually had an
18   office from the 90s until today?
19        A.      Yes.
20        Q.      Have you ever had an interest in
21   any entity for which BFC Construction Corp. is
22   a subsidiary, affiliate, to your
23   understanding?
24        A.      Yes.  At the present time.
25        Q.      What entity do you have an
```

```
 1                        BARON
 2    interest in at present as it relates to BFC
 3    Construction Corp.?
 4         A.      Just BFC.
 5         Q.      When did you obtain your interest
 6    in BFC Construction Corp.?
 7         A.      Probably a little over a year ago.
 8         Q.      That would be September of '05?
 9         A.      I would say it was probably
10    later.  A few months left of that.
11         Q.      Some time toward the end of --
12         A.      Or early '06.
13         Q.      Did you replace somebody who had a
14    prior interest at the time that you obtained
15    your interest in BFC Construction?
16         A.      Yes.
17         Q.      Who?
18         A.      Brandon Baron, Joe Ferrara and
19    Donald Capocci.
20         Q.      Did you ever come to have an
21    interest in 105 Street Associates at any time?
22         A.      No.
23         Q.      Did you ever come to have an
24    interest in BFC Partners?
25         A.      No.
```

```
 1                          BARON
 2          Q.      To your understanding, did Beth
 3    Berns ever have an interest in BFC
 4    Construction, 105 Street Associates, BFC
 5    Partners?
 6          A.      I don't believe so.
 7          Q.      Do you know someone by the name of
 8    Elizabeth Selby, S-E-L-B-Y?
 9          A.      I know of her.
10          Q.      What is your understanding of her?
11          A.      I don't really have intimate
12    knowledge of what she did, but she used to
13    work at the BFC office.
14          Q.      Do you know for which entity she
15    was employed by?
16          A.      No.
17          Q.      To your understanding, between the
18    period of July 2, 2002 and September 20, 2004,
19    was the office of BFC Construction Corp. and
20    105 Street Associates, LLC located at 2226
21    First Avenue?
22          A.      BFC, the answer is yes.  The Plaza
23    or the 105 Street Associates, I am not sure.
24    I don't know.
25          Q.      But BFC Construction did?
```

```
 1                          BARON
 2        A.    Yes.
 3        Q.    What about BFC Partners?
 4        A.    I don't know.
 5        Q.    Have you ever heard of WNC Eastern
 6   Community Development Advisors, LLC?
 7        A.    No.
 8        Q.    Between July 2nd of 2002 and
 9   September 20, 2004, who was the employer, if
10   anyone, of Brad Richards?
11        A.    I think it was BFC Construction.
12        Q.    Was he ever employed, to your
13   understanding, by 105 Street Associates, LLC?
14        A.    I don't know.
15        Q.    In the same time period, who was
16   Estelle, E-S-T-E-L-L-E, Rodriquez employed by?
17        A.    I also believe BFC Construction.
18        Q.    None of the other entities that I
19   have mentioned?
20        A.    I don't know about the other
21   entities.
22        Q.    Do you know what her job function
23   was for BFC Construction?
24        A.    Secretary.
25        Q.    In the time period that we have
```

```
 1                        BARON

 2    been dealing with, do you have an

 3    understanding as to who was responsible, if

 4    anyone, for sending notices of claims to the

 5    insurance broker for BFC Construction?

 6         A.    No.

 7         Q.    What about for 105 Street

 8    Associates?

 9         A.    No.

10         Q.    To your understanding, between

11    July 2, 2002 and September 20, 2004, did 105

12    Street Associates, LLC receive its mail at

13    2226 First Avenue?

14         A.    I wouldn't know.

15         Q.    What about BFC Construction Corp?

16         A.    Yes.

17         Q.    What about BFC Partners?

18         A.    I don't know.

19         Q.    In that time period, to your

20    understanding who, if anyone, was charged with

21    opening the mail for BFC Construction Corp. at

22    the office?

23         A.    I wouldn't know.  There were

24    different people there.

25         Q.    Like who?
```

```
 1                    BARON
 2        A.    Well, there was different -- I
 3    don't remember the names.  Different
 4    receptionists.  They usually opened the mail.
 5        Q.    That would be for BFC Construction
 6    Corp?
 7        A.    Yes.
 8        Q.    What about for 105 Street
 9    Associates?
10        A.    I wouldn't know that.
11        Q.    Do you know whether there was some
12    sort of procedure as to what the various
13    secretaries would do in terms of giving
14    particular pieces of mail to people who worked
15    at the office?
16        A.    No.  Would be distributed.  I
17    don't know what kind of procedure there would
18    be.
19        Q.    Were you ever familiar with an
20    entity known as North Shore Risk Management?
21        A.    Yes.
22        Q.    What was your understanding of
23    North Shore?
24        A.    An insurance broker.
25        Q.    To your understanding, was that a
```

```
 1                    BARON
 2   broker for 105th Street?
 3        A.     I wouldn't know.
 4        Q.     Do you know whether that was a
 5   broker for BFC Construction?
 6        A.     Yes.
 7               MR. SCHNEIDER:   Off the record.
 8               (Whereupon, an off-the-record
 9          discussion was held.)
10        Q.     Do you know whether it was a
11   broker for 105 Street Associates?
12        A.     I don't know.
13        Q.     The office at 2226 First Avenue,
14   in the 2002, 2004 period, approximately what
15   was the square footage?
16        A.     Probably, I am guessing, maybe
17   3,000 feet.
18        Q.     How many people, to your
19   recollection, worked there?
20        A.     Maybe about seven, eight, tops,
21   ten.
22        Q.     Of the number that you just gave
23   me, was Capocci one of them?
24        A.     Yes.
25        Q.     Ferrara another one?
```

```
 1                        BARON
 2        A.    Yes.
 3        Q.    Greg Brandon another one?
 4        A.    I am Greg.
 5        Q.    I am sorry.  Brandon.
 6        A.    Yes.
 7        Q.    Are you including yourself in that
 8  eight to ten?
 9        A.    Not really, no.
10        Q.    Estelle Rodriquez?
11        A.    Yes.
12        Q.    Ms. Berns?
13        A.    Yes.
14        Q.    Ms. Selby?
15        A.    I don't know if she was there
16  during that time.
17        Q.    Brad Richards?
18        A.    No.
19        Q.    In that two-year period, he did
20  not work in the office?
21        A.    He didn't work in the office, no.
22        Q.    Where did he work?
23        A.    I am not really sure, you know,
24  where he was working at that time, but he was
25  not in the office.  I think he was possibly
```

1                        BARON

2    working as an owner's rep or something.  Maybe

3    he was working on 105th Street for the owner.

4    I am not really sure.

5          Q.      He was basically in the field is

6    what you are saying?

7          A.      Yes.

8          Q.      As an owner's rep, you are

9    referring to the 105 Street Associates, LLC?

10         A.      Yes.  But I believe he worked in

11   many different capacities and locations.  He

12   was not in the office.

13         Q.      Did he work in some capacity for

14   BFC Construction?

15         A.      I don't actually have knowledge of

16   that.

17         Q.      Would part of his job function as

18   an owner's rep for 105 Street Associates

19   include dealing with insurance claims against

20   it?

21         A.      I don't know.

22         Q.      Would part of his job duties as

23   the owner's rep for 105 Street include dealing

24   with lawsuits filed against 105 Street

25   Associates?

```
 1                        BARON
 2         A.    I don't know.
 3         Q.    Who, to your understanding, would
 4    deal with insurance claims against BFC
 5    Construction?
 6         A.    I don't know.
 7         Q.    Who would deal with lawsuits filed
 8    against BFC Construction?
 9         A.    I don't know that either.
10         Q.    Let me show you what has been
11    previously marked as Exhibit B at a December
12    5, 2006 deposition (handing).
13               I ask you whether you have ever
14    seen that document prior to today?
15         A.    Not that I remember.
16         Q.    Did you review any documents in
17    preparation for today's deposition?
18         A.    No.
19         Q.    What, if anything, did you do to
20    prepare for today's deposition?
21         A.    I just spoke with Don a little bit
22    before this meeting.
23         Q.    When you say "Don", you are
24    referring to your attorney, Donald Schneider?
25         A.    Yes.
```

```
 1                      BARON
 2         Q.    Were you aware whether North Shore
 3    was terminated as the broker for BFC
 4    Construction because North Shore was unable to
 5    get 105 Street Associates named as an insured
 6    on the BFC Construction general liability
 7    policy?
 8         A.    I don't have knowledge of that.
 9         Q.    Do you have any knowledge as to
10    whether North Shore was terminated as broker
11    for BFC Construction?
12         A.    I know they are not the broker at
13    the present time.
14         Q.    But, do you know the reason for
15    North Shore's termination?
16         A.    No.
17         Q.    Did you participate in retaining
18    North Shore as the broker for BFC
19    Construction?
20         A.    In some sort of manner, yes,
21    because they were a broker for a company that
22    I was a principal in in the 1980s called SPG
23    Contracting.  They were the broker at that
24    time.  I recommended them to BFC as a broker.
25         Q.    Do you know whether North Shore
```

```
 1                     BARON

 2    was the broker for 105 Street Associates at

 3    any time?

 4         A.    I don't know.

 5         Q.    In the period of 2002 through 2004

 6    who, if anyone, would make the decision to

 7    terminate North Shore as the broker for BFC

 8    Construction?

 9               MR. SCHNEIDER:  Objection as to

10         the form of the question.  You can answer

11         it if you can.

12               THE WITNESS:  Say that again.

13               MR. FUERTH:  That is a technical

14         thing between the two of us.

15               MR. SCHNEIDER:  You can answer the

16         question if you know.

17         A.    Can you repeat the question?

18         Q.    Who, if anyone, to your

19    understanding, would be the individual to

20    decide to terminate North Shore as a broker?

21         A.    It would have had to be one of the

22    principals.

23         Q.    That would be in the period of

24    2002 through 2004, Capocci, Ferrara?

25         A.    Or Brandon.  Brandon Baron.
```

```
 1                          BARON
 2          Q.     Your son?
 3          A.     Yes.
 4          Q.     To your understanding, what would
 5     be the reason, if any, that Beth Berns would
 6     be copied on Exhibit B?
 7          A.     I need to read it to see what it
 8     is.
 9          Q.     Sure.
10          A.     Can you repeat the question
11     again?
12          Q.     What would be the reason, if any,
13     for Ms. Berns to be copied on Exhibit B?
14          A.     Well, from light reading this
15     letter, it looks like there was -- well, Beth
16     Berns was probably working with Donald on this
17     105th Street job, because that is the only
18     reason that I would say they copied her.
19               MR. SCHNEIDER:    Not for to you
20          speculate.  He is asking what you know.
21               THE WITNESS:    It is speculating.
22          I am guessing.
23          Q.     Looking at Exhibit B, does that
24     refresh your recollection as to what Ms.
25     Berns' job description was?
```

```
 1                         BARON
 2         A.      Not really, no.
 3         Q.      Did you ever have any discussions
 4    with anyone concerning the substance of
 5    Exhibit B?
 6         A.      Not to my knowledge.
 7         Q.      Let me show you what has been
 8    previously marked as Exhibit C for
 9    identification at a December 5, 2006
10    deposition (handing).
11               I ask you, between 2002 and 2004,
12    do you know who would respond to claims for
13    personal injuries asserted against BFC
14    Construction Corp?
15               MR. SCHNEIDER:   Asked and
16         answered.   You can answer.
17         A.      No, I don't.
18         Q.      Were you aware at any time between
19    2002 and 2004 of a claim for personal injury
20    by Richard Conrad at the 105th Street
21    construction site?
22         A.      I don't know, no.   No, I don't
23    know what that claim is about.
24         Q.      Were you ever made aware,
25    irrespective of what the claim was about, of
```

```
 1                         BARON
 2    its existence?
 3         A.    I may have heard the name Conrad
 4    at some time, but I don't know what it was in
 5    reference to.
 6         Q.    Do you know the means by which you
 7    may have heard about the Conrad claim?
 8         A.    Just overhearing talk possibly.
 9         Q.    Do you know talk between whom?
10         A.    No.
11         Q.    Let me show you what has been
12    previously marked as Defendant's G at the
13    December 5, 2006 deposition (handing).
14                I ask you whether you have ever
15    seen a copy of that document before?
16         A.    No.
17         Q.    Did you ever discuss the substance
18    of Exhibit G with anyone?
19         A.    No.
20         Q.    Did you ever overhear anyone
21    discussing the substance of Exhibit G with
22    anyone?
23         A.    No.
24         Q.    Let me show you what has been
25    marked as Exhibit D at a December 5, 2006
```

```
 1                        BARON
 2   deposition (handing).
 3              I ask you whether you have ever
 4   seen this document before?
 5        A.    No.
 6        Q.    Would a letter such as Exhibit D
 7   be something that was within the scope of
 8   Estelle Rodriquez's job description?  I am not
 9   talking about physically typing it but, you
10   know, compiling the information that is listed
11   in there.
12        A.    I wouldn't have knowledge of that.
13        Q.    Would Ms. Rodriquez send a letter,
14   such as Exhibit D, on her own initiative or
15   would that be something that she was directed
16   to do by someone?
17              MR. SCHNEIDER:    Objection as to
18         the form.  You can answer if you can.
19        A.    I wouldn't have knowledge of that
20   either.
21        Q.    You don't know whether she was
22   authorized to send letters like this on her
23   own or whether someone like Capocci, Ferrara,
24   Brandon or anyone else would be the one who
25   would say please prepare a letter containing
```

```
 1                          BARON
 2    certain information?
 3         A.      No, I wouldn't know.
 4         Q.      You personally did not give the
 5    information noted in Exhibit D to her for
 6    transmittal?
 7         A.      No.
 8         Q.      I'm showing you Exhibit F for
 9    identification at the December 5, 2006
10    deposition (handing).
11                 Do you recognize whose handwriting
12    that is?
13         A.      No.  I have never seen this
14    handwriting.
15         Q.      Have you ever seen that document?
16         A.      No.
17         Q.      Let me show you what has been
18    previously marked as Exhibit K at the December
19    5, 2006 deposition (handing).  I ask you
20    whether you have ever seen that document
21    before?
22         A.      No.
23         Q.      Were you ever made aware by anyone
24    that there was a risk manager for a claim by
25    Richard Conrad as against BFC Construction?
```

```
 1                    BARON

 2      A.     No.

 3      Q.     In dealing with correspondence

 4   coming from the insurance company to BFC

 5   Construction, who other than Ms. Rodriquez

 6   would be involved?

 7             MR. SCHNEIDER:   Objection as to

 8        the form of the question.  You can answer

 9        it.

10      A.     Involved in what?

11      Q.     In responding to letters from the

12   insurance company, being aware of the fact of

13   the transmittal of a letter by the insurance

14   company.

15      A.     I wouldn't know who.

16      Q.     Showing you Exhibit L from the

17   12/05/06 deposition (handing).

18             Would responding to such a letter

19   be within Ms. Rodriquez's employment

20   description or would she receive direction

21   from someone else.

22             MR. SCHNEIDER:   Objection as to

23        form of the question.  You can answer.

24      A.     I think we answered this before.

25   I don't know the answer.
```

1                      BARON

2          Q.    I am just asking whether that

3      letter would refresh your memory in any way.

4          A.    No.

5          Q.    You were never made aware of the

6      substance of that letter?

7          A.    No.

8          Q.    Let me show you what has been

9      marked as Exhibit N at the 12/05/06 deposition

10     (handing).

11              I ask you whether you have ever

12     seen that before?

13         A.    No.

14         Q.    In the 2002 through 2004 period

15     who, if anyone else, at BFC Construction,

16     besides Estelle Rodriquez, would be informed

17     of a denial of coverage by an insurance

18     carrier?

19              MR. SCHNEIDER:   Objection as to

20         the form of the question.  You can answer

21         it.

22         A.    I would guess the principals of

23     the company.

24              MR. SCHNEIDER:   Don't guess.

25         Answer the question if you know.  Don't

```
 1                          BARON
 2       guess.
 3       A.      I don't know.
 4       Q.      In that time period, Brandon was
 5   one of the principals of BFC Construction?
 6       A.      Yes.
 7       Q.      Did you have any discussions with
 8   Brandon about coverage being denied to BFC
 9   Construction for the Conrad claim?
10       A.      No.
11       Q.      Did you have discussions with any
12   other principal of BFC Construction concerning
13   the denial of coverage for the Conrad claim?
14       A.      Not that I remember.
15       Q.      Did you ever hear anything
16   discussed about the denial of coverage?
17       A.      No.
18       Q.      Let me show you what has been
19   previously marked as Defendants Exhibit O at
20   the 12/05/06 deposition (handing).
21               I ask you whether you were ever
22   made aware of any claim against BFC Partners
23   by Mr. Conrad?
24       A.      No.
25       Q.      Who is Greg Cross?
```

```
 1                         BARON

 2        A.      He was the CFO.

 3        Q.      Of BFC Construction?

 4        A.      Yes.

 5        Q.      Did he have any employment with

 6   105 Street Associates?

 7        A.      I wouldn't know that.

 8        Q.      What about BFC Partners?

 9        A.      No, I have no knowledge of that.

10        Q.      Who would make a determination

11   whether to communicate with the law office of

12   Schneider, Goldstein Bloomfield concerning

13   anything?

14               MR. SCHNEIDER:   On behalf of?

15               MR. FUERTH:  On behalf of BFC

16        Construction.

17               MR. SCHNEIDER:   Objection.  You

18        can answer.  What period of time?

19               MR. FUERTH:  2002 to 2004.

20        A.      Who would be speaking to --

21        Q.      Who would be the person who would

22   decide on behalf of BFC Construction that we

23   are going to contact that firm and assign work

24   to them?

25        A.      I don't have direct knowledge of
```

```
 1                          BARON

 2     that.

 3          Q.      Would you be a person who would do

 4     that?

 5          A.      No.  I didn't work for BFC.  I

 6     wouldn't have the ability to do that.

 7          Q.      You don't know who did at that

 8     time period?

 9          A.      No.

10          Q.      Do you know whether Greg Cross had

11     the authority to contact counsel on behalf of

12     BFC Construction?

13          A.      I don't know.

14          Q.      Do you know who had authority to

15     contact counsel on behalf of 105 Street

16     Associates?

17          A.      No.

18          Q.      Do you know who had authority to

19     contact counsel on behalf of BFC Partners?

20          A.      No.

21          Q.      Did you have any discussions with

22     Brandon, in the period of July 2004,

23     concerning a claim against BFC Construction

24     Corp. by Richard Conrad?

25          A.      No.
```

1                          BARON

2          Q.      Did you have any discussions with

3    Capocci or Ferrara concerning a claim by

4    Conrad against BFC Construction in July of

5    2004?

6          A.      Not that I remember.

7          Q.      Did you have any conversations

8    with Capocci or Ferrara about communicating

9    with counsel concerning a claim by Conrad

10   against BFC Construction in the July 2004

11   period?

12         A.      Not that I remember.

13         Q.      Did you have any discussion with

14   Mr. Potolsky at any point concerning the

15   Richard Conrad claim?

16         A.      Not that I remember.

17         Q.      Did you ever have any

18   conversations with Brad Richard about the

19   Conrad claim against BFC Construction?

20         A.      No.

21         Q.      Was Mr. Cross the CFO for BFC

22   Construction in the period of July 2, 2002

23   through September 20, 2004?

24         A.      Yes.

25         Q.      Do you know if he was employed by

```
 1                    BARON

 2   BFC Partners?

 3        A.      No.

 4        Q.      Between 2002 and 2004, was Mr.

 5   Schneider law counsel for 105 Street

 6   Associates?

 7        A.      I wouldn't know.

 8        Q.      Was his firm counsel for BFC

 9   Construction Corp?

10        A.      I believe so.

11        Q.      On behalf of BFC Construction

12   Corp., who would determine whether to have him

13   handle matters?

14        A.      I don't know.

15        Q.      Did you have any involvement in

16   determining whether to retain Mr. Schneider

17   for any matters on behalf of BFC Construction,

18   105 Street Associates or BFC Partners?

19        A.      No.

20        Q.      Let me show you what has been

21   previously marked as Exhibit Q for

22   identification at the December 5, 2006

23   deposition (handing).

24                I ask you, were you ever made

25   aware of this letter?
```

```
 1                        BARON
 2       A.     No.
 3       Q.     Were you ever made aware of the
 4  substance of that letter?
 5       A.     No.
 6       Q.     Were you ever made aware whether
 7  Mr. Schneider was contacted on behalf of BFC
 8  Construction Corporation concerning the
 9  substance of Exhibit Q?
10       A.     I have been made aware recently,
11  since I was made aware of this deposition.
12       Q.     When were you first made aware of
13  this deposition?
14       A.     About three, four weeks ago.
15       Q.     But up until three to four weeks
16  ago, were you aware of any lawsuit by Conrad
17  as against BFC Construction Corp?
18       A.     Like I said before, I heard the
19  name, but I am not familiar with the merits of
20  the lawsuit.
21       Q.     My question to you, sir, is just
22  solely as to the existence of the lawsuit.
23       A.     I knew the existence of the name.
24  I heard the name.
25       Q.     Were you made aware of whether he
```

```
 1                      BARON
 2   had sued BFC Construction Corp?
 3        A.     I don't remember.  I have heard
 4   the name, but I don't remember what it was in
 5   relation to.
 6        Q.     You don't know the context within
 7   which you heard the name?
 8        A.     No.
 9        Q.     To your understanding, between the
10   period of 2002 and 2004, was Donald Capocci
11   the agent for service of process for BFC
12   Partners?
13        A.     I don't know.
14        Q.     Was he the agent for service of
15   process for BFC Construction?
16        A.     I don't know.
17        Q.     Was he the agent for service of
18   process for 105 Street Associates?
19        A.     I don't know.
20        Q.     Let me show you what has been
21   previously marked as Exhibit E at a May 24,
22   2006 deposition (handing).
23               Specifically directing your
24   attention to a summons and verified complaint,
25   I ask you whether you have ever seen that
```

```
 1                    BARON
 2    document before?
 3         A.    No.
 4              MR. SCHNEIDER:   Off the record.
 5              (Whereupon, an off-the-record
 6         discussion was held.)
 7         Q.    I don't mean to repeat myself, but
 8    just to make sure the record is complete, do
 9    you know whether Capocci was the agent for
10    service of process for BFC Partners, 105
11    Street Associates and BFC Construction Corp.
12    in the 2002 through 2004 period?
13         A.    No.
14         Q.    Between 2002 and 2004, on behalf
15    of BFC Construction Corp., who would be
16    involved in dealing with lawsuits against that
17    company in the sense of deciding whether to
18    retain counsel, keeping aware of progress of
19    the lawsuit, things of that nature?
20              MR. SCHNEIDER:   Objection as to
21         the form of the question.  Also asked and
22         answered.  You can answer it if you can.
23         A.    It would probably have to be the
24    principals.
25         Q.    Ferrara, Capocci or Brandon?
```

```
 1                          BARON
 2        A.     Yes.
 3        Q.     What about 105 Street Associates?
 4        A.     I don't know much about 105th
 5   Street.
 6        Q.     To the extent that you know
 7   anything, who would be involved in
 8   administrating the lawsuits, for lack of a
 9   better description?
10        A.     I don't know.
11               MR. SCHNEIDER:   Just answer it.
12        A.     I don't know.
13        Q.     BFC Partners?
14        A.     I don't know.
15        Q.     Did you ever see what has been
16   previously marked as Exhibit F at the May 24,
17   2006 deposition (handing)?
18        A.     No.
19        Q.     Were you ever advised of the
20   substance of the letter?
21        A.     No.
22        Q.     On behalf of 105 Street Associates
23   who, if anyone, to your understanding, would
24   be made aware of a letter sent to that entity
25   advising that it is in default of a lawsuit?
```

```
 1                        BARON
 2              MR. SCHNEIDER:   Objection as to
 3         the form of the question.
 4         A.     I don't have knowledge of that.
 5         Q.     To your understanding who, if
 6    anyone, would become involved in responding to
 7    an attorney's letter advising that BFC
 8    Partners was in default of a lawsuit?
 9              MR. SCHNEIDER:   Objection as to
10         the form of the question.
11         A.     I have no knowledge of that.
12         Q.     Would that be left to Estelle
13    Rodriquez?
14              MR. SCHNEIDER:   Objection as to
15         the form of the question.
16         A.     I don't know.
17         Q.     Were you ever made aware that on
18    or about April 20, 2004, BFC Partners was sued
19    by Richard Conrad?
20         A.     No.
21         Q.     Let me show you what has been
22    previously marked as Exhibit U at a December
23    5, 2006 deposition (handing).
24              I ask you whether you have ever
25    seen a copy of that letter?
```

1                              BARON

2          A.     No.

3          Q.     Have you had any dealings with Mr.

4     Schneider other than being told that you were

5     going to be deposed concerning any lawsuit

6     arising out of the Richard Conrad claim?

7          A.     No.

8          Q.     Were you ever made aware of a

9     lawsuit by Regolodo, I don't know whether it

10    is a Mr. or Mrs., against BFC Construction?

11         A.     No.

12         Q.     Have you ever been made aware of a

13    lawsuit by Mr. or Mrs. Regolodo against BFC

14    Partners?

15         A.     No.

16         Q.     Same question as to 105 Street

17    Associates.

18         A.     No.

19         Q.     Were you made aware that the

20    Schneider firm had been retained on behalf of

21    BFC Construction to prepare lawsuits against

22    various insurance companies?

23         A.     No.

24         Q.     Were you made aware that the

25    Schneider firm had been retained to commence a

1                           BARON

2     lawsuit against Greenwich Insurance Company?

3           A.     No.

4           Q.     Have you had any discussions with

5     anyone concerning suits by BFC Construction

6     against its insurance companies arising out of

7     the Conrad lawsuit?

8           A.     No.

9           Q.     Did you have any discussions with

10    Brandon concerning lawsuits against any

11    insurance companies related to the Richard

12    Conrad lawsuit?

13          A.     No.

14          Q.     Did you have any participation in

15    any discussions giving rise to the retention

16    of Mr. Schneider to bring suit against various

17    insurance companies on behalf of BFC

18    Construction?

19          A.     No.

20          Q.     Let me show you what has been

21    marked as Exhibit W at a December 5, 2006

22    deposition (handing).

23                 I ask you whether you have ever

24    seen this document before?

25          A.     No.

1                          BARON

2          Q.      Did you ever have any discussions

3    with people who were noted as CCs, being Mr.

4    Capocci, Mr. Baron and Mr. Brad Richards, as

5    to a lawsuit involving Richard Conrad against

6    105 Street Associates?

7          A.      No.

8          Q.      Did you have any discussions with

9    any of the CCs concerning the decision to get

10   Mr. Schneider involved in the Conrad versus

11   105 Street Associates lawsuit?

12         A.      No.

13         Q.      Who, to your understanding,

14   introduced Mr. Schneider to BFC Construction?

15         A.      I don't know.

16         Q.      Who, if you know, introduced Mr.

17   Schneider to 105 Street Associates?

18         A.      No knowledge.

19         Q.      Who introduced Mr. Schneider to

20   Mr. Capocci?

21         A.      No knowledge.

22         Q.      Who introduced Mr. Schneider to

23   Brandon Baron?

24         A.      I don't know who it was.

25         Q.      Who introduced Mr. Schneider to

```
 1                      BARON
 2   Brad Richards?
 3        A.      I don't know.
 4        Q.      Had you ever retained Mr.
 5   Schneider on behalf of any of your other
 6   companies?  I think you mentioned some
 7   construction company.
 8        A.      No.
 9        Q.      Had you ever used the services of
10   Mr. Schneider's firm prior to August 18, 2004
11   on behalf of yourself personally or any entity
12   that you were a principal of?
13        A.      No.
14        Q.      Were you aware of Mr. Schneider
15   prior to August 18, 2004?
16        A.      Aware of the name or --
17        Q.      Of Mr. Schneider personally.
18        A.      Yes.
19        Q.      How did you become aware of him?
20        A.      Just overhearing talk.  What was
21   the date there?
22        Q.      August 18, 2004.
23                As of that time, had you been
24   aware of him?
25        A.      I heard the name, you know,
```

1                          BARON

2    mentioned many times.  I don't know if I ever

3    met him before that.

4         Q.    When you say that you had heard

5    his name mentioned many times --

6         A.    In connection with the name of the

7    firm.

8         Q.    What were the circumstances that

9    you overheard that?

10        A.    I don't know.

11        Q.    When did you overhear those

12   conversations?

13        A.    Just in being at the office.

14        Q.    Was that in 2002, 2003, 2004, or

15   something else?

16        A.    It was occasionally through that

17   period.

18        Q.    Do you recall the substance of

19   what Mr. Schneider and/or his firm's name was

20   being discussed in reference to?

21        A.    No.

22        Q.    Have you ever used the Schneider,

23   Goldstein firm, other than Mr. Schneider, in

24   the past, prior to 2004?

25        A.    Myself?

```
 1                        BARON

 2        Q.    Yes.

 3        A.    No.

 4        Q.    Did you ever have any conversation

 5   with Capocci, Ferrara or Brandon as to how Mr.

 6   Schneider's firm came to represent BFC

 7   Construction?

 8        A.    No.

 9        Q.    Let me show you what has been

10   previously marked as Exhibit X at a December

11   5, 2006 deposition (handing).

12              I ask you whether you have ever

13   seen this document before?

14        A.    I am going to need to read this.

15        Q.    Absolutely.

16        A.    I don't have remembrance of this

17   letter.  I have been CC'd on it, but I do not

18   remember such a letter.

19        Q.    Do you recall discussing the

20   substance of this letter with anybody?

21        A.    No.

22        Q.    Did you ever discuss this letter

23   with Mr. Potolsky?

24        A.    I don't believe so.

25        Q.    Do you recall having a
```

                          BARON

1                         BARON

2    conversation with Mr. Potolsky on August 16,

3    2004 concerning the lawsuit against 105 Street

4    Associates?

5         A.    No.

6         Q.    Do you recall whether you would

7    regularly receive correspondence in 2004 that

8    was addressed to you at the office on 2224

9    First Avenue?

10        A.    2226 --

11        Q.    First Avenue.

12        A.    Could you repeat the question?

13        Q.    Sure.

14              Do you recall whether in 2004 if

15   correspondence was addressed to you at 2226

16   First Avenue that you would regularly

17   receive?  Were you aware of not getting mail?

18        A.    Yes.  But I was not there on a

19   full-time basis, so when mail piled up, you

20   know, I'd generally see it, but I didn't get a

21   lot of mail.

22        Q.    When you say "piled up", with what

23   frequency would you come into the office?

24        A.    Once or twice a week.

25        Q.    People would just leave the mail

1                              BARON

2    addressed to you on -- did you have a desk?

3         A.     Yes.

4         Q.     Leave it on your desk, then you

5    would deal with it?

6         A.     Yes.

7         Q.     But the entire issue of a claim

8    against 105 Street Associates by Mr. Conrad is

9    something that you have no recollection

10   discussing with anyone?

11        A.     No.

12        Q.     You have no recollection being

13   made aware of it by anyone?

14        A.     Well, like I said before, I heard

15   the name, but I don't remember in what

16   context.

17        Q.     You heard the name of Richard

18   Conrad?

19        A.     Conrad.

20        Q.     But you don't recall hearing

21   Conrad in the context of having sued anybody?

22        A.     No.

23        Q.     Let me show you what has been

24   marked as Plaintiff's Exhibit 7 at a June 5,

25   2006 deposition (handing).

1                              BARON

2                    I ask you whether you have ever

3        seen that document before?

4               A.    No.

5               Q.    To your understanding, in August

6        of 2004, if Ms. Rodriquez received a letter,

7        such as Plaintiff's Exhibit 7, to your

8        understanding, was she authorized to respond

9        to that letter on her own or would she bring

10       this to the attention of someone else?

11              A.    I wouldn't have knowledge of that.

12              Q.    Let me show you what has been

13       previously marked as Plaintiff's Exhibit 8 at

14       a June 5th deposition (handing).

15                    I ask you whether you have ever

16       seen that document before?

17                    MR. FUERTH:    For the record, it

18            is a letter of denial of coverage on

19            behalf of Greenwich Insurance Company.

20              A.    No, I have never seen this.

21              Q.    Have you discussed with anyone

22       that Greenwich Insurance Company denied

23       coverage to 105 Street Associates for the

24       Richard Conrad case?

25              A.    During what period of time?

```
 1                        BARON

 2        Q.     Any period of time.

 3        A.     Well, I have become aware of it

 4   through this deposition.

 5        Q.     The first notice of this

 6   deposition was a communication from Mr.

 7   Schneider about a month ago?

 8        A.     Yes.

 9        Q.     Up until a month ago you had no

10   awareness that Greenwich Insurance Company had

11   denied coverage to 105 Street Associates for

12   the Richard Conrad claim?

13        A.     No.

14

15

16               (Continued on the following page

17         to include jurat.)

18

19

20

21

22

23

24

25
```

1                            BARON

2          Q.      You had no knowledge that 105

3     Street Associates had started a lawsuit

4     against Greenwich Insurance Company arising

5     out of that denial?

6          A.      No.

7                  MR. FUERTH:   Thank you very much.

8                  (Whereupon, at 12:38 p.m., the

9          Examination of this Witness was

10         concluded.)

11

12

13                                _____

14                                     GREGORY BARON

15    Subscribed and sworn to before me

16    this _____ day of _____ 2007.

17

18    _____
           NOTARY PUBLIC

19

20

21

22

23

24

25

1                          BARON

2                  C E R T I F I C A T E

3

4    STATE OF NEW YORK        )
                            :  SS.:
5    COUNTY OF KINGS          )

6

7

8        I, KENNETH KRINSKY, a Notary Public for

9    and within the State of New York, do hereby

10   certify:

11       That the witness whose examination is

12   hereinbefore set forth was duly sworn and that

13   such examination is a true record of the

14   testimony given by that witness.

15       I further certify that I am not related

16   to any of the parties to this action by blood

17   or by marriage and that I am in no way

18   interested in the outcome of this matter.

19       IN WITNESS WHEREOF, I have hereunto set

20   my hand this 29th day of January, 2007.

21

22

23    _____
                 KENNETH KRINSKY

24

25

## ERRATA SHEET

| Page | Line | Original Text | Correction |
|------|------|---------------|------------|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

_____        _____
        (Witness Name)                        (Witness Signature)

Subscribed and sworn to before me
this _____ day of _____, 2007.

_____
        NOTARY PUBLIC

BSA    01/11/07 105 STREET  vs  GREENWICH INS.    WITNESS: G. BARON    Look-See(13)

**Look-See Concordance Report**

- - -

UNIQUE WORDS: 572
TOTAL OCCURRENCES: 2,220
NOISE WORDS: 384
TOTAL WORDS IN FILE: 6,314

- - -

SINGLE FILE CONCORDANCE

- - -

CASE INSENSITIVE

- - -

INCLUDES ALL TEXT OCCURRENCES

- - -

DATES ON

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS ON

## – DATES –

12/05/06 [3]
*28:17; 29:9; 30:20*

## – 0 –

05 [2]
*8:20; 12:8*
05cv9938 [1]
*1:6*
06 [1]
*12:12*
06928.00226 [1]
*2:11*

## – 1 –

10004 [2]
*1:18; 2:5*
10017 [1]
*2:10*
10021 [1]
*4:13*
10029 [1]
*10:21*
105 [39]
*1:3; 6:16; 7:11, 19, 25; 8:25; 9:16; 12:21; 13:4, 20, 23; 14:13; 15:7, 11; 16:8; 17:11; 19:9, 18, 23, 24, 21:5; 22:2; 31:6; 32:15; 34:5, 18; 36:18; 37:10; 38:3, 22; 40:16; 42:6, 11, 17; 46:3; 47:8; 48:23; 49:11; 50:2*
105th [7]
*7:3, 15; 17:2; 19:3; 23:17; 24:20; 38:4*
11 [1]
*1:10*
11:22 [1]
*1:11*
12/05/06 [3]
*28:17; 29:9; 30:20*
12:38 [1]
*50:8*
150 [1]
*2:9*
16 [1]
*46:2*
18 [3]

43:10, 15, 22
1968 [1]
*5:8*
1980s [1]
*21:22*
1990s [2]
*11:11, 13*

## – 2 –

2 [6]
*5:14; 7:17; 9:10; 13:18; 15:11; 33:22*
20 [10]
*5:14; 7:5, 18; 8:9; 9:11; 13:18; 14:9; 15:11; 33:23; 39:18*
2002 [20]
*5:14; 7:17; 8:3; 9:10; 13:18; 14:8; 15:11; 17:14; 22:5, 24; 24:11, 19; 29:14; 31:19; 33:22; 34:4; 36:10; 37:12, 14; 44:14*
2003 [1]
*44:14*
2004 [34]
*5:14; 7:6, 18; 8:4, 9; 9:11; 13:18; 14:9; 15:11; 17:14; 22:5, 24; 24:11, 19; 29:14; 31:19; 32:22; 33:5, 10, 23; 34:4; 36:10; 37:12, 14; 39:18; 43:10, 15, 22; 44:14, 24; 46:3, 7, 14; 48:6*
2005 [2]
*8:13, 14*
2006 [13]
*20:12; 24:9; 25:13, 25; 27:9, 19; 34:22; 36:22; 38:17; 39:23; 41:21; 45:11; 47:25*
2007 [3]
*1:10; 50:16; 51:20*
20th [1]
*8:4*
2224 [1]
*46:8*
2226 [6]
*10:20; 13:20; 15:13; 17:13; 46:10, 15*
24 [2]
*36:21; 38:16*
29th [1]
*51:20*
2nd [2]
*8:3; 14:8*

## – 3 –

3,000 [1]
*17:17*
301 [1]
*4:12*
34d [1]
*4:13*

## – 4 –

42nd [1]
*2:9*

## – 5 –

5 [11]
*20:12; 24:9; 25:13, 25; 27:9,*

19; 34:22; 39:23; 41:21; 45:11; 47:24
5th [1]
*48:14*

## – 7 –

7 [2]
*47:24; 48:7*
79th [1]
*4:12*

## – 8 –

8 [1]
*48:13*

## – 9 –

90 [2]
*1:17; 2:5*
90s [1]
*11:18*

## – A –

a.m. [1]
*1:11*
ability [1]
*32:6*
absolutely [1]
*45:15*
action [1]
*51:16*
addressed [3]
*46:8, 15; 47:2*
administrating [1]
*38:8*
advice [1]
*6:5*
advised [1]
*38:19*
advisers [1]
*9:4*
advising [5]
*5:20, 21, 24; 38:25; 39:7*
advisors [2]
*6:20; 9:20; 14:6*
affiliate [1]
*11:22*
agent [4]
*36:11, 14, 17; 37:9*
agreed [3]
*3:5, 12, 17*
answer [14]
*4:18; 13:22; 22:10, 15; 24:16; 26:18; 28:8, 23, 25; 29:20, 25; 31:18; 37:22; 38:11*
answered [3]
*24:16; 28:24; 37:22*
anybody [2]
*45:20; 47:21*
apartment [1]
*4:12*
approximately [2]
*8:22; 17:14*
april [1]
*39:18*
arising [3]
*40:6; 41:6; 50:4*
asking [4]
*4:15, 18; 23:20; 29:2*
asserted [1]

24:13
assign [1]
*31:23*
associates [38]
*1:3; 6:16; 7:11, 20, 25; 8:25; 9:16; 12:21; 13:4, 20, 23; 14:13; 15:8, 12; 16:9; 17:11; 19:9, 18, 25; 21:5; 22:2; 31:6; 32:16; 34:6, 18; 36:18; 37:11; 38:3, 22; 40:17; 42:6, 11, 17; 46:4; 47:8; 48:23; 49:11; 50:3*
attention [2]
*36:24; 48:10*
attorney [1]
*20:24*
attorney's [1]
*39:7*
attorneys [2]
*2:4, 9*
august [5]
*43:10, 15, 22; 46:2; 48:5*
authority [3]
*32:11, 14, 18*
authorized [2]
*26:22; 48:8*
avenue [7]
*10:20; 13:21; 15:13; 17:13; 46:9, 11, 16*
aware [29]
*21:2; 24:18, 24; 27:23; 28:12; 29:5; 30:22; 34:25; 35:3, 6, 10, 11, 12, 16, 25; 37:18; 38:24; 39:17; 40:8, 12, 19, 24; 43:14, 16, 19, 24; 46:17; 47:13; 49:3*
awareness [1]
*49:10*

## – B –

b-e-r-n-s [1]
*10:5*
background [1]
*5:4*
baron [11]
*1:14; 4:10, 14; 8:5, 19, 25; 12:18; 22:25; 42:4, 23; 50:13*
basically [2]
*6:2; 19:5*
basis [1]
*46:19*
behalf [17]
*4:15; 31:14, 15, 22; 32:11, 15, 19; 34:11, 17; 35:7; 37:14; 38:22; 40:20; 41:17; 43:5, 11; 48:19*
believe [7]
*7:14, 21; 13:6; 14:17; 19:10; 34:10; 45:24*
berns [7]
*10:5; 13:3; 18:12; 23:5, 13, 16, 25*
besides [1]
*29:16*
beth [4]
*10:4; 13:2; 23:5, 15*
bfc [90]
*6:10, 23; 7:19, 21, 24; 8:5, 19; 9:8, 12, 23; 10:2, 8, 13, 14, 18; 11:21; 12:2, 4, 6, 15, 24; 13:3, 4, 13, 19, 22, 25;*

14:3, 11, 17, 23; 15:5, 15, 17;
21; 16:5; 17:5; 19:14; 20:4, 8;
21:3, 6, 11, 18, 24; 22:7;
24:13; 27:25; 28:4; 29:15;
30:5, 8, 12, 22; 31:3, 8, 15,
22; 32:5, 12, 19, 23; 33:4, 10,
19, 21; 34:2, 8, 11, 17, 18;
35:7, 17; 36:2, 11, 15; 37:10,
11, 15; 38:13; 39:7, 18;
40:10, 13, 21; 41:5, 17;
42:14; 45:6

**bit** [1]
20:21

**blood** [1]
51:16

**bloomfield** [3]
1:17; 2:4; 31:12

**brad** [5]
14:10; 18:17; 33:18; 42:4;
43:2

**brandon** [17]
5:22; 8:5, 18, 24; 12:18; 18:3,
5; 22:25; 26:24; 30:4, 8;
32:22; 37:25; 41:10; 42:23;
45:5

**broad** [2]
1:17; 2:5

**broker** [15]
15:5; 16:24; 17:2, 5, 11; 21:3,
10, 12, 18, 21, 23, 24; 22:2,
7, 20

**building** [1]
7:15

**business** [1]
6:3

— C —

**c-a-p-o-c-c-i** [1]
9:12

**capacities** [1]
19:11

**capacity** [2]
10:10; 19:13

**capocci** [13]
9:12; 12:19; 17:23; 22:24;
26:23; 33:3, 8; 36:10; 37:9,
25; 42:4, 20; 45:5

**carrier** [1]
29:18

**case** [1]
48:24

**cc'd** [1]
45:17

**ccs** [2]
42:3, 9

**certification** [1]
3:8

**certify** [2]
51:10, 15

**cfo** [2]
31:2; 33:21

**charged** [1]
15:20

**circumstances** [1]
44:8

**claim** [16]
24:19, 23, 25; 25:7; 27:24;
30:9, 13, 22; 32:23; 33:3, 9,
15, 19; 40:6; 47:7; 49:12

**claims** [4]

bit to effect

**closer** [1]
8:13

**coming** [1]
28:4

**commence** [1]
40:25

**commerce** [1]
5:6

**communicate** [1]
31:11

**communicating** [1]
33:8

**communication** [1]
49:6

**community** [4]
6:19; 9:4, 19; 14:6

**companies** [5]
40:22; 41:6, 11, 17; 43:6

**company** [14]
1:7; 4:16; 21:21; 28:4, 12, 14;
29:23; 37:17; 41:2; 43:7;
48:19, 22; 49:10; 50:4

**compiling** [1]
26:10

**complaint** [1]
36:24

**complete** [1]
37:8

**concerning** [13]
24:4; 30:12; 31:12; 32:23;
33:3, 9, 14; 35:8; 40:5; 41:5,
10; 42:9; 46:3

**concluded** [1]
50:10

**connection** [1]
44:6

**conrad** [25]
24:20; 25:3, 7; 27:25; 30:9,
13, 23; 32:24; 33:4, 9, 15, 19;
35:16; 39:19; 40:6; 41:7, 12;
42:5, 10; 47:8, 18, 19, 21;
48:24; 49:12

**construction** [65]
6:11; 7:19, 21; 8:6, 20; 9:13;
10:14, 16, 18; 11:21; 12:3, 6,
15; 13:4, 19, 25; 14:11, 17,
23; 15:5, 15, 21; 16:5; 17:5;
19:14; 20:5, 8; 21:4, 6, 11,
19; 22:8; 24:14, 21; 27:25;
28:5; 29:15; 30:5, 9, 12; 31:3,
16, 22; 32:12, 23; 33:4, 10,
19, 22; 34:9, 11, 17; 35:8, 17;
36:2, 15; 37:11, 15; 40:10,
21; 41:5, 18; 42:14; 43:7;
45:7

**contact** [4]
31:23; 32:11, 15, 19

**contacted** [1]
35:7

**containing** [1]
26:25

**context** [3]
36:6; 47:16, 21

**continually** [1]
11:17

**continued** [1]
49:16

**contracting** [1]
21:23

**contractor** [1]

(718) 624-7200

**7:22**

**conversation** [2]
45:4; 46:2

**conversations** [3]
33:7, 18; 44:12

**copied** [3]
23:6, 13, 18

**copy** [2]
25:15; 39:25

**corp** [17]
6:11; 8:20; 11:21; 12:3, 6;
13:19; 15:15, 21; 16:6; 24:14;
32:24; 34:9, 12; 35:17; 36:2;
37:11, 15

**corporation** [1]
35:8

**correspondence** [3]
28:3; 46:7, 15

**counsel** [8]
3:6; 32:11, 15, 19; 33:9; 34:5,
8; 37:18

**county** [1]
51:5

**court** [2]
1:2; 3:20

**coverage** [7]
29:17; 30:8, 13, 16; 48:18,
23; 49:11

**cross** [3]
30:25; 32:10; 33:21

— D —

**date** [2]
1:10; 43:21

**day** [2]
50:16; 51:20

**deal** [2]
20:4, 7; 47:5

**dealing** [5]
15:2; 19:19, 23; 28:3; 37:16

**dealings** [1]
40:3

**december** [10]
20:11; 24:9; 25:13, 25; 27:9,
18; 34:22; 39:22; 41:21;
45:10

**decide** [2]
22:20; 31:22

**deciding** [1]
37:17

**decision** [2]
22:6; 42:9

**default** [2]
38:25; 39:8

**defendant** [3]
1:8; 2:9; 4:16

**defendant's** [1]
25:12

**defendants** [1]
30:19

**denial** [5]
29:17; 30:13, 16; 48:18; 50:5

**denied** [2]
30:8; 48:22; 49:11

**deposed** [1]
40:5

**deposition** [25]
3:8, 17; 20:12, 17, 20; 24:10;
25:13; 26:2; 27:10, 19; 28:17;
29:9; 30:20; 34:23; 35:11, 13;

**36:12; 38:17; 39:23; 41:22;
45:11; 47:25; 48:14; 49:4, 6**

**description** [4]
23:25; 26:8; 28:20; 38:9

**desk** [2]
47:2, 4

**determination** [1]
31:10

**determine** [1]
34:12

**determining** [1]
34:16

**development** [6]
6:3, 19; 7:2; 9:4, 20; 14:6

**dicker** [1]
2:8

**direct** [1]
31:25

**directed** [1]
26:15

**directing** [1]
36:23

**direction** [1]
28:20

**discuss** [2]
25:17; 45:22

**discussed** [3]
30:16; 44:20; 48:21

**discussing** [3]
25:21; 45:19; 47:10

**discussion** [4]
8:17; 17:9; 33:13; 37:6

**discussions** [10]
24:3; 30:7, 11; 32:21; 33:2;
41:4, 9, 15; 42:2, 8

**distributed** [1]
16:16

**district** [2]
1:2

**document** [10]
20:14; 25:15; 26:4; 27:15, 20;
37:2; 41:24; 45:13; 48:3, 16

**documents** [1]
20:16

**don** [2]
20:21, 23

**donald** [6]
2:6; 9:12; 12:19; 20:24;
23:16; 36:10

**duly** [2]
4:3; 51:12

**duties** [1]
19:22

— E —

**e-s-t-e-l-l-e** [1]
14:16

**early** [2]
11:11; 12:12

**east** [2]
2:9; 4:12

**eastern** [4]
6:19; 9:4, 19; 14:5

**edelman** [1]
2:8

**education** [1]
5:10

**educational** [1]
5:3

**effect** [1]

BSA                     01/11/07 105 STREET  vs  GREENWICH INS.     WITNESS:  G. BARON              Look-See(15)

3:19
eight [2]
    17:20; 18:8
elizabeth [1]
    13:8
elser [1]
    2:8
employed [4]
    13:15; 14:12, 16; 33:25
employee [1]
    11:3
employer [1]
    14:9
employment [4]
    5:15; 6:7; 28:19; 31:5
end [2]
    8:14; 12:11
entities [3]
    7:7; 14:18, 21
entity [7]
    6:10; 11:21, 25; 13:14; 16:20;
    38:24; 43:11
esq [2]
    2:6, 10
estate [1]
    6:3
estelle [5]
    14:16; 18:10; 26:8; 29:16;
    39:12
examination [5]
    1:13; 4:6; 50:9; 51:11, 13
examined [1]
    4:5
except [1]
    3:12
exhibit [27]
    20:11; 23:6, 13, 23; 24:5, 8;
    25:18, 21, 25; 26:6, 14; 27:5,
    8, 18; 28:16; 29:9; 30:19;
    34:21; 35:9; 36:21; 38:16;
    39:22; 41:21; 45:10; 47:24;
    48:7, 13
existence [3]
    25:2; 35:22, 23
extent [2]
    5:18; 38:6

– F –

fact [1]
    28:12
familiar [3]
    10:4; 16:19; 35:19
feet [1]
    17:17
ferrara [8]
    12:18; 17:25; 22:24; 26:23;
    33:3, 8; 37:25; 45:5
field [1]
    19:5
file [1]
    2:11
filed [2]
    19:24; 20:7
filing [1]
    3:7
finish [1]
    4:17
firm [8]
    31:23; 34:8; 40:20, 25; 43:10;
    44:7, 23; 45:6

firm's [1]
    44:19
first [11]
    4:3; 10:20; 11:9; 13:21;
    15:13; 17:13; 35:12; 46:9, 11,
    16; 49:5
following [1]
    49:16
follows [1]
    4:5
footage [1]
    17:15
force [1]
    3:19
form [10]
    3:13; 22:10; 26:18; 28:8, 23;
    29:20; 37:21; 39:3, 10, 15
formal [1]
    6:5
formation [1]
    7:10
forth [1]
    51:12
four [2]
    35:14, 15
frequency [1]
    46:23
fuerth [7]
    2:10; 4:7; 22:13; 31:15, 19;
    48:17; 50:7
full-time [1]
    46:19
function [2]
    14:22; 19:17

– G –

gave [1]
    17:22
gestures [1]
    4:24
give [4]
    4:18, 22; 5:3; 27:4
given [1]
    51:14
giving [2]
    16:13; 41:15
glenn [1]
    2:10
goldstein [4]
    1:16; 2:4; 31:12; 44:23
graduated [1]
    5:5
greenwich [7]
    1:7; 4:16; 41:2; 48:19, 22;
    49:10; 50:4
greg [4]
    18:3, 4; 30:25; 32:10
gregory [3]
    1:14; 4:10; 50:13
guess [3]
    29:22, 24; 30:2
guessing [2]
    17:16; 23:22

– H –

hand [1]
    51:20
handing [17]
    20:12; 24:10; 25:13; 26:2;
    27:10, 19; 28:17; 29:10;

30:20; 34:23; 36:22; 38:17;
    39:23; 41:22; 45:11; 47:25;
    48:14
handle [1]
    34:13
handwriting [2]
    27:11, 14
head [1]
    4:24
hear [1]
    30:15
heard [11]
    14:5; 25:3, 7; 35:18, 24; 36:3,
    7; 43:25; 44:4; 47:14, 17
hearing [1]
    47:20
held [4]
    1:15; 8:17; 17:9; 37:6
helping [4]
    5:20, 21, 24; 11:8
hereby [3]
    3:5, 9; 51:9
hereinbefore [1]
    51:12
hereto [1]
    3:7
hereunto [1]
    51:19

– I –

i'd [1]
    46:20
identification [3]
    24:9; 27:9; 34:22
include [3]
    19:19, 23; 49:17
index [1]
    1:5
indicated [1]
    5:13
individual [1]
    22:19
information [3]
    26:10; 27:2, 5
informed [1]
    29:16
initiative [1]
    26:14
injuries [1]
    24:13
injury [1]
    24:19
insurance [19]
    1:7; 4:16; 15:5; 16:24; 19:19;
    20:4; 28:4, 12, 13; 29:17;
    40:22; 41:2, 6, 11, 17; 48:19,
    22; 49:10; 50:4
insured [1]
    21:5
interest [26]
    6:9, 13, 15, 18, 22, 25; 7:4, 6;
    8:5, 8, 19, 24; 9:3, 7, 11, 15,
    18, 22; 11:20; 12:2, 5, 14, 15,
    21, 24; 13:3
interested [1]
    51:18
intimate [1]
    13:11
introduced [5]
    42:14, 16, 19, 22, 25

involved [6]
    28:6, 10; 37:16; 38:7; 39:6;
    42:10
involvement [1]
    34:15
involving [1]
    42:5
irrespective [1]
    24:25
issue [1]
    47:7

– J –

january [2]
    1:10; 51:20
job [6]
    14:22; 19:17, 22; 23:17, 25;
    26:8
joe [1]
    12:18
july [11]
    5:13; 7:17; 8:3; 9:10; 13:18;
    14:8; 15:11; 32:22; 33:4, 10,
    22
june [2]
    47:24; 48:14
jurat [1]
    49:17

– K –

keeping [1]
    37:18
kenneth [2]
    51:8, 23
kings [1]
    51:5
knowledge [18]
    7:12, 13; 8:2; 13:12; 19:15;
    21:8, 9; 24:6; 26:12, 19; 31:9,
    25; 39:4, 11; 42:18, 21;
    48:11; 50:2
krinsky [2]
    51:8, 23

– L –

l.l.p. [1]
    2:8
lack [1]
    38:8
law [2]
    31:11; 34:5
lawsuit [16]
    35:16, 20, 22; 37:19; 38:25;
    39:8; 40:5, 9, 13; 41:2, 7, 12;
    42:5, 11; 46:3; 50:3
lawsuits [6]
    19:24; 20:7; 37:16; 38:8;
    40:21; 41:10
leave [2]
    46:25; 47:4
letter [21]
    23:15; 26:6, 13, 25; 28:13,
    18; 29:3, 6; 34:25; 35:4;
    38:20, 24; 39:7, 25; 45:17,
    18, 20, 22; 48:6, 9, 18
letters [2]
    26:22; 28:11
liability [1]
    21:6

light [1]
  23:14
limited [1]
  7:12
niting [1]
  5:12
listed [1]
  26:10
llc [11]
  1:3; 6:16; 7:11, 20, 25; 9:5;
  13:20; 14:6, 13; 15:12; 19:9
llp [2]
  1:17; 2:4
located [3]
  7:3; 10:19; 13:20
location [1]
  10:23
locations [1]
  19:11
looks [1]
  23:15
lot [1]
  46:21
lp [4]
  6:23; 9:8, 23; 10:2

– M –

mail [8]
  15:12, 21; 16:4, 14; 46:17,
  19, 21, 25
management [1]
  16:20
manager [1]
  27:24
anhattan [1]
  7:3
manner [1]
  21:20
marked [15]
  20:11; 24:8; 25:12, 25; 27:18;
  29:9; 30:19; 34:21; 36:21;
  38:16; 39:22; 41:21; 45:10;
  47:24; 48:13
marriage [1]
  51:17
matter [1]
  51:18
matters [2]
  34:13, 17
mean [1]
  37:7
means [1]
  25:6
meeting [1]
  20:22
memory [1]
  29:3
mentioned [4]
  14:19; 43:6; 44:2, 5
merits [1]
  35:19
month [2]
  49:7, 9
months [1]
  12:10
morning [1]
  4:14
moskowitz [1]
  2:8
mr [57]

light to record

4:7, 14; 8:15; 17:7; 22:9, 13,
  15; 23:19; 24:15; 26:17; 28:7,
  22; 29:19, 24; 30:23; 31:14,
  15, 17, 19; 33:14, 21; 34:4,
  16; 35:7; 37:4, 20; 38:11;
  39:2, 9, 14; 40:3, 10, 13;
  41:16; 42:3, 4, 10, 14, 16, 19,
  20, 22, 25; 43:4, 10, 14, 17;
  44:19, 23; 45:5, 23; 46:2;
  47:8; 48:17; 49:6; 50:7
mrs [2]
  40:10, 13
ms [8]
  18:12, 14; 23:13, 24; 26:13;
  28:5, 19; 48:6
myself [3]
  5:13; 37:7; 44:25

– N –

name [15]
  4:8; 13:7; 25:3; 35:19, 23, 24;
  36:4, 7; 43:16, 25; 44:5, 6,
  19; 47:15, 17
named [2]
  7:7; 21:5
names [1]
  16:3
nature [1]
  37:19
non-party [1]
  1:14
north [10]
  16:20, 23; 21:2, 4, 10, 15, 18,
  25; 22:7, 20
notary [5]
  1:18; 3:18; 4:4; 50:18; 51:8
noted [2]
  27:5; 42:3
notice [1]
  1:15; 49:5
notices [1]
  15:4
number [1]
  17:22
nyu [1]
  5:5

– O –

objection [10]
  22:9; 26:17; 28:7, 22; 29:19;
  31:17; 37:20; 39:2, 9, 14
objections [1]
  3:12
obtain [1]
  12:5
obtained [1]
  12:14
occasionally [2]
  11:5; 44:16
off-the-record [3]
  8:16; 17:8; 37:5
office [23]
  10:9, 13, 18, 22; 11:3, 4, 7, 9,
  15, 18; 13:13, 19; 15:22;
  16:15; 17:13; 18:20, 21, 25;
  19:12; 31:11; 44:13; 46:8, 23
offices [1]
  1:16
opened [1]
  16:4

opening [1]
  15:21
outcome [1]
  51:18
overhear [1]
  25:20; 44:11
overheard [1]
  44:9
overhearing [2]
  25:8; 43:20
owner [1]
  19:3
owner's [4]
  19:2, 8, 18, 23
owners [1]
  7:14

– P –

p.m. [1]
  50:8
page [1]
  49:16
part [2]
  19:17, 22
participate [1]
  21:17
participation [1]
  41:14
parties [3]
  1:15; 3:7; 51:16
partners [21]
  6:23; 7:25; 9:8, 23; 10:2, 14;
  12:24; 13:5; 14:3; 15:17;
  30:22; 31:8; 32:19; 34:2, 18;
  36:12; 37:10; 38:13; 39:8, 18;
  40:14
people [5]
  15:24; 16:14; 17:18; 42:3;
  46:25
period [26]
  5:12; 6:7; 7:17; 9:16, 19, 23;
  13:18; 14:15, 25; 15:19;
  17:14; 18:19; 22:5, 23; 29:14;
  30:4; 31:18; 32:8, 22; 33:11,
  22; 36:10; 37:12; 44:17;
  48:25; 49:2
person [2]
  31:21; 32:3
personal [2]
  24:13, 19
personally [3]
  27:4; 43:11, 17
physically [1]
  26:9
pieces [1]
  16:14
piled [2]
  46:19, 22
plaintiff [2]
  1:4; 2:4
plaintiff's [3]
  47:24; 48:7, 13
plaza [1]
  13:22
please [4]
  4:8, 17, 21; 26:25
point [1]
  33:14
policy [1]
  21:7

postgraduate [1]
  5:9
potolsky [3]
  33:14; 45:23; 46:2
preparation [1]
  20:17
prepare [3]
  20:20; 26:25; 40:21
present [3]
  11:24; 12:2; 21:13
previously [11]
  20:11; 24:8; 25:12; 27:18;
  30:19; 34:21; 36:21; 38:16;
  39:22; 45:10; 48:13
principal [5]
  9:14, 17; 21:22; 30:12; 43:12
principals [4]
  22:22; 29:22; 30:5; 37:24
prior [5]
  12:14; 20:14; 43:10, 15;
  44:24
procedure [2]
  16:12, 17
process [4]
  36:11, 15, 18; 37:10
progress [1]
  37:18
public [5]
  1:18; 3:18; 4:4; 50:18; 51:8
purpose [2]
  7:10; 11:6
pursuant [1]
  1:15

– Q –

question [18]
  3:13; 4:18, 21; 22:10, 16, 17;
  23:10; 28:8, 23; 29:20, 25;
  35:21; 37:21; 39:3, 10, 15;
  40:16; 46:12
questions [1]
  4:15

– R –

read [2]
  23:7; 45:14
reading [1]
  23:14
real [2]
  6:3; 11:2
reason [4]
  21:14; 23:5, 12, 18
recall [6]
  44:18; 45:19, 25; 46:6, 14;
  47:20
receive [4]
  15:12; 28:20; 46:7, 17
received [1]
  48:6
recently [1]
  35:10
receptionists [1]
  16:4
recognize [1]
  27:11
recollection [4]
  17:19; 23:24; 47:9, 12
recommended [1]
  21:24
record [7]

4:9; 8:15; 17:7; 37:4, 8;
48:17; 51:13
reference [2]
    25:5; 44:20
referring [2]
    19:9; 20:24
reflect [1]
    4:24
refresh [2]
    23:24; 29:3
regolodo [2]
    40:9, 13
regularly [2]
    46:7, 16
related [2]
    41:11; 51:15
relates [1]
    12:2
relation [1]
    36:5
relationship [2]
    7:18, 24
remember [10]
    16:3; 20:15; 30:14; 33:6, 12,
    16; 36:3, 4; 45:18; 47:15
remembrance [1]
    45:16
rep [4]
    19:2, 8, 18, 23
repeat [4]
    22:17; 23:10; 37:7; 46:12
rephrase [1]
    4:22
replace [1]
    12:13
reporter [1]
    4:19
represent [1]
    45:6
reserved [1]
    3:13
reside [1]
    4:11
respect [1]
    7:2
respective [2]
    1:15; 3:6
respond [2]
    24:12; 48:8
responding [3]
    28:11, 18; 39:6
response [1]
    4:23
responsible [1]
    15:3
retain [2]
    34:16; 37:18
retained [3]
    40:20, 25; 43:4
retaining [1]
    21:17
retention [1]
    41:15
retired [1]
    5:19
review [1]
    10:16
richard [12]
    24:20; 27:25; 32:24; 33:15,
    18; 39:19; 40:6; 41:11; 42:5;
    47:17; 48:24; 49:12

richards [4]
    14:10; 18:17; 42:4; 43:2
right [1]
    11:13
rise [1]
    41:15
risk [2]
    16:20; 27:24
rodríquez [7]
    14:16; 18:10; 26:13; 28:5;
    29:16; 39:13; 48:6
rodriquez's [2]
    26:8; 28:19
role [1]
    10:11

– S –

s-e-l-b-y [1]
    13:8
saying [1]
    19:6
schneider [44]
    1:16; 2:4, 6; 8:15; 17:7;
    20:24; 22:9, 15; 23:19; 24:15;
    26:17; 28:7, 22; 29:19, 24;
    31:12, 14, 17; 34:5, 16; 35:7;
    37:4, 20; 38:11; 39:2, 9, 14;
    40:4, 20, 25; 41:16; 42:10,
    14, 17, 19, 22, 25; 43:5, 14,
    17; 44:19, 22, 23; 49:7
schneider's [2]
    43:10; 45:6
school [1]
    5:5
scope [1]
    26:7
sealing [1]
    3:7
secretaries [1]
    16:13
secretary [1]
    14:24
selby [2]
    13:8; 18:14
semiretired [1]
    5:16
send [2]
    26:13, 22
sending [1]
    15:4
sense [1]
    37:17
september [14]
    5:14; 7:5, 18; 8:4, 9, 13, 20,
    21; 9:10; 12:8; 13:18; 14:9;
    15:11; 33:23
service [4]
    36:11, 14, 17; 37:10
services [1]
    43:9
seven [1]
    17:20
shore [9]
    16:20, 23; 21:2, 4, 10, 18, 25;
    22:7, 20
shore's [1]
    21:15
show [14]
    20:10; 24:7; 25:11, 24; 27:17;
    29:8; 30:18; 34:20; 36:20;

39:21; 41:20; 45:9; 47:23;
48:12
showing [2]
    27:8; 28:16
signed [2]
    3:18, 19
sir [1]
    35:21
site [1]
    24:21
solely [1]
    35:22
somebody [1]
    12:13
someone [5]
    13:7; 26:16, 23; 28:21; 48:10
someplace [1]
    11:13
son [4]
    5:20, 21; 11:8; 23:2
sorry [1]
    18:5
sort [3]
    5:16; 16:12; 21:20
source [2]
    5:15; 6:6
southern [1]
    1:2
speaking [1]
    31:20
specifically [1]
    36:23
speculate [1]
    23:20
speculating [1]
    23:21
spg [1]
    21:22
spoke [1]
    20:21
square [1]
    17:15
ss [1]
    51:4
started [1]
    50:3
state [5]
    1:19; 4:4, 8; 51:4, 9
states [1]
    1:2
stipulated [3]
    3:5, 11, 16
street [50]
    1:3, 17; 2:5, 9; 4:12; 6:16;
    7:3, 11, 15, 20, 25; 8:25;
    9:16; 12:21; 13:4, 20, 23;
    14:13; 15:7, 12; 16:8; 17:2,
    11; 19:3, 9, 18, 23, 24; 21:5;
    22:2; 23:17; 24:20; 31:6;
    32:15; 34:5, 18; 36:18; 37:11;
    38:3, 5, 22; 40:16; 42:6, 11,
    17; 46:3; 47:8; 48:23; 49:11;
    50:3
subscribed [1]
    50:15
subsidiary [1]
    11:22
substance [9]
    24:4; 25:17, 21; 29:6; 35:4, 9;
    38:20; 44:18; 45:20
sued [3]

36:2; 39:18; 47:21
suit [1]
    41:16
suits [1]
    41:5
summons [1]
    36:24
sworn [4]
    3:19; 4:3; 50:15; 51:12

– T –

talk [3]
    25:8, 9; 43:20
talking [1]
    26:9
technical [1]
    22:13
ten [2]
    17:21; 18:8
terminate [2]
    22:7, 20
terminated [2]
    21:3, 10
termination [1]
    21:15
terms [1]
    16:13
testified [1]
    4:5
testimony [1]
    51:14
thank [1]
    50:7
three [2]
    35:14, 15
times [3]
    3:14; 44:2, 5
today's [2]
    20:17, 20
tops [1]
    17:20
transcript [1]
    4:23
transmittal [2]
    27:6; 28:13
trial [2]
    1:13; 3:14
true [1]
    51:13
twice [1]
    46:24
two-year [1]
    18:19
typing [1]
    26:9

– U –

unable [1]
    21:4
understand [2]
    4:20, 25
understanding [26]
    7:9, 16, 23; 8:4, 18; 9:11, 25;
    11:23; 13:2, 10, 17; 14:13;
    15:3, 10, 20; 16:22, 25; 20:3;
    22:19; 23:4; 36:9; 38:23;
    39:5; 42:13; 48:5, 8
united [1]
    1:2



## – V –

verbal [1]
   4:22
verified [1]
   36:24
versus [1]
   42:10
visit [1]
   11:4
vm [1]
   1:6

## – W –

wait [1]
   4:17
waived [1]
   3:9
week [1]
   46:24
weeks [2]
   35:14, 15
whereof [1]
   51:19
whereupon [4]
   8:16; 17:8; 37:5; 50:8
wilson [1]
   2:8
witness [8]
   1:14; 4:3; 22:12; 23:21; 50:9;
   51:11, 14, 19
wnc [4]
   6:19; 9:4, 19; 14:5
work [9]
   10:8, 17; 13:13; 18:20, 21,
   22; 19:13; 31:23; 32:5
worked [3]
   16:14; 17:19; 19:10
working [4]
   18:24; 19:2, 3; 23:16
wouldn't [12]
   15:14, 23; 16:10; 17:3; 26:12,
   19; 27:3; 28:15; 31:7; 32:6;
   34:7; 48:11

## – Y –

year [3]
   8:14, 22; 12:7
york [15]
   1:2, 17, 18, 19; 2:5, 10; 4:4,
   13; 10:20, 21, 51:4, 9
yourself [2]
   18:7; 43:11



05/24/06  105 STREET vs GREENWICH INSURANCE     WITNESS: B. RICHARDS

**Diamond Reporting**

**Page 1 to Page 107**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DIAMOND REPORTING*
*Suite 907*
*16 Court Street*
*Brooklyn, NY    11241*
*Phone:    (718) 624-7200*
*FAX:    (718) 855-1772*

Page 1

(1)
(2)
(3) UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------x
(4) 105 STREET ASSOCIATES, LLC,
(5) Plaintiff,
(6)
(7) -against- Index #05 CV 9938
(8)
(9) GREENWICH INSURANCE COMPANY,
(10) Defendant.
-------------------------------------x
(11)
(12) May 24, 2006
(13) 10:25 a.m.
(14)
(15)
(16) EXAMINATION BEFORE TRIAL OF 105 STREET
(17) ASSOCIATES, LLC, the Plaintiff herein, by
(18) BRAD RICHARDS, taken by Defendant, held at the
(19) offices of Schneider, Goldstein, Bloomfield,
(20) LLP., 90 Broad Street, New York, New York,
(21) pursuant to Order, before Rita M. Labita, a
(22) Notary Public within and for the State of New
(23) York.
(24)
(25)

Page 2

(1)
(2)
(3) A P P E A R A N C E S :
(4)
SCHNEIDER, GOLDSTEIN, BLOOMFIELD, LLP
(5) Attorneys for Plaintiff
90 Broad Street
(6) New York, New York 10004
(7)
BY: DONALD SCHNEIDER, ESQ.
(8)
(9)
(10) WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER, LLP
(11) Attorneys for Defendant
150 East 42nd Street
(12) New York, New York 10017
(13) BY: GLENN J. FUERTH, ESQ.
File #: 06928.00226
(14)
(15)
(16)
(17)
* * *
(18)
(19)
(20)
(21)
(22)
(23)

(24)
(25)

Page 3

(1)
(2)
(3) S T I P U L A T I O N S
(4)
(5)
(6) IT IS HEREBY STIPULATED AND AGREED by and
(7) between the attorneys for the respective
(8) parties hereto that filing and sealing and
(9) the same are hereby waived.
(10) IT IS FURTHER STIPULATED AND AGREED that
(11) all objections except as to form of the
(12) question shall be reserved to the time of
(13) trial.
(14) IT IS FURTHER STIPULATED AND AGREED that
(15) the within deposition may be signed and sworn
(16) to before any Notary Public with the same force
(17) and effect as if signed and sworn to before the
(18) Court.
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 4

(1)
(2) B R A D  R I C H A R D S,
(3) after first having been duly sworn by Rita M.
(4) Labita, a Stenotype Reporter and Notary Public
(5) in and for the State of New York, was examined
(6) and testified as follows:
(7) EXAMINATION BY
(8) MR. FUERTH:
(9) Q. Please state your name for the
(10) record.
(11) A. Brad Richards.
(12) Q. Can I have an address for the
(13) record?
(14) A. 2226 First Avenue, New York, New
(15) York 10029.
(16) Q. Good morning, Mr. Richards. My
(17) name is Glenn Fuerth and I represent the
(18) defendant, Greenwich Insurance Company. I
(19) will ask you some questions today
(20) concerning the lawsuit and if there comes a
(21) time where you don't understand a question,
(22) please let me know and I will either have
(23) the Court Reporter read it back or rephrase
(24) it for you. Since the Court Reporter can
(25) only take verbal responses, please respond

Page 5

(1)
(2) in some fashion other than just shaking
(3) your head cause she can't get that down and
(4) one final point to make her happy, let me
(5) finish my question before you give an

(6)   answer because she can only take one person
(7)   at a time; do you understand that?
(8)      A.   Yes.
(9)   MR. FUERTH:   Usual stips?
(10)   MR. SCHNEIDER:   Usual stips.
(11)      Q.   You gave the Court Reporter your
(12)   address of 2226 First Avenue; is that your
(13)   business address; correct?
(14)      A.   Yes.
(15)      Q.   What is your residence address?
(16)      A.   I would request that my
(17)   attorney, can you accept subpoena if
(18)   necessary, I prefer not to give my
(19)   residence.
(20)   MR. FUERTH:   That was one of the
(21)   answers in the interrogatories that was
(22)   left with a notation.
(23)   MR. SCHNEIDER:   I understand
(24)   MR. FUERTH:   Give Brooklyn address
(25)   and I will not even ask for the phone

Page 6

(1)
(2)   number
(3)   MR. SCHNEIDER:   Let me just speak
(4)   to the witness
(5)   (Whereupon, a short recess was taken.)
(6)      A.   My home address is 99 Central
(7)   Avenue, New York, New York – Amityville
(8)   New York, 11701.
(9)      Q.   Sir, do you have another
(10)   residence address in Brooklyn?
(11)      A.   No. That's a satellite office
(12)   address.
(13)      Q.   A satellite office of what
(14)   entity?
(15)      A.   Kent Waterfront Builders.
(16)      Q.   What is the address of Kent
(17)   Waterfront Builders?
(18)      A.   450 Kent Avenue, Brooklyn, New
(19)   York, 11211.
(20)      Q.   Sir, what is your Social
(21)   Security number?
(22)   MR. SCHNEIDER:   Off the record.
(23)   (Whereupon, a discussion was held
(24)   off the record.)
(25)      A.   (Answer redacted).

Page 7

(1)
(2)      Q.   Could you briefly give me your
(3)   educational background post-high school?
(4)      A.   Post-high school, I was in the
(5)   United States Navy. I have my Series Seven
(6)   license or had, and some junior college.
(7)      Q.   You were in the Navy from when
(8)   to when?
(9)      A.   '94 to '97, I believe.
(10)      Q.   What rank did you attain?
(11)      A.   Just an enlisted.
(12)      Q.   Was it Seaman First Class?
(13)      A.   I believe it was Seaman First

(14)   Class. If I remember. I didn't bring my
(15)   DD 214s with me.
(16)      Q.   Not necessary. And the Series
(17)   Seven license, what is that?
(18)      A.   That's a broker's license. I'm
(19)   allowed to work securities.
(20)      Q.   Stocks and bonds, things of that
(21)   nature?
(22)      A.   And insurance, yes.
(23)      Q.   In order to get the Series Seven
(24)   license, what courses, if any, did you take
(25)   with respect to insurance?

Page 8

(1)
(2)      A.   It was just a general SEC
(3)   required course than the six hour test.
(4)      Q.   In terms of the –
(5)      A.   No specific classes regarding
(6)   insurance itself.
(7)      Q.   But you said it was an SEC
(8)   required course; what was the subject
(9)   matter?
(10)      A.   Well, the Series Seven was just
(11)   general definitions and applications for
(12)   investments and then I took a Series 63
(13)   which dealt with a little bit more of a
(14)   broad overview of laws but not anything
(15)   specific to insurance. It mostly dealt
(16)   with stocks, bonds, reits.
(17)      Q.   With respect to the insurance,
(18)   did the subject matter cover reading policy
(19)   and understanding?
(20)      A.   No.
(21)      Q.   Nothing at all?
(22)      A.   No.
(23)      Q.   Who are you presently employed
(24)   by?
(25)      A.   Kent Waterfront Builders.

Page 9

(1)
(2)      Q.   In what capacity?
(3)      A.   Project manager.
(4)      Q.   What do you do as a project
(5)   manager for Kent?
(6)      A.   Primarily the liaison between
(7)   architect and engineers and the field.
(8)      Q.   So that would be between the GC
(9)   and the CM?
(10)      A.   Usual the GC. Architect,
(11)   engineers and some administrative work.
(12)      Q.   When you say administrative
(13)   work, would that include approval of
(14)   progress payment applications by
(15)   contractors?
(16)      A.   Yes. But my signature is
(17)   meaningless in the process. It's the bank
(18)   and the architect are the ones that are
(19)   solely needed for payment to the owner and
(20)   then mine is only from the owner to the
(21)   general contractor.

(22)    *Q.    But you do review that?*

(23)    A.    Yes.

(24)    *Q.    As project manager, do you also*

(25)    *review the contracts between the owner and*

Page 10

(1)

(2)    *contractors such as the general contractor?*

(3)    A.    Sometimes, sometimes.

(4)    *Q.    How long have you been working*

(5)    *for Kent Waterfront as a project manager?*

(6)    A.    Early 2002.

(7)    *Q.    In reviewing a contract between*

(8)    *the owner and the general contractor are*

(9)    *you familiar with clauses such as the*

(10)    *indemnity clause and the additional insured*

(11)    *clause?*

(12)    A.    I have a general understanding

(13)    of the clauses, not specific.

(14)    *Q.    But in terms of your work as a*

(15)    *project manager, you are performing work on*

(16)    *behalf of the owner; is that correct?*

(17)    A.    Yes.

(18)    *Q.    So you would be, for lack of a*

(19)    *better expression, the owner representative*

(20)    *on a particular construction site?*

(21)    A.    Not necessarily on a

(22)    construction site. With regards to a

(23)    project.

(24)    *Q.    Is one of the things you do as*

(25)    *an owner's representative, is to make sure*

Page 11

(1)

(2)    *that certificates of insurance are provided*

(3)    *by contractors in favor of the owner,*

(4)    *naming the owner as an additional insured?*

(5)    A.    Usually the initial, there's an

(6)    initial sample certificate that we attach

(7)    that is required as part of the contract

(8)    documents but it would be the accounting

(9)    department's responsibility to make sure

(10)    that the certificates are written properly,

(11)    are up to date before they issue payment.

(12)    So they have a running log to make sure

(13)    that everything is okay prior to issuing

(14)    any payments to general contractors or

(15)    subcontractors.

(16)    *Q.    But that's once the contract is*

(17)    *signed, correct?*

(18)    A.    Correct.

(19)    *Q.    What about prior to the owner*

(20)    *signing the contract, do you make sure that*

(21)    *there are the appropriate insurance*

(22)    *certificates in accordance with the*

(23)    *contract before the contract is signed?*

(24)    A.    As stated before, we provide

(25)    them with a sample certificate so that they

Page 12

(1)

(2)    know what we are requiring of them. Then

(3)    we will sign a contract. Most of the time

(4)    these contracts are signed six months in

(5)    advance of the project and we would require

(6)    the insurance be in place until a week or

(7)    two before they actually start their job.

(8)    *Q.    And at that point the role of*

(9)    *ensuring that there is a proper certificate*

(10)    *of insurance lies with the accounting*

(11)    *department for Kent?*

(12)    A.    Correct.

(13)    *Q.    But you have an understanding of*

(14)    *what a certificate of insurance is with*

(15)    *respect to a construction contract between*

(16)    *the owner and GC?*

(17)    A.    Yes.

(18)    *Q.    What is your understanding?*

(19)    A.    Specifically for this project?

(20)    *Q.    In general. First we are go in*

(21)    *general and if necessary, narrow it down.*

(22)    A.    Once we enter into a contract

(23)    with let's say the general contractor,

(24)    there's clauses in there that specifically

(25)    state that the general contractor is

Page 13

(1)

(2)    responsible to indemnify the owner as well

(3)    as provide general liability, sometimes

(4)    excess liability with us, the architect,

(5)    the bank, as additionally insured of which

(6)    we would hold the policy.

(7)    *Q.    While working at Kent Waterfront*

(8)    *Builders, did you have any involvement with*

(9)    *a project located at 235-237 East 105th*

(10)    *Street in Manhattan?*

(11)    A.    I'm not sure if that's the

(12)    proper address or not specifically but yes,

(13)    I was involved with a project on 105th

(14)    Street.

(15)    *Q.    Can we call it 105th Street and*

(16)    *you will understand what we are talking*

(17)    *about?*

(18)    A.    Yes.

(19)    *Q.    Let me show you a verification*

(20)    *that was sent to, I guess be an add-on to*

(21)    *the interrogatory answers of 10 Street*

(22)    *Associates and I ask you whether you*

(23)    *recognize the handwriting on the line*

(24)    *underneath that is printed Brad Richards*

(25)    *and if you recognize the handwriting, whose*

Page 14

(1)

(2)    *signature is that?*

(3)    A.    Yes, that's mine.

(4)    *Q.    In that verification, it's*

(5)    *indicated that you are the owner's*

(6)    *representative. Do you see that, third to*

(7)    *last paragraph, second to last?*

(8)    A.    Yes.

(9)    *Q.    When did you become the owner's*

(10)    *representative for 105 Street?*

(11)    A.    About the same time I began

(12) working with Kent Waterfront Builders,

(13) early 2002.

(14) Q. *When you say early, is that the*

(15) *spring, March, April?*

(16) A. Spring.

(17) Q. *The function for the owner's*

(18) *representative for 105 at the project*

(19) *located at 105 Street, were your duties*

(20) *similar to what you just testified to?*

(21) MR. SCHNEIDER: Object to the form

(22) of the question. But you can answer.

(23) MR. FUERTH: I will rephrase it.

(24) Q. *As the owner's representative*

(25) *for the 105th Street project, what was your*

Page 15

(1)

(2) *job function?*

(3) A. Primarily to attend bimonthly

(4) progress meetings with the general

(5) contractor and if necessary engineers,

(6) architects or the bank to be kept abreast

(7) of the job and the general contractor's

(8) performance.

(9) Q. *Anything else?*

(10) A. No.

(11) Q. *Was construction already started*

(12) *at the 105th Street project at the time you*

(13) *were hired by Kent Waterfront Builders?*

(14) A. I believe so, yes.

(15) Q. *Do you recall what phase of the*

(16) *project when you were hired?*

(17) A. Very early on.

(18) Q. *Was it demo and excavation or*

(19) *something else?*

(20) A. Possibly excavation and

(21) foundation.

(22) (Whereupon, a short recess was taken.)

(23) Q. *Aside from attending the*

(24) *bimonthly progress meetings, did your role*

(25) *as the owner's representative include*

Page 16

(1)

(2) *reviewing contracts between the owner and*

(3) *the general contractor?*

(4) A. At the time I was brought on

(5) that had already been taken care of. We

(6) were already drawn up and signed and in

(7) place.

(8) Q. *At the time that you were*

(9) *brought onto the 105th Street project, did*

(10) *you have the understanding of what the*

(11) *additional insured provision of the*

(12) *contract required?*

(13) A. No, no.

(14) Q. *When did you learn what the*

(15) *requirements were of an additional insured*

(16) *provision in the contract between the owner*

(17) *and an architect; was that explained to you*

(18) *at some point by someone, did you take a*

(19) *course or something else?*

(20) A. Well, to be honest, it wasn't,

(21) the clause itself I was aware of but I

(22) never saw the 105th Street contract between

(23) the owner and the general contractor until

(24) it related to this claim. So I don't know

(25) if it was in there at the time when I was

Page 17

(1)

(2) brought on.

(3) Q. *What I'm asking is just in*

(4) *general, at the time that you were brought*

(5) *on as the owner's representative, did you*

(6) *have an understanding of what that clause*

(7) *meant, irrespective of whether it was in*

(8) *the contract between the owner and the GC?*

(9) A. Yes.

(10) Q. *Back 2002, did you have what you*

(11) *understood to be an ownership interest in*

(12) *105th Street Associates?*

(13) A. Did I have an ownership

(14) interest?

(15) Q. Yes.

(16) A. I don't understand the question.

(17) As it pertains to financial interests?

(18) Q. *Yes, in other words, did you*

(19) *have shares in 105 Street Associates, did*

(20) *you have some contract that said you are*

(21) *entitled to ex-percent of profits, things*

(22) *of that nature?*

(23) A. No.

(24) Q. *Did you have an understanding*

(25) *back in 2002 as to who the people were or*

Page 18

(1)

(2) *entities that had an ownership in 105*

(3) *Street Associates?*

(4) A. No.

(5) Q. *Prior to the commencement of*

(6) *litigation in this case, in December of*

(7) *2005, did you ever come to have an*

(8) *understanding as to who was the owner or*

(9) *owners of 105 Street Associates?*

(10) A. I know I've seen entity names

(11) but I don't remember specifically.

(12) Q. *Did you ever see any individual*

(13) *names?*

(14) A. Yes, but I don't remember who

(15) they are.

(16) Q. *Where did you see the entity and*

(17) *individual names that you understand to*

(18) *have an ownership interest in 105 Street*

(19) *Associates, was that in a document*

(20) *someplace?*

(21) A. Yes, documents that, documents

(22) that either were sent to me by Greenwich or

(23) by XL Claims or by possibly – I don't know

(24) who else would have sent it, but it was

(25) documents.

Page 19

(1)

(2)    MR. SCHNEIDER:   Maybe I can, if we
(3)  can, maybe I can clear this up.
(4)    MR. FUERTH:   Go right ahead.
(5)    MR. SCHNEIDER:   I showed the
(6)  witness a document this morning. You
(7)  are referring to one of the documents I
(8)  showed you this morning?
(9)    THE WITNESS:   Yes.
(10)    MR. SCHNEIDER:   What I showed the
(11)  witness, I showed him documents limited
(12)  to documents produced by defendant and
(13)  documents produced by plaintiff and I
(14)  think there's a document in there that
(15)  the witness might be referring to.
(16)  Would you like to pursue that?
(17)    MR. FUERTH:   Sure.
(18)    MR. SCHNEIDER:   Just give me a
(19)  moment to see if I can find it.
(20)    MR. FUERTH:   Absolutely.
(21)    (Whereupon, a short recess was taken.)
(22)    MR. SCHNEIDER:   For the record, the
(23)  witness is referring to a document or
(24)  documents, a document bearing Bates
(25)  number GR 93. That has been produced

Page 20

(1)
(2)  by defendant in discovery.
(3)    Q.   In preparing to testify today,
(4)  sir, what documents other than what your
(5)  counsel has just shown me bearing Bates
(6)  stamp GR 93 through 97 did you review in
(7)  preparation for your deposition?
(8)    A.   I don't remember all the
(9)  documents but the contract between owner
(10)  and general contractor, an insurance
(11)  certificate from, I believe, Larry Knight.
(12)  An insurance certificate I think GEM
(13)  Erectors and the underwritings and that's
(14)  about it. I didn't even review the
(15)  underwritings because I wouldn't know what
(16)  it means anyway.
(17)    Q.   Let me rephrase it. Did your
(18)  understanding of who has an ownership in
(19)  105 Street Associates arise out of your
(20)  review of the documents you just testified
(21)  to or did you see documents prior to your
(22)  preparation for your deposition?
(23)    A.   The only-- aside from what I saw
(24)  today, the only entity I was aware of was
(25)  105th Street Associates LLC. So, if that

Page 21

(1)
(2)  better answers the question.
(3)    Q.   Sure. Did you have an
(4)  understanding as to who owned 105 Street
(5)  Associates LLC?
(6)    A.   Individually?
(7)    Q.   Yes.
(8)    A.   I don't know specifically.
(9)    Q.   Who's your boss at Kent

(10)  Waterfront Builders?
(11)    A.   Peter Ferrara.
(12)    Q.   That F-E-R-R?
(13)    A.   A-R-A.
(14)    Q.   Do you have an understanding as
(15)  to whether he has an interest or had an
(16)  interest at any time in 105th Street
(17)  Associates?
(18)    A.   I wouldn't know.
(19)    Q.   To your understanding, did 105
(20)  Street Associates have an ownership
(21)  interest on or about July 2, 2002, in the
(22)  construction project at 105th Street?
(23)    MR. SCHNEIDER:   Objection to the
(24)  form of the question. But you can
(25)  answer if you can.

Page 22

(1)
(2)    MR. FUERTH:   I will rephrase it.
(3)    Q.   To your understanding, who was
(4)  the owner of the construction project at
(5)  105th Street for which you were the owner's
(6)  representative?
(7)    A.   I don't know how many entities
(8)  were involved but 105th Street Associates
(9)  LLC.
(10)    Q.   Have you ever been employed by
(11)  BFC Construction Corp.?
(12)    A.   Yes.
(13)    Q.   When?
(14)    A.   Prior to 2002. That's the
(15)  company I worked for right before I went to
(16)  work for Kent Waterfront Builders.
(17)    Q.   How long did you work for BFC
(18)  Construction?
(19)    A.   A year, maybe.
(20)    Q.   What did you do at BFC?
(21)    A.   I was a project manager for a
(22)  project in Crown Heights, Brooklyn.
(23)    Q.   Did you have an understanding as
(24)  to whether BFC Construction Corporation had
(25)  any involvement with the construction

Page 23

(1)
(2)  project at 105th Street?
(3)    A.   Not while I was working for
(4)  them.
(5)    Q.   To your understanding who was
(6)  the general contractor at the 105th Street
(7)  project?
(8)    A.   BFC Construction Corp.
(9)    Q.   Was the GC?
(10)    A.   Was the general contractor.
(11)    Q.   And that was the GC for the
(12)  entire time that you were working for 105th
(13)  Street Associates at that project; correct?
(14)    A.   Correct.
(15)    Q.   Did you have an understanding as
(16)  to who, if anyone had an ownership interest
(17)  in BFC Construction in July of 2002?

Page 26

(18)   A.   No, I don't know who had an
(19) ownership interest.
(20)   Q.   Did you have an ownership
(21) interest?
(22)   A.   No.
(23)   Q.   Have you ever been employed by
(24) BFC Partners?
(25)   A.   I don't even know who that is.

Page 24

(1)
(2)   Q.   Then I take it you don't have an
(3) ownership interest in it either?
(4)   A.   No.
(5)   Q.   I take it you don't know who
(6) would have an ownership interest in BFC
(7) Partners?
(8)   A.   No.
(9)   Q.   For the period July 2, 2002
(10) through September, 2004, were the offices
(11) of 105th Street Associates LLC located at
(12) 2226 First Avenue New York, New York?
(13)   A.   Yes.
(14)   Q.   For that same period I just
(15) asked you about, were the offices of BFC
(16) Construction Corp. located there?
(17)   A.   I don't know.
(18)   Q.   When did the project, the
(19) construction project at 105th Street
(20) conclude; when was the work done?
(21)   A.   I believe it finished in late,
(22) 2003 or early, 2004. At least my end of
(23) it. Actual construction, I'm not sure, but
(24) administrative work with it and final
(25) certificate of occupancy.

Page 25

(1)
(2)   Q.   In your capacity as the owner's
(3) representative, would you receive mail that
(4) was addressed to 105 Street Associates LLC?
(5)   A.   Yes.
(6)   Q.   Did you ever receive mail that
(7) was addressed to 105 Street Associates LLC
(8) care of BFC Construction at the 2226 First
(9) Avenue address?
(10)   A.   I might have, anything that said
(11) 105th Street Associates LLC came to me.
(12)   Q.   But you have no specific
(13) recollection of receiving mail addressed to
(14) 105th care of BFC Construction?
(15)   A.   I'm sure I did but I don't know
(16) specifically.
(17)   Q.   Would that refresh your
(18) recollection as to whether the office of
(19) BFC Construction was located at 2226 First
(20) Avenue, at least during the period than you
(21) were the owner's representative at the
(22) 105th Street project?
(23)   A.   The only documents I received
(24) regarding 105th Street Associates was in
(25) July of 2004. So I wouldn't know once

Page 26

(1)
(2) again whether BFC had their offices there
(3) during the time of construction. I don't
(4) recall.
(5)   Q.   Did BFC have its offices at 2226
(6) First Avenue in July of 2004?
(7)   A.   Yes.
(8)   Q.   When you were the owner's rep
(9) for the 105th Street project, was the 2226
(10) First Avenue address where you had your
(11) office?
(12)   A.   Yes.
(13)   Q.   And you were there from spring
(14) or so of 2002 at least up through July,
(15) 2004, is that correct?
(16)   A.   Yes.
(17)   Q.   I'm not sure whether I asked it,
(18) but in that time period of spring, 02,
(19) through July, 04, was the office of BFC
(20) Construction Corp. located at 2226?
(21)   MR. SCHNEIDER:    Asked and answered,
(22) you can answer it again.
(23)   A.   Like I said, I don't recall
(24) during the construction period but in July
(25) of 2004 they were.

Page 27

(1)
(2)   Q.   Do you recall when they first
(3) moved in, so to speak?
(4)   A.   No.
(5)   Q.   Was it a year before July 2004
(6) or something else?
(7)   A.   The reason being as I did not
(8) spend too much time in the 2226 office.
(9) Working for Kent Waterfront Builders, there
(10) was numerous projects and tasks that was
(11) asked of me, 105th Street being one of
(12) them. So......
(13)   Q.   Do you have a recollection
(14) though of the first time that you became
(15) aware that BFC had it's office at 2226?
(16)   A.   Around the same time, July,
(17) 2004.
(18)   Q.   To your understanding, did BFC
(19) Partners have it's office at 2226 First
(20) Avenue?
(21)   A.   Once again, I don't even know
(22) who that is.
(23)   Q.   In May of 2002, did you know a
(24) woman by the name of Estele Rodriguez?
(25)   A.   May of 2002, I believe so, yes.

Page 28

(1)
(2)   Q.   To your understanding who was
(3) she employed by?
(4)   A.   I don't know.
(5)   Q.   Did you have an understanding as
(6) to what her job function was?
(7)   A.   I thought she was a receptionist

Page 28

(8)  but, you know, I don't know specifically.

(9)  Q.  Since May of 2002, has your

(10)  knowledge as to who Ms. Rodriguez is

(11)  employed by changed; in other words, did

(12)  you come to know who she worked for?

(13)  A.  I know who she works for now.

(14)  Q.  Who does she work for now?

(15)  A.  Riverbridge – no, 610 West

(16)  Realty.

(17)  Q.  Do you know where 610 West

(18)  Realty's office is?

(19)  A.  No, I don't.

(20)  Q.  Do you know what her job

(21)  function is now?

(22)  A.  I believe still a receptionist.

(23)  Q.  Where did you first come to meet

(24)  Ms. Rodriguez?

(25)  A.  At the 2226 First Avenue office.

Page 29

(1)

(2)  Q.  At the time you first met her,

(3)  when was that?

(4)  A.  I don't remember.

(5)  Q.  At the time you met her at, was

(6)  it at 2226 First Avenue?

(7)  A.  Yes.

(8)  Q.  That's when it came to your

(9)  understanding that she was working for

(10)  someone as a receptionist?

(11)  A.  Yes.

(12)  Q.  When you first met her at 2226,

(13)  was it your understanding that the only

(14)  entity that had an office there was 105

(15)  Street Associates LLC?

(16)  A.  And Kent Waterfront Builders.

(17)  Q.  Do you know whether she worked

(18)  for Kent?

(19)  A.  No.

(20)  Q.  Do you know whether in May of

(21)  2002 Ms. Rodriguez was employed by BFC

(22)  Construction?

(23)  A.  I don't know.

(24)  Q.  Did you ever come to learn up

(25)  until December of 2005 or so, whenever the

Page 30

(1)

(2)  lawsuit between 105 Street Associates and

(3)  Greenwich started, whether 105 Street

(4)  Associates had an ownership interest in BFC

(5)  Construction Corp.?

(6)  A.  Like I said before, I don't

(7)  know.

(8)  Q.  Was about if BFC Construction

(9)  Corp. had an ownership interest in 105

(10)  Street Associates?

(11)  A.  I don't know.

(12)  Q.  And you know nothing about BFC

(13)  Partners; correct?

(14)  A.  Correct.

(15)  (Whereupon, a short recess was taken.)

Page 31

(16)  (Whereupon, the aforementioned

(17)  Worksheet was marked as Greenwich

(18)  Defendant's Exhibit A for identification

(19)  as of this date by the Reporter.)

(20)  Q.  Sir, I show you what's been

(21)  marked as Greenwich A for identification

(22)  which is a regional reporting incorporated

(23)  work sheet dated May 2, 2002. I ask you if

(24)  you ever have seen the original of which

(25)  this purports to be a copy?

Page 31

(1)

(2)  MR. SCHNEIDER:  Prior to today, I

(3)  assume your question is?

(4)  MR. FUERTH:  Yes. Yes.

(5)  MR. SCHNEIDER:  The only question

(6)  he asked is whether you have seen the

(7)  original of this document before today.

(8)  MR. FUERTH:  Right, and it's Bates

(9)  stamps GR 200.

(10)  A.  I've never seen an original of

(11)  this.

(12)  Q.  Have you seen a copy of it?

(13)  A.  I've seen a copy of it, yes.

(14)  Q.  Sir, it makes reference to the

(15)  fact that the individual interviewed with

(16)  Ms. Rodriguez, do you understand that to be

(17)  Estele Rodriguez?

(18)  A.  I wouldn't know.

(19)  Q.  It also makes reference in the

(20)  title block that the insured is 105 Street

(21)  Associates LLC care of BFC Construction

(22)  Corp.

(23)  Sir, does that refresh your

(24)  recollection as to whether 105 Street

(25)  Associates had any interest in BFC

Page 32

(1)

(2)  Construction Corp.?

(3)  A.  No.

(4)  Q.  It also on the heading indicates

(5)  the insured as 105 Street Associates LLC

(6)  care of BFC Construction Corp. Then in the

(7)  first paragraph it says "The insured is

(8)  serving as the general contractor on this

(9)  project".

(10)  Do you have an understanding as to

(11)  whether any time with respect to the 105th

(12)  Street project that 105 Street Associates

(13)  was the GC?

(14)  A.  No. I'm – no.

(15)  (Whereupon, the aforementioned

(16)  GR255 through GR 260 was marked as

(17)  Greenwich Defendant's Exhibit B for

(18)  identification as of this date by the

(19)  Reporter.)

(20)  MR. FUERTH:  Bates number GR 255

(21)  through GR 260. Let the record reflect

(22)  that what is being marked as Greenwich

(23)  B for identification is a document

BSA    05/24/06  105 STR[ ]vs GREENWICH INSURANCE  WITN[ ] B. RICHARDS    XMAX(8/8)

(24)  dated March 14th, 2002, bearing Bates
(25)  numbers GR 255 through GR 260.

Page 33

(1)
(2)    Q.    I ask you whether you ever have
(3)  seen the original of which this purports to
(4)  be a copy at any time prior to right now?
(5)    A.    I don't remember if I ever saw
(6)  the original.
(7)    Q.    Did you ever see a copy?
(8)    A.    Yes.
(9)    Q.    When did you see a copy of this?
(10)    A.    Aside from today, I don't
(11)  recall.
(12)    Q.    Would it have been sometime in
(13)  2002 or something else?
(14)    A.    No, no, no. It would be
(15)  sometime after July, 2004.
(16)    Q.    What were the circumstances
(17)  under which you had the occasion to see a
(18)  copy of Exhibit B?
(19)    A.    After receiving the letter from
(20)  an attorney regarding this claim in July of
(21)  2004, I was responsible to find any and all
(22)  documents requested. So ...
(23)    Q.    When you say this claim, is that
(24)  the Conrad personal injury claim?
(25)    A.    Yes.

Page 34

(1)
(2)    Q.    At the time that you saw the
(3)  attorney's letter concerning the Conrad
(4)  claim, was it your job responsibility to
(5)  put together insurance related documents?
(6)    A.    No. As I said before, usually
(7)  that's handled by accounting.
(8)    Q.    So what was the reason then that
(9)  you had occasion to see Exhibit B?
(10)    A.    After we received the letter and
(11)  documents started going back and forth
(12)  between our broker and our attorney and XL,
(13)  you know, all the documents requested for,
(14)  I guess defense, this has come across my
(15)  desk. So......
(16)    Q.    What was your involvement that
(17)  Exhibit B would come across your desk; in
(18)  other words, if accounting is putting
(19)  together the insurance documents as you've
(20)  testified, what would be the reason that a
(21)  document such as Exhibit B would come
(22)  across your desk as opposed to someone in
(23)  accounting?
(24)    A.    Because it must have been
(25)  requested by either our attorney or

Page 35

(1)
(2)  somebody else and they would give it to me
(3)  to forward along.
(4)    Q.    So accounting would give it to
(5)  you and you would pass it onto whomever; is

(6)  that how it worked?
(7)    A.    Yes.
(8)    Q.    Looking at the first page of
(9)  Exhibit B, do you recall whether 105 Street
(10)  Associates LLC did, in fact, hire a general
(11)  contractor?
(12)    A.    It was my understanding that
(13)  they did, yes.
(14)    Q.    Was the general contractor BFC
(15)  Construction Corp.?
(16)    A.    Yes.
(17)    Q.    To your understanding, was the
(18)  retention of BFC as the GC pursuant to a
(19)  written contract?
(20)    A.    I believe it was an AIA contract
(21)  between the owner and the contractor.
(22)    Q.    The standard owner general
(23)  contractor contract?
(24)    A.    Yes.
(25)    Q.    Do you know where a copy of that

Page 36

(1)
(2)  owner general contractor contract is
(3)  presently located as of today?
(4)    A.    I know there's a copy here. An
(5)  original, I'm not sure of.
(6)    Q.    Fine, a copy works.
(7)    MR. FUERTH:    I request to be
(8)  provided with a copy of the contract
(9)  between 105 and BFC Construction.
(10)    MR. SCHNEIDER:    I believe when he
(11)  saw it it was in one of these
(12)  productions. Just give me a moment and
(13)  let me see if I can find it for you.
(14)    MR. FUERTH:    Sure.
(15)    (Whereupon, a discussion was held
(16)  off the record.)
(17)    MR. SCHNEIDER:    I'm referring now
(18)  to the production made by defendant in
(19)  this case bearing Bates numbers GR 44
(20)  through and including GR 92.
(21)    Q.    Sir, you just heard your
(22)  counsel's comments; correct?
(23)    A.    Yes.
(24)    Q.    In reviewing the contract
(25)  bearing the Bates numbers that he

Page 37

(1)
(2)  mentioned, in your review, were you able to
(3)  determine whether that was the complete and
(4)  full contract between 105 and BFC?
(5)    A.    May I review it?
(6)    Q.    Absolutely, absolutely.
(7)    A.    (Witness looking at documents).
(8)  I believe it to be the full contract, yes.
(9)    Q.    If you just look on the second
(10)  page of Exhibit B which is Bates stamped GR
(11)  256, and particularly under the remarks
(12)  section where it states, "insured has hired
(13)  BFC Construction Corp. to construct this

BSA          05/24/06  105 STREET vs GREENWICH INSURANCE   WIT'SS: B. RICHARDS          XMAX(9/9)

(14) eight-story fire-resistive building et
(15) cetera" Does that indicate to you that
(16) BFC Construction was, in fact, hired as the
(17) general contractor?
(18)    A.    (Witness looking at document).
(19) Yes.
(20)    Q.    Also in that remark section
(21) before you turn the page further down there
(22) is some reference to the owner being named
(23) as an additional insured; do you see that,
(24) I'm paraphrasing right now.
(25)    A.    Any person who knowingly and

Page 38

(1)
(2) with intent.
(3)    MR. SCHNEIDER:    No, no.
(4)    THE WITNESS:    Which one are we
(5) talking about?
(6)    A.    The hold harmless clause at the
(7) end?
(8)    MR. SCHNEIDER:    Let him tell you.
(9)    Q.    Under remarks, the last
(10) sentence, "BFC will add our insured to
(11) their policy and provide a hold harmless
(12) clause in favor of the insured"
(13)    A.    Yes.
(14)    Q.    So to your understanding BFC
(15) Construction BFC referred to in that
(16) section was BFC Construction Corp ?
(17)    A.    Yes.
(18)    Q.    To your understanding, did that
(19) refer to BFC Construction Corp. adding 105
(20) Street Associates LLC as an additional
(21) insured to BFC Construction Corp.'s general
(22) liability policy?
(23)    A.    Yes, and that is what would be
(24) required in the contract.
(25)    Q.    To your understanding, was, in

Page 39

(1)
(2) fact, 105 Street Associates LLC named as an
(3) additional insured to the BFC Construction
(4) Corp general liability policy?
(5)    A.    I believe so, yes.
(6)    (Whereupon, the aforementioned
(7) Certificate of liability insurance was
(8) marked as Greenwich Defendant's Exhibit
(9) C for identification as of this date by
(10) the Reporter.)
(11)    Q.    Sir, I show you what has been
(12) marked as Greenwich Exhibit C for
(13) identification, which purports to be a copy
(14) of a certificate of liability insurance
(15) where the insured is BFC Construction Corp.
(16) and the certificate holder is 105 Street
(17) Associates LLC care of BFC Construction
(18) Corp. I ask you, sir, whether you've ever
(19) seen a copy of this document prior to
(20) today?
(21)    A.    (Witness looking at document).

(22) Yes.
(23)    Q.    What were the circumstances
(24) under which you had occasion to see a copy
(25) of Exhibit C?

Page 40

(1)
(2)    A.    During my research for the
(3) Conrad case after receiving the letter in
(4) July of '04.
(5)    Q.    When you say your research, what
(6) research were you doing after you saw the
(7) July, 04 letter in the Conrad case?
(8)    A.    Just making sure that we had all
(9) the documents that were requested of our
(10) attorney and of the insurance company and
(11) XL.
(12)    Q.    When you say the insurance
(13) company, which insurance company?
(14)    A.    I meant the broker, sorry.
(15)    Q.    And the broker was who?
(16)    A.    North Shore.
(17)    Q.    In July of '04, did you receive
(18) any communications from Sirius America
(19) Insurance Company.
(20)    A.    I don't believe so, no.
(21)    Q.    To your understanding, did BFC
(22) Construction Corp. retain any
(23) subcontractors on this project?
(24)    A.    Yes.
(25)    Q.    Was GEM Erectors one of the

Page 41

(1)
(2) subcontractors retained by BFC Construction
(3) Corp.?
(4)    A.    I believe that Larry Knight was
(5) the named subcontractor and in his contract
(6) he names GEM Erectors as ...
(7)    Q.    That was going to be my next
(8) question. What relationship to the project
(9) did Larry Knight, Inc. have with the
(10) project?
(11)    A.    My knowledge of Larry Knight
(12) only from reviewing the documents was that
(13) he was the builder erector.
(14)    Q.    When you say builder erector,
(15) was he involved with the structural steel?
(16)    A.    This was a block and plank and
(17) it had miscellaneous steel so he may or may
(18) not. I don't know if it was in his scope.
(19) The block is the load bearing.
(20)    Q.    To your understanding, what was
(21) the scope of work of GEM Erectors?
(22)    A.    I don't know.
(23)    Q.    But to your understanding GEM
(24) Erectors was a sub-sub retained by Larry
(25) Knight?

Page 42

(1)
(2)    A.    Yes.
(3)    Q.    On July 2 of 2002, was there a

(4)  procedure in place at the project for
(5)  notification of 105 Street Associates of
(6)  any injuries to workers?
(7)      A.   The common standard was if there
(8)  was any emergency or any issue that they
(9)  were to contact us immediately.
(10)     Q.   Who is they?
(11)     A.   BFC Construction Corp.
(12)     Q.   So it's your understanding if a
(13) worker was injured BFC would get notified
(14) in some fashion and then pass it onto 105
(15) Street Associates?
(16)     A.   Yes.
(17)     Q.   What was that procedure, was
(18) that by phone, fax, e-mail or something
(19) else?
(20)     A.   It would be required that they
(21) supply us with a fax or original copy of an
(22) accident report to allow us to forward it
(23) to our insurance company.
(24)     Q.   Aside from you being the project
(25) manager for 105 Street Associates?

Page 43

(1)
(2)      MR. SCHNEIDER:   Can we just back
(3)  up. When you say PM–
(4)      MR. FUERTH:   Project manager
(5)      MR. SCHNEIDER:   The testimony was
(6)  that he was the owner's rep.
(7)      MR. FUERTH:   I'm sorry, let me
(8)  rephrase that.
(9)      Q.   As the owner's rep for 105
(10) Street Associates, did you have occasional
(11) on-site visits to the project?
(12)     A.   No.
(13)     Q.   Was there anyone from 105 Street
(14) Associates who made occasional on-site
(15) visits to the project in 2002 through 2004?
(16)     A.   No.
(17)     Q.   The notification by accident
(18) report from BFC Construction Corp. to 105,
(19) who at 105 would get the accident report?
(20)     A.   Me.
(21)     Q.   At any time between July 2,
(22) 2002, and August 6th, 2002, were you made
(23) aware of an accident at the project
(24) involving a Richard Conrad?
(25)     A.   No.

Page 44

(1)
(2)      Q.   Were you aware of anyone in the
(3)  period of July 2, 2002 through September,
(4)  2004 who was employed by both 105 Street
(5)  Associates and BFC Construction Corp.?
(6)      A.   I don't know of anybody.
(7)      Q.   Were you aware whether BFC
(8)  Construction Corp  had its office at 2226
(9)  First Avenue in August of 2002?
(10)     MR. SCHNEIDER:   Asked and answered.
(11) You can answer it again.

(12)     A.   Like I said before, I personally
(13) don't know if their offices were there
(14) during the construction of 105th Street.
(15)     Q.   When you say you don't know,
(16) does that mean you don't remember or you
(17) have no knowledge?
(18)     A.   No knowledge.
(19)     MR. FUERTH:   Plaintiff 99 to 100.
(20)     (Whereupon, the aforementioned
(21) Bates Plaintiff 99 to 100 was marked as
(22) Greenwich Defendant's Exhibit D for
(23) identification as of this date by the
(24) Reporter.)
(25)     Q.   Sir, you have in front of you a

Page 45

(1)
(2)  copy of what has been marked as Greenwich
(3)  Exhibit D for identification, which is a
(4)  copy of a letter of August 6th, 2002 on the
(5)  letterhead of Conrad J  Benedetto.
(6)  Addressed to BFC Construction, 2226 First
(7)  Avenue, New York, New York. With a second
(8)  page having a copy of I guess certified
(9)  mail envelope bearing Bates numbers P-99
(10) through P 100. And I ask, sir, when for
(11) the first time, if ever, did you see a copy
(12) of Exhibit D?
(13)     A.   I believe it was today.
(14)     Q.   That was in preparation of your
(15) deposition?
(16)     A.   Correct.
(17)     Q.   Looking at the address of BFC
(18) Construction Corp. shown in Exhibit D, does
(19) that refresh your recollection as to
(20) whether the office of BFC Construction
(21) Corp. was at 2226 First Avenue in August of
(22) 2002?
(23)     MR. SCHNEIDER:   I object to the
(24) form of the question. I guess what is
(25) a little troublesome is that merely

Page 46

(1)
(2)  because somebody sent a piece of
(3)  correspondence to a particular address
(4)  doesn't necessarily mean that was or
(5)  that wasn't the actual address at that
(6)  point in time of the company
(7)      MR. FUERTH:   I understand that.
(8)      MR. SCHNEIDER:   I don't know how it
(9)  could refresh your recollection, but
(10) can you read back the question and
(11) answer it, if you can.
(12) [Thereupon, the question referred
(13) to was read by the reporter as above
(14) recorded.]
(15)     A.   Like I said, I have no knowledge
(16) of whether or not BFC Construction on the
(17) letter had an office at 2226 First Avenue
(18) at that time.
(19)     Q.   Well, at that time, was 2226

BSA                    05/24/06  105 ST   ET vs GREENWICH INSURANCE    WIT   SS: B. RICHARDS         XMAX(11/11)

(20)  First Avenue the location of your office?
(21)    A.    Of?
(22)    Q.    Where you were working
(23)    A.    No.
(24)    Q.    You were working at Kent in
(25)  Brooklyn at that time?

Page 47

(1)
(2)    A.    Yes.
(3)    Q.    Did you ever have occasion to go
(4)  to 2226 First Avenue in the period of
(5)  August 2002?
(6)    A.    Not usually, no.
(7)    Q.    I'm not saying usually, ever?
(8)    A.    No.
(9)    Q.    You were never at 2226 First
(10)  Avenue at any time in 2002?
(11)    MR. SCHNEIDER:    I believe your
(12)  question was August, 2002.
(13)    MR. FUERTH:    Now I've changed it.
(14)    MR. SCHNEIDER:    Then read it back,
(15)  listen to the question.
(16)  [Thereupon, the question referred
(17)  to was read by the reporter as above
(18)  recorded.]
(19)    A.    Yes.
(20)    Q.    You were there?
(21)    A.    Yes.
(22)    Q.    I know it's awhile back. On
(23)  approximately how many occasions?
(24)    A.    I don't know.
(25)    Q.    More than five?

Page 48

(1)
(2)    A.    Throughout the entire year of
(3)  2002?
(4)    Q.    Yes.
(5)    MR. SCHNEIDER:    Don't speculate but
(6)  answer his question if you can.
(7)    A.    Maybe six times.
(8)    Q.    At any of the times that you
(9)  were there, were you ever aware of anyone
(10)  else being in that office who you
(11)  understood to be employed by BFC
(12)  Construction Corp.?
(13)    A.    No.
(14)    Q.    How many people were located in
(15)  the office at 2226 First Avenue on the six
(16)  occasions that you were there in 2002?
(17)    A.    Approximately how many people?
(18)    Q.    Yes.
(19)    A.    Five or six.
(20)    Q.    Was Ms. Rodriguez one of them?
(21)    A.    Yes.
(22)    Q.    Aside from her, who else?
(23)    A.    Donald Cappoccio, Peter Ferrara,
(24)  that's about all I can remember.
(25)    Q.    Ferrara I understand was your

Page 49

(1)

(2)  boss at Kent; correct?
(3)    A.    Correct.
(4)    Q.    What was he doing to your
(5)  understanding, at 2226 when you saw him
(6)  there in 2002?
(7)    A.    I don't know.
(8)    Q.    Who was Donald Cappoccio in
(9)  2002?
(10)    A.    I believe he was still Donald
(11)  Coppoccio.
(12)    Q.    Yes, but aside from that, do you
(13)  know what his job function was?
(14)    A.    No.
(15)    Q.    Do you know who employed him?
(16)    A.    No.
(17)    Q.    Do you know whether he was an
(18)  employee of Kent?
(19)    A.    That, I don't know either.
(20)    Q.    Do you know what he was doing in
(21)  the office at the times you saw him?
(22)    A.    No.
(23)    MR. FUERTH:    Plaintiff 81 through
(24)  95.
(25)    (Whereupon, the aforementioned

Page 50

(1)
(2)  Bates Plaintiff 81-95 was marked as
(3)  Greenwich Defendant's Exhibit E for
(4)  identification as of this date by the
(5)  Reporter.)
(6)    Q.    Sir, I show you what has been
(7)  marked as Defendant Greenwich E for
(8)  identification bearing Bates numbers P-81
(9)  through P 95 which is a copy of receipt of
(10)  service from the New York Department of
(11)  State, an affidavit of service an summons
(12)  and verified complaint in an action
(13)  captioned Richard Conrad plaintiff against
(14)  105 Street Associates, LLC, BFC
(15)  Construction Corp. and BFC Partners, LP  I
(16)  ask you, sir, when for the first time did
(17)  you ever see a copy of Exhibit E?
(18)    A.    This is an entire package;
(19)  correct?
(20)    Q.    I'm sorry?
(21)    A.    This is a complete package?
(22)    Q.    It's an affidavit and receipt
(23)  and summons and verified complaint
(24)    A.    Because I mean I've seen, I
(25)  haven't seen the cover and I don't believe

Page 51

(1)
(2)  I've seen this (indicating).
(3)    Q.    "This" you are talking about the
(4)  affidavit of service?
(5)    MR. SCHNEIDER:    Let's identify it
(6)  for the record. I don't know if he
(7)  would know it. P 00082. That's what
(8)  you meant by this.
(9)    A.    I don't know about the first

---

(10)    three pages but I have seen a complaint,
(11)    whether or not it's this actual complaint,
(12)    I don't know.
(13)        Q.    That's why I asked you whether
        you have seen a copy
(15)        A.    Right.
(16)        Q.    When did you first see a copy of
(17)    the verified complaint?
(18)        A.    Not until after July of 2004,
(19)    sometime.
(20)        Q.    What were the circumstances
(21)    under which you came to see a copy of the
(22)    verified complaint?
(23)        A.    I don't know if I requested or
(24)    if Donald requested, it was when we were in
(25)    that default letter from the attorney and

                Page 52

(1)
(2)    we were asking about what this case was
(3)    about. And I think that's how I got a copy
(4)    of the complaint.
(5)        Q.    So you asked for it from
(6)    someone?
(7)        A.    I believe so.
(8)        Q.    Who did you ask for a copy of
(9)    the complaint?
(10)        A.    Whoever the attorney that wrote
(11)    us that letter was. I don't remember the
(12)    attorney's name.
(13)        Q.    Did you call the attorney?
(14)        A.    That's why I say, I don't
(15)    remember if I requested it from Donald or
(16)    not.
(17)        Q.    Now, in July, August of 2004,
(18)    who was 105 Street Associates' insurance
(19)    broker?
(20)        A.    I believe it was North Shore.
(21)        Q.    Did you notify, when I say you,
(22)    you personally notify North Shore of the
(23)    summons and verified complaint?
(24)        A.    I think I notified them before
(25)    the verified Summons and Complaint. I

                Page 53

(1)
(2)    think I notified them when I got that
(3)    judge – that default letter.
(4)        MR. FUERTH:    P 79 and P 80
(5)    (Whereupon, the aforementioned P
(6)    79, P 80 was marked as Greenwich
(7)    Defendant's Exhibit F for identification
(8)    as of this date by the Reporter.)
(9)        Q.    Let me show you what has been
(10)    marked as Greenwich Exhibit F for
(11)    identification. Which is a copy of a
(12)    July 8, 2004 letter from Kelner & Kelner
(13)    105 Street Associates LLC, care of Donald
(14)    Cappoccio, at 2226 First Avenue and a
(15)    July 8, 2004 letter from Kelner & Kelner to
(16)    BFC Partners LP care of Donald Cappoccio
(17)    2226 First Avenue. I ask you, first sir,

(18)    did you ever see a copy of rates numbers P
(19)    79 and P 80 prior to today?
(20)        A.    (Witness looking at documents).
(21)    P 79 was the letter that came to me that
(22)    first initiated the notification of Donald
(23)    Schneider and North Shore Risk.
(24)        Q.    P 79 is the letter that is to
(25)    BFC Construction?

                Page 54

(1)
(2)        A.    It's 105 Street Associates LLC.
(3)        Q.    I'm sorry.
(4)        A.    Then this P 80 which is
(5)    addressed to BFC Partners, I still don't
(6)    know who BFC Partners is, so I never saw
(7)    that letter.
(8)        Q.    But you saw P 79?
(9)        A.    Yes.
(10)        Q.    You said the letter came to you.
(11)    How did it come to you, if you know?
(12)        A.    I don't. It was on my desk.
(13)        Q.    Did you ever inquire of anyone
(14)    as to how it came on your desk?
(15)        A.    No.
(16)        Q.    When you got that letter, what
(17)    did you do?
(18)        A.    When I received that, I put it
(19)    back over here, sorry. When I received the
(20)    letter I forwarded it to North Shore risk.
(21)        Q.    How?
(22)        A.    Certified, certified return
(23)    receipt.
(24)        Q.    Was there a cover letter with it?
(25)        A.    I believe there was but I don't

                Page 55

(1)
(2)    recall. That's usually what I would do.
(3)        Q.    So that would be your operating
(4)    procedure back then?
(5)        A.    Correct.
(6)        Q.    Since that would have been your
(7)    operating procedure, would you have kept a
(8)    copy of the letter?
(9)        A.    Not necessarily, it would have
(10)    been just a quick transmittal stating to
(11)    North Shore risk management.
(12)        Q.    Stating what?
(13)        A.    Following is a letter of a claim
(14)    regarding 105 Street Associates LLC, please
(15)    call me.
(16)        Q.    As you sit here today, you do
(17)    not recall whether there was a cover
(18)    letter?
(19)        A.    No, I don't recall.
(20)        Q.    Did you ever get a call from
(21)    North Shore?
(22)        A.    I actually, I believe I called
(23)    them after a few days.
(24)        Q.    When did you call them?
(25)        A.    Sometime in July of 2004.

Page 56

(1)
(2)    Q.    Well, Exhibit F is dated July
(3)  8th. So does that give you a time frame to
(4)  indicate when in July you called North
(5)  Shore?
(6)    A.    Towards the end of July.
(7)    Q.    July 30th, 20th, if you have
(8)  anything to indicate to you when you made
(9)  the call?
(10)    A.    No, no, I don't know. I know
(11)  that they received the letter a little
(12)  while after this. So the week of the 20th,
(13)  maybe?
(14)    MR. SCHNEIDER:    He's not asking you
(15)  to guess. He's asking you if there is
(16)  anything that would tell you when you
(17)  sent the letter.
(18)    A.    When I sent it?
(19)    MR. SCHNEIDER:    I'm sorry, we are
(20)  talking about the phone call.
(21)    Q.    Is there any phone note or
(22)  anything that would indicate?
(23)    A.    No.
(24)    Q.    So your recollection as to when
(25)  you called North Shore would have been the

Page 57

(1)
(2)  end of July, the week of July 20th, you
(3)  said?
(4)    A.    The end of July.
(5)    Q.    Anything more specific than the
(6)  end of July?
(7)    A.    No.
(8)    Q.    Who did you speak with?
(9)    A.    Barbara Weiner.
(10)    Q.    What did you discuss with her?
(11)    A.    I called to follow-up to make
(12)  sure that she received the letter then she
(13)  would forward it to our insurance company.
(14)    Q.    What did she say to you, if
(15)  anything?
(16)    A.    She said that she received it
(17)  and that she would forward it along.
(18)    Q.    That she would forward it along
(19)  or that she had forwarded it along?
(20)    A.    Would.
(21)    Q.    So as of the time that you spoke
(22)  to her at the end of July, it had not yet
(23)  been sent to the insurance company?
(24)    A.    I would assume not according to
(25)  her language.

Page 58

(1)
(2)    Q.    Did you notify anyone at BFC
(3)  Construction Corp. about getting that
(4)  letter?
(5)    MR. SCHNEIDER:    Which letter, just
(6)  for the record?
(7)    MR. FUERTH:    July 8th letter from

(8)  Kelner that is addressed to 105, P 79
(9)  or something.
(10)    MR. SCHNEIDER:    Yes.
(11)    A.    I didn't, no.
(12)    Q.    Do you know if anyone at 105
(13)  reached out to anybody at BFC Construction
(14)  Corp.?
(15)    A.    No.
(16)    Q.    You had not received any prior
(17)  notification from BFC in the form of an
(18)  accident form concerning this incident; had
(19)  you?
(20)    A.    No.
(21)    Q.    What was the reason that if you
(22)  did not call BFC to look into the
(23)  circumstances of this incident for which
(24)  your first notice was a letter talking
(25)  about a default?

Page 59

(1)
(2)    MR. SCHNEIDER:    Object to the form
(3)  of the question. It seems it was a
(4)  conscious decision but if you want him
(5)  to answer that question, could you
(6)  please read it back.
(7)    MR. FUERTH:    I will rephrase it.
(8)    Q.    What was the reason you didn't
(9)  follow-up with BFC Construction Corp.?
(10)    MR. SCHNEIDER:    Same objection.
(11)  You can answer
(12)    A.    Well, I'm not an attorney and
(13)  knowing that there are indemnification
(14)  clauses and whatever else, I didn't want to
(15)  divulge any information to BFC Construction
(16)  Corp. which may hinder our being able to
(17)  use them to indemnify us.
(18)    Q.    What was your understanding of
(19)  how your speaking to them would hinder the
(20)  indemnification clause?
(21)    A.    I don't – I'm not an attorney,
(22)  I don't know.
(23)    Q.    But what were you thinking that
(24)  caused you not to contact them out of a
(25)  concern that the indemnification clause

Page 60

(1)
(2)  would be impacted?
(3)    A.    Like I said, I don't know. I
(4)  don't know what I could have said or even
(5)  by contacting them whether or not it would
(6)  hinder the indemnification clause. I would
(7)  much prefer the insurance companies or our
(8)  attorneys to contact them, not me.
(9)    Q.    So it was your thought that you
(10)  would call them you potentially could
(11)  adversely impact the indemnification
(12)  clause?
(13)    A.    Yes.
(14)    Q.    So that concern on your part was
(15)  the reason why you didn't contact BFC to

(16)  find out what this incident was about; is
(17)  that correct?
(18)     A.   After receiving the letter in
(19)  2004, yes.
(20)     Q.   But the fact that your first
(21)  notice of this incident involving Mr.
(22)  Conrad was a letter from someone purporting
(23)  to represent him, did that indicate a
(24)  breakdown of the procedure whereby BFC
(25)  Construction was supposed to notify 105 of

Page 61

(1)
(2)  job site accidents?
(3)     MR. SCHNEIDER:   Objection to form
(4)  but you can answer.
(5)     A.   The flow of notification from
(6)  BFC to 105th Street had broken down.
(7)     Q.   That's what I'm asking you. Did
(8)  you consider that flow of information to
(9)  have broken down?
(10)    A.   Not necessarily, whether or not
(11)  they were even aware of the accident, I
(12)  don't know. So I mean if they didn't know
(13)  of the accident then there was no
(14)  breakdown. If they did know of the
(15)  accident then there was a breakdown. But
(16)  once again, me not being an attorney, I
(17)  don't know how that would impact a future
(18)  suit against BFC Construction Corp. getting
(19)  them to indemnify us.
(20)    Q.   So therefore because of your
(21)  concern about the potential impact on the
(22)  indemnity clause you made no effort to find
(23)  out whether, in fact, there had been a
(24)  breakdown in the notification procedure; is
(25)  that correct?

Page 62

(1)
(2)     A.   Myself, no.
(3)     Q.   Were you aware of anyone on
(4)  behalf of 105 Street Associates who did
(5)  contact BFC Construction Corp  to find out
(6)  what the story was with the Conrad
(7)  incident?
(8)     A.   Representing 105th Street being
(9)  an employee or our insurance broker or–
(10)    Q   Right now anybody.
(11)    MR. SCHNEIDER:   You can mention
(12)  counsel, just don't say anything that
(13)  was discussed.
(14)    A.   As I said, I can't definitely
(15)  say, it would only be an assumption so I
(16)  don't know.
(17)    Q.   You don't know whether your
(18)  counsel is?
(19)    A.   Right, I don't know. At this
(20)  time. At this time. July of 2004. I
(21)  don't know.
(22)    Q.   Did you in addition to sending
(23)  the summons and verified complaint to North

Page 63

(24)    Shore also send a copy to counsel?
(25)    A.   Yes.

Page 63

(1)
(2)     Q.   And counsel is Mr. Schneider?
(3)     A.   Yes.
(4)     Q.   How did you know that
(5)  Mr. Schneider was counsel for 105 Street
(6)  Associates?
(7)     A.   I asked Peter Ferrara who to
(8)  send it to.
(9)     Q   And Peter Ferrara was your boss
(10)  at Kent?
(11)    A.   Correct.
(12)    Q.   Did he tell you whether
(13)  Mr. Schneider was counsel for Kent and 105?
(14)    A.   That wouldn't have been
(15)  discussed. I said I received the letter, I
(16)  forwarded it to North Shore, it's talking
(17)  about a default, is this something we have
(18)  to act on right away. He said I would send
(19)  it to Schneider, Goldstein and Bloomfield.
(20)    Q.   Did you send the summons and
(21)  verified complaint to Schneider Goldstein?
(22)    MR. SCHNEIDER:   It's a yes or no
(23)  answer.
(24)    A.   I don't know. I know I sent the
(25)  letter. I don't know.

Page 64

(1)
(2)     Q.   I'm asking, did you send the
(3)  summons and verified complaint?
(4)     A.   As I said before, the thing that
(5)  prompted me to send anything to anybody was
(6)  this letter. I believe that I didn't see
(7)  the complaint until after I sent this
(8)  letter and either counsel or North Shore
(9)  contacted Kelner.
(10)    Q.   So when you sent the letter
(11)  which is Exhibit F and P 79 of Exhibit F,
(12)  did you have a cover letter when you sent
(13)  it to Schneider, Goldstein?
(14)    A.   Once again, I'm sure I did.
(15)    Q.   Did you send it by regular mail,
(16)  certified mail, fax or something else?
(17)    A.   Common practice is Federal
(18)  Express.
(19)    MR. FUERTH:   I would request a copy
(20)  of the cover letter to both North Shore
(21)  and Schneider, Goldstein which was
(22)  enclosed P 79
(23)    MR. SCHNEIDER:   We will take that
(24)  under advisement.
(25)    MR. SCHNEIDER:   A copy of the cover

Page 65

(1)
(2)  letter to North Shore accompanying P 79
(3)  and any letter received by my firm
(4)  which did what?
(5)     MR. FUERTH:   Enclosed P 79. Just

BSA   05/24/06 105 STREET vs GREENWICH INSURANCE   WITNESS: B. RICHARDS   XMAX(15/15)

(6) to make the record clear.

(7) Q. You sent a cover letter when you

(8) sent the July 8 letter to North Shore and

(9) you also sent a cover letter when you sent

(10) the July 8 letter to Schneider, Goldstein;

(11) correct?

(12) MR. SCHNEIDER: Object to the form.

(13) I'm not quite sure that was his

(14) testimony.

(15) MR. FUERTH: I will make sure that

(16) the record is crystal clear.

(17) Q. When you sent a copy of P 79 to

(18) North Shore, it's your recollection it was

(19) with a cover letter; correct?

(20) A. My statement was that I would

(21) have sent it with a cover letter.

(22) Q. So to the best of your

(23) recollection, as you sit here today, it was

(24) your procedure and custom and practice to

(25) have sent a letter such as P 79 to the

Page 66

(1)

(2) insurance broker with a cover letter,

(3) correct?

(4) A. Correct.

(5) Q. To the best of your

(6) recollection, it was your custom and

(7) practice to have sent a copy of P 79 to

(8) Schneider, Goldstein with a cover letter?

(9) A. Correct.

(10) Q. So your best recollection as you

(11) sit here today is that you prepared two

(12) cover letters, one to the broker and one to

(13) the lawyer; correct?

(14) A. Correct.

(15) MR. FUERTH: I ask for a copy of

(16) each cover letter.

(17) Q. Did you have an understanding in

(18) July of 2004 as to what it meant to be "in

(19) default?"

(20) A. No. I knew it was bad.

(21) Q. I take it you also considered it

(22) bad for them to make moving for a default

(23) judgement?

(24) A. Yes.

(25) Q. Was that something that you

Page 67

(1)

(2) considered needed the immediate attention

(3) of the lawyer, if not the insurance broker?

(4) A. Yes.

(5) Q. What was the reason you didn't

(6) fax it to Mr Schneider?

(7) A. I don't recall if I did. I

(8) don't know if I did. But our practice is

(9) to guarantee that they receive it through

(10) either Federal Express or certified mail.

(11) Q. Wouldn't a fax confirmation

(12) sheet also indicate that they received it?

(13) A. Once again, I'm not an attorney,

(14) I don't know what's permissible.

(15) Q. Your intention when you send it

(16) by FedEx or certified mail is not to be

(17) legal but rather to ensure that who you are

(18) sending it to gets it; correct?

(19) A. No, to be legal.

(20) Q. Whether someone gets it or not

(21) is not the primary concern that you have

(22) but rather legality?

(23) A. Absolutely.

(24) Q. Do you know whether BFC

(25) Construction Corp.'s insurance broker was

Page 68

(1)

(2) notified of the July 8th letter that is

(3) marked as P 80?

(4) A. Not to get off the topic but

(5) that's to BFC Partners who I have no idea

(6) who that is.

(7) Q. Do you know whether BFC

(8) Construction got a letter?

(9) A. I don't know.

(10) Q. Do you know whether BFC

(11) Construction notified its insurance

(12) company?

(13) A. I don't know.

(14) Q. Did you have an understanding as

(15) to whether North Shore was the broker for

(16) BFC Construction?

(17) A. I don't know.

(18) Q. Same question as to BFC

(19) Partners?

(20) A. I don't know. Once again, I

(21) don't even know who BFC Partners is.

(22) Q. Did you know a fellow by the

(23) name of Greg Baron in August of 2004?

(24) A. Yes.

(25) Q. Who was he?

Page 69

(1)

(2) A. I don't know what his role was

(3) but he was an employee of – I don't know,

(4) he was located at 2226 First Avenue but I

(5) don't know who he worked for.

(6) Q. Would you have any interaction

(7) with Mr Baron at the time that you would

(8) come to the 2226 office?

(9) A. The only time I had any

(10) interaction with Greg Baron was through

(11) Steven Potolsky regarding, I don't know.

(12) Q. Who is Steven Potolsky?

(13) A. He's our broker, I believe.

(14) Q. Broker where?

(15) A. 105 Street Associates' broker.

(16) Q. Insurance broker?

(17) A. Yes.

(18) Q. Is Mr Potolsky, he is at North

(19) Shore?

(20) A. Yes.

(21) Q. Can you venture a guess at how

(22)  to spell Potolsky's last name?

(23)  A.  P-O-T-O-L-S-K-Y, I believe.

(24)  Q.  It's Peter?

(25)  A.  No, I think it was Steven

Page 70

(1)

(2)  Potolsky.

(3)  Q.  Under what circumstances did you

(4)  have any dealings with Mr. Potolsky?

(5)  A.  I don't remember the phone call.

(6)  All I know is he contacted Greg regarding

(7)  105th Street Associates and Greg Baron had

(8)  no knowledge so he asked if I knew anything

(9)  about it and I said yes. And I spoke to

(10)  him about this, but I don't remember with

(11)  what regard.

(12)  Q.  You don't remember what you

(13)  discussed with Mr. Potolsky concerning the

(14)  Conrad action?

(15)  A.  That's the only time I ever had

(16)  any contact with him is regarding Conrad

(17)  but I don't remember what the discussion

(18)  was.

(19)  Q.  Did you know whether Mr. Baron's

(20)  fax number in August of 2004 was

(21)  (212)348-3418?

(22)  A.  I don't know.

(23)  Q.  Was there a fax machine at 2226

(24)  First Avenue?

(25)  A.  Yes.

Page 71

(1)

(2)  Q.  Do you know what the fax number

(3)  was?

(4)  A.  No, no, I don't.

(5)  MR. FUERTH:  GR 270

(6)  (Whereupon, the aforementioned G

(7)  270 was marked as Greenwich Defendant's

(8)  Exhibit G for identification as of this

(9)  date by the Reporter.)

(10)  Q.  Sir, I show you a copy of what

(11)  has been marked as Greenwich Exhibit G

(12)  which is a copy of a July 8th, 2004 letter

(13)  from Kelner & Kelner to BFC Partners LP

(14)  care of Donald Coppoccio at 2226 First

(15)  Avenue bearing Bates number GR 270. I ask

(16)  whether you ever have seen a copy of this

(17)  letter prior to today?

(18)  MR. SCHNEIDER:  Can I just ask a

(19)  question? Are you focusing the witness

(20)  on the fax tag line?

(21)  MR. FUERTH:  Yes.

(22)  A.  I never saw the letter and this

(23)  was to BFC Partners, so......

(24)  Q.  I'm just asking, did you ever

(25)  see a copy of that letter once it had a fax

Page 72

(1)

(2)  number up on top?

(3)  A.  No.

(4)  Q.  Do you know whether Mr. Baron

(5)  worked for BFC Partners?

(6)  A.  I don't know.

(7)  Q.  Do you know whether he worked

(8)  for BFC Construction?

(9)  A.  I don't know.

(10)  Q.  Do you know whether the fax

(11)  machine number at 2226 First Avenue on

(12)  August 18, 2004 was (212)348-3418?

(13)  A.  No, I don't know.

(14)  Q.  Do you know whether the fax of

(15)  North Shore Risk Management on August 18th,

(16)  2004 was (516)464-9410?

(17)  A.  No, I don't know.

(18)  Q.  You have no idea who decided to

(19)  fax GR 270 to North Shore?

(20)  A.  No.

(21)  Q.  And it's your recollection that

(22)  you sent P 79 to Miss Weiner at North Shore

(23)  sometime at the end of July, 2004; is that

(24)  correct?

(25)  A.  No, I said I spoke to her at the

Page 73

(1)

(2)  end of July 2004. I sent the letter within

(3)  a week of receiving it.

(4)  Q.  What was the reason that you

(5)  waited sometime more than the day of

(6)  receipt to send the letter to North Shore?

(7)  A.  I didn't mean within a week of

(8)  receiving the letter, within the week of

(9)  the date of the letter.

(10)  Q.  But the day you got it you sent

(11)  it?

(12)  A.  The day I saw it I sent it, yes.

(13)  I'm sorry.

(14)  Q.  Did you tell anyone that you

(15)  were sending the letter to North Shore?

(16)  A.  No.

(17)  Q.  What was the reason that you

(18)  didn't tell anybody?

(19)  MR. SCHNEIDER:  Object to the form

(20)  of the question. Was there a reason?

(21)  A.  There was no reason to tell

(22)  anybody at that time.

(23)  Q.  So you were going to handle the

(24)  notification to the insurance broker on

(25)  your own?

Page 74

(1)

(2)  A.  Yeah.

(3)  Q.  Did you ever send the Summons

(4)  and Complaint which is Exhibit E to North

(5)  Shore?

(6)  A.  As I said before, Exhibit E I'm

(7)  pretty sure I never saw, especially the

(8)  first three pages and—

(9)  Q.  But the summons and complaint.

(10)  A.  The Summons and Complaint

(11)  whether or not it was this specific one or

(12) some other form of the complaint, that was
(13) sent to North Shore by me at a later date,
(14) later than July of '04.
(15)    Q.    Do you recall when?
(16)    A.    No.
(17)    Q.    But you do specifically recall
(18) sending a copy of the Summons and Complaint
(19) to North Shore in July?
(20)    A.    No. I don't recall the time
(21) when I did send it, cause like I said, the
(22) first thing I received was P 79. P 79 went
(23) to them first and then whenever I received
(24) a copy of one of the complaints, I
(25) forwarded that along as well.

Page 75

(1)
(2)    Q.    Was that certified mail?
(3)    A.    Yes.
(4)    Q.    Was there a cover letter with
(5) it?
(6)    A.    Once again, I don't recall.
(7)    Q.    But it would have been your
(8) practice and procedure to send a cover
(9) letter to North Shore enclosing the summons
(10) and complaint?
(11)    A.    Yes.
(12)    MR. FUERTH:    I would request a copy
(13) of that cover letter as well.
(14)    Q.    Your best recollection through
(15) is that you sent the Summons and Complaint
(16) to North Shore in August of '04?
(17)    A.    I don't recall, whenever I
(18) received it.
(19)    Q.    Do you recall the manner in
(20) which you received the Summons and
(21) Complaint, was that from your lawyer, in
(22) the mail or something else?
(23)    A.    I don't remember.
(24)    MR. FUERTH:    GR 269
(25)    (Whereupon, the aforementioned GR

Page 76

(1)
(2) 269 was marked as Greenwich Defendant's
(3) Exhibit H for identification as of this
(4) date by the Reporter.)
(5)    Q.    Did you ever fax the Summons and
(6) Complaint to North Shore management?
(7)    A.    I don't recall.
(8)    Q.    Would there have been a cover
(9) letter along with the fax?
(10)    MR. SCHNEIDER:    Object to the form
(11) of the question. I don't know that –
(12) I'm only focusing on the word fax. I
(13) didn't recall he had testified that it
(14) was done by fax.
(15)    MR. FUERTH:    That's what I asked,
(16) he said he doesn't know.
(17)    MR. SCHNEIDER:    Can you read back
(18) the question then?
(19)    [Thereupon, the question referred

(20) to was read by the reporter as above
(21) recorded.]
(22)    Q.    Do you recall if you faxed the
(23) Summons and Complaint to North Shore on
(24) August 18th, 2004?
(25)    A.    Now you are saying August 18th?

Page 77

(1)
(2)    Q.    Yes.
(3)    A.    Previously you didn't say a
(4) date. No, I did not fax it on August 18th,
(5) 2004.
(6)    Q.    Do you recall whether you faxed
(7) the Summons and Complaint to North Shore
(8) prior to August 18th?
(9)    A.    I don't recall.
(10)    Q.    If you had faxed the Summons and
(11) Complaint to North Shore, would there have
(12) been a cover letter with it?
(13)    A.    Not necessarily. If Barbara was
(14) expecting something from me, I would have
(15) faxed it straight over.
(16)    Q.    Do you recall having any
(17) discussion with Barbara Weiner at North
(18) Shore prior to August 18th, where you told
(19) her that you would be faxing her a copy of
(20) the summons and complaint?
(21)    A.    I don't recall.
(22)    Q.    Let me just show you what's been
(23) marked as Exhibit H for identification,
(24) which is Bates stamp GR 269. And ask you
(25) whether you spoke to Barbara Weiner on

Page 78

(1)
(2) August 18th, 2004 concerning the Summons
(3) and Complaint?
(4)    A.    I don't recall.
(5)    Q.    Did you speak with Barbara
(6) Weiner on August 18th, 2004 concerning the
(7) July 8th letter from Kelner & Kelner that
(8) you had sent her certified mail?
(9)    A.    No, I spoke to her about that in
(10) late July.
(11)    Q.    When you spoke to Miss Weiner in
(12) late July, did she indicate to you whether
(13) she had sent that July 8th letter to the
(14) insurance company?
(15)    MR. SCHNEIDER:    Asked and answered.
(16) You can answer it again.
(17)    A.    She said that she would send it
(18) along.
(19)    Q.    Did you speak with her at any
(20) time after the late July phone call to
(21) confirm that it had been sent to the
(22) insurance company?
(23)    A.    I don't recall.
(24)    Q.    Did she ever tell you when, in
(25) fact, she sent it to the insurance company?

Page 79

(1)

(2)  A.  I don't remember. I don't
(3)  remember.
(4)  MR. FUERTH:  P 103 through 108.
(5)  (Whereupon, the aforementioned P
(6)  103 - 108 was marked as Greenwich
(7)  Defendant's Exhibit I for identification
(8)  as of this date by the Reporter.)
(9)  Q.  Sir, you have in front of you a
(10)  copy of Exhibit I which is a September 20,
(11)  2004 letter from Steven Postelnek of my
(12)  firm to you bearing Bates numbers P 103
(13)  through P 108. Do you recall getting the
(14)  original of which Exhibit I and the
(15)  document your attorney has shown you
(16)  purport to be copies?
(17)  A.  Yes, I received the original.
(18)  Q.  Did you have an understanding of
(19)  what Exhibit I was when you received it and
(20)  had an opportunity to read it?
(21)  A.  Just a basic gist that we were
(22)  being denied coverage.
(23)  Q.  Did you understand why?
(24)  A.  Not at that time, no.
(25)  Q.  Other than your attorney, did

Page 80

(1)
(2)  you discuss this letter with anyone?
(3)  A.  I don't recall.
(4)  Q.  Did you have an understanding as
(5)  to what denial of coverage meant when you
(6)  received the letter?
(7)  A.  I didn't understand what it
(8)  meant with regards to this case but from
(9)  the gist of it it said that the insurance
(10)  company said that they weren't going to
(11)  defend us.
(12)  Q.  Did you have an understanding
(13)  that they were not going to defend 105
(14)  Street Associates with respect to the
(15)  Conrad case?
(16)  A.  I don't know what extent they
(17)  weren't going to cover us. That's why I
(18)  forwarded it to counsel.
(19)  Q.  And you made the decision to
(20)  forward it to counsel on your own?
(21)  A.  Yes.
(22)  Q.  You did not discuss that with
(23)  Mr. Ferrara?
(24)  A.  There was no need to.
(25)  Q.  This was something you understood

Page 81

(1)
(2)  to do on your own?
(3)  A.  Yes.
(4)  Q.  Had you been previously told by
(5)  anyone that any letter from a law firm you
(6)  send to counsel for 105?
(7)  A.  That was established back when
(8)  we received P 79 and I told him that it was
(9)  a letter regarding some sort of default,

(10)  what should I do with it, that's when he
(11)  referred me to Schneider, Goldstein,
(12)  Bloomfield.
(13)  Q.  That was Mr Ferrara?
(14)  A.  Yes.
(15)  Q.  At that time, did he say to you
(16)  Brad, in substance, any time you get a
(17)  letter from a lawyer just send it right to
(18)  don't Schneider?
(19)  A.  Regarding 100–
(20)  Q.  Anything
(21)  A.  No.
(22)  Q.  So what caused you to send
(23)  Exhibit I to Mr. Schneider?
(24)  A.  Because he had already been
(25)  involved regarding 105th Street regarding

Page 82

(1)
(2)  the P 79 letter that I needed counsel to
(3)  tell me what this meant.
(4)  Q.  So from the bare language in
(5)  here you didn't understand other than the
(6)  insurance company was denying coverage
(7)  A.  Correct.
(8)  Q.  If you look at Bates page P 105
(9)  starting at the bottom where it's 2b, going
(10)  through P 106, the top of the page where it
(11)  ends with small c item 3, did you have any
(12)  understanding of what that meant prior to
(13)  sending it to your attorney?
(14)  A.  Did I know what it meant?
(15)  Q.  The language that is set forth
(16)  there, that I just pointed out to you, did
(17)  you understand at the time you received
(18)  Exhibit I what was being referred to in
(19)  that portion of the letter?
(20)  A.  All I understood is that from
(21)  this letter as a whole we were being denied
(22)  coverage.
(23)  Q.  What I'm asking you now
(24)  specifically is pointing out items 2b and
(25)  2c. Did you understand what was set forth

Page 83

(1)
(2)  there?
(3)  A.  2b and 2c.
(4)  MR. SCHNEIDER:  You are asking if
(5)  he understands what the language meant
(6)  when he read it?
(7)  MR. FUERTH:  Yes.
(8)  A.  No, I don't know what it means.
(9)  Q.  In the Conrad lawsuit, to your
(10)  understanding, is Mr. Schneider's firm
(11)  representing 105 Street Associates?
(12)  A.  As far as I understand, yes.
(13)  Q.  That's all I was asking  Let me
(14)  ask you, to your understanding is
(15)  Mr. Schneider's firm also representing BFC
(16)  Construction Corp. and BFC Partners?
(17)  A.  I don't know.

(18)   Q.    Did you ever become aware of
(19)   whether BFC Construction has agreed to
(20)   indemnify 105 Street Associates for its
(21)   legal fees other than what Mr. Schneider
(22)   may have told you?
(23)   A.    No, I'm not aware.
(24)   Q.    Other than what Mr. Schneider
(25)   may have told you, have you ever become

Page 84

(1)
(2)   aware of whether BFC Construction Corp. is
(3)   agreeing to indemnify 105 Street Associates
(4)   in the event of any verdict that may be
(5)   rendered against it in the Conrad suit?
(6)   A.    No, I'm not aware.
(7)   Q.    Do you know whether BFC
(8)   Construction Corp. is being provided
(9)   coverage for the Conrad lawsuit by Sirius
(10)   America Insurance Company?
(11)   A.    I'm not aware.
(12)   Q.    Do you know whether BFC
(13)   Construction Corp. has brought suit against
(14)   Sirius Insurance for coverage?
(15)   A.    I don't recall, I don't know,
(16)   I'm not aware if they did.
(17)   (Whereupon, the aforementioned
(18)   Summons and Complaint was marked as
(19)   Richard Defendant's Exhibit J for
(20)   identification as of this date by the
(21)   Reporter.)
(22)   Q.    Sir, I show you what has been
(23)   marked as Defendant's Exhibit J for
(24)   identification which is a copy of the
(25)   Summons and Complaint by 105 Street

Page 85

(1)
(2)   Associates LLC against Greenwich Insurance
(3)   Company. I ask you whether you've ever
(4)   seen a copy prior to today?
(5)   A.    I don't know if I did ever see
(6)   it prior to today.
(7)   Q.    Let me ask you something
(8)   Looking at the first cause of action,
(9)   paragraphs 16 through 18 of the complaint,
(10)   what facts are you aware of that support
(11)   the first cause of action?
(12)   A.    (Witness looking at document).
(13)   You are saying 16 through 18?
(14)   Q.    It's the first cause of action,
(15)   if you want to look at the whole document,
(16)   please. Also, I ask you what facts are you
(17)   aware of which support the second cause of
(18)   action?
(19)   MR. SCHNEIDER:    Note my objection
(20)   to the form of the question. As well
(21)   as the fact that well, it does ask for
(22)   factual assertions The question may
(23)   assume an understanding of claims in a
(24)   lawsuit and the way it's pleaded that
(25)   the witness may or may not have any

Page 86

(1)
(2)   understanding of.
(3)   MR. FUERTH:    The interrogatories,
(4)   specifically interrogatory 11 states
(5)   identify each individual who has
(6)   knowledge of any of the facts that
(7)   support the first cause of action, the
(8)   second cause of action and the third
(9)   cause of action and the response to A
(10)   and B relating to the first and second
(11)   cause of actions is Brad Richards among
(12)   some other people and he verified those
(13)   answers. So I believe it's an
(14)   appropriate area of inquiry.
(15)   MR. SCHNEIDER:    I'm not attempting
(16)   to block the inquiry but whether a
(17)   witness knows underlying facts and what
(18)   supports a cause of action is a
(19)   different issue but answer the
(20)   question, if you can.
(21)   A.    So 16 plaintiff, repeats and
(22)   realleges each and every allegation set
(23)   forth paragraphs one through--
(24)   Q.    Let me do it in an easier way or
(25)   at least I think it's an easier way.

Page 87

(1)
(2)   Basically the first and second causes of
(3)   action, subject to your counsel's
(4)   concurrence, in essence say that 105 Street
(5)   Associates is entitled to a judgement
(6)   directing Greenwich to insure and defend
(7)   and pay any loss payments in the Conrad
(8)   action. What I'm asking you then is what
(9)   facts are you aware of whereby the
(10)   insurance company is obligated to defend
(11)   and pay any loss or verdict or recovery
(12)   that may be rendered against 105 in the
(13)   Conrad action?
(14)   MR. SCHNEIDER:    Note my same
(15)   objection as to the prior question but
(16)   answer it if you can.
(17)   A.    Greenwich was the insurance
(18)   company of the project. We were notified
(19)   July 8th, 2004 of an incident. Our first
(20)   receipt of any accident. 105th Street
(21)   Associates via North Shore notified them in
(22)   a timely manner.
(23)   Q.    When you say a timely manner,
(24)   what is the basis for your statement that
(25)   it was a timely manner?

Page 88

(1)
(2)   A.    Certified receipt that North
(3)   Shore received our letter within a few days
(4)   of the actual written letter.
(5)   Q.    So it's your position that
(6)   because you allegedly notified North Shore
(7)   in a fax where they should have gotten

---

(8)    notice within a couple of days of the July
(9)    8th letter, P 79, that Greenwich has to
(10)   give coverage?
(11)   MR. SCHNEIDER:    Same objection,
(  )   answer it if you can.
(13)   A.    I personally notified North
(14)   Shore within a few days.
(15)   Q.    So it's because of that, that is
(16)   your understanding that Greenwich should
(17)   provide coverage?
(18)   A.    Yes.
(19)   Q.    Do you know whether Greenwich
(20)   was ever notified?
(21)   A.    I received a letter from XL
(22)   Claims stating that they received it and I
(23)   don't remember the extent of the letter.
(24)   But I received a letter from XL stating
(25)   that they received notification. I'm

Page 89

(1)
(2)    assuming XL was the adjustor for Greenwich.
(3)    (Whereupon, the aforementioned P
(4)    101 and 102 was marked as Greenwich
(5)    Defendant's Exhibit K for identification
(6)    as of this date by the Reporter.)
(7)    MR. FUERTH:    Exhibit K is P 101 and
(8)    102. And GR 23 through 30 will be L.
(9)    (Whereupon, the aforementioned GR
(10)   23 through GR 30 was marked as Greenwich
(  )   Defendant's Exhibit L for identification
(  )   as of this date by the Reporter )
(13)   Q.    Sir, I show you what has been
(14)   marked as Exhibit K for identification
(15)   consisting of Bates numbers P 101 through P
(16)   102 which is a September 15th, 2004 letter
(17)   from XL specialty claims administrators to
(18)   BFC Construction Corporation from Michael
(19)   J. Barnaba. And I ask you, sir, have you
(20)   ever seen a copy of Exhibit K prior to
(21)   today?
(22)   A.    I believe so, yes.
(23)   Q.    When did you first see that?
(24)   A.    I believe it was sometime around
(25)   the September 15th date on the letter,

Page 90

(1)
(2)    sometime around there.
(3)    Q.    What were the circumstances that
(4)    you came to see Exhibit K?
(5)    A.    It was left on my desk.
(6)    Q.    Do you know by whom?
(7)    A.    No.
(8)    Q.    Did you make any inquiry as to
(9)    who left it on your desk?
(10)   A.    No.
(  )   Q.    When you received this, what, if
(  )   anything, did you do?
(13)   A.    It was issued to BFC
(14)   Construction Corp. so I just put it in our
(15)   file of documents, our copy of documents.

(16)   Q.    Your copy of documents, the 105
(17)   Street Associates?
(18)   A.    The file that relates to Conrad.
(19)   Q.    When you say the file, is that a
(20)   105 file or is that a 105 and a BFC
(21)   Construction file or something else?
(22)   A.    It's just labeled the Conrad
(23)   file.
(24)   Q.    What I'm asking you, is you
(25)   didn't work for BFC Construction Corp?

Page 91

(1)
(2)    A.    No.
(3)    Q.    Did you make any efforts to give
(4)    the letter to BFC Construction since it
(5)    wasn't addressed to 105?
(6)    A.    No.
(7)    Q.    What was the reason that you
(8)    didn't?
(9)    A.    I didn't receive an original, I
(10)   received a copy.
(11)   Q.    You got a copy of it?
(12)   A.    You didn't specify original or
(13)   not.
(14)   Q.    Do you know who got the
(15)   original?
(16)   A.    No, I would assume BFC
(17)   Construction Corp.
(18)   Q.    Did you make any inquiry as to
(19)   who made the copy of the letter and left it
(20)   on your desk?
(21)   A.    No.
(22)   Q.    What was the reason you didn't
(23)   send it to your lawyer?
(24)   A.    It was addressed to BFC
(25)   Construction Corp.

Page 92

(1)
(2)    Q.    The fact that it dealt with
(3)    Conrad was not reason for you to send it to
(4)    your lawyer?
(5)    A.    I don't know if I sent it to him
(6)    eventually but not immediately.
(7)    Q.    What caused you to send it to
(8)    him eventually?
(9)    MR. SCHNEIDER:    Object to the form.
(10)   It assumes a fact that is inconsistent
(11)   with the witness' prior answer.
(12)   MR. FUERTH:    I will rephrase it.
(13)   Q.    Did you, in fact, ever send
(14)   Exhibit K to your lawyer?
(15)   A.    I don't know for sure.
(16)   Q.    Would you have sent it to him
(17)   with a cover letter?
(18)   MR. SCHNEIDER:    Same objection.
(19)   Inconsistent with the testimony  I
(20)   guess you are asking a hypothetical.
(21)   MR. FUERTH:    He doesn't know
(22)   whether he sent it.
(23)   Q.    Assuming you did would you have

(24)  sent it with a cover letter?
(25)  A.   Yes.

Page 93

(1)
(2)  MR. FUERTH:   I will add that to the
(3)  request for cover letters
(4)  Q.   Did 105 Street Associates ever
(5)  get a letter from a Mr. Michael Barnaba at
(6)  XL Specialty Claims Administrators?
(7)  A.   About a month before this letter
(8)  was dated.
(9)  (Whereupon, a short recess was taken.)
(10)  MR. FUERTH:   While we are waiting
(11)  with that, we can proceed.
(12)  Q.   Sir, I show you what has been
(13)  marked as Exhibit L consisting of Bates
(14)  number GR 23 through GR 30. And I ask
(15)  whether you ever have seen a copy of these
(16)  documents prior to today?
(17)  A.   This is Exhibit E which is the
(18)  same thing. Different Exhibit, same paper.
(19)  MR. SCHNEIDER:   Do you want me to
(20)  get my copy and show it to him of
(21)  Exhibit L or can he testify off there?
(22)  Q.   Did you ever get a copy of the
(23)  documents that comprise Exhibit L?
(24)  A.   That comprise Exhibit L. I
(25)  don't believe I've seen those prior to

Page 94

(1)
(2)  today.
(3)  Q.   And that was shown to you by
(4)  your counsel in preparation for today's
(5)  deposition?
(6)  A.   Yes.
(7)  Q.   At the time you verified the
(8)  answers to interrogatories, those documents
(9)  had not been seen by you; is that correct,
(10)  and your verification is dated May 17th,
(11)  2006.
(12)  A.   No, not these.
(13)  Q.   So the documents that consist of
(14)  Exhibit L was not documentation that you
(15)  were aware of at the time you were listed
(16)  as having knowledge of the facts supporting
(17)  the first and second causes of action?
(18)  A.   Except for the last page, I'm
(19)  sorry, I didn't make it to the last
(20)  page ...
(21)  Q.   Can I see the last page for a
(22)  second?
(23)  A.   (Handing).
(24)  Q.   So the last page which is GR 30
(25)  is a letter from 105 Street Associates of

Page 95

(1)
(2)  August 26th from you to Michael Barnaba,
(3)  correct?
(4)  A.   Correct.
(5)  Q.   What is the reason that you

(6)  signed it Brad Richards BFC Construction as
(7)  opposed to 105 Street Associates?
(8)  A.   A typo.
(9)  Q.   A typo?
(10)  A.   Yes.
(11)  Q.   Did you type this letter?
(12)  A.   Yes, that's my signature.
(13)  Q.   Well, you could have signed it
(14)  if someone else typed it.
(15)  A.   No, I typed it myself.
(16)  Q.   When you said a typo, in other
(17)  words, you intended to write 105 Street
(18)  Associates, as opposed to typing BFC
(19)  Construction?
(20)  A.   Yes.
(21)  Q.   At the time you signed it, I
(22)  take it you saw BFC Construction?
(23)  A.   I wasn't looking for that, I was
(24)  just signing my name.
(25)  Q.   At the time of this letter you

Page 96

(1)
(2)  had no involvement with BFC Construction
(3)  Corp.?
(4)  A.   I wasn't employed by BFC
(5)  Construction Corp.
(6)  Q.   Did you do anything for BFC
(7)  Construction Corp.?
(8)  A.   Can I see the date of the
(9)  letter?
(10)  Q.   August 26, 2004.
(11)  A.   No, I don't believe I did have
(12)  any involvement with BFC Construction Corp.
(13)  Q.   Just looking at the top of the
(14)  letter where it's FR: which I take it means
(15)  from, Brad Richards, BFC Construction, that
(16)  was also a typo?
(17)  A.   Yes.
(18)  Q.   When you indicate at the second
(19)  to last sentence of the letter, "please
(20)  note that the person who is making the
(21)  complaint was an employee of GEM Erectors,
(22)  et cetera". How did you come to know that
(23)  the person who was making a complaint was
(24)  an employee of GEM Erectors?
(25)  A.   Can I see the letter, please?

Page 97

(1)
(2)  Q.   Sure.
(3)  A.   I had spoken to the project
(4)  manager, where it says on line six, Robert
(5)  Carrao who is the project manager for BFC
(6)  Construction on that project.
(7)  Q.   When did you speak to him?
(8)  A.   Sometime prior to this letter.
(9)  Q.   After July 8th?
(10)  A.   After July 8th, well, it's
(11)  actually after the letter that I received
(12)  from Michael Barnaba requesting these
(13)  documents.

(14)    Q.    So up until then you had made no
(15)  inquiry as to Mr. Corrao as to what
(16)  happened giving rise to the Conrad lawsuit?
(17)    A.    No.
(18)    Q.    What was the reason for that?
(19)    MR. SCHNEIDER:    Asked and answered.
(20)    A.    As I said before, I didn't want
(21)  to– I didn't want to–
(22)    Q.    Jeopardize.
(23)    A.    Jeopardize the indemnification
(24)  clause that was in the contract.
(25)    Q.    So at no time did you ever

Page 98

(1)
(2)  contact him and say hey, why didn't you
(3)  tell me before; correct? Why didn't you
(4)  tell me about the accident before?
(5)    A.    No, I never asked.
(6)    MR. FUERTH:    Exhibit M is GR 31
(7)  through 32.
(8)    (Whereupon, the aforementioned GR
(9)  32 and GR 32 was marked as Greenwich
(10)  Defendant's Exhibit M for identification
(11)  as of this date by the Reporter.)
(12)    Q.    Did you ever see a copy of
(13)  Exhibit M prior to today?
(14)    A.    Yes.
(15)    Q.    When?
(16)    A.    Around the same time as the
(17)  letter's dated.
(18)    Q.    And how did you come to see
(19)  Exhibit M?
(20)    A.    On my desk.
(21)    Q.    Did you speak to Ms. Rodriguez
(22)  about it?
(23)    A.    No.
(24)    Q.    Were you, was it part of your
(25)  custom and practice in August of 2004 to

Page 99

(1)
(2)  respond to letters addressed to Ms.
(3)  Rodriguez?
(4)    A.    It was regarding 105 Street
(5)  Associates which I was affiliated with and
(6)  in turn would be responsible for acquiring
(7)  the documents. There was no reason to
(8)  discuss it with Estele.
(9)    Q.    Was she affiliated with it as
(10)  well since she's a recipient of the letter?
(11)    A.    I don't know who she was
(12)  employed with except that she was a
(13)  receptionist in the office.
(14)    Q.    So the receptionist is getting
(15)  correspondence from XL as opposed to you
(16)    A.    It seems so.
(17)    Q.    You never spoke to her as to
(18)  whether she put it on your desk or someone
(19)  else?
(20)    A.    No.
(21)    Q.    You never spoke to her ever

(22)  about anything concerning Exhibit M?
(23)    A.    No.
(24)    Q.    Looking at Exhibit M which is
(25)  Bates stamped GR 31 and 32, did you provide

Page 100

(1)
(2)  Mr. Barnaba with the documents requested in
(3)  item five?
(4)    MR. SCHNEIDER:    I would ask that
(5)  you show the witness.
(6)    A.    Can I see my letter to Michael
(7)  Barnaba?
(8)    Q.    Sure.
(9)    A.    I complied with Number five by
(10)  letting Mr. Barnaba know who the project
(11)  manager was in order for him to follow-up
(12)  to get copies of any reports or logs or
(13)  incidents. Because as I said before, we
(14)  were unaware of any accident on the job.
(15)    Q.    So you did that as opposed to
(16)  just saying no, 105 has no documents?
(17)    A.    I was trying to be as helpful as
(18)  possible for the adjustor.
(19)    Q.    Did you respond to him with
(20)  respect to item four concerning whether 105
(21)  Street Associates had an on-site
(22)  representative?
(23)    A.    That was also indicated in
(24)  number six who the project manager was.
(25)    Q.    But that was for BFC

Page 101

(1)
(2)  Construction as opposed to 105?
(3)    A.    Under subcontract documents it
(4)  specifically states that they are supposed
(5)  to supply us with on-site supervision. We
(6)  subcontracted that responsibility to the
(7)  general contractor.
(8)    Q.    I understand that, but the
(9)  question that you were being asked of by XL
(10)  was simply whether 105 had an on-site
(11)  representative?
(12)    A.    No, it's not – we didn't have
(13)  an on-site representative.
(14)    Q.    My question is what is the
(15)  reason that you did not respond to
(16)  Mr. Barnaba saying you didn't have one?
(17)    A.    There was no need.
(18)    Q.    Item four states in part" please
(19)  advise of 105 Street Associates, LLC had an
(20)  on-site representative for the duration of
(21)  this project, and if so....
(22)    A.    I didn't understand that he was
(23)  specifically speaking about 105 Street
(24)  Associates LLC as I said. We subcontracted
(25)  the work to the general contractor and the

Page 102

(1)
(2)  on-site representative was Robert Carrao
(3)  worked for BFC Construction Corp. who

(4) attended the progress meetings to give me
(5) the progress reports.
(6)   MR. FUERTH:   Move to strike those
(7) portions that are not responsive.
(8)   Q.   What in the language that I just
(9) read to you led you not to understand that
(10) he was not asking about 105 Street
(11) Associates?
(12)   MR. SCHNEIDER:   Objection to the
(13) form of the question, you can answer if
(14) you can.
(15)   A.   Because 105 Street Associates
(16) LLC subcontracted that work to BFC
(17) Construction Corp.
(18)   Q.   I understand that. But the
(19) question is asking to tell him whether 105
(20) had an on-site representative. If it did
(21) not –
(22)   A.   I was under the understanding
(23) that by the subcontract between the owner
(24) and the general contractor, the clauses of
(25) which state they are supposed to have an

Page 103

(1)
(2) on-site representative for us made them an
(3) employee of 105 Street Associates and so
(4) that on-site representative would be Robert
(5) Carrao.
(6)   Q.   It was your understanding that
(7) BFC Construction Corp. was an employee of
(8) 105 Street Associates?
(9)   A.   Through a contract.
(10)   Q.   That was your understanding.
(11)   A.   Yes.
(12)   MR. FUERTH:   No further questions,
(13) thank you very much.
(14)   MR. SCHNEIDER:   Let me just take a
(15) few moments
(16)   (Whereupon, a short recess was taken.)
(17)   MR. FUERTH:   One more question.
(18)   Q.   Mr. Richards, do you have any
(19) understanding as to whether BFC
(20) Construction, irrespective of whether there
(21) was any insurance, has agreed to indemnify
(22) 105 Street Associates for the Conrad case
(23) with respect to legal fees and/or any
(24) recovery?
(25)   MR. SCHNEIDER:   Asked and answered

Page 104

(1)
(2) in two separate questions but please
(3) answer it.
(4)   A.   All I'm aware of is the contract
(5) states that they agreed to. I don't know
(6) if they personally agreed to.
(7)   Q.   You don't know then whether 105
(8) Street Associates legal fees that are being
(9) incurred in the Conrad action are being
(10) paid by BFC Construction Corp.?
(11)   A.   No knowledge.

(12)   MR. FUERTH:   Thank you.
(13)
(14)   (Whereupon, at 1·30 p.m. The
(15) examination of this witness was
(16) concluded.)
(17)

(18) BRAD RICHARDS
(19)
(20) Subscribed and sworn to before me
(21) this        day of        , 2006
(22)

(23) NOTARY PUBLIC
(24)
(25)

Page 105

(1)
(2)  E X H I B I T S
(3)
(4)   DEFENDANTS EXHIBITS:
(5)
(6) EXHIBIT EXHIBIT PAGE:
(7) NUMBER DESCRIPTION
(8) A for I.D. Worksheet 30
(9) B for I.D. GR255 through GR 32
        260
(10)
(11) C for I.D. Certificate of 39
        liability
(12) insurance
(13) D for I.D  Bates Plaintiff 44
        99 to 100
(14)
        E for I.D  Bates Plaintiff 50
(15) 81-95
(16) F for I.D  P 79, P80
        TL:1
(17)
        G for I.D  G 270 71
(18)
        H for I.D  GR 269 76
(19)
        I for I.D  P 103 - 108 79
(20)
        J for I.D  Summons and 84
(21) Complaint
(22) K for I.D  P 101 and 102 89
(23) L for I.D  GR 23 through GR 89
        30
(24)
        M for I.D. GR 32 and GR 32 98
(25)

Page 106

(1)
(2)
(3)
(4)  INFORMATION AND/OR DOCUMENTS REQUESTED
(5)
(6)  INFORMATION AND/OR DOCUMENTS PAGE·

(7)  copy of the cover letter to 64
     both North Shore and
(8)  Schneider, Goldstein which
     was enclosed P 79
(9)
(10) copy of each cover letter 66
(11)
(12) copy of that cover letter 75
     as well
(13)
(14) add that to the request for 93
     cover letters
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

Page 107

(1)
(2)  C E R T I F I C A T E
(3)  STATE OF NEW YORK )
(4)  : SS.:
(5)  COUNTY OF NEW YORK )
(6)
(7)      I, RITA MARIE LABITA, a Notary Public
(8)  for and within the State of New York, do
(9)  hereby certify:
(10) That the witness whose examination is
(11) hereinbefore set forth was duly sworn and that
(12) such examination is a true record of the
(13) testimony given by that witness.
(14) I further certify that I am not related
(15) to any of the parties to this action by blood
(16) or by marriage and that I am in no way
(17) interested in the outcome of this matter.
(18) IN WITNESS WHEREOF, I have hereunto
(19) set my hand this 1st day of June, 2006.
(20)
(21)
(22) RITA MARIE LABITA
(23)
(24)
(25)

**Look-See Concordance Report**

- - -

UNIQUE WORDS: 1,117
TOTAL OCCURRENCES: 5,208
NOISE WORDS: 384
TOTAL WORDS IN FILE: 14,268

- - -

SINGLE FILE CONCORDANCE

CASE SENSITIVE

- - -

INCLUDES ALL TEXT
OCCURRENCES

- - -

DATES **ON**

- - -

INCLUDES PURE NUMBERS

- - -

POSSESSIVE FORMS **ON**

## – DATES –

**April** [1]
  14:15
**August, 2002** [2]
  47:5, 12
**August 6th, 2002** [2]
  43:22; 45:4
**August 18, 2004** [1]
  72:12
**August 18th** [3]
  76:25; 77:8, 18
**August 18th, 2004** [5]
  72:15; 76:24; 77:4; 78:2, 6
**August 26, 2004** [1]
  96:10
**August 26th** [1]
  95:2
**August of 04** [1]
  75:16
**August of 2002** [2]
  44:9; 45:21
**August of 2004** [4]
  52:17; 68:23; 70:20; 98:25
**December of 2005** [2]
  18:6; 29:25
**July** [11]
  52:17; 56:4, 6; 57:2, 4, 6, 22;
  74:19; 78:10, 12, 20
**July, 2004** [6]
  26:14; 27:5, 16; 33:15; 72:23;
  73:2
**July 04** [2]
  26:19; 40:7
**July 2** [1]
  42:3
**July 2, 2002** [4]
  21:21; 24:9; 43:21; 44:3
**July 8** [2]
  65:8, 10
**July 8, 2004** [2]
  53:12, 15
**July 8th** [8]
  56:2; 58:7; 68:2; 78:7, 13;
  88:8; 97:9, 10
**July 8th, 2004** [2]
  71:12; 87:19
**July 20th** [1]
  57:2
**July 30th** [1]

**56:** (?)
**July of 04** [3]
  40:4, 17; 74:14
**July of 2002** [1]
  23:17
**July of 2004** [8]
  25:25; 26:6, 24; 33:20; 51:18;
  55:25; 62:20; 66:18
**June, 2006** [1]
  107:19
**March** [1]
  14:15
**March 14th, 2002** [1]
  32:24
**May 2, 2002** [1]
  30:23
**May 17th, 2006** [1]
  94:10
**May 24, 2006** [1]
  1:12
**May of 2002** [4]
  27:23, 25; 28:9; 29:20
**September, 2004** [2]
  24:10; 44:3
**September 15th** [1]
  89:25
**September 15th, 2004** [1]
  89:16
**September 20, 2004** [1]
  79:10

## – ( –

**(212)348-3418** [2]
  70:21; 72:12
**(516)464-9410** [1]
  72:16

## – 0 –

**00082** [1]
  51:7
**02** [1]
  26:18
**04** [6]
  26:19; 40:4, 7, 17; 74:14;
  75:16
**05** [1]
  1:7
**06928.00226** [1]
  2:13

## – 1 –

**10** [1]
  13:21
**100** [5]
  44:19, 21; 45:10; 81:19;
  105:13
**10004** [1]
  2:6
**10017** [1]
  2:12
**10029** [1]
  4:15
**101** [4]
  89:4, 7, 15; 105:22
**102** [4]
  89:4, 8, 16; 105:22
**103** [4]
  79:4, 6, 12; 105:19
**105** [79]

**1:** 4, 16; 14:10, 18, ...; 17:19;
  18:2, 9, 18; 20:19; 21:4, 19;
  25:4, 7; 29:14; 30:2, 3, 9;
  31:20, 24; 32:5, 12; 35:9;
  36:9; 37:4; 38:19; 39:2, 16;
  42:5, 14, 25; 43:9, 13, 18, 19;
  44:4; 50:14; 52:18; 53:13;
  54:2; 55:14; 58:8, 12; 60:25;
  62:4; 63:5, 13; 69:15; 80:13;
  81:6; 82:8; 83:11, 20; 84:3,
  25; 87:4, 12; 90:16, 20; 91:5;
  93:4; 94:25; 95:7, 17; 99:4;
  100:16, 20; 101:2, 10, 19, 23;
  102:10, 15, 19; 103:3, 8, 22;
  104:7
**105th** [31]
  13:9, 13, 15; 14:25; 15:12;
  16:9, 22; 17:12; 20:25; 21:16,
  22; 22:5, 8; 23:2, 6, 12;
  24:11, 19; 25:11, 14, 22, 24;
  26:9; 27:11; 32:11; 44:14;
  61:6; 62:8; 70:7; 81:25; 87:20
**106** [1]
  82:10
**108** [4]
  79:4, 6, 13; 105:19
**10:25** [1]
  1:13
**11** [1]
  86:4
**11211** [1]
  6:19
**11701** [1]
  6:8
**14th** [1]
  32:24
**150** [1]
  2:11
**15th** [2]
  89:16, 25
**16** [3]
  85:9, 13; 86:21
**17th** [1]
  94:10
**18** [3]
  72:12; 85:9, 13
**18th** [8]
  72:15; 76:24, 25; 77:4, 8, 18;
  78:2, 6
**1:30** [1]
  104:14
**1st** [1]
  107:19

## – 2 –

**2** [6]
  21:21; 24:9; 30:23; 42:3;
  43:21; 44:3
**20** [1]
  79:10
**200** [1]
  31:9
**2002** [31]
  10:6; 14:13; 17:10, 25; 21:21;
  22:14; 23:17; 24:9; 26:14;
  27:23, 25; 28:9; 29:21; 30:23;
  32:24; 33:13; 42:3; 43:15, 22;
  44:3, 9; 45:4, 22; 47:5, 10,
  12; 48:3, 16; 49:6, 9
**2003** [1]

**24:22**
**2004** [36]
  24:10, 22; 25:25; 26:6, 15,
  25; 27:5, 17; 33:15, 21;
  43:15; 44:4; 51:18; 52:17;
  53:12, 15; 55:25; 60:19;
  62:20; 66:18; 68:23; 70:20;
  71:12; 72:12, 16, 23; 73:2;
  76:24; 77:5; 78:2, 6; 79:11;
  87:19; 89:16; 96:10; 98:25
**2005** [2]
  18:7; 29:25
**2006** [4]
  1:12; 94:11; 104:21; 107:19
**20th** [3]
  56:7, 12; 57:2
**214s** [1]
  7:15
**2226** [30]
  4:14; 5:12; 24:12; 25:8, 19;
  26:5, 9, 20; 27:8, 15, 19;
  28:25; 29:6, 12; 44:8; 45:6,
  21; 46:17, 19; 47:4, 9; 48:15;
  49:5; 53:14, 17; 69:4, 8;
  70:23; 71:14; 72:11
**23** [4]
  89:8, 10; 93:14; 105:23
**235-237** [1]
  13:9
**24** [1]
  1:12
**255** [2]
  32:20, 25
**256** [1]
  37:11
**26** [1]
  96:10
**260** [4]
  32:16, 21, 25; 105:9
**269** [4]
  75:24; 76:2; 77:24; 105:18
**26th** [1]
  95:2
**270** [5]
  71:5, 7, 15; 72:19; 105:17
**2b** [3]
  82:9, 24; 83:3
**2c** [2]
  82:25; 83:3

## – 3 –

**3** [1]
  82:11
**30** [6]
  89:8, 10; 93:14; 94:24; 105:8,
  23
**30th** [1]
  56:7
**31** [2]
  98:6; 99:25
**32** [7]
  98:7, 9; 99:25; 105:9, 24
**39** [1]
  105:11

## – 4 –

**42nd** [1]
  2:11
**44** [2]
  36:19; 105:13

450 [1]
  6:18

— 5 —

) [1]
  105:14

— 6 —

610 [2]
  28:15, 17
63 [1]
  8:12
64 [1]
  106:7
66 [1]
  106:10
6th [2]
  43:22; 45:4

— 7 —

71 [1]
  105:17
75 [1]
  106:12
76 [1]
  105:18
79 [23]
  53:4, 6, 19, 21, 24; 54:8;
  58:8; 64:11, 22; 65:2, 5, 17,
  25; 66:7; 72:22; 74:22; 81:8;
  82:2; 88:9; 105:16, 19; 106:8

— 8 —

[4]
  53:12, 15; 65:8, 10
80 [5]
  53:4, 6, 19; 54:4; 68:3
81 [1]
  49:23
81-95 [2]
  50:2; 105:15
84 [1]
  105:20
89 [2]
  105:22, 23
8th [10]
  56:3; 58:7; 68:2; 71:12; 78:7,
  13; 87:19; 88:9; 97:9, 10

— 9 —

90 [2]
  1:20; 2:5
92 [1]
  36:20
93 [3]
  19:25; 20:6; 106:14
94 [1]
  7:9
95 [2]
  49:24; 50:9
97 [2]
  7:9; 20:6
98 [1]
  105:24
) [4]
  6:6; 44:19, 21; 105:13
9938 [1]
  1:7

— A —

A-R-A [1]
  21:13
a.m. [1]
  1:13
able [2]
  37:2; 59:16
abreast [1]
  15:6
Absolutely [3]
  19:20; 37:6; 67:23
absolutely [1]
  37:6
accept [1]
  5:17
accident [11]
  42:22; 43:17, 19, 23; 58:18;
  61:11, 13, 15; 87:20; 98:4;
  100:14
accidents [1]
  61:2
accompanying [1]
  65:2
accordance [1]
  11:22
according [1]
  57:24
accounting [6]
  11:8; 12:10; 34:7, 18, 23;
  35:4
acquiring [1]
  99:6
act [1]
  63:18
action [16]
  50:12; 70:14; 85:8, 11, 14,
  18; 86:7, 8, 9, 18; 87:3, 8, 13;
  94:17; 104:9; 107:15
actions [1]
  86:11
Actual [1]
  24:23
actual [3]
  46:5; 51:11; 88:4
add [3]
  38:10; 93:2; 106:14
add-on [1]
  13:20
adding [1]
  38:19
addition [1]
  62:22
additional [7]
  10:10; 11:4; 16:11, 15; 37:23;
  38:20; 39:3
additionally [1]
  13:5
address [15]
  4:12; 5:12, 13, 15, 24; 6:6,
  10, 12, 16; 13:12; 25:9;
  26:10; 45:17; 46:3, 5
Addressed [1]
  45:6
addressed [8]
  25:4, 7, 13; 54:5; 58:8; 91:5,
  24; 99:2
adjustor [2]
  89:2; 100:18
administrative [3]
  9:11, 12; 24:24

Administrators [1]
  93:6
administrators [1]
  89:17
advance [1]
  12:5
adversely [1]
  60:11
advise [1]
  101:19
advisement [1]
  64:24
affidavit [3]
  50:11, 22; 51:4
affiliated [2]
  99:5, 9
aforementioned [13]
  30:16; 32:15; 39:6; 44:20;
  49:25; 53:5; 71:6; 75:25;
  79:5; 84:17; 89:3, 9; 98:8
AGREED [3]
  3:6, 10, 14
agreed [2]
  83:19; 103:21; 104:5, 6
agreeing [1]
  84:3
AIA [1]
  35:20
allegation [1]
  86:22
allegedly [1]
  88:6
allow [1]
  42:22
allowed [1]
  7:19
America [2]
  40:18; 84:10
Amityville [1]
  6:7
Answer [1]
  6:25
answer [18]
  5:6; 14:22; 21:25; 26:22;
  44:11; 46:11; 48:6; 59:5, 11;
  61:4; 63:23; 78:16; 86:19;
  87:16; 88:12; 92:11; 102:13;
  104:3
answered [5]
  26:21; 44:10; 78:15; 97:19;
  103:25
answers [5]
  5:21; 13:21; 21:2; 86:13; 94:8
anybody [6]
  44:6; 58:13; 62:10; 64:5;
  73:18, 22
anyway [1]
  20:16
applications [2]
  8:11; 9:14
appropriate [2]
  11:21; 86:14
approval [1]
  9:13
Approximately [1]
  48:17
approximately [1]
  47:23
April [1]
  14:15
Architect [1]

9:10
architect [4]
  9:7, 18; 13:4; 16:17
architects [1]
  15:6
area [1]
  86:14
arise [1]
  20:19
Aside [4]
  15:23; 33:10; 42:24; 48:22
aside [2]
  20:23; 49:12
asking [15]
  17:3; 52:2; 56:14, 15; 61:7;
  64:2; 71:24; 82:23; 83:4, 13;
  87:8; 90:24; 92:20; 102:10,
  19
assertions [1]
  85:22
ASSOCIATES [2]
  1:4, 17
Associates [67]
  13:22; 17:12, 19; 18:3, 9, 19;
  20:19, 25; 21:5, 17, 20; 22:8;
  23:13; 24:11; 25:4, 7, 11, 24;
  29:15; 30:2, 4, 10; 31:21, 25;
  32:5, 12; 35:10; 38:20; 39:2,
  17; 42:5, 15, 25; 43:10, 14;
  44:5; 50:14; 52:18; 53:13;
  54:2; 55:14; 62:4; 63:6;
  69:15; 70:7; 80:14; 83:11, 20;
  84:3; 85:2; 87:5, 21; 90:17;
  93:4; 94:25; 95:7, 18; 99:5;
  100:21; 101:19, 24; 102:11,
  15; 103:3, 8, 22; 104:8
assume [4]
  31:3; 57:24; 85:23; 91:16
assumes [1]
  92:10
Assuming [1]
  92:23
assuming [1]
  89:2
assumption [1]
  62:15
attach [1]
  11:6
attain [1]
  7:10
attempting [1]
  86:15
attend [1]
  15:3
attended [1]
  102:4
attending [1]
  15:23
attention [1]
  67:2
attorney [15]
  5:17; 33:20; 34:12, 25; 40:10;
  51:25; 52:10, 13; 59:12, 21;
  61:16; 67:13; 79:15, 25;
  82:13
attorney's [2]
  34:3; 52:12
Attorneys [2]
  2:5, 11
attorneys [2]
  3:7; 60:8

**August** [22]
43:22; 44:9; 45:4, 21; 47:5,
12; 52:17; 68:23; 70:20;
72:12, 15; 75:16; 76:24, 25;
77:4, 8, 18; 78:2, 6; 95:2;
96:10; 98:25
**Avenue** [26]
4:14; 5:12; 6:7, 18; 24:12;
25:9, 20; 26:6, 10; 27:20;
28:25; 29:6; 44:9; 45:7, 21;
46:17, 20; 47:4, 10; 48:15;
53:14, 17; 69:4; 70:24; 71:15;
72:11
**aware** [20]
16:21; 20:24; 27:15; 43:23;
44:2, 7; 48:9; 61:11; 62:3;
83:18, 23; 84:2, 6, 11, 16;
85:10, 17; 87:9; 94:15; 104:4
**awhile** [1]
47:22

**– B –**

**background** [1]
7:3
**bank** [3]
9:17; 13:5; 15:6
**Barbara** [5]
57:9; 77:13, 17, 25; 78:5
**bare** [1]
82:4
**Barnaba** [8]
89:19; 93:5; 95:2; 97:12;
100:2, 7, 10; 101:16
**Baron** [5]
68:23; 69:7, 10; 70:7; 72:4
**Baron's** [1]
70:19
**basic** [1]
79:21
**Basically** [1]
87:2
**basis** [1]
87:24
**Bates** [22]
19:24; 20:5; 31:8; 32:20, 24;
36:19, 25; 37:10; 44:21; 45:9;
50:2, 8; 53:18; 71:15; 77:24;
79:12; 82:8; 89:15; 93:13;
99:25; 105:13, 14
**bearing** [10]
19:24; 20:5; 32:24; 36:19, 25;
41:19; 45:9; 50:8; 71:15;
79:12
**behalf** [2]
10:16; 62:4
**believe** [29]
7:9, 13; 15:14; 20:11; 24:21;
27:25; 28:22; 35:20; 36:10;
37:8; 39:5; 40:20; 41:4;
45:13; 47:11; 49:10; 50:25;
52:7, 20; 54:25; 55:22; 64:6;
69:13, 23; 86:13; 89:22, 24;
93:25; 96:11
**Benedetto** [1]
45:5
**BFC** [107]
22:11, 17, 20, 24; 23:8, 17,
24; 24:6, 15; 25:8, 14, 19;
26:2, 5, 19; 27:15, 18; 29:21;
30:4, 8, 12; 31:21, 25; 32:6;

35:14, 18; 36:9; 37:4, 13, 16;
38:10, 14, 15, 16, 19, 21;
39:3, 15, 17; 40:21; 41:2;
42:11, 13; 43:18; 44:5, 7;
45:6, 17, 20; 46:16; 48:11;
50:14, 15; 53:16, 25; 54:5, 6;
58:2, 13, 17, 22; 59:9, 15;
60:15, 24; 61:6, 18; 62:5;
67:24; 68:5, 7, 10, 16, 18, 21;
71:13, 23; 72:5, 8; 83:15, 16,
19; 84:2, 7, 12; 89:18; 90:13,
20, 25; 91:4, 16, 24; 95:6, 18,
22; 96:2, 4, 6, 12, 15; 97:5;
100:25; 102:3, 16; 103:7, 19;
104:10
**bimonthly** [2]
15:3, 24
**bit** [1]
8:13
**block** [4]
31:20; 41:16, 19; 86:16
**blood** [1]
107:15
**BLOOMFIELD** [1]
2:4
**Bloomfield** [3]
1:19; 63:19; 81:12
**bonds** [2]
7:20; 8:16
**boss** [3]
21:9; 49:2; 63:9
**BRAD** [2]
1:18; 104:18
**Brad** [6]
4:11; 13:24; 81:16; 86:11;
95:6; 96:15
**breakdown** [4]
60:24; 61:14, 15, 24
**briefly** [1]
7:2
**Broad** [2]
1:20; 2:5
**broad** [1]
8:14
**broken** [2]
61:6, 9
**Broker** [1]
69:14
**broker** [14]
34:12; 40:14, 15; 52:19; 62:9;
66:2, 12; 67:3, 25; 68:15;
69:13, 15, 16; 73:24
**broker's** [1]
7:18
**Brooklyn** [5]
5:24; 6:10, 18; 22:22; 46:25
**builder** [2]
41:13, 14
**Builders** [10]
6:15, 17; 8:25; 13:8; 14:12;
15:13; 21:10; 22:16; 27:9;
29:16
**building** [1]
37:14
**business** [1]
5:13

**– C –**

**call** [11]
13:15; 52:13; 55:15, 20, 24;

56:9, 20; 58:22; 60:.., 70:5;
78:20
**capacity** [2]
9:2; 25:2
**Cappoccio** [4]
48:23; 49:8; 53:14, 16
**captioned** [1]
50:13
**care** [9]
16:5; 25:8, 14; 31:21; 32:6;
39:17; 53:13, 16; 71:14
**Carrao** [3]
97:5; 102:2; 103:5
**case** [8]
18:6; 36:19; 40:3, 7; 52:2;
80:8, 15; 103:22
**caused** [3]
59:24; 81:22; 92:7
**Central** [1]
6:6
**Certificate** [2]
39:7; 105:11
**certificate** [9]
11:6, 25; 12:9, 14; 20:11, 12;
24:25; 39:14, 16
**certificates** [3]
11:2, 10, 22
**Certified** [2]
54:22; 88:2
**certified** [7]
45:8; 54:22; 64:16; 67:10, 16;
75:2; 78:8
**certify** [2]
107:9, 14
**cetera** [2]
37:15; 96:22
**changed** [2]
28:11; 47:13
**circumstances** [6]
33:16; 39:23; 51:20; 58:23;
70:3; 90:3
**claim** [6]
16:24; 33:20, 23, 24; 34:4;
55:13
**Claims** [3]
18:23; 88:22; 93:6
**claims** [2]
85:23; 89:17
**Class** [2]
7:12, 14
**classes** [1]
8:5
**clause** [12]
10:10, 11; 16:21; 17:6; 38:6,
12; 59:20, 25; 60:6, 12;
61:22; 97:24
**clauses** [5]
10:9, 13; 12:24; 59:14;
102:24
**clear** [3]
19:3; 65:6, 16
**CM** [1]
9:9
**college** [1]
7:6
**commencement** [1]
18:5
**comments** [1]
36:22
**Common** [1]
64:17

**common** [1]
42:7
**communications** [1]
40:18
**companies** [1]
60:7
**COMPANY** [1]
1:9
**Company** [4]
4:18; 40:19; 84:10; 85:3
**company** [16]
22:15; 40:10, 13; 42:23; 46:6;
57:13, 23; 68:12; 78:14, 22,
25; 80:10; 82:6; 87:10, 18
**Complaint** [14]
52:25; 74:4, 10, 18; 75:15,
21; 76:6, 23; 77:7, 11; 78:3;
84:18, 25; 105:21
**complaint** [20]
50:12, 23; 51:10, 11, 17, 22;
52:4, 9, 23; 62:23; 63:21;
64:3, 7; 74:9, 12; 75:10;
77:20; 85:9; 96:21, 23
**complaints** [1]
74:24
**complete** [1]
37:3; 50:21
**complied** [1]
100:9
**comprise** [1]
93:23, 24
**concern** [4]
59:25; 60:14; 61:21; 67:21
**concerning** [8]
4:20; 34:3; 58:18; 70:13;
78:2, 6; 99:22; 100:20
**conclude** [1]
24:20
**concluded** [1]
104:16
**concurrence** [1]
87:4
**confirm** [1]
78:21
**confirmation** [1]
67:11
**Conrad** [23]
33:24; 34:3; 40:3, 7; 43:24;
45:5; 50:13; 60:22; 62:6;
70:14, 16; 80:15; 83:9; 84:5,
9; 87:7, 13; 90:18, 22; 92:3;
97:16; 103:22; 104:9
**conscious** [1]
59:4
**consider** [1]
61:8
**considered** [2]
66:21; 67:2
**consist** [1]
94:13
**consisting** [2]
89:15; 93:13
**construct** [1]
37:13
**Construction** [79]
22:11, 18, 24; 23:8, 17;
24:16; 25:8, 14, 19; 26:20;
29:22; 30:5, 8; 31:21; 32:2, 6;
35:15; 36:9; 37:13, 16; 38:15,
16, 19, 21; 39:3, 15, 17;
40:22; 41:2; 42:11; 43:18;

44:5, 8; 45:6, 18, 20; 46:16;
48:12; 50:15; 53:25; 58:3, 13;
59:9, 15; 60:25; 61:18; 62:5;
67:25; 68:8, 11, 16; 72:8;
83:16, 19; 84:2, 8, 13; 89:18;
90:14, 21, 25; 91:4, 17, 25;
95:6, 19, 22; 96:2, 5, 7, 12,
15; 97:6; 101:2; 102:3, 17;
103:7, 20; 104:10
construction [12]
10:20, 22; 12:15; 15:11;
21:22; 22:4, 25; 24:19, 23;
26:3, 24; 44:14
contact [7]
42:9; 59:24; 60:8, 15; 62:5;
70:16; 98:2
contacted [2]
64:9; 70:6
contacting [1]
60:5
contract [28]
10:7; 11:7, 16, 20, 23; 12:3,
15, 22; 16:12, 16, 22; 17:8,
20; 20:9; 35:19, 20, 23; 36:2,
8, 24; 37:4, 8; 38:24; 41:5;
97:24; 103:9; 104:4
contractor [21]
9:21; 10:2, 8; 12:23, 25; 15:5;
16:3, 23; 20:10; 23:6, 10;
32:8; 35:11, 14, 21, 23; 36:2;
37:17; 101:7, 25; 102:24
contractor's [1]
15:7
contractors [4]
9:15; 10:2; 11:3, 14
ntracts [3]
9:25; 12:4; 16:2
copies [2]
79:16; 100:12
Coppoccio [2]
49:11; 71:14
copy [59]
30:25; 31:12, 13; 33:4, 7, 9,
18; 35:25; 36:4, 6, 8; 39:13,
19, 24; 42:21; 45:2, 4, 8, 11;
50:9, 17; 51:14, 16, 21; 52:3,
8; 53:11, 18; 55:8; 62:24;
64:19, 25; 65:17; 66:7, 15;
71:10, 12, 16, 25; 74:18, 24;
75:12; 77:19; 79:10; 84:24;
85:4; 89:20; 90:15, 16; 91:10,
11, 19; 93:15, 20, 22; 98:12;
106:7, 10, 12
Corp [50]
22:11; 23:8; 24:16; 26:20;
30:5, 9; 31:22; 32:2, 6; 35:15;
37:13; 38:16, 19, 21; 39:4,
15, 18; 40:22; 41:3; 42:11;
43:18; 44:5, 8; 45:18, 21;
48:12; 50:15; 58:3, 14; 59:9,
16; 61:18; 62:5; 67:25; 83:16;
84:2, 8, 13; 90:14, 25; 91:17,
25; 96:3, 5, 7, 12; 102:3, 17;
103:7; 104:10
Corporation [2]
22:24; 89:18
orrao [1]
97:15
correspondence [2]
46:3; 99:15
counsel [13]

20:5; 62:12, 18, 24; 63:2, 5,
13; 64:8; 80:18, 20; 81:6;
82:2; 94:4
counsel's [2]
36:22; 87:3
COUNTY [1]
107:5
couple [1]
88:8
course [3]
8:3, 8; 16:19
courses [1]
7:24
COURT [1]
1:2
Court [4]
3:18; 4:23, 24; 5:11
cover [28]
8:18; 50:25; 54:24; 55:17;
64:12, 20, 25; 65:7, 9, 19, 21;
66:2, 8, 12, 16; 75:4, 8, 13;
76:8; 77:12; 80:17; 92:17, 24;
93:3; 106:7, 10, 12, 14
coverage [8]
79:22; 80:5; 82:6, 22; 84:9,
14; 88:10, 17
Crown [1]
22:22
crystal [1]
65:16
custom [3]
65:24; 66:6; 98:25
CV [1]
1:7

– D –

date [19]
11:11; 30:19; 32:18; 39:9;
44:23; 50:4; 53:8; 71:9; 73:9;
74:13; 76:4; 77:4; 79:8;
84:20; 89:6, 12, 25; 96:8;
98:11
dated [6]
30:23; 32:24; 56:2; 93:8;
94:10; 98:17
day [5]
73:5, 10, 12; 104:21; 107:19
days [4]
55:23; 88:3, 8, 14
DD [1]
7:15
dealings [1]
70:4
dealt [3]
8:13, 15; 92:2
December [2]
18:6; 29:25
decided [1]
72:18
decision [2]
59:4; 80:19
default [7]
51:25; 53:3; 58:25; 63:17;
66:19, 22; 81:9
defend [2]
80:11, 13; 87:6, 10
Defendant [4]
1:10, 18; 2:11; 50:7
defendant [4]
4:18; 19:12; 20:2; 36:18

Defendant's [14]
30:18; 32:17; 39:8; 44:22;
50:3; 53:7; 71:7; 76:2; 79:7;
84:19, 23; 89:5, 11; 98:10
DEFENDANTS [1]
105:4
defense [1]
34:14
definitely [1]
62:14
definitions [1]
8:11
demo [1]
15:18
denial [1]
80:5
denied [2]
79:22; 82:21
denying [1]
82:6
Department [1]
50:10
department [1]
12:11
department's [1]
11:9
deposition [5]
3:15; 20:7, 22; 45:15; 94:5
DESCRIPTION [1]
105:7
desk [10]
34:15, 17, 22; 54:12, 14;
90:5, 9; 91:20; 98:20; 99:18
determine [1]
37:3
DICKER [1]
2:10
directing [1]
87:6
discovery [1]
20:2
discuss [4]
57:10; 80:2, 22; 99:8
discussed [3]
62:13; 63:15; 70:13
discussion [4]
6:23; 36:15; 70:17; 77:17
DISTRICT [2]
1:2, 3
divulge [1]
59:15
document [14]
18:19; 19:6, 14, 23, 24; 31:7;
32:23; 34:21; 37:18; 39:19,
21; 79:15; 85:12, 15
documentation [1]
94:14
DOCUMENTS [2]
106:4, 6
documents [35]
11:8; 18:21, 25; 19:7, 11, 12,
13, 24; 20:4, 9, 20, 21; 25:23;
33:22; 34:5, 11, 13, 19; 37:7;
40:9; 41:12; 53:20; 90:15, 16;
93:16, 23; 94:8, 13; 97:13;
99:7; 100:2, 16; 101:3
doesn't [3]
46:4; 76:16; 92:21
DONALD [1]
2:7
Donald [9]

48:23; 49:8, 10; 51:24; 52:15;
53:13, 16, 22; 71:14
drawn [1]
16:6
duly [2]
4:3; 107:11
duration [1]
101:20
duties [1]
14:19

– E –

e-mail [1]
42:18
Early [1]
10:6
early [4]
14:13, 14; 15:17; 24:22
easier [2]
86:24, 25
East [2]
2:11; 13:9
EDELMAN [1]
2:10
educational [1]
7:3
effect [1]
3:17
effort [1]
61:22
efforts [1]
91:3
eight-story [1]
37:14
ELSER [1]
2:10
emergency [1]
42:8
employed [11]
8:23; 22:10; 23:23; 28:3, 11;
29:21; 44:4; 48:11; 49:15;
96:4; 99:12
employee [7]
49:18; 62:9; 69:3; 96:21, 24;
103:3, 7
Enclosed [1]
65:5
enclosed [2]
64:22; 106:8
enclosing [1]
75:9
end [9]
24:22; 38:7; 56:6; 57:2, 4, 6,
22; 72:23; 73:2
ends [1]
82:11
engineers [3]
9:7, 11; 15:5
enlisted [1]
7:11
ensure [1]
67:17
ensuring [1]
12:9
enter [1]
12:22
entities [2]
18:2; 22:7
entitled [1]
17:21; 87:5

entity [5]
6:14; 18:10, 16; 20:24; 29:14
envelope [1]
45:9
erector [2]
41:13, 14
Erectors [7]
20:13; 40:25; 41:6, 21, 24;
96:21, 24
ESQ [2]
2:7, 13
essence [1]
87:4
established [1]
81:7
Estele [3]
27:24; 31:17; 99:8
et [2]
37:14; 96:22
event [1]
84:4
eventually [2]
92:6, 8
ex-percent [1]
17:21
EXAMINATION [2]
1:16; 4:7
examination [3]
104:15; 107:10, 12
examined [1]
4:5
excavation [2]
15:18, 20
Except [1]
94:18
except [2]
3:11; 99:12
excess [1]
13:4
EXHIBIT [2]
105:6
Exhibit [56]
30:18; 32:17; 33:18; 34:9, 17,
21; 35:9; 37:10; 39:8, 12, 25;
44:22; 45:3, 12, 18; 50:3, 17;
53:7, 10; 56:2; 64:11; 71:8,
11; 74:4, 6; 76:3; 77:23; 79:7,
10, 14, 19; 81:23; 82:18;
84:19, 23; 89:5, 7, 11, 14, 20;
90:4; 92:14; 93:13, 17, 18,
21, 23, 24; 94:14; 98:6, 10,
13, 19; 99:22, 24
EXHIBITS [1]
105:4
expecting [1]
77:14
explained [1]
16:17
Express [2]
64:18; 67:10
expression [1]
10:19
extent [2]
80:16; 88:23

— F —

F-E-R-R [1]
21:12
fact [11]
31:15; 35:10; 37:16; 39:2;

94:17
Five [1]
48:19
five [3]
47:25; 100:3, 9
flow [2]
61:5, 8
focusing [2]
71:19; 76:12
follow-up [3]
57:11; 59:9; 100:11
Following [1]
55:13
follows [1]
4:6
force [1]
3:16
form [15]
3:11; 14:21; 21:24; 45:24;
58:17, 18; 59:2; 61:3; 65:12;
73:19; 74:12; 76:10; 85:20;
92:9; 102:13
forth [5]
34:11; 82:15, 25; 86:23;
107:11
forward [6]
35:3; 42:22; 57:13, 17, 18;
80:20
forwarded [5]
54:20; 57:19; 63:16; 74:25;
80:18
foundation [1]
15:21
four [2]
100:20; 101:18
FR [1]
96:14
frame [1]
56:3
front [2]
44:25; 79:9
FUERTH [46]
2:13; 4:8; 5:9, 20, 24; 14:23;
19:4, 17, 20; 22:2; 31:4, 8;
32:20; 36:7, 14; 43:4, 7;
44:19; 46:7; 47:13; 49:23;
53:4; 58:7; 59:7; 64:19; 65:5,
15; 66:15; 71:5, 21; 75:12,
24; 76:15; 79:4; 83:7; 86:3;
89:7; 92:12, 21; 93:2, 10;
98:6; 102:6; 103:12, 17;
104:12
Fuerth [1]
4:17
full [2]
37:4, 8
function [5]
14:17; 15:2; 28:6, 21; 49:13
future [1]
61:17

— G —

gave [1]
5:11
GC [8]
9:8, 10; 12:16; 17:8; 23:9, 11;
32:13; 35:18
GEM [7]
20:12; 40:25; 41:6, 21, 23;
96:21, 24

60:20; 61:23; 78:25; 85:21;
92:2, 10, 13
facts [6]
85:10, 16; 86:6, 17; 87:9;
94:16
factual [1]
85:22
familiar [1]
10:9
fashion [2]
5:2; 42:14
favor [2]
11:3; 38:12
fax [19]
42:18, 21; 64:16; 67:6, 11;
70:20, 23; 71:2, 20, 25;
72:10, 14, 19; 76:5, 9, 12, 14;
77:4; 88:7
faxed [4]
76:22; 77:6, 10, 15
faxing [1]
77:19
Federal [2]
64:17; 67:10
FedEx [1]
67:16
fees [2]
83:21; 103:23; 104:8
fellow [1]
68:22
Ferrara [7]
21:11; 48:23, 25; 63:7, 9;
80:23; 81:13
field [1]
9:7
File [1]
2:13
file [6]
90:15, 18, 19, 20, 21, 23
filing [1]
3:8
final [2]
5:4; 24:24
financial [1]
17:17
find [6]
19:19; 33:21; 36:13; 60:16;
61:22; 62:5
Fine [1]
36:6
finish [1]
5:5
finished [1]
24:21
fire-resistive [1]
37:14
firm [5]
65:3; 79:12; 81:5; 83:10, 15
First [27]
4:14; 5:12; 7:12, 13; 12:20;
24:12; 25:8, 19; 26:6, 10;
27:19; 28:25; 29:6; 44:9;
45:6, 21; 46:17, 20; 47:4, 9;
48:15; 53:14, 17; 69:4; 70:24;
71:14; 72:11
first [28]
4:3; 27:2, 14; 28:23; 29:2, 12;
32:7; 35:8; 45:11; 50:16;
51:9, 16; 53:17, 22; 58:24;
60:20; 74:8, 22, 23; 85:8, 11,
14; 86:7, 10; 87:2, 19; 89:23;

gets [2]
67:18, 20
gist [2]
79:21; 80:9
Give [1]
5:24
give [11]
5:5, 18; 7:2; 19:18; 35:2, 4;
36:12; 56:3; 88:10; 91:3;
102:4
given [1]
107:13
giving [1]
97:16
GLENN [1]
2:13
Glenn [1]
4:17
GOLDSTEIN [1]
2:4
Goldstein [9]
1:19; 63:19, 21; 64:13, 21;
65:10; 66:8; 81:11; 106:8
gotten [1]
88:7
GR [33]
19:25; 20:6; 31:9; 32:16, 20,
21, 25; 36:19, 20; 37:10;
71:5, 15; 72:19; 75:24, 25;
77:24; 89:8, 9, 10; 93:14;
94:24; 98:6, 8, 9; 99:25;
105:9, 18, 23, 24
GR255 [2]
32:16; 105:9
GREENWICH [1]
1:9
Greenwich [29]
4:18; 18:22; 30:3, 17, 21;
32:17, 22; 39:8, 12; 44:22;
45:2; 50:3, 7; 53:6, 10; 71:7,
11; 76:2; 79:6; 85:2; 87:6, 17;
88:9, 16, 19; 89:2, 4, 10; 98:9
Greg [4]
68:23; 69:10; 70:6, 7
guarantee [1]
67:9
guess [7]
13:20; 34:14; 45:8, 24; 56:15;
69:21; 92:20

— H —

hand [1]
107:19
Handing [1]
94:23
handle [1]
73:23
handled [1]
34:7
handwriting [2]
13:23, 25
happy [1]
5:4
harmless [2]
38:6, 11
haven't [1]
50:25
He's [3]
56:14, 15; 69:13
head [1]

5:3
**heading** [1]
32:4
**heard** [1]
36:21
ights [1]
22:22
**held** [3]
1:18; 6:23; 36:15
**helpful** [1]
100:17
**HEREBY** [1]
3:6
**hereby** [2]
3:9; 107:9
**herein** [1]
1:17
**hereinbefore** [1]
107:11
**hereto** [1]
3:8
**hereunto** [1]
107:18
**hey** [1]
98:2
**hinder** [3]
59:16, 19; 60:6
**hire** [1]
35:10
**hired** [4]
15:13, 16; 37:12, 16
**hold** [3]
13:6; 38:6, 11
**holder** [1]
39:16
ome [1]
6:6
**honest** [1]
16:20
**hour** [1]
8:3
**hypothetical** [1]
92:20

– I –

**I've** [7]
18:10; 31:10, 13; 47:13;
50:24; 51:2; 93:25
**I.D.** [13]
105:8, 9, 11, 13, 14, 16, 17,
18, 19, 20, 22, 23, 24
**idea** [2]
68:5; 72:18
**identification** [22]
30:18, 21; 32:18, 23; 39:9,
13; 44:23; 45:3; 50:4, 8; 53:7,
11; 71:8; 76:3; 77:23; 79:7;
84:20, 24; 89:5, 11, 14; 98:10
**identify** [2]
51:5; 86:5
**immediate** [1]
67:2
**immediately** [2]
42:9; 92:6
**impact** [3]
60:11; 61:17, 21
impacted [1]
60:2
**Inc** [1]
41:9

**incident** [6]
58:18, 23; 60:16, 21; 62:7;
87:19
**incidents** [1]
100:13
**include** [2]
9:13; 15:25
**Inconsistent** [1]
92:19
**inconsistent** [1]
92:10
**incorporated** [1]
30:22
**incurred** [1]
104:9
**indemnification** [6]
59:13, 20, 25; 60:6, 11; 97:23
**indemnify** [6]
13:2; 59:17; 61:19; 83:20;
84:3; 103:21
**indemnity** [2]
10:10; 61:22
**Index** [1]
1:7
**indicate** [8]
37:15; 56:4, 8, 22; 60:23;
67:12; 78:12; 96:18
**indicated** [2]
14:5; 100:23
**indicates** [1]
32:4
**indicating** [1]
51:2
**individual** [4]
18:12, 17; 31:15; 86:5
**Individually** [1]
21:6
**INFORMATION** [2]
106:4, 6
**information** [2]
59:15; 61:8
**initial** [2]
11:5, 6
**initiated** [1]
53:22
**injured** [1]
42:13
**injuries** [1]
42:6
**injury** [1]
33:24
**inquire** [1]
54:13
**inquiry** [5]
86:14, 16; 90:8; 91:18; 97:15
**INSURANCE** [1]
1:9
**Insurance** [6]
4:18; 40:19; 69:16; 84:10, 14;
85:2
**insurance** [39]
7:22, 25; 8:6, 15, 17; 11:2,
21; 12:6, 10, 14; 20:10, 12;
34:5, 19; 39:7, 14; 40:10, 12,
13; 42:23; 52:18; 57:13, 23;
60:7; 62:9; 66:2; 67:3, 25;
68:11; 73:24; 78:14, 22, 25;
80:9; 82:6; 87:10, 17; 103:21;
105:12
**insure** [1]
87:6

**insured** [15]
10:10; 11:4; 13:5; 16:11, 15;
31:20; 32:5, 7; 37:12, 23;
38:10, 12, 21; 39:3, 15
**intended** [1]
95:17
**intent** [1]
38:2
**intention** [1]
67:15
**interaction** [2]
69:6, 10
**interest** [14]
17:11, 14; 18:18; 21:15, 16,
21; 23:16, 19, 21; 24:3, 6;
30:4, 9; 31:25
**interested** [1]
107:17
**interests** [1]
17:17
**interrogatories** [3]
5:21; 86:3; 94:8
**interrogatory** [2]
13:21; 86:4
**interviewed** [1]
31:15
**investments** [1]
8:12
**involved** [4]
13:13; 22:8; 41:15; 81:25
**involvement** [5]
13:8; 22:25; 34:16; 96:2, 12
**involving** [2]
43:24; 60:21
**irrespective** [2]
17:7; 103:20
**issue** [3]
11:11; 42:8; 86:19
**issued** [1]
90:13
**issuing** [1]
11:13
**Item** [1]
101:18
**item** [2]
82:11; 100:3, 20
**items** [1]
82:24

– J –

**Jeopardize** [2]
97:22, 23
**job** [9]
12:7; 15:2, 7; 28:6, 20; 34:4;
49:13; 61:2; 100:14
**judge** [1]
53:3
**judgement** [2]
66:23; 87:5
**July** [52]
21:21; 23:17; 24:9; 25:25;
26:6, 14, 19, 24; 27:5, 16;
33:15, 20; 40:4, 7, 17; 42:3;
43:21; 44:3; 51:18; 52:17;
53:12, 15; 55:25; 56:2, 4, 6,
7; 57:2, 4, 6, 22; 58:7; 62:20;
65:8, 10; 66:18; 68:2; 71:12;
72:23; 73:2; 74:14, 19; 78:7,
10, 12, 13, 20; 87:19; 88:8;
97:9, 10

**June** [1]
107:19
**junior** [1]
7:6

– K –

**Kelner** [10]
53:12, 15; 58:8; 64:9; 71:13;
78:7
**Kent** [20]
6:15, 16, 18; 8:25; 9:5; 10:5;
12:11; 13:7; 14:12; 15:13;
21:9; 22:16; 27:9; 29:16, 18;
46:24; 49:2, 18; 63:10, 13
**kept** [2]
15:6; 55:7
**Knight** [5]
20:11; 41:4, 9, 11, 25
**knowing** [1]
59:13
**knowingly** [1]
37:25
**knowledge** [9]
28:10; 41:11; 44:17, 18;
46:15; 70:8; 86:6; 94:16;
104:11

– L –

**labeled** [1]
90:22
**LABITA** [2]
107:7, 22
**Labita** [2]
1:21; 4:4
**lack** [1]
10:18
**language** [5]
57:25; 82:4, 15; 83:5; 102:8
**Larry** [5]
20:11; 41:4, 9, 11, 24
**last** [9]
14:7; 38:9; 69:22; 94:18, 19,
21, 24; 96:19
**late** [4]
24:21; 78:10, 12, 20
**law** [1]
81:5
**laws** [1]
8:14
**lawsuit** [6]
4:20; 30:2; 83:9; 84:9; 85:24;
97:16
**lawyer** [7]
66:13; 67:3; 75:21; 81:17;
91:23; 92:4, 14
**learn** [2]
16:14; 29:24
**legal** [5]
67:17, 19; 83:21; 103:23;
104:8
**legality** [1]
67:22
**Let's** [1]
51:5
**let's** [1]
12:23
**letter** [105]
33:19; 34:3, 10; 40:3, 7; 45:4;
46:17; 51:25; 52:11; 53:3, 12,
15, 21, 24; 54:7, 10, 16, 20,

24; 55:8, 13, 18; 56:11, 17;
57:12; 58:4, 5, 7, 24; 60:18,
22; 63:15, 25; 64:6, 8, 10, 12,
20; 65:2, 3, 7, 8, 9, 10, 19,
21, 25; 66:2, 8, 16; 68:2, 8;
71:12, 17, 22, 25; 73:2, 6, 8,
9, 15; 75:4, 9, 13; 76:9;
77:12; 78:7, 13; 79:11; 80:2,
6; 81:5, 9, 17; 82:2, 19, 21;
88:3, 4, 9, 21, 23, 24; 89:16,
25; 91:4, 19; 92:17, 24; 93:5,
7; 94:25; 95:11, 25; 96:9, 14,
19, 25; 97:8, 11; 99:10;
100:6; 106:7, 10, 12

**letter's** [1]
98:17
**letterhead** [1]
45:5
**letters** [4]
66:12; 93:3; 99:2; 106:14
**letting** [1]
100:10
**liability** [7]
13:3, 4; 38:22; 39:4, 7, 14;
105:11
**liaison** [1]
9:6
**license** [4]
7:6, 17, 18, 24
**lies** [1]
12:10
**limited** [1]
19:11
**line** [3]
13:23; 71:20; 97:4
**listed** [1]
94:15
**listen** [1]
47:15
**litigation** [1]
18:6
**LLC** [24]
1:4, 17; 20:25; 21:5; 22:9;
24:11; 25:4, 7, 11; 29:15;
31:21; 32:5; 35:10; 38:20;
39:2, 17; 50:14; 53:13; 54:2;
55:14; 85:2; 101:19, 24;
102:16
**LLP** [3]
1:20; 2:4, 10
**load** [1]
41:19
**located** [9]
13:9; 14:19; 24:11, 16; 25:19;
26:20; 36:3; 48:14; 69:4
**location** [1]
46:20
**log** [1]
11:12
**logs** [1]
100:12
**loss** [2]
87:7, 11
**LP** [3]
50:15; 53:16; 71:13

### – M –

**machine** [2]
70:23; 72:11
**mail** [11]

25:3, 6, 13; 45:9; 64:15, 16;
67:10, 16; 75:2, 22; 78:8
**Management** [1]
72:15
**management** [2]
55:11; 76:6
**manager** [12]
9:3, 5, 24; 10:5, 15; 22:21;
42:25; 43:4; 97:4, 5; 100:11,
24
**Manhattan** [1]
13:10
**manner** [4]
75:19; 87:22, 23, 25
**March** [2]
14:15; 32:24
**MARIE** [2]
107:7, 22
**marked** [25]
30:17; 21; 32:16, 22; 39:8,
12; 44:21; 45:2; 50:2, 7; 53:6,
10; 68:3; 71:7, 11; 76:2;
77:23; 79:6; 84:18, 23; 89:4,
10, 14; 93:13; 98:9
**marriage** [1]
107:16
**matter** [1]
8:9, 18; 107:17
**May** [7]
1:12; 27:23, 25; 28:9; 29:20;
30:23; 94:10
**mean** [5]
44:16; 46:4; 50:24; 61:12;
73:7
**meaningless** [1]
9:17
**means** [3]
20:16; 83:8; 96:14
**meant** [10]
17:7; 40:14; 51:8; 66:18;
80:5, 8; 82:3, 12, 14; 83:5
**meet** [1]
28:23
**meetings** [3]
15:4, 24; 102:4
**mention** [1]
62:11
**mentioned** [1]
37:2
**Michael** [5]
89:18; 93:5; 95:2; 97:12;
100:6
**mine** [2]
9:20; 14:3
**miscellaneous** [1]
41:17
**Miss** [2]
72:22; 78:11
**moment** [2]
19:19; 36:12
**moments** [1]
103:15
**month** [1]
93:7
**months** [1]
12:4
**morning** [3]
4:16; 19:6, 8
**MOSKOWITZ** [1]
2:10
**mostly** [1]

8:15
**Move** [1]
102:6
**moved** [1]
27:3
**moving** [1]
66:22
**MR** [102]
4:8; 5:9, 10, 20, 23, 24; 6:3,
22; 14:21, 23; 19:2, 4, 5, 10,
17, 18, 20, 22; 21:23; 22:2;
26:21; 31:2, 4, 5, 8; 32:20;
36:7, 10, 14, 17; 38:3, 8;
43:2, 4, 5, 7; 44:10, 19;
45:23; 46:7, 8; 47:11, 13, 14;
48:5; 49:23; 51:5; 53:4;
56:14, 19; 58:5, 7, 10; 59:2,
7, 10; 61:3; 62:11; 63:22;
64:19, 23, 25; 65:5, 12, 15;
66:15; 71:5, 18, 21; 73:19;
75:12, 24; 76:10, 15, 17;
78:15; 79:4; 83:4, 7; 85:19;
86:3, 15; 87:14; 88:11; 89:7;
92:9, 12, 18, 21; 93:2, 10, 19;
97:19; 98:6; 100:4; 102:6, 12;
103:12, 14, 17, 25; 104:12
**Mr** [25]
4:16; 60:21; 63:2, 5, 13; 67:6;
69:7, 18; 70:4, 13, 19; 72:4;
80:23; 81:13, 23; 83:10, 15,
21, 24; 93:5; 97:15; 100:2,
10; 101:16; 103:18
**Ms** [7]
28:10, 24; 29:21; 31:16;
48:20; 98:21; 99:2
**Myself** [1]
62:2
**myself** [1]
95:15

### – N –

**name** [7]
4:9, 17; 27:24; 52:12; 68:23;
69:22; 95:24
**named** [3]
37:22; 39:2; 41:5
**names** [3]
18:10, 13, 17; 41:6
**naming** [1]
11:4
**narrow** [1]
12:21
**nature** [2]
7:21; 17:22
**Navy** [2]
7:5, 7
**North** [38]
40:16; 52:20, 22; 53:23;
54:20; 55:11, 21; 56:4, 25;
62:23; 63:16; 64:8, 20; 65:2,
8, 18; 68:15; 69:18; 72:15,
19, 22; 73:6, 15; 74:4, 13, 19;
75:9, 16; 76:6, 23; 77:9, 11,
17; 87:21; 88:2, 6, 13; 106:7
**NOTARY** [1]
104:23
**Notary** [1]
1:22; 3:16; 4:4; 107:7
**notation** [1]
5:22

**Note** [1]
85:19; 87:14
**note** [2]
56:21; 96:20
**notice** [3]
58:24; 60:21; 88:8
**notification** [8]
42:5; 43:17; 53:22; 58:17;
61:5, 24; 73:24; 88:25
**notified** [10]
42:13; 52:24; 53:2; 68:2, 11;
87:18, 21; 88:6, 13, 20
**notify** [4]
52:21, 22; 58:2; 60:25
**NUMBER** [1]
105:7
**Number** [1]
100:9
**number** [11]
6:2, 21; 19:25; 32:20; 70:20;
71:2, 15; 72:2, 11; 93:14;
100:24
**numbers** [8]
32:25; 36:19, 25; 45:9; 50:8;
53:18; 79:12; 89:15
**numerous** [1]
27:10

### – O –

**Object** [6]
14:21; 59:2; 65:12; 73:19;
76:10; 92:9
**object** [1]
45:23
**Objection** [3]
21:23; 61:3; 102:12
**objection** [5]
59:10; 85:19; 87:15; 88:11;
92:18
**objections** [1]
3:11
**obligated** [1]
87:10
**occasion** [4]
33:17; 34:9; 39:24; 47:3
**occasional** [2]
43:10, 14
**occasions** [2]
47:23; 48:16
**occupancy** [1]
24:25
**office** [20]
6:11, 13; 25:18; 26:11, 19;
27:8, 15, 19; 28:18, 25;
29:14; 44:8; 45:20; 46:17, 20;
48:10, 15; 49:21; 69:8; 99:13
**offices** [6]
1:19; 24:10, 15; 26:2, 5;
44:13
**okay** [1]
11:13
**on-site** [11]
43:11, 14; 100:21; 101:5, 10,
13, 20; 102:2, 20; 103:2, 4
**ones** [1]
9:18
**operating** [2]
55:3, 7
**opportunity** [1]
79:20

opposed [6]
    34:22; 95:7, 18; 99:15;
    100:15; 101:2
Order [1]
    1:21
der [2]
    7:23; 100:11
original [12]
    30:24; 31:7, 10; 33:3, 6; 36:5;
    42:21; 79:14, 17; 91:9, 12, 15
outcome [1]
    107:17
overview [1]
    8:14
owned [1]
    21:4
owner [23]
    9:19, 20, 25; 10:8, 16, 19;
    11:3, 4, 19; 12:16; 13:2; 16:2,
    16, 23; 17:8; 18:8; 20:9; 22:4;
    35:21, 22; 36:2; 37:22;
    102:23
owner's [13]
    10:25; 14:5, 9, 17, 24; 15:25;
    17:5; 22:5; 25:2, 21; 26:8;
    43:6, 9
owners [1]
    18:9
ownership [13]
    17:11, 13; 18:2, 18; 20:18;
    21:20; 23:16, 19, 20; 24:3, 6;
    30:4, 9

– P –

P-81 [1]
    50:8
.99 [1]
    45:9
P-O-T-O-L-S-K-Y [1]
    69:23
p.m. [1]
    104:14
P80 [1]
    105:16
package [2]
    50:18, 21
PAGE [2]
    105:6; 106:6
page [10]
    35:8; 37:10, 21; 45:8; 82:8,
    10; 94:18, 20, 21, 24
pages [2]
    51:10; 74:8
paid [1]
    104:10
paper [1]
    93:18
paragraph [2]
    14:7; 32:7
paragraphs [2]
    85:9; 86:23
paraphrasing [1]
    37:24
part [4]
    11:7; 60:14; 98:24; 101:18
rties [2]
    3:8; 107:15
Partners [15]
    23:24; 24:7; 27:19; 30:13;
    50:15; 53:16; 54:5, 6; 68:5,

19, 21; 1:13, 23; 72:5; 83:16
pass [2]
    35:5; 42:14
pay [2]
    87:7, 11
payment [3]
    9:14, 19; 11:11
payments [2]
    11:14; 87:7
people [4]
    17:25; 48:14, 17; 86:12
performance [1]
    15:8
performing [1]
    10:15
period [7]
    24:9, 14; 25:20; 26:18, 24;
    44:3; 47:4
permissible [1]
    67:14
person [4]
    5:6; 37:25; 96:20, 23
personal [1]
    33:24
personally [4]
    44:12; 52:22; 88:13; 104:6
pertains [1]
    17:17
Peter [1]
    21:11; 48:23; 63:7, 9; 69:24
phase [1]
    15:15
phone [6]
    5:25; 42:18; 56:20, 21; 70:5;
    78:20
piece [1]
    46:2
place [3]
    12:6; 16:7; 42:4
Plaintiff [9]
    1:5, 17; 2:5; 44:19, 21; 49:23;
    50:2; 105:13, 14
plaintiff [3]
    19:13; 50:13; 86:21
plank [1]
    41:16
pleaded [1]
    85:24
Please [1]
    4:9
please [9]
    4:22, 25; 55:14; 59:6; 85:16;
    96:19, 25; 101:18; 104:2
PM [1]
    43:3
point [4]
    5:4; 12:8; 16:18; 46:6
pointed [1]
    82:16
pointing [1]
    82:24
policy [3]
    8:18; 13:6; 38:11, 22; 39:4
portion [1]
    82:19
portions [1]
    102:7
position [1]
    88:5
Post-high [1]
    7:4

post-high [1]
    7:3
Postelnek [1]
    79:11
potential [1]
    61:21
potentially [1]
    60:10
Potolsky [6]
    69:11, 12, 18; 70:2, 4, 13
Potolsky's [1]
    69:22
practice [6]
    64:17; 65:24; 66:7; 67:8;
    75:8; 98:25
prefer [2]
    5:18; 60:7
preparation [4]
    20:7, 22; 45:14; 94:4
prepared [1]
    66:11
preparing [1]
    20:3
presently [2]
    8:23; 36:3
pretty [1]
    74:7
Previously [1]
    77:3
previously [1]
    81:4
Primarily [2]
    9:6; 15:3
primary [1]
    67:21
printed [1]
    13:24
Prior [3]
    18:5; 22:14; 31:2
prior [20]
    11:13, 19; 20:21; 33:4; 39:19;
    53:19; 58:16; 71:17; 77:8, 18;
    82:12; 85:4, 6; 87:15; 89:20;
    92:11; 93:16, 25; 97:8; 98:13
procedure [8]
    42:4, 17; 55:4, 7; 60:24;
    61:24; 65:24; 75:8
proceed [1]
    93:11
process [1]
    9:17
produced [3]
    19:12, 13, 25
production [1]
    36:18
productions [1]
    36:12
profits [1]
    17:21
progress [5]
    9:14; 15:4, 24; 102:4, 5
Project [2]
    9:3; 43:4
project [42]
    9:4, 24; 10:5, 15, 23; 12:5,
    19; 13:9, 13; 14:18, 25;
    15:12, 16; 16:9; 21:22; 22:4,
    21, 22; 23:2, 7, 13; 24:18, 19;
    25:22; 26:9; 32:9, 12; 40:23;
    41:8, 10; 42:4, 24; 43:11, 15,
    23; 87:18; 97:3, 5, 6; 100:10,

24; 101:21
projects [1]
    27:10
prompted [1]
    64:5
proper [2]
    12:9; 13:12
properly [1]
    11:10
provide [5]
    11:24; 13:3; 38:11; 88:17;
    99:25
provided [5]
    11:2; 36:8; 84:8
provision [2]
    16:11, 16
PUBLIC [1]
    104:23
Public [4]
    1:22; 3:16; 4:4; 107:7
purport [1]
    79:16
purporting [1]
    60:22
purports [3]
    30:25; 33:3; 39:13
pursuant [1]
    1:21; 35:18
pursue [1]
    19:16
putting [1]
    34:18

– Q –

question [34]
    3:12; 4:21; 5:5; 14:22; 17:16;
    21:2, 24; 31:3, 5; 41:8; 45:24;
    46:10, 12; 47:12, 15, 16;
    48:6; 59:3, 5; 68:18; 71:19;
    73:20; 76:11, 18, 19; 85:20,
    22; 86:20; 87:15; 101:9, 14;
    102:13, 19; 103:17
questions [3]
    4:19; 103:12; 104:2
quick [1]
    55:10

– R –

rank [1]
    7:10
read [11]
    4:23; 46:10, 13; 47:14, 17;
    59:6; 76:17, 20; 79:20; 83:6;
    102:9
reading [1]
    8:18
realleges [1]
    86:22
Realty [1]
    28:16
Realty's [1]
    28:18
reason [18]
    27:7; 34:8, 20; 58:21; 59:8;
    60:15; 67:5; 73:4, 17, 20, 21;
    91:7, 22; 92:3; 95:5; 97:18;
    99:7; 101:15
recall [28]
    15:15; 26:4, 23; 27:2; 33:11;
    35:9; 55:2, 17, 19; 67:7;

74:15, 17, 20; 75:6, 17, 19;
76:7, 13, 22; 77:6, 9, 16, 21;
78:4, 23; 79:13; 80:3; 84:15
**receipt** [6]
50:9, 22; 54:23; 73:6; 87:20;
88:2
**receive** [5]
25:3, 6; 40:17; 67:9; 91:9
**received** [28]
25:23; 34:10; 54:18, 19;
56:11; 57:12, 16; 58:16;
63:15; 65:3; 67:12; 74:22, 23;
75:18, 20; 79:17, 19; 80:6;
81:8; 82:17; 88:3, 21, 22, 24,
25; 90:11; 91:10; 97:11
**receiving** [6]
25:13; 33:19; 40:3; 60:18;
73:3, 8
**receptionist** [5]
28:7, 22; 29:10; 99:13, 14
**recess** [6]
6:5; 15:22; 19:21; 30:15;
93:9; 103:16
**recipient** [1]
99:10
**recognize** [2]
13:23, 25
**recollection** [13]
25:13, 18; 27:13; 31:24;
45:19; 46:9; 56:24; 65:18, 23;
66:6, 10; 72:21; 75:14
**record** [12]
4:10, 13; 6:22, 24; 19:22;
32:21; 36:16; 51:6; 58:6;
65:6, 16; 107:12
**recorded** [3]
46:14; 47:18; 76:21
**recovery** [2]
87:11; 103:24
**redacted** [1]
6:25
**refer** [1]
38:19
**reference** [3]
31:14, 19; 37:22
**referred** [6]
38:15; 46:12; 47:16; 76:19;
81:11; 82:18
**referring** [4]
19:7, 15, 23; 36:17
**reflect** [1]
32:21
**refresh** [4]
25:17; 31:23; 45:19; 46:9
**regard** [1]
70:11
**Regarding** [1]
81:19
**regarding** [11]
8:5; 25:24; 33:20; 55:14;
69:11; 70:6, 16; 81:9, 25;
99:4
**regards** [2]
10:22; 80:8
**regional** [1]
30:22
**regular** [1]
64:15
**reits** [1]
8:16
**related** [3]

16:2; 34:5; 107:14
**relates** [1]
90:18
**relating** [1]
86:10
**relationship** [1]
41:8
**remark** [1]
37:20
**remarks** [2]
37:11; 38:9
**remember** [18]
7:14; 18:11, 14; 20:8; 29:4;
33:5; 44:16; 48:24; 52:11, 15;
70:5, 10, 12, 17; 75:23; 79:2,
3; 88:23
**rendered** [2]
84:5; 87:12
**rep** [3]
26:8; 43:6, 9
**repeats** [1]
86:21
**rephrase** [7]
4:23; 14:23; 20:17; 22:2;
43:8; 59:7; 92:12
**report** [3]
42:22; 43:18, 19
**Reporter** [17]
4:4, 23, 24; 5:11; 30:19;
32:19; 39:10; 44:24; 50:5;
53:8; 71:9; 76:4; 79:8; 84:21;
89:6, 12; 98:11
**reporter** [2]
46:13; 47:17; 76:20
**reporting** [1]
30:22
**reports** [2]
100:12; 102:5
**represent** [2]
4:17; 60:23
**representative** [19]
10:19, 25; 14:6, 10, 18, 24;
15:25; 17:5; 22:6; 25:3, 21;
100:22; 101:11, 13, 20;
102:2, 20; 103:2, 4
**Representing** [1]
62:8
**representing** [2]
83:11, 15
**request** [6]
5:16; 36:7; 64:19; 75:12;
93:3; 106:14
**REQUESTED** [1]
106:4
**requested** [8]
33:22; 34:13, 25; 40:9; 51:23,
24; 52:15; 100:2
**requesting** [1]
97:12
**require** [1]
12:5
**required** [6]
8:3, 8; 11:7; 16:12; 38:24;
42:20
**requirements** [1]
16:15
**requiring** [1]
12:2
**research** [3]
40:2, 5, 6
**reserved** [1]

3:12
**residence** [3]
5:15, 19; 6:10
**respect** [7]
7:25; 8:17; 12:15; 32:11;
80:14; 100:20; 103:23
**respective** [1]
3:7
**respond** [4]
4:25; 99:2; 100:19; 101:15
**response** [1]
86:9
**responses** [1]
4:25
**responsibility** [3]
11:9; 34:4; 101:6
**responsible** [3]
13:2; 33:21; 99:6
**responsive** [1]
102:7
**retain** [1]
40:22
**retained** [2]
41:2, 24
**retention** [1]
35:18
**return** [1]
54:22
**review** [7]
9:22, 25; 20:6, 14, 20; 37:2, 5
**reviewing** [4]
10:7; 16:2; 36:24; 41:12
**Richard** [2]
43:24; 50:13; 84:19
**RICHARDS** [2]
1:18; 104:18
**Richards** [7]
4:11, 16; 13:24; 86:11; 95:6;
96:15; 103:18
**Right** [4]
31:8; 51:15; 62:10, 19
**right** [6]
19:4; 22:15; 33:4; 37:24;
63:18; 81:17
**rise** [1]
97:16
**Risk** [2]
53:23; 72:15
**risk** [2]
54:20; 55:11
**RITA** [2]
107:7, 22
**Rita** [2]
1:21; 4:3
**Riverbridge** [1]
28:15
**Robert** [2]
97:4; 102:2; 103:4
**Rodriguez** [9]
27:24; 28:10, 24; 29:21;
31:16, 17; 48:20; 98:21; 99:3
**role** [3]
12:8; 15:24; 69:2
**running** [1]
11:12

─ S ─

**sample** [2]
11:6, 25
**satellite** [2]

6:11, 13
**saying** [5]
47:7; 76:25; 85:13; 100:16;
101:16
**SCHNEIDER** [59]
2:4, 7; 5:10, 23; 6:3, 22;
14:21; 19:2, 5, 10, 18, 22;
21:23; 26:21; 31:2, 5; 36:10,
17; 38:3, 8; 43:2, 5; 44:10;
45:23; 46:8; 47:11, 14; 48:5;
51:5; 56:14, 19; 58:5, 10;
59:2, 10; 61:3; 62:11; 63:22;
64:23, 25; 65:12; 71:18;
73:19; 76:10, 17; 78:15; 83:4;
85:19; 86:15; 87:14; 88:11;
92:9, 18; 93:19; 97:19; 100:4;
102:12; 103:14, 25
**Schneider** [18]
1:19; 53:23; 63:2, 5, 13, 19,
21; 64:13, 21; 65:10; 66:8;
67:6; 81:11, 18, 23; 83:21,
24; 106:8
**Schneider's** [2]
83:10, 15
**school** [2]
7:3, 4
**scope** [2]
41:18, 21
**sealing** [1]
3:8
**Seaman** [2]
7:12, 13
**SEC** [2]
8:2, 7
**second** [10]
14:7; 37:9; 45:7; 85:17; 86:8,
10; 87:2; 94:17, 22; 96:18
**section** [3]
37:12, 20; 38:16
**securities** [1]
7:19
**Security** [1]
6:21
**send** [20]
62:24; 63:8, 18, 20; 64:2, 5,
15; 67:15; 73:6; 74:3, 21;
75:8; 78:17; 81:6, 17, 22;
91:23; 92:3, 7, 13
**sending** [5]
62:22; 67:18; 73:15; 74:18;
82:13
**sentence** [2]
38:10; 96:19
**separate** [1]
104:2
**September** [5]
24:10; 44:3; 79:10; 89:16, 25
**Series** [5]
7:5, 16, 23; 8:10, 12
**service** [3]
50:10, 11; 51:4
**serving** [1]
32:8
**Seven** [4]
7:5, 17, 23; 8:10
**shaking** [1]
5:2
**shares** [1]
17:19
**she's** [1]
99:10

sheet [2]
30:23; 67:12

Shore [38]
40:16; 52:20, 22; 53:23;
54:20; 55:11, 21; 56:5, 25;
62:24; 63:16; 64:8, 20; 65:2,
8, 18; 68:15; 69:19; 72:15,
19, 22; 73:6, 15; 74:5, 13, 19;
75:9, 16; 76:6, 23; 77:7, 11,
18; 87:21; 88:3, 6, 14; 106:7

show [12]
13:19; 30:20; 39:11; 50:6;
53:9; 71:10; 77:22; 84:22;
89:13; 93:12, 20; 100:5

sign [1]
12:3

signature [3]
9:16; 14:2; 95:12

signed [9]
3:15, 17; 11:17, 23; 12:4;
16:6; 95:6, 13, 21

signing [2]
11:20; 95:24

Sir [14]
6:9, 20; 30:20; 31:14, 23;
36:21; 39:11; 44:25; 50:6;
71:10; 79:9; 84:22; 89:13;
93:12

sir [6]
20:4; 39:18; 45:10; 50:16;
53:17; 89:19

Sirius [3]
40:18; 84:9, 14

sit [3]
55:16; 65:23; 66:11

te [3]
10:20, 22; 61:2

six [7]
8:3; 12:4; 48:7, 15, 19; 97:4;
100:24

Social [1]
6:20

solely [1]
9:19

somebody [2]
35:2; 46:2

someone [8]
16:18; 29:10; 34:22; 52:6;
60:22; 67:20; 95:14; 99:18

someplace [1]
18:20

sorry [8]
40:14; 43:7; 50:20; 54:3, 19;
56:19; 73:13; 94:19

sort [1]
81:9

SOUTHERN [1]
1:3

speak [7]
6:3; 27:3; 57:8; 78:5, 19;
97:7; 98:21

speaking [2]
59:19; 101:23

Specialty [1]
93:6

specialty [1]
39:17

specific [6]
8:5, 15; 10:13; 25:12; 57:5;
74:11

Specifically [1]

12:19

specifically [11]
12:24; 13:12; 18:11; 21:8;
25:16; 28:8; 74:17; 82:24;
86:4; 101:4, 23

specify [1]
91:12

speculate [1]
48:5

spell [1]
69:22

spend [1]
27:8

spoke [8]
57:21; 70:9; 72:25; 77:25;
78:9, 11; 99:17, 21

spoken [1]
97:3

Spring [1]
14:16

spring [3]
14:15; 26:13, 18

SS [1]
107:4

stamp [2]
20:6; 77:24

stamped [1]
37:10; 99:25

stamps [1]
31:9

standard [2]
35:22; 42:7

start [1]
12:7

started [3]
15:11; 30:3; 34:11

starting [1]
82:9

STATE [1]
107:3

State [4]
1:22; 4:5; 50:11; 107:8

state [3]
4:9; 12:25; 102:25

stated [1]
11:24

statement [2]
65:20; 87:24

STATES [1]
1:2

States [1]
7:5

states [5]
37:12; 86:4; 101:4, 18; 104:5

Stating [1]
55:12

stating [3]
55:10; 88:22, 24

steel [2]
41:15, 17

Stenotype [1]
4:4

Steven [4]
69:11, 12, 25; 79:11

stips [2]
5:9, 10

STIPULATED [3]
3:6, 10, 14

Stocks [1]
7:20

stocks [1]

8:16

story [1]
62:6

straight [1]
77:15

STREET [2]
1:4, 16

Street [92]
1:20; 2:5, 11; 13:10, 14, 15,
21; 14:10, 19, 25; 15:12;
16:9, 22; 17:12, 19; 18:3, 9,
18; 20:19, 25; 21:4, 16, 20,
22; 22:5, 8; 23:2, 6, 13;
24:11, 19; 25:4, 7, 11, 22, 24;
26:9; 27:11; 29:15; 30:2, 3,
10; 31:20, 24; 32:5, 12; 35:9;
38:20; 39:2, 16; 42:5, 15, 25;
43:10, 13; 44:4, 14; 50:14;
52:18; 53:13; 54:2; 55:14;
61:6; 62:4, 8; 63:5; 69:15;
70:7; 80:14; 81:25; 83:11, 20;
84:3, 25; 87:4, 20; 90:17;
93:4; 94:25; 95:7, 17; 99:4;
100:21; 101:19, 23; 102:10,
15; 103:3, 8, 22; 104:8

strike [1]
102:6

structural [1]
41:15

sub-sub [1]
41:24

subcontract [2]
101:3; 102:23

subcontracted [3]
101:6, 24; 102:16

subcontractor [1]
41:5

subcontractors [3]
11:15; 40:23; 41:2

subject [3]
8:8, 18; 87:3

subpoena [1]
5:17

Subscribed [1]
104:20

substance [1]
81:16

suit [3]
61:18; 84:5, 13

Summons [14]
52:25; 74:3, 10, 18; 75:15,
20; 76:5, 23; 77:7, 10; 78:2;
84:18, 25; 105:20

summons [9]
50:11, 23; 52:23; 62:23;
63:20; 64:3; 74:9; 75:9; 77:20

supervision [1]
101:5

supply [2]
42:21; 101:5

support [3]
85:10, 17; 86:7

supporting [1]
94:16

supports [1]
86:18

supposed [3]
60:25; 101:4; 102:25

sworn [5]
3:15, 17; 4:3; 104:20; 107:11

# – T –

tag [1]
71:20

talking [6]
13:16; 38:5; 51:3; 56:20;
58:24; 63:16

tasks [1]
27:10

terms [2]
8:4; 10:14

test [1]
8:3

testified [5]
4:6; 14:20; 20:20; 34:20;
76:13

testify [2]
20:3; 93:21

testimony [4]
43:5; 65:14; 92:19; 107:13

Thank [1]
104:12

thank [1]
103:13

there's [4]
11:5; 12:24; 19:14; 36:4

Thereupon [1]
46:12; 47:16; 76:19

thinking [1]
59:23

third [2]
14:6; 86:8

three [2]
51:10; 74:8

timely [3]
87:22, 23, 25

times [3]
48:7, 8; 49:21

title [1]
31:20

TL:1 [1]
105:16

today's [1]
94:4

topic [1]
68:4

Towards [1]
56:6

transmittal [1]
55:10

TRIAL [1]
1:16

trial [1]
3:13

troublesome [1]
45:25

true [1]
107:12

type [1]
95:11

typed [2]
95:14, 15

typing [1]
95:18

typo [4]
95:8, 9, 16; 96:16

# – U –

unaware [1]
100:14

underlying [1]

86:17

**underneath** [1]
13:24

**understand** [19]
4:21; 5:7, 23; 13:16; 17:16;
18:17; 31:16; 46:7; 48:25;
79:23; 80:7; 82:5, 17, 25;
83:12; 101:8, 22; 102:9, 18

**understanding** [48]
8:19; 10:12; 12:13, 18; 16:10;
17:6, 24; 18:8; 20:18; 21:4,
14, 19; 22:3, 23; 23:5, 15;
27:18; 28:2, 5; 29:9, 13;
32:10; 35:12, 17; 38:14, 18,
25; 40:21; 41:20, 23; 42:12;
49:5; 59:18; 66:17; 68:14;
79:18; 80:4, 12; 82:12; 83:10,
14; 85:23; 86:2; 88:16;
102:22; 103:6, 10, 19

**understands** [1]
83:5

**understood** [4]
17:11; 48:11; 80:25; 82:20

**underwritings** [2]
20:13, 15

**UNITED** [1]
1:2

**United** [1]
7:5

**Usual** [3]
5:9, 10; 9:10

### – V –

**venture** [1]
69:21

**verbal** [1]
4:25

**verdict** [2]
84:4; 87:11

**verification** [3]
13:19; 14:4; 94:10

**verified** [11]
50:12, 23; 51:17, 22; 52:23,
25; 62:23; 63:21; 64:3; 86:12;
94:7

**via** [1]
87:21

**visits** [2]
43:11, 15

### – W –

**waited** [1]
73:5

**waiting** [1]
93:10

**waived** [1]
3:9

**Waterfront** [11]
6:15, 17; 8:25; 10:5; 13:7;
14:12; 15:13; 21:10; 22:16;
27:9; 29:16

**week** [6]
12:6; 56:12; 57:2; 73:3, 7, 8

**Weiner** [6]
57:9; 72:22; 77:17, 25; 78:6,
11

**weren't** [2]
80:10, 17

**West** [2]
28:15, 17

**what's** [3]
30:20; 67:14; 77:22

**whenever** [3]
29:25; 74:23; 75:17

**whereby** [2]
60:24; 87:9

**WHEREOF** [1]
107:18

**Whereupon** [22]
6:5, 23; 15:22; 19:21; 30:15,
16; 32:15; 36:15; 39:6; 44:20;
49:25; 53:5; 71:6; 75:25;
79:5; 84:17; 89:3, 9; 93:9;
98:8; 103:16; 104:14

**Who's** [1]
21:9

**Whoever** [1]
52:10

**whomever** [1]
35:5

**WILSON** [1]
2:10

**WITNESS** [3]
19:9; 38:4; 107:18

**Witness** [5]
37:7, 18; 39:21; 53:20; 85:12

**witness** [13]
6:4; 19:6, 11, 15, 23; 71:19;
85:25; 86:17; 92:11; 100:5;
104:15; 107:10, 13

**woman** [1]
27:24

**word** [1]
76:12

**words** [4]
17:18; 28:11; 34:18; 95:17

**work** [15]
7:19; 9:11, 13; 10:14, 15;
22:16, 17; 24:20, 24; 28:14;
30:23; 41:21; 90:25; 101:25;
102:16

**worked** [8]
22:15; 28:12; 29:17; 35:6;
69:5; 72:5, 7; 102:3

**worker** [1]
42:13

**workers** [1]
42:6

**Working** [1]
27:9

**working** [8]
10:4; 13:7; 14:12; 23:3, 12;
29:9; 46:22, 24

**works** [2]
28:13; 36:6

**Worksheet** [2]
30:17; 105:8

**Wouldn't** [1]
67:11

**wouldn't** [5]
20:15; 21:18; 25:25; 31:18;
63:14

**write** [1]
95:17

**written** [3]
11:10; 35:19; 88:4

**wrote** [1]
52:10

### – X –

**XL** [10]
18:23; 34:12; 40:11; 88:21,
24; 89:2, 17; 93:6; 99:15;
101:9

### – Y –

**Yeah** [1]
74:2

**year** [3]
22:19; 27:5; 48:2

**YORK** [3]
1:3; 107:3, 5

**York** [20]
1:20, 23; 2:6, 12; 4:5, 14, 15;
6:7, 8, 19; 24:12; 45:7; 50:10;
107:8

**you've** [3]
34:19; 39:18; 85:3

# MEMORANDUM OF LAW

2786068.1

**FILE COPY**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X

105 STREET ASSOCIATES, LLC                    Index No.: 05-cv-9938 (VM)

                    Plaintiff,

        -against-

GREENWICH INSURANCE COMPANY,

                    Defendant.
------------------------------------------------------------------ X

RECEIVED
APR 1 3 2007
CHAMBERS OF
JUDGE MARRERO

# MEMORANDUM OF LAW OF DEFENDANT GREENWICH INSURANCE COMPANY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York 10017

Of Counsel:   Glenn J. Fuerth

2741024.1

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1
FACTUAL BACKGROUND ................................................................................... 1
ARGUMENT ......................................................................................................... 10
    I.    NOTICE TO THE BROKER IS NOT NOTICE TO GREENWICH ............................ 11
    II.   105 STREET FAILED TO COMPLY WITH THE NOTICE PROVISION OF THE
    POLICY AND GREENWICH PROPERLY AND TIMELY DENIED COVERAGE ........... 12
    III.  GREENWICH TIMELY DISCLAIMED COVERAGE AND IS NOT OBLIGATED
    TO INDEMNIFY 105 STREET IN THE PRIMARY ACTION .............................................. 18
    IV.   105 STREET IS NOT ENTITLED TO REIMBURSEMENT OF ATTORNEY FEES,
    COSTS AND OTHER EXPENSES ...................................................................... 21
CONCLUSION ..................................................................................................... 23

2741024.1

## TABLE OF AUTHORITIES

**Cases**

*2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.,* 271 A.D.2d 282, 283,
707 N.Y.S.2d 59 (1st Dept. 2000) ............................................................ 11, 12, 18, 19

*26 Warren Corp. v. Aetna Casualty and Surety Company,* 253 A.D.2d 375
(1st Dept. 1998) ...................................................................................................... 17

*Allcity Ins. Co. v. Jimenez,* 78 N.Y.2d 1054, 1056, 576 N.Y.S.2d 87, 581 N.E.2d 1342
(N.Y. 1991) ...................................................................................................... 13, 19

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) .......................................... 11

*County of Nassau v. Michigan Mut. Ins. Co.,* 276 A.D.2d 578 (2nd Dept. 2000) .................. 21, 22

*DiGuglielmo v. Travelers Prop. Cas.,* 6 A.D.3d 344, 346
(1st Dep't 2004) .................................................................................................... 18

*Hartford Ins. Co. v. County of Nassau,* 46 N.Y.2d 1028, 416 N.Y.S.2d 539,
389 N.E.2d 1061 (N.Y. 1979) ................................................................................... 19

*Incorporated Village of Pleasantville v. Calvert Ins. Co.,* 204 A.D.2d 689,
612 N.Y.S.2d 441 (2d Dept. 1994) ............................................................................ 11

*Johnson v. General Mutual Ins. Co.,* 24 N.Y.2d 42 (1969) .......................................... 22

*Kamyr, Inc. v. St. Paul Surplus Lines Ins. Co.,* 152 A.D.2d 62, 547 N.Y.S.2d 964
(3d Dept. 1989) .................................................................................................... 11

*Kreger Truck Renting Co. v. American Guarantee & Liability Ins. Co.,*
213 A.D.2d 453, 623 N.Y.S.2d 623 (2nd Dept. 1995) ...................................................... 12

*Matsushita Elec. Induc. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986) .................. 10

*Mighty Midgets, Inc. v. Centennial Ins. Co.,* 47 N.Y.2d 12 (1979) .................................. 21, 22

*Mount Vernon Fire Ins. Co. v. Harris,* 193 F. Supp. 2d 674, 680 (E.D.N.Y. 2002) .................. 18

*Norfolk & Dedham Mut. Fire Ins. Co. v. Petrizzi,* 121 A.D.2d 276, 278,
503 N.Y.S.2d 51, denied 68 N.Y.2d 611, 502 N.E.2d 1007, 510 N.Y.S.2d 1025
(1st Dep't 1986) .................................................................................................... 18

*Paramount Ins. Co. v. Rosedale Gardens, Inc.,* 293 A.D.2d 235, 743 N.Y.S.2d 59
(1st Dept. 2002) .................................................................................................... 13

*Progressive Casualty Ins. Co. v. Yodice,* 276 A.D.2d 540, 714 N.Y.S.2d 715
(2d Dept. 2000) .................................................................................................... 11, 12

*Pub. Serv. Mut. Ins. Co. v. Harlen House Assocs.,* 7 A.D.3d 421, 422, 423
(1st Dep't 2004) ................................................................................................ 18, 19, 20, 21

*Public Service Mutual Ins. Co. v. Hollander,* 228 A.D.2d 283, 644 N.Y.S.2d 214 .................... 13

*Security Mutual Ins. Co. of New York v. Acker-Fitzsimons Corp.,* 31 N.Y.2d 436,
340 N.Y.S.2d 902, 293 N.E.2d 76 (1972) ............................................................... 11, 12, 13

*SSBSS Realty Corp. v. Public Service Mutual Ins. Co.,* 253 A.D.2d 583,
677 N.Y.S.2d 136 (1st Dept. 1998) ............................................................................ 12

*Travelers Ins. Co. v. Volmar Construction Co.,* 2002 WL 31723191 (1st Dept. 2002) ............... 13

*U.S. Delivery Systems, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA,*
265 A.D.2d 402, 696 N.Y.S.2d 502 (2d Dept. 1999) ........................................................ 11

*White v. City of New York,* 81 N.Y.2d 955, 598 N.Y.S.2d 759, 615 N.E.2d 216 (1993) ........ 12, 13

*Wilczak v. Ruda & Capozzi, Inc.,* 203 A.D.2d 944, 611 N.Y.S.2d 73, 74 (4th Dep't 1994). ........ 19

A

**Rules**

*Fed R. Civ. P. 56(c)* ........................................................................................................ 10

*McKinney's Business Corp. Law §306(b)(1)* ...................................................... 16, 17

2741024.1

Defendant GREENWICH INSURANCE COMPANY, ("Greenwich") by its attorneys, Wilson, Elser, Moskowitz, Edelman & Dicker LLP, submits this Memorandum of Law in support of its motion for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

This memorandum of law is submitted on behalf of Greenwich, in support of its motion for summary judgment which seeks an order to be entered for the following relief:

(a) Pursuant to Federal Rules of Civil Practice 56(c), dismissing the complaint of plaintiff, 105 STREET ASSOCIATES, LLC ("105 Street"), and

(b) For such other and further relief as this Court may deem just and necessary.

## FACTUAL BACKGROUND

The declaratory judgment action by 105 Street seeks coverage for defense and indemnification of the underlying action, ( "Primary Action") a personal injury lawsuit brought against *inter alia*, 105 Street, by Richard Conrad ("Conrad"). The Primary Action by Conrad arises from injuries allegedly sustained while Conrad was working for a sub-contractor, Jem Erectors, Inc. ("Jem Erectors") at the premises owned by 105 Street located at 235-237 East 105th Street, New York, New York (hereinafter referred to as the "Subject Premises") on July 2, 2002.[1]

The three defendants in the Primary Action are: 105 Street; BFC Construction Corp. ("BFC Construction"); and BFC Partners, L.P. ("BFC Partners"). BFC Construction was the general contractor for the Subject Premises and its principals were Brandon Baron, Peter

---

[1] All references to the Conrad Summons and Complaint in the Primary Action will be made as ("Conrad Complt. ¶_"). A copy of the Conrad Complaint is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "A."

1

Ferrara, and Donald Capoccia.  It is unclear as to the role that BFC Partners played in the Primary Action.  However, it should be noted that the "BFC" in both BFC Construction and BFC Partners stand for the first letter of the last name of each principal, Baron, Ferrara and Capoccia. Moreover, the principals of 105 Street were Baron, Ferrara, and Capoccia as well.[2] (B. Baron Dep. pg. 12, line 17, Exhibit "B").

Additionally, all three named defendants in the Primary Action are located at the same business address.  As of March 26, 2007, according to the New York State Department of State, Division of Corporations, all three defendants in the Primary Action have the same designated agent and address for service of process: c/o Donald Capoccia, 2226 1st Avenue, New York, New York, 10029.[3]

At the time of the Conrad occurrence, 105 Street was insured by Greenwich under Commercial General Liability policy number WGG 5001058 (the "Policy")[4] for the policy period of April 13, 2002 to April 15, 2003.  The Certificate of Insurance for 105 Street[5] stated the named insured as:

> 105 Street Associates
> c/o BFC Construction Corp.
> 2226 1st Avenue
> New York, NY 10029

[Certificate, Exhibit "E"]

---

[2] All references to the December 7, 2006 deposition transcript of Brandon Baron will be made as (B. Baron Dep. Pg_, Line __.) A copy of the December 7, 2006 B. Baron transcript is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "B".
[3] All references to the 105 Street, BFC Partners, and BFC Construction New York State Department of State Division of Corporations entity information will be made as ("NYS DOS Info"). Copies of the NYS DOS Info are annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "C."
[4] All references to the Policy will be made as (Pol. Section __). A copy of the Policy is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "D."
[5] All references to the Certificate of Insurance for 105 Street will be made as ("Certificate"). A copy of the Certificate is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "E."

2741024.1

Under the heading, "COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY," the Policy provides:

1.    Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

b.    This insurance applies to "bodily injury" and "property damage" only if:

    (1)    The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

    (2)    The "bodily injury" or "property damage" occurs during the policy period.

c.    Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury".

The Policy contains the following definitions:

    (3)    "Bodily Injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time

    (13)    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

As a condition precedent to coverage, the Policy requires 105 Street to provide Greenwich with notice of an "occurrence," which may result in a claim, as soon as practicable. Specifically, the relevant portions of the Policy provide as follows:

**"SECTION IV – COMMERCIAL GENERAL LIABILITY CONDITIONS":**

2.    <u>**Duties In The Event Of Occurrence, Offense, Claim Or Suit**</u>

3

a.    You must see to it that **we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim**. To the extent possible, notice should include:

      (1)    How, when and where the "occurrence" or offense took place;

      (2)    The names and addresses of any injured persons and witnesses; and

      (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

b.    If a claim is made or "suit" is brought against any insured, you must:

      (1)    Immediately record the specifics of the claim or "suit" and the data received; and

      (2)    Notify us as soon as practicable. **You must see to it that we receive written notice of the claim or "suit" as soon as practicable**.

c.    You and any other involved insured must:

      (1)    Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

      (2)    Authorize us to obtain records and other information;

      (3)    Cooperate with us in the investigation or settlement of the claim or defense against the "suit";...

(Pol. Section IV, Exhibit "D") [*emphasis added*].

Accordingly, in order for coverage under the Policy to attach, 105 Street was required to provide notice to Greenwich of the occurrence as soon as practicable or once 105 Street, its agents and/or employees, were aware of the occurrence.

On August 6, 2002, Conrad J. Benedetto, counsel for Conrad in the Primary Action, wrote via certified mail to BFC Construction advising it of Conrad's recent filing of a

4

worker's compensation claim in connection with an alleged accident.[6]    Specifically, Mr. Benedetto states in said letter that the Conrad claim arises from a July 2, 2002 accident at 105th Street between 2nd and 3rd Avenue. (August 6, 2002 letter, Exhibit "F"). The Subject Premises, owned by 105 Street is located at 105th Street between 2nd and 3rd Avenues.[7]    Additionally, Mr. Benedetto requested that BFC Construction forward the August 6, 2002 letter to its liability carrier. At that time, 105 Street failed to notify Greenwich of Conrad's alleged accident and subsequent worker's compensation claim, typical predicates to personal injury lawsuits.

Moreover, on September 9, 2002, Mr. Benedetto again wrote via certified mail to BFC Construction with a "second request" that it forward the aforementioned letter to its liability carrier and informing it of the potential lawsuit.[8]    Again, notwithstanding the fact that 105 Street owned the Subject Premises cited in both the August 6, 2002 and September 9, 2002 letters as where the Conrad claim occurred, 105 Street failed to forward the claim to Greenwich pursuant to the Policy agreement (Pol. Section IV, Exhibit "D").

On April 20, 2004, Conrad served a summons and complaint naming 105 Street, BFC Construction, and BFC Partners as defendants, on the Secretary of State in connection with the July 2, 2002 accident.[9]    On the same day, the Secretary of State forwarded the Conrad summons and complaint via certified mail to 105 Street, BFC Construction, and BFC Partners.[10]

---

[6] All references to the August 6, 2002 letter from Conrad J. Benedetto to BFC Construction will be made as ("August 6, 2002 letter"). A copy of the August 6, 2002 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "F."

[7] All references to the March 26, 2007 Google Map of 235 105th Street, New York, New York, will be made as ("Google Map"). A copy of the Google Map is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "G."

[8] All references to the September 9, 2002 letter from Conrad J. Benedetto to BFC Construction will be made as ("September 9, 2002"). A copy of the September 9, 2002 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "H."

[9] All references to the Affidavit of Service by the Secretary of State, dated April 20, 2004, will be made as ("AOS"). A copy of the Affidavit of Service is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "I."

[10] All references to the Receipt for Service dated April 20, 2004, will be made as ("Receipt"). A copy of the receipt is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "J."

2741024.1

Furthermore, the Service of Process Unit, Division of Corporations, confirmed delivery and produced the signed return receipt by Estelle Rodriguez, the employee responsible for forwarding claims of the business entities residing at 2226 1st Avenue, New York, New York.[11] However, despite the fact that 105 Street was a first-named defendant on the summons and complaint signed for by Estelle Rodriguez on April 26, 2004, 105 Street again failed to notify Greenwich of the Conrad lawsuit until August 18, 2004.

On July 8, 2004, counsel for Conrad wrote to Donald Capoccia, the registered agent for service of process and partner in all three of the named defendants in the Primary Action.[12] The July 2004 letter notified BFC Construction that it was in default as it had not interposed an answer or appeared in connection with the Conrad action. (July 8, 2004 letter). Additionally, counsel enclosed a courtesy copy of the summons and complaint and again directed BFC Construction to forward all documents to its liability carrier. (July 8, 2004 letter).

Nevertheless, according to Steven Potolsky, owner of North Shore Risk Management (hereinafter "North Shore"), the insurance broker for 105 Street, the July 8, 2004 letter was not forwarded to North Shore until July 19, 2004.[13] At that time, Mr. Potolsky was inexplicably confused as to whether 105 Street was covered by insurance for the Primary Action, and thus failed to forward the claim to Greenwich for another month.[14] (Potolsky Summary, Exhibit "M"). In fact, Mr. Potolsky conceded that he did not immediately forward the July 8,

---

[11] All references to the March 28, 2007 letter and annexed copy of the April 26, 2004 certified mail return receipt, from Service of Process Unit, Division of Corporations, will be made as ("March 28, 2007 letter"). A copy of the March 28, 2007 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "K."

[12] All references to the July 8, 2004 letter from Kelner & Kelner to Donald Capoccia will be made as ("July 8, 2004 letter"). A copy of the July 8, 2004 letter is annexed to the declaration in support, dated April 13, 2007, as Exhibit "L."

[13] All references to the Steven Potolsky summarization of events will be made as ("Potolsky Summary"). A copy of the Potolsky summary is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "M."

[14] All references to the Steven Potolsky deposition transcript will be made as ("Potolsky Dep. Pg_ Line _."). A copy of the Potolsky transcript is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "N."

6

2004 letter to Greenwich because it was an "oversight" that was "corrected...a number of weeks later." (Potolsky Dep., pg. 77, lines 12-13, Exhibit "N").

Specifically, Mr. Potolsky was initially confused as to whether 105 Street had coverage for the Conrad claim and as such, failed to immediately notify Greenwich of the late claim.[15] Two years prior, on or about September 18, 2002, Ms. Rodriguez had forwarded Mr. Potolsky the August 6, 2002 and September 9, 2002 letters from Mr. Benedetto informing BFC Construction of the Conrad worker's compensation claim. (July 26, 2004 letter, Exhibit "O"). Among the papers forwarded by Ms. Rodriguez to Mr. Potolsky was a Certificate of Insurance for Jem Erectors, the subcontractor Conrad was employed by at the time of the alleged accident. (Potolsky Dep., pg. 33, lines 22-25, Exhibit "N"). Mr. Potolsky claims that the confusion concerning coverage stemmed from Jem Erector's Certificate of Insurance because it stated that the coverage provided was for a project on Madison Avenue, not for 105th Street, the Subject Premises. (Potolsky Dep., pg. 34, lines 19-23, Exhibit "N"). Due to his confusion, Mr. Potolsky phoned Ms. Rodriguez to inquire as to the correct location of the Conrad accident. (Potolsky Dep., pg. 35, lines 7-9, Exhibit "N"). At that time, Mr. Potolsky claims that Ms. Rodriguez told him that she had no further information to give him other than what was already forwarded to North Shore. (Potolsky Dep., pg. 35, lines 16-18, Exhibit "N"). Despite being the broker for both 105 Street and BFC Construction, and the individual responsible for securing insurance coverage for the Subject Premises, Mr. Potolsky failed to forward the August 6, 2002 and September 9, 2002 letters to Greenwich in a timely fashion.

Two years later when Mr. Potolsky received the July 8, 2004 letter from 105 Street he was again confused and sent the paperwork back to Ms. Rodriguez. (July 24, 2004

---

[15] All references to the July 26, 2004 letter from Steven Potolsky to Estelle Rodriguez, will be made as ("July 26, 2004 letter"). A copy of the July 26, 2004 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "O."

7

letter, Exhibit "O"). Again, despite being the broker, Mr. Potolsky believed that 105 Street was not covered by insurance for the Conrad claim. (July 24, 2004 letter, Exhibit "O"). Almost another month went by until Mr. Potolsky realized his ongoing mistake and forwarded the file on to Greenwich.[16]

Accordingly, more than two years after it occurred and four months after the lawsuit was served, Greenwich was not notified of the accident until the late afternoon of August 18, 2004[17]. (Barnaba Aff., ¶3). Michael Barnaba, a Senior Claims Consultant for XL Insurance, the claim administrator for Greenwich, handled the Conrad claim.[18] (Barnaba Aff., ¶1). After receiving the notice of claim from North Shore, on August 20, 2004, Mr. Barnaba requested from Ms. Weiner of North Shore, among other things, the summons and complaint in the Conrad action (Barnaba Aff. ¶3). August 20, 2004 was the first time that Greenwich was provided with the summons and complaint that was initially served on 105 Street **four months** prior on April 20, 2004. (Barnaba Aff., ¶3). Additionally, it should be noted that many documents requested from 105 Street remain outstanding to date. (Barnaba Aff., ¶5).

Specifically, on August 25, 2004, Mr. Barnaba faxed Estelle Rodriguez, an employee and contact for 105 Street, with requests for various documents necessary to properly investigate the newly submitted Conrad claim.[19] Among other things, Mr. Barnaba requested: copies of insurance certificates of 105 Street and BFC Construction; contracts between 105

---

[16] All references to the August 18, 2004 letter from Steven Potolsky to Donald Schneider, will be made as ("August 18, 2004 letter"). A copy of the August 18, 2004 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "P."

[17] All references to the Affidavit of Michael Barnaba, sworn to on April 5, 2007, will be made as ("Barnaba Aff. ¶__). A copy of the Barnaba Aff. is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth.

[18] All references to the December 29, 2006 Michael Barnaba deposition transcript will be made as ("Barnaba Dep., pg.__, line __). A copy of the Barnaba transcript is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "Q.

[19] All references to the August 25, 2004 fax from Mr. Barnaba to Ms. Rodriguez will be made as ("August 25, 2004 fax"). A copy of the August 25, 2004 fax is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "R."

8

Street and BFC Construction; contracts between 105 Street or BFC Construction and the subcontractor, Jem Erectors, Inc.; copies of corporate filings identifying the principals/members of 105 Street; advisement as to whether 105 Street had an "on-site representative" for the duration of the construction project; and copies of any and all incident/claim reports, daily project logs, etc. (Barnaba Aff., ¶5). To date, a number of the aforementioned documents remain outstanding. (Barnaba Aff., ¶5). Significantly, 105 Street failed to provide any copies of an incident/claim report, daily project log, or any documentation pertaining to the Conrad incident. (Barnaba Aff., ¶5).

After receiving notice from North Shore, Greenwich immediately began investigating the Conrad claim and retained Wilson, Elser, Moskowitz, Edelman & Dicker, LLP (hereinafter "Wilson Elser") as coverage counsel to confirm that 105 Street had not notified Greenwich in a timely fashion of the Primary Action and/or the Conrad incident (Barnaba Aff., ¶4). While Wilson Elser was analyzing the coverage issue, to the extent that 105 Street provided contracts with other entities involved in the construction project to Greenwich, Mr. Barnaba began sending out tender letters. (Barnaba Aff., ¶6). As a result, at least one of the tenders was denied based on late reporting. (Barnaba Aff., ¶6).

Upon completion of its coverage analysis, Wilson Elser submitted a coverage opinion to Greenwich recommending a declination of coverage for the Conrad action as a result of late notice.[20] (Barnaba Aff.,¶8). Specifically, Wilson Elser emphasized that 105 Street was served with the summons and complaint on April 20, 2004, over four months prior to submitting the claim to Greenwich. (Barnaba Aff.,¶8).

---

[20]   All references to the September 10, 2004 letter from Wilson Elser to XL Insurance, redacted pursuant to the November 7, 2006 Court Order, will be made as ("September 10, 2004 letter"). A copy of the September 10, 2004 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "S."

9

On September 15, 2004, Ed Walsh, Assistant Vice President and Claim Manager for XL Insurance, officially authorized Mr. Barnaba to disclaim coverage for the Conrad action to 105 Street due to late notice (Barnaba Aff., ¶9). A mere five days later, on September 20, 2004 a denial letter based on Wilson Elser's opinion of late notice was served on 105 Street.[21] (Barnaba Aff., ¶10).

On or about October 24, 2005, 105 Street served a summons and complaint on Greenwich, seeking defense and indemnification for the Primary Action in the Supreme Court of the State of New York, New York County.[22] In response, pursuant to 28 USCA 1332, on or about November 21, 2005, Greenwich filed a notice of removal in the United States District Court for the Southern District of New York.[23] The United States District Court for the Southern District removed the action, and Greenwich interposed an Answer on or about December 16, 2005.[24]

## ARGUMENT

This Court should grant summary judgment to defendant Greenwich as there are no genuine issues of material fact, and thus Greenwich is entitled to judgment as a matter of law dismissing the complaint. See *Fed R. Civ. P. 56(c); Matsushita Elec. Induc. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). To create an issue for trial, there must be sufficient evidence in the record to support a jury verdict in the Plaintiff's favor. *Anderson v. Liberty*

---

[21] All references to the September 20, 2004 denial letter from Wilson Elser on behalf of Greenwich to 105 Street will be made as ("September 20, 2004 letter"). A copy of the September 20, 2004 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "T."

[22] All references to the 105 Street Summons and Complaint against Greenwich will be made as ("Complt. ¶__"). A copy of the Complaint is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "U."

[23] All references to the Notice of Removal will be made as ("Removal Notice"). A copy of the Removal Notice is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "V."

[24] All references to the Answer will be made as ("Answer"). A copy of the Answer is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "W."

10

*7Lobby, Inc.,* 477 U.S. 242, 249 (1986). In the case at bar, it is clear that 105 Street cannot proffer sufficient evidence to defeat Greenwich's motion for summary judgment.

I.   **NOTICE TO THE BROKER IS NOT NOTICE TO GREENWICH**

The Policy clearly requires notice to Greenwich as a condition precedent to coverage. Courts have historically held that an insurance broker is the agent of the insured, not of the insurer. *2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282, 707 N.Y.S.2d 59 (1st Dept. 2000); *Progressive Casualty Ins. Co. v. Yodice*, 276 A.D.2d 540, 714 N.Y.S.2d 715 (2d Dept. 2000). Notice to the insurance broker is not notice to the liability insurer. *Security Mutual Ins. Co. of New York v. Acker-Fitzsimons Corp.*, 31 N.Y.2d 436, 340 N.Y.S.2d 902, 293 N.E.2d 76 (1972); *Incorporated Village of Pleasantville v. Calvert Ins. Co.*, 204 A.D.2d 689, 612 N.Y.S.2d 441 (2d Dept. 1994); *Kamyr, Inc. v. St. Paul Surplus Lines Ins. Co.*, 152 A.D.2d 62, 547 N.Y.S.2d 964 (3d Dept. 1989). Only if there is some evidence of action on the insurer's part will a broker be held to have acted as the insurer's agent. *U.S. Delivery Systems, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 265 A.D.2d 402, 696 N.Y.S.2d 502 (2d Dept. 1999).

Contrary to the assertion that 105 Street first received notice of the Conrad lawsuit in "mid-July"[25], its broker North Shore did not notify Greenwich of the occurrence until late on August 18, 2004. (Barnaba Aff., ¶3). Moreover, Greenwich could not properly investigate the Conrad claim until at earliest, August 20, 2004, after Greenwich requested the Conrad summons and complaint, as well as the other documents necessary to properly investigate the Primary Action. (Barnaba Aff., ¶3). Despite being requested, not all of the demanded documents by Greenwich were produced by 105 Street. (Barnaba Aff., ¶5). Thus, 105 Street cannot claim

---

[25]   All references to the March 20, 2007 letter to the Court by counsel for plaintiff, Donald Schneider, will be made as ("March 20, 2007 letter"). A copy of the March 20, 2007 letter is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "X."

2741024.1

thatit notified Greenwich prior to August 18, 2004, because notice to North Shore, its broker, was not notice to Greenwich, its liability insurer. (Barnaba Aff., ¶2,). *2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282, 707 N.Y.S.2d 59 (1st Dept. 2000); *Progressive Casualty Ins. Co. v. Yodice*, 276 A.D.2d 540, 714 N.Y.S.2d 715 (2d Dept. 2000).

Section IV of the Policy, entitled Commercial General Liability Conditions, specifically, paragraph 2(a) of that section provides as follows:

> You must see to it that **we** are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. [emphasis added] (Exhibit "D").

Further, the second paragraph of the first page of the Policy specifically provides that, "[t]he words 'we', 'us' and 'our' refer to the company providing this insurance." (Exhibit "D"). It cannot be disputed that Greenwich is the company that provided insurance to 105 Street. Further, North Shore was not an agent of Greenwich, and thus 105 Street and its agents failed to comply with the notice conditions of the policy as notice was only provided to its broker prior to August 18, 2004, not to Greenwich.

## II.    105 STREET FAILED TO COMPLY WITH THE NOTICE PROVISION OF THE POLICY AND GREENWICH PROPERLY AND TIMELY DENIED COVERAGE

It is well settled that compliance with the terms of an insurance contract is a condition precedent to coverage. *White v. City of New York*, 81 N.Y.2d 955, 598 N.Y.S.2d 759, 615 N.E.2d 216 (1993); *Security Mutual Ins. Co. Of New York v. Acker-Fitzsimons Corp.,* supra; *SSBSS Realty Corp. v. Public Service Mutual Ins. Co.*, 253 A.D.2d 583, 677 N.Y.S.2d 136 (1st Dept. 1998) (three-month delay in notifying insurer of trip and fall unreasonable as a matter of law); *Kreger Truck Renting Co. v. American Guarantee & Liability Ins. Co.*, 213 A.D.2d 453, 623 N.Y.S.2d 623 (2nd Dept. 1995).

12

The requirement that notice be given "as soon as practicable" is a standard provision in liability policies that has been interpreted to require notice within a reasonable time under the circumstances. *Travelers Ins. Co. v. Volmar Construction Co.*, 2002 WL 31723191 (1st Dept. 2002). Absent a showing of legal justification, the failure to comply with the notice condition vitiates coverage. *Allcity Ins. Co. v. Jimenez*, 78 N.Y.2d 1054, 576 N.Y.S.2d 87, 581 N.E.2d 1342. An insurer need not show prejudice to sustain a coverage disclaimer. *Paramount Ins. Co. v. Rosedale Gardens, Inc.*, 293 A.D.2d 235, 743 N.Y.S.2d 59 (1st Dept. 2002). Instead, the burden is on the insured to demonstrate reasonableness for the delay. *Public Service Mutual Ins. Co. v. Hollander*, 228 A.D.2d 283, 644 N.Y.S.2d 214, citing *Security Mutual Ins. Co. of New York v. Acker-Fitzsimons Corp.*, supra. As such, an insurance carrier may disclaim coverage under an insurance contract where an insured fails to provide notice of a potential claim as soon as practicable. *White v. City of New York*, 81 N.Y.2d 955, 598 N.Y.S.2d 759, 615 N.E.2d 216 (1993).

It is undisputed that the Policy, which is the subject of this litigation, has a notice requirement. Specifically, Coverage "A" of Section I of the Policy entitled, "Bodily Injury and Property Damage Liability," provides, in pertinent part, as follows:

### 1. Insuring Agreement

a.    We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

13

Furthermore, Section IV of the Policy entitled, "Commercial General Liability Conditions," in pertinent part, provides as follows:

> 2.    Duties In The Event Of Occurrence, Offense, Claim Or Suit
>
> a.    You must see to it that we are notified <u>as soon as practicable</u> of an "occurrence" or an offense, which may result in a claim.  To the extent possible, notice should include: (emphasis added)
>
> (1)    How, when and where the "occurrence" or offense took place;
>
> (2)    The names and addresses of any injured persons and witnesses; and
>
> (3)    The nature and location of any injury or damage arising out of the "occurrence" or offense.

Section V of the Policy provides the following definitions:

> 3.    "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.
>
> 13.    "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

As can be seen from the above referenced policy language, 105 Street was required to give Greenwich notice of an occurrence "as soon as practicable." (Pol. Section IV, Exhibit "D").

In the instant declaratory judgment action, the incident in the Primary Action occurred on July 2, 2002. (Conrad Complaint ¶48, Exhibit "A").  Greenwich did not receive notice until at earliest, August 18, 2004, over two years after the occurrence, and four months after the lawsuit was served, despite the fact that 105 Street could have given notice on at least the following occasions:

- July 2, 2002 – Date of Loss

14

- August 6, 2002 – Notice of Worker's Compensation Claim

- September 9, 2002 – 2nd Notice of Worker's Compensation Claim

- April 20, 2004 – Summons & Complaint Served

- July 8, 2004 – Notice of Default of Primary Action

Thus, 105 Street did not notify Greenwich of the occurrence "as soon as practicable."

(Pol. Section IV, Exhibit "D"). 105 Street's two year delay in notifying Greenwich of the

Conrad incident was unreasonable given the fact that 105 Street was aware of the incident given

the close business, legal, and insurance-related relationship between BFC Construction and 105

Street. The August 6, 2002 and September 9, 2002 letters advising Plaintiff of the Conrad

worker's compensation claim, including the date and location of the claimed occurrence, was

sufficient notice of an occurrence *which may result in a claim.* (August 6, 2002 letter, Exhibit

"F"; September 9, 2002 letter, Exhibit "H"; and Pol. Section IV, Exhibit "D").

Moreover, if anyone was in the position to possess knowledge of the business entities that

would be affected by the Conrad claim, it would be an employee of BFC Construction. First,

BFC Construction is cited as the corporation in "care of" (c/o) of 105 Street on the Certificate of

Insurance. (Certificate, Exhibit "E."). Second, all three of the named defendants in the Primary

Action are housed in the same 3,000 square foot business space[26]: 2226 First Avenue, New York,

New York. (G. Baron Dep. pg. 17, line 17, Exhibit "Y."). In fact, there were approximately only

five (5) or six (6) employees in the entire aforementioned office space[27]. (Richards Dep., pg. 48,

line 19, Exhibit "Z"). Third, Donald Capoccia is the agent of service from the Secretary of State

---

[26] All references to the January 11, 2007 deposition transcript of Greg Baron will be made as (G. Baron Dep. Pg_ Line __.) A copy of the January 11, 2007 G. Baron transcript is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "Y".

[27] All references to the May 24, 2006 deposition transcript of Brad Richards will be made as (Richards Dep. Pg_ Line __.) A copy of the May 24, 2006 Richards transcript is annexed to the declaration in support, dated April 13, 2007, by Glenn J. Fuerth as Exhibit "Z".

15

for all three of the named defendants in the Primary Action. (NYS DOS Info, Exhibit "C").

Fourth, with regard to BFC Construction, the "BFC" stood for "Baron, Ferrara, and Capoccia."

All three of the principals of BFC Construction, were also the partners of 105 Street. (B. Baron

Dep. pg. 12, line 17, Exhibit "B").

Of significant note, all three of the named defendants share employees, including Estelle

Rodriguez, one of the employees responsible for opening the mail for both BFC Construction

and 105 Street. (B. Baron Dep., p. 23, line 15, Exhibit "B"). In addition to opening the mail,

Ms. Rodriguez is responsible for sending Notice of Claims for personal injuries and forwarding

insurance-related documents to North Shore, the insurance broker for 105 Street and BFC

Construction. (B. Baron Dep., p. 24, line 19, Exhibit "B"). In fact, Ms. Rodriguez was the

employee who signed the certified mail return receipt from the Secretary of State for the April

20, 2004 Conrad summons and complaint (March 28, 2007 letter, Exhibit "K"). In addition to

the foregoing, Ms. Rodriguez was identified as the contact person for 105 Street when

Greenwich required additional information to investigate the Conrad claim. (Barnaba Aff., ¶5,

7). Accordingly, 105 Street cannot claim that notice to BFC Construction of the Conrad incident

(occurring at the premises owned by 105 Street) and lawsuit was not notice to 105 Street as well.

In addition to claiming that 105 Street was not aware of the Conrad claim prior to the

initiation of the Conrad lawsuit, 105 Street also claims that it did not receive the April 20, 2004

summons and complaint until "mid-July." (March 20, 2007 letter, Exhibit "X"). However,

service of process on a domestic corporation is deemed complete when the Secretary of State is

so served, and thus 105 Street was served on April 20, 2004. (AOS, Exhibit "I"). *McKinney's

Business Corp. Law §306(b)(1).*

In *26 Warren Corp. v. Aetna Casualty and Surety Company*, 253 A.D.2d 375 (1st Dept. 1998), Plaintiff-insured failed to timely notify its insurer of a lawsuit because it claimed that it never received a copy of the summons and complaint from the Secretary of State. . Plaintiff-insured's policy notice provision explicitly stated that a condition precedent to coverage was that, "the insured shall immediately forward to [the insurer] every demand, notice, summons or other process received by him or his representatives." *Id*. The Court held that the insurer's provision was "devoid of ambiguity" and that the receipt of service of the summons and complaint by the Secretary of State "constituted receipt by a representative within the meaning of the policy." *Id*. at 376.

On April 20, 2004, 105 Street was properly served through the Secretary of State in accordance with New York State Business Law. *McKinney's Business Law §306(b)(1)*, (AOS, Exhibit "I"). Also on April 20, 2004, the Secretary of State immediately mailed the Conrad summons and complaint via certified mail to Donald Capoccia, 2226 First Avenue, New York, New York, 105 Street's designated agent and address for service of process. (Receipt of Service, Exhibit "J", and NYS DOCS Info, "Exhibit "C"). Additionally, a receipt of the certified mail, dated April 26, 2004, was returned to the Secretary of State by the U.S. Postal Service, signed by Estelle Rodriguez. (March 28, 2007 letter, Exhibit "K"). It should be noted that 105 Street is the first-named defendant on the Complaint, and yet Ms. Rodriguez still failed to forward the Complaint to Greenwich. (Complt., Exhibit "U"). However, regardless of 105 Street's assertions that it never received the Conrad summons and complaint, 105 Street, as a matter of law, was served on April 20, 2004 when the Secretary of State was served. *26 Warren Corp. v. Aetna Casualty and Surety Company*, 253 A.D.2d 375. Accordingly, 105 Street breached the

17

Policy notice provisions when it failed to notify Greenwich of the Conrad action in a timely manner.

Greenwich was therefore well within its rights to disclaim coverage, as compliance with the notice provision of the policy is a condition precedent to defense and indemnification. In light of 105 Street's failure to comply with the notice provision of the policy, Greenwich properly and timely disclaimed coverage as a matter of law.

## III.    GREENWICH TIMELY DISCLAIMED COVERAGE AND IS NOT OBLIGATED TO INDEMNIFY 105 STREET IN THE PRIMARY ACTION

Under New York law, an insurer is not obligated to rely upon allegations in a complaint to determine coverage, but rather insurers are urged to conduct investigations into coverage to avoid piecemeal disclaimers. See *Pub. Serv. Mut. Ins. Co. v. Harlen House Assocs.*, 7 A.D.3d 421, 423 (1st Dep't 2004) citing *Norfolk & Dedham Mut. Fire Ins. Co. v. Petrizzi*, 121 A.D.2d 276, 278, 503 N.Y.S.2d 51, denied 68 N.Y.2d 611, 502 N.E.2d 1007, 510 N.Y.S.2d 1025 (1st Dep't 1986) (holding that it is reasonable for an insurer to investigate before deciding to disclaim coverage. This allows the disclaimer to be based on 'concrete evidence' and avoids 'piecemeal disclaimers'); see also *2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282 (1st Dep't 2000) (holding that investigation into claims is preferred to piecemeal disclaimers); see also *Mount Vernon Fire Ins. Co. v. Harris*, 193 F. Supp. 2d 674, 680 (E.D.N.Y. 2002) (holding that "forcing an insurer to issue 'piecemeal denials of coverage would frustrate [the insurer's] right to investigate claims'"); see also *DiGuglielmo v. Travelers Prop. Cas.*, 6 A.D.3d 344, 346 (1st Dep't 2004) citing *2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282 (1st Dep't 2000) (holding that "an insurer is not required to disclaim on timeliness grounds before conducting a prompt, reasonable investigation into other possible grounds for disclaimer; in fact,

18

a 'reasonable investigation is preferable to piecemeal disclaimers" especially after reporting the incident to the insurer seven months after its occurrence); see also *Wilczak v. Ruda & Capozzi, Inc.*, 203 A.D.2d 944, 611 N.Y.S.2d 73, 74 (4th Dep't 1994).

Greenwich was well within its rights, and in fact encouraged by New York law, to conduct its investigation into 105 Street's claim. *2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282, 283 (1st Dep't 2000), citing *First Financial Insurance Co.*, 1 N.Y.3d 64, 69 (N.Y. 2003) citing *Allcity Ins. Co. v. Jimenez*, 78 N.Y.2d 1054, 1056, 581 N.E.2d 1342, 576 N.Y.S.2d 87 (N.Y. 1991) citing *Hartford Ins. Co. v. County of Nassau*, 46 N.Y.2d 1028, 416 N.Y.S.2d 539, 389 N.E.2d 1061 (N.Y. 1979). As the summons and complaint could not facially confirm when and who first became aware of the incident, but did allege that the incident occurred in July of 2002, Greenwich was justified in conducting an investigation into 105 Street's potential late notice. Additionally, the summons and complaint was dated April 20, 2004, but Greenwich was not notified until August 18, 2004. (Barnaba Aff. ¶3). In order to gather accurate information, an investigation was essential. *2540 Associates, Inc. v. Assicurazioni Generali, S.P.A.*, 271 A.D.2d 282, 283 (1st Dep't 2000); *Pub. Serv. Mut. Ins. Co. v. Harlen House Assocs.*, 7 A.D.3d 421 (1st Dep't 2004).

Two days later, on August 20, 2004, Michael Barnaba, a Greenwich claims analyst, emailed North Shore, the broker for 105 Street, requesting additional documentation concerning the Conrad claim, including a request for the summons and complaint which had not been provided to Greenwich. (Barnaba Aff. ¶3). Although North Shore immediately forwarded the summons and complaint, a number of documents demanded from 105 Street remain outstanding to this day. (Barnaba Aff. ¶5).

19

Five days later, on August 25, 2004, Greenwich retained coverage counsel to confirm the untimeliness of 105 Street's notification to Greenwich of the Conrad claim. (Barnaba Aff. ¶4). Sixteen days later, on September 10, 2004, after a thorough investigation, Wilson Elser opined that coverage should be denied to 105 Street on the basis of late notice. (Barnaba Aff. ¶8). Five days thereafter, Ed Walsh, Assistant Vice President and Claim Manager for XL Insurance, authorized Mr. Barnaba to disclaim coverage. (Barnaba Aff. ¶9). A mere five days later, Greenwich properly and timely disclaimed coverage to 105 Street, only 30 days after receiving the summons and complaint in the Primary Action. (Barnaba Aff. ¶10).

It should be noted that despite being the broker for both 105 Street and BFC Construction, and the individual responsible for securing insurance coverage for the Subject Premises, Mr. Potolsky required an entire month to investigate and comprehend the complexity and confusion surrounding the Conrad claim. (August 18, 2004 letter, Exhibit "P"). In contrast, Greenwich was able to investigate, secure coverage counsel, send tender letters, and disclaim coverage without all the relevant documentation within a month of receiving the Conrad summons and complaint. (September 20, 2004 letter, Exhibit "T").

In *Pub. Serv. Mut. Ins. Co. v. Harlen House Assocs.*, 7 A.D.3d 421 (1st Dep't 2004), the insureds owned and managed an apartment building at which a tenant was injured by a gunshot. The policy provision governing notice to the insured was nearly identical to that of the Greenwich Policy. *Pub. Serv. Mut. Ins. Co. v. Harlen House Assocs.*, 7 A.D.3d 421 (1st Dep't 2004). The Court held that the insureds had to notify the insurer of a possible claim as soon as practicable, and its delay, nearly seven months, was unreasonable as a matter of law as they had information shortly after the incident indicating the tenant might have been seriously injured. Id. at 422. The Court further held, as a matter of law, that the insurer did not unreasonably delay

20

disclaiming coverage as it properly conducted an investigation into the insured's possible late notice. Id. at 422, 423. Specifically, the Court held that the insurer did not have enough information to disclaim coverage until it received the investigative report. Id. at 423. Accordingly, the court held that the insurer's disclaimer, which was issued only 27 days after it learned of the grounds for disclaimer, was timely as a matter of law. Id.

In the case at hand, Greenwich did not have sufficient information in the materials provided in the notice of claim to disclaim coverage. (Barnaba Aff. ¶7). Greenwich was therefore justified in conducting its investigation into the potential violation of the notice provision of the Policy by 105 Street. Accordingly, on or about September 10, 2004, when Greenwich received confirmation from Wilson Elser supporting the declination of coverage, this was the date upon which the time for Greenwich to disclaim coverage began to accrue (Barnaba Aff. ¶8); *Pub. Serv. Mut. Ins. Co. v. Harlen House Assocs.*, 7 A.D.3d 421 (1st Dep't 2004).

Therefore, Greenwich's disclaimer on September 20, 2004 is both proper and timely as it was made only 10 days after Greenwich became aware of information substantiating the grounds for disclaiming coverage.

## IV.    105 STREET IS NOT ENTITLED TO REIMBURSEMENT OF ATTORNEY FEES, COSTS AND OTHER EXPENSES

Plaintiff is not entitled to any fees as a result of the declaratory judgment action because Greenwich did not place them in a defensive posture. *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12 (1979); see also *County of Nassau v. Michigan Mut. Ins. Co.*, 276 A.D.2d 578 (2nd Dept. 2000). New York Courts regularly hold that an insured is not entitled to attorneys' fees where it has brought an action against its insurer to determine the availability or applicability of insurance. Id. Moreover, New York Courts generally have looked to whether the

21

insurer commenced legal proceedings in order to assess an insured's claim for attorneys' fees. Id. (Noting that even though the insurer denied coverage for the claim and the insured brought an action to determine its rights as a result, the insured is not entitled to attorneys' fees).

In *Mighty Midgets, Inc. v. Centennial Ins. Co.*, an insured brought a declaratory judgment action against its insurer after the insurer had declined to defend the insured in a personal injury action. Id. The New York Court of Appeals denied the insured recovery of its attorney's fees and expenses incurred. Id. The Court explained: "it is the rule in New York that such a recovery may not be had in an affirmative action brought by an [insured] to settle its rights . . ., but only when he has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations." Id. citing *Johnson v. General Mutual Ins. Co.*, 24 N.Y.2d 42 (1969). Because the insured in that case had taken the offensive, and thus had not been compelled "to defend against an attempt by its insurer to obtain a declaration of its right to disclaim," the Court found that the insured was not entitled to recover its attorney's fees and costs. Id.

105 Street filed a summons and complaint seeking an Order declaring its rights and legal limitations under the subject policy. (Complt. ¶17, Exhibit "U"). Since 105 Street brought this affirmative action against Greenwich to settle its rights under the policy, 105 Street is not entitled to attorneys fees and costs incurred in its own defense of the underlying claims because Greenwich properly and timely denied coverage.

As such, 105 Street's request for relief for costs and disbursements must be denied, and the complaint must be dismissed in its entirety.

**CONCLUSION**

Based on the foregoing, it is respectfully requested that the Court enter an Order pursuant to Federal Rules of Civil Practice 56(c), granting summary judgment in favor of defendant, Greenwich Insurance Company.


Dated: New York, New York
       April 13, 2007


                          Yours, etc.,

        WILSON, ELSER, MOSKOWITZ EDELMAN & DICKER LLP

              By: _____
                          Glenn J. Fuerth (GJF5848)
                          Attorneys for Defendant
                          GREENWICH INSURANCE COMPANY
                          150 East 42nd Street
                          New York, New York 10017-5639
                          (212) 490-3000


TO:    Donald F. Schneider
       Attorney for Plaintiff
       90 Broad Street, 6th Floor
       New York, NY 10004
       212-265-2266

23

2741024.1

# AFFIDAVIT OF PERSONAL SERVICE

# AFFIDAVIT OF SERVICE

*SUPREME COURT OF THE CITY OF NEW YORK/ NEW YORK COUNTY*

No. 06 CV-9938 (VM)

*105 STREET ASSOCIATES, LLC,*
             *Plaintiff,*

        -against-

*GREENWICH INSURANCE COMPANY,*
             *Defendant.*

State Of New York, County of New York SS:
**JOLANTYNA CAGNEY**
Being duly sworn, deposes and says that she is over the age of 18 years, is not a party to this action and resides in New York.

That on the **13**TH day of **APRIL 2007**, At: **12:15 PM**

At: **C/O SCHNEIDER GOLDSTEIN BLOOMFIELD LLP, 90 BROAD STREET, NEW YORK, NEW YORK**

Deponent served the Annexed: **DEFENDANT GREENWICH INSURANCE COMPANY NOTICE OF MOTION FOR SUMMARY JUDGMENT,DEFENDANT GREENWICH INSURANCE COMPANY LOCAL RULE 56.1 STATEMENT, DECLARATION IN SUPPORT, THE AFFIDAVIT OF MICHAEL BARNABA AND SUPPORTING MEMORANDUM OF LAW**

Upon: **DONALD SCHNEIDER**

### PERSONAL SERVICE ON AN INDIVIDUAL
An individual, by delivering thereat a true copy to **JOAN HAMMOND (PARALEGAL)**, who stated, that she the said individual to be *Authorized To Accept Service* on behalf of **DONALD SCHNEIDER** thereof.

**DESCRIPTION** - Deponent describes the individual served or spoken to as follows:
Sex: **FEMALE** Color: **WHITE** Hair: **BLONDE** App. Age: **50** App. Ht: **5'5"**App. Wt.**130**
Other identifying features:

Sworn to before me this
**13**TH day of **APRIL 2007**

LINA B. VARGAS
Notary Public, State of New York
No. 01VA5063776
Qualified in Queens County.
Commission Expires July 29, 2009

JOLANTYNA CAGNEY 116-9105